J2PVOME1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OMEGA SA, et al.,

                Plaintiffs,

           v.                        12 Civ. 6979 (PAC)

375 CANAL, LLC, et al.,

                Defendants.
                                     Trial
------------------------------x
                                     New York, N.Y.
                                     February 25, 2019
                                     9:05 a.m.

Before:

                   HON. PAUL A. CROTTY,

                                     District Judge
                                     –and a Jury–

                       APPEARANCES

WILMER CUTLER PICKERING HALE & DORR LLP
     Attorneys for Plaintiffs
BY:  ROBERT J. GUNTHER JR.
     ISLEY MARKMAN GOSTIN
     CHRISTOPHER R. NOYES

DENTONS U.S.LLP
     Attorneys for Defendants
BY:  STEPHEN G. DELLA FERA
     –and–
TROUTMAN SANDERS LLP
BY:  AVI SCHICK




Also Present:  Sarah Finkel, Paralegal
               Clinton Lam, Technician
```

J2PVOME1

1          THE COURT:  Is Mr. Schick here?

2          MR. DELLA FERA:  He's in traffic, your Honor.  He

3    should be here in another two, three minutes.

4          THE COURT:  I know you want to take up the letters

5    that we received over the weekend.

6          Do you want to take up anything else, Mr. Della Fera,

7    while we're waiting for Mr. Schick?

8          MR. DELLA FERA:  No, your Honor.

9          MR. GUNTHER:  Your Honor, we have some other issues;

10   but if you want to do the letters first or we can raise other

11   issues now.  Whatever your preference is.

12         THE COURT:  I think I'll wait another five minutes for

13   Mr. Schick.

14         MR. GUNTHER:  Okay.

15         MR. DELLA FERA:  Thank you, your Honor.  We appreciate

16   that.

17         (Recess)

18         MR. SCHICK:  I apologize, your Honor.

19         THE COURT:  We did say 9 o'clock, didn't we, Mr.

20   Schick?

21         MR. SCHICK:  My apologies.  I got stuck in traffic,

22   your Honor.  I apologize.

23         THE COURT:  You have to allot for that.

24         The first order of business is to take up Mr. Joshua

25   Paul as a trial witness.

J2PVOME1

1            Mr. Gunther, do you want to go first?

2            MR. GUNTHER:  Yes, your Honor.

3            So, your Honor, I think, from our perspective, what

4    this really comes down to is that if we do not call him as a

5    witness, and assuming he's out completely, we would not intend

6    to call him as a witness.  Basically what's left is then the

7    defendants would be calling him as a witness solely to impeach

8    him.

9            Now, what they've said -- they've offered a couple of

10   justifications as to why what they have -- their proffer for

11   him is relevant, even if we were not going to call him.  And

12   they said, Well, it's relevant to chain of custody.

13           And what we've said in the letters to you and what

14   we're planning to prove in this case, your Honor, is that the

15   watch that we have in our possession is, in fact, a watch that

16   was purchased in May of 2012 at 375 Canal Street.  We're going

17   to do that by putting on the investigator, Leslie Quinonez, who

18   purchased the watch; the investigator who led the

19   investigation, Brad Cole, who was there and took possession of

20   the watch afterwards; and then we're going to call Mr. Foster,

21   who was the Swatch employee who was going to match up the watch

22   we have with a photograph that Mr. Cole took right after the

23   purchase, shortly after the purchase.

24           And Mr. Foster is going to be able to say that the

25   watch in our possession is the same as the watch in that

J2PVOME1

1    photograph.  And that is how we are going to prove -- we are

2    not doing it in terms of this person handed it to this person,

3    this person handed it to that person.

4            So they say they want to put Mr. Paul on because

5    Mr. Paul had possession of the watch for a significant period

6    of time.

7            Now, of course he's an attorney.  Had he not been

8    dismissed from the case under the circumstances we're all aware

9    of, they wouldn't have called him with respect to that issue at

10   all.  And so what we are left with, your Honor, is what they

11   want to do is they want to put him on the witness stand.  They

12   have never deposed him.  So they are going to ask him

13   questions, I presume, about the chain of custody.  And what

14   he's going to answer is, I had the watch; I had it in my

15   possession for whatever period of time.  And ultimately that is

16   transferred to our firm, when we took over the case.  That's

17   what I believe his testimony will be.

18           So then having done that, which is all, again,

19   undisputed, your Honor, what they really want to do is use this

20   as an effort to bring up not only the issues with respect to

21   the declarations with the inaccurate statements -- and

22   remember, your Honor, we're putting Mr. Cole on the witness

23   stand; they will be able to talk to him about that, that's a

24   subject of your motion *in limine*.  They are going to call some

25   of the other investigators.  To the extent there are issues

1    with those declaration, they can do that.

2            But, your Honor, what they should not be able to do is

3    to take the attorney and really just run him over the coals,

4    not only with respect to the inaccurate statements in the

5    declarations, but, your Honor, what I believe they also want to

6    do is to go further than that and to say that -- and to bring

7    up the issue of whether or not he should have disclosed the

8    inaccuracies when he discovered them to the Court sooner than

9    it ultimately came up.

10            Your Honor, that opens up, as I said in the letter, a

11    host of other issues, including whether he did that properly or

12    not.  And again, we just see that as a complete trial within a

13    trial, the main purpose of which is to impugn Mr. Paul and, by

14    extension, impugn Swatch.

15            And so, your Honor, for all of those reasons, we think

16    if we do not call him -- and we do not intend to call him if he

17    will not be a witness -- that he should not be able to be

18    called by the other side solely to impeach him.

19            THE COURT:  Mr. Shtick.

20            MR. SCHICK:  A couple of points, your Honor.

21            First is we continue to have difficulty understanding

22    how it can be that Mr. Paul is relevant if they choose to call

23    him, but he's not equally relevant if they make a strategic

24    decision not to call him and we do call him.

25            Now, your Honor, this is not a case in which they

1    listed Mr. Paul and we said we reserve the right to call

2    anybody who plaintiffs have on their list.  We affirmatively

3    placed Mr. Paul on our witness list on January 14th of this

4    year and provided it to the plaintiffs.  We then had a

5    meet-and-confer about the witness list and potential for

6    motions *in limine*.  Plaintiffs did not make a motion *in limine*

7    to preclude Mr. Paul, who was on our witness list.

8           With regard to the chain of custody, your Honor, this

9    is a case in which the testimony will be Ms. Quinonez, who was

10   a school teacher, had a watch for five minutes.

11          She had that watch --

12          THE COURT:  She purchased the watch, right?

13          MR. SCHICK:  She purchased a watch that day.  She

14   purchased six watches that day.  And she had them for a few

15   minutes, put them in a handbag, and gave them to Mr. Cole.

16   Mr. Cole had all six watches, and he had them for two, three

17   days.  And then he transmitted all those watches in one package

18   to Mr. Paul.

19          Mr. Paul had those watches for five years.  And this

20   is all prior to the Wilmer firm coming in.  Prior to the Wilmer

21   firm coming in, Mr. Paul transmitted a watch to Mr. Foster and

22   said this is the watch that was bought at 375 Canal Street, not

23   the five other watches which were in the same box, but this

24   one, and had him identify it.  That's August 2017, prior to

25   this firm.

J2PVOME1

1        So clearly he's relevant to chain of custody, your

2   Honor.

3        Your Honor will see that the chain of custody here

4   involved Ms. Quinonez and Mr. Cole putting the watch in a

5   Ziploc bag with a Post-It note.  There's no tag, identifying

6   tag or anything that would have said this is the watch.

7   There's a Ziploc bag and a Post-It note.

8        So surely, your Honor, we have the ability to call

9   Mr. Paul to question him about the watches that he received,

10  the jumble of watches that he received, which all sat in a

11  single cardboard box in his office; and how he then determined

12  which one to give Mr. Foster.  He only gave Mr. Foster one to

13  look at.  We certainly have the ability to do that.

14       Beyond that, your Honor, Mr. Paul was the single

15  witness who can talk about the various different buys that he

16  authorized with respect to 375 Canal Street that came back

17  unsuccessfully.  He was the single person who is the focal

18  point of all of them.  Some of them were carried out by Paul

19  Stone-Jansen, some of them were carried out by William

20  Quinonez, some of them were carried out by Brad Cole.  But all

21  of them reported up to Mr. Paul.

22       THE COURT:  But for that incident that occurred when

23  we were getting ready, the almost final pretrial conference,

24  Mr. Paul would not have been a witness; is that right?

25       MR. SCHICK:  That is probably the case.  But they

1    wouldn't have put him on their list either, your Honor.  And

2    they didn't make a motion *in limine*.  I don't understand how it

3    could be that we are reopening the whole process of motions *in*

4    *limine* with respect to witnesses.

5          They made eight motions *in limine*, your Honor.

6    Mr. Paul was on our witness list.  He is the chain of custody

7    in this case.  He is the person who authorized the

8    investigation in this case.  He is the person who told Brad

9    Cole what the scope of what they are looking for in this case

10   is.  He is that single person.  And he's not an attorney in

11   this case.  That wasn't our doing.  That's their doing.

12         And they did not complain about it, your Honor, at any

13   point until the moment, your Honor, when you said that their

14   motion *in limine* with respect to whether his misconduct can be

15   brought up, at that moment they said, Well, why is he a witness

16   in this case at all?  There was no dispute.  Both parties

17   understood that he was a central witness.  They listed him; we

18   listed him.  They didn't even bother to seek a motion *in limine*

19   to preclude him from testifying.

20         It would be enormously prejudicial at this moment for

21   your Honor to say that plaintiffs have the sole right to choose

22   who can testify; plaintiffs have the right for a second shot at

23   motions *in limine*, when they didn't do the first set of them.

24         THE COURT:  All right.  I've heard enough.

25         I've gotten four letters, two from Wilmer Hale, one

J2PVOME1

1    from Troutman Sanders, that's Mr. Shtick that came in, I read

2    that this morning; and one from Dentons on Friday night from

3    Mr. Della Fera.

4           I believe that the preparation of declarations from

5    the third-party investigators and Mr. Paul's decision regarding

6    disclosure accuracies which led to the incident of 2017 are not

7    relevant to the trial.  Accordingly, I'm going to preclude

8    defendant from calling Mr. Paul at trial if plaintiffs do not

9    call Mr. Paul as a witness in the case on trial.  We made it a

10   supplement to motion *in limine* No. 8.  Mr. Paul cannot be

11   called.

12          Okay.  What else do we have before we resume?

13          MR. GUNTHER:  Thank you, your Honor.

14          MR. SCHICK:  So, your Honor, if we don't raise the

15   misconduct, we can still call him?

16          THE COURT:  Pardon me?

17          MR. SCHICK:  First of all, I must say -- I'll try to

18   make a record later -- the fact that the Court is reopening

19   motions *in limine* for one party in this case and not the other

20   is extraordinarily prejudicial.

21          But second of all --

22          THE COURT:  You said that in your argument.  I heard

23   you say it.  You said it again.

24          MR. SCHICK:  Second of all, your Honor, we have a few

25   other motions *in limine* which we'll try to bring on tonight

J2PVOME1

1   with respect to Mr. Taute, other considerations which we think

2   should have been decided differently and weren't.  But now that

3   the Court has reopened them, we might.  We'll speak to the

4   Court afterwards if we have the ability to do that.

5           But with respect to Mr. Paul, since your Honor said

6   that the thing that can't be called is his preparation of the

7   affidavit, a reversal of the decision that your Honor made last

8   Tuesday --

9           THE COURT:  It's not a reversal of the decision I made

10   last Tuesday.  The ruling is final.

11           You want to make a record, Mr. Shtick?

12           MR. SCHICK:  Can we call Mr. Paul and not bring up

13   that affidavit?

14           THE COURT:  No.  He's precluded.

15           MR. GUNTHER:  Your Honor, may I raise a few other

16   issues?

17           THE COURT:  Yes.

18           MR. GUNTHER:  Some of these are housekeeping, your

19   Honor, so they'll hopefully go quickly.

20           I just want to introduce the Court to Ms. Carol

21   Aubert.  And I'd ask Ms. Aubert to stand up.  She is going to

22   be our corporate representative from Swatch at the trial, your

23   Honor.  And we had the back-and-forth about Mr. Foster.  We

24   took what your Honor said quite specifically, and we're not

25   going to have him be our corporate representative.

1          THE COURT:  All right.

2          MR. GUNTHER:  Your Honor, what we will do, what we

3     understand -- I talked to Mr. Della Fera this morning --

4          THE COURT:  Tell me again who the corporate

5     representative is.

6          MR. GUNTHER:  Yes, yes.  It's Ms. Carol Aubert.  She's

7     legal counsel --

8          THE COURT:  Carol, what's the last name?

9          MR. GUNTHER:  Excuse me.  A-U-B-E-R-T.

10         THE COURT:  Aubert.  Okay.

11         MR. GUNTHER:  And she's legal counsel from the Swatch

12    Group in Switzerland, which is the parent company of Omega.

13         Your Honor, I understand from talking with counsel for

14    the defense that they are going to use one of the other Laboz

15    brothers, not Albert Laboz, who will be a witness; they are

16    going to use one of the other Laboz brothers as the corporate

17    representative.  We don't have an objection to that.

18         THE COURT:  Okay.

19         MR. GUNTHER:  Your Honor, the second matter -- we

20    informed plaintiffs about -- sorry, defendants about this last

21    night.  With respect to one of our trademarks, this was

22    Plaintiff's Exhibit 2.  And your Honor, the trademark

23    registration number is 577415.

24         Your Honor, we made a decision to drop that particular

25    trademark.  We are still going forward with the other four.

J2PVOME1

<table>
<tbody>
<tr><td>1</td><td>And the reason we did that, your Honor, is that while it was a</td></tr>
</tbody>
</table>

1   And the reason we did that, your Honor, is that while it was a

2   registration that was enforced at the time of the purchase in

3   May of 2012, subsequent to that, it is a mark that related to

4   certain -- a certain type of way the mark is depicted on

5   watchbands that is no longer used by Omega.  That lapsed, that

6   trademark registration lapsed.

7          And so given that, your Honor, we made the decision to

8   drop that.  We informed the other side last night.  It does not

9   affect -- we've looked through your pretrial jury instructions.

10   The fact that we drop that one mark does not affect your

11   pretrial instructions.

12          It does affect your final jury charge on page 11,

13   where it says five Omega marks, and it will be four.  And then

14   on the verdict form I think we need to make a correction there.

15   We can provide those to Mr. Gonzalez after court today but,

16   your Honor, but I wanted to advise the Court of that change.

17          THE COURT:  Okay.  577415 is the first trademark

18   listed on the special verdict form.

19          MR. GUNTHER:  I believe that's correct, your Honor.

20          THE COURT:  That's out?

21          MR. GUNTHER:  We would obviously take that out.  We

22   would change the reference to five Omega marks on page 11 of

23   your final instructions to four Omega marks.

24          Your Honor, a third housekeeping measure -- and I'd

25   like to introduce -- we have a jury consultant with us today,

J2PVOME1

1    Matt McClendon.  He's in the back.  Matt, could you stand up

2    for a second?

3              Your Honor, at jury selection, what we would propose

4    to do is just have Mr. McClendon come up and sit at counsel

5    table.  We wouldn't presume to introduce him.  We would

6    obviously not bring up the fact that he's a jury consultant.

7    We'd ask that no one bring up that fact.  He'll help us with

8    respect to that issue and then he'll go back into the back.

9    And we just wanted to make sure you were okay with that.

10             THE COURT:  All right.

11             MR. GUNTHER:  Your Honor, one last thing.  Well, maybe

12   not last.  We have a gentleman here I want to introduce,

13   Clinton Lam.  He's sitting over to the left.  He's our tech.

14             THE COURT:  Mr. Lam.

15             MR. GUNTHER:  Mr. Lam.

16             And so Mr. Lam is going to help us put things up on

17   the screen and whatnot.

18             We don't know whether or not the other side has a

19   tech.  We're willing, within reason, if they need something

20   that we've put up back up.  But what we wouldn't want, your

21   Honor, is them kind of co-opting Mr. Lam and using him as their

22   tech.  Again, we'll help where we can, but we don't want --

23   what we wouldn't want is in front of the jury them saying, Hey,

24   can you get this, can you get that.  If they have their own

25   tech, they should have them do that.

J2PVOME1

1          THE COURT:  Mr. Shtick, do you have your own tech?

2          MR. SCHICK:  We have Ms. Sarah Harris Finkel, who is a

3     paralegal at our firm and who will be handling those matters.

4          THE COURT:  Usually people work out on this

5     cooperatively.  There hasn't been a problem.

6          MR. GUNTHER:  I don't think there will be.

7          THE COURT:  I assume that you will.  You will

8     cooperate.

9          MR. GUNTHER:  We will, your Honor.  We will totally

10    cooperate.

11         And your Honor, I have a list which I can hand up of

12    some exhibits that as to which -- plaintiffs' exhibits as to

13    which there is no longer any objection; and that we would

14    propose, with your Honor's guidance, to move in in front of the

15    jury, maybe just sort of at the beginning or at an appropriate

16    point, and just sort of get those into the record so that we

17    don't have to do that as we use those exhibits with witnesses.

18         THE COURT:  Mr. Schick.

19         MR. SCHICK:  Your Honor, we have a problem with one of

20    them, but not as to the rest of them.  And the one we have a

21    problem with is 228.  It is true that there was a mistaken

22    omission when we prepared our list.  On the other hand, they

23    prepared a list of 180 and have withdrawn most of them in the

24    mess of so many of them.  With respect to all others but that

25    one, your Honor, we would not have any problem.

J2PVOME1

1              MR. GUNTHER:  Your Honor, given that Mr. Schick has

2     raised that issue, we'll work with him on that one, and we

3     won't try to put that one in at this time.

4              THE COURT:  All right.

5              MR. GUNTHER:  Your Honor, I think that there are some

6     remaining objections to exhibits that will be used with the

7     opening and exhibits that may come up today in the course of

8     testimony.  I think it's fair to say that we don't have any

9     objections at this point, do we?

10             MR. NOYES:  That's correct, your Honor.  We don't have

11    any objections to the materials that Mr. Schick indicated they

12    were using during their opening statement.  But there are some

13    objections to our opening presentation we provided to the

14    defendant last night.  And with your permission, I can pass up

15    a copy of our presentation.

16             THE COURT:  All right.

17             MR. NOYES:  So, your Honor, we provided our opening

18    presentation which Mr. Gonzalez is handing to you.

19             So this consists of, your Honor, demonstrative

20    exhibits to assist the jury to understand the substantive

21    evidence, as well as exhibits that we believe in good faith

22    will be admitted in evidence during the trial.

23             The defendant has some objections.  They indicated to

24    us that they object to any slide that includes an exhibit they

25    have objected to previously, and also any slide that they say

J2PVOME1

1    was previously -- includes a document that they say was

2    previously undisclosed.  As I understand it that also includes

3    standard demonstrative exhibits.

4           So they haven't given us a page or slide-by-slide

5    objection.  To the extent they still have objections, we would

6    ask the Court to resolve those now so we don't have them during

7    the openings.

8           THE COURT:  What do you object to, Mr. Schick?

9           MR. SCHICK:  Your Honor, we actually had a

10   conversation, Mr. Noyes wasn't able to join in, but we made two

11   points during the meet-and-confer last night.

12          The first was that with respect to any exhibit that is

13   objected to and that has not been worked out, it's certainly

14   prejudicial for them to throw it up on the screen and show it

15   to the jury because it's not an admitted document.

16          In addition and moreover, your Honor, if one looks

17   through this, you'll see that while your Honor previously has

18   said that this is not a case about other buildings and it's not

19   a case about other brands, with limited exceptions, what we

20   object to is entirely about other buildings and other brands.

21          We have not objected to any part of this which

22   reflects a document or an exhibit to which we have no

23   objection, which is many, many, many pages, and they know that.

24   So while it's true we haven't said specifically which page we

25   object to, we gave them the more than dozen pages that we don't

1    object to.

2            So, for example, your Honor, PDX -- page 8, page 9,

3    page 10 are just listings of buildings managed by United

4    American Land with no relevance to this case at all.  Your

5    Honor has precluded even counterfeiting.

6            THE COURT:  Where are the numbers?

7            MR. SCHICK:  On the bottom right, your Honor.  I'm

8    sorry.

9            THE COURT:  PDX 1-2.  PDX 1-8, is that the one that's

10   marked PX 222 and has three buildings on it?

11           MR. SCHICK:  Yes, and a list of buildings.  And that

12   goes on for several pages, your Honor.

13           Your Honor has previously ruled with respect to

14   motions *in limine* that even evidence of counterfeiting of

15   another building is inadmissible; and yet here they just want

16   to inflame the jury about, I don't know, the fact that --

17           THE COURT:  Inflame or inform?

18           MR. SCHICK:  Inflame, your Honor.  United American

19   Land owns many, many buildings, your Honor.

20           MR. NOYES:  Your Honor, may I address the other

21   buildings objection?

22           THE COURT:  This is an opening statement, right?

23           MR. NOYES:  That's correct.

24           THE COURT:  To educate the jury.

25           MR. NOYES:  That's correct, your Honor.

1          And all the evidence we've cited we believe we have a

2     good-faith basis to admit and offer in evidence during the

3     course of the trial.

4          But with respect to the other buildings in particular,

5     your Honor, your jury instructions correctly point out that the

6     deterrent effect on others besides the defendant is relevant to

7     statutory damages.  And as you know, your Honor, we are only

8     pursuing statutory damages in this case.

9          The evidence with respect to the other buildings, in

10    particular, PDX 1-8, 1-9, PDX 1-10 all relate to -- are all

11    relevant to that issue of statutory damage and deterrent effect

12    on others besides the defendant.

13         MR. SCHICK:  I don't understand that at all, your

14    Honor.  Every address on Canal Street is a building.

15         The fact that there are eight buildings or whatever

16    number they have here that are managed by United American Land

17    for which there is no evidence going to be admitted about any

18    counterfeiting activity, I don't understand how that goes to

19    their statutory damages case, unless they want to say, your

20    Honor, affirmatively that there are all these buildings and

21    there's only counterfeiting at one.

22         But it seems to be creeping very close, your Honor,

23    again to going back on your prior ruling with respect to the

24    inadmissibility --

25         THE COURT:  What else do you have, Mr. Schick?  I

J2PVOME1

1    understand your objection to that.

2            MR. SCHICK:  There are also, your Honor, a whole

3    series of photographs with respect to watches that we've never

4    seen before that are maybe high resolution and never produced

5    that are relevant.  We have a problem with PDX 1-17, 1-22,

6    which has not been authenticated.

7            THE COURT:  What's 1-17?

8            MR. NOYES:  Your Honor, 1-17 is a chronology timeline

9    that I will walk through during our opening statement of events

10   which we believe we will prove during the course of trial.

11   Again, it's a demonstrative exhibit to assist the jury.

12           THE COURT:  Okay.  1-17.  What else?

13           MR. SCHICK:  1-23.  1-22, your Honor.

14           THE COURT:  I don't have 22 or 23.  I skip from 1-17

15   to 1-24.

16           MR. NOYES:  Your Honor, I apologize.  PDX 1-17 repeats

17   a few times in the slide deck because during the presentation

18   the chronology will come up event-by-event.  But for

19   completeness, we provided the slides to complete the

20   chronology.

21           THE COURT:  I see.

22           So what do you object to, Mr. Schick?

23           MR. SCHICK:  1-22 has not been authenticated.  1-23.

24   1-24 they purport to inform the jury of the law in this case,

25   which I believe is your Honor's job.  1-25 is another

J2PVOME1

1    demonstrative.  This is a whole bunch of buildings managed by

2    United American Land.

3                THE COURT:  Okay.  What else?

4                You can sit down.

5                MR. SCHICK:  And 1-26, which I'm not sure what

6    building it even is, we therefore previously objected to.  It's

7    299 Canal Street, your Honor.

8                THE COURT:  What is 1-26 a picture of?

9                MR. NOYES:  Your Honor, 1-26 is a current picture, a

10   recent picture of 299 Canal Street.  And that is one of the

11   properties that the Laboz brothers, United American Land, owns.

12               THE COURT:  What's the relevance of 375?

13               MR. NOYES:  Again, that is relevant, your Honor, to

14   the deterrent effect on the defendant and others.  The point

15   is, your Honor, that not only 375 Canal Street is owned by the

16   defendant, but other stores in the Canal Street area is owned

17   by the defendant.

18               MR. SCHICK:  Your Honor has already ruled that even

19   evidence of counterfeiting activity at other buildings are

20   inadmissible.  So I don't understand how they get in --

21               THE COURT:  1-26 is excluded.  You can't use it in the

22   opening statement.  You can try to admit it during the course

23   of the trial, but --

24               MR. NOYES:  Thank you, your Honor.

25               THE COURT:  Anything else, Mr. Schick?

J2PVOME1

1              MR. SCHICK:  Your Honor, again, here, in this case the

2      name of presumably Mr. Laboz certainly and United American Land

3      was well-known to plaintiffs even before the case was

4      initiated, certainly during discovery.

5              There are no claims against Mr. Laboz, any of the

6      Labozes.  There are no claims against United American Land.

7              They certainly could have brought those claims if they

8      thought they had them.  But instead here, your Honor, this is a

9      claim about counterfeiting of Omega watch only at 375 Canal

10     Street.  Your Honor previously ruled that they can have a

11     limited amount of evidence with respect to other buildings.

12             But here it seems like they are trying to put United

13     American Land on trial; they are trying to put Mr. Laboz on

14     trial.  And that's contrary to the complaint they filed and

15     it's contrary to your Honor's prior rulings.

16             THE COURT:  Okay.  1-26, this can't be used in the

17     opening statement.

18             What are the other ones, Mr. Schick?

19             MR. SCHICK:  1-25.

20             THE COURT:  1-25 can stay in.

21             1-8 and 1-9 are going to come out.

22             MR. NOYES:  Apologies, your Honor.  I didn't hear

23     exactly what you said with respect to 1-8 and 1-9.

24             THE COURT:  1-8 and 1-9 cannot be used in opening.

25     That's without prejudice.  You're trying to get the statements

J2PVOME1

