J2QVOME1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OMEGA SA, et al.,

                Plaintiffs,

         v.                          12 Civ. 6979 (PAC)

375 CANAL, LLC, et al.,

                Defendants.
                                     Trial
------------------------------x
                                     New York, N.Y.
                                     February 26, 2019
                                     9:00 a.m.

Before:

                    HON. PAUL A. CROTTY,

                                     District Judge
                                     -and a Jury-

                         APPEARANCES

WILMER CUTLER PICKERING HALE & DORR LLP
        Attorneys for Plaintiffs
BY:  ROBERT J. GUNTHER JR.
        ISLEY MARKMAN GOSTIN
        CHRISTOPHER R. NOYES

DENTONS U.S.LLP
        Attorneys for Defendants
BY:  STEPHEN G. DELLA FERA
        -and-
TROUTMAN SANDERS LLP
BY:  AVI SCHICK




Also Present:  Sarah Finkel, Paralegal
               Clinton Lam, Technician
```

```
 1                  (Trial resumed; jury not present)

 2                  MR. GUNTHER:  Your Honor, this relates to the letter

 3     that we sent to you last night, as well as, your Honor -- and I

 4     want to take two minutes to expand on that letter, if I can.

 5                  THE COURT:  Okay.

 6                  MR. GUNTHER:  And your Honor, it relates to statements

 7     that were made by Mr. Schick during the opening, specifically

 8     relating to Mr. Paul.

 9                  Now, your Honor, we had just had it out in front of

10     you before openings about whether or not Mr. Paul, they'd be

11     permitted to call him as a witness, and whether or not

12     misconduct of Mr. Paul, albeit in a slightly different context,

13     could be put in front of the jury.  So we have that discussion.

14                  You ruled that Mr. Paul's testimony is out, provided

15     we don't call him.  And then in their opening statement they

16     make the following statements regarding Mr. Paul.  And your

17     Honor, I'm going to put this up on the screen from yesterday's

18     transcript.  This is from page 80 of the transcript, starting

19     at line 15.

20                  Your Honor, so this is Mr. Schick, and he's talking to

21     the jury:

22                  "So you're asking yourself why are we here this week?

23     If Omega didn't follow up with the distributor, if Omega waited

24     almost a year to follow up with 375 Canal, why are they making

25     this a federal case?"
```

1          Then at line 21:  "Well, we'll tell you the answer to

2     that.  The answer is this whole case was a setup by a lawyer in

3     search of a payday.  We know that again because we have an

4     email."

5          And he goes on.

6          And then on page 81, starting at line 2, he said:

7     "And the email I'm talking about is again an email from Brad

8     Cole -- " I think he misspoke; it's actually from Joshua Paul.

9     " -- who you're going to hear from tomorrow.  It's an email

10    dated October 18, 2018 before anything happened here, before

11    even the December 2010 sale.  And Mr. Paul writes a letter, an

12    email to Mr. Cole, and he says, We would like to follow up with

13    the proposal -- "

14          THE COURT:  I think I have your point.

15          MR. GUNTHER:  Your Honor, I can go on about this, but,

16    your Honor, it's extraordinarily important.  Two things they

17    made very clear in their opening statement:

18          They don't want this to be a case about whether or not

19    counterfeiting activity occurred at 375 Canal, whether it was a

20    haven for counterfeiting activity, and whether we purchased a

21    watch.  What they want this to be about is stuff that you

22    already told them was out with respect to other claims.  They

23    want the case to be about that and they're talking about empty

24    witness chairs.

25          And then they go on and make statements about Mr. Paul

J2QVOME1

```
 1    impugning, his character, with no evidence, your Honor.  And
 2    even when you look at that email, Exhibit W that he couldn't
 3    get up on the screen, but he read parts of it to the jury, that
 4    email says nothing about going after landlords.  It talks about
 5    retail establishments.
 6                And so, your Honor, we think --
 7                THE COURT:  What do you want?
 8                MR. GUNTHER:  I want a curative instruction.  And I
 9    want a curative instruction that says the stuff about the other
10    parties, the retailers, etc., that's not part of this case.
11    Mr. Paul is not part of this case.
12                THE COURT:  Let me hear from Mr. Schick.
13                MR. SCHICK:  Thank you, your Honor.
14                I'll address what Mr. Gunther just raised first this
15    morning and not his midnight email, and then I'll go to the
16    midnight email.
17                With respect to Mr. Paul, we said nothing about
18    misconduct.  There is a document which is not objected to which
19    is an email between Mr. Paul and Mr. Cole that certainly goes
20    to the origins of this case.  Mr. Cole is going to be here.
21    It's an admitted document.  It's to be discussed.
22                We did not go anywhere near misconduct, your Honor.
23    In fact, they are the ones who went to misconduct because they
24    talk about all the inaccuracies in the Cole declaration.  They
25    brought it up, not us.  And presumably Mr. Cole, when they have
```

J2QVOME1

1    him on the stand today, will talk about how Mr. Paul drafted

2    that.  We're not going to be the ones to bring that up first,

3    they will.

4            So we didn't go anywhere near it.  The idea that we

5    can't talk about this case generally is just not right.  They

6    had the opportunities to object.  They objected; you overruled

7    on one or two of their objections during my opening statement

8    yesterday.

9            With respect to what they say in their midnight letter

10   was referenced to dismissed claims, that's absolutely false,

11   your Honor.  There is nothing in there about dismissed claims.

12   We made the point, the simple point, that they are not going to

13   have the jury hear from the people who are closest to what they

14   say are the events at issue here.  It's their right not to call

15   that people, your Honor.  They don't have to call that

16   people -- those people.

17           THE COURT:  Just so long as it's clear, Mr. Schick,

18   that to prove contributory infringement, there does not have to

19   be proof of direct infringement.  I may be wrong, but that's

20   what I've ruled.

21           MR. SCHICK:  Your Honor has the jury instructions.

22           THE COURT:  I'm going to instruct the jury at the end.

23           MR. SCHICK:  Yes, your Honor, we understand that.

24           THE COURT:  Okay.

25           MR. SCHICK:  We understand.

J2QVOME1

1          Just one final point.

2          It was plaintiffs who actually brought up the

3     dismissed claims.  Because in their opening yesterday, three

4     times they brought up Swatch claims.  The Swatch claims are

5     dismissed, so it would be prejudicial.

6          THE COURT:  All right.  I'm going to tell the jury as

7     a result of yesterday's opening statements, I want to remind

8     them that lawyers don't testify and the law will come from the

9     bench at the end of the trial.

10          We've had a complaint from a juror about the way she

11     was treated this morning in security.  I'm going to have a

12     sidebar conference with her.  I'd like a representative from

13     each firm, Mr. Gunther and Mr. Schick, to be present at the

14     sidebar.

15          You can bring it -- is it Juror No. 6?

16          THE DEPUTY CLERK:  I believe so, your Honor.

17          Just the one, Judge?

18          THE COURT:  Just No. 6.

19          (At sidebar)

20          (Juror No. 6 present)

21          THE COURT:  Hi.  Can you tell me what happened?

22          JUROR:  If I have to go through that type of security

23     every day, I can't come, because I feel it's really

24     disrespectful.  I'm very upset.

25          THE COURT:  Tell me what happened.

1          JUROR:  I had to actually take -- the zipper is

2     broken, so the whole thing doesn't come off.  The metal here on

3     the belt, the belt is attached, so I can't take the belt off,

4     so they made me take the whole thing off, and then, like, in

5     front of everybody.  And there's, like, all these people

6     around.  And I just felt that this is a real violation of my

7     privacy.

8          And here I am trying to serve my country and be of

9     service; and I'm not a criminal and I'm being treated like a

10    criminal.  And it's very plain to see that this is the only

11    metal that was setting anything off.

12         And I tried to say, Why can't you just scan it?  This

13    is the problem.  He's, Oh, just like -- they don't -- they

14    never made me get undressed at the airport and especially in

15    front of everyone.

16         THE COURT:  I'm very sorry.

17         JUROR:  I'm just a very private person, and I can't

18    come every day and be subjected to that.  And I was angry and I

19    was cursing because I feel violated.  I just -- I don't feel

20    like it's right to have anybody be subjected to that kind of

21    search.  We are jurors.  We're not criminals.

22         THE COURT:  You're performing a public service and one

23    that I said yesterday is very valuable.  So I apologize.  And

24    I'll inquire further and try to make sure this doesn't happen

25    again.  And I'd ask you to continue to serve.

1              JUROR:  Want me to stay?

2              THE COURT:  Yes, if you could.  If you're very, very

3    upset, I mean I'll respect your wishes.

4              JUROR:  I'll calm down.  But it's not just for me,

5    it's for --

6              THE COURT:  For everybody.

7              JUROR:  For everyone.  There's people coming in with

8    boots on and metal things and that's obvious.  But here we're

9    jurors, you know, we're not criminals.  We should be treated

10   with respect.  And that disrespect in taking our clothes off,

11   and this wouldn't have happened in another country, like women

12   are sacred.  I'm just really upset.  I'm sorry.

13             THE COURT:  I'd ask you to continue to serve.

14             JUROR:  Okay.

15             THE COURT:  We'll inquire further about this.  And

16   jurors ought to be treated with dignity and respect, and I'll

17   look into it right away.

18             MR. SCHICK:  I surely can't speak for what happened

19   downstairs, but if it is possible to get an apology, if one is

20   warranted, that might go a long way.

21             JUROR:  I got angry and was cursing myself.  They

22   don't need to apologize, I should apologize.  But I was very

23   upset.

24             MR. GUNTHER:  We appreciate your service.

25             THE COURT:  Thank you very much.

J2QVOME1

```
1              (Juror No. 6 not present)

2              MR. SCHICK:  Your Honor, should we give her a few

3    minutes, wait for her to calm down?  About ten minutes?  Just

4    because --

5              MR. GUNTHER:  Your Honor, it's up to you.  You do more

6    of these than I do.

7              THE COURT:  It's the first time I've heard this.

8              MR. GUNTHER:  That's a new one.

9              MR. SCHICK:  Give her five, ten minutes.

10             THE COURT:  All right.

11             Let me make a phone call to get to the bottom of this.

12             MR. GUNTHER:  Thank you.

13             THE COURT:  David, wait five minutes.

14             MR. GUNTHER:  Your Honor, can I just say one last

15   thing?  Can we have a ruling that no more "Mr. Paul payday"

16   stuff?  That's just outrageous, I think.

17             THE COURT:  Okay.

18             (In open court)

19             (Jury present)

20             THE COURT:  Good morning.

21             THE JURY:  Good morning.

22             THE COURT:  Thank you for being on time.

23             Please be seated.

24             Before we start this morning, I want to remind you

25   what I said to you yesterday in my preliminary instructions
```

J2QVOME1                        L. Quinonez - direct

1     about the opening statements.  Those opening statements are by

2     the lawyers, but they are not evidence.  And if they misstate

3     the facts or the law, you will find out about the misstatements

4     of fact.  As to the law, I will instruct you and give you final

5     instructions.  And that's what's binding on you, not the

6     lawyers' interpretation of the law, but the legal instructions

7     that I give to you.

8                Okay.  Go ahead.

9                MR. NOYES:  May I proceed?

10               THE COURT:  Ms. Quinonez, I want to remind you that

11    you are still under oath.

12               Go ahead.

13    LESLIE QUINONEZ, resumed.

14    DIRECT EXAMINATION (continued)

15    BY MR. NOYES:

16    Q.  Good morning, Ms. Quinonez.

17    A.  Good morning.

18    Q.  Yesterday you were testifying about a video that you took

19    at 375 Canal Street, do you recall that?

20    A.  Yes.

21    Q.  Now, before we go back to where we left off in the video,

22    during the video we reviewed at some points your notice it was

23    shaky or you were looking at people's belts or waistlines.

24    A.  Yes.

25    Q.  Now, can you explain why that's the case?

J2QVOME1                           L. Quinonez - direct

1   A.   Yes.  I was holding the tablet in a discrete way.  So it

2   was kind of -- I don't know, can I just show you guys?

3            THE COURT:  Yes.

4   Q.   Why don't you stand up and show everyone.

5   A.   So the way I was holding the tablet was kind of here, waist

6   level, so no one could see.  It was discrete.  I didn't want

7   anyone to know I was recording.  So it was like this.  So

8   that's why sometimes you'll see shots of the floor, you'll see

9   the waistline, because it was at my waistline, so that's where

10  I was holding the tablet, kind of like this, like if I was

11  holding a pocketbook or something.

12  Q.   Thank you, Ms. Quinonez.

13            Now, during the investigation on May 19, 2012, did

14  anyone ask you whether you were recording?

15  A.   Not that I recall.

16  Q.   Okay.  So let's go back to the video, which is PX 108A in

17  evidence.  And you left off, I believe, at 4:15, four minutes

18  15 seconds.  And just to remind where we left off, up until

19  this point, what is happening in the investigation?

20  A.   Up until this point, my partner and I have approached the

21  store, we entered the store, we engaged with the clerk, we

22  looked at the watch stand.  My partner, Porco, asked the clerk

23  if he had Omega James Bond watches, and the clerk has proceeded

24  to enter into the back holding room to retrieve those watches.

25            MR. NOYES:  I just want to make sure that the jury --

1    that they can see the video on the screen?

2             THE JURY:  Yes.

3             MR. NOYES:  Okay.  Thank you.

4             So Mr. Lam, will you please play the video to the

5    four-minute-31-second mark.

6             (Video played)

7    Q.  Okay.  Now, Ms. Quinonez, what are you doing at this

8    portion of the video?

9    A.  The gentleman has gone to the back of the store; so I kind

10   of wander towards the back as well.  And you can see that there

11   is another gentleman sitting there, but the one we were

12   engaging with has entered into a kind of back storage room.

13            MR. NOYES:  Mr. Lam, can you put a circle around that

14   middle right-hand portion of the screen.

15   Q.  Ms. Quinonez, can you identify what's been circled on the

16   video?

17   A.  That's the entryway to that back storage room.

18   Q.  Did you see the clerk that you were interacting with enter

19   that room?

20   A.  Yes, I did.

21   Q.  Okay.  Now, did you see the clerk that you were interacting

22   with come out of that room?

23   A.  Yes, I did.

24            MR. NOYES:  Mr. Lam, will you play the video to the

25   four-minute-55-second mark please.

1              (Video played)

2     Q.   Ms. Quinonez, what happened in that part of the video?

3     A.   The clerk returned with two watches in a plastic baggie.

4     Q.   In the video you see a person holding something in their

5     hands.  What is that?

6     A.   That is a -- it's branded "Omega watch."

7     Q.   And you said there were two plastic bags or two watches

8     that the clerk brought.  Can you identify those on the screen?

9     A.   Yes, I can.

10    Q.   Where are they?

11    A.   They are right in the center of the screen.  Now, my

12    partner is actually holding one of the watches and looking at

13    them.

14    Q.   And where is the other one?

15    A.   The other one is resting on those T-shirts.

16              MR. NOYES:  Mr. Lam, will you play the video to the

17    five-minute-11-second mark please.

18              (Video played)

19    Q.   What was happening in this portion of the video,

20    Ms. Quinonez?

21    A.   My partner and I were discussing which watch he should buy.

22    We were mentioning like, Oh, you have one.  And then you see

23    that watch that he's holding right now that's in a Ziploc bag,

24    that's the watch that we ended up purchasing.

25              MR. NOYES:  Mr. Lam, please play the video to the

J2QVOME1                            L. Quinonez - direct

1   six-minute-15-second mark.

2                   (Video played)

3   Q.  Ms. Quinonez, can you tell us what was happening during

4   that portion of the video?

5   A.  My partner was trying on the watch that we purchased.  He's

6   looking at it.  We're kind of thinking about whether we should

7   buy it or not.

8   Q.  And then the watch in the middle of the screen, what watch

9   is that?

10  A.  That's the watch that we ended up purchasing at 375 Canal

11  Street.

12  Q.  And how do you know that that was the watch that you

13  purchased at 375 Canal Street?

14  A.  I see it.  I recognize it.  I see the silver and the blue

15  stickers, and the rim that's also in the silver face.

16  Q.  What do you mean the rim that's also --

17  A.  If you look at the rim on, like, the face of the watch,

18  it's the only watch that was silver without any markings on the

19  side of it, number marks.

20  Q.  What do you mean it's the only watch without number

21  markings on it?

22  A.  So we purchased a total of six watches that day.  All the

23  other five watches had numbers on that outside rim of the

24  watch.  This is the only one that is just a plain silver rim.

25                   MR. NOYES:  Mr. Lam, can you please play the video to

J2QVOME1                         L. Quinonez – direct

1    the seven-minute-29-second mark.

2                  (Video played)

3    Q.  Ms. Quinonez, can you describe what happened during that

4    segment of the video?

5    A.  My partner and I were bargaining with the clerk to see how

6    much we could pay for the watch.  And then we are looking at

7    the other counterfeit Omega watch that he brought out from the

8    back room as well.

9    Q.  Now, there is a watch on the screen that we paused from

10   PX 108A.  Is that a watch that you purchased?

11   A.  It is not the watch that I purchased.

12   Q.  Why did you believe that that watch was a counterfeit Omega

13   watch?

14   A.  Well, it was -- the brand there is marked "Omega," and it

15   was brought out in a plastic bag from a back room.  In the

16   context we were in, I assumed it was a counterfeit watch.

17   Q.  Where do you see the Omega mark on that watch?

18   A.  On the top part of the watch where the 12 should be.

19                  MR. NOYES:  Mr. Lam, could you play the video to the

20   seven-minute-56-second mark please.

21                  (Video played)

22   Q.  Ms. Quinonez, in the right -- in the gentleman's hand, he's

23   holding something.  What is that?

24   A.  It's a small Ziploc bag.

25   Q.  And what was that bag used for?

1  A.   That's the watch that he brought.  That's the bag that he

2  brought the watch out in.  And that's the bag that we actually

3  purchased the watch in.

4           MR. NOYES:  Mr. Lam, can you play the video to the

5  eight-minute-24-second mark.

6           (Video played)

7  Q.   Can you describe for us what was happening here during the

8  segment of the video?

9  A.   During the segment of the video is when I actually

10 purchased the watch; took out the money, counted it, and then

11 we handed it over to the clerk.  And you can see he seems very

12 excited to be completing this purchase.

13 Q.   There's something back in the left-hand side of the video.

14 Do you see that?

15 A.   Yes.

16 Q.   What is that?

17 A.   That is the black plastic bag that the clerk sold us the

18 watch in.  He put the watch that was in the Ziploc bag inside

19 that black bag.

20           MR. NOYES:  Now, Mr. Lam, can you play the video to

21 the eight-minute-42-second mark.

22           (Video played)

23 Q.   What happened during this portion of the video?

24 A.   The clerk proceeded to try to sell me some additional

25 counterfeit watches of other brands:  Michael Kors, Bulgari.

1          MR. NOYES:  Now, let's play the video to the

2     nine-minute-11-second mark please.

3          (Video played)

4     Q.  Now, Ms. Quinonez, what is happening at this part of the

5     investigation?

6     A.  You see in the lower left part of the screen, that's my

7     backpack that I was carrying that day.  And I'm proceeding to

8     label the watch that we just purchased in a black plastic bag.

9     Q.  Now, there's something yellow in your hand; is that right?

10    A.  Yes.

11    Q.  And what is that?

12    A.  That's a Post-It that I was labeling all of the purchases

13    we made according to the locations of the stores.

14    Q.  And what did you write on that Post-It?

15    A.  375 and the number 4.

16    Q.  Why did you write 375 and the number 4 on that Post-It?

17    A.  Number 4 because it was the fourth store that we had

18    visited that day; and 375 because it was 375 Canal Street.

19    Q.  And why were you writing -- why were you using a Post-It

20    note to identify where you had been?

21    A.  It was really important that we accurately labeled all the

22    purchases we made on that day and kept track of that.

23    Q.  Now, did you put the Post-It note in the black plastic bag?

24    A.  Yes, I did.

25    Q.  And after you did that, what did you do with the black

1  plastic bag?

2  A.  Then I closed it back up and I left it inside my backpack

3  until the end of the day.

4          MR. NOYES:  Now, let's play the video till the end,

5  please.

6          (Video played)

7  Q.  Okay.  Ms. Quinonez, now, after the events ended as we saw

8  on the video, what did you do with the watch that you purchased

9  at 375 Canal Street?

10  A.  After the events in the video, I gave all the watches to

11  Brad Cole.

12  Q.  And again, who is Mr. Cole?

13  A.  Mr. Cole is the head of the investigation; he was the lead

14  investigator in this case.

15  Q.  Okay.  And after the investigation that you conducted on

16  Canal Street, what did you do with the tablet that you used to

17  record the investigations?

18  A.  I also gave that to Brad Cole.

19  Q.  Now, after the investigation ended, did you do anything

20  else to record what you had done that day on Canal Street?

21  A.  Yes, I did.  I wrote an email.

22  Q.  And why did you write an email?

23  A.  Brad Cole asked me to summarize the purchases that we made

24  on that day.

25  Q.  Okay.

J2QVOME1                          L. Quinonez – direct

1                MR. NOYES:  Your Honor, I conferred with defense

2        counsel, and we agreed we could show this to the jury.

3                MR. DELLA FERA:  That's right, your Honor.

4                THE COURT:  It's in evidence?

5                MR. NOYES:  I haven't offered it, but I will.

6                THE COURT:  Okay.  You should do that.

7                MR. NOYES:  I offer Plaintiffs' 246, your Honor.

8                THE COURT:  Any objection?

9                MR. DELLA FERA:  No objection, your Honor.

10               THE COURT:  246 in evidence.

11               (Plaintiffs' Exhibit 246 received in evidence)

12               MR. NOYES:  Can you please put that up on the screen.

13       BY MR. NOYES:

14       Q.  Ms. Quinonez, in front of you on the screen is Plaintiffs'

15       Exhibit 246.  Do you recognize that email?

16       A.  Yes, I do.

17       Q.  And what is that?

18       A.  This is the email I wrote to Brad Cole on May 20, 2012.

19       Q.  Okay.  Now, in that email, how many locations do you

20       identify?

21       A.  I identify six locations.

22       Q.  And why did you identify six locations?

23       A.  These were the six locations that we completed purchases on

24       that day.

25       Q.  Okay.  Now, let's highlight 375 Canal Street.

1          Now, in that you write, "I purchased a counterfeit

2     Omega watch."  Do you see that?

3     A.  Yes.

4     Q.  And at the time did you believe the watch you purchased was

5     counterfeit?

6     A.  Yes, I did.

7     Q.  Why did you believe that?

8     A.  Because I purchased it on Canal Street, and it was $80.

9     And I know that an Omega watch is probably about -- in the

10    thousands.  And I also purchased it on Canal Street.  And

11    growing up in New York City, I know that Canal Street is known

12    for selling counterfeit items.  So I pretty much knew it was a

13    counterfeit Omega watch.

14    Q.  After you gave the watch that you purchased at 375 Canal

15    Street to Mr. Cole, were you ever asked to determine whether

16    the watch was counterfeit?

17    A.  No.

18          MR. NOYES:  We can take that down.

19    Q.  Now, Ms. Quinonez, do you have a binder of documents on the

20    witness stand?  Can you take that?

21    A.  Yes.

22    Q.  And I want to show you an exhibit, Plaintiffs' Exhibit 104.

23          Do you have that?

24    A.  Yes, I do.

25    Q.  This is a photograph.

J2QVOME1                         L. Quinonez - direct

1              Can you describe what's shown in the photograph?

2    A.  Yes.

3              MR. DELLA FERA:  Objection, your Honor.

4              The photograph is not in evidence yet.

5              MR. NOYES:  I'm laying a foundation to offer it in

6    evidence, your Honor.

7              THE COURT:  Don't show the picture until it's in

8    evidence.

9              MR. NOYES:  I'm not showing the picture.

10             THE COURT:  I thought it was on the screen.

11             MR. DELLA FERA:  It's not on the screen, but the

12   witness is about to testify what is in the picture.

13             THE COURT:  It's not in evidence, so go ahead, ask the

14   question.

15   BY MR. NOYES:

16   Q.  Do you recognize this photo, Ms. Quinonez?

17   A.  Yes, I do.

18   Q.  Do you recognize the items in this photo?

19   A.  Yes, I do.

20   Q.  And what are the items in this photo?

21             MR. DELLA FERA:  Objection, your Honor.

22             Again, it's testifying.

23             THE COURT:  Overruled.  Overruled.

24             THE WITNESS:  Should I answer the question?

25             THE COURT:  Yes, you should answer the question.

J2QVOME1                          L. Quinonez - direct

1              THE WITNESS:  Thank you, your Honor.

2    A.   Here is pictured the watch that I purchased at 375 Canal

3    Street, the Post-It note with the number "4" and "375" written

4    on it, the Ziploc baggie that the clerk brought the watch out

5    to us in, and the black plastic bag that I purchased this item

6    in.

7    Q.   And how do you recognize those items, Ms. Quinonez?

8    A.   I recognize them -- there's the blue stickers on this

9    watch.  I recognize my handwriting on the Post-It.  In the

10   video you clearly see this watch, the Ziploc bag, the black

11   plastic bag.

12             MR. NOYES:  Your Honor, plaintiffs offer Plaintiffs'

13   Exhibit 104.

14             MR. DELLA FERA:  Objection, your Honor.

15             If I may have brief voir dire?

16             THE COURT:  Yes.

17   VOIR DIRE EXAMINATION

18   BY MR. DELLA FERA:

19   Q.   Ms. Quinonez, is there a date on this photograph?

20   A.   You're asking me, sir?

21   Q.   Yes.

22   A.   There is no date on this photograph.

23   Q.   Did you take this photograph?

24   A.   I did not.

25             MR. DELLA FERA:  Your Honor, there's no foundation for

J2QVOME1                          L. Quinonez - direct

1    the witness having taken --

2                THE COURT:  The objection is overruled.

3                MR. NOYES:  Thank you, your Honor.

4                THE COURT:  104 is in evidence.

5                (Plaintiffs' Exhibit 104 received in evidence)

6                MR. NOYES:  Let's put Plaintiffs' Exhibit 104 on the

7    screen.

8    BY MR. NOYES:

9    Q.  And again, in Plaintiffs' Exhibit 104, Ms. Quinonez,

10   there's a yellow Post-It note, do you see that?

11   A.  Yes, I do.

12   Q.  And do you recognize the handwriting on that note?

13   A.  I do.

14   Q.  And whose handwriting is that?

15   A.  That's my handwriting.

16   Q.  And you mentioned a black plastic bag.

17   A.  Correct.

18   Q.  Where is that represented in the photo?

19   A.  It's the backdrop of the photo.  It's the watch, the little

20   plastic baggie in a Ziploc on top of the black plastic bag.

21   Q.  The Ziploc bag, how do you recognize that?

22   A.  That's the Ziploc bag that the clerk brought the watch out

23   in and it was in the video.

24   Q.  And how do you recognize the watch in the picture as the

25   one that you purchased at 375 Canal Street on May 19, 2012?

1   A.  As we saw in the video, it has those blue stickers on it.

2   The rim is silver, the face is silver, and the rim does not

3   have any markings on it, so I recognize it from the video.

4           MR. NOYES:  Your Honor, permission to approach the

5   witness.

6           THE COURT:  Yes.

7   Q.  Ms. Quinonez, I've handed you what's been marked as

8   Plaintiffs' Exhibit 100.

9           Do you recognize the items in Plaintiffs' Exhibit 100?

10  A.  Yes, I do.

11  Q.  And what are those items?

12  A.  Inside this Ziploc bag is the Post-It with my handwriting

13  on it, 375, the number 4, the little Ziploc bag with the red

14  line in it that I purchased the watch in, and the actual watch

15  with the blue stickers on it and silver face.

16  Q.  And how do you recognize that watch in Plaintiffs' Exhibit

17  100 as the watch you purchased at 375 Canal Street on May 19th,

18  2012?

19  A.  As seen in the video, it's that same watch.  As I said, the

20  blue stickers, the silver face.

21          MR. NOYES:  Your Honor, plaintiffs offer Plaintiffs'

22  Exhibit 100.

23          THE COURT:  Any objection?

24          MR. DELLA FERA:  Your Honor, there's -- no objection,

25  your Honor.

1          THE COURT:  100 is in evidence.

2          (Plaintiffs' Exhibit 100 received in evidence)

3          MR. NOYES:  Thank you, your Honor.

4   Q.  Ms. Quinonez, can you take the watch out of the bag that

5   it's in, Exhibit 100.  Can you show it to the jury please.

6          Can you take the sticky note that's in Plaintiffs'

7   Exhibit 100 and can you show it to the jury please.

8          And finally, can you take the Ziploc bag that is in

9   Plaintiffs' Exhibit 100, can you show it to the jury.

10          Thank you.

11          MR. NOYES:  Your Honor, permission to approach.

12          THE COURT:  Yes.

13          MR. NOYES:  Your Honor, may I pass the watch to the

14   jury for inspection?

15          THE COURT:  Yes, you may.  Put it back in the bag.

16   Q.  Ms. Quinonez, why don't you put everything back in the bag.

17   A.  Okay.

18          THE COURT:  Okay, Mr. Noyes.

19   BY MR. NOYES:

20   Q.  Final topic, Ms. Quinonez.

21          With respect to your investigation -- withdrawn.

22          With respect to the visit to 375 Canal Street on May

23   19, 2012, did you receive a bonus or any additional

24   compensation for a successful watch purchase that day?

25   A.  No, I did not.

1    Q.  And are you receiving any compensation for appearing -- for

2    your time appearing here in court today and yesterday?

3    A.  Just my expenses are being covered.  And I missed two days

4    of work, so I'm being reimbursed for those two days of work.

5    Q.  And are you entitled to a bonus or additional compensation

6    based on the outcome of this case?

7    A.  No, I am not.

8    Q.  Now, before today and yesterday, had you testified in court

9    before?

10   A.  No, this is my first time.

11   Q.  When did you travel from Colorado to New York to testify in

12   court?

13   A.  I started my journey Friday night and did not get here till

14   Saturday morning.

15   Q.  Why did it take so long?

16   A.  There was a random snowstorm in Colorado, so it turned out

17   to be a ten-hour trip.

18   Q.  Why did you agree to travel from Colorado to testify?

19            MR. DELLA FERA:  Objection, your Honor.

20            This is bordering on relevance.

21            THE COURT:  Sustained.

22            MR. NOYES:  No further questions, your Honor.

23            THE COURT:  Mr. Schick or Mr. Della Fera.

24            MR. SCHICK:  Mr. Della Fera.

25            THE COURT:  Mr. Della Fera.

J2QVOME1                        L. Quinonez – cross

1           MR. NOYES:  Your Honor, may I obtain Exhibit 100 from

2      the jury?

3           THE COURT:  Yes.

4           MR. DELLA FERA:  Your Honor, may I approach the

5      witness?

6           THE COURT:  Yes, you may.

7      CROSS-EXAMINATION

8      BY MR. DELLA FERA:

9      Q.  Ms. Quinonez, I just handed you a binder of documents I'll

10     be asking you about.

11          THE COURT:  Do you have a copy for the Court,

12     Mr. Della Fera?

13          MR. DELLA FERA:  Your Honor, these are all exhibits in

14     the larger binder that we provided.  It would be cumbersome for

15     the witness to have it.

16          THE COURT:  Okay.  Go ahead.  I don't want to stop.

17          MR. DELLA FERA:  Thank you, your Honor.

18     Q.  Good morning, Ms. Quinonez.

19     A.  Good morning.

20     Q.  You've testified that you went on an investigation of 375

21     Canal Street on May 19th, 2012; correct?

22     A.  Correct.

23     Q.  And that was the first and only investigation of 375 Canal

24     Street that you went on?

25     A.  Correct.

J2QVOME1                    L. Quinonez - cross

1    Q.  Do you know whether or not your father has previously gone

2    on an investigation into 375 Canal Street before your May 19th,

3    2012 investigation?

4    A.  I'm sorry, can you repeat the question?

5    Q.  Yes.  I'm sorry.

6           Do you know whether or not your father had, before May

7    19th, 2012, gone on an investigation into 375 Canal Street?

8    A.  Before this, I did not.  I saw an email about -- about

9    that, but that's all I know.

10   Q.  But you don't personally know whether or not your father

11   went previously or not?

12   A.  Correct.

13   Q.  And do you personally know whether or not Brad Cole had

14   gone to 375 Canal Street before May 19, 2012?

15   A.  I do not.

16   Q.  And you don't know whether or not they purchased a watch at

17   any of those businesses?

18   A.  Right.  I do not.

19   Q.  Ms. Quinonez, you said you arrived here Saturday morning;

20   is that right?

21   A.  Correct.

22   Q.  And prior to your testimony yesterday and today, did you

23   meet with Mr. Noyes or any of his colleagues at Wilmer Hale?

24   A.  Yes, I did.

25   Q.  And what day did you meet with them?

1   A.  Saturday and Sunday.

2   Q.  Both days?

3   A.  Yes.

4   Q.  And you met with them -- I'm sorry, I cut you off.

5   A.  Yes, I did meet with them.

6   Q.  And did you meet with them yesterday as well?

7   A.  Correct.

8   Q.  And how many hours did you meet with them on Saturday?

9   A.  Maybe three.

10  Q.  How many hours on Sunday?

11  A.  Possibly around the same.

12  Q.  And prior to your testimony yesterday, how many hours did

13  you meet with them?

14  A.  Chris came out to Denver one day to meet me, and maybe like

15  an hour or two.

16  Q.  So Mr. Noyes flew to Denver to meet with you?

17  A.  Correct.

18  Q.  Do you remember what month that was?

19  A.  No, I do not.

20  Q.  Ms. Quinonez, when you met with Mr. Noyes and his

21  colleagues at Wilmer Hale, was there anyone else present who

22  was not an attorney, a paralegal, or other employee of Wilmer

23  Hale?  If you know.

24  A.  No, I'm not sure.

25  Q.  And so we just watched a video of you doing an

1    investigation of 375 Canal Street; correct?

2    A.   Yes.

3    Q.   And in that video you spent approximately nine, ten minutes

4    going into -- spending some time in the store and walking out

5    of 375 Canal Street?

6    A.   Correct.

7    Q.   And then you met with Mr. Noyes and his colleagues for

8    three hours on Saturday, three hours on Sunday, and previously

9    one to two hours in Denver to prepare for your testimony about

10   those ten minutes?

11   A.   Correct.

12   Q.   And again, you testified you purchased a watch at the

13   storefront located at 375 Canal Street on May 19, 2012;

14   correct?

15   A.   Yes.

16   Q.   Are you aware that prior to this trial, Bradford Cole had

17   sworn under penalty of perjury that he was the person that

18   purchased that watch?

19   A.   I was unaware.

20   Q.   You did not know that?

21   A.   I did not know that.

22   Q.   Ms. Quinonez, during your testimony yesterday and today,

23   you testified about, I believe, five individuals who went on

24   the investigation of 375 Canal Street; is that correct?

25   A.   I just want to make sure it's five.

1              Including myself, correct.

2   Q.   Including yourself?

3   A.   Yes.

4   Q.   It was yourself; correct?

5   A.   Yes.

6   Q.   It was your father, William Quinonez?

7   A.   Yes.

8   Q.   It was Brad Cole?

9   A.   Correct.

10   Q.   And then a man named Luigi Porco?

11   A.   Yes.

12   Q.   And another man named, I believe, Robert Shea?

13   A.   Correct.

14   Q.   Ms. Quinonez, isn't it true that you previously submitted a

15   sworn declaration in this case?

16   A.   Can you clarify "sworn declaration"?

17   Q.   Yes.

18              Prior to Wilmer Hale being counsel, you worked with

19   Omega's former counsel and completed a document that you signed

20   your signature to; is that right?

21   A.   Yes.

22   Q.   Okay.

23              And that document was submitted under penal of

24   perjury?

25              MR. NOYES:  Objection, your Honor.

J2QVOME1                          L. Quinonez - cross

 1              Misstates the evidence.

 2              THE COURT:  Overruled.

 3   Q.  Ms. Quinonez, I'd like you to turn in your binder to the

 4   exhibit that's marked as DX UUU, that's Defense Exhibit UUU.

 5              THE COURT:  Three U's?  Mr. Della Fera, three U's?

 6              MR. DELLA FERA:  Three U's, yes, your Honor.  I

 7   believe it may be the final document.

 8   Q.  Ms. Quinonez, do you have Defense Exhibit UUU in front of

 9   you?

10   A.  Yes.

11   Q.  And do you recognize Defense Exhibit UUU?

12   A.  Yes.  Can I have a second to look that over?

13   Q.  Absolutely.  Take your time.

14   A.  Thank you.

15              (Pause)

16              THE COURT:  What's the question?

17              MR. DELLA FERA:  The witness is still looking.

18              THE COURT:  What's the question?

19   Q.  Do you recognize Defense Exhibit UUU, Ms. Quinonez?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's titled "Declaration of Leslie Quinonez."

23   Q.  And if you turn to page 2 of Defense Exhibit UUU, that's

24   your significant on the bottom of page 2?

25   A.  Correct.

1   Q.  You signed this on September 6, 2017; is that right?

2   A.  Yes.

3   Q.  Again, this is a declaration that you submitted in this

4   case?

5   A.  Yes.

6           MR. DELLA FERA:  Your Honor, I would offer Defense

7   Exhibit UUU into evidence.

8           MR. NOYES:  No objection.

9           THE COURT:  Defendant's UUU is in evidence.

10          (Defendant's Exhibit UUU received in evidence)

11          MR. DELLA FERA:  Sarah, can we publish that to the

12  jury please.

13  Q.  Ms. Quinonez, I'd like to direct you to paragraph 4 of

14  Defense Exhibit UUU.

15          Are you there?

16  A.  Yes.

17  Q.  I'm going to read paragraph 4 into the record.

18          And you wrote in paragraph 4, and I quote:  "On the

19  morning of May 19, 2012, my father and I met Brad Cole at a

20  diner.  To my knowledge, Mr. Cole has a private investigations

21  company and sometimes works with my father.  I was told that

22  our goal was to visit a specific list of stores along Canal

23  Street and try to purchase a counterfeit Omega watch from each

24  store."

25          Did I read that correctly?

J2QVOME1                          L. Quinonez - cross

1    A.  Yes.

2    Q.  And so you met with your father and Brad Cole on the

3    morning of May 19, 2012; correct?

4    A.  Yes.

5    Q.  And that was in preparation for your investigation of 375

6    Canal Street?

7    A.  Yes.

8    Q.  And other locations?

9    A.  Yes.

10   Q.  I'd like to have you turn to page 2.

11           MR. DELLA FERA:  Sarah if you could turn to page 2 as

12   well.

13   Q.  I direct you to paragraph 5 of this declaration, Defense

14   Exhibit UUU.  I'm going to read this to you.  Please tell me if

15   I read it incorrectly.

16           You wrote in paragraph 5, and I quote:  "After we left

17   the diner, we ultimately were joined by a fourth person who I

18   believe was an acquaintance of Brad Cole.  I do not remember

19   his name and will refer to him as my partner."

20           Did I read that correctly?

21   A.  Yes.

22   Q.  And then if you go down to paragraph 6, I'll read that into

23   the record as well; tell me if I read it incorrectly.

24           You wrote, and I quote:  "The four of us, Brad Cole,

25   my father, William Quinonez, my partner and I, handled each of

1  the buys the same way.  My partner and I walked into a store on

2  our list and began to talk with the clerk.  My father and Brad

3  Cole would stay outside the store watching.  We went to each of

4  the stores as a group, all four of us together."

5          Did I read that correctly?

6  A.  Yes.

7  Q.  So Ms. Quinonez, in this declaration, you stated that you

8  did not remember your partner's name; isn't that right?

9  A.  Yes.

10 Q.  And yesterday and today you identified him quite

11 confidently as Luigi Porco; isn't that right?

12 A.  Yes.

13 Q.  And you did so after having met with Mr. Noyes and his

14 colleagues for three hours on Saturday; correct?

15 A.  Mm-hmm.

16 Q.  And three hours on Sunday?

17 A.  About, yes.

18 Q.  And one or two hours previously?

19 A.  Mm-hmm.

20          THE COURT:  "Mm-hmm" is yes?

21          THE WITNESS:  Yes.  Sorry.

22 Q.  And did you meet with Mr. Noyes or his colleagues at all

23 between the end of your testimony yesterday and your testimony

24 today?

25 A.  Yes.

J2QVOME1                         L. Quinonez – cross

1   Q.  How long did you meet for?

2   A.  Maybe 40 minutes.

3   Q.  Thank you, Ms. Quinonez.

4           And then if we go back and look at paragraph 6, you

5   wrote:  "The four of us handled each of the buys."

6           Is that right?

7   A.  Yes.

8   Q.  There's no mention of a man named Robert Shea?

9   A.  Yes.  Can I explain why?

10          THE COURT:  No.

11  Q.  I'll ask the questions, Ms. Quinonez.

12          And again, nowhere in this entire declaration is

13  mention of a man named Robert Shea; is that correct?

14  A.  Yes.

15  Q.  And again, now, almost a year and-a-half after you

16  submitted this declaration to the Court, you remember who

17  Robert Shea is; correct?

18  A.  Yes.

19  Q.  And you remember Luigi Porco's name?

20  A.  Yes.

21  Q.  Ms. Quinonez, during the video that we watched, you and

22  Mr. Porco spent some time conversing with the salesperson, is

23  that right?

24  A.  Yes.

25  Q.  And you chatted with him, it looked like, a few minutes;

J2QVOME1                         L. Quinonez - cross

1    correct?

2    A.   Yes.

3    Q.   You told him that you were looking for a James Bond watch;

4    correct?

5    A.   Yes.

6    Q.   And after you purchased the watch, you testified that he

7    asked you if you were interested in purchasing some more items;

8    correct?

9    A.   Yes.

10   Q.   So he was willing to talk with you, the salesperson?

11   A.   Yes.

12   Q.   I was watching the video along with everyone here.  I'm not

13   sure I heard that you asked the salesperson for his name.  Did

14   I miss that?

15   A.   Can you repeat the question?

16   Q.   Did you ask the salesperson for his name?

17   A.   I did not.

18   Q.   Did Mr. Porco ask the salesperson for his name?

19   A.   No.

20   Q.   Your father was outside; correct?

21   A.   Yes.

22   Q.   He didn't ask the salesperson for his name either, right?

23   A.   Not that I'm aware.

24   Q.   And Brad Cole was also outside; correct?

25   A.   Yes.

J2QVOME1                          L. Quinonez - cross