```
 1   in during the course of the trial, but not during the opening.
 2            Anything else, Mr. Schick?
 3            MR. SCHICK:  Yes.  1-24, which is their attempt to
 4   supplant your Honor with respect to telling the jury what the
 5   law is.
 6            THE COURT:  Yes.  This is a legal interpretation.
 7   This is what you need to establish, contributory trademark
 8   infringement.  It's mentioned in my preliminary instructions,
 9   and certainly it's covered in my final instructions, and it's
10   in the form jury verdict.  So 1-24 is out.
11            MR. SCHICK:  Your Honor, just a couple more.
12            I believe 1-22, which has never been authenticated.
13            MR. NOYES:  Your Honor, with respect to
14   authentication, again, we believe we have a good-faith basis to
15   authenticate those exhibits at trial.
16            THE COURT:  1-22 will stay in.
17            MR. SCHICK:  And 1-23, your Honor.
18            THE COURT:  Is that a watch too, Mr. Schick?
19            Same ruling.
20            MR. DELLA FERA:  Your Honor, I was going to make a
21   point about 1-22.  That's a picture of a physical watch.
22   PX 100 isn't as an exhibit in evidence, but it's the physical
23   watch.  PX 100 isn't a picture of a watch.  This is an entirely
24   new picture we know nothing about, when it was taken, who took
25   it.  Presumably the person who took it isn't going to testify
```

J2PVOME1

1    to authenticate it at trial.

2              MR. SCHICK:  They put a label on this picture, but

3    that's not PX 100 actually.

4              MR. NOYES:  Your Honor, it's a photograph of the watch

5    that we will offer in evidence and it is a demonstrative

6    exhibit.

7              THE COURT:  It stays in then.

8              Anything else from the defendants?

9              MR. SCHICK:  Your Honor, two issues, one that I'll

10   address, one that Mr. Della Fera will address.

11             THE COURT:  Okay.

12             MR. SCHICK:  With respect to the first, as your Honor

13   is aware, when this case was filed there were two plaintiffs,

14   there was Omega and Swatch.  And there were claims regarding

15   Omega trademarks and claims regarding Swatch trademarks.  The

16   Swatch trademark claims were dismissed or withdrawn, and that

17   should leave only one plaintiff, Omega.

18             For reasons we do not quite understand, plaintiff

19   counsel seems to refer repeatedly to plaintiffs Omega and

20   Swatch.  Now, your Honor has previously ruled, for example,

21   that we cannot talk about dismissed claims, we should not talk

22   about there were seven trademarks at issue, now this morning

23   there are three; there were two brands, now there's one; there

24   were various different claims, now they've been withdrawn.

25             That's fine, your Honor, we respect to that and, of

1    course, we'll abide by it.  By the same token I don't know how

2    since there are no Swatch claims they can now refer to

3    "plaintiffs" as opposed to just plaintiff Omega.

4                THE COURT:  Mr. Gunther.

5                MR. GUNTHER:  Your Honor, Swatch is the corporate

6    parent of Omega.  And the witness that we have here, the person

7    that we have here is who's going to be our corporate

8    representative, is an employee of Swatch Group, which is the

9    owner of Omega.  And so I think it's perfectly reasonable --

10   we're not going to be standing up and down and jumping up and

11   down about Swatch.  But the fact is there remain two plaintiffs

12   in this case, one the corporate parent of the other.  We think

13   that's appropriate.

14               MR. SCHICK:  They don't own the trademarks, your

15   Honor; they weren't in the case as a parent.  A parent is not a

16   proper party, as your Honor would know when people try to get a

17   removal at times.

18               There's a plaintiff in this case, it's Omega.  They

19   voluntarily withdrew this watch claim because they couldn't

20   prove it up.  So they shouldn't be able to have it both ways,

21   your Honor.

22               THE COURT:  I think that's right, Mr. Gunther.

23               MR. GUNTHER:  Your Honor, again, in the opening --

24               THE COURT:  Talk about Omega.

25               MR. GUNTHER:  We'll talk about Omega.

J2PVOME1

1              Can I introduce Ms. Aubert with her correct title?

2              THE COURT:  Yes.

3              MR. GUNTHER:  That's fine.

4              That's all I need to do, your Honor.

5              MR. DELLA FERA:  And then, your Honor, we just have

6    one point on the instructions after the jury selection.  We

7    have other points we wanted to make about the jury charge; we

8    think it's appropriate to raise that after the trial has ended.

9              The only point we have with the instructions after

10   jury selection relates to the instruction on page 8 --

11             THE COURT:  Wait a minute.

12             Okay.  Mr. Della Fera, where are you?

13             MR. DELLA FERA:  Page 8, your Honor, the final

14   paragraph that begins --

15             THE COURT:  Let me get to page 8.

16             "Your job on this trial is to determine two things"?

17             MR. DELLA FERA:  Yes, your Honor.

18             And you say, First you must determine whether a

19   tenant, subtenant or occupant directly infringed -- excuse me.

20   I'm reading what I would propose.  But you had said, First you

21   must determine whether it's contributory infringement; and then

22   second you must determine whether or not damages should be

23   awarded.  And we think that that's slightly incorrect, your

24   Honor.  If there is no contributory infringement, then there is

25   no need to determine damages.

J2PVOME1

1        And we would propose that the jury be instructed that

2    first they must determine if there was direct infringement;

3    second, if you determine direct infringement, you must

4    determine if there is contributory infringement; and then if

5    you determine contributory infringement, you must determine the

6    amount of damages.  We just think it's a slightly more accurate

7    reflection of the law, your Honor.

8            THE COURT:  Okay.

9            MR. GUNTHER:  And, your Honor, we've had this

10   discussion with your Honor several times going back even before

11   we were counsel.  Your Honor has consistently ruled that direct

12   infringement need not be shown and that we can proceed directly

13   to contributory infringement which is consistent with the

14   cases.  I think your pre instruction --

15           THE COURT:  That's the law of the case.

16           MR. GUNTHER:  That's right.

17           And, your Honor, I think it should stay.

18           MR. DELLA FERA:  Your Honor, I'm not sure I understand

19   that that's the law of the case.  Your Honor has previously

20   ruled that direct infringement is relevant.  We had motions *in*

21   *limine* relating to the risk of consumer confusion, because that

22   is a factor that goes directly to direct infringement.

23           THE COURT:  If it's counterfeit there's presumed

24   confusion, right?

25           MR. DELLA FERA:  And they have argued in the motions

J2PVOME1

*in limine* that counterfeiting hasn't been established, and that

therefore they need to provide the factors in the jury

instructions regarding confusion by consumers.  And your Honor

included those in the jury instructions.

         And just as a point of fact, direct infringement is a

necessary predicate of contributory --

         THE COURT:  So what language do you want,

Mr. Della Fera?

         MR. DELLA FERA:  Our language would be that your job

in this trial is to determine two things.  First you must

determine whether a tenant, subtenant or occupant at 375 Canal

Street directly infringed on one of Omega's trademarks.

Second, if you find direct infringement upon four or more of

Omega's trademarks, you must determine whether 375 Canal

contributed to that direct infringement.  Then if you find that

375 Canal contributed to the infringement of Omega's

trademarks, you must also determine the amount of damages to be

awarded to Omega.

         I think that's completely accurate and comports with

the *Tiffany* standard, your Honor.

         MR. GUNTHER:  And, your Honor, just a last point on

this.  What they are trying to bring in is that we didn't sue

the subtenant.  And it's all stuff that your Honor has already

looked at and ruled on.

         What you have in here, which was after they had

1    proposed exactly what Mr. Della Fera is reading to you now, is

2    the correct statement of the law.  It's law of this case and it

3    should stay.

4              MR. DELLA FERA:  Your Honor, just one final point, if

5    I may.

6              Discussing PDX 1.  If you look at PDX 1-1, the first

7    page.  That includes documents that go to the brand value.

8    Again, that's a factor that was brought up by plaintiffs

9    regarding direct infringement and consumer confusion

10   specifically.

11             And regardless of what plaintiffs may think about what

12   we are going to argue at trial, the fact remains that the

13   standard is that there must be direct infringement first, then

14   there must be contributory infringement, and then they go to

15   damages.

16             THE COURT:  Have you looked at the final instructions?

17             MR. DELLA FERA:  Yes, your Honor.

18             THE COURT:  This is consistent with the final

19   instructions, isn't it?

20             MR. DELLA FERA:  It is, your Honor.  And we do have

21   points about the final instructions that we thought would be

22   best to raise after the trial ended, we would make those same

23   points there.

24             THE COURT:  You can raise it again.

25             I'm going to deny your objections to the preliminary

1    instructions.  It's going to stay the way it is.

2              MR. SCHICK:  Your Honor, if that's the case, why are

3    they bringing all of this evidence in with respect to

4    Mr. Foster, Mr. Cole -- they are going to show him a watch that

5    was counterfeit -- if they don't have to prove direct

6    infringement?

7              THE COURT:  Why don't you ask Mr. Gunther?

8              MR. SCHICK:  Why is that admissible in this trial?

9    Why isn't that a trial within a trial, your Honor?

10             THE COURT:  Listen, let's get something straight in

11   the beginning here, Mr. Schick.  I've given you this material

12   in advance so that you can object.  I've considered your

13   objections.  I've ruled.  Please don't then engage in debate.

14   I made my ruling.  That's the ruling.  I don't want sidebar

15   conferences.  I don't want extra argument about why I'm wrong.

16   You know what the rules are.  Make your objection; I make my

17   ruling; we go on to something else.

18             MR. SCHICK:  Your Honor, I didn't mean -- that came

19   off the wrong way.  My apologies.  I meant to suggest then, in

20   light of that ruling, it would be inappropriate for plaintiffs

21   to put on the evidence that they discuss with respect to

22   whether the watch is counterfeit, that's all.  And I can object

23   at the time.

24             THE COURT:  Okay.  We've checked with the jury clerk.

25   We won't have a jury -- it will 10:15 or 10:20 at the earliest.

1          Anything else to take up?

2          MR. GUNTHER:  Your Honor, there still are some

3     objections to exhibits that we intend to use today with the

4     witnesses that we expect to get on the witness stand.  And

5     we're happy to do -- we're happy to do it however you want,

6     your Honor.  We can actually qualify the exhibits and move them

7     into evidence or we can work out the objections now.  We're

8     happy to do it either way.

9          THE COURT:  We have time.  Do you want to do it now?

10          MR. GUNTHER:  Sure.

11          MR. NOYES:  With respect to our first witness, your

12     Honor, which will be Leslie Quinonez, there are some objections

13     to exhibits we intend to offer through Ms. Quinonez, and the

14     first of which is PX 100, your Honor, Plaintiffs' Exhibit 100.

15          Your Honor, that's the physical watch, the counterfeit

16     watch that was purchased at 375 Canal Street.  We intend to

17     show it to Ms. Quinonez and I'll have her authenticate it.

18          Defendant's objection I understand is lack of

19     authentication.  So, again, we will do that through

20     Ms. Quinonez.  I don't know if there's anything else for the

21     Court to address at that time with respect to that exhibit.

22          THE COURT:  Mr. Schick.

23          MR. DELLA FERA:  That's fine, your Honor.  She can

24     authenticate it; she can authenticate it.  If not, we'll object

25     at that time.

J2PVOME1