```
 1    Q.  He also did not ask the salesperson for his name?

 2    A.  Not that I know of.

 3    Q.  And where was Robert Shea during all of this?  I didn't see

 4    him in the video.

 5    A.  He was in the store with us.

 6    Q.  He was in the store with us -- or with you, excuse me?

 7    A.  Yes.

 8    Q.  Did he ask the salesperson for his name?

 9    A.  Not that I know of.

10    Q.  Okay.

11           And do you know if that unnamed, unknown salesperson

12    who sold you the watch had ever previously sold a counterfeit

13    watch?

14    A.  I am not aware.

15    Q.  Ms. Quinonez, you testified yesterday that your goal on May

16    19th, 2012, was to purchase an Omega watch at 375 Canal Street;

17    correct?

18    A.  Yes.

19    Q.  And you just testified earlier today that your job wasn't

20    to determine whether the watch was counterfeit; correct?

21    A.  Yes.

22    Q.  That was somebody else's job?

23    A.  Correct.

24    Q.  But then you testified that you knew that the watch was

25    counterfeit; correct?
```

J2QVOME1                          L. Quinonez - cross

1    A.  Yes.

2    Q.  And you did so based on price?

3    A.  Along with other reasons.

4    Q.  What were the other reasons?

5    A.  I grew up in New York City and I know that on Canal Street

6    it's known for counterfeit items at very low prices.  And I

7    also was given the watch in a plastic bag.  And I know that an

8    Omega watch is priced in the thousands, and I purchased the

9    watch for $80.

10   Q.  Let's start with the statement that the Omega watch is

11   priced at thousands.  When did you learn that?

12   A.  I can't tell you the precise moment when I learned that.  I

13   know Omega watches are pretty expensive.

14   Q.  You know that today?

15   A.  Correct.

16   Q.  Back in May of 2012 you were in college?

17   A.  Yes.

18   Q.  You spent a lot of time in college thinking about Omega

19   watches?

20   A.  I did not.

21   Q.  And their price?

22   A.  No.

23   Q.  And Ms. Quinonez, you also testified that people who go to

24   Canal Street, they know that there's counterfeit goods on Canal

25   Street; correct?  I'm summarizing, but that was essentially

J2QVOME1                          L. Quinonez – cross

1   what you were saying?

2   A.  Yeah.

3   Q.  So would it be fair to say that any consumer that walks

4   into a store, in your opinion, and purchases a watch from Canal

5   Street would know that the watch was not a genuine Omega watch?

6           MR. NOYES:  Objection, your Honor.

7           Withdrawn.  Withdrawn.

8   A.  I can't say any person.  I'd say people from New York

9   probably know.  I'm not sure if tourists would know or not.

10  But I think it's -- it's pretty well-known.

11  Q.  And most people would also probably know that you don't

12  purchase an authentic Omega watch in a plastic bag; correct?

13  A.  Correct.

14  Q.  Now, it could be possible, however, that somebody purchases

15  an authentic Omega watch because it was, for instance, stolen;

16  correct?

17  A.  Can you repeat the question?

18  Q.  That was inartfully stated.

19          It could be possible there's a cheap watch for sale on

20  Canal Street that has an Omega brand on it because it was

21  stolen; correct?

22  A.  Correct.

23  Q.  You didn't determine whether or not this watch was stolen

24  versus whether or not it was counterfeit; correct?

25  A.  I did not.

 1          THE COURT:  Could be both.

 2          MR. DELLA FERA:  I'm sorry, your Honor?

 3          THE COURT:  Could be both stolen and counterfeit.

 4          MR. DELLA FERA:  It could be both, your Honor.

 5  Q.  And we saw you then, after you purchased the watch, put it

 6  in your bag; is that right?

 7  A.  Correct.

 8  Q.  And you put it first in a black plastic bag and then put it

 9  in your bag; correct?

10  A.  Well, the clerk put it in a black plastic bag, and then I

11  did put that black plastic bag in my backpack.

12          MR. DELLA FERA:  Permission to approach the witness,

13  your Honor.

14          THE COURT:  Yes.

15  Q.  Ms. Quinonez I'm going to hand you Plaintiffs' Exhibit 100

16  again.

17          Ms. Quinonez, looking just at the watch in Plaintiffs'

18  Exhibit 100, is there any unique identifier on this watch,

19  something that would make it so that it was no other watch but

20  the watch you purchased on May 19, 2012?

21  A.  I see the blue stickers on it, I see the silver face, I see

22  the silver rim.

23  Q.  The other watch in the video that we just watched had blue

24  stickers on it, correct, the one you didn't purchase?

25  A.  I believe so.

J2QVOME1                         L. Quinonez – cross

1   Q.  So it's possible that there are multiple watches with blue

2   stickers on them; correct?

3   A.  Correct.

4   Q.  It's possible there are multiple watches with silver faces?

5   A.  Correct.

6   Q.  And silver rims?

7   A.  In the world?

8   Q.  In the world.

9   A.  Yes.

10  Q.  Okay.

11          And then when you purchased this watch -- and so,

12  Ms. Quinonez, can you say with absolute certainty that the

13  watch that you have in front of you is the watch that you

14  purchased on May 19, 2012, and is not a replica or other watch

15  that looks like that watch?

16  A.  Yes.

17  Q.  And how can you say that?

18  A.  It's in the Ziploc bag -- I mean it has the Ziploc bag with

19  it and the Post-It.  And when I handed it over, I don't see any

20  reason why this would be changed for another watch.

21  Q.  Now, when we watched the video --

22          MR. DELLA FERA:  Actually, if we could, your Honor,

23  I'd like to add PX 108A, play it for the witness, Sarah, can

24  you do that please.

25          (Video played)

1   A.  Sorry, I can't see anything.

2   Q.  Just give us one second.

3           THE COURT:  That's the noise of Canal Street.

4           MR. DELLA FERA:  Sarah, could you go to the

5   seven-minute-and-50-second mark please.

6           THE COURT:  While you're doing that, I'm going to take

7   just a short two-minute recess for just a second.

8           (Recess)

9           THE COURT:  I'm sorry.  Go ahead.

10          MR. DELLA FERA:  Thank you, your Honor.

11          Sarah, actually I would like to go to a minute nine

12  ten, I believe that's about correct.  Can you play that please?

13  Q.  Ms. Quinonez, can you watch the video please.

14          (Video played)

15          MR. NOYES:  I think the witness may not --

16          THE WITNESS:  I can't see anything.  Sorry.

17          (Video played)

18  Q.  Ms. Quinonez, that was the portion of the video that we

19  just watched where you took out the Post-It note, wrote on it,

20  and said that you put it in the black bag; correct?

21  A.  Yes.

22  Q.  I didn't see in the video it actually go in the black bag

23  though, right?  Did I miss that?

24  A.  No, it went -- I know it went in the black bag.

25  Q.  But the video you took doesn't show that?

J2QVOME1                          L. Quinonez - cross

1    A.  No.

2    Q.  I'd like you to take a look at PX 100 which is in front of

3    you.  And do you see PX 100?  The thin plastic bag that the

4    watch was contained in, the watch isn't inside of that, is it?

5    A.  Are you asking if it's inside of it right now?

6    Q.  Yeah, it's currently inside of it?

7    A.  It's not in the red Ziploc bag, no.

8    Q.  Can you hold up the rim.  You can take everything out.

9            Can you hold up what you call the red Ziploc bag which

10   I believe is the thinner one.  The watch is not inside of that;

11   correct?

12   A.  Correct.

13   Q.  And the black plastic bag, that isn't here today; correct?

14   A.  Correct.

15   Q.  Instead the watch was in this clear larger clear Ziploc

16   bag; correct?

17   A.  Yes.

18   Q.  And so for the watch to get from your purse on May 19, 2012

19   to this courtroom, somebody took the watch out of the black

20   plastic bag; correct?

21   A.  Yes.

22   Q.  And then they took it out of the thin plastic bag; correct?

23   A.  Yes.

24   Q.  And then they put both of them separately into a new Ziploc

25   bag; correct?

1    A.   Yes.

2              (Continued on next page)

```
 1    BY MR. DELLA FERA:
 2    Q.  Where is the black plastic bag?
 3    A.  I'm not sure.
 4    Q.  You were talking about how important it is to preserve your
 5    evidence in this case, correct?
 6    A.  Correct.
 7    Q.  And you didn't preserve the black plastic bag that you
 8    bought the watch in?
 9    A.  I don't have the -- I didn't have this with me, so I
10    didn't -- Brad Cole had all of these things.
11    Q.  So Brad Cole was the person who was in charge of ensuring
12    that the evidence was preserved?
13    A.  Correct.
14    Q.  And Brad Cole is a trained investigator, correct?
15    A.  Yes.
16    Q.  So he should know about correct evidentiary preservation
17    efforts, correct?
18    A.  Correct.
19    Q.  And I know you testified about the use of the Post-it note
20    and how that was used to identify the bag.  Is the use of a
21    Post-it note a standard investigatory practice for marking
22    evidence, as far as you know?
23    A.  Not that I'm aware.
24    Q.  That was something that Brad Cole just came up with on his
25    own that day?
```

1   A.  I don't remember who came up with it, but that's what we

2   were using to mark our purchases that day.

3   Q.  And do you personally know what Mr. Cole did with the watch

4   after you handed it to him that day?

5   A.  No.

6   Q.  And between you purchasing the watch and you giving it to

7   Mr. Cole, how much time elapsed?

8   A.  I can't tell you exactly.  Maybe a few hours.

9   Q.  So you had the watch in your possession for a few hours?

10  A.  Correct.

11  Q.  And that was in 2012?

12  A.  Yes.

13  Q.  And it's 2019 right now, correct?

14  A.  Yes.

15  Q.  It's been a long time since you've had that watch in your

16  possession, isn't that right?

17  A.  Yes.

18  Q.  Ms. Quinonez, can you flip to the tab in your binder, which

19  is in front of you that is PX-246, which is an exhibit Mr.

20  Noyes just showed you?

21  A.  Should I put these things back in, or do you want me to

22  leave them out?

23  Q.  You can leave them out.

24  A.  OK.

25          MR. DELLA FERA:  Sir, can you pull up 246 and publish

1    to the jury.

2    Q.  Now, you testified that this is the email that you sent the

3    day after the investigation you went on on May 19, 2012,

4    correct?

5    A.  Yes.

6    Q.  And Mr. Noyes had you read from a portion of this email,

7    isn't that right?

8        Correct?

9        Mr. Noyes, when he was questioning you, highlighted a

10   portion of this email, correct?

11   A.  Yes.

12   Q.  And he asked you about it?

13   A.  Yes.

14   Q.  And it was the portion of the email that says, in the

15   middle of the page, "375 Canal Street I purchased a counterfeit

16   Omega watch," correct?

17   A.  Yes.

18   Q.  He didn't read the rest of that sentence, though, did he?

19   A.  No.

20   Q.  It says, and I quote, "I purchased a counterfeit Omega

21   watch from a male/Hindu for $80."  Did I read that correctly?

22   A.  Yes.

23   Q.  You described the salesperson as a male/Hindu?

24   A.  Yes.

25   Q.  We just watched that video of you purchasing this watch; I

J2qWome2                          L. Quinonez – Cross

1    don't think I heard him tell you his religion.  Did I miss

2    that?

3    A.  He did not say that.

4    Q.  How did you know he was a male Hindu?

5    A.  I didn't.

6    Q.  So why'd you call him a Hindu?

7    A.  Well, when I was talking to my father how I should identify

8    the man, that's what he told me to write, and it's pretty

9    embarrassing, looking back at that.  I'm -- yeah.

10   Q.  And if we look at the rest of the email, we see, at the top

11   of the page, 213 Canal Street is underlined, correct?

12   A.  Yes.

13   Q.  And at 213 Canal Street you purchased, again, from a

14   male/Hindu?

15   A.  Yes.

16   Q.  And at 209 Canal Street, you purchased from a

17   "female/Hindu"?

18   A.  Yes.

19   Q.  303 Canal Street, you purchased from a male/Hindu?

20   A.  Yes.

21   Q.  Skipping 375 Canal Street and going to 112 Mulberry Street,

22   again, it was from a male/Hindu?

23   A.  Yes.

24   Q.  And finally, 351 Canal Street was a male/Hindu?

25   A.  Yes.

1    Q.  Do you believe people who are quote/unquote Hindus are more

2    likely to engage in counterfeit activity?

3              MR. NOYES:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.  Now, looking at PX-246, Ms. Quinonez, you described the

6    watch you purchased at 375 Canal Street that day --

7         Ms. Quinonez, looking at the line in this email that says

8    375 Canal Street, you described the watch you purchased as a

9    counterfeit Omega watch, correct?

10   A.  Yes.

11   Q.  But you didn't determine it was counterfeit, correct?

12   A.  Correct.

13   Q.  And there are multiple other buildings listed here, are

14   they not?

15   A.  They are listed.

16   Q.  And as far as you know, does 375 Canal LLC, the defendant

17   in this case, own any of those buildings?

18   A.  As far as I know -- I'm sorry.  Can you repeat that

19   question one more time?

20   Q.  As far as you know, does the defendant in this case, 375

21   Canal LLC, does it own any of those building?

22   A.  I'm aware that they own some buildings.  I'm not sure

23   exactly which ones.

24   Q.  You're aware that 375 Canal LLC owns some buildings?

25   A.  All I know is that the person owns one of these buildings,

1   and that's why we were here.

2   Q.  The purchase person who sold you the watch owns one of

3   these buildings?

4   A.  No.

5   Q.  Assuming these buildings aren't owned by 375 Canal LLC, do

6   you know if Omega has sued the landlord for any -- for

7   instance, for 213 Canal Street for the watch purchased that

8   day?

9           MR. NOYES:  Objection, your Honor.

10          THE COURT:  Sustained.

11  Q.  Have you testified in any case relating to any of these

12  other buildings?

13          THE COURT:  Sustained.

14  Q.  Ms. Quinonez, you testified about your background as an

15  investigator, correct?

16  A.  Yes.

17  Q.  You described it as somewhat of a family business, family

18  trade, is that fair?

19  A.  Can you clarify what you mean by that?

20  Q.  You testified that your father is an investigator, correct?

21  A.  Correct.

22  Q.  And that he sort of taught you how to investigate growing

23  up, correct?

24  A.  Yes.

25  Q.  Sort of a daily part of your life, I believe?

J2qWome2                          L. Quinonez - Cross

1    A.  Yes.

2    Q.  But you also testified that you have been on a grand total

3    of two investigations, correct?

4    A.  Yes.

5    Q.  And the very first one was this investigation of 375 Canal

6    Street on May 19, 2012, correct?

7    A.  Yes.

8    Q.  And you also said that you have an investigator's license,

9    isn't that right?

10   A.  Yes, I had an investigative license at the time.

11   Q.  When did you obtain the license?

12   A.  I can't tell you the exact date.

13   Q.  Did you take a test to get the license?

14   A.  No, I did not.

15   Q.  Was it your personal license?

16   A.  No.  It was -- it was my personal license, yes.

17   Q.  But it wasn't a license that you obtained by taking a test,

18   correct?

19   A.  No.

20   Q.  Is it a license that your father obtained by taking a test?

21   A.  It was my license, so I don't think he took a test for me

22   to get that license.

23   Q.  How did you get a license without taking a test?

24   A.  It was through my father's investigative company.

25   Q.  OK.  So your father's company had an existing license,

1    correct?

2    A.  Correct.

3    Q.  And you essentially latched on without a license and became

4    a person who was covered by that license, is that fair to say?

5          MR. NOYES:  Objection, your Honor.

6          THE COURT:  Sustained.

7    Q.  Your father's company, you just testified, had its own

8    investigator's license, correct?

9    A.  Correct.

10         THE COURT:  You're really starting to lead here, Mr.

11   Della Fera.

12         MR. DELLA FERA:  Your Honor, I'm just exploring the

13   witness's background.

14         THE COURT:  I understand, but you can explore without

15   starting to lead.

16         MR. DELLA FERA:  I will, Judge.  A few more questions.

17         THE COURT:  Move on.

18         MR. DELLA FERA:  Just one final question, if I may,

19   your Honor, about this topic?

20   Q.  Did your father train you about identifying counterfeits at

21   any point in --

22         THE COURT:  Sustained.

23   Q.  Ms. Quinonez, just a few final questions for you.  Earlier

24   today you testified that you did not know -- actually, just a

25   few minutes ago, you did not know the name of the clerk that

1   you purchased this watch from, isn't that right?

2   A.  Correct.

3   Q.  Do you know if he owned the store that was located at 375

4   Canal Street?

5   A.  No.

6   Q.  Do you know if he was a tenant at 375 Canal Street?

7   A.  No.

8   Q.  Do you know if he was a subtenant at 375 Canal Street?

9   A.  A what?

10  Q.  A subtenant.

11  A.  No.

12  Q.  Do you know who gave him the watch you purchased from him?

13  A.  No.

14  Q.  Do you know if there was a distributor that might have been

15  providing watches to the vendors on Canal Street or not?

16  A.  No.

17  Q.  And do you know who manufactured the watch that you

18  purchased?

19  A.  No.

20  Q.  And again, as you testified earlier, you don't even know if

21  this individual had ever sold a watch, counterfeit watch

22  previously, correct?

23  A.  Correct.

24  Q.  Now, this investigation was led by Brad Cole, correct?

25  A.  Yes.

1   Q.  And did Mr. Cole ever tell you to find out the name of the

2   clerk who sold you the watch?

3   A.  No.

4   Q.  Do you know if Mr. Cole or his firm ever tried to find out

5   the name of the clerk who sold you this watch?

6           MR. NOYES:  Objection, your Honor.

7           THE COURT:  Sustained.

8   Q.  Ms. Quinonez, you also identified another man in the back

9   of the store, is that correct?

10  A.  Yes.

11  Q.  You believed he was also working that day in the shop at

12  375 Canal Street?

13  A.  Yes.

14  Q.  And you didn't ask that man his name, did you?

15  A.  No.

16  Q.  Ms. Quinonez, did you personally witness anything that 375

17  Canal did wrong on May 19, 2012?

18          MR. NOYES:  Objection, your Honor.

19          THE COURT:  Sustained.

20          MR. DELLA FERA:  I have nothing further, your Honor.

21          THE COURT:  Thank you.

22          MR. NOYES:  Just very brief redirect, your Honor?

23          THE COURT:  You may.

24  REDIRECT EXAMINATION

25  BY MR. NOYES:

J2qWome2                          L. Quinonez - Redirect

1    Q.  Ms. Quinonez, in college, did you know that Omega watches

2    were expensive?

3    A.  Yes.

4    Q.  Now, Mr. Della Fera asked you about the other watch that

5    was offered for sale at 375 Canal Street?

6    A.  Yes.

7    Q.  Did that watch have a silver face on it?

8    A.  It did not.

9    Q.  What color face did that watch have?

10   A.  I can't remember, but I just don't have, like, a lot of

11   memories on it.  It was very different.

12   Q.  During the course of your cross-examination, you asked to

13   explain about Mr. Shea.  Can you please go ahead and explain?

14   A.  Yeah.  At the time of this statement that I wrote, I hadn't

15   seen the video.  It had been five years since the

16   investigation, so a lot of the details of that video were

17   unclear, and I couldn't recall a lot of what had happened that

18   day, because I hadn't had the chance to relook at that video or

19   study -- I've had a lot of time to actually look at it this

20   time, and I've been able to refresh my memory and remember a

21   lot of the details that were unclear the day that I wrote that.

22   Q.  And since September 6, 2017, how many times have you

23   reviewed the video of your investigation at 375 Canal Street?

24   A.  Since September 6?

25   Q.  Correct.

1    A.   A few times, quite a few times.  I can't say, like, a lot

2    of memories.

3    Q.   OK.  And did your review of the video since you submitted

4    the declaration refresh your memory about the events?

5    A.   Yes, I've had a chance to review the video now.  I feel

6    like I'm very aware of the details in that video now and of

7    that day.

8    Q.   OK.  And just to be clear, Ms. Quinonez, before you

9    submitted the declaration in September of 2017, did you have

10   your deposition taken in this case?

11   A.   I did.

12   Q.   Were you shown the video during that deposition?

13   A.   Yes, I saw it just one time during the deposition, not

14   before.

15   Q.   OK.  So now, from the time that you took the video and May

16   19 to 2012, to the time you were shown the video at your

17   deposition in August 2017, how many times had you seen the

18   video?

19   A.   I had not seen that video.

20   Q.   So August 2017 was the first time?

21   A.   Yes.

22             MR. NOYES:  Thank you.

23             Your Honor, no further questions.

24             MR. DELLA FERA:  Brief recross, your Honor?

25             THE COURT:  Two questions.

1          MR. DELLA FERA:  Two questions?

2    RECROSS-EXAMINATION

3    BY MR. DELLA FERA:

4    Q.  Ms. Quinonez, you just testified that you watched the video

5    at your deposition that we watched in court today, correct?

6    A.  Yes.

7    Q.  After watching that video, did you still not recall the

8    name of Luigi Porco or Robert Shea, correct?

9    A.  Correct.

10   Q.  But now you recall the names?

11   A.  Yes.

12   Q.  After having met with counsel for several hours on Saturday

13   and Sunday?

14          MR. NOYES:  Objection.

15          THE COURT:  Sustained.

16          MR. DELLA FERA:  Nothing further.

17          THE COURT:  Ms. Quinonez, you're excused.  Have a safe

18   trip back.

19          THE WITNESS:  Thank you so much, your Honor.

20          (Witness excused)

21          THE COURT:  Next witness.

22          MR. GUNTHER:  Your Honor, our next witness is going to

23   be Mr. Cole, Bradford Cole.  We're bringing him into the

24   courtroom.  Can I just clear the decks, if that's OK?

25          THE COURT:  Yes.  Do you want to take the watch back?

J2qWome2                          Cole - Direct

1              MR. GUNTHER:  Yes, I think I'd better do that, your

2     Honor.  Thank you.  And I'm just going to take the binders as

3     well.

4      BRADFORD COLE,

5           called as a witness by the plaintiffs,

6           having been duly sworn, testified as follows:

7              MR. GUNTHER:  Your Honor, can I just hand out some

8     binders so we can get ourselves set?

9              THE COURT:  Yes.

10             MR. GUNTHER:  Your Honor, may I proceed?

11             THE COURT:  Yes, you may.

12             MR. GUNTHER:  Thank you, sir.

13    DIRECT EXAMINATION

14    BY MR. GUNTHER:

15    Q.  Can you tell us your name, please.

16    A.  Bradford Cole.

17    Q.  And where do you live?

18    A.  Milford, Connecticut.

19    Q.  Now, Mr. Cole, what do you do for a living?

20    A.  I'm a private investigator.

21    Q.  Where are you employed, or by whom are you employed?

22    A.  Diogenes LLC.

23    Q.  What is Diogenes LLC?

24    A.  A private investigation agency.

25    Q.  Sir, what is your position at Diogenes LLC?

1    A.  I'm the managing member.

2    Q.  Sir, how long have you held that position as managing

3    member of Diogenes LLC?

4    A.  Since July 2000.

5    Q.  Sir, how long have you worked as a private investigator?

6    A.  I've been working for approximately 35 years, doing

7    investigations of various things.

8    Q.  Thank you very much.

9         Can you tell us what types of investigations Diogenes

10   conducts?

11   A.  Business, legal and domestic investigations.

12   Q.  Do those investigations include issues relating to

13   intellectual property?

14   A.  Yes.

15   Q.  Now, sir, have you done any trademark counterfeiting

16   investigations in your time as an investigator?

17   A.  Yes.

18   Q.  Sir, have you done those at retail stores?

19   A.  Yes.

20   Q.  Have you done those online?

21   A.  Yes.

22   Q.  Now, sir, for how long have you been conducting retail

23   investigations?  I'm focusing now on retail investigations

24   relating to counterfeit goods.

25   A.  Since approximately 1998, '99.

J2qWome2                          Cole - Direct