```
 1              THE COURT:  All right.

 2              MR. NOYES:  And with respect to Plaintiffs' Exhibit

 3     104, which is the photograph of the watch, which is also in our

 4     opening slides, that's another authentication issue.  We will

 5     show that to Ms. Quinonez.  And your Honor, in the opening

 6     slide presentation, that is PDX 1-22.  It's a photograph of.

 7     PX 104.

 8              THE COURT:  What is the background?

 9              MR. NOYES:  Your Honor, after Ms. Quinonez turned the

10     watches over to Mr. Cole, Mr. Cole took them and photographed

11     them.  And Ms. Quinonez will testify that the yellow sticky

12     note in the picture, that's her handwriting, that she included

13     that with the watch, and that the watch was put in that Ziploc

14     bag with a red line on it, as well as the black plastic bag.

15              MR. DELLA FERA:  Your Honor, as Mr. Noyes just said,

16     Ms. Quinonez didn't take this picture; this picture doesn't

17     have a time stamp on it.  We don't believe that she's capable

18     of authenticating it.  Perhaps Mr. Cole is, but if we are

19     talking about Ms. Quinonez specifically, we don't think she is

20     capable of authenticating this picture.

21              THE COURT:  It all depends on her testimony, doesn't

22     it?

23              MR. DELLA FERA:  It does, your Honor.

24              We don't seek a ruling now on that issue; we would

25     raise the objection at that time, see what she says.
```

J2PVOME1

1          MR. NOYES:  Your Honor, I think the same issue is with

2    respect to Plaintiff Exhibit 108A.  That is a video, your

3    Honor, that Ms. Quinonez took during the investigation at 375

4    Canal Street.  We will show her a portion of that video and

5    have her authenticate it and, with the Court's permission,

6    offer it and publish it to the jury.

7          MR. DELLA FERA:  Again, your Honor, it would just be a

8    matter of what the testimony is, whether or not she is going to

9    authenticate it.  We were just reserving our objection.

10          THE COURT:  Okay.

11          MR. NOYES:  The final exhibit that we intend to use

12    with Ms. Quinonez is Plaintiffs' Exhibit 246, your Honor.  And

13    that's an email that Ms. Quinonez wrote to Mr. Cole after the

14    investigation on May 19th, 2012.  And that is a summary of the

15    investigation that she prepared.

16          Ms. Quinonez will be on the stand and testify about

17    the fact that she prepared the email, that she prepared it

18    while events were fresh in her memory.  And for those reasons

19    we would offer that in evidence.

20          MR. DELLA FERA:  Your Honor, Plaintiffs' Exhibit 246

21    is also on defendant's exhibit list.  We don't object to

22    PX 246.

23          THE COURT:  Okay.  That takes care of Ms. Quinonez.

24          MR. NOYES:  That does, your Honor.  Thank you.

25          MR. GUNTHER:  Your Honor, now there's one other

J2PVOME1

1    witness and I've got a couple of exhibits with respect to that

2    witness, and this is Mr. Cole.  I think I can do this based on

3    the discussion we just had relatively quickly, your Honor.

4          There are five exhibits:  Plaintiffs' 106, Plaintiffs'

5    107, Plaintiffs' 108, Plaintiffs' 108C, and Plaintiffs' 108D,

6    all of which are either photos or videos that Mr. Cole took and

7    will authenticate on the witness stand.

8          The only objections are authentication.  We'll lay the

9    appropriate foundation.  If they have an objection after we do

10   that, they can raise it; but I think we're in the same boat

11   with respect to those.

12         MR. SCHICK:  That's fine, your Honor.

13         MR. GUNTHER:  Your Honor, the last exhibit is Exhibit

14   240.  And that's a report that Mr. Cole made shortly after the

15   May 12th, 2012 purchase of the watch at 375 Canal, as well as

16   the other purchases that the investigative team made that day.

17   We're going to qualify that as a business record that he

18   regularly creates in the course of his work and keeps.  And we

19   would move that in under 803(6).

20         MR. SCHICK:  Your Honor, that truly was created in

21   anticipation of litigation, so I'm not sure it would qualify as

22   a business record.  Of course, I assume they are going to ask

23   him about it.

24         THE COURT:  He's an investigator, though, isn't he?

25   That's what investigators do.

J2PVOME1

         MR. GUNTHER:  That's right, your Honor.  Exactly.

         THE COURT:  So you can make your objection at the
time, Mr. Schick.

         MR. SCHICK:  Thank you, your Honor.

         MR. GUNTHER:  And your Honor, I think that does it for
today.

         THE COURT:  All right.

         Now, you have Quinonez and Cole today.

         MR. GUNTHER:  Yes.  And, your Honor, just so that we
make sure we don't run out of witnesses today, we'll have
Mr. Foster available if we fly through things.  I'm not
anticipating that will happen, but he will be available if need
be.

         If we have Quinonez and Cole today, and that's as far
as we get, then we have a witness who we have subpoenaed,
Mr. Taute, who is a former detective, police detective.  The
plan would be for tomorrow to have him testify first, and then
have Mr. Foster testify if he hasn't already done so.

         THE COURT:  Okay.  And witnesses after that, Mr.
Gunther?

         MR. GUNTHER:  Your Honor, I think that after that we
have Ms. Caponegro, who is an employee at a law firm who is
going to get in the notices, a selection of the notices of
counterfeiting that were provided to the owners of 375 Canal
Street over a period of time.  Ms. Gostin is going to put

J2PVOME1

1    Ms. Caponegro on.

2            Sharyn Tritto, who was an outside counsel for the

3    Laboz brothers, we're going to put certain documents relating

4    to notice in through her.  And then we're going to call

5    Mr. Laboz as our final witness to deal with notice issues and

6    things of that nature.

7            THE COURT:  So you have, what, all told, six

8    witnesses?

9            MR. GUNTHER:  That's correct.

10           THE COURT:  Mr. Schick, how about you?

11           MR. SCHICK:  I think in addition to those we've

12   mentioned, we are going to call Paul Stone-Jansen, who is an

13   investigator who conducted a failed buy; and Mr. William

14   Quinonez.

15           MR. GUNTHER:  And, your Honor, I think I miscounted.

16   I think we had seven actually when you add up those numbers.

17           THE COURT:  I miscounted.

18           MR. SCHICK:  Your Honor, there certainly will be

19   issues to discuss with respect to Mr. Taute.  If he's going to

20   go first tomorrow, we have time now, we can discuss it now or

21   we can discuss it tomorrow morning.  I just raise the issue.

22           THE COURT:  What are your issues with Mr. Taute?

23           MR. SCHICK:  Primarily, your Honor, they intend to try

24   to admit as a business record an email that he sent from his

25   private email account to Mr. Josh Paul.

J2PVOME1

1              THE COURT:  When did he do this?

2              MR. SCHICK:  In 2007, while he was an officer of the

3    New York City Police Department.  2010, I'm sorry, your Honor.

4    December 7, 2010.

5              THE COURT:  What's your objection?

6              MR. SCHICK:  It's not a business record of the New

7    York City Police Department if somebody sends an email from his

8    private email account to an attorney who wasn't involved in the

9    case at all.  It's just not a business record.  Obviously if

10   you can authenticate it, you can authenticate it, but it

11   shouldn't come in as a business record.

12             THE COURT:  Yes.

13             MS. GOSTIN:  Your Honor, the document Mr. Schick is

14   referring to is an email that takes information from the New

15   York City Police Department Peddler's Task Force arrest log and

16   merely puts that into an email and sends it to Mr. Paul.  And

17   Mr. Schick also mentioned that it was from a personal email

18   account.

19             Mr. Taute will testify that at that time regular

20   patrol officers did not have official email accounts, those

21   were only for detectives and other higher-up members of the

22   police department; and that they were instructed to use their

23   personal email; and that that was in the course of his business

24   as a police officer to send that email -- or to send that

25   information by email to Mr. Paul.

J2PVOME1

1          THE COURT:  Mr. Della Fera.

2          MR. DELLA FERA:  Just on that point, it sounds like

3     there's a double hearsay problem here.  There's information in

4     these emails taken from another database or document.  And I

5     believe that potentially that document that Mr. Taute looked at

6     is a business record.  But a private email using his

7     verizon.net email account sent to an attorney for a private

8     party certainly does not qualify as a business record.

9          MS. GOSTIN:  Mr. Taute will also testify that because

10    Swatch was a complainant for these counterfeiting crimes, that

11    that's why they were supposed to be part of Mr. Taute's

12    position and NYPD was to coordinate with brand owners and

13    provide them as complainants with this information from the

14    NYPD Peddler's Task Force arrest log.  And that's the

15    information.

16         And the Peddler's Task Force arrest log would, of

17    course, be a public record under the hearsay exception.  He

18    will also testify that the reason he didn't simply photocopy

19    the arrest log itself and sent it is because Swatch was only

20    entitled as a complainant to information about arrests based on

21    their brands and the arrest lists would have included other

22    brands and that's why Mr. Taute just extracted the information

23    to which Swatch was entitled and put in an email.

24         MR. DELLA FERA:  Your Honor, first of all --

25         THE COURT:  Sounds like I'll have to hear a lot more

J2PVOME1

1    on this.

2               MR. DELLA FERA:  We agree.

3               MR. SCHICK:  Your Honor, just one other issue with

4    respect to Mr. Taute.  I do not mean to retread old ground, so

5    I tread slowly and carefully.

6               I recognize and acknowledge that there was a motion *in*

7    *limine* with respect to Mr. Taute's nonprosecute agreement.  And

8    the only point I wish to raise for the Court's consideration as

9    it relates to this jury is while we don't have the nonprosecute

10   agreement, the letter from his attorney states that under the

11   terms of the agreement, Mr. Taute is obligated to advise any

12   court before which he appears about the circumstances of the

13   nonprosecute agreement.

14              The only question we raise is in the context of a jury

15   trial where the jury is acting in its capacity, whether that

16   entitles the jury to hear just that one paragraph.

17              THE COURT:  What does the nonprosecution agreement

18   say, before he does what?

19              MR. DELLA FERA:  We don't know, your Honor.  We don't

20   have the nonprosecute agreement.  We have a letter from his

21   attorney that says that the terms of the nonprosecute agreement

22   require Mr. Taute to inform the Court of the underlying conduct

23   that caused the nonprosecution agreement to be executed.

24              THE COURT:  What was the underlying conduct?

25              MR. DELLA FERA:  That he accepted payment from a

J2PVOME1

1    peddler of counterfeit goods in exchange for information about

2    raids of various places.

3        THE COURT:  This is while he was on the NYPD or off

4    the NYPD?

5        MR. DELLA FERA:  This is after he was on the NYPD,

6    while he worked as a private investigator.  However, it was

7    very shortly after.  I believe it was at some point in 2011.

8    And the evidence in this case is that he was conducting raids

9    of Canal Street in earlier 2011.

10       But the main point, as Mr. Schick noted, is that the

11   terms of the nonprosecute agreement appear to require Mr. Taute

12   to inform the Court of his underlying conduct.  And we query

13   whether or not the jury in this context would also then need to

14   be informed because of that requirement.

15       MR. GUNTHER:  Your Honor, this is the motion *in limine*

16   before we got involved in the case.  Back at the September 5th,

17   2017 conference, your Honor, you ruled on that at page 5 of

18   that transcript.  And your Honor granted the motion and made it

19   clear that this subsequent conduct, after he had left the New

20   York City Police Department, was not relevant and should not be

21   brought up.

22       Now, to the extent that there's something in his

23   nonprosecution agreement that would require him to inform the

24   Court, you know about it; you've been informed.  But I think

25   your Honor made a considered decision and a correct decision

J2PVOME1

1   that what a jury might do with that information, particularly

2   given that it's after the fact, after the time that he left the

3   police force, is inherently problematic.  You made a flat

4   ruling on that, your Honor.  We think it was right.  It's the

5   law of the case.  We think it should stay.

6               THE COURT:  All right.  I'll check my ruling.

7               MR. SCHICK:  Judge, can I have ten more seconds on

8   that, your Honor?

9               THE COURT:  Yes.  Please.

10               MR. SCHICK:  I started by acknowledging that ruling.

11   And we understand, consistent with that ruling, we are not

12   asking if we can then explore while he's on the stand a series

13   of questions with respect to that.  What we are asking simply

14   is that whatever he is, under the terms of his agreement,

15   required to read to the Court, he both inform the Court and the

16   jury.  Beyond that we don't think that we would ask additional

17   questions.

18               THE COURT:  I'll go back and check my ruling.

19               MR. GUNTHER:  Thank you, your Honor.

20               THE COURT:  If there's nothing else, I'm going to

21   excuse myself.  We'll resume when the jury gets here.

22               MR. GUNTHER:  Thank you, your Honor.

23               MR. NOYES:  Thank you, your Honor.

24               (Recess)

25               (Continued on next page)

J2pWome2

```
 1                   (A jury of eight was impaneled and sworn)

 2                   THE COURT:  Ladies and gentlemen, I will take a few

 3       moments now to give you some initial instructions about this

 4       case and about your duties as jurors.  At the end of the trial,

 5       I will give you further instructions.  I may also give

 6       instruction during the trial.  Unless I specifically tell you

 7       otherwise, all such instructions -- both those I give you now

 8       and those I give you later -- are equally binding on you, and

 9       you have to follow them.