```
 1    Q.  OK.  Sir, for what types of goods have you conducted
 2    counterfeiting investigations?
 3    A.  A variety of goods, luxury brands.  It could be watches,
 4    leather goods, apparel items, eyewear, automobile parts, food
 5    products.
 6    Q.  Sir, can you name some of the owners, the brand owners,
 7    that you've conducted these types of counterfeiting
 8    investigations for?
 9    A.  Omega, Rado, Swatch, Rolex, Burberry.
10    Q.  OK.  That's fine.
11              Sir, in your experience, how are these retail
12    anticounterfeiting investigations typically initiated?
13    A.  The client would reach out to an investigator asking for
14    some work to be performed.
15    Q.  Now, sir, can you walk us through the steps that you
16    perform in a typical retail anticounterfeiting investigation?
17    A.  First of all, we'd receive the information from the client,
18    then go out to that retail brick-and-mortar location and to
19    observe what we could see being offered for sale to the general
20    public and then report back to the client our observations.
21    Q.  Now, that part, do you have a name for that?
22    A.  It's called canvassing.
23    Q.  When you're doing canvassing, are you actually trying to
24    purchase counterfeit goods?
25    A.  No.
```

J2qWome2                           Cole - Direct

1   Q.  Can you describe what the purpose, then, of the canvass

2   portion of the investigation is?

3   A.  It's to determine if what the client had reported to us Was

4   stolen, in fact, indeed at the time we go out to the location

5   present, were there watches of interest being sold or other

6   goods or leather goods or a product the client was interested

7   in.

8   Q.  Now, as part of the investigation, do you sometimes then go

9   on to actually conduct a separate investigation, where you

10  actually purchase watches or counterfeit goods?

11  A.  Yes.

12  Q.  And sir, have you conducted any retail anticounterfeiting

13  investigations in New York City?

14  A.  Yes.

15  Q.  In what areas of New York City?

16  A.  Generally, the Canal Street, Chinatown area.

17  Q.  Sir, how long have you been conducting these type of

18  investigations in the Canal Street area?

19  A.  Approximately 2000, 2001.

20  Q.  Approximately how many anticounterfeiting investigations,

21  approximately, have you done in the Canal Street area in the

22  course of your career?

23  A.  A dozen to maybe two dozen.

24  Q.  Sir, is there a reason why so many of those investigations

25  you perform are in the Canal Street area?

1   A.  The Canal Street area is known as an area that sells

2   counterfeit or knock-off goods to, especially tourists.  It has

3   a reputation for this.  I'm not quite sure where or how that

4   reputation came about, but it's commonly known.

5   Q.  Now, sir, do you document your investigations?

6   A.  Yes.

7   Q.  How do you typically document your investigations?

8   A.  On a single location, an investigator will go in, engage a

9   clerk in discussion, purchase an item, pay for item either cash

10  or via credit card, get the item, get a receipt and then exit

11  the store.  The investigator then at that particular point

12  would make some notations, when appropriate, on who he

13  interacted with, what was said, amount of money exchanged.  And

14  that's basically it.

15  Q.  And do you record that in a report?

16  A.  Yes, it's recorded in a report form.

17  Q.  What do you typically include in a report to your client

18  relating to anticounterfeiting work?

19  A.  The initial request from the client, our observations and

20  investigation of the store, the description of the subject, how

21  much an item was purchased.  We would then also photograph the

22  item and document it and then put everything in a report format

23  and send it to the client via United Parcel Service, generally

24  THE vendor of choice, with a tracking number.

25  Q.  Now, sir, when are your reports typically drafted relative

J2qWome2                         Cole - Direct

1   to the date of the investigation?

2   A.   Relatively soon, the same day or relatively soon after,

3   depending upon the amount of information and product to be

4   processed.

5   Q.   Now, have you done video, have you taken video in

6   connection with anticounterfeiting investigations?

7   A.   Yes.

8   Q.   Under what circumstances would you video an investigation?

9   A.   If an investigation involved many different locations in a

10  period of time, we would videotape, because to take handwritten

11  notes would be, one, time-consuming; two, might draw the

12  attention of the clerks or their lookouts that some have

13  outside the store, and our job is not to draw attention to

14  ourselves.  And we videotape just to have an accurate record of

15  what we saw, observed and interacted with.

16  Q.   When you're doing a canvass, is it your practice to take

17  video?

18  A.   No.

19  Q.   Why is that?

20  A.   It's not requested and the canvass is just general

21  information, and it -- kind of like window-shopping, so to

22  speak.

23  Q.   Now, sir, have you ever been hired to investigate the sale

24  of potentially counterfeit Omega watches?

25  A.   Yes.

1    Q.  When were you first hired to conduct such an investigation?

2    A.  Possibly 1998, '99.

3    Q.  And sir, how many investigations since then have you done

4    relating to potential Omega counterfeit watches?

5    A.  Dozens.  I can't -- I don't really have an exact number,

6    but dozens.

7    Q.  Now, sir, I want to focus on a particular time frame, and

8    that's December of 2010.  Were you involved in any

9    anticounterfeiting investigations regarding Omega watches in

10   December 2010?

11   A.  Yes.

12   Q.  And do you recall what you were asked to do?

13   A.  Yes.

14   Q.  Can you tell us?

15   A.  The client contacted me, asked me to meet a New York Police

16   Department officer, I believe, Richard Taute, and the New York

17   Police Department had an enforcement action scheduled.  And the

18   client asked me to be the industry representative for the

19   watches.

20   Q.  Now, what did you understand the New York Police Department

21   to be doing as part of that enforcement action?

22   A.  They were going to be going to a number of locations they

23   believed counterfeit watches were being sold to do seizure and,

24   I believe, subsequent arrests of those individuals selling the

25   watches.

J2qWome2                         Cole - Direct

1    Q.  Now, did you go with the New York Police Department to the

2    Canal Street area in December 2010 during that enforcement

3    action?

4    A.  Yes.

5    Q.  And you said Mr. Taute was the police officer who was with

6    you?

7            MR. SCHICK:  Objection, your Honor.  That wasn't what

8    was said, and there's a lot of leading going on this morning,

9    which is inappropriate.

10           MR. GUNTHER:  I'll ask another question.

11           THE COURT:  Ask another question.

12           MR. GUNTHER:  Sure.  Sure.

13   Q.  You mentioned Richard Taute.  Who is he?

14   A.  My understanding, he's an officer with the New York Police

15   Department.

16   Q.  Was he affiliated with a particular part of the police

17   department?

18   A.  I believe it was the peddlers task force, possibly.

19   Q.  Do you recall, in terms of the enforcement action, which

20   brands the New York Police Department was focusing on?

21   A.  I was -- there were a variety of brands.  I was there for

22   The Swatch Group trademarks.

23   Q.  Did that include Omega?

24   A.  Yes.

25   Q.  Now, sir, can you generally describe what happened in

1   December 2010 during the enforcement action by the New York

2   City Police Department peddlers task force?

3   A.  The officers approached a number of the locations, I

4   believe, close to simultaneously, going inside, protecting what

5   evidence they believed to be counterfeit watches -- it might be

6   putting a sheet over some suspected watches -- to make sure

7   they weren't sold.

8   Q.  Now -- I'm sorry.

9   A.  And then they would secure the scene, and I would go from

10  one particular location to another to do a field identification

11  of exemplar of Omega trademark.

12  Q.  Now, when you say you went and looked at exemplars of Omega

13  trademarks, can you be more specific?  Can you tell us what

14  you're talking about?

15  A.  Yeah.  Sometimes there may be 40, 50, 60 watches visible

16  for sale, and they would hand me one or two of the Omega

17  watches there.  I would examine the watches, based on my

18  knowledge, training, experience, and depending upon the

19  totality of circumstances, markings that should be on the watch

20  or that are missing from the watch, how the watch is packaged

21  and how the watch is kept, make a determination if the watch is

22  more likely than not to be authentic or counterfeit.

23  Q.  Sir, what factors did you consider in conducting that

24  analysis during the December 2010 investigation?

25  A.  The Omega watches have certain information on the watches

J2qWome2                          Cole - Direct

1    themselves, serial numbers.  There's a way the bands are

2    connected to the case, back of the watch itself, and there are

3    certain numbers that might be appearing there, based upon

4    model.  Legitimate Omega watches do not have shrink wrap around

5    the, what we'll call the bracelet of the watch.  And also,

6    legitimate Omega watches have a nice box, a warranty card, a

7    product card, and they're not contained inside of a, of a

8    pouch.  And also, the price point of the watch that's being

9    offered; Omega watches are in excess of 1,000, $1,500, on the

10   low side.  And so if a watch is being sold for $80, it's kind

11   of too good to be true, so the totality of circumstances, I'm

12   able to give a field determination of, if I believe the watch

13   to be authentic or not.

14   Q.   In terms of that field determination, does the way the

15   watches are displayed in the retail location add weight to your

16   analysis?

17   A.   It's a factor.

18   Q.   Can you describe how that would factor in?

19   A.   Retail establishments that have Omega watches, or any

20   luxury brand watch, would have the watch displayed out on a

21   counter, in a separate -- generally under, maybe, lock and key

22   or just out so you couldn't smash it or just grab it and run,

23   because if you have 30 watches, Omega watches, that could be

24   thirty-five to $50,000 of watches right there.  There would be,

25   some cases, the box the watch would be contained in.  And so

1    just the factor of having an expensive watch just hanging on a

2    shelf by the street versus inside of a case, like a jewelry

3    store might do that.

4    Q.  Now, sir, during the December 2010 enforcement action, did

5    you take any photographs?

6    A.  Yes.

7    Q.  Now, sir, could you take a look in your binder -- and I've

8    given you two, it's the bigger binder of the two -- at

9    Plaintiffs' Exhibit 106, 107 and 108.  And for now, we're not

10   going to put those up.

11          Sir, can you take a look at each one of those three

12   exhibits and tell me whether you've seen them before?

13   A.  Yes.

14   Q.  Sir, what are they?

15   A.  Exhibit 106 is a picture of 375B Canal Street taken from

16   the sidewalk viewpoint, looking into the store.

17   Q.  Who took the photograph, do you know?

18   A.  I did.

19   Q.  When was the photograph taken?

20   A.  Contemporaneously with the enforcement action by the NYPD.

21          MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

22   106.

23          MR. SCHICK:  Your Honor, we object.  First of all,

24   there's no date on this photograph to identify it.  And more

25   importantly, while Mr. Cole just testified that he always made

J2qWome2                        Cole - Direct

1    contemporaneous reports in enforcement actions, there is no

2    December 2010 report to which this would be associated.

3                   THE COURT:  You object?

4                   MR. SCHICK:  Yes.

5                   THE COURT:  Overruled.

6                   106 is admitted.

7                   (Plaintiffs' Exhibit 106 received in evidence)

8                   MR. GUNTHER:  Let's put 106 in evidence up on the

9    screen, please.

10   Q.  Can you describe for us what is in the photograph that you

11   took during the December 2010 enforcement action?

12   A.  This is the, as stated before, the storefront looking in

13   from the sidewalk view.  If you look to the left is a display

14   of generic watches that are being offered for sale on a stand

15   that has some drawers beneath it.

16   Q.  Sir, if I could interrupt you, I want to focus just below

17   the red awning and just above the watch display.  There are

18   some numbers.  Can you tell us what those are?

19   A.  Yes, the number there is 375B, as in boy.

20   Q.  What does that refer to?

21   A.  That refers to the location of the stall.

22   Q.  What street was that store on?

23   A.  On Canal Street.

24   Q.  There is some additional lettering, and Mr. Lam has put a

25   circle around that.  Can you tell us what those numbers say?

1   A.   375.

2   Q.   OK.  Sir, now if I can ask you, is this a photo that you

3   took of the storefront at 375 Canal Street during the December

4   2010 enforcement action?

5   A.   Yes, it is.

6   Q.   Now, sir, I'd like to go to Plaintiffs' Exhibit 107, and

7   again, before we put that up, can you tell me what it is?

8   A.   This is a further interior shot of 375B Canal Street.

9   Q.   OK.  Who took -- is this a photograph?

10  A.   Yes, I took this photograph.

11  Q.   All right.  And when did you take it?

12  A.   At the time of the enforcement action.

13  Q.   Does it accurately reflect what you saw and observed at

14  that time?

15  A.   Yes.

16          MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

17  107.

18          THE COURT:  107 is received in evidence.

19          MR. GUNTHER:  Thank you.

20          (Plaintiffs' Exhibit 107 received in evidence)

21          MR. GUNTHER:  Can we put 107 up on the screen.

22  Q.   Sir, could you just generally describe for us what this

23  photograph shows?

24  A.   This is a continued view from the prior photograph in which

25  more of the interior and rear of the store are observed.  To

1   the left-hand side, where you see the shirts, that starts just

2   after the display that had the black cloth covering it.  So

3   that's the left-hand side of the store.  The rear side, far

4   side, has a bunch of handbags on a slotted wall.  You can see a

5   doorway partition, barely, there.

6   Q.  Let me stop you, if I can, and ask you if you can describe

7   for me the door that you see at the right rear of Exhibit 107.

8   A.  Yes.  If you look at the slotted lines, you'll see a

9   vertical line going up in between the purses, from the floor

10  up, and then you'll see what appears to be a latch, a simple

11  bolt latch that cuts across, and that would be a door into the

12  back room.

13  Q.  And there's been a circle, a large oval that's placed, that

14  Mr. Lam's placed on the screen.  What does that represent?

15  A.  That represents the latch to the door.

16  Q.  OK.  That's the small oval?

17  A.  Yes.

18  Q.  OK.  What about the larger oval?

19  A.  Larger oval is the door itself.

20  Q.  OK.  Now, sir, I'd like you to take a look at Plaintiffs'

21  Exhibit 108 and tell me what that is.

22  A.  108 is a, more of a close-up shot showing the, what I call

23  the generic watches on display, and to the right of that is

24  another area where, if I recall correctly, the counterfeit

25  watches were covered up by the NYPD.

1    Q.   Is Plaintiffs' Exhibit 108 a photograph?

2    A.   Yes, it is.

3    Q.   Did you take it?

4    A.   Yes.

5    Q.   When did you take it?

6    A.   Contemporaneous with the enforcement action.

7    Q.   In December 2010?

8    A.   Correct.

9    Q.   Is this also a photograph of the storefront at 375 Canal

10   Street?

11   A.   Yes, the left-hand side of the store.

12           MR. GUNTHER:   Your Honor, I offer Plaintiffs' Exhibit

13   108.

14           THE COURT:   108's in evidence.

15           (Plaintiffs' Exhibit 108 received in evidence)

16           MR. GUNTHER:   Let's put the photograph up, please.

17   Q.   Again, can you just describe what you see in the

18   photograph?

19   A.   The main portion of the photograph is what I call generic

20   watches displayed there, some on a tray, and then down below is

21   a storage area with drawers.  To the right of that is a black

22   cloth covering up, if I recall correctly, the counterfeit

23   watches that were later seized by the New York Police

24   Department.

25   Q.   Now, sir, when you were at 375 Canal Street in December

1    2010 during the enforcement action, did you see any signs

2    posted warning that counterfeiting was a crime?

3    A.  No, sir.  There were no signs that I recall.

4    Q.  OK.  Now, sir, I want to focus now, go forward in time a

5    little bit to May 2012.  Did you perform an investigation

6    relating to Omega counterfeit watches in May of 2012?

7    A.  Yes.

8    Q.  Did you prepare a report of that investigation?

9    A.  Yes.

10   Q.  Now, I've given you a second binder, sir, and that's a

11   smaller binder.  I'd like you to take a look at what we've

12   marked in that binder as Plaintiffs' Exhibit 240A and, if you

13   could, tell me what that is.

14   A.  OK.  240A, if I may take a moment to look at it.

15   Q.  Yes.

16   A.  This appears to be my report and supporting attachments.

17   Q.  Supporting attachments of the investigation that you did

18   relating to anticounterfeiting in May of 2012?

19   A.  Yes.

20   Q.  Now, sir, what was the date of that investigation?

21   A.  It was Saturday, May 19, 2012.

22   Q.  And sir, how soon after the investigation was your report

23   prepared?

24   A.  The report was finalized May 23, 2012.

25   Q.  Sir, was it your regular business practice to make this

1    type of report?

2    A.  Yes.

3    Q.  Was this report created and maintained in the files of

4    Diogenes in the course of your regular business activities?

5    A.  Yes.

6    Q.  Sir, based -- on what information is the report based?

7    A.  The information is based on the observations of the

8    investigators, myself and also video notes that were taken at

9    the time.

10   Q.  And photographs?

11   A.  And photographs.

12   Q.  Now, sir, in drafting the report, did you attempt to

13   accurately recount the investigation relating to counterfeit

14   Omega watches that took place on May 19, 2012?

15   A.  Yes.

16          MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

17   240A.

18          MR. SCHICK:  Your Honor, just two or three things.

19          No. 1, we object to the extent they weren't identified

20   as a business record.  If Mr. Cole can identify it, that's

21   fine.

22          I would also note that despite everything else, it

23   wasn't until very late last night that plaintiff identified to

24   us that this might be a potential trial exhibit.

25          THE COURT:  OK.  If that's an objection, it's

 1    overruled.

 2              240A is received in evidence.

 3              (Plaintiffs' Exhibit 240A received in evidence)

 4    BY MR. GUNTHER:

 5    Q.  All right.  If we could put up the first page of your

 6    report of the May 19, 2012, investigation.  Sir, what's the

 7    date of your report?  Is it stated there?

 8    A.  It is May 23, 2012.

 9    Q.  All right.  And sir, if you look on the first page, towards

10    the bottom, there's a heading that says "case continuance"?

11    A.  Yes.

12    Q.  And then there's a number of street addresses, most of them

13    on Canal Street, one on Mulberry.  Is that correct?

14    A.  Correct.

15    Q.  What were you trying to convey here?

16    A.  That this case was -- excuse me -- continuing on, and

17    purchases were made of Omega trademark watches from the

18    following identified street addresses.

19    Q.  OK.  And sir, if you look at the next page, page 2, of your

20    report, Exhibit 240A, there's a heading that says "executive

21    summary."  Do you see that?

22    A.  Yes.

23    Q.  Sir, could you read that, please?

24    A.  "Successful undercover purchases were made during Saturday

25    afternoon, May 19, 2012, at all businesses above, except for

J2qWome2                              Cole - Direct

1    393 Canal Street.  393 Canal Street did not have any visible

2    nor offer any Omega, Swatch, or Rado watches for sale."

3    Q.  Right below that it says "investigators BC" -- who did that

4    stand for?

5    A.  Myself, Brad Cole.

6    Q.  WQ, can you tell us who that is?

7    A.  William Quinonez.

8    Q.  And LQ?

9    A.  Leslie Quinonez.

10   Q.  -- "performed the undercover operation."  Then you go on to

11   say, "Investigator LQ made each of the undercover purchases and

12   obtained video and audio recordings from these purchases."  Do

13   you see that?

14   A.  Yes.

15   Q.  Is that, in fact, what happened?

16   A.  Yes.

17   Q.  Now, sir, if you'd look to the next sentence,

18   "Investigators BC" -- that's you, right?

19   A.  Yes.

20   Q.  "And WQ," that's William Quinonez, correct?

21   A.  Correct.

22   Q.  -- "observed each of these transactions from in front of

23   the store."  Do you see that?

24   A.  Yes.

25   Q.  Is that, in fact, what happened?

J2qWome2                          Cole - Direct

1    A.  Yes.

2    Q.  And finally, it says, "Investigators BC and WQ shot video,

3    as appropriate, and related screenshots supplement the video

4    and audio obtained by Investigator LQ."  Do you see that?

5    A.  Yes.

6    Q.  And did that, in fact, occur?

7    A.  Yes.

8    Q.  Now, sir, finally, under that heading, it says, "Support

9    personnel were used as 'customers' to distract store personnel

10   during the respective buys."  Do you see that?

11   A.  Yes.

12   Q.  Sir, do you recall who those support personnel were?

13   A.  Yes.

14   Q.  And who were they?

15   A.  Luigi Porco and Robert Shea.

16   Q.  And what was -- OK.

17           Sir, if we go back to the first page of the report --

18           MR. GUNTHER:  The first page of the report, page 1.

19   A.  Yes.

20   Q.  -- sir, can you identify for the jury, and this is at the

21   bottom, which locations during the investigation in May of 2012

22   Omega counterfeit watches were actually purchased?

23   A.  There were six locations on Canal Street, 209, 215, 303,

24   351, 375, and 112 Mulberry Street.

25   Q.  Now, sir, let me ask you with respect to 215 Canal Street,

1    had you reviewed this report in advance of your testimony?

2    A.  Yes.

3    Q.  Is there anything about the notation of 215 Canal Street

4    that you want to correct?

5    A.  Yes.  There's a typographical error.  I think it should be

6    213.

7    Q.  And why do you say that?

8    A.  The actual address is 213, and just a typographical error

9    when I wrote that.

10   Q.  Sir, if you look at page 2 of your report, there's a

11   heading a little bit further down from where we were looking

12   before that says 215 Canal Street.  Do you see that?

13   A.  Correct.

14   Q.  All right.  And then, if you look down further, we actually

15   go on to the next page, which is a continuation of your

16   description of the purchase at 215 Canal Street, you see

17   there's an attachment 5?

18   A.  Yes.

19   Q.  And sir, what does it say in the report on page 3 relating

20   to attachment 5?

21   A.  "Attachment 5 depicts the watch purchased by Investigator

22   LQ."

23   Q.  And sir, if you turn to attachment 5 in Exhibit 240A in

24   evidence, can you tell me what you see?

25   A.  There's a yellow sticky with the number 213 printed on it.

J2qWome2                        Cole - Direct

1   Q.  All right.  And whose handwriting is that?

2   A.  Leslie Quinonez's.

3   Q.  And sir, in terms of the typographical error that you

4   identified just now, can you explain the error using attachment

5   5?

6   A.  Just a typo.  When this sticky was written, it is when the

7   investigator left the store and was out on the sidewalk, and so

8   the -- identifying which purchase came from which location.

9   Q.  Now, sir, prior to the time the investigation began, did

10  you provide the team with any instructions?

11  A.  Yes.

12  Q.  And what did you tell them?

13  A.  They were provided money.  They were to go to a list of

14  locations that I provided them and to engage the clerks --

15  well, first of all, to be shoppers, typical tourists, shop

16  around the store.  If a clerk approached them, what are you

17  looking for?  If they did not see any, for example, Omega

18  watches for sale, say, Oh, you don't have what I want; it's all

19  right.  And if the clerk continued to pursue the conversation

20  by saying, Oh, what do you want, what do you need, to say that

21  you're looking for the James Bond watch, for example.  And if

22  that was -- conversation continued, the clerk said, Oh, yes, I

23  can help you with that, to engage in conversation, conduct a

24  transaction, purchase the watch and then leave the store.

25  Q.  Did you give any instructions with respect to recording the

1   transactions?

2   A.   Yes.

3   Q.   And what did you say?

4   A.   I supplied Leslie Quinonez with what's called a BlackBerry

5   PlayBook.  I instructed her on how to use the PlayBook, turn it

6   on and off, and to record the transaction so we could

7   accurately document the individuals involved in what occurred

8   during the transaction.

9   Q.   Did you give the team instructions about what to do with

10  any watches that were purchased?

11  A.   Yes.

12  Q.   What did you tell them?

13  A.   I instructed Investigator Quinonez that upon leaving the

14  store -- I supplied her with some yellow sticky notes, and to

15  write down the number of the store which the watch purchase was

16  made.  So she would step outside, fiddle with her handbag.  By

17  doing so, she would write the number on the yellow sticky and

18  place it inside the bag that was given with the watch sale,

19  like a little plastic bag.

20  Q.   Now, sir, why did you decide to take video, to use

21  videotapes of the investigation?

22  A.   We were visiting seven locations, spending quite a bit of

23  time, and to individually take detailed notes would draw

24  attention.  Canal Street vendors often use lookouts on the

25  street to make sure that police or industry investigators are

1    not in the area or about to do any sort of enforcement action,

2    so we did not want attention drawn to ourselves.  So we just

3    did something very simple, wrote the number down, put it inside

4    the bag and tied the bag off.

5    Q.  Sir, are there other ways you could have identified which

6    watch was purchased at which location?

7    A.  There could have been different ways to do so but more

8    time-consuming and involved more detailed handling of the

9    watch, which would expose the amount of time we're fiddling

10   with the watch out in public.

11   Q.  And why would that be relevant?

12   A.  If we're being watched or drawing attention, you just

13   bought the watch, why did you go outside and, all of a sudden,

14   taking indelible marker and trying to wrap the watch up into

15   something, that would be noticed.

16   Q.  Now, sir, let me ask you this.  Let's focus on the

17   transaction at 375 Canal Street.  Can you tell us generally

18   what happened there?

19   A.  Investigator Quinonez and her shopping partner, Luigi

20   Porco, entered the store.  Separately, another individual,

21   Robert Shea, posed as a customer walking into a different area

22   of the store.  They pretended to shop.  A clerk came up to them

23   and said, How can I help you?  As with their instructions, they

24   said:  No.  You don't have what we need.  It's all right.

25   Thank you.

1    And the clerk continued by saying, What do you want?  And

2    they discussed the James Bond watch, the Omega watch, and the

3    clerk then went into the rear, hidden door, back stockroom, and

4    then a few moments later exited with a couple of watches in his

5    hand.

6    Q.  And then what happened?

7    A.  Leslie Quinonez and Luigi Porco, they looked at the

8    watches, as a couple would.  Looking at them, Luigi Porco tried

9    it on, since he's the man and it's a man's watch that's being

10   used.  Meanwhile, the store clerk had his back to them, kind of

11   interested more on what's going on out in front of the store,

12   not really paying too much attention with them.  Then they

13   engaged in conversation.  They negotiated the rate of -- the

14   price of the watch, and then a price was agreed upon.

15   Luigi and Leslie Quinonez handled money, exchanged money

16   and then gave the money to the clerk.  The transaction was

17   done.  The -- Luigi Porco and Leslie Quinonez exited the store.

18   Upon exiting the store, Leslie Quinonez did as I described

19   before, took a little sticky marked down the number 375, put it

20   into a little black plastic bag and tied off the top of the

21   bag.

22   Q.  All right.  And then did she at some point provide that

23   black plastic bag to you?

24   A.  Yes, she did.  It was in her custody until she provided it

25   to me.

J2qWome2                           Cole - Direct

1  Q.  Now, sir, can you turn to your report, Exhibit 240A, at

2  page 5?

3          MR. GUNTHER:  And if we could put that up.

4  Q.  Sir, does this part of the report describe the part of the

5  investigation at 375 Canal Street?

6  A.  Yes, it does.

7  Q.  Is that consistent with the testimony you just gave?

8  A.  Yes.

9  Q.  Now, sir, did you take any videos at 375 Canal Street, you

10 yourself, during the investigation on May 19, 2012?

11 A.  Yes.

12 Q.  Where were you positioned during that part of the

13 investigation?

14 A.  On the sidewalk in front of the store.

15 Q.  OK.  Now I want to show you plaintiffs' --

16         MR. GUNTHER:  We can take this down.

17 Q.  I want to show you, but again, I'm just going to show you

18 for the moment, the first few seconds of the video that's been

19 marked as plaintiffs' 108C.  Why don't we do that, and then I'm

20 going to ask you a question.

21         MR. GUNTHER:  If we could have the sound off as well.

22         (Video played)

23 Q.  Now, sir, did you review this video in advance of your

24 testimony today?

25 A.  Yes.

J2qWome2                          Cole - Direct

1   Q.  What is it?

2   A.  It is a video I shot from a cell phone during the purchase

3   of the watch from 375B Canal Street.

4   Q.  And that was on May 19, 2012?

5   A.  Yes.

6   Q.  Now, sir, you were in front of the store, is that correct?

7   A.  Correct.

8   Q.  Now, sir, can you generally describe what the video shows?

9   A.  The video shows Investigator Quinonez and Luigi Porco

10  shopping, engaged in conversation with the clerk, the clerk

11  returning to the rear, into the rear of -- the stockroom area

12  and coming back out with a couple of watches, putting them down

13  for them to look at, and a transaction occurred.

14  Q.  Now, sir, does this video accurately depict what you

15  recorded at 375 Canal Street on May 19, 2012?

16  A.  Yes, it does.

17          MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

18  108C.

19          MR. SCHICK:  No objection, your Honor.

20          THE COURT:  108C is in evidence.

21          (Plaintiffs' Exhibit 108C received in evidence)

22          MR. GUNTHER:  Now I'd like to ask Mr. Lam if we could

23  go to the 36-second mark of the video.

24          (Video played)

25  Q.  Now, it's a little tough to see, but can you identify for

1  us the various people that are shown at this point in the

2  video?

3  A.  Yes.  In the forefront, the gentleman with the dark hair,

4  blue shirt with white stripes, is a clerk at the store, 375B

5  Canal Street.  To his right you'll see a gentleman.  It's

6  difficult to tell, but he's wearing a hat, sunglasses, a white

7  shirt, which looks like his sleeves are pushed up.  That is the

8  clerk that interacted with Investigator Quinonez and Luigi

9  Porco.

10 Q.  OK.  Now just to the right of that clerk, it looks like

11 there's someone with a baseball cap, and Mr. Lam is putting an

12 arrow --

13        MR. SCHICK:  Your Honor, it might be easier if they

14 don't actually put arrows before the witness talks about what

15 he sees, because the witness is going to describe, your Honor,

16 what he sees.

17        THE COURT:  It's in evidence, though.  What difference

18 does it make?

19        MR. GUNTHER:  Thank you.

20 Q.  Go ahead.  You can continue.

21 A.  That is Luigi Porco.

22 Q.  OK.  That's the guy with the baseball cap?

23 A.  Correct.

24 Q.  And then to his right, and this is tough, but I'm going to

25 ask you, can you see somebody there, and can you tell me who

1   that is?

2   A.  Yes.  That is Leslie Quinonez.

3   Q.  OK.  Now, all the way over to the right, by the sunglasses

4   rack, there was one last person.  Can you tell us who that is?

5   He has a black shirt on.

6   A.  Yes.  That is Robert Shea.

7          MR. GUNTHER:  OK.  All right.  Now I'm going to ask

8   Mr. Lam to go to the beginning.  This is relatively short.

9   It's about a minute or so.  I'm going to ask him to play the

10  entirety of 108C from the beginning.  Let's watch and then I'll

11  ask you a question.

12          (Video played)

13  BY MR. GUNTHER:

14  Q.  OK.  That's the whole video.  What I would ask you, if you

15  can, is to tell us what was happening in that 46 seconds that

16  you shot there.

17  A.  The store clerk had gone into the back of the store.  Luigi

18  Porco and Leslie Quinonez were waiting for him.  He re -- he

19  appeared back from the back stockroom, carrying two watches.

20  He walked up to the shelf area they were at, placed the watches

21  down for Leslie and Luigi to look at.  He turned his back to

22  them and blocked the watches from view from the street side,

23  and then Leslie and William looked at the watches.

24  Q.  Now, sir, I'm going to ask Mr. Lam to take us back to a

25  couple of parts of the video and just ask you a few questions.

1    First I'd like to go to about the one- to two-second mark of

2    the video.

3              (Video played)

4              MR. GUNTHER:  Let's just stop right there.

5    Q.  What do you see in this frame?

6    A.  It is a Bank of America ATM with the numbers 375 above the

7    doorway.

8    Q.  All right.  And what does that represent?