10                   I want to give you a few instructions about your

11       duties as jurors.  Your duty is to find from the evidence what

12       the facts are.  You and you alone are the judges of those

13       facts, and then you apply the law, as I give it to you, to the

14       facts as you find them in order to reach your verdict.  You

15       have to follow the law whether or not you agree with it.

16       Please remember that nothing I may say or do during the course

17       of the trial is intended to indicate or should be taken by you

18       to be indicating what your verdict should be.  What your

19       verdict should be will be strictly up to you.

20                   The evidence from which you are going to find the

21       facts will consist of the testimony of the witnesses from this

22       chair right here; documents and other materials that will be

23       received into evidence; and occasionally facts that the parties

24       agree to, which we call stipulations.

25                   Now, certain things are not evidence and you should
```

J2pWome2

not consider them.  I'm going to list them for you.

First of all, the statements, arguments and questions are not evidence.  Let me emphasize this again.  It is not the question the lawyer asks that is evidence.  What is important is the witness's answer to the question.

Second, the objections to questions are not evidence either.  Remember, as we go through this process, if someone objects because they believe the evidence being offered is improper under the rules of evidence, you should not be influenced by the objection or by my ruling on it.  If the objection is sustained, you will hear me say "sustained"; then you should ignore the question.  If I overrule the objection, then you should treat the answer just like any other answer.  And if I instruct you that some of the items of evidence are being received for a limited purpose only, you must follow that instruction, which is called a limiting instruction, as you must follow all of my instructions.

You don't have to worry about this right now.  There may not be a limiting instruction in this case, but if there is, I will explain it to you at the time and I will give you instructions as clearly as I possibly can about what the limitations are.  In addition, I may tell you that I am excluding testimony or ask you to disregard certain testimony.  When I do that, it means you have to follow my instructions as if the testimony is not in evidence, and you may not consider

it.

In addition, anything you may have seen or heard outside this courtroom is not evidence and should be disregarded by you.  You are to decide this case solely on the admissible evidence that is presented in this courtroom.

There are two kinds of evidence that I want to review with you -- direct evidence and circumstantial evidence.

Direct evidence is the direct proof of a fact.  An example of that would be testimony of an eyewitness, somebody who actually saw the event as it occurred.  Circumstantial evidence is proof of a fact or facts from which you may infer or conclude that some other fact or facts exist.  Obviously, I am going to give you further instructions on this and more details on these and other matters at the end of the case, but just keep in mind that you must consider both kinds of evidence -- direct and circumstantial.

A very important task for every jury is to determine the credibility of witnesses, and it is going to be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.  Again, in my instructions to you at the end of the trial, I will give you some guidelines which I hope will be helpful to you in determining the credibility of witnesses.

This is a civil case.  The standard, also called the burden of proof, by which you must weigh the evidence in this

J2pWome2

case is the preponderance of the evidence standard.  To

establish a fact by a preponderance of the evidence means the

greater weight of the evidence supports that fact.  It refers

to the quality of the persuasiveness of the evidence, not the

number of witnesses or documents.  In determining whether a

claim has been proved by a preponderance of the evidence, you

may consider the relevant testimony of all witnesses,

regardless of who may have called them, and all the relevant

exhibits received in evidence, regardless of who may have

produced them.

In this case, the plaintiff has the burden of

establishing its claims by a preponderance of the evidence.  If

you find that the evidence on a given issue is evenly divided

between the parties, then you must decide that issue against

the plaintiff, because it has the burden of proof.  But if you

find that the scales tip, however slightly, in favor of the

plaintiff, the party with the burden of proof, then that

element will have been proven by a preponderance of the

evidence.

Those of you who have sat on juries in criminal cases

or even watched television shows like Law & Order will have

heard of proof beyond a reasonable doubt.  That requirement

does not apply in a civil case such as this one, and therefore,

you should not consider it.

I also want to tell you a little about the issue in

J2pWome2

this case.  This case involves a dispute relating to United

States trademarks.  Before summarizing the positions of the

parties and the legal issues involved in the dispute, I will

define what a trademark is and tell you why the law gives it

protection.

      The term "trademark" includes any words, symbols or

devices that a person or company uses to identify its products

and to distinguish them from those sold by others.  The law

permits the use of a trademark to help consumers identify a

company's product and to protect the company's reputation for

quality from being harmed by the sale of similar, though

inferior, merchandise.  You come in contact with trademarks

every day of your lives.  They are the names and symbols that

bring to your mind a particular company, certain products or

other images, sometimes positive and sometimes negative.  Think

of, for example, the companies Coca-Cola, Kodak, GE and

Kellogg's and the symbols you associate with their brands.

      Once a company has established a trademark, the right

to use that word or symbol belongs to that company exclusively,

and it becomes its property.  No other person can use the same

or similar words or symbols because the law recognizes that

people associate trademarks with particular companies or

products, and without trademark protection, the public could be

misled about the nature, source and quality of products or

services.

J2pWome2

1        The law entitles the owner of a trademark to exclude

2    others from using that trademark without its permission.  The

3    unauthorized use of a trademark is referred to as trademark

4    infringement.

5        Counterfeiting, or the use of counterfeit marks, is a

6    type of trademark infringement.  Counterfeit marks are marks

7    that are identical to or substantially indistinguishable from

8    the mark of the trademark owner.

9        To help you follow the evidence, I will now give you a

10   summary of the positions of the parties with respect to the

11   trademark claims.

12       This case involves a number of registered United

13   States trademarks, each owned by Omega.  Omega's claim against

14   375 Canal is what the law calls contributory trademark

15   infringement.  Omega does not allege that 375 Canal directly

16   sold or offered for sale watches containing counterfeit Omega

17   trademarks.  Instead, Omega contends that watches containing

18   counterfeit Omega trademarks were sold or offered for sale from

19   property that the defendant is the landlord of, and that the

20   defendant, through its actions or inactions, contributed to or

21   facilitated those sales.

22       Omega also contends that it is entitled to receive

23   damages from 375 Canal for contributing to the infringement of

24   Omega's trademarks.

25       Your job at this trial is to determine two things:

J2pWome2

         First, you must determine whether 375 Canal

contributed to the infringement of one or more of Omega's

trademarks;

         Second, if you find that 375 Canal contributed to the

infringement of Omega's trademarks, you must determine the

amount of damages to be awarded to Omega.

         Now, just a few words about your own conduct as

jurors.

         First of all, do not discuss the case with anyone or

permit anyone to discuss it with you.  That includes your

fellow jurors.  You cannot deliberate on your verdict until

after you are charged by me, and that takes place at the end of

the case.  Until then, you simply cannot talk about the case.

You can talk to each other about almost anything else you'd

like, but don't talk about this case.

         That probably seems a little strange to you, but

here's the reason.  Obviously the evidence can only be

presented one witness at a time and one exhibit at a time, and

we don't want you to start talking to each other and reaching

conclusions before having the opportunity to see and hear all

the evidence in this case and hear my instructions on the law.

That is why we direct you to begin your deliberations at the

end and, until that time, not to have any discussions about the

case.

         You should think about the case like a painting, where

1   you can't tell from one stroke or one color what the painting

2   will look like.  You have to wait until it's finished to make

3   your judgment, and that's what we ask you to do.

4              If at any time during the course of this trial any

5   person attempts to talk to you or communicate about the case,

6   either inside or outside the courthouse -- and I hope this does

7   not happen -- you should immediately report such attempt to me.

8   Don't bring it to the attention of other jurors.  Just send me

9   a note directly.

10             Also, the lawyers and other participants at counsel

11  table have been instructed not to have any communications with

12  you as jurors.  That's the rule, so don't say hello or even

13  wave.  That goes for you, the lawyers and the witnesses.  In

14  this courthouse, you may see people in the elevator, so if you

15  run into one another, please don't acknowledge them or expect

16  them to acknowledge you.  They are under instructions not to

17  have any communication with you, and they are going to observe

18  that rule.

19             Don't read or listen to anything touching upon this

20  case in any way.  Don't try to do any research on your own or

21  any investigation about the case.  Those of you who have

22  computers at home, please do not use them for research on this

23  case.  You must deal solely with the facts that are presented

24  in this courtroom.

25             Now, if you wish, we'll give you notepads and pens so

J2pWome2

```
1   you can take notes while the evidence is being presented.  This

2   is permitted because some people find that taking notes helps

3   them focus on the testimony being given.  You should not,

4   however, try to summarize the testimony.  We have excellent

5   court reporters here -- Carol is one of them -- who take down

6   everything that is said throughout the trial.  Your job is to

7   listen to the testimony and assess the credibility of the

8   witnesses.

9            If you do take notes, do not let it distract you from

10  your task.  Moreover, your notes are for your private use only,

11  as a way to help you recall the testimony when you begin your

12  deliberations.  Your notes are not entitled to any greater

13  weight than the recollection of a juror who did not take notes.

14  Finally, you may not take your notes away from the court.  You

15  must leave them in the jury room at the end of each day.

16           As I mentioned earlier, this case should take five

17  days.  Let me tell you how important your service is and how

18  much we appreciate it.

19           The way that trial works is that all of us here have

20  to be here before any work can be done.  That includes the

21  attorneys; the witnesses; the court reporters; me, the judge;

22  and you, the jurors.  If one person is missing, everything

23  stops until that person shows up.  This is what makes it a

24  little bit different from work.  It is not a situation where

25  you can simply call in sick.  There are, of course, of
```

J2pWome2

extraordinary circumstances, but in all other circumstances, we
need you to be here every day and on time.  I understand that
this may impose a burden, but as I've said, this is an
important service and one that is greatly appreciated.

        Now, I'm going to start my trial day at 9:00 in the
morning.  Before that, we open the jury room at 8:30 and
provide you with a light breakfast.  The trial will go until
2:30 each day, with a half-hour break for lunch.  We'll provide
you with a snack during the lunch break.

        Now, here's how we're going to proceed.

        The plaintiffs will make an opening statement, which
is an outline of what it hopes to prove and to help you
understand the evidence as it comes in.  Next, the defendant
may make an opening statement but does not have to.  Please
remember as you're listening to the opening statements that
they're not evidence.

        Plaintiffs will then start presenting witnesses, and
the defense may cross-examine those witnesses.  Following the
plaintiffs' case, the defendant may, if it wishes, present
witnesses, but it does not have to do so.  After all the
evidence is in, each side will have an opportunity to get up
and present their closing arguments to you.  In these
arguments, they're going to summarize or interpret the evidence
for you, and then, of course, I'll instruct you on the law.

        After all that is completed, you'll retire to the jury

J2pWome2

1    room to begin your deliberations on your verdict.

2            I want to introduce David Gonzalez, my courtroom

3    deputy.  You are going to be working with Mr. Gonzalez.  He

4    will help you in the jury room and take care of your needs.

5    He'll get you notepads if you want to take notes.  If you have

6    any problems, see Mr. Gonzalez.

7            I'm assisted in this matter by my two law clerks.

8    Working on this case is Amy Torres, sitting right here, and

9    Annie O'Toole, who is sitting over there against the wall.

10           It's 12:30 now.  What we're going to do is take a

11   half-hour break.  Mr. Gonzalez will take you back to the jury

12   room.  You can hang up your stuff, grab a coke and a snack.

13   We'll resume at 1:00 and have the opening statement by the

14   plaintiff and then we'll have an opening statement by

15   defendant.  Then we'll have the first witness this afternoon.

16           Thank you very much.

17           (Jury not present)

18           THE COURT:  You're going to be how long?

19           MR. GUNTHER:  Your Honor, Mr. Noyes is going to

20   present the opening argument.

21           THE COURT:  Mr. Noyes, how long are you going to be?

22           MR. NOYES:  Approximately half an hour.

23           THE COURT:  Mr. Schick.

24           MR. SCHICK:  About 20 to 25 minutes, your Honor.

25           MR. GUNTHER:  Your Honor, can I just raise one issue

J2pWome2

```
 1    with respect to our first witness?

 2                THE COURT:  Yes.

 3                Please be seated.

 4                MR. GUNTHER:  Yes, your Honor.

 5                With respect to our first witness, Ms. Quinonez, she's

 6    come in from Denver to testify.  She's a teacher.  We need to,

 7    if it's at all possible, we told her we had hoped to get her on

 8    and off the stand today.

 9                THE COURT:  Yes.

10                MR. GUNTHER:  And your Honor, the direct examination

11    is probably about 30 to 45 minutes.

12                THE COURT:  Yes.

13                MR. GUNTHER:  So we'll be getting towards the 2:30

14    time frame.

15                THE COURT:  Right.

16                MR. GUNTHER:  Would your Honor be able to indulge us

17    to complete her testimony today?

18                THE COURT:  I think I have appointments upstairs

19    starting at 2:30, quarter to three.

20                MR. GUNTHER:  OK.

21                THE COURT:  You can make a shorter opening statement.

22                MR. GUNTHER:  We can do that, and we can maybe even

23    work on the length of her direct testimony.  We'll work on

24    that.

25                THE COURT:  If it's a matter of, say, two or three
```

J2pWome2

1     minutes, five minutes, I'm flexible, but not much beyond that.

2                MR. GUNTHER:  Thank you, your Honor.

3                THE COURT:  OK.  I'll see you at 1:00.

4                (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         AFTERNOON SESSION

 2                             1:00 p.m.

 3              (Jury not present)

 4              MR. GUNTHER:  Your Honor, just a quick point of

 5     protocol.  Should we stand when the jury goes in and out?

 6              THE COURT:  That's my habit.

 7              MR. GUNTHER:  OK.  Thank you, sir.

 8              MR. DELLA FERA:  Your Honor, I just wanted to provide

 9     exhibit binders of defendants' exhibits to the Court and deputy

10     clerk.

11              THE COURT:  OK.  Thank you very much.

12              (Jury present)

13              THE COURT:  Please be seated.

14              Mr. Shin, would you mind removing your cap.

15              JUROR:  Oh, my apologies.

16              THE COURT:  Mr. Noyes.

17              MR. NOYES:  Yes.  May I proceed, your Honor?

18              THE COURT:  Yes, you may.

19              MR. NOYES:  Thank you.

20              Your Honor, members of the jury, my name is Chris

21     Noyes, and together with my colleagues, Bob Gunther, Isley

22     Gostin and Joseph Elks, we represent the plaintiff in this

23     case, Omega S.A.  I also want to introduce Clinton Lam, who is

24     at the end of the table.  He will be helping us with our

25     audiovisual presentation, and also Carole Aubert.  Ms. Aubert
```

J2pWome2                    Opening – Mr. Noyes

1   is from The Swatch Group in Switzerland, the parent company of

2   Omega, and she will be here throughout the trial.

3            As you heard during jury selection, Omega is a watch

4   company, but it's not just any watch company.  Omega has been

5   making high-quality Swiss watches since 1848.  In the 170 years

6   since, Omega watches have done extraordinary things.  When Buzz

7   Aldrin landed on the moon in 1969, he was wearing an Omega

8   watch.  To this day, Omega is the only brand of watch worn by

9   NASA astronauts, but it's not just NASA that has made the Omega

10  brand so well-known.  Omega has been a presence at the Olympics

11  for years.  Omega is the Olympics official timekeeper.  And

12  since 1995, James Bond has worn an Omega watch in every Bond

13  film.