9    A.  The address of the ATM.

10   Q.  And is that on Canal Street?

11   A.  That is on Canal Street, yes.

12   Q.  Where was the shop where the rest of the video was shot?

13   A.  375B is to the right of the ATM.

14             MR. GUNTHER:  Now I'm going to ask Mr. Lam if you

15   could please play the video from about 31 seconds to 35

16   seconds.

17             (Video played)

18   Q.  OK.  What do you see in that very short snippet of the

19   video?

20   A.  The clerk that was engaged in conversation with Luigi Porco

21   and Leslie Quinonez appeared to walk from the area of the

22   doorway, which I had identified previously, carrying in his

23   right hand two watches.

24             MR. GUNTHER:  OK.  Now, Mr. Lam, can you run the video

25   from this point until we hit the 45-second mark and stop at

1    that point.

2              (Video played)

3    Q.  What do you see, and can you describe what's happening in

4    that portion of the video?

5    A.  Yes.  He just came out and placed the watches down on the

6    shelf.  He made a nod to the -- to the couple saying, Here are

7    the watches to look at.  He turned his back to them and to the

8    watches.  He glanced at his -- the clerk that was out front,

9    and then he proceeded to take a hat, for whatever reason, and

10   move it towards the front of him.

11   Q.  All right.  Now, sir, based on your experience as an

12   investigator, do you know what -- can you tell us what you

13   think the man in the striped shirt was doing?

14   A.  The man in the striped shirt I would view as a lookout or a

15   secondary clerk.  He's out on the street, and he does a couple

16   things.  One is to drive customers in, but two, also look for

17   police or industry investigators as to give a heads-up, so to

18   speak, if anyone was approaching that was suspicious to them.

19   Q.  All right, sir.  Now I want to show you --

20             MR. GUNTHER:  Again, let's take this down, Mr. Lam,

21   and if you could show just the witness, Mr. Cole, plaintiffs'

22   108D.

23   Q.  And this is another video.  I'm going to show you the first

24   few seconds of it, and then I'll ask you a question.

25             (Video played)

J2qWome2                        Cole - Direct

1    Q.  Did you, sir, review this video in advance of your

2    testimony today?

3    A.  The video's not on the screen, sir.

4    Q.  Oh, I apologize.

5           MR. GUNTHER:  Let's see if we can make that happen.

6    Q.  Is anything showing on your screen?

7    A.  No, sir.

8           THE COURT:  Mr. Cole, why don't you stand up and look

9    at it over here.

10          MR. GUNTHER:  That's fine.

11          THE WITNESS:  May I approach down to the screen, your

12   Honor?

13          THE COURT:  Yes.

14          MR. GUNTHER:  Mr. Lam, can you just show those few

15   seconds at the beginning of the video, 108D.

16          (Video played)

17   BY MR. GUNTHER:

18   Q.  Now, Mr. Cole, did you review this video in advance of your

19   testimony today?

20   A.  Yes.

21   Q.  What is it?

22   A.  It is a second video I took of -- from the street side into

23   the store during the transaction process of the purchase of the

24   watch.

25   Q.  All right.  And what was the date that this video was made?

J2qWome2                         Cole - Direct

1    A.   May 12.

2    Q.   May 12th or 19th?

3    A.   May -- excuse me.   May 19, 2012.

4              (Continued on next page)

J2QVOME3                        Cole - direct

1    BY MR. GUNTHER:

2    Q.  Okay.  And, sir, is that the video that you took of what

3    was -- of what you observed at 375 Canal Street?

4    A.  Yes.

5    Q.  Does it accurately depict what you observed on May 19, 2012

6    at 375 Canal Street?

7    A.  Yes.

8              MR. GUNTHER:  Your Honor, I offer Exhibit 108D in

9    evidence.

10             MR. SCHICK:  No objection, your Honor.

11             THE COURT:  It's in evidence.

12             (Plaintiffs' Exhibit 108D received in evidence)

13   Q.  Now, sir, before we show it, I want to ask you just a

14   question in terms of chronology.

15             The video that you took in 108D, did you take that

16   before or after the video that we just reviewed, which is

17   Plaintiffs' Exhibit 108C?

18   A.  I believe it was before.

19   Q.  Okay.

20             THE COURT:  D is before C.

21             MR. GUNTHER:  D.

22             THE COURT:  D is before C?

23   Q.  So the question, I guess --

24             MR. GUNTHER:  We can take a look at it and maybe ask

25   it.

1    Q.  Let me do this.  Let me show you the video and then I'll

2    ask you the question again.

3    A.  Okay.

4         MR. GUNTHER:  Now, let's show everyone the video,

5    Mr. Lam, from the beginning to the end.  And hopefully the jury

6    can see this.  Please let us know if you can't.

7         (Video played)

8    BY MR. GUNTHER:

9    Q.  Now, sir, can you describe what's happening in the video?

10   A.  This was a continuation of the buying process of the watch.

11        The clerk was standing in a similar position as last

12   video.  Luigi Porco is there looking at the watch, trying on

13   the watch.  And Leslie Quinonez is immediately to Mr. Porco's

14   left as well, as he's examining the watch.

15   Q.  During the video it sounds like someone is speaking.  Can

16   you tell us who that is?

17   A.  That is myself.

18   Q.  All right.

19        Can you tell us what you were doing at that point?

20   A.  I was on my cell phone camera.  And due to the fact that I

21   was not sure if the clerk outside was looking at me or not, I

22   faked a phone call.  So my actions then had my phone to my ear

23   would seem consistent.

24   Q.  Now, I want to come back to the chronology question I asked

25   you before and see if we can get it nailed down.

J2QVOME3                          Cole - direct

1           The video we just looked at from Exhibit 108D, was

2      that taken before or after the first video that we looked at,

3      108C?

4      A.   That was taken after.

5      Q.   Okay.  And how do you know that?

6      A.   Because in the video, the first video, you see the clerk

7      bring out the watches.  In the second video, Mr. Porco is

8      trying on the watches.

9      Q.   Okay.  Now, sir --

10          MR. GUNTHER:  Mr. Lam, could we go to 44 seconds on

11     the video that is marked Plaintiffs' Exhibit 108D and stop

12     there.

13     Q.   Now, sir, can you tell us what you observed at this portion

14     of the video?

15     A.   Yes.  Going from foreground to background, the clerk with

16     the dark hair, the blue shirt with the white stripes is closest

17     to me.  The clerk involved in the transaction with the hat,

18     dark sunglasses and white shirt has his arms crossed, looking

19     at Luigi Porco trying on the watch on his left wrist.  And to

20     the right it's a little bit difficult to tell just because of

21     shadowing, but Leslie Quinonez is there as well.

22     Q.   Okay.

23          Now, sir, when you were at 375 Canal Street conducting

24     the investigation on May 19, 2012, did you observe any signs

25     posted in which there was a warning that counterfeiting is a

1    crime?

2    A.  No.

3             MR. GUNTHER:  All right.  We can take this down.

4             Thank you, Mr. Lam.

5    Q.  Now, what did Ms. Quinonez do with the watch she purchased

6    at 375 Canal Street?

7    A.  After she purchased the watch, she went into her bag, wrote

8    a yellow sticky indicating number 375 on the sticky, put it

9    inside the black plastic bag the watch was put into by the

10   clerk, and then she tied off the top of the bag.  And then --

11   to keep the watch and the sticky secure, and then put it inside

12   of her handbag.

13   Q.  Did she follow that same procedure with respect to the

14   purchases made at the other five locations?

15   A.  Yes.

16   Q.  And, sir, is what you just told us consistent with the

17   instructions that you gave to Ms. Quinonez in terms of how to

18   conduct the investigation?

19   A.  Yes.

20   Q.  Now, sir, following the end of the investigation, there

21   were six watches that were purchased?

22   A.  Yes.

23   Q.  Did you obtain custody of them at some point?

24   A.  Yes, I did.

25   Q.  And how did you obtain that custody?

1    A.  Leslie Quinonez gave those to me directly.  I took care of

2    custody and control and then brought them back and put them

3    into the evidence safe.

4    Q.  All right.

5         And then after you put them -- is the evidence safe

6    located at your office?

7    A.  Yes.

8    Q.  All right.

9         After you did that, what did you do next with respect

10   to the watches?

11   A.  Then I examined each watch individually, photographed the

12   watch, photographed the packaging, yellow sticky.  In some

13   cases the watches came with a bag; others they just gave them

14   this -- the watches have a clear plastic sleeve.  I'd remove

15   the sticker and I'd photograph all the evidence in its

16   totality.

17   Q.  Okay.

18         What did you do with the watches after you

19   photographed them?

20   A.  After I photographed each one individually, again, I tied

21   them up, put them in the safe, and started to draft my report

22   after reviewing the videotape.

23   Q.  When you completed the report, what did you do with the

24   report and the watches?

25   A.  The report and the watches were sent to the client.  The

1   watches were sent United Parcel Service with a particular

2   tracking number and were sent overnight to their offices.

3   Q.  All right.

4           Now, sir, I want to go back to your report, Exhibit

5   240A, and turn back to page 5, if we can.

6   A.  Yes.

7   Q.  And, sir, under the heading "375 Canal Street," there is --

8           MR. GUNTHER:  And if we can go down a little bit more,

9   Mr. Lam.

10  Q.  There is a line that says:  Attachment 21 depicts the watch

11  purchased by Investigator LQ.

12  A.  Yes, I see that.

13  Q.  And, sir, which watch is being referred to here on page 5?

14  A.  Attachment 21 refers to the watch purchased at 375 Canal

15  Street.

16  Q.  All right.

17          Now, sir, could you turn to tab 21 in your -- in

18  Exhibit 240A.

19  A.  Yes.

20  Q.  What is that, sir?

21  A.  That is the watch that was handed to me by Leslie Quinonez

22  that I subsequently processed and photographed.

23  Q.  All right.  So is this your photograph?

24  A.  Yes, it is.

25  Q.  What is shown in that photograph?

1    A.  There are four things that are shown.

2              In the way background is the black plastic bag the

3    watch was placed into by the clerk; secondly is a Ziploc bag

4    with a red stripe across it, that's where the watch was placed

5    into and sold by the clerk; and the yellow sticky indicating

6    the number 375 from which location the watch was purchased; and

7    finally, the watch itself.

8    Q.  All right.

9              MR. GUNTHER:  And, your Honor, I'd note just as a

10   housekeeping measure that we've also marked the same photograph

11   as Plaintiffs' Exhibit 104, and I'd offer Plaintiffs' Exhibit

12   104.

13             THE COURT:  I thought 104 was in evidence.

14             MR. GUNTHER:  Oh, it is in evidence.  You're right,

15   your Honor.  I apologize.  Thank you very much.

16   Q.  Now, sir, I want to hand you a physical exhibit.

17             MR. GUNTHER:  Your Honor, can I approach?

18             THE COURT:  Yes, you may.

19             MR. GUNTHER:  Thank you, sir.

20   Q.  I'm going to hand you what is in evidence as Plaintiffs'

21   Exhibit 100.  Do you recognize Plaintiffs' Exhibit 100?

22   A.  Yes, I do.

23   Q.  What do you recognize it as?

24   A.  I recognize it to be the watch, the yellow sticky, and the

25   bag with the red line attached that is from my photograph.

J2QVOME3                          Cole - direct

1    Q.  All right.

2              Is that the same watch, yellow sticky, and plastic bag

3    that appears in attachment 21 to your report, Exhibit 240A?

4    A.  Yes.

5    Q.  And, sir, if you could just take a look at Plaintiffs'

6    Exhibit 104 in evidence, that's in the other binder.  Can you

7    confirm for me -- can you tell me whether or not what you have

8    in front of you, the watch, the yellow sticky, and the bag is

9    the same as shown in that photograph?

10             THE WITNESS:  Your Honor, may I take the watch out of

11   the bag momentarily?

12             THE COURT:  Yes, you may.

13   A.  Yes, the watch, the yellow sticky, and the Ziploc bag are

14   all in that photograph, from the photograph.

15   Q.  Okay.  And, sir, can you compare the watch in Exhibit 100

16   to the watch shown in the photograph of Exhibit 104, which is

17   also attachment 21 to your report?

18   A.  Yes, it is the same watch.

19   Q.  And why do you say that?

20   A.  It is indistinguishable.  It has shrink-wrap on what we

21   refer to as the bracelet of the watch.  At the 6 o'clock

22   position of the watch dial and the 12 o'clock position there

23   are some blue striping, maybe approximately a centimeter wide

24   on this point.  The color of the watch, the three buttons on

25   the right, what I call -- at the 12 noon position I call it a

1    tuning fork, and this watch here has the exact same tuning fork

2    there.  There are three round dials at the 3 o'clock, 6

3    o'clock, and 9 o'clock position which are the same in the

4    watch.  It's indistinguishable from each other.

5    Q.  Okay.  Now, sir, can you compare the yellow sticker Post-It

6    note that is in exhibit -- as part of Exhibit 100 to the

7    photograph that is in evidence as Plaintiffs' Exhibit 104,

8    which is also attachment 21.

9    A.  Yes.

10   Q.  And what is the result of that comparison?

11   A.  They are the same.

12   Q.  And why do you say that?

13   A.  It's a yellow sticky.  The number 4 in handwriting is

14   consistent in the same position relative to the larger number

15   375 that was written.  And the "7" is written as a French 7,

16   and those are consistent with each other.

17   Q.  All right.

18           Now, sir, the watch that we have -- sorry.  The

19   photograph of the watch in Plaintiffs' Exhibit 104, and if you

20   turn to attachment 21 of your report, sir, can you tell us

21   approximately when you took that photograph?

22   A.  That was taken May 19th, 2012.

23   Q.  Okay.  Back in 2012, the same day as the investigation, you

24   took that photograph?

25   A.  Yes.

1   Q.  Is that right?

2   A.  Yes.

3   Q.  Sir, the watch that you have before you, the yellow sticker

4   that you have before you, the plastic bag that you have before

5   you today in 2019, is it your testimony that that's the same,

6   that each of those are the same as the watch that you

7   photographed, the sticky you photographed, and the baggie that

8   you photographed on May 19, 2012?

9   A.  Yes.  And I know it's the exact same bag because it's faded

10  here on my initials and date on the bag.

11  Q.  Thank you.

12          Now, sir, I would like to talk with you a little bit

13  about some of the other purchases that were made that day, May

14  19, 2012.

15  A.  Are we done with People's Exhibit 100?

16          THE COURT:  Set it aside.

17  Q.  You can just put it to the side.

18          MR. GUNTHER:  Thank you, your Honor.

19  Q.  Now, you testified that there were five -- a total of six

20  watches purchased that day, right?

21  A.  Yes.

22  Q.  So let's talk about a couple of the others.

23          And if we look at the first page of your report --

24  sorry.  If we look at the second page of your report, 240A, you

25  have 215 Canal Street, and you have a description of what

1   happened at 215 Canal Street as part of the investigation,

2   right?

3   A.  Correct.

4   Q.  And you've made the correction that that's a typo and it

5   should be 213; correct?

6   A.  Yes.

7   Q.  All right.

8           Now, sir, with respect to that, can you tell me what

9   occurred in general terms during the purchase at 215 Canal

10  Street? -- I'm sorry, 213 Canal Street.  Excuse me.

11  A.  If I may have a moment to review.

12  Q.  Sure.

13          (Pause)

14  A.  Investigator Quinonez and Luigi Porco had entered the

15  store.  They were talking amongst themselves.  The clerk

16  overheard them speaking, and he interjected that he had the

17  James Bond watch.  And he said it was an Omega brand watch.

18          He then bent down to retrieve the Omega watch from a

19  display behind a display of belts.  They had a conversation,

20  negotiated price; 80 U.S. dollars was agreed upon.  Transaction

21  occurred, and they exited the store.

22  Q.  And what does your report say about what Ms. Quinonez did

23  with that watch?

24  A.  They exited the store, and then she tagged the watch with

25  the identifying marker, in this case the yellow sticky.  And it

1   remained in her possession until it was turned over directly to

2   me.

3   Q.  Now, if you look over on page 3 -- and this is a

4   continuation of your report's description of the purchase at

5   213 Canal Street -- there is a line that says:  Attachment 5

6   depicts the watch purchased by Investigator LQ.

7          Do you see that?

8   A.  Yes.

9   Q.  And you were referring to Leslie Quinonez there?

10  A.  Leslie Quinonez, yes.

11  Q.  What does attachment 5 depict, which watch does it depict?

12  And again, I'm focusing on the location of purchase.

13  A.  It depicts the watch purchased from 213 Canal Street.

14  Q.  Okay.  Now, if you turn to attachment 5 in your report, can

15  you tell us what that is?

16  A.  Yes.  It is a picture of the watch, the bag the watch came

17  in, and the yellow sticky marked with the number 213.

18  Q.  All right.  And whose handwriting is on the yellow sticky?

19  A.  Leslie Quinonez.

20  Q.  And what does 213 represent?

21  A.  It is the number of the location on Canal Street the watch

22  was purchased from.

23  Q.  All right.  And what else is in the photograph?

24  A.  The bag the watch came in is a clear plastic bag, and it's

25  underneath the sticky and the watch itself.

1    Q.  All right.

2            Now, the watch itself -- and again, sir, comparing it

3    to the watch in Exhibit 100 and the watch in the photograph

4    Exhibit 104 -- are there differences between that watch and the

5    other watch?

6    A.  Yes.

7    Q.  Can you describe them?

8    A.  This has a movable rotating bezel that's blue.

9    Q.  Let me stop you there.

10           What's a bezel?

11   A.  It's the outer ring that can be moved on a diver's watch.

12   I call it a bezel.  I don't know if that's the correct term or

13   not.

14           THE COURT:  It's the one with the numbers on it, 20,

15   30, 40, 50.

16           THE WITNESS:  Yes, your Honor.  And what's blue in the

17   background.  And it has, as your Honor indicated, 20, 30, 40,

18   60, and a little luminous dot on top.

19   Q.  Okay.  Now, sir, could you describe -- you've described

20   that circle, that bezel.  How does that differ, if it does,

21   from the watch that was purchased at 375 Canal Street?

22   A.  The watch that was purchased from 375 Canal Street does not

23   have a numerical bezel or any bezel with hashmarks on it.

24   Q.  All right.  Now, I want to go to the next purchase that is

25   referenced in your report, and that is a purchase at 209 Canal

1    Street.  And that's on page 3 of your report.

2              Sir, can you generally -- what does your report,

3    generally, at a high level, say about that purchase?

4    A.  If I may have a moment to review.

5    Q.  Sure.

6              (Pause)

7    A.  In this particular transaction, Leslie Quinonez engaged the

8    clerk in conversation.  The clerk indicated that they did carry

9    Omega watches, and produced a watch from beneath a drawer

10   underneath the cash register.  The clerk also went to the back

11   room to get additional Omega watches for Investigator Quinonez

12   to look at.  Omega Speedmaster watch was agreed upon.  The

13   negotiated price was $55.  Leslie Quinonez purchased the watch,

14   thanked him for his help, and exited the store.

15   Q.  What does your report say about what Leslie Quinonez did

16   with that watch?

17   A.  Leslie Quinonez tagged the watch with the identifier, in

18   this case the yellow sticky, and it remained in her possession

19   until she later turned it over to myself.

20   Q.  And, sir, do you see there's a reference down towards the

21   bottom of the page, page 3 under the 209 Canal Street heading,

22   that says:  Attachment No. 11 depicts the watch purchased by

23   Investigator LQ.

24             What did you understand that watch to be in terms of

25   where it was purchased?

1   A.   That attachment 11 is the watch purchased from 209 Canal

2   Street.

3   Q.   All right.

4          Now, let's take a look, if we can at exhibit -- at

5   attachment 11 to your report.  What is shown in attachment 11?

6   A.   Attachment 11 shows four items.  One is the yellow sticky

7   with the smaller numeral 2 and the number 209, which reflects

8   the location the watch was purchased from; a bracelet link; a

9   clear plastic sleeve the watch was sold in; and the Omega watch

10  itself to the right.

11  Q.   And the yellow sticky has handwriting on it.  Whose

12  handwriting is that?

13  A.   Leslie Quinonez.

14  Q.   And what does the 209 refer to?

15  A.   "209" refers to the location, 209 Canal Street, the watch

16  was purchased from.

17  Q.   Okay.  And focusing on the bezel of the watch in the

18  photograph, can you describe the bezel of that watch?

19  A.   Yes.  It is a bezel that appears to have numbers

20  surrounding the entire watch face itself.

21  Q.   Okay.  And how would you compare that watch in terms of its

22  similarity or dissimilarity, the bezel portion of it, to the

23  watch that was purchased at 375 Canal Street that's shown in

24  Exhibit 104 and Exhibit 100?

25  A.   The watch purchased from 209 Canal Street has a bezel.  The

1    watch purchased from 375 Canal Street does not have this bezel.

2    Q.  All right.

3         And does it have any markings on the circle outside

4    the watch face?

5    A.  No, it does not.

6    Q.  Okay.  Now, sir, let's go to the next purchase of the watch

7    that's referenced in your report, and that is on page 4 of your

8    report, and that's at 303 Canal Street.

9         And referring to your report at page 4, can you

10   generally describe what the report says with respect to the

11   purchase of an Omega branded watch at 303 Canal Street?

12   A.  Yes, if I may have a moment to review.

13        (Pause)

14   A.  Investigator Quinonez and with Luigi Porco entered this

15   retail location.  Clerk No. 3 engaged Leslie Quinonez in

16   conversation.  Leslie Quinonez inquired if they carried Omega

17   watches.  The clerk No. 3 indicated they had.  And the other

18   clerk present, clerk No. 4, was observed going into the rear

19   stockroom and retrieving an Omega watch.  There's some

20   conversation that ensued once the watches were brought out.  A

21   negotiated price of $75 was agreed upon for the purchase of the

22   watch.

23   Q.  And what does your report say about what Ms. Quinonez did

24   with that watch?

25   A.  In this case, again, the watch was tagged with a yellow

J2QVOME3                        Cole - direct

1    sticky when she left the store, and it was placed with the

2    watch itself.

3    Q.  All right.

4            Now, if we look at attachment 16 -- and this is now a

5    little bit below, but this is part of the description of your

6    report relating to your investigation of 303 Canal Street -- it

7    says:  Attachment No. 16 depicts the watch purchased by

8    Investigator LQ.  Do you see that?

9    A.  Yes, I do.

10   Q.  What is your understanding of where that watch was

11   purchased as depicted in attachment 16?

12   A.  From 303 Canal Street.

13   Q.  All right.

14           Let's turn to, if we can, then, attachment 16 to your

15   report.  Sir, what is shown in this photograph?

16   A.  There are three items shown in this photograph.

17           Firstly is the yellow sticky with the smaller number

18   3.  The larger numerals, "303," written on the sticky.  On top

19   of the sticky is an Omega watch with shrink-wrap with a little

20   blue stripe on it.  And to the left is the clear plastic bag

21   the watch was sold in.

22   Q.  All right.  Can you compare -- and you took this

23   photograph, sir?

24   A.  Pardon me?

25   Q.  You took this photograph?

1    A.  Yes, I did.

2    Q.  Okay.

3         Can you compare the watch that's shown in attachment

4    16 to your report, the watch purchased at 303 Canal Street with

5    the watch purchased at 375 Canal Street?

6    A.  Yes.  The watch from 303 has the rotating bezel on the

7    outside with numerals indicating 20, 30, 40, 50, a luminescent

8    dot, has some hashmarks as well on the outside rotating bezel,

9    and has more of a blue face on it in comparison to the watch

10   that was purchased at 375, there is no outside bezel with any

11   markings or hashmarks, and the watch face is a different color.

12   Q.  All right.

13        Now, sir, the next watch in your report is the one

14   purchased at 375 Canal Street.  We've done that, so I'm not

15   going to do that again.

16        So let's go down to the watch that was purchased at

17   351 Canal Street.  And this is towards the bottom of page 5 of

18   your report.

19        Can you review that portion of your report and tell us

20   what the report -- in summary what the report says about the

21   purchase of the watch at that location.

22   A.  Yes.

23        (Pause)

24   A.  As in the other locations, Investigator Quinonez/Luigi

25   Porco entered the store.  Investigator Quinonez, posing as a

1   tourist, engaged clerk No. 6 in conversation.  The clerk

2   offered to sell Omega watch to Leslie Quinonez and went to

3   retrieve two Omega watches from a bag on the left rear shelf.

4   Negotiation conversation continued, and the agreed-upon price

5   was $85 to purchase Omega Speedmaster watch.

6   Q.  What did Ms. Quinonez do with that watch after the

7   purchase?

8   A.  Once again, once it was purchased, they exited the store,

9   created a yellow sticky, and tagged it to associate it with the

10  watch purchased for that location.

11  Q.  All right.

12          Now, sir, if you look a little further down under the

13  heading "351 Canal Street" in your report, we actually have to

14  turn over to page 6, there are some attachments that are

15  listed, and one of them is attachment 26.  Do you see that?

16  A.  Yes, I do.

17  Q.  And it says:  Attachment No. 26 depicts the watch purchased

18  by Investigator LQ.  Do you see that?

19  A.  Yes, I do.

20  Q.  What is your understanding of where that watch was

21  purchased?

22  A.  That watch was purchased from 351 Canal Street.

23  Q.  Okay.  Let's take a look at the photograph in attachment

24  26.

25          And can you tell us what that shows?

1   A.  Yes.  That shows three items.  It shows a yellow sticky

2   with the numerical number 351, next to the purchased Omega

3   watch.  And they are resting on top of the black plastic bag

4   that the purchase was placed into by the store clerk.

5   Q.  All right.  And sir, you took this photograph?

6   A.  Yes, I did.

7   Q.  All right.  Can you compare the watch that appears in

8   attachment 26, that is, the watch that was purchased at 351

9   Canal Street, with the watch that was purchased at 375 Canal

10  Street?

11  A.  This watch also has a rotating bezel on the outside with

12  various numerals, and the wording tachymeter on the exterior

13  bezel.

14  Q.  Where does it say "tachymeter"?

15  A.  If you look at the watch between the 12 o'clock and 1

16  o'clock position on the outside of the bezel, you can see

17  T-A-C-H-Y-M-E-T-E-R-E.

18  Q.  Okay.

19          And has Mr. Lam put an oval around that?  Has he done

20  that?

21  A.  Yes, he has.

22  Q.  Now, sir, how does that compare -- specifically that

23  portion of the watch, the bezel, how does that compare with the

24  bezel on -- of the watch that was purchased at 375 Canal

25  Street?

1   A.  The bezel on the watch for 351 Canal Street does not exist

2   on the watch purchased at 375 Canal Street.

3   Q.  And how are they different?

4   A.  They are different in the fact that the bezel is not

5   present, number one.  Two, the color of the hashmarks

6   indicating 5, 10, 15, 20, etc., is different.

7   Q.  And so the coloring is different with respect to the bezel,

8   and with respect to 375 Canal Street there's no markings on

9   that portion of the watch; is that right?

10  A.  Correct.  There's no bezel, period; so there's no markings

11  to be had.

12  Q.  Okay.  Now, sir, just one more.  Bear with me.  We're just

13  about done with this.

14          I want to go to your report and talk about the final

15  location where an Omega counterfeit watch was purchased, and

16  that's 112-A Mulberry Street.  That's on page 6 of your report

17  and it continues over to page 7.

18          Sir, can you take a look at that description and tell

19  us in general terms what happened in terms of the purchase of

20  an Omega branded watch on May 19, 2012 at 112-A Mulberry

21  Street?

22  A.  Investigator Quinonez and Luigi Porco entered the store.

23  Leslie Quinonez engaged the clerk in conversation.  The clerk

24  offered to sell Omega watch to Leslie Quinonez.  He then

25  retrieved two Omega watches from the rear stockroom.

1    Conversation/negotiation continued.  And the agreed-upon price

2    was $85 for the Omega watch.

3    Q.  All right.

4          Now, after the purchase of the Omega watch for $85,

5    what does the report say that Ms. Quinonez did with the watch?

6    A.  Ms. Quinonez exited the store, tagged the watch with an

7    identifying marker, again, the yellow sticky, and then the

8    watch remained in her possession till she later turned it over

9    to me.

10   Q.  All right.

11         And then if you look on the next page, page 7 -- and

12   this is still under the heading of the operation at 112-A

13   Mulberry Street -- there is a reference on attachment 31.  Do

14   you see that?

15   A.  Yes, I do.

16   Q.  And it says:  Attachment 31 depicts the watch purchased by

17   Investigator LQ.  Do you see that?

18   A.  Yes, I do.

19   Q.  And, sir, what is your understanding of where -- in terms

20   of the physical location, where that watch that's depicted in

21   attachment 31 was purchased?

22   A.  The watch was purchased from 112-A Mulberry Street.

23   Q.  Let's turn now to attachment 31 of your report.

24         Sir, this is a photograph; is that correct?

25   A.  Yes, it is.

1    Q.  Who took it?

2    A.  I did.

3    Q.  And did you take it at or about the time of your report?

4    A.  Yes, I did.

5    Q.  Now, sir, can you describe what's in the photograph that's

6    attached to your report as attachment 31?

7    A.  You have three items.  One is the yellow sticky, 112 with

8    the word "Mulberry"; the second is a Omega watch; and the third

9    is the bag the watch came in, which has a Ziploc bag with a red

10   stripe across the top of it.

11   Q.  All right.  And sir, focusing on the watch itself and

12   focusing on the bezel, can you describe that for the jury?

13   A.  It appears to be a black rotating bezel with numbers and

14   hashmarks on it.  And the other watch, between the 12 and 1

15   o'clock position on the bezel, the word "tachymeter" is

16   visible.

17   Q.  All right.  So "tachymeter" appears on this watch as well?

18   A.  Yes, it does.

19   Q.  Can you compare that watch, particularly that portion of

20   the watch in attachment 31, with the watch that was purchased

21   at 375 Canal Street?

22   A.  The watch at 112 Mulberry has the rotating bezel with the

23   numbers -- with "tachymeter" on it.  The watch purchased from

24   375 does not, has no rotating bezel.

25   Q.  All right.  Now, sir, we've gone through all six watches

J2QVOME3                         Cole - direct

1    that were purchased during the May 19, 2012 investigation,

2    right?

3    A.   Correct.

4    Q.   And you can check your report if you want to be sure.

5    A.   Okay.  Yes.

6    Q.   Sir, how many of those watches, those six watches, had

7    bezels on them with either numerals and/or writing?

8    A.   Five of the six did.

9    Q.   Okay.  Of the six watches, how many had no numerals or

10   writing on that ring around the watch?

11   A.   One.

12   Q.   Which one?

13   A.   The watch that was purchased at 375 Canal Street.

14   Q.   And, sir, if you look at Exhibit 104 in evidence, what does

15   that depict in terms of the circle around the watch face?

16   A.   It is smooth where the others you would see a rotating

17   bezel with numbers and hashmarks.  This is smooth silver in

18   appearance and highly polished.

19   Q.   All right.  And if you'd pick up the watch that is

20   contained in Exhibit 100, the physical exhibit.  Again,

21   focusing on the ring around the watch face, can you describe

22   that and compare it to what's shown in the photograph

23   Plaintiffs' Exhibit 104.

24   A.   The watch is indistinguishable.  It is -- again, what I

25   call the tuning fork at the 12 o'clock position is visible in

1    the picture, as well as the watch I have in my hand, along with

2    the shrink-wrap and the thin blue stripe approximately a

3    centimeter wide at the 6 o'clock and 12 o'clock position.  Two

4    push buttons and a crown stem at the right.  Three dials, one

5    at 3 o'clock, one at 6 o'clock, and one at the 9 o'clock

6    position.

7    Q.  Now, sir, I've taken you through each of the purchases that

8    were made in the investigation.  And we've taken you through

9    the report and the photographs that you took.

10         The defendants have alleged in this case that you and

11   the other investigators working for you did a sloppy

12   investigation.  Do you agree with that allegation?

13             MR. SCHICK:  Objection, your Honor.

14             THE COURT:  Sustained.

15   Q.  Did you attempt, in doing this investigation, to be

16   careful?

17   A.  Yes.

18   Q.  Did you follow the best practices that you were aware of

19   and utilized at the time?

20             MR. SCHICK:  Objection, your Honor.

21             Leading the witness.

22             THE COURT:  Overruled.

23   Q.  You can answer.

24   A.  Yes.

25   Q.  Did you attempt, in doing the work that you did on May 19th