14           Now, given Omega's more than 170 years as a Swiss

15  watchmaker and its prominent place in popular culture, Omega's

16  trademarks have come to symbolize and identify the brand.  As

17  you heard the judge this morning, this case involves Omega's

18  trademarks, and you'll hear about four of them throughout the

19  course of this trial.  They are shown here on the screen.  The

20  Omega symbol, which is the last letter in the Greek alphabet,

21  has been a trademark representing the Omega brand since 1894.

22           The Omega trademarks shown here were registered in the

23  United States Patent and Trademark Office.  That means that

24  Omega has the exclusive right to use them.  They can be

25  enforced against others.  They are Omega's property.  Other

1   companies cannot use these trademarks without Omega's

2   permission.  Unfortunately, people do use Omega's trademarks

3   without their permission, and people counterfeit Omega's

4   valuable trademarks.  People make fake versions of Omega's

5   world-class watches, watches that cost thousands of dollars at

6   an authorized retailer, but counterfeit versions are sold for

7   less than a hundred dollars.

8           These are people trying to profit from Omega's success

9   and hard work, and they're trying to do that without Omega's

10  permission.  That's wrong, and that's not fair.  And that's

11  what this case is about.  This case is about the unlawful

12  counterfeiting of Omega's trademarks.

13          Omega brought this case to protect its trademarks from

14  those, like the defendant, 375 Canal LLC, that profit from

15  Omega's trademarks by allowing or simply being willfully blind

16  to the sale of the counterfeits.

17          Now, the key events in this case took place a few

18  years ago, between 2004 and 2012, but this case is important.

19  Why is it important?  It's important because counterfeiting is

20  wrong, and when a landlord, like the defendant, allows

21  counterfeit activity to happen on its property, looking the

22  other way and collecting rent, that's just as wrong as making

23  and selling the counterfeit goods themselves.  And you will

24  hear during the trial that that is exactly what the defendant

25  did.  The defendant looked the other way despite being told,

1  again and again and again, that counterfeit goods were being

2  sold on its property.

3       Now, counterfeiting is a problem.  It's a problem for

4  Omega, so Omega hired investigators to look into the problem,

5  and ultimately, because the defendant failed to take reasonable

6  steps to address the issue of counterfeiting on its property at

7  375 Canal Street, in May 2012, investigators purchased a

8  counterfeit Omega watch.  It had multiple counterfeit Omega

9  trademarks on it and it was from this shop, a souvenir gift

10 shop, located at 375 Canal Street.  That watch was sold for $80

11 cash.  It didn't come with an instruction manual.  It didn't

12 come with a warranty card.  It wasn't sold in an Omega box.  It

13 wasn't sold in a box at all.  It was sold in a plastic Ziploc

14 bag.  It was one of two counterfeit Omega watches the clerk

15 offered to sell Omega's investigators that day.

16      But this case is about more than the sale of a single

17 counterfeit watch, as serious as that is.  The evidence will

18 show that the defendant has repeatedly looked the other way

19 while its tenants sold counterfeit goods at 375 Canal Street.

20 Time and time again, the defendant did little or nothing to

21 address the problem of counterfeiting on its property, and the

22 little that it did do didn't work.  From at least 2004 through

23 2012, counterfeiting was a constant problem at 375 Canal

24 Street.

25      So who is the defendant?

1            As the judge told you, 375 Canal LLC is the owner and

2    landlord of the commercial building located at 375 Canal

3    Street, here in lower Manhattan.  It's owned that building

4    since 2005, and it's owned by Albert Laboz, who you will hear

5    testify here today, during this trial, and his two brothers.

6    The Laboz brothers are principals in a company called United

7    American Land LLC, which owns the defendant.  American United

8    Land LLC owns and manages a number of properties in the Canal

9    Street area.

10           MR. SCHICK:  Your Honor, that's actually not accurate,

11    and we discussed it this morning.

12           THE COURT:  Go ahead.

13           MR. NOYES:  As you will learn, stores located at 375

14    Canal Street have been accused of selling counterfeit goods for

15    years, and this is not just an Omega watch issue.

16           Starting in at least 2004, other brands -- like Rolex,

17    Tiffany, Chanel -- gave notice that counterfeit goods were

18    being sold at 375 Canal Street.  Brands gave notice that

19    counterfeit merchandise was sold at 375 Canal Street in 2004.

20    In 2007, Tiffany gave notice that a counterfeit ring was sold

21    at 375 Canal Street.  In 2011, Chanel gave notice that a

22    counterfeit Chanel necklace was sold at 375 Canal Street.  In

23    2006, Louis Vuitton sued the defendant.  They sued the

24    defendant because 375 Canal Street had been selling counterfeit

25    goods with its Louis Vuitton trademarks.  The defendant agreed

1    to be permanently enjoined and restrained from infringing Louis

2    Vuitton's trademarks.  But it's not just private companies that

3    have attempted to stop the counterfeiting at 375 Canal Street.

4    The city of New York sued the defendant twice, once in 2006 and

5    once in 2009, because counterfeit merchandise was being sold at

6    375 Canal Street.  The defendant settled those cases as well.

7         But the counterfeiting didn't stop at 375 Canal Street

8    after it was sued by Louis Vuitton in 2006, and it didn't stop

9    after the defendant was sued by the city of New York in 2009.

10   During this trial, you will hear evidence that the defendant

11   knowingly and willfully contributed to the infringement of

12   Omega's valuable trademarks.  Here's what the evidence will

13   show, and I'm going to walk through it for you chronologically.

14        In 2005, the defendant takes ownership and control of

15   the property, 375 Canal Street.  In 2006, both Louis Vuitton

16   and city of New York sue the defendant because counterfeit

17   goods are being sold at 375 Canal, and again, the defendant

18   settled those cases.  In 2007, the defendant is notified that

19   Tiffany jewelry, counterfeit Tiffany jewelry was sold at 375

20   Canal.  In mid-2009, the city of New York again sues the

21   defendant because counterfeit goods are being sold at 375 Canal

22   Street.  The case is settled, again, and as part of that

23   settlement, the defendant agreed that any future tenants and/or

24   subtenants shall be permanently and perpetually enjoined from

25   selling, facilitating the sale or possessing trademarked

1    counterfeit merchandise and/or pirated merchandise.  That was

2    August of 2009.

3            Just a month earlier, in July of 2009, the defendant

4    entered into a lease agreement with a company called T.A.

5    Discount Store.  Now, in that lease, T.A. Discount was required

6    to use the premises at 375 Canal as a store selling perfume,

7    and the lease also said that the tenant shall not sell

8    trademark or counterfeit merchandise of any kind.

9            But T.A. Discount was involved in the sale of

10   counterfeit merchandise at 375 Canal Street.  As you will hear,

11   it was involved in the sale of counterfeit Omega watches.  In

12   December of 2010, the New York City Police Department peddler

13   task force conducted raids on Canal Street.  As you will learn,

14   that task force is responsible for enforcing rules and

15   regulations against trademark counterfeiting in the city, and

16   on that day, the New York Police Department confiscated

17   counterfeit Omega watches at the souvenir shop at 375 Canal

18   Street, and they arrested someone at the store.  Then two

19   months later, in February 2011, the NYPD conducted raids again

20   on Canal Street, including 375 Canal.  They made another

21   arrest, and they confiscated several counterfeit Swatch

22   watches.  During this trial, you'll hear from Richard Taute,

23   and he was a member of the New York Police Department peddler

24   task force at the time of these raids, and he'll tell you about

25   these arrests.

1          Now, a month later, in April 2011, the defendant is

2     notified again about counterfeit goods, this time Chanel

3     jewelry being sold at 375 Canal.  And then on September 28,

4     2011, Omega sends the defendant a letter.  In that letter,

5     Omega notifies the defendant that counterfeit Omega and Swatch

6     watches were being sold at 375 Canal Street.  On October 3,

7     2011, defendant responds to Omega.  Defendant's attorney,

8     Ms. Sharyn Tritto, who will testify during this trial, wrote

9     with respect to 375 Canal, apparently the tenant sublet the

10    space to an entity that was selling counterfeit goods bearing

11    her client's trademark.  Now, the defendant's response here to

12    Omega said that the offending tenant had been removed, but the

13    evidence will show that the counterfeiting did not stop at 375

14    Canal Street.  Just eight months after Omega told the defendant

15    that 375 Canal had been involved in the sale of counterfeit

16    Omega watches, and seven months after the defendants told Omega

17    that the offending tenant had been removed, counterfeit watches

18    appeared again at 375 Canal Street.

19         On May 19, 2012, a team of investigators visit the

20    storefronts along Canal Street.  They had the goal of

21    purchasing watches with Omega trademarks, counterfeit Omega

22    trademarks.  During the investigation, one of Omega's

23    investigators, Leslie Quinonez, purchased a counterfeit watch

24    at 375 Canal Street for $80 cash.

25         You'll hear from Ms. Quinonez in this case.  She'll be

J2pWome2                    Opening – Mr. Noyes

 1    our first witness.  She's now a schoolteacher in Denver, but

 2    she's come here to testify for you.  She will tell you about

 3    the investigation in May 2012, and she'll tell you about the

 4    purchase of the counterfeit watch.  And you'll see the video

 5    that she took while she was conducting the investigation.

 6          You will also hear from Brad Cole, another

 7    investigator who witnessed the Omega watch purchased that day.

 8    You will see his videos of the investigation, and you will see

 9    the photo he took of the counterfeit watch purchased at 375

10    Canal that day, soon thereafter.

11          Here's that photo.

12          And you will see the counterfeit watch itself in this

13    case.

14          Here it is.

15          And here are some photos of that watch.

16          Now, this watch purports to be an Omega Seamaster

17    Broad Arrow watch.  You will learn that Omega has never made a

18    Seamaster Broad Arrow watch.  And you will learn that this

19    watch has multiple counterfeit trademarks on it, on the watch

20    face, on the watchband and on the watch back.  And you will

21    learn this watch is an obvious fake.  You will hear from Peter

22    Foster, who is the vice president of customer service at The

23    Swatch Group U.S.  He's been working for Swatch for 15 years,

24    and he has nearly that many years' experience identifying

25    counterfeit watches.  He'll explain why this $80 watch

1    purchased at 375 Canal Street is a counterfeit.  He will

2    compare it to the closest authentic Omega watch, which is an

3    Omega Seamaster Aqua Terra, which retailed for about $5,000.

4           Finally, you will learn that T.A. Discount Store, the

5    company that was leasing 375 Canal Street, starting in 2009,

6    you will learn that they were more than a year after the

7    defendant told Omega the offending tenant had been removed from

8    375 Canal Street.  You will learn that T.A. Discount was still

9    leasing the store when this lawsuit was filed on September 14,

10   2012.  And you will learn that T.A. Discount didn't vacate 375

11   Canal Street until two months after the lawsuit was filed,

12   November 26, 2012.

13          Taken together, this evidence will show that the

14   defendant is liable for contributory trademark infringement.

15   As the Court told you, it is Omega's burden -- it is our

16   burden -- to prove that, and we will.  The evidence will show

17   that the defendant owned and controlled 375 Canal Street; that

18   the defendant had been notified repeatedly that counterfeit

19   goods had been sold at 375 Canal Street; and that it knew that

20   counterfeit Omega watches specifically -- with Omega

21   trademarks -- had been sold there, and despite having notice of

22   the counterfeit goods, despite having notice that Omega

23   counterfeit watches with counterfeit Omega trademarks had been

24   sold there, the defendant continued to lease the property to

25   known trademark infringers.  And the evidence will show that

1    the defendant failed to take reasonable steps to stop known

2    trademark infringers from using 375 Canal Street.

3              Now, soon you will hear from the defendant, and we

4    will have an opportunity to address you at the conclusion of

5    the evidence, during closing arguments, so I wanted to address

6    some of the things that you might hear during the course of the

7    trial from the defendant.

8              I suspect that the defendant will criticize our

9    investigations at 375 Canal Street.  The defendant may even

10   suggest that the $80 watch purchased on Canal Street, sold in a

11   plastic bag, without a box, without a warranty card, is an

12   authentic watch and not a counterfeit.  In response to that, we

13   would ask you, members of the jury, to use your judgment and

14   common sense when evaluating the evidence as the trial

15   proceeds.

16             Now, the defendant may criticize our witnesses in this

17   case, and they may criticize the witnesses for some mistakes

18   that were made.  And there were mistakes.  This case involves

19   people, human beings.  Human beings make mistakes.  Mr. Cole,

20   one of our investigators that you will hear testify, made some

21   mistakes, and he will admit that.  Four years after the

22   investigation in May of 2012 at 375 Canal Street, he submitted

23   a declaration in this case.  That's a sworn statement to the

24   court.  And in that declaration, he said that he, Mr. Cole, was

25   the person who purchased the counterfeit watch at 375 Canal

1    Street.  That was an error.  He didn't purchase the watch.

2    Now, he was there when the watch was purchased.  He was running

3    the investigation, but the watch purchase was made by Leslie

4    Quinonez, who was working with Mr. Cole that day.

5        Ms. Quinonez will testify that she purchased the

6    counterfeit watch at 375 Canal Street.  Mr. Cole will come here

7    and testify to the same thing.  And errors in Mr. Cole's

8    declaration in 2016, four years after the investigation, were

9    truly inadvertent errors.  Mr. Cole wrote a report of the May

10   19, 2012, investigation just days after it happened, and that

11   report was attached to the declaration he submitted to this

12   Court.  That report correctly identifies Ms. Quinonez as the

13   person who bought the counterfeit Omega watch.

14       Mr. Cole's mistakes in 2016 do not change the evidence

15   we will present, the photographs, the videos and the testimony

16   that you will hear confirming that there was a counterfeit

17   Omega watch purchased at 375 Canal Street on May 19, 2012.

18       Now, the defendant may also suggest that this case

19   doesn't matter; that it's not a big deal; that it's just a case

20   about a single watch, and there's no counterfeiting problem

21   anymore at 375 Canal Street; and that 375 Canal Street is now a

22   wine store.  And it's true.  It's a wine store.  It's a wine

23   store today, but it was a souvenir gift shop from at least July

24   2009 through November 2012.  It wasn't a wine shop when the

25   NYPD raided Canal Street and confiscated Omega watches there in

1    2010, and it wasn't a wine store when Ms. Quinonez purchased a

2    counterfeit Omega watch there in 2012.  And just because one

3    storefront is now selling wine doesn't mean the risk of

4    counterfeiting is over.

5            As you will hear from Albert Laboz himself, the person

6    who is an owner of 375 Canal Street, he and his brothers own

7    several properties with retail space along Canal Street.  Some

8    of these retail spaces are vacant, available to rent, and as

9    you will hear, some of them are souvenir shops and that they

10   are collecting rent from those shops.

11           In the end, this case isn't about one store selling

12   counterfeit goods.  It's not even about the sale of one

13   counterfeit Omega watch, even though those things are certainly

14   wrong by themselves.  This case is about more than that.  It's

15   about making sure that the defendants, the commercial landlord,

16   take the steps necessary to prevent counterfeit goods from

17   being sold on its property.  It's about making sure that this

18   landlord focuses on the problem of counterfeiting and not just

19   collecting rent from its tenants.  It's about getting them to

20   do the right thing, and not just one time but every time.

21           Members of the jury, let me conclude by thanking you

22   for your time, attention and patience.  Jury duty does impose a

23   burden on all of you, but as I mentioned at the beginning, this

24   is an important case.  Allowing unlawful conduct to occur on

25   your property, like the sale of counterfeit goods, is wrong.