```
 1   and thereafter, to be careful that the watches purchased at
 2   each location were not mixed up?
 3   A.  Yes.
 4            MR. SCHICK:  Objection, your Honor.
 5            THE COURT:  Overruled.
 6   Q.  And how did you do that?
 7   A.  The watches were either in a sales bag, a black bag, or in
 8   a silver pouch.  Leslie Quinonez was instructed and did write
 9   the identifying yellow sticky note and placed it inside the bag
10   the watch was contained in or inside the bag the watch was
11   placed inside with and tied off.  So the chance of mixing up
12   the watches was extremely minimal.
13   Q.  All right, sir.
14            THE COURT:  Would this be a convenient place for a
15   break?
16            MR. GUNTHER:  This would be a terrific place.
17            THE COURT:  All right.  We'll take our luncheon recess
18   and resume in about 40 minutes.
19            (Jury not present)
20            THE COURT:  You can step down, Mr. Cole.
21            THE WITNESS:  Thank you.
22            (Witness not present)
23            THE COURT:  How much more do you have?
24            MR. GUNTHER:  I've got two topics.  It's probably 20
25   minutes.
```

1            THE COURT:  Okay.

2            MR. GUNTHER:  Maybe.

3            THE COURT:  How much do you have, Mr. Schick?

4            MR. SCHICK:  I would think it would go 30, 45 minutes,

5      your Honor.

6            THE COURT:  All right.

7            Now, this is the first time I've had this schedule.

8      We start at 9 in the morning, go to 11:30.  I intend to ask the

9      jury what their reaction is, but what's your reaction?

10           MR. GUNTHER:  Your Honor, here's what I would say:

11           I like it.  One of the reasons I like it is I think we

12     get virtually as much testimony as we would do starting a

13     little bit later with a longer lunch break and maybe ending at

14     4:30.

15           THE COURT:  You get five hours.

16           MR. GUNTHER:  And I think you'd probably get about

17     five hours on the record if you do it the other way.

18           The terrific thing for us -- and I know we're probably

19     the last ones we have to worry about, but the terrific thing

20     for us is that we get to go back and do some work between 2:30,

21     3 o'clock.  And, you know, even though we're up pretty late,

22     we're not up quite as late as we otherwise would be.

23           So I think it's awesome.

24           THE COURT:  How do you feel, Mr. Schick?

25           MR. SCHICK:  If it works for Wilmer Hale, what could

1    be bad?

2            THE COURT:  Okay.  I'll take that as a positive.

3            We found the marshal who investigated what happened

4    this morning.  And Ms. Brisson is wearing a belt which

5    contained -- was setting off the metal detector.  You set off

6    the metal detector, fellows downstairs thinks guns.  So they

7    asked her to remove the belt; couldn't remove the belt, so they

8    asked her to remove the jacket, which caused the upset.

9            I'm trying to find the marshal now.  The marshal was

10   here.  He had something else to do --

11           THE MARSHAL:  I'm here, your Honor.

12           THE COURT:  Oh, you are.  Okay.

13           So I'm going to have Ms. Brisson come out and we'll

14   talk to the marshal.  I'll do that in the robing room and do it

15   off the record.

16           MR. GUNTHER:  Your Honor, I think that's perfectly

17   fine.  And I'll say this:  I don't think that the lawyers need

18   to be in there for that.

19           THE COURT:  All right.

20           MR. SCHICK:  I agree, your Honor.

21           THE COURT:  All right.

22           Well, Marshal, come on in.

23           MR. SCHICK:  If we could just ask that 240A, as I

24   said, was something that wasn't previously identified as a

25   trial exhibit.  If we could just ask the plaintiffs to send it

J2QVOME3                          Cole - direct

1    across electronically so that we can do it with Mr. Cole and we

2    don't have to bother Mr. Lam.

3                MR. GUNTHER:  We'll do that.

4                (Luncheon recess)

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2qWome4                              Cole - Direct