J2pWome2                          Opening - Mr. Noyes

1  Prioritizing profits over the property rights of others, the

2  trademark rights of others, is wrong, so at the conclusion of

3  the evidence we will ask you to bring your collective judgment

4  and your wisdom to bear and decide that, first, Omega's

5  trademarks have been infringed; second, that the defendant, 375

6  Canal Street LLC, contributed to the infringement of Omega's

7  trademarks; and finally, as the Court will explain to you at

8  the conclusion of the evidence, Omega is entitled to an award

9  of statutory damages because of the defendant's knowing and

10  willful contributory trademark infringement.

11          We look forward to presenting the evidence to you.

12  Thank you for listening.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. Schick.

2          MR. SCHICK:  Yes, your Honor.

3          Good morning.  My name is Avi Schick, and I am the

4    lawyer for the defendant in this case, the single defendant in

5    this case, 375 Canal LLC, which, as we affirm, is the owner of

6    the building, the commercial building at 375 Canal Street.

7    Now, I'm going to be here with you this week for many reasons,

8    but it's very rare that I get to play the little guy, and this

9    week I do.  So thank you.

10          As you'll see for yourselves throughout the week, this

11   is a very odd case.  It's odd because it's a case about the

12   supposed sale of a single watch.  It's odd because even though

13   this is a case about whether a counterfeit Omega watch was sold

14   and what the landlord had to do with that sale, Omega does not

15   claim that 375 Canal LLC, the landlord -- and I'm going to call

16   them the landlord because otherwise you're going to get

17   confused between 375 Canal LLC, the company, and 375 Canal

18   Street, the address.  And that's going to be very confusing, a

19   full week we have two or 375 Canals.  So I'm going to refer to

20   them as the landlord just because otherwise we're going to get

21   stuck I think.

22          Omega does not allege that 375 -- that the landlord

23   had anything to do with the decision, whoever made it, to

24   manufacture counterfeit Omega watches.  Omega does not claim

25   that 375 Canal LLC, the landlord, had anything to do with the

1   distribution of any counterfeit watches.  And they do not

2   allege that the landlord had anything to do with the sale of

3   the watch.  The sale of the watch, if there was a watch sold,

4   and if they have that watch, it was done by an employee of a

5   tenant or a subtenant.  They don't allege that.  They don't

6   allege that 375 Canal LLC had anything to do with that.

7        It's also odd because of what Mr. Noyes didn't say,

8   perhaps he was embarrassed.  But what he didn't tell you is

9   that the numbers change, but at this moment Omega is seeking $8

10  million from the landlord for the sale of that single watch.

11  That's what they say they are entitled to; that's what you're

12  here for this week, to determine whether Omega is entitled to

13  $8 million, because on May 19th, 2012, they say an employee of

14  a subtenant of the tenant of the landlord sold a watch.

15       It's odd because while today Mr. Noyes said, Of course

16  the watch is counterfeit; it was sold there, previously their

17  claim was there's consumer confusion; who knows what people

18  think when they buy the watch.

19       And they took that watch that was bought on May 19,

20  2012, and, as they said, they are going to have witnesses come

21  in and tell you it was counterfeit; that we can sell the watch,

22  we don't have the watch.

23       But what's odd about this case is that they say that

24  watch was purchased on May 19th, 2012.  And you will hear that

25  they didn't seek to evaluate that watch for counterfeiting

1    until August 2017.  They waited more than five years.

2              Now, what has happened with that watch?  They are

3    going to come in and Mr. Noyes said he has a watch.  But I

4    don't know what you expect when this company says that there's

5    watches that were sold and they are going to prove it to you.

6              But you will hear in this case that what Omega did,

7    that what this multibillion-dollar European corporation did

8    with this watch is as follows:

9              They took a Ziploc bag, they took a Post-It note, they

10   stuck it in, and they said, You see?  Here is proof, seven

11   years later, that it's the same watch.

12             Now, we don't have to prove anything in this case;

13   they do.  But ask yourselves, are there better ways other than

14   what -- professional ways?  Are there tamperproof tags that can

15   be put on so that you, the jury, know for sure which watch it

16   is?

17             I got home late last night from preparation.  And my

18   son, who was home for the week and went back to school, left me

19   something.  And what he left me was this.  And so I called him

20   and I said, Aaron, what's this?

21             And he said, Well, I was hearing about the case this

22   weekend, and I decided I could be an Omega investigator.

23   Because I have a watch, I have a Ziploc bag, and I have a

24   Post-It.

25             So here we are.  That's all they have on this case.

1          And so remember, the question for you this week is not

2     necessarily whether a watch sold on May 19th, 2012 was

3     counterfeit.  That is a question, but that's, by far, not the

4     only question.  The question is is the watch they are showing

5     you this week the same watch that was purchased on May 19th,

6     2012?

7          And what you'll hear is that on the same day

8     Ms. Quinonez purchased the watch at 375 Canal Street at that

9     store, she purchased five other watches that same day.  Five

10    other what she says are counterfeit Omega watches.  We haven't

11    seen those watches; we don't know where they are.  But none of

12    them were tagged; they were all put in Ziploc bags.  And years

13    later they are saying, Trust us.  There's a Post-It note,

14    there's a Ziploc bag.  It's the same watch.

15          They tried to get ahead of the Brad Cole issue.

16    They'll bring in Brad Cole to try to convince you it's the same

17    watch.  They said he made some mistakes in his declaration.

18    Now, we'll get into that tomorrow probably with Mr. Cole, but

19    understand he submitted a sworn declaration.  It said twice

20    that it's under penalty of perjury to this Court.

21          He asked the Court to make a legal ruling based on the

22    declaration.  And it started saying, I'm giving this under

23    penalty of perjury, and it concluded saying it's under penalty

24    of perjury.  And it had 20 short paragraphs.  And he has

25    admitted to this Court that 11 of those paragraphs were false.

J2PVOME3                          Opening - Mr. Schick

Not a mistake.  Not brain freeze.  Eleven out of 20 paragraphs
were false.  But he's the best they have to convince you that
you're looking at the same Ziploc baggie and the same Post-It
note.

          So ask yourself all throughout this week, why didn't
Omega take the common sense steps that are necessary to
preserve evidence?  It's not that complicated; it's not that
expensive.  But there's something more fundamental to keep in
mind, and I ask you to keep it in mind throughout the case.

          As I said, Omega is not claiming that 375 Canal
manufactured the counterfeit merchandise; Omega does not claim
that 375 Canal distributed the merchandise; and Omega does not
claim that 375 Canal sold any of the counterfeit merchandise.
Not only that, just to be clear, Omega is going to claim that
anybody who worked for the landlord distributed or sold
counterfeit merchandise.  No one at any time ever.

          Now, Omega truly thinks that someone was
counterfeiting merchandise; and, of course, in this case they
have to prove that someone was counterfeiting merchandise.  And
they have to prove that someone distributed it, and they have
to prove that someone sold it.  Not only that, despite all
their talk, it's a very professional, well-done, fancy,
expensive presentation they made.  But it's also distracting,
because it had very little about Omega, it talked about a lot
of other things.  They talked about Swatch and the Swatch

1  Watch.

2        Well, as the judge said, lawyers don't provide

3  evidence.  There are no claims about a Swatch Watch in this

4  case.  Period.  Full stop.  They are suggesting they had

5  evidence; they are suggesting something was wrong.  You have

6  all these lawyers; you have someone here from Switzerland.

7  There is not a single claim in this case about a Swatch Watch.

8  They are just trying to distract you, distract you from the

9  fact that what Omega has to prove is that there was

10  counterfeiting of an Omega watch; there was a distribution of

11  an Omega watch; that there was a sale of a counterfeit Omega

12  watch at the premises at 375 Canal Street.

13        Now, what's strange is that you see here there are

14  three empty chairs.  And those chairs are empty because Omega

15  has chosen not to call to this trial anybody who is involved in

16  that counterfeiting.  They don't want you to hear --

17        MR. NOYES:  Your Honor --

18        MR. SCHICK:  I'm just saying they made this choice not

19  to call as a witness anybody in this trial --

20        THE COURT:  It's fair comment.  It's argument.

21        Your objection is overruled.

22        MR. SCHICK:  They chose not to call anybody who

23  manufactured the watch, they didn't call anybody who

24  distributed the watch, and they are not calling anybody who

25  sold the watch.  They tell you they know who sold it; we'll

1    talk later about what efforts they made.  I'll show you an

2    email soon.  They know who the sole distributor was in New

3    York, they say, and they did nothing.

4          But Omega doesn't want any of these people here at

5    this trial.  They are entitled to do that, but you have to

6    wonder, what are they worried about?  Why not have the people

7    who they say were actually involved in the counterfeiting here

8    at this trial?

9          I'll tell you why.

10          Because they want you to think only about the landlord

11    375 Canal.  They do not want you to think about all the other

12    people who actually sold, manufactured, distributed the watch.

13          And I wrote this before I got here, but it turned out

14    to be true, they want you to just assume that the trademarks

15    were counterfeited without thinking too hard about it or asking

16    too many tough questions.  They want to slide over all of the

17    necessary facts.  Was there a counterfeit watch?  Is it the

18    same watch?  Who manufactured it?  Who sold it?  Who

19    distributed it?  They want you to skip over all of that and

20    think about the landlord, the only one they've asked to be

21    here.

22          Well, that doesn't seem right and it doesn't seem

23    fair, not to my client the landlord, not to the jury, not to

24    the truth.  In a case that is a claim about counterfeiting that

25    requires proof of counterfeit Omega merchandise that was sold,

1    and in a case in which there's no dispute Omega had the burden

2    of proof to establish all the facts, a case in which Omega has

3    to establish a sale of counterfeit Omega merchandise, it

4    doesn't make sense not to have them prove their case.

5            Now, there are lots of lawyers and legal personnel in

6    this courtroom, but there are only two people here who are

7    lawyers who don't work for Omega, that's myself and my

8    colleague Steve Della Fera, who you'll be seeing and hearing

9    from this week.

10           So we will ask questions this week about the claims of

11   counterfeiting.  We will ask those questions even though 375

12   Canal, the landlord, was not involved with the counterfeiting.

13   Omega doesn't claim that we manufactured, distributed, or sold

14   the merchandise.  Omega doesn't claim anybody who worked for

15   the company manufactured, distributed, sold the merchandise.

16           So why are we asking those questions?  We are asking

17   those questions because you deserve to be able to make a

18   decision based on facts.

19           But please keep something in mind.  Just because we

20   are asking questions, that does not mean that we think

21   counterfeiting is okay.  It's not okay.  We don't think it's

22   okay.  Our client doesn't think it's okay.  That's why our

23   client was never involved with the counterfeiting.  But I have

24   to ask the questions because there's no one else here.

25           Also, please remember that the landlord does not have

J2PVOME3                         Opening – Mr. Schick

1    to prove anything at this trial.  The burden of proof in this

2    trial is entirely and exclusively on Omega.

3              A couple other things to keep in mind.

4              In this case Omega is seeking, as I said, $8 million

5    in damages for the sale of a single watch, the watch in a

6    Ziploc bag with a Post-It note that they now say was sold at

7    375 Canal on May 19, 2012.  You'll hear lots of evidence about

8    how that watch traveled, who it traveled with, how it was kept.

9              It's important to remember, just like Omega is trying

10   to confuse things by not having those who they claim were

11   actually involved with the counterfeiting here at trial, Omega

12   may try to confuse you by talking a lot about merchandise that

13   is not Omega merchandise, as they did this morning.

14             But please keep in mind Omega has no claims about any

15   other trademark.  Not any other trademark that you heard about

16   this morning other than Omega do they have a claim for.  Omega

17   doesn't own those trademarks.  Omega is not entitled to any

18   damages for the sale of any nonOmega merchandise.  Omega can

19   talk a lot about those trademarks, but all that talk does not

20   legally entitle it to five cents, not a nickel.  It's just a

21   distraction.

22             Omega's only claim for damages is about the single

23   watch they say was sold on May 19th, 2012.  And as the judge

24   will tell you, for 375 Canal to be liable, they would have to

25   have had knowledge of sales of counterfeit Omega merchandise.

1          Now, I said before that Omega knows who distributed

2     and sold the watch at issue in this case.  How do I know that?

3     They are not here.  How do I know that Omega knows who the

4     distribute was?  Well, let me show you.  I want to show you an

5     email from Brad Cole, the investigator they talked about.  It's

6     an email to a lawyer, a Mr. Lindenbaum, whose firm used to

7     represent Omega in this case.  And the exhibit is NN and we'll

8     pull it up on your screens in a minute, I hope.

9          (Pause)

10          THE COURT:  You'd better go ahead.

11          MR. SCHICK:  Anyway, in this email, which you'll see,

12     it's dated February 21st, 2012.  And in the email Mr. Cole

13     writes to Mr. Lindenbaum.  I'm sorry you don't have it on the

14     screen; you'll see it throughout the trial.  Our apologies.

15          It says:  Dear Jeff, my report on our Canal Street

16     visit is attached.  In reviewing what we observed, I believe

17     the following is happening.

18          Here's what he says.  This is a quote:  A common

19     distributor is supplying the bulk of Canal Street.  I believe

20     this because -- and he gives several reasons.  And then he

21     says:  The above would also mean -- "the above," meaning

22     there's a common distributor that is supplying all of Canal

23     Street with counterfeit Omega goods.  The above would mean a

24     centralized distribution point.  This means inventory, possibly

25     sizable.

1        So they had their investigator tell them that he knows

2   where all the inventory, supplying all the distributors,

3   supplying all the shopkeepers with counterfeit goods was

4   located.

5        Now, ask yourself, what do you think they did with

6   that?  I'll tell you.  Nothing.  That's right, Omega and its

7   lawyers did absolutely nothing with that information.  They did

8   not follow up, they did not make a claim, they did not tell the

9   city, they did not tell the police, they did not file a

10  lawsuit.  They did nothing to prevent the flow of all that

11  counterfeit Omega product into the streets of New York.

12       Let me give you another oddity.

13       Omega claims, as you heard this morning, that there

14  was a counterfeit Omega watch sold at 375 Canal Street in

15  December 2010.  To be precise, they say on December 7, 2010.

16  You'll hear the evidence about that and you'll decide whether

17  they really have evidence.  They certainly have no watch.  The

18  witness they mentioned, they mention a witness that is going to

19  come tomorrow, he will tell you he has no recollection whether

20  he was even there that day, but okay.

21       But Omega claims they knew it at the time.  Omega says

22  they know.  We had a lawyer, Mr. Paul; and he was aware on

23  December 7th that it was sold.

24       Now, what did Omega do with that information?

25       Again, nothing, at least not for a very long time.

J2PVOME3                    Opening - Mr. Schick

Well, they are here today saying how horrible it was.  So a
timeline stretching back till 15 or more years ago, when Omega
and their lawyer at the time, Mr. Paul, had the information
that they say that an Omega counterfeit watch was sold on
December 7th, 2010, they did nothing.

        Now, almost a year later what they did was they wrote
a letter.  Mr. Noyes showed you a letter.  They waited
December, January, February, March, April, May, June, July,
August, September 28th.  They waited almost an entire year, ten
months, to send the letter to the landlord saying there was a
watch found there.

        I would show you the letter, but there are some
technical difficulties and we don't want to waste time.  You
saw part of the letter, snippets; they only showed you part of
the letter.  There was a lot misleading with what they snipped
in and snipped out and the testimony that they said, but we'll
take care of that with witnesses.

        But they didn't show you anything about the second
page of the letter.  The first page of the letter was what they
called a notice.  The second page of the letter was a demand.
They said, Okay, there's this watch there.  Do something about
it.  But they actually said, We'll tell you what we want you to
do.  And you'll see it this week in full.  And it says:  We
demand you immediately remedy the situation by taking the
following action.  And the action was to remove the tenant or

1   subtenant, which they did.  Mr. Noyes was very clever before.

2   He said the same tenant was there.  That's because it was a

3   subtenant.