```
 1                          AFTERNOON SESSION

 2                             12:10 p.m.

 3              (Jury not present)

 4              THE COURT:  Good afternoon.  Please be seated.

 5              Are you getting Mr. Cole?

 6              MR. GUNTHER:  Yes, we're bringing him right in, your

 7    Honor.

 8              (Jury present)

 9              THE COURT:  Please be seated.

10              Mr. Gunther, go ahead.

11              MR. GUNTHER:  Thank you, your Honor.

12    Q.  Good afternoon, Mr. Cole.

13    A.  Good afternoon.

14    Q.  I'm going to switch topics now and ask you some questions

15    about emails.

16              MR. GUNTHER:  Let me start by saying this.  I offer

17    DX-W.

18              THE COURT:  DX-W, any objection?

19              MR. SCHICK:  No, your Honor.

20              THE COURT:  It's received in evidence.

21              (Defendants' Exhibit W received in evidence)

22              MR. GUNTHER:  Thank you.  Could we put DX-W up on the

23    screen, and could we blow up the top of it.  That's perfect,

24    Mr. Lam.

25    Q.  Sir, can you tell us what is shown at the top of the first
```

1    page of Defendants' Exhibit W?

2    A.  An email from Joshua Paul to myself, dated October 18,

3    2010, at 11:55 a.m.

4    Q.  Do you have any doubt you received this on or about October

5    18, 2010?

6    A.  No.

7    Q.  Sir, if you can take a look at the email and read through

8    it, the first thing I'd like you to do is to tell me what your

9    understanding of what Mr. Paul is trying to convey to you.

10        MR. SCHICK:  Your Honor, shouldn't the question be

11   what he understood from the email, not what Mr. Paul was trying

12   to tell him?

13        THE COURT:  Yes.

14   Q.  What did you understand from the email?  What did you take

15   from the email?  What was your understanding of what Mr. Paul

16   was writing to you about?

17        MR. SCHICK:  Same objection, your Honor.

18        THE COURT:  Overruled.

19        MR. GUNTHER:  Thank you.

20   A.  There are two different areas of this email Mr. Paul was

21   discussing.  One indicated that, and I'll start from the New

22   York Police Department, a Richard Taute might be doing some

23   enforcement action.  Wanted us to collaborate on some

24   enforcement action, and that's it's preliminary at this stage

25   and may want to get us involved, us meaning me get involved, at

1   some point as it pertains to identification of counterfeit

2   product versus genuine product.

3        And on a second issue, a parallel track, as he said, a

4   proposal to bring one or more civil actions against two groups

5   of defendants: brick-and-mortar retail establishments and

6   operators of replica websites.

7   Q.  All right.  Now, sir, that second paragraph --

8             MR. GUNTHER:  Mr. Lam, maybe you can highlight.

9   Q.  -- says, "On a parallel track, we would like to follow up

10  with a proposal to the client to bring one," and it says "of,"

11  but I think it means "or," "one or more civil lawsuits in the

12  NYC area against two groups of defendants: one,

13  brick-and-mortar retail establishments from which we already

14  have a report from you."  I'm going to stop there.

15       What did you understand when you read brick-and-mortar

16  retail establishments?  What did you understand him to be

17  conveying?

18  A.  My take on it was locations known to sell counterfeit

19  merchandise, presumably Canal Street area.

20  Q.  OK.  And sir, then it says, "two, operators of 'replica

21  websites.'"  What did you understand that to mean?

22  A.  Those individuals who operate and sell quote/unquote

23  replica watches via the Internet.

24  Q.  All right.  Now, sir, is there anything in this email about

25  taking enforcement action against landlords?

1    A.  No, there's not.

2    Q.  Is there anything, is there any mention of landlords

3    anywhere in this email?

4    A.  No.

5    Q.  Now, sir, I'd like to refer you to another email string,

6    which is Plaintiffs' Exhibit 304.

7            MR. GUNTHER:  Please don't put that up yet.

8    Q.  I'd like you to turn in your binder, the larger binder, to

9    Plaintiffs' Exhibit 304.  I'm going to ask you to take a look

10   at that and tell me what it is.

11   A.  This looks to be an email chain with the first page of the

12   email dated September 8, 2010, 9:28 a.m.

13   Q.  All right.  Who sent the email and who is listed as the

14   recipient?

15   A.  Joshua Paul sent the email to myself.

16   Q.  All right.  Sir, if you look through the rest of the

17   exhibit, are there other emails in the early September period

18   going back and forth between you and Mr. Paul?

19   A.  Yes.  It looks like this is an email chain in reverse

20   chronological order -- let me check -- going back to another

21   email, dated September 8, 2010, at 7:41; another email, dated

22   September 7, 2010, at 5:20 p.m.; another email, dated Friday,

23   September 3, at 12:18 p.m.

24   Q.  All right, sir.  There's a stamp.  There are several stamps

25   on the bottom, but there's one stamp that says Diogenes, and

1    the first page is 159.  Do you see that?

2    A.  Yes, I do.

3    Q.  And it goes on, and each page has a stamp that starts

4    Diogenes and then has a number running from 159 to 162.  Do you

5    see that?

6    A.  Yes, I do.

7    Q.  Is it your understanding that this document came from your

8    files?

9    A.  Yes.

10             MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

11   304.

12             MR. SCHICK:  No objection, your Honor.

13             THE COURT:  304's in evidence.

14             (Plaintiffs' Exhibit 304 received in evidence)

15   BY MR. GUNTHER:

16   Q.  What I'd like to do, because email strings are in reverse

17   chronological order, is start with the first email, which is

18   going to be at the end.  If we look at the bottom of the third

19   page, Diogenes 161, the very top of that email is going to be

20   shown.  Do you see it at the top there, sir?

21   A.  Yes.  It's the highlighted portion that says from Joshua

22   Paul, sent Friday, September 3, 2010, at 12:18 p.m.

23   Q.  OK.  So September 3, 2010, Mr. Paul is sending you an

24   email.

25             MR. GUNTHER:  If we could scroll up a little bit,

1   Mr. Lam, so we can see the body of the email.

2   Q.  Can you tell us what he wrote to you on that date?  Does

3   it, in fact, say, "To confirm our phone discussion just now, we

4   would like you to open up an investigation of counterfeit

5   Swatch Group watches in the New York metropolitan area.  Please

6   focus on the following five brands:  Omega, Swatch, Rado, CK

7   and Tiffany.  (Our client is the exclusive licensee of the CK

8   and Tiffany marks for use with watches).  Initially, we're

9   interested in getting an understanding of the lay of the land.

10  Please give me a call when you have something to report.

11  Thanks and regards."

12      Do you see that?

13  A.  Yes.

14  Q.  Sir, is there anything in here that tells you where to do

15  that investigation?

16  A.  No, there is not.

17  Q.  Is there anything in there that tells you that you should

18  target a specific retail location?

19  A.  No.

20  Q.  Is there anything in there that tells you that you should

21  target 375 Canal Street?

22  A.  No.

23  Q.  OK.  Let's go to the next email, which is now going to be

24  on page 161, and it's at the top of the page.  This is an

25  email.  Can you tell us what the email is at the top of the

1   page?

2   A.   The email's from Joshua Paul, dated Tuesday, September 7,

3   2010, at 5:20 p.m.

4   Q.   OK.   And that's an email he sent to you?

5   A.   That's correct.

6   Q.   What's the re line say?

7   A.   I'm sorry.   What was that, sir?

8   Q.   The re line says, "Counterfeit watch investigation (Omega,

9   Swatch, Rado, CK and Tiffany)."

10  A.   Oh, OK.

11  Q.   Do you see that?

12  A.   Yes, I do.

13  Q.   Sir, can you read the first two sentences of the body of

14  the email that Mr. Paul sent to you on September 7, 2010?

15  A.   "Brad, unbeknownst to me when we spoke on Friday, it turns

16  out that there's a bit of time urgency to the project we

17  discussed.   My client is interested in getting at least a

18  preliminary read on the availability of counterfeit watches in

19  Manhattan as soon as possible."

20  Q.   Sir, now, reading that, does the email indicate to you that

21  Mr. Paul, rather than his client, was the driving force behind

22  this investigation?

23           MR. SCHICK:   Your Honor, objection.   Again, leading.

24           THE COURT:   Sustained.

25  Q.   What does this email tell you?   What do you understand this

1    email to say in terms of who, as between Mr. Paul and the

2    client, his client, Swatch Group, was directing this

3    investigation?

4    A.   Well, my understanding is, it's the client is interested

5    and has -- is the driver of this, for lack of a better term.

6    Q.   Why do you say that?

7    A.   "My client is interested in getting at least a preliminary

8    read," so he's speaking, I presume, for The Swatch Group

9    client.

10   Q.   OK.  And when he refers to urgency, what is your

11   understanding of where that urgency is coming from?

12          MR. SCHICK:  Your Honor, once again, he's asking him

13   to speculate about what Mr. Paul, a witness who is available to

14   them, had in mind when he wrote an email years ago.

15          MR. GUNTHER:  Your Honor, I'm not doing that, and as a

16   matter of fact, I'm asking him --

17          THE COURT:  Why don't you try again, Mr. Gunther.

18          MR. GUNTHER:  Yes, sir.  I will.

19   Q.   What do you understand, reading this, as to between

20   Mr. Paul and his client, Swatch Group, who was expressing time

21   urgency?

22   A.   It's the client that -- that is expressing urgency.

23   Q.   Again, does this email tell you where to do the

24   investigation?

25   A.   No.

1    Q.  Does it say anything about targeting landlords?

2    A.  No.

3    Q.  Does it say anything about targeting any particular retail

4    location?

5    A.  No.

6    Q.  Does it say anything about targeting 375 Canal Street?

7             MR. SCHICK:  Your Honor, again, he's leading the

8    witness.

9             THE COURT:  No.  He's asking a specific question.

10            MR. GUNTHER:  Thank you, your Honor.

11            THE COURT:  Overruled.

12   A.  No.

13   Q.  All right.  Let's go to the next email in the chain.  We're

14   kind of looking backwards up through the document.  And this is

15   an email that begins on the first page.  It's an email, and

16   I've got it up on the screen.  Can you tell us who sent this

17   email and when?

18   A.  This email was sent Wednesday, September 8, 2010, at 7:41

19   a.m., from myself to Joshua Paul.

20   Q.  OK.  And what did you say in that email?

21   A.  Basically, are there any time frames this needs to be done?

22   Are we looking at any filing or court deadlines?

23   Q.  All right.  And did you refer to it as a canvass?

24   A.  Yes.

25   Q.  Now, sir, we talked about canvassing as part of the work

J2qWome4                         Cole - Direct

1   that you do earlier.  Does canvassing involve purchasing

2   counterfeit items?

3   A.  No.

4   Q.  Now, sir, let's look at the last email.  It's actually the

5   first one in the document, Plaintiffs' Exhibit 304, but the

6   last email.  Can you tell us who sent that email and when?

7   A.  That was from Joshua Paul to myself, dated September 8,

8   2010, at 9:28 a.m.

9   Q.  And can you read what he says, and specifically the first

10  two sentences?

11  A.  "There are no filing deadlines.  The only deadline is

12  internal at the client."

13  Q.  What did you understand that to mean in terms of whether

14  the deadline was coming from the client -- that is, The Swatch

15  Group -- as opposed to Mr. Paul?

16  A.  My understanding is, is that is internal to the client and

17  driven by the client.

18  Q.  OK.  Now, there's a sentence there that says, "Keep in mind

19  that we do not need at this point to identify specific

20  potential targets."  Do you see that?

21  A.  Yes.

22  Q.  "For now we are interested simply in your informed

23  impressions about the prevalence of counterfeit Omega, Swatch,

24  Rado, CK or Tiffany watches in Manhattan."  Right?

25  A.  Correct.

1   Q.  Does it say anything about where you ought to do the

2   investigation?

3   A.  No.

4   Q.  Does it say anything about Canal Street?

5   A.  No.

6   Q.  Does it say anything about 375 Canal Street?

7   A.  No, sir.

8   Q.  Thank you.

9        Who determined where to do that investigation?

10  A.  I believe I did.

11  Q.  Thank you.

12       Now let's go to another exhibit, sir, and I'm going to

13  ask you to -- first I'm going to put it up.

14       Sir, first I'm going to ask you to look at it in the binder

15  before we put it up, and it's Plaintiffs' Exhibit 305.  It's a

16  series of emails.  Well, it's an email and something else.  Can

17  you tell me what it is?

18  A.  Nothing's on my screen yet, sir.

19  Q.  No, no.  I'm sorry.  That's my fault.  Could you take a

20  look in your big binder and look at Plaintiffs' Exhibit 305?  I

21  apologize.

22  A.  Yes.

23  Q.  Sir, can you tell us what Exhibit 305 is?

24  A.  Exhibit 305 is an email from myself to Joshua Paul, subject

25  line ROI No. 1, Canal Street, New York, New York, canvass and

1    invoice.

2    Q.  All right.  Sir, can you tell me what the next page of

3    Exhibit 305 is?

4    A.  It's an invoice.

5    Q.  And then the page after that?

6    A.  Report of investigation.

7    Q.  And that's representative of a report that you created?

8    A.  Yes.

9    Q.  And sir, what's the date of the investigation?

10   A.  Friday, September 10, 2010.

11   Q.  And that's two days after the last email back and forth

12   that we looked at in Exhibit 304, is that right?

13   A.  Yes.

14   Q.  Sir, is that a report you created in the course of your

15   investigative business?

16   A.  Yes.

17   Q.  Was it made close in time to the investigation?

18   A.  Yes.

19   Q.  Is it the type of report you regularly make and maintain in

20   the course of your business?

21   A.  Yes.

22   Q.  Is it a report that you made in response to emails that you

23   received from Mr. Paul that we just went over in Plaintiffs'

24   Exhibit 304?

25   A.  It is a report based off the action requested in emails,

1    yes.

2              MR. GUNTHER:  I offer Plaintiffs' Exhibit 305, your

3    Honor.

4              MR. SCHICK:  No objection, your Honor.

5              THE COURT:  305's in evidence.

6              (Plaintiffs' Exhibit 305 received in evidence)

7              MR. GUNTHER:  Let's put up on the screen the first

8    page.

9    Q.  Sir, can you just tell us who sent the email and what it

10   is?

11   A.  I sent the email to Joshua Paul on September 16, 2010, at

12   10:27 a.m.

13   Q.  Sir, let's turn, if we can, to the third page of the

14   document, which is the first page of your report.  Do you see

15   that?

16   A.  Yes, sir.

17   Q.  Sir, what's the date of the report?

18   A.  Friday, September 10.

19   Q.  What was the date of the investigation?  And you can take a

20   look through your report.

21   A.  Friday, September 10.

22   Q.  All right.  So the report was made the same day?

23   A.  I believe so.

24   Q.  All right.  Now, sir, if you look down under the heading

25   "investigation," it's a little bit down towards the bottom of

1   page 1, it says, "On Friday, September 10, 2010, the

2   investigator canvassed the Canal Street business area,

3   including the area of NYC Chinatown from Bowery to Broadway

4   west/north of Canal Street."  Do you see that?

5   A.  Yes.

6   Q.  Was that you, or did someone else do the investigation?

7   A.  It was another individual.

8          MR. SCHICK:  I didn't hear the answer.

9          THE WITNESS:  Another individual.

10  Q.  Do you know who it is?

11  A.  I believe it was William Quinonez.

12  Q.  Now, sir, you talk about a canvassing operation, right, in

13  that first sentence under investigation?

14  A.  Yes.

15  Q.  And remind us what a canvass is.

16  A.  A canvass is basically a walk-through, window-shopping of

17  an area, to see what's being offered for sale.

18  Q.  And you're not purchasing?

19  A.  Not purchasing, no.

20  Q.  Sir, if you take a look at the second page of the report,

21  there's 11 stores listed there, right?

22  A.  Yes.

23  Q.  Sir, any of those 375 Canal?

24  A.  No, sir, they are not.

25  Q.  All right.  Sir, what was -- looking at this page of the

1    report, what does this convey to you?

2    A.   Could you restate the question, please?

3    Q.   Sure.

4            THE COURT:   What idea were you trying to convey by

5    listing these 11 companies?

6            MR. GUNTHER:   Thank you, your Honor.

7            THE WITNESS:   Trying to just indicate these are the

8    locations that either Omega, Rado and/or Swatch product or

9    trademarks we observed being offered for sale.

10   Q.   Sir, do you recall in conducting this investigation

11   Mr. Paul ever telling you where this investigation should be

12   conducted?

13   A.   I don't recall him giving specific addresses or anything

14   like that.

15   Q.   Sir, was there any targeting, and you can look at your

16   report.  Does your report indicate any effort to target

17   landlords as opposed to retail sellers?

18   A.   No, because we were looking for retailers selling

19   counterfeit merchandise.

20   Q.   OK.  Did Mr. Paul ever tell you, in words or substance,

21   that he was trying to set up the landlord at 375 Canal Street?

22           MR. SCHICK:   Objection, your Honor.

23           THE COURT:   Sustained.

24   Q.   Did Mr. Paul ever tell you, in words or substance, that it

25   was his intent to target the landlord at 375 Canal Street?

1    A.  No.

2    Q.  Did Mr. Paul ever tell you, in words or substance, that he

3    saw this operation as a way to get money for him and his law

4    firm?

5            MR. SCHICK:  Objection, your Honor.

6            THE COURT:  Sustained.

7    BY MR. GUNTHER:

8    Q.  All right.  I have one last topic to cover with you.  We're

9    coming into the homestretch.

10       Now, sir, did you sign any declarations that were filed in

11   this case?

12   A.  Yes.

13   Q.  Were they signed under penalty of perjury?

14   A.  Yes.

15   Q.  Sir, let me show you Exhibit UU.

16           MR. GUNTHER:  Your Honor, I'll offer Exhibit UU.

17           MR. SCHICK:  No objection, your Honor.

18           THE COURT:  UU is received in evidence.

19           (Defendants' Exhibit UU received in evidence)

20           MR. GUNTHER:  Let's put it up on the screen, the first

21   page.

22   Q.  Sir, is this a declaration that you submitted in this case?

23   A.  Yes, it is.

24   Q.  All right.  It should be in your binder under Defendants'

25   Exhibit UU.

1    A.  I have it.

2    Q.  All right.  Can you tell me what the date of the

3    declaration is?

4    A.  July 21, 2016.

5    Q.  July 21, 2016.  And is this describing the purchase of the

6    watch at 375 Canal on May 19, 2012?

7    A.  Yes.

8    Q.  How many years later is it after the event?

9    A.  We're looking four, approximately four years after.

10   Q.  All right.  And sir, how many investigations did you

11   conduct during the period May 19, 2012, and July 21, 2016, that

12   related to anticounterfeiting?

13   A.  A dozen, two dozen.  I'm not sure of the exact number.

14   Q.  All right.  And sir, who prepared the initial draft of this

15   declaration?

16   A.  Joshua Paul.

17   Q.  Is that one of Swatch's counsel?

18   A.  Yes.

19   Q.  All right.  Now, sir, have you submitted declarations in

20   other court cases?

21   A.  Yes.

22   Q.  Was it unusual for the declaration, for you, in terms of

23   what you had experienced in the past, was it unusual for the

24   declaration to have been drafted in the first instance by your

25   counsel?

1   A.  No.

2   Q.  Or by counsel, rather, for the client?

3   A.  No.

4   Q.  Now, sir, did you discuss -- you discussed in this

5   declaration, UU, the investigation on May 19, 2012, with

6   counsel, right?

7   A.  Correct.

8   Q.  What did you say in your declaration about who actually

9   purchased the watch at 375 Canal Street in your declaration?

10  A.  I stated that it was myself that made purchases.

11  Q.  All right.  And sir, who actually made the purchases?

12  A.  The purchases were made by Leslie Quinonez.

13  Q.  Why did you sign the declaration saying that you had

14  purchased the watch?

15  A.  Quite honestly, my wife had a medical issue that came up

16  quickly and urgently, and between diagnosis, surgery and

17  recovery, I was in and out of state and did not take the time

18  to look at all the documents supporting this declaration, like

19  I normally would.  I'm embarrassed.

20      I again apologize to the Court for my error.

21  Q.  Now, sir, how do you know that Ms. Quinonez rather than

22  yourself purchased the watch at 375 Canal Street on May 19,

23  2012?

24  A.  I referred to the report that was submitted in that

25  investigation as well as the videotape of the purchases

J2qWome4                          Cole - Direct

1  themselves.

2  Q.  All right.  Now, sir, was your report, a copy of your

3  investigative report that has come into evidence as Exhibit

4  240, was that attached to your July 2016 declaration that was

5  submitted to the Court?

6  A.  Yes.

7  Q.  And sir, let me turn, and am I correct that it was attached

8  as Exhibit 4 to your declaration?  You can take a look at

9  Exhibit UU to confirm that.

10  A.  UU, sir?

11         THE COURT:  Do you want to point it out, Mr. Gunther?

12         MR. GUNTHER:  Yes, certainly.

13  Q.  If you have UU, and you turn to -- let me see if I can find

14  it.  Turn to paragraph 13 of your declaration.

15  A.  Oh, yes.

16  Q.  OK.  So what does that tell you?

17  A.  My report to Collen IP, dated May 23, 2012, which detailed

18  the purchases of the watch at 375 was attached to my

19  declaration.

20  Q.  And it was attached as Exhibit 4?

21  A.  As Exhibit 4, yes.

22  Q.  All right.  Let's take a look, quickly, at Exhibit 240,

23  your report, and I want to turn to page 5.

24         MR. GUNTHER:  And we can put up the section under 375

25  Canal Street.

1   Q.  Sir, if you look at the first paragraph, it talks about LQ

2   posing as a tourist.  This is the third sentence, or fourth

3   sentence of the first paragraph, "Posing as a tourist,

4   Investigator LQ engaged clerk No. 5."  And further on down, it

5   says, "Conversation and negotiation continued and an Omega

6   Seamaster watch was purchased for $80 USD.  Investigator LQ

7   handed the money to clerk 5, thanked him for his help and

8   exited the store approximately 1:10 p.m."  Do you see that?

9   A.  Yes, sir, I do.

10  Q.  All right.  Now, sir, this report was attached to your

11  declaration, is that correct?

12  A.  Correct.

13  Q.  Does it correctly or incorrectly identify the purchaser of

14  the watch at 375 Canal Street?

15          MR. SCHICK:  Objection, your Honor.

16          THE COURT:  Sustained.

17  Q.  Sir, insofar as you understand what happened at 375 Canal

18  Street is this report accurate in stating that Ms. Quinonez

19  purchased the watch?

20  A.  Yes.

21  Q.  So your declaration mistakenly said that you purchased the

22  watch, right?

23  A.  Yes.

24  Q.  The report that you attached to that very same declaration

25  accurately stated that Ms. Quinonez purchased the watch, is

1    that right?

2              MR. SCHICK:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  Sir, have you seen the video that Ms. Quinonez took of the

5    purchase of the watch at 375 Canal Street?

6    A.  Yes, I have.

7              MR. GUNTHER:  And we've marked that as Plaintiffs'

8    Exhibit 108A.

9    Q.  What does that video show in terms of who purchased the

10   Omega brand watch at 375 Canal Street?

11   A.  It shows that Luigi Porco and Leslie Quinonez entered the

12   store as a couple, engaged the clerk in conversation.  Luigi

13   handed the money to Leslie to purchase the watch.  A watch was

14   purchased from the clerk, and that transaction, the entire

15   transaction inside the store was recorded on video and audio.

16   Q.  All right.  Now, did you file a second declaration in this

17   case, sir?

18   A.  Yes, I did.

19   Q.  All right.  Let me ask you to take a look --

20             MR. GUNTHER:  First, let me do this.  It's Defendants'

21   Exhibit XX.  I'll offer it into evidence.

22             THE COURT:  Any objection?

23             MR. SCHICK:  No objection, your Honor.

24             THE COURT:  OK.  XX is in evidence.

25             (Defendants' Exhibit XX received in evidence)

1              MR. GUNTHER:  All right.  Let's put it up.  Let's put

2    the first page up on the screen.

3    Q.  Mr. Cole, you can turn to it in your binder.

4         Sir, can you confirm for us that this is, in fact, the

5    second declaration that you filed in this case?

6    A.  Yes, it is.

7    Q.  What is the date of the second declaration?

8    A.  November 10, 2017.

9    Q.  Now, sir, in that second declaration, were you attempting

10   to correct errors in your first declaration?

11   A.  Yes.

12   Q.  And how did you do that?

13   A.  By correctly identifying the individual making the purchase

14   of the watch.

15   Q.  Is your second declaration consistent with the description

16   of the purchase of the watch set forth in Exhibit 240, your

17   report?

18              MR. SCHICK:  Objection, your Honor.

19              THE COURT:  Can I have the question read back, Carol.

20              (Record read)

21              THE COURT:  Sustained.

22   BY MR. GUNTHER:

23   Q.  Sir, in the second declaration -- the second declaration --

24   what do you say about who bought the watch at 375 Canal Street?

25   A.  I indicated that Leslie Quinonez purchased the watch at 375

J2qWome4                              Cole - Direct

1    Canal Street.

2    Q.  And sir, in Exhibit 240 that we just looked at, what do you

3    say about who purchased the watch at 375 Canal Street?

4    A.  I'm sorry.  Exhibit 240, sir?

5    Q.  240.

6    A.  Oh.

7    Q.  Your report.

8               THE COURT:  That's your report.

9               THE WITNESS:  OK.

10   A.  Yes.  My report corrects that Leslie Quinonez purchased the

11   watch at 375 Canal Street.

12   Q.  All right.  Sir, did you have to correct the number of

13   paragraphs in your declaration because you were making that

14   change, that Ms. Quinonez rather than you purchased the watch?

15              MR. SCHICK:  Objection, your Honor.

16              THE COURT:  Sustained.

17              MR. SCHICK:  It goes way beyond what the foundation

18   is.

19              THE COURT:  Sustained.

20   BY MR. GUNTHER:

21   Q.  Can you take a look through the declaration and tell me how

22   many of the paragraphs you have changed because of the point

23   that you were correcting Ms. Quinonez rather than you had

24   purchased the watch?  Count them.

25              MR. SCHICK:  Objection, your Honor.  We can go through

1  this.  There's lots of corrections, but not for the reason that

2  he's suggesting.

3           MR. GUNTHER:  I've asked a specific correction.

4           THE COURT:  OK.  The objection is overruled.

5           MR. GUNTHER:  Thank you.

6           THE COURT:  Go ahead.

7  BY MR. GUNTHER:

8  Q.  Go ahead, Mr. Cole.

9  A.  I would have to look at my original declaration.  Which

10  exhibit was that?

11  Q.  There's actually a redline attached to Exhibit XX that

12  should help you do that.  If you look at Exhibit XX --

13  A.  Yup.

14  Q.  -- and you look at Exhibit 5, and if you look across the

15  top, it will say on it, document 185-5, and then it starts page

16  1 of 8, 2 of 8, etc.  It's Exhibit 5.

17  A.  I have Exhibit 5 here.

18  Q.  All right.  I want you to go through and count up the

19  number of paragraphs you had to make corrections to in order to

20  accurately state that Leslie Quinonez rather than you purchased

21  the watch.

22           THE COURT:  How many are there, Mr. Cole?

23           THE WITNESS:  I'm just counting up, sir.

24           THE COURT:  What number are you at now?

25           THE WITNESS:  I'm on page 6.

1          THE COURT:  How many have you counted so far?

2          THE WITNESS:  Three regarding changing I to Leslie.

3    Four.

4          MR. GUNTHER:  Four all together?

5          THE COURT:  There's at least four.

6          MR. GUNTHER:  Thank you, your Honor.  That's plenty

7    for me.

8    Q.  Sir, there are a number of instances in this redline, and

9    we can show an example of that on the screen?

10         MR. GUNTHER:  Paragraph 9, for example, if we could

11   put that up.

12         That's paragraph 7.  If we could just go to paragraph

13   9, a little bit further.  Thank you, Mr. Lam.

14   Q.  Do you see that in the second declaration you deleted the

15   word "counterfeit"?

16   A.  Yes.

17   Q.  You did that in a number of places in this declaration,

18   correct?

19   A.  Yes.

20   Q.  Why did you do that?

21   A.  Our goal is to purchase Omega brand watches, not to request

22   counterfeit watches.

23   Q.  All right.  And sir, did you believe that the watches that

24   Ms. Quinonez purchased at 375 Canal Street --

25         MR. GUNTHER:  Sorry.  Strike that.

1    Q.  Did you believe that the watch that Ms. Quinonez purchased

2    at 375 Canal Street on May 19, 2012, was, in fact, counterfeit?

3    A.  At the time of the purchase, I suspected it, and later on,

4    when I examined it, I believed it to be counterfeit.

5    Q.  All right.  So why did you take counterfeit out of various

6    paragraphs in your declaration?

7    A.  Because at the time of purchase, the watches had not been

8    examined to their authenticity.

9    Q.  All right.  Now, sir, let me ask you this.  In signing your

10   first declaration, did you intentionally intend to mislead

11   anyone?

12   A.  No, not at all.

13            MR. GUNTHER:  All right.  Thank you.

14            Your Honor, I have no further questions.

15            THE COURT:  Mr. Schick.

16            MR. SCHICK:  I have a few, your Honor.

17            THE COURT:  OK.  I'm not surprised.

18   CROSS-EXAMINATION

19   BY MR. SCHICK:

20   Q.  Good morning, Mr. Cole.

21            THE COURT:  Good afternoon.

22   A.  Good afternoon, sir.

23            THE COURT:  Time flies.

24   Q.  Good afternoon.

25            MR. SCHICK:  Could we pull up Exhibit W again.

1   Q.  You should have it before you in the binder or something,

2   Mr. Cole.  We're going to show you Exhibit W again, which is

3   the email between yourself and Josh Paul with respect to retail

4   establishments.  See that?

5   A.  Yes, sir.

6   Q.  And do you see in the third paragraph, the one that begins

7   "on a parallel track" --

8   A.  Yes.

9   Q.  -- and you see there, there's a reference, No. 1, second

10  line, to brick-and-mortar retail establishments, correct?

11  A.  Correct.

12  Q.  And I believe Mr. Gunther a few minutes ago asked you

13  questions about your understanding of what brick-and-mortar

14  retail establishments referred to, is that correct?

15  A.  Correct.

16  Q.  And your understanding is that it refers to the stores and

17  not the landlords themselves, is that correct?

18  A.  It refers to stores.

19  Q.  And not the owners of the stores, correct?

20  A.  I -- someone could own a store.  I don't know.  It's just a

21  retail establishment.

22  Q.  But it was the operator of the store as opposed to the

23  owner of the building, correct?

24  A.  It was a store that was present there.  I don't know if the

25  retailer would own the building or not.

1    Q.  But my point is your focus was on who operated the store,

2    not who owned the building?

3    A.  On the store.

4    Q.  That's what your testimony was, correct?

5    A.  Yes.

6    Q.  Now, this email is about nine years old, eight and a half

7    years old, October 2010, correct?

8    A.  Yes.

9    Q.  And Mr. Cole, are you aware of any lawsuits that were

10   brought against operators of retail stores?

11            MR. GUNTHER:  Objection, your Honor.

12            THE COURT:  Sustained.

13   Q.  Mr. Cole, are you aware of any lawsuits that were brought

14   against landlords?

15            MR. GUNTHER:  Objection, your Honor.

16            THE COURT:  Landlord is different.

17            MR. GUNTHER:  Wait a minute.  I withdraw it.

18            THE COURT:  Overruled.

19            You can answer.

20   A.  I'm aware in general, but I don't have any specific -- I've

21   never seen filings of the lawsuits.

22   Q.  Well, you're here today, aren't you?

23   A.  Yes.

24   Q.  And this is a lawsuit against the landlord?

25   A.  I believe it is.

1   Q.  By Omega, correct?

2   A.  I believe it is.

3   Q.  And that's a lawsuit you're familiar with, correct?

4   A.  I'm aware of it, yes.

5   Q.  Now, do you still have Exhibit 240A, the big binder, of

6   your May 19, 2012 -- the report of your May 19, 2012, visit,

7   dated a few days later?

8   A.  Yes.

9          MR. SCHICK:  Can you pull that up, please.

10  Q.  As we discussed earlier, there were seven locations visited

11  that day, is that correct?

12  A.  Yes.

13  Q.  And there were watches purchased at six of those locations?

14  A.  Correct.

15  Q.  And your report contains a summary with respect to the

16  relevant information for each of those locations a watch was

17  purchased, correct?

18  A.  Yes.

19         MR. SCHICK:  OK.  If we could turn to page 2 for a

20  moment.

21  Q.  And the first report in this, the first location mentioned

22  in this report is 215 Canal Street, correct?

23  A.  Yes.

24  Q.  Though I believe you testified that that was an error and

25  it actually refers to a different address?

J2qWome4                         Cole - Cross

1    A.  Typographical error, yes.

2    Q.  Correct, but for purposes of today, we'll discuss 215 so it

3    will be easier, I think.

4    A.  Uh --

5    Q.  OK.

6             THE COURT:  215 is 213, Mr. Schick.

7             MR. SCHICK:  Correct.

8    Q.  Now, if we can turn, and so, what you see in front of you,

9    on page 2, under 215 Canal Street is your report of your

10   investigation with respect to the activity there, is that

11   correct?

12   A.  Yes.

13            MR. SCHICK:  And could we turn to page 3, please.

14   Q.  And what's the last entry, attachment 7, in your report?

15   A.  "Attachment 7 contains property owner information for 215

16   Canal Street."

17   Q.  Now, could you please identify for the jury where in this

18   report of 215 Canal Street, or 213 Canal Street, you have an

19   attachment with respect to the operator of the store?

20            MR. GUNTHER:  Objection, your Honor.

21            THE COURT:  Overruled.

22   A.  I do not have any information regarding the operator of the

23   store.

24   Q.  You don't even have the name of the operator of the store,

25   do you?

1    A.  Where the name of the store, as displayed.

2    Q.  Now, if we can continue on to the report with respect to

3    209 Canal Street, do you see that?  That's the second location

4    visited that morning, correct?

5    A.  Yes.

6    Q.  And if you look at the last entry on page 3, which is part

7    of your report with respect to 209 Canal Street, do you see

8    that?

9    A.  Yes.

10   Q.  And that's attachment 12, correct?

11   A.  Yes.

12   Q.  And please read to the jury what attachment 12 was.

13   A.  "Contains the property owner information for 209 Canal

14   Street."

15   Q.  And again, with respect to 209 Canal Street, is there an

16   attachment that identifies the store operator?

17   A.  No, not beyond the name listed in the report.

18           MR. SCHICK:  Let's go to the next page, please, page

19   4.

20   Q.  That's 303 Canal Street, correct?

21   A.  Correct.

22   Q.  And page 4 contains a summary of your visit, report of the

23   visit at 303 Canal Street on May 19, 2012?

24   A.  Correct.

25           (Continued on next page)

1  BY MR. SCHICK:

2  Q.  And this is a report that you were preparing for the

3  client; correct?

4  A.  Correct.

5  Q.  And what's attachment 17, please read to the jury.

6  A.  Attachment 17 contains the property owner information for

7  303 Canal Street.

8  Q.  And again, it's an attachment that discusses the store

9  operator at 303 Canal Street?

10  A.  No attachment beyond the name of the business identified in

11  the report.

12  Q.  And are there other names of any employees or anybody else

13  who was present at 303 Canal Street that day?

14  A.  No.

15  Q.  Let's continue with 375 Canal Street.  Next page, page 5.

16         This is a similar summary with respect to the May 19,

17  2012 visit; correct?

18  A.  Correct.

19  Q.  And again, the last attachment is attachment 22; correct?

20  A.  Correct.

21  Q.  And please read to the jury what attachment 22 was.

22  A.  Attachment 22 contains a property owner information for 209

23  Canal Street.

24  Q.  And was there anything identifying the store operator at

25  375 Canal Street in this report?

J2QVOME5                         Cole - cross

 1   A.  No.

 2   Q.  Were there any names that you obtained of the operators or

 3   sellers at 375 Canal Street that day?

 4   A.  No.

 5   Q.  Continuing on, the next one is 351 Canal Street; correct?

 6   A.  Yes.

 7   Q.  That's at the bottom of page 5 and it carries over to page

 8   6?

 9   A.  Yes.

10   Q.  And it's a summary of your relevant information with

11   respect to 351 Canal Street?

12   A.  Yes.

13   Q.  And 351 Canal Street is an address; correct?

14   A.  Yes.

15   Q.  And at that address there was a retail store operating?

16   A.  Yes.

17   Q.  And the building also had an owner?

18   A.  I would not -- I presume so.

19   Q.  And what is attachment 27?  Please read it to the jury.

20   A.  Attachment 27 contains the property owner information for

21   351 Canal Street.

22   Q.  And please tell the jury, Mr. Cole, which attachment

23   contained the information about the operator of the retail

24   store at 351 Canal Street?

25   A.  There was no attachment.

1    Q.   Excuse me?

2              THE COURT:   There was no attachment.

3    Q.   Is there any information about who operated the store?

4    A.   No, sir.

5    Q.   Okay.  Next one, 112-A Mulberry Street.  Do you see that?

6    A.   Yes, sir.

7    Q.   That starts on page 6?

8    A.   Yes.

9    Q.   And the summary carries over to page 7?

10   A.   Yes.

11   Q.   And what's the last attachment with respect to 112-A

12   Mulberry Street?

13   A.   I'm sorry, could you repeat please, sir?

14   Q.   Sure.  In this report on page 7, what's the last attachment

15   that's associated with the summary of your visit at 112-A

16   Mulberry Street?

17   A.   It's attachment 32.

18   Q.   And please read to the jury what attachment 32 was.

19   A.   Attachment 32 contains the property owner information for

20   112-A Mulberry Street.

21   Q.   And please direct the jury's attention to where in this

22   summary you listed the retail store operator's information.

23   A.   None.  But there is a reason why I include the property

24   owner information.

25   Q.   I get to ask the questions here.

1   A.  I was trying to more fully answer.  I apologize.

2   Q.  Thank you.

3           Now, do these reports occasionally -- let's go to 375

4   Canal Street, for example, back to page 5.

5   A.  Yes.

6   Q.  And I think you testified earlier that you prepared this

7   report?

8   A.  Yes.

9   Q.  And focusing on the first paragraph, on the second to the

10  last line, the last sentence that begins clerk No. 5, do you

11  see that?

12  A.  Yes.

13  Q.  Can you read that to the jury please?

14  A.  Clerk No. 5 can be described as a Hindu male, five-ten,

15  medium build, black hair, wearing a white dress shirt, brown

16  hat, and sunglasses.

17  Q.  And your testimony is that you were at 375 Canal Street on

18  May 19, 2012; correct?

19  A.  Yes.

20  Q.  And you shot video; correct?

21  A.  Yes.

22  Q.  And you prepared this report; correct?

23  A.  Yes.

24  Q.  And can you please tell us with all your investigative

25  experience how you identified the seller as a Hindu male?

1          MR. GUNTHER:  Objection, your Honor.

2          THE COURT:  Overruled.

3   A.  I use that just as a term to differentiate saying someone

4   may be from India or Pakistan; it's just a generic term.

5   Q.  What did you mean to convey by the generic term of Hindu?

6   A.  That his overall appearance was not that of a Caucasian, a

7   Spanish, a black male, but one more from general -- from the

8   Pakistan/India area.

9          THE COURT:  You could have said southeast Asian, it's

10  easier.

11         MR. SCHICK:  He could have had a basis for what he

12  wrote.

13  Q.  Now, throughout this report, which is 240A, right, the

14  report of the May 19, 2012 visit, did you identify each of the

15  operators as a Hindu either male or female?

16  A.  I don't know if I identified each of them, but the videos

17  of each of them speak for themselves.

18  Q.  Please take your time through the report to tell us if each

19  and every individual you identified was identified as Hindu

20  male or female.

21         (Pause)

22  A.  Yes, the adjective as Hindu was used.

23  Q.  So everybody you saw that day looked the same, is that your

24  testimony?

25         MR. GUNTHER:  Objection, your Honor.

1              THE COURT:  Sustained.

2     Q.  Mr. Cole, did everybody look the same to you?

3              MR. GUNTHER:  Objection.

4              THE COURT:  Sustained.

5     Q.  Now, Mr. Cole, I think you testified before -- well,

6     withdrawn.

7              Mr. Cole, is Leslie Quinonez's name mentioned anywhere

8     in the May 23, 2012 report of the May 19, 2012 visits to Canal

9     Street?

10    A.  No.  Let me double-check.  I used her initials.  No, I just

11    used her initials.

12    Q.  So is there any way for anybody reading this report to know

13    that Leslie Quinonez was involved other than hearing it from

14    you or Ms. Quinonez?

15             MR. GUNTHER:  Objection, your Honor.

16             THE COURT:  Sustained.

17             MR. GUNTHER:  Calls for speculation.

18             THE COURT:  Sustained.

19    Q.  Mr. Cole, is it your testimony that somebody reading what's

20    been marked as 240A should derive from that that Ms. Quinonez

21    made the purchases on May 19, 2012?

22    A.  The report in its entirety with the video attachments,

23    because that's part of the entire report, very clearly shows

24    Leslie Quinonez there.

25    Q.  Well, let's take it piece-by-piece.

1           Let's first talk about the written report.  Is there

2      any way -- is it your testimony that someone reading the

3      written report, which goes from pages 1 through pages 8, can

4      derive from that that Leslie Quinonez made the purchases?

5               MR. GUNTHER:  Objection, your Honor.

6               THE COURT:  Overruled.

7      A.  No, sir.

8      Q.  Now, with respect to the video you mentioned, is there

9      anything in that video that identifies an individual as Leslie

10     Quinonez?

11     A.  In terms of identifying herself, no.

12     Q.  And in that video, at all times was Ms. Quinonez with a

13     male?

14     A.  Yes.

15     Q.  And is it possible for somebody reading this report to

16     believe that you were the male standing next to Ms. Quinonez on

17     May 19, 2012?

18              MR. GUNTHER:  Objection, your Honor.

19              THE COURT:  Sustained.

20     Q.  Mr. Cole, can you turn to page 1 of the report in front of

21     you.

22     A.  Yes.

23     Q.  Now, there are seven addresses listed on the front?

24              THE COURT:  On the first page.

25     Q.  On the first page.

J2QVOME5                         Cole - cross

1    A.  Yes.

2    Q.  And those are addresses of seven different retail

3    operations; correct?

4    A.  Correct.

5    Q.  And as you sit here today, do you have any reason to

6    believe that the defendant in this case, 375 Canal LLC, has

7    anything to do with any of those addresses other than 375 Canal

8    Street?

9    A.  I have no knowledge that the defendant does or does not

10   have any connection with those addresses.

11   Q.  And you have the landlord information; correct?

12   A.  Yes.

13   Q.  In your report?

14   A.  Yes.

15   Q.  And based on that, you still have no clue?

16   A.  In terms of beneficial ownership, ownership, straight

17   outright, it doesn't appear to be, at blush of first records.

18   Q.  Thank you.

19        Now, if we can look at the paragraph above the

20   addresses, the one that begins "The client contacted," do you

21   see that?

22   A.  Yes.

23   Q.  And do you see the first line of that paragraph?  It says

24   that the client requested this matter be continued.  Do you see

25   that?

J2QVOME5                          Cole - cross

1    A.  Yes, I do.

2    Q.  So does that indicate that this was a continuing

3    investigation?

4    A.  This was a continuing matter under their file number K802.

5    Q.  And when did this matter begin?

6    A.  I do not know when they opened file number K802.

7    Q.  Roughly.  A couple years?

8    A.  I don't know when they opened it, because there are,

9    oftentimes, many enforcement actions.  I don't know.

10             THE COURT:  Whose number is K802?  Is that your

11   number?

12             THE WITNESS:  It's not my number, no.  It's the

13   client's.

14             MR. SCHICK:  He's referring to the file number on the

15   fourth line on top of the exhibit.

16   Q.  Correct?

17   A.  Correct.

18   Q.  Now, with regard to this continuing investigation and as it

19   relates to 375 Canal Street, at any time prior to May 19th,

20   2012, had you or any investigator you were working with made a

21   purchase of a counterfeit watch at 375 Canal Street?

22   A.  Not to my knowledge.

23   Q.  And I think you testified that you were at the -- you were

24   either inside or outside all of the retail establishments on

25   May 19th, 2012; is that correct?

1    A.  Yes.

2    Q.  And there were seven of them?

3    A.  There were several locations.

4    Q.  And was there anything that particularly distinguished the

5    375 Canal Street location from the other locations?

6    A.  Distinguished how, sir?

7    Q.  In any way that you think is relevant.

8    A.  There's nothing that stuck out to me that it was not a

9    typical Canal Street store.

10   Q.  Thank you.

11             MR. SCHICK:  If we can pull for -- for one moment

12   Plaintiffs' 106, which was already admitted into evidence and

13   was used by Mr. Gunther.

14   Q.  Do you remember looking at this before?

15   A.  Yes, I do.

16   Q.  And this is a picture that you say you took?

17   A.  Yes.

18   Q.  And I think Mr. Gunther, when he showed it to you, asked

19   you to read the address that you see on the left side --

20   A.  Yes.

21   Q.  -- of the store; is that correct?

22   A.  Yes.

23   Q.  But there's another address to the right, is there not?

24   A.  Yes, there is.

25   Q.  With all apologies to John Madden, I don't have a

telestrator here so I can't do the circling thing, but right

under the awning, about two-thirds to the right, right, there's

an address?

A.  Yes.

Q.  Is that correct?

A.  There's a number.

Q.  There's a number.  And what's the number?

A.  375.

Q.  And do you believe that number indicates that that's the

address of this store 375 Canal Street?

A.  If memory serves me correctly, I seem to recall an outline

of adhesive next to that that indicated something that had been

up there before.  So I don't know what that would have been.

But I believe the stall to be 375B, and I don't know what that

last number was, if memory serves.

Q.  Let's look at the picture that you say you took and

Mr. Gunther admitted into evidence, right?

A.  Mm-hmm.

Q.  Do you see -- on the right side do you see three numbers

over the store entrance?  Do you see that?

A.  Yes.

Q.  And what street was that taken on?

A.  Canal Street.

Q.  And what are the three numbers?

A.  375.

J2QVOME5                          Cole - cross

1    Q.  And would that indicate to you that the address of that

2    store is 375 Canal Street?

3    A.  If I took it literally, the right side of the store would

4    be 375, the left side of the store would be 375B, if I took a

5    literal.

6    Q.  As an investigator, if someone sent you the 375 Canal

7    Street, you would only walk into the right side and not the

8    left?

9    A.  Canal Street has many different addresses, and so we are

10   very cautious.  There's A, B's, one halves, etc.  So we

11   basically follow what the U.S. Postal Service would deliver

12   mail to.  If it's 375B, mail would go to 375B, that's where we

13   would go.

14             MR. SCHICK:  Can we go back to -- well, we don't --

15   let's put it on the screen for a second.  Can we go back to 248

16   for a moment please, page 5.

17   Q.  What address did you indicate?

18   A.  We were using the address 375 Canal Street.

19   Q.  Thank you.

20             Does that refresh your recollection as to what the

21   address of that retail location is?

22   A.  That was the address that we were utilizing.

23             MR. SCHICK:  We can take that off the screen, sir.

24             Thank you.

25             We'll turn to another topic.

1    Q.  Mr. Cole, I think you answered some questions by

2    Mr. Gunther with respect to Diogenes, do you remember that?  Is

3    that correct?

4    A.  Yes.

5    Q.  And you said that you are a managing member or the managing

6    member of Diogenes?

7    A.  Yes.

8    Q.  Are you the owner of Diogenes?

9    A.  Yes.

10   Q.  Does Diogenes have any employees other than you?

11   A.  No.

12   Q.  Now, I believe Mr. Gunther took you through some material

13   dating to the 2010 period when you were retained to canvass or

14   look for Omega merchandise on Canal Street; correct?  Do you

15   remember that?

16   A.  Yes.

17   Q.  And Mr. Gunther referred you repeatedly to your client.  Do

18   you remember that?

19   A.  Yes.

20   Q.  And who was your client?

21   A.  The legal counsel for Swatch Corp.

22   Q.  Who was your client?

23   A.  Legal counsel for Swatch Corp.

24   Q.  You didn't have a name for them?

25   A.  Collen IP.

1    Q.  So you were retained by Collen IP; correct?

2    A.  Correct.

3    Q.  And Collen IP is a law firm?

4    A.  Yes.

5    Q.  And with respect to this matter, did you deal with several

6    different lawyers at Collen IP?

7    A.  There were several different attorneys involved in this

8    matter I communicated with at different times.

9    Q.  And who were they?

10   A.  Joshua Paul, there are various paralegals.  I just can't

11   remember their names offhand.

12   Q.  So Mr. Paul was your primary point of contact?

13   A.  Yes.

14   Q.  And when you sent bills for your work on this matter, who

15   did you send bills to?

16   A.  To Collen IP.

17   Q.  And have you at any time spoken to any Omega employee about

18   your work on these investigations?

19   A.  Not to my knowledge.

20   Q.  Mr. Cole, with respect to your personal knowledge only, do

21   you have any knowledge of whether the reports you created --

22   and you transmitted them to Mr. Paul and his law firm; correct?

23   A.  Correct.

24   Q.  And do you know personally whether any of those reports

25   were transmitted by Mr. Paul to Omega?

1        MR. GUNTHER:  Objection, your Honor.  It's irrelevant.

2   That has nothing to do with this case.

3        THE COURT:  Overruled.

4   A.  I have no firsthand knowledge that they were transmitted.

5   Q.  Thank you.

6        Now, Mr. Cole, you talked today about -- this

7   afternoon or this morning about some of the investigations you

8   conducted around Canal Street; correct?

9   A.  Correct.

10  Q.  And are private investigators required to have a license

11  issued by the State of New York in order to conduct

12  investigations in New York?

13  A.  Yes.

14  Q.  Do you, Mr. Cole, have a New York private investigator

15  license?

16  A.  No, I do not.

17  Q.  So how do you investigate in New York?

18  A.  William Quinonez, I subcontract work to him and his agency.

19  Q.  So let me understand this.

20       Were you in charge of the investigation you talked

21  about this morning or was Mr. Quinonez?

22  A.  In terms of what activity, sir?

23  Q.  Well, was Mr. Quinonez working for you or were you working

24  for Mr. Quinonez?

25  A.  I hired Mr. Quinonez at Q Investigations.

1   Q.  And did Mr. Quinonez pay you or did you pay Mr. Quinonez?

2   A.  I paid Mr. Quinonez.

3   Q.  And do you believe you were paying Mr. Quinonez -- Quinonez

4   allows you to act as a private investigator in New York?

5   A.  I was -- I'm registered with his company and I was

6   supervising the work of purchasing a watch.

7   Q.  You were registered with his company as what?

8   A.  As an investigator.

9   Q.  As a licensed investigator?

10  A.  As a registered investigator.

11  Q.  Is that different from a licensed investigator?

12  A.  Licensed is generally towards a business.

13  Q.  Mr. Cole, I believe you testified earlier that it was your

14  practice to prepare reports, written reports, on the day of or

15  very shortly after you conducted investigatory activity; is

16  that correct?

17  A.  Correct.

18  Q.  Now, Mr. Gunther asked you questions about December 7th,

19  2010.  Do you remember that?

20  A.  Yes, I do.

21  Q.  Have you seen a report that you prepared with respect to

22  December 7th, 2010?

23  A.  No formal report was written.

24  Q.  Was there an informal report written?

25  A.  There was an email with information from the NYPD in terms

1   of some initial counts of watches that were recovered.

2   Q.  Did you, Mr. Cole, prepare anything in writing, formal or

3   informal, about December 7, 2010?

4   A.  No.

5   Q.  You haven't done it at any time, did you?

6   A.  No, I did not.

7   Q.  So as you sit here today, is it fair to say this morning

8   Mr. Gunther was asking you about May 19, 2012, you referred

9   repeatedly back to the written report that he had given you?

10  A.  Yes.

11  Q.  And that's because you didn't have a present recollection

12  of the events, and so the report was the best way to recall

13  what happened?

14          MR. GUNTHER:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Mr. Cole, this morning did you testify from your memory

17  about what happened on May 19, 2012?

18  A.  I used my report to refresh my memory.

19  Q.  With respect to December 7th, 2010, do you have any

20  document that you have ever looked at that you prepared to

21  refresh your recollection?

22  A.  No.

23  Q.  And have you seen any document with respect to December

24  7th, 2010 that indicates that you were present?

25  A.  No.  In terms of any document that I was present, yes,