4          What's a subtenant and a tenant, just to make sure we

5   know?  A landlord owns a building.  It doesn't operate the

6   building, it doesn't have offices there.  It rents the space to

7   a tenant.  Sometimes a tenant, in turn, rents some of that

8   space to a subtenant.  That's what happened at 375 Canal

9   Street.

10          And so when they got this letter, the subtenant was

11   removed, as requested.  And you'll see there was communication

12   about it, and Omega was fine.  Omega didn't say give me $8

13   million.  Omega didn't say do anything more.  Omega said

14   nothing.

15          So you're asking yourself, Why are we here this week?

16   If Omega itself didn't follow up with the distributor, if Omega

17   waited almost a year to follow up with 375 Canal in 2010/2011,

18   why is Omega making a federal case about this, literally a

19   federal case?  Why are they doing that if the evidence is so

20   flimsy?

21          Well, we'll tell you the answer to that.  The answer

22   is this whole case was a setup by a lawyer in search of a

23   payday.  We know that, again, because we have an email.  And

24   again, we're having some technical difficulties and it's

25   unfortunate, but it's not going to change the evidence in this

1    case and it's not going to change the testimony.

2             And the email I'm talking about is, again, an email

3    from Brad Cole, who you're going to hear from tomorrow.  It's

4    an email dated October 18, 2010, before anything happened here,

5    before, they say, even the December 2010 sale.

6             And Mr. Paul writes a letter, an email, to Mr. Cole.

7    And he says:  We would like to follow up with a proposal to

8    bring to his clients.

9             Mr. Paul, the lawyer, wanted to go to Omega to

10   convince Omega to file civil lawsuits against brick-and-mortar

11   retail establishments, in other words, landlords.

12            The lawyer, before December 7, 2010, sent an email to

13   the investigator saying, You know what I want to do here,

14   investigator?  I'm not looking to find out who distributes this

15   stuff.  I'm not looking to find out who sells this stuff.  I

16   want to set up a lawsuit.  I want to convince my client Omega

17   in Switzerland to authorize me to file a lawsuit against a

18   landlord.  That's what the evidence will show.

19            So this is not a case in which Omega has ever tried to

20   eradicate counterfeiting.  This is not a case in which Omega

21   felt it was damaged and sought compensation; instead this is a

22   case in which Mr. Paul -- now when I say lawyers, prior

23   lawyers, I want to be very clear.  Mr. Paul and his colleagues

24   used to represent Omega.  Anything I say has nothing to do with

25   the fine men and women of the current law firm for Omega.  I

1    don't want to impugn them in any way or suggest that.

2              But this is not a case in which Omega felt it was

3    damaged and sought compensation; it's a case in which Mr. Paul

4    saw a payday, it's a case in which Mr. Paul saw a windfall.

5    And so instead of notifying 375 Canal, instead of going to the

6    landlord or the distributor to get rid of counterfeiting,

7    Mr. Paul set out to set the landlord up.

8              So what did he do?  And what's one of the main things

9    you didn't hear this morning from Omega?

10             Well, Mr. Paul decided, after that email with

11   Mr. Cole, he's going to send investigators to 375 Canal Street

12   to get them to purchase counterfeit Omega merchandise.

13             What did he do?  He sent them repeatedly.

14             He sent an investigator from whom you'll hear from

15   this week in December 2010 to find merchandise.  The fellow

16   wrote back, there was no Omega for sale there.

17             He sent investigators early December 2011, whose sole

18   job was to locate, identify, see if you can purchase Omega

19   merchandise at the store at 375 Canal Street.  And the guy

20   wrote back, There is none.

21             He sent the guy again on December 30th, 2011, two

22   weeks later.  They weren't happy with these answers.  Sent him

23   back again to try to purchase counterfeit Omega merchandise.

24   And again the fellow wrote back and said, There is none.

25             Mr. Paul was not to be stopped.

1          In February 2012, he sent investigators again to

2     identify, locate, and purchase counterfeit Omega merchandise at

3     375 Canal Street.  And again the investigators said there are

4     none.  Over a period of about 15 months, from December 2010

5     through 2011, through early 2012, Omega and its attorney hired

6     multiple different investigators to go to 375 Canal Street

7     undercover and to identify counterfeit Omega merchandise.  And

8     each and every time they reported back that there was no Omega

9     merchandise for sale in the store.

10         Now, you might think that would be cause for

11    celebration at Omega.  No counterfeit sales should be good

12    news.  But this wasn't about counterfeit merchandise and,

13    frankly, we don't even know if the lawyers reported back to

14    Omega that there was no counterfeit merchandise for sale.

15    That's because this is not a case about counterfeit; it's a

16    case about a big payday and windfall.

17         So what did they do?  Here's what they did:

18         On May 19, 2012, they sent a team of five people to

19    375 Canal Street in search of counterfeit Omega merchandise.

20    You've heard about them.  This was their fifth attempt to

21    identify and try to find counterfeit Omega merchandise at 375

22    Canal in 15 months.  And as you heard from Mr. Noyes, they say

23    that on that day, on their fifth attempt, they finally found a

24    counterfeit Omega watch there.

25         Well, what did they do?

1          The Omega Paul gotcha machine went into high gear and

2     they filed this federal lawsuit.  They didn't send a letter,

3     they didn't ask for anything else.  They went directly to file

4     a lawsuit, asking for millions and millions and millions and

5     millions of dollars.

6          Now, Mr. Noyes talked about a video he's going to set

7     up.  Now, I want to ask you some common sense questions.

8          They're going to show you a video of the May 19th buy.

9     And I don't know what watch they are showing you, but I'm

10     certainly not in a position -- I wasn't there, I'm not in a

11     position to say no watch was sold that day.  It's not my burden

12     of proof.  But they are going to show you a big video because

13     it's fancy and impressive.

14          But ask yourselves, where's the video of the failed

15     buys?  How come on the first four times when they went -- and

16     we have documents that they sent saying that there's no Omega

17     merchandise -- there's no video?  And all of a sudden, on the

18     fifth buy, they are there with a whole team of videographers.

19          So ask yourself and wonder, did Omega create the very

20     demand that it's now suing over?  Were Omega and Mr. Paul

21     responsible for creating the demand for a watch that they are

22     now suing about?

23          You know the sign you often see in stores, You don't

24     see it, ask for it?  Well, Omega asked for it; Omega asked for

25     it not once in December 2010, not twice in 2011, not a fourth

1    time in early 2012, but on a fifth time, and it was finally

2    there.  But whose fault is that?  It's not the landlord's

3    fault.

4            Now, I said what did Omega do?  Omega was just so

5    concerned about its counterfeiting of its trademarks.  And

6    again, it's a serious matter; we don't condone it; we're not

7    involved with it.  I shouldn't be the one having to get up here

8    and talk about it, except they didn't invite all the other

9    people here, strategically.

10           You got to say there's two Avis here.  My wife will

11   say that's a problem I have; I got to reduce a little bit.  But

12   there's two Avis here.  And so I can ask questions about it,

13   even though it's not part of our case, just because they should

14   be put to the burden of proof.

15           So what did Omega do after May 19th?  Did they go to

16   the City of New York and ask them to go after counterfeiters?

17   No.

18           MR. NOYES:  Your Honor --

19           MR. SCHICK:  Did they write a letter to 375 Canal?

20           MR. NOYES:  Object, your Honor.  This is speculation.

21           THE COURT:  Overruled.

22           MR. SCHICK:  Did they write a letter to 375 Canal, as

23   they had a year earlier, asked them to take action to remove

24   the seller from the premises?  No.  Did they even try to find

25   out the name of the individuals who they say sold the watch?

1   You'll hear no.  They filed this lawsuit seeking $8 million, a

2   big payday and a windfall.

3          Now, the events relevant to this lawsuit happened a

4   long time ago.  The events happened in 2010, 2011, and '12.  I

5   don't know about you, but how much do people remember about

6   what happened in a few moments, over the course of a few

7   moments.  You walk in, you buy something, you see something

8   once, eight, nine, ten years ago.  Not easy to remember details

9   from that long ago.

10         Luckily we have reports from back then that will show

11  you what happened.  We have reports that establish that there

12  was no counterfeit Omega merchandise at 375 Canal in December

13  2010, all through 2011, and in February 2012.

14         But there are witnesses you will hear from and will

15  testify to one very important thing:  Mr. Noyes mentioned

16  Mr. Foster.  He's their star witness.  He's going to say, You

17  see?  It's counterfeit.

18         What Mr. Noyes didn't mention was that Mr. Foster

19  destroyed his notes about this case right before he was

20  supposed to answer questions under oath about it in August

21  2017.  That's right.  The only witness they say who is going to

22  swear that the watch they show you is the same watch that was

23  purchased in 2012, their expert, he had contemporaneous notes

24  and he destroyed them.

25         Now, ask yourselves a few questions.  I said

1    earlier -- and I'm trying to wind down.  I said earlier that

2    Omega waited five years to get the watch evaluated.  The watch,

3    they say, was sold on May 19th, 2012.  They will tell you,

4    Mr. Foster will say he didn't see the watch until August 2017,

5    more than five years.

6          Well, one question is why they sued first and

7    evaluated later.  But the more important question when we think

8    about Mr. Foster is what was he supposed to do when his bosses

9    came to him at Omega and said, Look at this watch.  This was

10   the watch.  That's the only evidence in an $8 million lawsuit

11   that they filed five years before.  They didn't ask him to

12   determine whether it was counterfeit, they asked him to testify

13   that it was counterfeit.

14         Now, ask yourself again why did Mr. Foster destroy his

15   notes about the watch in August 2017, right before he was going

16   to have to answer questions about it?  And who was Mr. Foster

17   with that morning when he destroyed the notes?  Mr. Paul, the

18   lawyer for Colin at the time -- I'm sorry, the lawyer for Omega

19   at the time, the architect of the setup and the shakedown.  So

20   we'll never know what was in those notes.  We'll never know

21   what Mr. Foster was actually told about the watch in 2017.

22   We'll never know what Omega told Mr. Foster he was supposed to

23   do or say with the watch because he destroyed his notes, notes

24   that he destroyed while standing with Mr. Paul.

25         Now, I already mentioned that Omega is seeking $8

1    million for the sale of that watch, a watch we didn't

2    distribute, a watch we didn't manufacture, and a watch we

3    didn't sell.  And they'll tell you, well, we should have known

4    what was happening; we should have known that there was going

5    to be counterfeiting activity there.  But think about it, Omega

6    sent teams of trained professional undercover investigators to

7    375 Canal Street on four different occasions in the 15 months

8    prior to May 19, 2012.  Each of those times the investigator

9    reported back that there was no counterfeit Omega merchandise

10   for sale at the store.  The investigator said there was no

11   counterfeit Omega merchandise.  What was the landlord to do?

12          THE COURT:  Mr. Schick, are you getting close to the

13   end?

14          MR. SCHICK:  Yes, I am, your Honor.  I actually was

15   just skipping over some things that I had covered before.

16          Now, I mentioned that Omega skipped over

17   manufacturing, distributor, seller, tenant, subtenant.  They

18   want straight to the landlord.  And they did that for probably

19   two reasons:  Maybe they think they get a big payday, and also

20   landlords are not that popular.

21          But that's one final thing that's very odd about this

22   case.  You see, landlords usually aren't popular because they

23   change neighborhoods.  They bring in outsiders, they drive out

24   locals, they bring in immigrants.  In this case the landlord,

25   375 Canal LLC, is being accused of being too nice a landlord,

1    too accommodating of locals, too welcoming of immigrants.  I

2    guess 375 Canal LLC can plead guilty to giving the local

3    shopkeeper a shot instead of bringing in one more Starbucks to

4    the neighborhood.  But that's not to be punished.

5            Landlords also get accused of taking improper steps to

6    drive out tenants, of implying all types of underhanded tricks

7    to get immigrants and others out of their spaces.  But in this

8    case, 375 Canal is accused of being too slow of its tenants, of

9    giving immigrants and local merchants a chance.

10           Now, I'm very proud to represent 375 Canal LLC, the

11   landlord.  As we said, it's a building that's owned by three

12   brothers.  It was originally owned by their dad.  One of the

13   three brothers, Jason Laboz, who's sitting at the end of the

14   table -- Mr. Laboz, you can rise.  One of the brothers is here

15   today.  And as you heard from Mr. Noyes, another brother,

16   Albert Laboz, you'll meet later this week.

17           But keep in mind, this is not a case with anyone named

18   Laboz.  There is no party to this case named Laboz.  Omega,

19   with its big team of lawyers, did not sue anybody named Laboz.

20   Omega sued 375 Canal LLC and only 375 Canal LLC.

21           And so as we get to the evidence, as we get to the

22   witnesses and we get to the documents, remember, Omega is going

23   to try to confuse you about what this case is about and who

24   it's about.  They'll confuse you by talking about entities that

25   are not 375 Canal LLC; they'll confuse you by talking about

J2PVOME3                    Opening - Mr. Schick

brands that are not Omega merchandise.  But Omega is only

entitled to seek damages for the sale of a single watch it

claims was sold on May 19th, 2012.

          In conclusion, as I said, keep in mind that we are the

only one here; that 375 Canal LLC, the landlord, is not accused

of selling any counterfeit Omega merchandise, not in 2012, not

ever.

          Remember, we don't have the burden of proof.  It's not

our job to prove that.  It's hard to prove the negative.  It's

hard to prove we never did.  It's their job to prove something

happened and that we are responsible for it.  Omega must prove

each and every element of its claim.  We don't have to prove

anything.

          So I ask you, I ask you this week to please listen

very closely to the witness, listen to everything that is said.

And more importantly, perhaps, listen closely to everything

that is not said.  Like that famous Sherlock Holmes story with

the dog that didn't bark, sometimes the things that you don't

hear are the most important of all.

          So please pay attention to what Omega says, and please

pay even closer attention to what Omega does not say.  What you

don't hear will be most important.

          Now, we don't have an army of lawyers on our side;

it's just me and Steve.  But what we do have is an army of

facts that are on our side.  What we do have is an army of

J2PVOME3

1    evidence that is on our side.  And what we do have is common

2    sense on our side.

3              And I'm confident that after you hear all the evidence

4    and after you listen to all the witnesses, we will have you,

5    the jury, on our side as well.

6              Thank you so much for listening this afternoon.  And I

7    look forward to spending the next few days together with you.

8              THE COURT:  Thank you, Mr. Schick.

9              Call your first witness.

10             MR. NOYES:  Yes, your Honor.

11             Before we call our first witness, we do have some

12   exhibits we would offer.  They are not objected to.

13             THE COURT:  Okay.

14             MR. NOYES:  Your Honor, we would offer Plaintiffs'

15   Exhibit 3, 4, 5 and 6.  Those are Omega's trademark

16   registrations.

17             THE COURT:  All right.

18             MR. NOYES:  We would offer Plaintiffs' Exhibit 87, 90,

19   137, 140, 147, 206, 227, 252, 253, 254, and 255.

20             THE COURT:  Any objection, Mr. Schick?

21             MR. SCHICK:  Mr. Della Fera is going to handle

22   Mr. Quinonez.

23             THE COURT:  Okay.  Mr. Della Fera.

24             MR. DELLA FERA:  No objection, your Honor.

25             I would just ask if counsel wouldn't mind repeating

J2PVOME3                          L. Quinonez - direct

1   them.  I lost track.

2            THE COURT:  3, 4, 5, 6, 87, 90, 137, 140, 147, 206,

3   227, 252, and 3, 254 and 255.

4            MR. DELLA FERA:  No objection, your Honor.

5            THE COURT:  They are received in evidence.

6            (Plaintiffs' Exhibits 3, 4, 5, 6, 87, 90, 137, 140,

7   147, 206, 227, 252, 253, 254, 255 received in evidence)

8            MR. NOYES:  Thank you, your Honor.

9            The plaintiffs call Ms. Leslie Quinonez.

10           THE COURT:  Is somebody going to get Ms. Quinonez?

11           MR. NOYES:  I think Mr. Gunther is getting

12   Ms. Quinonez.

13   LESLIE QUINONEZ,

14        called as a witness by the Plaintiffs,

15        having been duly sworn, testified as follows:

16           MR. NOYES:  May I proceed, your Honor?

17           THE COURT:  All right, Mr. Noyes.  Go ahead.

18   DIRECT EXAMINATION

19   BY MR. NOYES:

20   Q.  Good afternoon, Ms. Quinonez.

21   A.  Good afternoon.

22   Q.  Can you please introduce yourself to the jury.

23   A.  My name is Leslie Quinonez.

24   Q.  Where do you live?

25   A.  I currently live in Denver, Colorado.

J2PVOME3                          L. Quinonez - direct

1    Q.   How long have you lived in Denver, Colorado?

2    A.   It will be -- it's been about four years.

3    Q.   Before Denver, Colorado, where did you live?

4    A.   I lived in New York City, in Queens.

5    Q.   Where are you from originally?

6    A.   I was born and raised in Queens, New York.

7    Q.   What part of Queens?

8    A.   Woodhaven.

9    Q.   What do you do for a living, Ms. Quinonez?

10   A.   I'm teacher.

11   Q.   What type of teacher?

12   A.   So I'm currently an English language development teacher.

13   So kids can come from other countries and are learning English

14   in middle school, so sixth, seventh, and eighth graders all in

15   one room.  I teach them English.