```
 1   there is a document.
 2   Q.  Thank you.
 3            That was prepared by whom?
 4   A.  Myself.
 5   Q.  What is that document?
 6   A.  It's a billing invoice.
 7   Q.  And has that been produced in this case?
 8   A.  I don't know if it has or has not been.
 9            MR. SCHICK:  We haven't seen it, your Honor.
10            MR. GUNTHER:  Your Honor, objection.
11            THE COURT:  I will strike that.
12            The jury is instructed to ignore it.
13   Q.  Mr. Cole, did you at one point in this case give a
14   deposition?
15   A.  Yes, I did.
16   Q.  And was that in or about August 2017?
17   A.  July or August; I believe maybe July.
18   Q.  And do you recall that you were --
19   A.  Excuse me.  2017?
20            THE COURT:  Yes, 2017.
21   A.  Okay.  I'd have to look.  I didn't know if it was '16 or
22   '17.
23   Q.  I understand things get fuzzy over time.  Not a problem.
24            Do you recall you were asked about that
25   investigation --
```

1          MR. GUNTHER:  Your Honor, I'd ask that the extraneous

2     comments be stricken.

3     Q.  Mr. Cole, do you recall that you were asked at that

4     deposition about the December 7th, 2010 visit?

5     A.  Yes.

6     Q.  And do you recall your testimony with regard to who you say

7     the police officer in attendance that day was?

8     A.  I believe I recall the name.

9     Q.  And do we have a copy of the deposition that we can provide

10    to you to help refresh your recollection of what you testified

11    at the deposition?

12    A.  That would be helpful, yes, thank you.

13         MR. GUNTHER:  Your Honor, there's been no indication

14    that he needs his recollection refreshed.  If he wants to

15    use --

16         THE COURT:  We're halfway through the process,

17    Mr. Gunther.

18         MR. GUNTHER:  Thank you, your Honor.

19         MR. SCHICK:  Just for the witness, I'm not putting it

20    up for everybody else.

21         MR. GUNTHER:  And your Honor, to help speed things

22    along, I actually put a copy of Mr. Cole's deposition -- it's

23    in the big binder of the two binders that I gave to you.  It

24    should be marked as your deposition.  So hopefully that will

25    speed things up.

1          MR. SCHICK:  Sure.  We have it up on the screen.

2     Q.  If I can direct your recollection to page 82.

3          MR. GUNTHER:  Your Honor, if he's using it to refresh

4     recollection, he's not to put it up on the screen.

5          MR. SCHICK:  I said that.  We're putting it up for him

6     only.

7          MR. GUNTHER:  Thank you.

8          THE COURT:  What page, Mr. Schick?

9          MR. SCHICK:  82.

10         THE COURT:  Thank you.

11    A.  Okay.  I'm at page 82 of my deposition, sir.

12    Q.  And if you look at the question and answer that begins at

13    page 5 and ends at page -- at -- sorry, the question that -- on

14    page 82 that begins on line 5 and with the answer that ends on

15    line 9.

16    A.  Yes.

17    Q.  And do you see the name there?

18    A.  Yes.

19    Q.  And what name did you give at the deposition testimony?

20         MR. GUNTHER:  Your Honor, this is now not refreshing

21    recollection, it's sort of like some kind of --

22         THE COURT:  It's impeachment.  Go ahead.

23    A.  Talbert Taute.

24    Q.  Excuse me?

25    A.  It says here Talbert Taute, T-A-U-T-E.

1   Q.  Where does it say -- where do you see that name?

2   A.  On line 7.

3             THE COURT:  Line 7.

4   Q.  It says T-A-U-T-E?

5   A.  Yes.

6   Q.  Not on my transcript.

7             THE COURT:  It's on my transcript.

8             MR. SCHICK:  That's interesting that the plaintiffs

9   and defendants have different transcripts here, your Honor.

10             MR. GUNTHER:  Your Honor, I'll explain it.

11             THE COURT:  Don't explain it.  Just go on.  The

12   transcript says Taute, T-A-U-T-E.

13             MR. SCHICK:  With respect, your Honor, it doesn't.

14   They may have quote/unquote -- well, I don't want to do it in

15   front of the jury, your Honor.

16             THE COURT:  Don't do it in front of the jury.  Ask a

17   question.  Go ahead.  Go on to something else.  Time is

18   precious.

19   BY MR. SCHICK:

20   Q.  Mr. Cole, is there a reason you neglected to prepare any

21   written report with respect to December 7, 2010?

22   A.  Yes.

23   Q.  And what was that?

24   A.  It was not my investigation.  I was an observer.  And the

25   details of the investigation of the formal business names and

1   individuals arrested, the inventories taken and the

2   disposition, the incident report number and the charges filed I

3   did not have available.

4   Q.  And again, I'm sorry, you listed a whole number of

5   documents that you would not have available to you; is that

6   correct?

7   A.  That I did not have available to me, yes.

8   Q.  And what were those documents?

9   A.  The arrest reports, the detailed inventory, the

10  names/addresses of the individuals that were arrested, their

11  charges that they had, and the report numbers.

12  Q.  And were those documents made and kept by the New York City

13  Police Department?

14  A.  Yes.

15  Q.  And based on your experience as an investigator, would it

16  have been possible for your client to request copies of those

17  reports from the police department?

18  A.  My client, it is my understanding, they were to do so, yes.

19  Q.  But you have not seen them?

20  A.  No, I have not.

21  Q.  Now, Mr. Cole, we referred a bit earlier to the declaration

22  that you submitted in 2016.

23  A.  Yes.

24  Q.  And that was Exhibit UU?

25  A.  Yes.

1             MR. SCHICK:  And if you could please bring that up.

2    Q.  Now, did you draft this declaration?

3    A.  No, I did not.

4    Q.  And I'm talking about the version that's here before you

5    that's signed July 21, 2016.  What did you understand the

6    purpose of the declaration was?

7    A.  The purpose of the declaration was to summarize the

8    investigative activity and formalize it in a statement to the

9    Court.

10   Q.  Now, was it supposed to be a document that had advocacy or

11   just a document to state the facts?

12   A.  Document to state the facts.

13   Q.  Do you recall who sent you the draft of the declaration?

14   A.  I believe it was Joshua Paul.

15   Q.  Do you believe that you made any changes between the draft

16   he sent you and the document you signed?

17   A.  I may have made one or two minor changes.

18   Q.  As you sit here today do you know what they are?

19   A.  I'm not quite sure.  Maybe dates, I'm not -- I'm not sure.

20   Q.  Can you turn to the last page of the declaration, and

21   that's paragraph 20.

22   A.  Yes.

23   Q.  Do you see that?

24   A.  Yes, I do.

25   Q.  And can you read the paragraph?

1    A.  For the foregoing reasons, I respectfully request the Court

2    deny defendant's motion for summary judgment.

3    Q.  Was that a factual statement or an advocate's statement?

4    A.  I guess as an advocacy statement.

5    Q.  And right below that, what does it say?

6    A.  I declare under penalty of perjury that the foregoing is

7    true and correct.

8    Q.  And as we've established with Mr. Gunther, was the

9    foregoing true and correct?

10   A.  No, it was not.

11   Q.  And I think Mr. Gunther also showed you the supplemental

12   declaration, do you recall that?  That was at XX.

13   A.  Yes.

14   Q.  And I believe that he referred your attention to Exhibit 5

15   of that supplemental declaration, which is what they call a

16   redline.  Do you see that?

17   A.  Let me find Exhibit 5.  Bear with me.  I'm at Exhibit 5.

18   Q.  And I think we indicated before there were 20 paragraphs in

19   the declaration; correct?

20   A.  Yes.

21   Q.  And this exhibit also has 20 paragraphs, 20 numbered

22   paragraphs?

23   A.  Yes, it does.

24   Q.  And can you please tell the jury how many of the 20

25   numbered paragraphs did you have to correct because there were

1    false and inaccurate statements?

2    A.  I'd have to look at them.

3              THE WITNESS:  But, your Honor, I would like to

4    carefully review this to give him an accurate number.

5    Q.  Please.

6              THE COURT:  Do you have an accurate number in mind,

7    Mr. Schick?

8              MR. SCHICK:  I believe it's 11, which is the majority

9    of the numbered paragraphs had false and inaccurate statements.

10             THE COURT:  Want to check and see if there's 11,

11   Mr. Cole?

12             (Pause)

13             THE COURT:  Help us out here, Mr. Schick.  Do you want

14   to number the paragraphs?

15             MR. SCHICK:  Excuse me?

16             THE COURT:  Do you want to tell us the number of the

17   paragraphs?

18             MR. SCHICK:  Sure.  Certainly.

19   Q.  Paragraph 5.

20   A.  Yes, that was changed from "I" to "Leslie Quinonez."

21   Q.  Seven.  In 7 you had given the original version of

22   paragraph 7; you stated information as fact, and this clarifies

23   that the information was -- you were just reporting what you

24   were told by Collen IP?

25   A.  Okay.  If -- okay.

1    Q.  Paragraph 8.

2    A.  I changed "I" to "William Quinonez."

3    Q.  That's the third one; correct?

4              Now, let's look at paragraph 9.  Paragraph 9 relates

5    to the December 2010 visit; correct?

6    A.  Correct.

7    Q.  And what's struck out means that it was in the original

8    declaration, but taken out as inaccurate subsequently; correct?

9    A.  Correct.

10   Q.  And the initial declaration said "I first visited 375 Canal

11   Street on December 7, 2010"; correct?

12   A.  Correct.

13   Q.  And did that turn out to be inaccurate?

14   A.  I don't know if it's inaccurate or not, but out of an

15   abundance of caution, I do not know what matters are related to

16   this case pending, may have walked by, been to 375 Canal.

17   Q.  So you felt it was inaccurate as initially drafted and

18   corrected it?

19   A.  I felt it needed clarification, so I took the word "first"

20   out.

21   Q.  Now, with respect to paragraph 10, is that another one?

22   A.  Yes, it is.

23   Q.  Paragraph 13 had numerous corrections; correct?

24   A.  It had revisions.  The instance of right after the word

25   "Exhibit 4" changed the word "I" to "Leslie Quinonez."

1    Q.  That's a big change, right?  You had previously testified

2    it was you, and now you're saying it was somebody else; is that

3    correct?

4    A.  That is correct.

5    Q.  So is that another instance where your original declaration

6    had false and inaccurate information until it was corrected?

7    A.  The declaration had incorrectly attributed some of the buy

8    activity to another person; did not make that activity false or

9    misleading.

10   Q.  Was your sworn statement submitted on July 21, 2016 true?

11   A.  It had errors.

12   Q.  Was it true?

13   A.  No.

14   Q.  So if it wasn't true, is it correct that it was false?

15   A.  The entirety of the statement was not false.  Just because

16   a section of a statement is false does not mean the entire

17   statement is false.

18   Q.  But there were many false statements within it; correct?

19   A.  Yes.

20   Q.  Including almost every time you used the word "I"; correct?

21   A.  I don't know.  I'd have to count all the times of "I" to

22   say if it's mostly or not.  But I did make several mistakes

23   where I did not catch "I" versus "Leslie Quinonez," who did the

24   activity.

25   Q.  Mr. Cole, have you ever submitted declarations in court

1    previously?

2    A.   Yes.

3    Q.   How many times roughly?

4    A.   Dozen, two dozen, I'm not quite sure.  Through the years

5    I've done --

6    Q.   Have you ever had to have them withdrawn and corrected?

7    A.   No.

8    Q.   This is the first and only time?

9    A.   Embarrassingly, yes.

10   Q.   Now, there came a time, did there not, when you came to

11   realize that the declaration that you submitted in July 2016

12   contained false and inaccurate information, did there not?

13   A.   Yes.

14   Q.   And was that about a year later?

15   A.   Approximately.

16   Q.   The summer of 2017?

17   A.   I believe so.

18   Q.   And what did you do when you realized that your declaration

19   contained false and inaccurate information?

20   A.   I notified Swatch counsel that there were errors in the

21   declaration.

22   Q.   Who did you notify?

23   A.   Joshua Paul.

24   Q.   And I believe you testified at deposition that your

25   expectation was that Mr. Paul would advise this Court of that;

J2QVOME5                          Cole - cross

1   correct?

2              MR. GUNTHER:  Objection, your Honor.  This is covered

3   directly by your motion *in limine*.

4              THE COURT:  Sustained.  Sustained.

5              MR. GUNTHER:  Thank you.

6   Q.  Did you take any other steps in the summer of 2017, other

7   than notifying Mr. Paul that there was false and inaccurate

8   information in your sworn declaration?

9   A.  Other steps pertaining to what, sir?  I'm not sure --

10  Q.  Did you bring it to the Court's attention?

11  A.  No, I did not.

12  Q.  Did you notify anybody else?

13  A.  No, I did not.

14  Q.  Did you feel in the summer of '17, when you notified

15  Mr. Paul about the false statements, did you feel you had

16  fulfilled your duty by bringing it to the attorney's attention?

17  A.  Yes.

18  Q.  Did you have expectation as to what would he do with that

19  information?

20             MR. GUNTHER:  Objection, your Honor.

21             THE COURT:  Sustained.

22  Q.  We've seen UU, which was prepared by, you said, Mr. Paul;

23  correct?  And that's the initial declaration?

24  A.  The initial declaration; correct.

25  Q.  And then there's Exhibit XX, which is the supplemental

J2QVOME5                      Cole - cross

1    declaration, correct?

2    A.   Correct.

3    Q.   And do you recall who prepared that declaration?

4    A.   I don't know all the parties that were involved, and my

5    mind is drawing a blank.  I was involved in it.

6    Q.   Did you deal with Mr. Paul?

7    A.   Honestly, I can't remember.  I don't -- I don't think so.

8    Q.   Did you deal with Mr. Gunther or Mr. Noyes?

9         MR. GUNTHER:  Objection, your Honor.

10        THE COURT:  Sustained.

11        MR. GUNTHER:  Thank you.

12   Q.   Did you draft this declaration, Mr. Cole, the one that's

13   before you as Exhibit XX?

14   A.   I participated in the drafting of it.

15   Q.   And did you do the first draft?

16   A.   First draft being the initial declaration?

17   Q.   The initial draft of XX.

18   A.   No, I did not.

19   Q.   Who did?

20   A.   I don't know who the author of that was.

21   Q.   Who transmitted it to you?

22   A.   I can't recall offhand.

23   Q.   This was about a year and-a-half ago; correct?

24   A.   Correct.

25   Q.   And this is the first time in your career that you had to

J2QVOME5                    Cole - cross

1   withdraw a sworn declaration that contained false and

2   inaccurate information; correct?

3   A.  Yes.

4   Q.  And yet you don't recall who you dealt with to correct

5   that?

6   A.  There was a change in counsel at some point, and so I'm

7   not -- I don't have a clear recollection of who emailed it to

8   me, when it was received.  Sitting right here, I just don't.

9   Q.  I'd like to bring to your --

10          MR. SCHICK:  I'd like to show Mr. Cole Exhibit DD.  I

11  don't believe there's an objection, but should we publish it

12  just to --

13          MR. GUNTHER:  Your Honor, sorry it took so long, but I

14  just had to get this in front of me.  No objection.

15          THE COURT:  DD is in evidence.

16          (Defendant's Exhibit DD received in evidence)

17          MR. SCHICK:  Thank you.

18          If you could publish it please, Sarah.

19  BY MR. SCHICK:

20  Q.  Mr. Cole, is this an email from Mr. Quinonez, Mr. William

21  Quinonez, to you?

22  A.  There's nothing on my screen, sir.

23  Q.  Oh, okay.  I'm sorry.

24          MR. SCHICK:  Thank you, your Honor.

25          THE COURT:  That's DD.

J2QVOME5                          Cole – cross

1    A.  I have DD in front of me.

2    Q.  Thank you.

3             MR. SCHICK:  Can we hand up a binder of the exhibits

4    as well, so your Honor does not have to give up his own?

5             THE COURT:  Okay.  Fine.

6    A.  I'm at the email, sir.

7    Q.  And is this an email -- is Exhibit DD an email that

8    Mr. William Quinonez sent to you?

9    A.  Yes, it is.

10   Q.  And have you seen this before?

11   A.  Yes, I have.

12   Q.  And can you please read the email to the jury?

13   A.  On December 11th, 2011, a visit was made to stores located

14   at 375 Canal Street.  There were no watches associated with the

15   client's trademark's watch.  Photos were taken by cellphone and

16   forwarded to you via text.

17   Q.  Thank you.

18            When it says the client's trademark's watch, does that

19   include Omega?

20   A.  I believe we were discussing referring to the Swatch Group

21   trademarks overall.

22   Q.  Does that include Omega?

23   A.  That would include Omega.

24   Q.  And was Mr. Quinonez writing to you because Mr. Quinonez

25   had been subcontracted by you to conduct this investigation?

J2QVOME5                           Cole - cross

1    A.   Yes.

2    Q.   And this is his report to you with respect to his

3    investigation at 375 Canal Street on December 11, 2011?

4    A.   Yes.

5    Q.   And the report was that there was no Omega watches to be

6    found at 375 Canal Street?

7    A.   That is what the email says.

8    Q.   And do you believe Mr. Quinonez to be a good investigator?

9    A.   Yes.

10   Q.   Do you believe that there's anything incorrect in this

11   report?

12   A.   No, I do not.

13   Q.   Now, getting back to your Exhibit UU, which was your

14   declaration to the Court, did you advise the Court that on

15   December 11, 2016, Diogenes had conducted an investigation at

16   375 Canal Street?

17             MR. GUNTHER:  Objection, your Honor.

18   Q.   And had not found any Omega watches for sale there?

19             THE COURT:  Sustained.  Sustained.

20   Q.   Were you trying to give the Court a full report of the

21   activities --

22             MR. GUNTHER:  Objection.

23   Q.   -- in the declaration?

24             MR. GUNTHER:  Objection, your Honor.

25             THE COURT:  Sustained.  The objection is sustained.

1          MR. SCHICK:  Can we look at -- can I have UU up on the

2     screen please.  And can we turn to the third page after the

3     declaration itself.

4     Q.  Was there an attachment to the declaration that we

5     discussed earlier?

6          MR. GUNTHER:  I'm sorry, this is the first or the

7     second?

8          MR. SCHICK:  This is the third page, the first

9     declaration, UU.

10          MR. GUNTHER:  Thank you.

11          MR. SCHICK:  Yes, page 3 after the declaration itself.

12          MR. GUNTHER:  Thank you, Mr. Schick.

13          THE COURT:  Diogenes number 150 you want us to look

14     at?

15          MR. SCHICK:  150.

16          THE COURT:  150, Mr. Schick?

17          MR. SCHICK:  Yes.  It says on top "Investigation

18     December 30, 2011."

19          THE COURT:  Okay.  Thank you.

20     BY MR. SCHICK:

21     Q.  Do you see that, Mr. Cole?

22     A.  Yes, I do.

23     Q.  And this is a report that you would have prepared?

24     A.  Yes.

25     Q.  And do you recall the incident report that you prepared

1   based on your visit to these locations or did you send a

2   subcontractor?

3   A.  I believe I sent a subcontractor.

4   Q.  And who would that subcontractor have been?

5   A.  William Quinonez.

6   Q.  Is it correct, Mr. Cole, that you testified your practice

7   is to create reports on the day of the activity or as soon

8   thereafter as possible?

9   A.  To create a report when the investigative activity is

10  complete.

11  Q.  And this report is dated December 30, 2011?

12  A.  Correct.

13  Q.  And do you see, again, this was an attempt to identify

14  potentially Omega branded merchandise in the Canal Street area;

15  is that correct?

16  A.  Omega and, I believe, possibly other Swatch Group

17  trademarks, but --

18  Q.  We're focused on Omega.  When I say "Omega," I don't mean

19  to exclude others, I just mean to make sure that includes

20  Omega.

21  A.  Included Omega, yes.

22  Q.  Okay.

23          And it discusses targeted and general canvasses, do

24  you see that?

25  A.  Yes.

1   Q.  It says that under case continuance, do you see that?

2   A.  Yes, I do.

3   Q.  That's right before -- that's the sentence before the list

4   of addresses at group one; correct?

5   A.  Correct.

6   Q.  And can you tell us the difference between a targeted and a

7   general canvass?

8   A.  A general canvass is no particular direction of locations

9   to go to.  And targeted is locations that are provided to make

10  sure we visit during the canvass itself.

11  Q.  When you say "locations," do you mean general areas or do

12  you mean specific addresses?

13  A.  Specific addresses.

14  Q.  So a targeted canvass would be one in which you were asked

15  to go to a specific address?

16  A.  Yes.

17  Q.  Okay.  And as you sit here today, can you identify which of

18  the addresses on page 1 of this exhibit was the subject of a

19  targeted canvass?

20  A.  I don't recall which ones were targeted and which ones were

21  general.

22  Q.  Just don't know.

23  A.  I can't recall.

24  Q.  How many addresses are there in the group one listing of

25  buildings?

1    A.   Eleven addresses, but one location shares two addresses,

2    I'm sorry.  Thirteen, but one location shares a common address,

3    297 Canal and 401 Broadway.

4    Q.   And in group two, how many buildings were there?

5    A.   Eight.

6    Q.   So overall, as you sit here today, so there's 20 or so

7    buildings overall listed?

8    A.   Approximately.

9    Q.   On this December 30, 2011 report?

10   A.   Yes.

11   Q.   And as you sit here, you just don't know which of those

12   buildings you were asked to go to and which ones you or your

13   subcontractor decided to go to?

14   A.   I don't have a specific recollection of each and every

15   individual address being provided to me.  Very possibly could

16   have been.

17   Q.   Do you have any recollection?

18   A.   I would have -- no, I have no independent recollection.

19   Q.   But, in any event, with respect to all the buildings listed

20   there, this is an executive summary; correct?

21   A.   It's a case continuance.

22            THE COURT:  He's referring to a --

23   Q.   I'm sorry, page 2.

24   A.   I'm sorry.  Yes, there's executive summary, yes.

25   Q.   And can you read that please?

1    A.   No Swatch Group trademark observed for sale, nor were any

2    offered for sale upon investigator's inquiries.

3    Q.   And when it says, again, Swatch Group trademarks, does that

4    include Omega?

5    A.   Yes, it does.

6    Q.   Now, can you go a couple of paragraphs down, under

7    "Investigation."

8    A.   Yes.

9    Q.   Now, again, it says, first of all -- under "Investigation"

10   it says:  An investigator knowledgeable in the Swatch Group

11   trademarks conducted the undercover investigation and canvass.

12   Is that correct?

13   A.   Yes.

14   Q.   And do you know who that was?

15   A.   William Quinonez.

16   Q.   And he conducted the entire investigation and canvass?

17   A.   I believe so.  I have to refer to my billing, but I believe

18   he did.

19   Q.   And can you please read the second sentence to the jury.

20   A.   Are you referring to other counterfeit items?

21   Q.   No, no, no.  Do you see the paragraph where it says -- it's

22   the heading of investigation.  You just read the first

23   paragraph.  And you said -- the first sentence.  And you said

24   the investigator there refers to Mr. Quinonez.  And I'm asking

25   you to read to the jury the second sentence.

1    A.  No swap group trademarks were observed for sale, nor were

2    any offered for sale upon undercover investigator's inquiries.

3    Q.  And did you believe that to be an accurate report that you

4    were making to your client?

5    A.  Yes.

6    Q.  And again, in that sentence, when you said "no Swatch Group

7    trademarks," that includes Omega?

8    A.  Yes, it does.

9    Q.  Now, can I ask you about the last paragraph under

10   investigation?

11   A.  Yes.

12   Q.  It references 375 Canal Street as being turned into a Bank

13   of America; correct?

14   A.  Yes.

15   Q.  As we saw before in PX 106, 375 Canal Street had a store;

16   correct?

17   A.  375B had a store.  375 Canal Street, by the numbering, was

18   a Bank of America.

19   Q.  So you believe PX 106, with the numbers 375 over the store

20   is inaccurate?

21   A.  375B, sir.

22   Q.  And let's go back to your May 19th, 2012 report, Exhibit

23   248, page 5, is the summary with respect to 375 Canal Street.

24   A.  Yes.

25   Q.  It refers to the store located at 375 Canal Street?

1    A.  Yes.

2    Q.  Was that inaccurate?

3    A.  No.

4    Q.  So there was a store at 375 Canal Street?

5    A.  Well, there's a store located to the right, the numbers 375

6    Canal Street.

7    Q.  Read the first sentence in this report.

8    A.  "Investigator LQ entered the store located at 375 Canal

9    Street at approximately 1 p.m."

10   Q.  Now, do you believe she entered into a Bank of America?

11            THE COURT:  This is getting tiresome.

12            The store is located to the right of Bank of America.

13   A.  The ATM machine.

14            MR. GUNTHER:  Thank you, your Honor.

15   Q.  And you referred to it as 375 Canal Street; correct?

16   A.  That's how we referred to it in discussions and in the

17   book.  There was no visible business name observed for the

18   store.

19   Q.  Thank you.

20            THE COURT:  It's not a bank, it's an ATM machine.

21   Q.  Mr. Cole, with respect to your --

22            MR. SCHICK:  Can I have -- Mr. Gunther, can I have for

23   a moment what you marked as Exhibit 100?

24            MR. GUNTHER:  Sure.  Let me just lay my hands on it.

25            There it is.

1           THE COURT:  He's got it.

2           MR. SCHICK:  Okay.

3           THE COURT:  I'm going to take it home.

4           MR. SCHICK:  I'm going to stay silent, your Honor.

5   BY MR. SCHICK:

6   Q.  With respect to Exhibit 100, do you have that in front of

7   you?

8   A.  Yes, I do, sir.

9   Q.  And I believe you testified about it earlier this morning?

10  A.  That's correct.

11  Q.  And I believe you referred to several items that separately

12  comprised Exhibit 100?

13  A.  Yes.

14  Q.  And those items were a Post-It note; correct?

15  A.  Correct.

16  Q.  And a small baggie?

17  A.  Correct.

18  Q.  And a watch?

19  A.  Yes.

20  Q.  And is there a fourth item that's part of Exhibit 100?

21  A.  None in this bag, no.

22  Q.  Well, isn't there an outer bag?

23  A.  When I photographed it, there was --

24  Q.  No, no, no.  What's before you is Exhibit 100, the actual

25  exhibit that you have.

1   A.  There is -- I did not see --

2   Q.  No, I'm asking you right now, do you have Exhibit 100?

3   A.  Yes.

4   Q.  Is that piece of paper that's there --

5   A.  Yes.

6   Q.  -- isn't that -- is that marked as Exhibit 100?

7   A.  It's marked as Exhibit 100.

8   Q.  Okay.

9   A.  I'm just confused.  I apologize.

10  Q.  It's okay.

11          And your testimony is you never saw that bag before?

12  A.  This particular bag?

13  Q.  Correct.

14  A.  I've seen it before.

15  Q.  When did you see it?

16  A.  Prior -- in prior -- maybe at the deposition.

17  Q.  Okay.  And what does the bag say?

18  A.  It says "Diagonese," Diogenes misspelled, report dated May

19  23rd, 2012.  It says Exhibit Cole 3 circled, 8/28/17, with

20  initials, maybe EP, Plaintiffs' Exhibit 100, and then there's

21  another sticker that says Omega watch purchase at 375 Canal.

22  Q.  Can you go back, I'm sorry.

23          So you said you didn't prepare that; correct?

24  A.  No, I did not.

25  Q.  You didn't ship the watch in that, did you?

1    A.  No, I did not.

2    Q.  You're not the one who made a typo in the name of your

3    company Diogenes, did you?

4    A.  No, I did not.

5    Q.  There are other references after Diogenes.  Can we just

6    please go back to that please?

7    A.  Okay.  Diogenes report.

8    Q.  Okay.

9    A.  Dated May 23rd, 2012.

10   Q.  And is there anything else, some other letters and numbers

11   you said?

12   A.  Down below, quote/unquote, Omega watch purchased at 375

13   Canal.

14   Q.  And there's nothing else in writing on that little strip?

15   A.  No, there's exhibit stickers, and just as I read both of

16   these.

17   Q.  And do you know who prepared that?

18   A.  No, I do not.

19   Q.  And do you know when that was prepared?

20   A.  No, I do not.

21   Q.  And can you state with certainty that you did not prepare

22   that?

23   A.  Yes.

24   Q.  And can you state with certainty that you did not ship that

25   to anybody after you shipped whatever watches you sent on or

1    about May 23rd, 2012?

2              MR. GUNTHER:  Objection to form, your Honor.

3              THE COURT:  Sustained.

4              Try again, Mr. Schick.

5    Q.  Mr. Cole, you shipped the watches purchased on May 19, 2012

6    on or about May 23rd, 2012?

7    A.  Correct.

8    Q.  And you shipped them to Mr. Paul or the Collen firm?

9    A.  Correct.

10   Q.  And your testimony was that you shipped the Post-It note in

11   the little Ziploc baggie; correct?

12   A.  Correct.

13   Q.  And I'm asking you, did you ship the larger bag with the

14   writing on it that's the outer larger part of Exhibit 100, did

15   you ship that?

16   A.  This bag was not used in my shipment to Joshua Paul or

17   Collen IP.

18   Q.  Was that all part of your investigation?

19   A.  No.

20   Q.  That wasn't identified in your investigation?

21   A.  No, sir.

22   Q.  It wasn't obtained in your investigation?

23   A.  No, sir.

24   Q.  Do you know how the watch came to be put in that bag?

25   A.  No, sir.

1   Q.  Do you know how that label came to be made and placed on

2   the bag of the watch?

3   A.  No, sir.

4   Q.  Now, do you recall, Mr. Cole, that as we said earlier, you

5   gave a deposition in or about the summer of 2017?

6   A.  Yes.

7   Q.  And that deposition was at the offices of Collen IP?

8   A.  Yes.

9   Q.  And was it Mr. Paul's office?

10  A.  Yes.

11  Q.  And were there watches placed before you there?

12  A.  Yes.

13  Q.  And do you recall if there was a box that was placed on the

14  table which contained the watches?

15  A.  I recall there was a box.

16  Q.  Do you recall that the box said 303/375 Canal Street?

17  A.  I don't recall.

18  Q.  Do you have your deposition in front of you?  If I can

19  direct your attention to page 170 to refresh your recollection.

20  A.  Okay.  I'm at page 170.

21  Q.  And you can look at the question starting on line 6.

22  A.  Okay.

23  Q.  And if you could just read page 170, 171, and 172, it might

24  help refresh your recollection.

25  A.  Read out loud?

1    Q.  No, no, no, to yourself, sir.

2              (Pause)

3    A.  Okay.  I read 170, 171.  And did you want me to read 172,

4    sir?

5              THE COURT:  No, 170 and 171.

6              What's the question, Mr. Schick?

7    Q.  Does this refresh your recollection, Mr. Cole, about how

8    the watches were provided to you at the deposition?

9    A.  Yes.

10   Q.  And were they provided in Paul's office in a box?

11   A.  Yes.

12   Q.  And did you identify that box?

13   A.  I indicated that there was -- there was not a box supplied

14   as part of the investigation.

15   Q.  It was supplied from a different investigation; correct?

16             MR. GUNTHER:  Objection, your Honor.

17             THE COURT:  Overruled.

18   A.  It was just used for me to send the evidence.

19   Q.  To send?

20   A.  The evidence.

21   Q.  In this case or a different case?

22   A.  I'm not quite sure.  The box -- I'm not quite sure.  It's a

23   long time ago.

24   Q.  And what did the box say on it?

25   A.  In terms of referring back to deposition page 170, are you

1    referring to line 15?

2    Q.   Yes.

3    A.   It had the word -- capital N 1484, parentheses, 303 Canal,

4    end parentheses; and N, as in Nancy, 1485, parentheses 37

5    Canal.

6    Q.   And you think that "37" was supposed to be 375 Canal?

7              MR. GUNTHER:  Calls for speculation, your Honor.

8              THE COURT:  Sustained.

9    Q.   How many watches were in the box that day?

10   A.   Looking at my deposition, I believe I counted six.

11   Q.   And how many watches were purchased at 303 and 375 Canal

12   Street that day on May 19, 2012?

13   A.   Should be one from each.

14   Q.   So two, not six?

15   A.   One from each location, so that would be two locations.

16   Q.   Thank you.

17             Nothing further with that exhibit.  You can put down

18   the watch.

19             THE COURT:  Do you have much more, Mr. Schick?

20             MR. SCHICK:  I do have a little bit, your Honor.  I

21   know it took a long time this morning, and I am going to try to

22   pare it down.  It might be that after I do one more bit here, a

23   three or four-minute break might help speed things up by me

24   cutting stuff out.

25             But first, before I do that, I'd like to go to Exhibit