16   Q.   How long have you been an English language development

17   teacher?

18   A.   Two years now.

19   Q.   How long have you been teaching?

20   A.   It's been about four years.  Before this I taught in fifth

21   and sixth grade, and I taught math, science, and social

22   studies.

23   Q.   Now, before you started living in Colorado, what did you do

24   for a living?

25   A.   Before I started living in Colorado, I was actually a

J2PVOME3                    L. Quinonez – direct

1   student here in New York.  And then I worked a little bit with

2   my father.

3   Q.  Okay.  We'll come to that in a moment.

4        But first, where did you attend college?

5   A.  I went to John Jay Community College, and then I

6   transferred to Queens College, and that's where I decided to

7   become a teacher.

8   Q.  What were you studying at John Jay?

9   A.  Criminal justice.

10  Q.  Did you obtain a degree?

11  A.  No, I did not.

12  Q.  From Queens College?

13  A.  From Queens College, yes, I did.

14  Q.  What is your degree in?

15  A.  Elementary education.

16  Q.  And other than your degree from Queens College, do you have

17  any other education or schooling that you have done?

18  A.  Yeah.  Right now I'm actually working towards my masters in

19  culturally and linguistically diverse education.

20  Q.  When do you anticipate to obtain your masters?

21  A.  May 18th.

22  Q.  Of this year?

23  A.  Of this year.

24  Q.  Now, you mentioned working with your father.  What type of

25  work did you do with your father?

1    A.  So my father works for the New York state government, and

2    he also has a private investigating company.  So I worked with

3    him.

4    Q.  When did you work with your father?

5    A.  In 2012.

6    Q.  What type of work did you do with him?

7    A.  I was a private investigator.

8    Q.  And how many times did you work with your father as a

9    private investigator?

10   A.  Two times.

11   Q.  And when did this happen?

12   A.  In 2012.

13   Q.  Now, when you worked on investigations with your father,

14   were you licensed as an investigator?

15   A.  Yes, I was.

16   Q.  And did you have any credentials showing that you were a

17   licensed private investigator?

18   A.  Yes, I had an identification card saying that I was a

19   private investigator through my father's company.

20   Q.  Now, did you receive any training before working on

21   investigations with your father?

22   A.  Growing up with my father, it was training every day.  He

23   has been in law enforcement for as long as I can remember, and

24   I received training with him on a daily basis just, you know,

25   learning people.  And he explained his job thoroughly to me,

J2PVOME3                      L. Quinonez - direct

1    and I feel like I got training in that way.  And then I got

2    some particular training for the actual private investigating

3    part.

4    Q.  And can you describe some of the training or techniques

5    that your father described to you about private investigation?

6    A.  Being very thorough in collecting data, knowing people,

7    knowing your goals, being discrete.  A lot of discretion if you

8    are studying people and you don't want them to know.  And

9    basically kind of always knowing your goals and what the

10   outcome should be.

11   Q.  Now, you mentioned you conducted investigations with your

12   father in 2012.  Do you remember the months that you did that?

13   A.  Yes.  It was in May.

14   Q.  Okay.  So let's focus on the May 2012 time.

15           How many investigations did you conduct in May of

16   2012?

17   A.  Just one.

18   Q.  And what was the goal of that investigation?

19   A.  The goal of that investigation was to purchase Omega

20   counterfeit watches in the Canal Street area.

21   Q.  What was your role in that investigation?

22   A.  My role was to document any purchases that we created and

23   actually purchase the watches.

24   Q.  Other than you, Ms. Quinonez, who took part in that May

25   2012 investigation?

1   A.  So other than myself, it was my father, William Quinonez,

2   Brad Cole, Rob Shea, and my partner Luigi Porco.

3   Q.  All right.  Now, starting with your father, what was your

4   father's role in the May 2012 investigation?

5   A.  My father was recording my purchases from different angles

6   and kind of being observant on what purchases I was making.

7   Q.  You mentioned someone named Brad Cole.  Who is Brad Cole?

8   A.  Brad Cole was the lead investigator on this case.  He's the

9   one that worked with Omega and got the request from Omega to

10  conduct this investigation.

11  Q.  What was Mr. Cole's role during that investigation?

12  A.  He led the investigation.  He told me basically what --

13  what was happening.  He also was documenting different views of

14  the investigation we were conducting.

15  Q.  You mentioned a gentleman by the name of Robert Shea.  What

16  was his role in the investigation?

17  A.  He was also observing us conduct the purchases and was

18  getting different viewpoints of the purchases we made.

19  Q.  You mentioned Luigi Porco as your partner.  What was

20  Mr. Porco's role in the investigation?

21  A.  Luigi Porco and I were the ones who were actually making

22  the purchases.  So he acted as my partner in the purchases.  So

23  we were playing kind of tourists buying watches together.

24  Q.  Do you recall the day that this investigation took place?

25  A.  May 19th of 2012.

J2PVOME3                    L. Quinonez - direct

1    Q.  Where specifically did it take place?

2    A.  This was in the Canal Street area of Manhattan.

3    Q.  Before you started the investigation on May 19, 2012, did

4    you talk to anyone about what was going to happen that day?

5    A.  Yes.  Brad Cole and my father and I met at a diner

6    beforehand where I was given the list of the locations we were

7    to visit, an overview of what we were going to do, and was

8    given some technology that I might use as an option to record

9    these transactions.

10   Q.  And did you record your investigation on Canal Street on

11   May 19th, 2012?

12   A.  Yes, I did.

13   Q.  How did you record your investigation?

14   A.  So originally Brad Cole had brought these glasses that were

15   supposed to record how we made the purchases.  They were very

16   goofy and kind of really apparent, so we decided not to use

17   them, and they weren't working very well.

18         So he had a tablet computer that he had as an option.

19   And I decided, Hey, why don't I just hold it while I make the

20   transactions.

21         And he was like, Do you think you can do that?

22         And I said, Yeah, I think I can hold it pretty

23   naturally and record it, just like if I was, you know, walking

24   around using it as like a way for me to get around or whatnot.

25   Q.  How old were you when you were conducting these

J2PVOME3                          L. Quinonez - direct

1   investigations?

2   A.   Twenty-two.

3   Q.   Now, do you recall what retail locations you visited during

4   your May 19th, 2012 investigation on Canal Street?

5   A.   Yes.

6   Q.   What locations did you visit?

7   A.   So I visited five locations on Canal Street.  375 Canal

8   Street is the one that I remember the most.

9   Q.   And why do you remember 375 Canal Street the most?

10  A.   Because that's the one I've been looking at the videos and

11  seeing the recording that I have from that day.

12  Q.   And in total, how many stores did you visit on May 19th,

13  2012?

14  A.   Seven stores.

15  Q.   And were you able to purchase watches with Omega

16  logos/trademarks on them that day?

17  A.   I was, six out of the seven locations.

18  Q.   Now, let's focus on your visit to 375 Canal Street.

19         Would you describe what happened during your

20  investigation at that location.

21  A.   Sure.

22         So we approached the store.  And there was a gentleman

23  standing in the storefront like right when we first entered.

24  And there were -- there was a watch display on the side of the

25  store, on the left side of the store.

J2PVOME3                          L. Quinonez - direct

1          And my partner and I proceeded to look at the watches

2    and see if there were any Omega watches on display.  We spoke a

3    little bit about which watches were nice or what they looked

4    like or which ones Luigi was actually looking for.

5          And then we started talking about 007 watches, James

6    Bond watches.  And the clerk kind of asked us, like, Oh, yeah,

7    and engaged in conversation with Luigi.  And he asked for Omega

8    or James Bond watches.

9          And then the clerk went to the back storage room,

10   brought back two watches for us to look at, both with the

11   trademark Omega on them.  And we looked at the watches and kind

12   of talked over which one we wanted, bargained a little bit with

13   the sales clerk, and then made the purchase.

14   Q.  And you mentioned you were discussing or asking for the

15   James Bond watch.  Why were you doing that?

16   A.  It was one of the Omega watches that was pretty popular at

17   this time.  So as soon as we mentioned that to a few store

18   clerks, they knew what we were talking about.

19   Q.  Now, were you able to purchase a watch at 375 Canal Street?

20   A.  Yes, I was.

21   Q.  And how much did you pay for that watch?

22   A.  $80.

23   Q.  And how was that watch packaged when you purchased it?

24   A.  It was in a Ziploc baggie.

25   Q.  After you purchased it, was it put in any other type of

1   packaging?

2   A.  It was.  It was put into a black plastic bag.

3   Q.  After you purchased the watch, what did you do with it?

4   A.  I had a backpack that I was carrying.  I had a Post-It that

5   I wrote "375" on, and then I put that inside the black bag, and

6   then put that inside my backpack.

7   Q.  And why did you write "375" on a Post-It note?

8   A.  It was really important to document which stores the

9   watches were purchased at, so that was why I wrote that on

10  there.

11  Q.  Now, Ms. Quinonez, you mentioned you took a video of the

12  investigation on May 19th, 2012.  Did you take a video at 375

13  Canal Street?

14  A.  Yes, I did.

15          MR. NOYES:  Your Honor, I'd like to show Ms. Quinonez

16  what we've marked as Plaintiffs' Exhibit 108A, which is her

17  video.

18          And Mr. Lam, only show Ms. Quinonez, and don't play

19  the volume please.  And Mr. Lam, can you please play her the

20  first 40 seconds of the video.

21          (Video played)

22  Q.  Ms. Quinonez, you've been shown the first 40 seconds of

23  Plaintiffs' Exhibit 108A.  Did you review this video in advance

24  of your testimony today?

25  A.  I'm sorry, I don't see anything on here.

J2PVOME3                          L. Quinonez - direct

1   Q.  Oh, you did not see that?

2   A.  I did not see it, no.

3          THE DEPUTY CLERK:  Play it again.

4          MR. NOYES:  So Mr. Lam, please play the first 40

5   seconds of Plaintiffs' Exhibit 108A for Ms. Quinonez.

6          And after it's done, Ms. Quinonez, I'll ask you a

7   question.

8          (Video played)

9   Q.  Ms. Quinonez, were you able to see the video this time?

10  A.  Yes.

11  Q.  Did you review this video in advance of your testimony

12  today?

13  A.  Yes.

14  Q.  What is that video?

15  A.  This is the video of the purchase I made at 375 Canal

16  Street.

17  Q.  When did you take that video?

18  A.  May 19, 2012.

19  Q.  How did you take that video?

20  A.  I had a tablet computer in my hand.

21  Q.  And where were you located when this video was taken?

22  A.  I was just inside the store of 375 Canal Street.

23  Q.  And we showed you the first 40 seconds, but can you

24  generally describe what the video shows?

25  A.  Sure.

1         You'll see me enter the store with my partner Porco.

2    And we'll look at the watches displayed there and engage with

3    the clerk.  He will bring out two watches from the back room,

4    which we will purchase one of those Omega watches at that

5    store.

6    Q.  Ms. Quinonez, does the video that we've marked as

7    Plaintiffs' Exhibit 108A accurately depict what you recorded at

8    375 Canal Street on May 19th, 2012?

9    A.  Yes.

10         MR. NOYES:  Your Honor, plaintiff offers Plaintiffs'

11   Exhibit 108A.

12         THE COURT:  Mr. Della Fera?

13         MR. DELLA FERA:  No objection, your Honor.

14         THE COURT:  108A is received in evidence.

15         (Plaintiffs' Exhibit 108A received in evidence)

16         MR. NOYES:  Thank you, your Honor.

17         permission to show the video to the jury.

18         THE COURT:  Yes.

19         MR. NOYES:  Thank you.

20   Q.  Okay.  Now, Ms. Quinonez, let's walk through the video you

21   took at 375 Canal Street.

22         MR. NOYES:  And Mr. Lam, start the video and play it

23   to the 11th second mark please.

24         (Video played)

25   Q.  Okay.  Ms. Quinonez we stopped it here.  Can you describe

J2PVOME3                           L. Quinonez - direct

1   what was happening in this portion of the video?

2   A.  Yes.  I was approaching 375 Canal.  And you see 373 Canal

3   Street right next door to it.

4   Q.  Okay.  And after you pass by 373 Canal Street --

5            THE DEPUTY CLERK:  Now it's on.

6            MR. NOYES:  Okay.  So Mr. Lam, can we play that again

7   from beginning and stop it at the 11-second mark.

8            (Video played)

9            MR. NOYES:  We went a little past 11 seconds.

10  Q.  But, Ms. Quinonez, can you tell us what happened in that

11  portion of the video?

12  A.  Yes.  You see 373 Canal Street as I'm walking towards 375

13  Canal Street.

14            MR. NOYES:  Now, Mr. Lam, please go back to the

15  14-second mark there.

16  Q.  Can you tell me what store is shown on the screen there,

17  Ms. Quinonez?

18  A.  Yes, that's 375 Canal Street.

19  Q.  Is that where you conducted your investigation on May 19th,

20  2012?

21  A.  Yes, it is.

22  Q.  Okay.

23            MR. NOYES:  Mr. Lam, can you please play the video to

24  the 38-second mark please.

25            (Video played)

J2PVOME3                        L. Quinonez - direct

1   Q.  Ms. Quinonez, what was happening in this portion of the

2   video?

3   A.  We were approaching 375 Canal Street and we entered the

4   storefront.

5   Q.  Now, on the screen there you see a gentleman there wearing

6   a hat and sunglasses?

7   A.  Yes.

8   Q.  Who was that individual?

9   A.  That is the store clerk that sold us the watch.

10  Q.  Now, on the video you could hear a woman's voice.  Did you

11  hear that?

12  A.  Yes.

13  Q.  Whose voice was that?

14  A.  Mine.

15          MR. NOYES:  Now, Mr. Lam, please play the video to the

16  four-minute-15-second mark.

17          (Video played)

18  Q.  Ms. Quinonez, can you describe what was happening in this

19  portion of the video?

20  A.  Yes.  My partner and I were looking at the watches on

21  display.  And he proceeded to ask the clerk if he had James

22  Bond Omega watches.  And the clerk is going to the back room to

23  retrieve them.

24  Q.  Did the clerk respond to your partner when he asked for an

25  Omega, for a James Bond watch?

J2PVOME3                            L. Quinonez – direct

1   A.  Yes.

2   Q.  What did he say?

3   A.  He said –– he said yes, and then he went to the back.

4   Q.  And the man holding the sunglasses in the video, who's

5   that?

6   A.  That is Luigi Porco, my partner.

7           MR. NOYES:  Your Honor, it's 2:30.  This may be a good

8   place to stop.

9           THE COURT:  All right.  We're going to break now.

10          We're going to resume tomorrow morning promptly at 9

11  o'clock.  Remember my instructions:  Don't talk about the case.

12  Keep open mind.

13          Safe home tonight.  See you tomorrow morning at 9

14  o'clock.  We'll have coffee and tea.

15          Thank you very much.

16          (Jury not present)

17          (witness not present)

18          THE COURT:  I have another matter, so I'm going to

19  need the courtroom.

20          MR. NOYES:  Thank you, your Honor.

21          THE COURT:  See you tomorrow at 9 o'clock.

22          (Adjourned to February 26, 2019 at 9 o'clock a.m.)

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

LESLIE QUINONEZ

Direct By Mr. Noyes  . . . . . . . . . . . . .92

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

3, 4, 5, 6, 87, 90, 137, 140, 147, 206, . . . .92
          227, 252, 253, 254, 255

108A    . . . . . . . . . . . . . . . . . . 103

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300