```
 1   NN.
 2            THE COURT:  NN you said?
 3            MR. SCHICK:  NN, yes.  My apologies.
 4   BY MR. SCHICK:
 5   Q.  Is it up on your screen?
 6   A.  It's not on my screen, but I do have it in the exhibits in
 7   front of me.
 8   Q.  And do you recognize this document?
 9   A.  This would be the document I believe you were referring, to
10   an email from myself to Jeffrey Lindenbaum dated February 21st,
11   2012 at 10:31 a.m.  Is that the document, sir?
12   Q.  Yes.
13   A.  Yes.
14   Q.  Is this an email you prepared during the course of your
15   investigatory work in this matter?
16   A.  Yes.
17            MR. SCHICK:  We'd like to offer it in evidence, your
18   Honor.
19            MR. GUNTHER:  No objection, your Honor.
20            THE COURT:  NN is in evidence.
21            (Defendant's Exhibit NN received in evidence)
22            MR. SCHICK:  May we publish it to the jury please?
23            THE COURT:  Yes.
24            MR. SCHICK:  Thank you, your Honor.
25   Q.  And who is Jeff Lindenbaum?
```

1   A.  Jeffrey Lindenbaum is the attorney.

2   Q.  Attorney where?

3   A.  With at the time Collen IP.

4   Q.  Is he at a different firm now?

5          Withdrawn.  Withdrawn.  It doesn't matter.  Withdrawn.

6          Can you read the second and third sentences of this

7   email?

8   A.  In reviewing what we had observed, I believe the following

9   is happening.  A common distributor or parentheses distributors

10  is supplying the bulk of Canal Street.

11  Q.  Thank you.

12         And this is an email that you provided to the Collen

13  firm to Mr. Lindenbaum in February 2012; is that correct?

14  A.  Yes.

15  Q.  And did you have at that time the identity of the common

16  distributor?

17  A.  No, I did not.

18  Q.  Did you follow up after this email to learn the identity of

19  the common distributor?

20  A.  No.

21  Q.  Did you have any idea who the common distributor was?

22  A.  It was an opinion that I had, but I did not have any

23  specific names.

24  Q.  Excuse me.  You said it was an opinion you had?

25  A.  Opinion I had, but I did not have any specific names.

1   Q.   And what was the opinion based on?

2   A.   Common knowledge of the area and discussions with

3   confidential informants in the area.

4   Q.   And did you have an opinion about the individual running

5   the distribution ring or the location or both?

6           MR. GUNTHER:   Objection.   Lack of foundation.

7           He's now acting as if there was a distribution ring,

8   and the witness was offering an opinion.

9           THE COURT:   Sustained.

10  Q.   Without a name, what was your opinion that you had?

11  A.   The opinion I had, that based on the totality of the

12  circumstances and information I received from confidential

13  informants in the area, that there very well could be a common

14  distributor and/or a centralized point to keep the watches.

15  Q.   And based on your years as an investigator, did you have

16  any opinion as to who or where that distribution point or

17  distributor would be?

18  A.   I did not have enough information at the time.

19  Q.   Did you ever follow up?

20  A.   No, I did not.

21  Q.   Do you know if you ever got a response to this email?

22  A.   It was such a long time ago, I would have to check.  I

23  don't know if there was a response or not.

24  Q.   Now, with respect -- do you see there's four lettered

25  paragraphs or sentences, A, B, C, D?  Do you see that?

J2QVOME5                         Cole - cross

1    A.  Yes.

2    Q.  Take a drink.  I'm sorry.

3           And then beneath that it says -- the sentence above,

4    could you read that to the jury please?

5    A.  The above would also mean a centralized distribution point,

6    parentheses, warehouse.  This means inventory possibly sizable.

7    Q.  Did you suspect that the distribution point was in or

8    around Canal Street?

9           MR. GUNTHER:  Objection.  Lack of foundation.

10          THE COURT:  Sustained.

11   Q.  Now, let's go back to -- go up to A on this sheet.

12          Sorry.  Go back.  We talk about this inventory

13   possibly sizable.

14          What number or range of numbers or watches were you

15   suggesting to Mr. Lindenbaum when you wrote this?

16   A.  Sizable being enough watches to meet the need for the area.

17   I was not necessarily zeroed in on a dollar figure -- or,

18   excuse me, not a dollar figure, a numerical figure, but just to

19   be able to supply.

20   Q.  When you wrote this did you think it meant dozens?

21   A.  At least.

22   Q.  Hundreds possibly?

23   A.  Yes.

24   Q.  Potentially thousands of watches?

25          MR. GUNTHER:  Again, objection.  Lack of foundation.

1              MR. SCHICK:  I'm asking what he meant.  He wrote it to

2      his client.

3              THE COURT:  He's trying to find out the dimensions of

4      the word "sizable."

5              MR. GUNTHER:  I withdraw the objection.

6              THE COURT:  The objection is overruled.

7      A.  Possibly, depending on a multitude of factors.

8      Q.  And just for the record, "possibly" means possibly

9      thousands of counterfeit watches; correct?

10     A.  Possibly.

11     Q.  Now, going above that to A, do you see that?

12     A.  Yes.

13     Q.  And there's a reference in both A and B to street sellers,

14     do you see that?

15     A.  Yes.

16     Q.  And what are street sellers?

17     A.  Street sellers would be roaming Canal Street or any other

18     streets in that area.  And they would have a picture book.  And

19     they would hang out by where the tourists get dropped off,

20     listen to conversations.  And they'd approach.  Would you like

21     some nice watches?  Oh, look what I have here, and open up a

22     picture book of a variety of watches, a variety of trademarks.

23     And they would engage a potential customer and show them the

24     inventory that they have.

25     Q.  And do street sellers have fixed addresses?

1   A.  The individuals are street sellers.  I'm sure they live

2   someplace, but I don't have --

3   Q.  I'm sorry.  Let me rephrase the question more accurately.

4          With respect to their street-selling activity of

5   watches, do those street sellers generally have fixed

6   addresses?

7   A.  They are on the street.  I don't know if their home base is

8   a fixed address or not.

9   Q.  In terms of their selling watches on Canal Street, did they

10  have fixed addresses from which they sold, or they sold on the

11  street?

12  A.  The interaction was on the street.

13  Q.  And any of your canvasses, did you try to identify the

14  supply available for street sellers?

15  A.  That was not within the scope of the canvass.

16         MR. SCHICK:  Your Honor, if I could take two minutes,

17  I think it would save us -- it would pay a dividend.

18         THE COURT:  Do you promise?

19         MR. SCHICK:  I think you'll make sure, your Honor.

20  You can make sure I deliver the promise, not me.

21         THE COURT:  We're nearing the end of the day.  Why

22  don't we just take a short recess while Mr. Schick will review

23  his notes.  We'll be back in five minutes.

24         (Recess)

25         (Jury not present)

J2QVOME5                        Cole – cross

```
 1              THE COURT:  Mr. Schick.

 2              MR. SCHICK:  I will soon be done by our 2:30 deadline.

 3   I will finish by then and probably earlier.

 4              MR. GUNTHER:  Okay.  I have a little redirect, not a

 5   lot, but I've got a little.

 6              MR. SCHICK:  I'll be done in a couple minutes, your

 7   Honor.

 8              MR. GUNTHER:  Right now, your Honor, maybe ten

 9   minutes.

10              (Jury present)

11              THE COURT:  Mr. Schick.

12              MR. SCHICK:  We have in front of us NN.  If you could

13   still pull it up.

14   BY MR. SCHICK:

15   Q.  Mr. Cole, we were looking before at the email that is the

16   first page of Exhibit NN, which is your email to

17   Mr. Lindenbaum?

18   A.  Yes.

19   Q.  And if you continue through Exhibit NN, you see first the

20   bill that you sent and then -- and the file number on that bill

21   is 11-046; correct?

22   A.  File number on the bill?

23   Q.  It says on the bill, does it say our file number?

24   A.  Oh, invoice -- oh, our file number, yes.

25   Q.  And it's 11-046; correct?
```

1     A.  11-046.

2     Q.  And then it continues to a four-page report that you

3     prepared of your February 18, 2012 visit; correct?

4     A.  Yes.

5     Q.  And is it correct that Mr. Lindenbaum or the Collen law

6     firm accompanied you on that visit?

7     A.  Yes.

8     Q.  And does the Canal -- sorry.  Does the report indicate that

9     any watches were found for sale, any Omega watches for sale?

10    A.  We did run into people who offered to sell a James Bond

11    watch, which is known and is an Omega brand watch.

12    Q.  And with respect to at least one retail location on page 2,

13    you mentioned a particular street address; correct?  Paragraph

14    number two.

15    A.  Referring to 251 Canal?

16    Q.  Yes.

17    A.  Yes.

18    Q.  And that indicated that you observed potential counterfeit

19    activity of Omega at 251 Canal?

20    A.  I indicated the clerk expressed knowledge of counterfeit

21    watches.

22    Q.  And with respect -- let's go to paragraph 4.

23    A.  Yes.

24    Q.  And does paragraph 4 also make reference to a particular

25    street address?

J2QVOME5                         Cole - cross

1    A.   81 Mott Street.

2    Q.   And is that another store that you had -- another address,

3    a retail location, that you had been focused on?

4    A.   We happened to walk by.  We weren't focused on it, but we

5    happened to walk by it and walk in and out.

6    Q.   File number 11 -- well, you weren't focused on 81 Mott

7    Street, but you do have a full paragraph note about it under

8    paragraph H on page 3; correct?

9    A.   Correct.

10   Q.   And it noted that it had been raided on December -- in

11   December 2010; correct?

12   A.   Correct.

13   Q.   And is that the same raid that you testified you have a

14   recollection today that also identified activity at 375 Canal

15   Street?

16   A.   Referring to the December 2010 raid?

17   Q.   Yes.

18   A.   Yeah, that was -- that had activity at 375 Canal Street.

19   Q.   And is the 81 Mott Street raid that you're referring to in

20   this paragraph the same raid?

21   A.   Yes.

22   Q.   And you felt it was noteworthy to mention potential

23   counterfeit activity at 81 Mott Street as a result of that

24   raid, at that earlier raid; is that correct?

25   A.   I remembered it when I was writing the report and it

1    sounded familiar.

2    Q.  Does this report indicate anywhere that there was potential

3    counterfeit activity at 375 Canal Street?

4    A.  I don't believe so.

5    Q.  And is it fair to say that if you had observed potential

6    activity at 375 Canal Street, you would have noted it?

7    A.  Yes.

8    Q.  And just for the record, just keep that open in front of

9    you.  And remember, we have the big exhibit, 240A, which is of

10   the May 19th, 2012 buy.  Do you recall that?

11   A.  Yes.

12   Q.  Can you look at the first page there.

13   A.  The first page of the report, sir?

14   Q.  Yes.

15   A.  Yes.

16   Q.  And on the third line does it indicate our file number?

17   A.  Yes.

18   Q.  And it's 11-046?

19   A.  Correct.

20   Q.  And is that the same file number as what we identified in

21   the February 18, 2012 report?

22   A.  Yes, it is.

23   Q.  So that's all part of the same investigation?

24   A.  That's what I put in underneath.

25            MR. SCHICK:  I would just like to show Mr. Cole one

1   more document, and that is what's been marked as Exhibit EE.

2   A.   That would be in the notebook you presented to me, sir;

3   correct?

4   Q.   Yes.  Do you see that email chain?

5   A.   Yes, I do, sir.

6   Q.   And is that an email chain between yourself and Mr. William

7   Quinonez?

8   A.   Yes, it is.

9   Q.   And was that email exchange in connection with your

10  subcontractor, Mr. Quinonez, to visit locations at Canal Street

11  in search of counterfeit Omega merchandise?

12  A.   Yes.

13  Q.   And was that exchange in the ordinary course of your work

14  as an investigator on this matter?

15  A.   Yes.

16          MR. SCHICK:  Your Honor, I would like to introduce

17  Defendant's EE.

18          MR. GUNTHER:  Your Honor, I don't have an objection to

19  it.

20          THE COURT:  Okay.  EE is in evidence.

21          (Defendant's Exhibit EE received in evidence)

22  Q.   Earlier we had looked at a December 11th email from

23  Mr. Quinonez to you; correct?

24  A.   I believe so.

25  Q.   And this is an email from you to him on December 12th;

1    correct?

2    A.   Correct.

3    Q.   And can you please read the first paragraph of the email

4    after "Hi, William."  It's from you, Monday, December 12, 2011,

5    at 3:18 p.m.

6    A.   "Reviewed your emails and text messages.  All the locations

7    on the client's hit list were either closed down or did not

8    have any watches.  Am I correct?"

9    Q.   Thank you.

10        Does this refresh your recollection that the client

11   had a hit list of locations to visit?

12            MR. GUNTHER:  Objection to form.

13            THE COURT:  Sustained.

14            MR. GUNTHER:  Thank you, your Honor.

15   Q.   Did you write this email?

16   A.   Yes, I did.

17   Q.   And you wrote the words "on the client's hit list," that

18   was written by you?

19   A.   Yes, it was.

20   Q.   And did you expect that Mr. Quinonez would understand what

21   you were writing about?

22   A.   Yes.

23   Q.   And what did you intend to convey when you spoke about the

24   client's hit list?

25   A.   That there were certain locations the client wanted

1    visited.

2    Q.   Those are specific addresses?

3    A.   Yes.

4    Q.   And as you sit here today, do you know which addresses

5    those were?

6    A.   I cannot recall off the top of my head.

7    Q.   But it is the case that as part of this on the day earlier,

8    Mr. Quinonez went to 375 Canal Street; correct?

9    A.   I believe that was one of the locations, yes.

10   Q.   So as you sit here today, can you say that Mr.  -- that 375

11   Canal Street was not on the client's hit list?

12   A.   I believe -- I believe it was on the list provided by the

13   client of stores to visit.

14   Q.   And by "the client," you mean by the Collen law firm?

15   A.   Yes.

16   Q.   And who would have provided you the addresses?

17   A.   At different times it could have been Attorney Paul or it

18   could have been another paralegal.  Because during that period

19   of time, there were different people emailing, conversing, etc.

20   Q.   And when you say "Attorney Paul," you mean Joshua Paul?

21   A.   Yes.

22   Q.   And you testified earlier he was your main point of contact

23   on this matter?

24   A.   Yes.

25   Q.   Do you have any reason to believe these specific addresses

1    did not come from him?

2              MR. GUNTHER:  Objection, your Honor.

3              Lack of foundation.

4              THE COURT:  Overruled.

5              You're coming to an end now, Mr. Schick.

6              MR. SCHICK:  Yes.

7    A.  No, I don't have a reason to believe or not believe that he

8    had knowledge of those locations.

9    Q.  And Mr. Cole, the last question:

10             With respect to the February 18th visit and your

11   report, you had a visit with Mr. Lindenbaum, a report that you

12   prepared, and the email that we saw, right?

13   A.  Yes.

14   Q.  Exhibit NN.

15             Did either Collen IP or Omega ask you to follow up

16   with respect to the potential distribution source?

17   A.  No, did not.

18             MR. SCHICK:  Thank you, your Honor.  Nothing further.

19             THE COURT:  Ladies and gentlemen --

20             MR. GUNTHER:  I'm sorry.

21             THE COURT:  Pardon me?

22             MR. GUNTHER:  I have a bit of redirect.

23             THE COURT:  I think we're going to have to do it

24   tomorrow morning.

25             MR. GUNTHER:  That's perfectly fine, your Honor.

J2QVOME5

```
 1                  Thank you.
 2                  THE COURT:  I promised the jury we'd be out of here at
 3     2:30 in the afternoon.
 4                  MR. GUNTHER:  I'm sorry, your Honor.  I lost track of
 5     time.
 6                  THE COURT:  Remember the instructions.  Keep an open
 7     mind; don't talk about the case.
 8                  Safe home.  We'll resume tomorrow morning at
 9     9 o'clock.
10                  MR. SCHICK:  Thank you, your Honor.
11                  THE COURT:  We're going to give the jurors juror
12     passes.
13                  THE DEPUTY CLERK:  They have it.
14                  THE COURT:  They have it.  Okay.
15                  That will help you get through the line quicker.
16                  Thank you very much.  Good night.
17                  (Jury not present)
18                  MR. GUNTHER:  Your Honor, I apologize for losing track
19     of the time.
20                  THE COURT:  That's all right.
21                  Okay.  How are we doing on time?
22                  THE WITNESS:  Am I excused, your Honor?
23                  THE COURT:  Yes.  You're going to be back tomorrow at
24     9 o'clock.
25                  THE WITNESS:  Yes, your Honor.
```

J2QVOME5

1          (Witness not present)

2          MR. GUNTHER:  So, your Honor, I think we're just about

3   done with -- then we have Mr. Taute.  I think he's about half

4   hour to 45, plaintiffs on direct.  And then we have Mr. Foster.

5   And how long?

6          MR. NOYES:  He is 45 minutes.

7          MR. GUNTHER:  On direct examination.

8          MR. NOYES:  Yes.

9          MR. GUNTHER:  Then we have -- Ms. Gostin is going to

10  cover Caponegro and Tritto.  I think they are both relatively

11  short witnesses.

12         MS. GOSTIN:  Correct.

13         THE COURT:  You are just going to authenticate the

14  documents?

15         MR. GUNTHER:  That's right, yes.

16         And then we have Mr. Laboz, and I'll probably have

17  about an hour with him.

18         THE COURT:  Okay.

19         And Mr. Schick, how about you?

20         MR. SCHICK:  We will have cross, obviously, of all the

21  witnesses.

22         THE COURT:  Obviously.

23         MR. SCHICK:  And so --

24         THE COURT:  And the cross is --

25         MR. SCHICK:  With respect to our case, we're down to

1    Mr. William Quinonez and Mr. Stone-Jansen.  So it will not be

2    long.

3             THE COURT:  Do you think Friday is still a legitimate

4    target?

5             MR. SCHICK:  I pray for it every night.

6             MR. GUNTHER:  And that's what we're aiming for, your

7    Honor.  And if we get to a point where we start to get worried

8    about that, we'll let you know.

9             MR. SCHICK:  Your Honor, can I raise one issue?

10            We spoke yesterday with regard to Mr. Taute, who's now

11   going to testify tomorrow.  And without getting into the weeds

12   on it, I would ask that if -- looking back at his testimony

13   deposition and at his lawyer's statements at the deposition,

14   the lawyer offered to have a copy of the nonprosecute agreement

15   provided for the Court to review *in camera*.

16            Now, given that the question is that since the jury

17   is, in this case, operating as the finder of fact, whether the

18   terms of the agreement that require notice being given would

19   require that, we don't intend to get into it very deeply.

20            Also, your Honor just asked the question yesterday

21   about whether the activity covered by the nonprosecute

22   agreement occurred while he was a police officer or subsequent.

23   Do you recall that question was asked?

24            THE COURT:  I do.

25            MR. SCHICK:  The answer was we believe -- it certainly

1    was subsequent in time, but I wanted to note just the following

2    oddity, which is that Mr.  -- it was very close in time, and

3    Mr. Taute left the police force in 2011, I believe, less than a

4    year before his 20.  So there is certainly reason to think that

5    someone who leaves several months or a year shy of his 20-year

6    pension, that it might have been related --

7                THE COURT:  We shouldn't speculate.

8                MR. SCHICK:  We shouldn't, that's why I'm asking if he

9    could be told to bring the thing for your Honor's *in camera*

10   review, that's all.  So we don't have to worry about it.  If he

11   has it tomorrow, your Honor can do with it what he wishes.

12               MR. GUNTHER:  Your Honor, the nonprosecution agreement

13   is part of the motion *in limine* that you ruled on a year ago.

14               THE COURT:  Yes.  Right.

15               MR. GUNTHER:  It's out.  This is a constant effort to

16   try to get back into that.  It's law of the case.  We think

17   that Mr.  -- you were clear on this and we ought to stick with

18   that ruling.

19               THE COURT:  Okay.

20               MR. GUNTHER:  Thank you.

21               THE COURT:  I'm sticking to the ruling.

22               MR. GUNTHER:  Thank you, your Honor.

23               THE COURT:  See you tomorrow morning, 9 o'clock.

24               MR. GUNTHER:  Thank you, your Honor.

25               MR. DELLA FERA:  Thank you, your Honor.

J2QVOME5

1                (Adjourned to February 27, 2019 at 9 o'clock a.m.)

```
 1                        INDEX OF EXAMINATION
 2   Examination of:                          Page
 3   LESLIE QUINONEZ
 4   Direct By Mr. Noyes  . . . . . . . . . . . . 117
 5   Cross By Mr. Della Fera  . . . . . . . . . . 134
 6   Redirect By Mr. Noyes  . . . . . . . . . . . 162
 7   Recross By Mr. Della Fera  . . . . . . . . . 165
 8   BRADFORD COLE
 9   Direct By Mr. Gunther  . . . . . . . . . . . 166
10   Cross By Mr. Schick  . . . . . . . . . . . . 253
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          PLAINTIFF EXHIBITS

2       Exhibit No.                                      Received

3        246     . . . . . . . . . . . . . . . . . 126

4        104     . . . . . . . . . . . . . . . . . 130

5        100     . . . . . . . . . . . . . . . . . 132

6        106     . . . . . . . . . . . . . . . . . 177

7        107     . . . . . . . . . . . . . . . . . 178

8        108     . . . . . . . . . . . . . . . . . 180

9        240A    . . . . . . . . . . . . . . . . . 183

10       108C    . . . . . . . . . . . . . . . . . 192

11       108D    . . . . . . . . . . . . . . . . . 199

12       304     . . . . . . . . . . . . . . . . . 232

13       305     . . . . . . . . . . . . . . . . . 240

14

15

16                         DEFENDANT EXHIBITS

17      Exhibit No.                                      Received

18       UUU     . . . . . . . . . . . . . . . . . 140

19       W       . . . . . . . . . . . . . . . . . 228

20       UU      . . . . . . . . . . . . . . . . . 243

21       XX      . . . . . . . . . . . . . . . . . 248

22       DD      . . . . . . . . . . . . . . . . . 289

23       NN      . . . . . . . . . . . . . . . . . 306

24       EE      . . . . . . . . . . . . . . . . . 316

25