J2RBOME1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    OMEGA SA, et al.,

 4              Plaintiffs,

 5         v.                              12 Civ. 6979 (PAC)

 6    375 CANAL, LLC, et al.,

 7              Defendants.
                                           Trial
 8    ------------------------------x
                                           New York, N.Y.
 9                                         February 27, 2019
                                           9:15 a.m.
10
      Before:
11
                        HON. PAUL A. CROTTY,
12
                                           District Judge
13                                         -and a Jury-

14                        APPEARANCES

15    WILMER CUTLER PICKERING HALE & DORR LLP
           Attorneys for Plaintiffs
16    BY:  ROBERT J. GUNTHER JR.
           ISLEY MARKMAN GOSTIN
17         CHRISTOPHER R. NOYES

18    DENTONS U.S.LLP
           Attorneys for Defendants
19    BY:  STEPHEN G. DELLA FERA
           -and-
20    TROUTMAN SANDERS LLP
      BY:  AVI SCHICK
21

22

23    Also Present:  Sarah Finkel, Paralegal
                     Clinton Lam, Technician
24

25
```

J2RBOME1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please be seated.

3          Has everybody seen the note from the juror?

4          MR. GUNTHER:  Your Honor, we have.

5          MR. SCHICK:  Yes, your Honor.

6          THE COURT:  I'm going to mark it as Court Exhibit 1 so

7     it's part of the court record.

8          What are your wishes, Mr. Gunther?

9          MR. GUNTHER:  Your Honor, what we think should be done

10    is the following.  We have enough jurors, and I think your

11    Honor gave us a cushion.  I would suggest that when you bring

12    the jury in, that you let them know that Ms. Brisson is no

13    longer going to be part of the jury, that an issue came up that

14    has nothing to do with this case, that has nothing to do with

15    the parties in this case or the lawyers or the witnesses, that

16    caused her to withdraw as a juror, and that basically the

17    remaining jurors will go forward and basically make clear that

18    it had nothing to do with anything that's going on in this

19    courtroom.

20          THE COURT:  Mr. Schick.

21          MR. SCHICK:  Your Honor, we respectfully submit that

22    there is no choice other than to declare a mistrial under Rule

23    48.  It says that each juror must participate in the verdict

24    unless excused under rule 47(c).  Rule 47(c) reflects the

25    ability to excuse a juror for good cause.  Of course no juror

J2RBOME1

1    has been excused here and surely sending a note to a federal

2    judge saying I refuse to come back is not good cause to excuse

3    a juror.

4           THE COURT:  You saw her.  She was traumatized by the

5    event that occurred.

6           MR. SCHICK:  Your Honor, she hasn't even asked to be

7    excused.  She sent a letter saying she's not coming to court.

8    And we submit it can't be a good cause and it would be error to

9    proceed -- she's an impaneled juror and she hasn't asked to

10   proceed -- for a federal judge to *sua sponte* excuse a juror for

11   good cause after a letter like that, I believe would be

12   unprecedented.  If your Honor thinks that this is an issue

13   worthy of briefing, I would suggest that we use today to give

14   three hours or so just to submit a letter briefs on this issue

15   and your Honor can decide the issue.

16          THE COURT:  Well, the issue we had eight jurors is so

17   we could have two alternates, and it's within my discretion in

18   light of Ms. Brisson's letter to excuse her.  That's what I

19   intend to do.  I intend to follow Mr. Gunther's suggestion.

20          MR. SCHICK:  Let the record reflect --

21          THE COURT:  Excuse me.  Have you finished?  Because I

22   want you to make whatever record you want to make.

23          Are you moving for a mistrial?

24          MR. SCHICK:  Yes, your Honor.  We're moving for a

25   mistrial.  The record reflects that no juror has asked to be

excused.  A juror has said that she is refusing to come, and

under Rule 48, a juror once impaneled, she's not an alternate,

there are no alternates, there are eight members of this jury,

and Rule 48 is clear that each juror must participate in the

verdict unless excused for good cause under rule 47(c).  This

juror has not been excused for good cause.  This juror has said

she's not coming back.  To *post hoc, sua sponte* excuse her when

there's been no request to be excused, there is certainly not

good cause, and it would be error, and, therefore, we object.

THE COURT:  The motion for a mistrial is denied.

I read that letter as saying that she's traumatized.

We saw her yesterday.  She was literally shaking with anger and

fear and in reaction to an unfortunate incident which occurred

as she was entering the building.  The letter speaks for

itself.  In light of that, I'm going to excuse the juror.  I'm

going to instruct the jury that the excusal had nothing to do

with anything that's going on here in the courtroom.

OK.  Call in the jury.

MR. SCHICK:  May I make one more request?

THE COURT:  Yes.

MR. SCHICK:  I think -- we have no idea, obviously

none of news this room have any idea what the other jurors know

about her experience, what she said or didn't say yesterday

when she was called in and called out.  It might be useful for

your Honor or Mr. Gonzalez just to poll the jury to find out

J2RBOME1

1    whether there was anything that was said that could potentially

2    be prejudicial.  She was in there with them obviously in the

3    morning before she was pulled out, during lunch, other times,

4    they spent time together, and I think we shouldn't just assume

5    that nobody has any idea about what was going on.

6              THE COURT:  Call the jury in.

7              (Continued on next page)

J2RBOME1

```
 1              (Jury present)

 2              THE COURT:  Good morning.  Please be seated.

 3              THE WITNESS:  Good morning, your Honor.

 4              THE COURT:  I've excused Juror No. 8 because of a

 5    letter that she wrote.  It has nothing to do with the trial,

 6    nothing to do with the parties, nothing to do with anything.

 7    She was upset.

 8              Did she talk to you about the reason for her upsetment

 9    yesterday?

10              JUROR:  Briefly, yes.

11              THE COURT:  What did she tell you?

12              JUROR:  The security line.

13              THE COURT:  Yes.  She had trouble in the security

14    line.

15              JUROR:  She was upset by that.

16              THE COURT:  In light of that, I've excused her, but

17    it's got nothing to do with this.  So I ask you to put that out

18    of your mind.

19              All right.  Mr. Cole, you're still under oath.

20              MR. GUNTHER:  Your Honor, can I just suggest one

21    thing, and maybe this is going to be something that's helpful

22    or maybe not, but I notice the juror that's sitting all the way

23    over here, it's a little bit tough to see, and I'm wondering

24    and that juror was moved into that seat it might be a little

25    bit easier.
```

1              Now, maybe that's fine for you.

2              JUROR:  Who, me?

3              MR. GUNTHER:  Yes.

4              JUROR:  I can see.

5              MR. GUNTHER:  You're fine.  I withdraw it.

6              THE COURT:  Thank you.

7              MR. GUNTHER:  Thank you.  Sorry.

8              THE COURT:  Your license as an usher is revoked.

9              MR. GUNTHER:  I failed again, your Honor.

10    BRADFORD COLE, resumed.

11   REDIRECT EXAMINATION

12   BY MR. GUNTHER:

13   Q.  Good morning, Mr. Cole.

14   A.  Good morning.

15   Q.  Now, Mr. Cole, I want to put up Exhibit NN, if I can, and I

16   want to make sure that everybody's screens are working when we

17   get that on the screen.

18              MR. GUNTHER:  Members of the jury, can you see?

19              JUROR:  Yes.

20              MR. GUNTHER:  OK.  You're good.  Thank you.

21   Q.  Mr. Cole, do you have that in front of you?

22   A.  Yes, it's on my screen.

23   Q.  Now, sir, you were shown this e-mail during your

24   cross-examination, correct?

25   A.  Yes.

1  Q.  And you were asked about your statement in the e-mail that

2  there might be a distributor of counterfeit watches with the

3  warehouse in the area?

4  A.  Yes.

5  Q.  Now, sir, and this is relating to the investigation that

6  you and Mr. Lindenman did in February of 2012, correct?

7  A.  Correct.

8  Q.  Now, sir, did you press to follow up on that issue with

9  Omega specifically?

10  A.  No.

11  Q.  Why not?

12  A.  The street sellers were showing me a catalog of a variety

13  of trademarks -- watches, leather goods, etc., and Omega was

14  one of many trademarks represented in that catalog.  And so in

15  order to do an investigation, you need a gathering of trademark

16  holders to come together to investigate collectively.

17  Q.  Now, sir, you were asked a number of questions about

18  Mr. Schick about the property owner information that you

19  included in your report of the May 2012 investigation that's in

20  evidence as 240A, right?

21  A.  Correct.

22  Q.  Sir, let me ask you this: based on your experience as an

23  investigator, is information regarding the owner of the

24  building in New York City publicly available?

25  A.  Yes.

J2RBOME1                         Cole - Redirect

1    Q.  In your experience, is information relating to who is

2    leasing property in a building publicly available?

3              MR. SCHICK:  Your Honor, objection, leading, many

4    times.

5              THE COURT:  Overruled.

6    A.  No.

7    Q.  Now, sir, I want to refer you back to the December 2010

8    New York Police Department enforcement action on Canal Street.

9    You were asked about that on your cross-examination, correct?

10   A.  Correct.

11   Q.  And you were asked about whether you had made a report to

12   your client with respect to your participation in that

13   investigation, correct?

14   A.  Yes.

15   Q.  Now, sir, did you organize that enforcement action?

16   A.  No.

17   Q.  Who did?

18   A.  The New York City Police Department.

19   Q.  Now, sir, I want to the ask you if you can take a look at,

20   and I just want for now -- if you can look at it from your

21   binder, Plaintiffs' Exhibit 290.

22   A.  OK.

23   Q.  Can you tell us what that is?

24   A.  It is an e-mail from myself to Joshua Paul dated

25   December 8, 2010, at 4:56 p.m.

J2RBOME1                          Cole - Redirect

1    Q.  Is that the day after the New York Police Department

2    enforcement on Canal Street that you participated in?

3    A.  Yes.

4          MR. SCHICK:  Your Honor, this is a document that was

5    not marked as an exhibit previously.  So I understand, it's not

6    up to the jury, but if a witness starts reading it before we

7    have a voir dire or ruling on its admissibility, it undermines

8    the whole process of having the objection and ruling.

9          MR. GUNTHER:  Your Honor, I hadn't offered it yet and

10   that kind of statement is improper.  I offer Plaintiffs'

11   Exhibit 290.

12         THE COURT:  Go ahead with your question, Mr. Gunther.

13         MR. GUNTHER:  I offer Plaintiffs' Exhibit 290.

14         MR. SCHICK:  Your Honor, just that we object.  This is

15   not a document that was marked as an exhibit.  It was marked

16   previously with their witness that we had on direct several

17   hours yesterday.

18         MR. GUNTHER:  Your Honor, this is a document that

19   they've had in their possession, that we put --

20         THE COURT:  It was a trial exhibit.

21         MR. GUNTHER:  Yes, sir.  It's a trial exhibit.

22         THE COURT:  Go ahead.

23         MR. GUNTHER:  Thank you.

24         MR. SCHICK:  Hold on one moment.

25         MR. DELLA FERA:  Your Honor, Exhibit 290 was not on

1      the trial exhibit list.  It was not included with the pretrial

2      order.

3                  MR. GUNTHER:  We submitted this to them.  They've had

4      it, your Honor.  Whether it was on the exhibit list, it was

5      submitted to them, and it's a document that actually rebuts

6      arguments that were made in the cross-examination yesterday.

7                  THE COURT:  Well, we have rules here.  Was it listed

8      as a trial exhibit?

9                  MR. GUNTHER:  Your Honor, it was not initially listed

10     as a trial exhibit, but your Honor, it was given to them,

11     they've had it for several days.  And they had --

12                 THE COURT:  The objection is sustained.

13                 MR. GUNTHER:  Thank you, your Honor.

14     BY MR. GUNTHER:

15     Q.  Mr. Cole, can you tell me, and not reflecting anything

16     about this e-mail, can you tell me why you did not prepare a

17     report after your participation in the December 7, 2010

18     enforcement action?

19     A.  I was not in charge of that particular enforcement action

20     or investigation.  I was there to be an observer.  So all the

21     information regarding the defendants, their particular charges,

22     it's a NYSID report numbers, booking information, detailed

23     breakdown of watches recovered, the status of the watches,

24     etc., I did not have.  So for me to write a report would not be

25     appropriate.

J2RBOME1                          Cole - Redirect

1   Q.  Do you have an understanding as to whether that information

2   was available from the New York Police Department?

3   A.  I believe it was.

4   Q.  Now, sir, I'm going for?

5          MR. GUNTHER:  Your Honor, if I may approach, I just

6   want to hand the witness Exhibit 100.

7          THE COURT:  Yes.

8   Q.  Mr. Cole, you were asked a number of questions in your

9   cross-examination about the outer bag for Plaintiffs' Exhibit

10  100.

11  A.  Correct.

12  Q.  And whether or not that's something that you, in fact,

13  yourself had created; is that correct?

14  A.  Correct.

15  Q.  Now, sir, does anything about those questions cause you to

16  change your testimony that the watch in Exhibit 100 is the

17  watch that Leslie Quinonez purchased at 375 Canal Street on

18  May 19, 2012?

19  A.  No.

20  Q.  Does anything in those questions that you were asked by

21  Mr. Schick cause you to change your testimony that the yellow

22  sticker contained in Exhibit 100 is the yellow sticker on which

23  Ms. Quinonez had made the markings 375 during the purchase on

24  May 19, 2012?

25  A.  No, it does not change my testimony.

J2RBOME1                          Cole - Redirect

1    Q.  Sir, do you recall that in addition the third item in

2    Exhibit 100 is the small baggy with the ziplock top?  Does

3    anything in any of the questions that you were asked by

4    Mr. Schick cause you to change your testimony that that baggy

5    was the baggy in which the watch was sold to Ms. Quinonez at

6    375 Canal Street on May 19, 2012?

7    A.  No.

8    Q.  Now, sir, Mr. Schick spent a lot of time during his

9    examination on your declarations, right?

10   A.  Correct.

11   Q.  Sir, what does your report, Exhibit 240A, say about who

12   purchased the counterfeit Omega watch at 375 Canal Street on

13   May 19, 2012?

14   A.  Investigator LQ, which stands for Leslie Quinonez.

15   Q.  Sir, have you watched the video that Ms. Quinonez took

16   during the purchase of the watch at 375 Canal Street on May 19,

17   2012?

18             MR. SCHICK:  Your Honor, at this point we're just

19   repeating his direct testimony from yesterday.

20             THE COURT:  That's an objection that's overruled.

21   Q.  Let me ask you the question again.  Have you watched Leslie

22   Quinonez's video of the purchase of the Omega counterfeit watch

23   at 375 Canal Street on May 19, 2012?

24   A.  Yes.

25   Q.  What does that show in terms of who purchased the watch?

1    A.  It shows that Leslie Quinonez engaged in conversation with

2    the clerk and purchased the watch.

3              MR. GUNTHER:  Thank you.  I have no further questions.

4              MR. SCHICK:  Your Honor, I just have very few

5    questions.

6              THE COURT:  Two minutes.

7              MR. SCHICK:  Thank you.

8    RECROSS EXAMINATION

9    BY MR. SCHICK:

10   Q.  Mr. Cole, do you still have the declaration that

11   Mr. Gunther just referenced before you, that would be up.  You

12   have the exhibits that you had from yesterday?

13   A.  Let me look at it, sir.  Yes, sir I have it.

14   Q.  Do you see the paragraph -- I want to focus your attention

15   on paragraph 9.  Do you see that?

16   A.  Yes, sir.

17   Q.  And paragraph 9 relates to the December 7, 2010 police

18   action?

19   A.  Yes.

20   Q.  And I think you testified that you did not prepare any

21   report with regard to that visit that day; is that correct?

22   A.  Correct.

23   Q.  And you did not draft this declaration, correct?

24   A.  Correct.

25   Q.  Mr. Paul drafted this declaration?

1    A.  Correct.

2    Q.  So how, if you did not prepare any report, how did Mr. Paul

3    get the information that's reflected in paragraph 9?

4    A.  I communicated information to him, but I did not prepare a

5    report.

6    Q.  So your testimony is that you called him?

7    A.  We spoke about it on the phone, if I recall correctly.

8    Q.  Now, just two more questions.  If you can turn to XX, which

9    is your supplemental declaration that corrected the inaccurate

10   and false statements.

11   A.  OK.

12   Q.  And if you can turn to Exhibit 5, which is the red line

13   that we discussed yesterday.

14   A.  OK.

15   Q.  And do you see if we turn to page 3, again, paragraph 9,

16   that's a paragraph that relates to again that December 2010

17   police raid?

18   A.  Yes.

19   Q.  There are several corrections made in this one, correct?

20   A.  Yes.

21   Q.  And what you see in 9, everything that's crossed out means

22   it was initially put in by Mr. Paul in the sworn declaration

23   that you submitted in 2016?

24   A.  Correct.

25   Q.  And you were taking it out in this 2017 version; is that

J2RBOME1                       Cole - Recross

1   correct?

2   A.   Correct.

3   Q.   So we focused yesterday on the fact that the word "first"

4   was taken out, correct?

5   A.   Correct.

6   Q.   But now I want to focus on the second sentence.  Can you

7   read the second sentence into the record?

8   A.   Starting with the word, "I observed"?

9   Q.   Yes.

10   A.   "I observed the police confiscate Omega brand watches from

11   the storefront at 375 Canal Street and watched the police

12   arrest the store clerk at that address."

13   Q.   Now, you read everything that was not struck out, correct,

14   but does this show you that initially in 2016, the sworn

15   affidavit prepared by Mr. Paul had you testify under penalty of

16   perjury that you witnessed at least a dozen counterfeit Omega

17   watches at 375 canal?

18   A.   Yes.

19   Q.   And you corrected that by taking out the words "at least a

20   dozen" and "counterfeit," correct?

21   A.   I took out "at least a dozen counterfeit."

22   Q.   In other words, you felt that it was inaccurate to state

23   under penalty of perjury that you had observed the police

24   confiscate at least a dozen counterfeit Omega watches at 375

25   Canal Street?

J2RBOME1                          Taute - Direct

1    A.  The phrase, at least a dozen counterfeit watches at the

2    time I was working on this document.  I did not have a specific

3    recollection of number of Omega watches.

4            THE COURT:  One more question, Mr. Schick.

5    Q.  You didn't take any pictures of anything that was taken out

6    of the store that day, did you?

7    A.  No, I did not.

8            MR. SCHICK:  Nothing further.

9            THE COURT:  You're excused, Mr. Cole.

10           THE WITNESS:  Thank you, your Honor.

11           THE COURT:  Drop off that watch.

12           THE WITNESS:  Yes.

13           THE COURT:  Call your next witness.

14           MR. GUNTHER:  Thank you, your Honor.  We're requesting

15   to call Richard Taute and if I can have a second to just clean

16   up and we'll get the binders passed out.

17           THE COURT:  Yes.  Good morning.

18    RICHARD TAUTE,

19        called as a witness by the plaintiffs,

20        having been duly sworn, testified as follows:

21           MR. GUNTHER:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MR. GUNTHER:

24   Q.  Mr. Taute, is there a binder in front of you?

25   A.  No.

1   Q.  I apologize.  Let me just get you a binder.  These are some

2   documents that I may go over with you.

3           Mr. Taute, can you tell us what you did for a living?

4   A.  I was a New York City police officer.

5   Q.  And what is your current position?

6   A.  I work public safety for St. John's University.

7   Q.  Sir, are you retired from the New York Police Department?

8   A.  Yes.

9   Q.  When did you retire?

10  A.  March 31, 2011.

11  Q.  Sir, how long did you work for the NYPD?

12  A.  From June 1992 to March 31, 2011.

13  Q.  And at the time that you retired, what was your position?

14  A.  Training coordinator.

15  Q.  And how long did you hold that position?

16  A.  Approximately two years.

17  Q.  Now, during the time that you were with the NYPD, were you

18  with any particular task force?

19  A.  Yes, which was the Manhattan South Peddler Task Force.

20  Q.  And what was the time frame that you were part of the

21  New York Police Department, Manhattan South Peddler Task force?

22  A.  From October 1997, to my retirement March 31, 2011.

23  Q.  Now, sir, what is the Manhattan South Peddler Task Force?

24  A.  Manhattan South Peddler Task Force addresses conditions

25  such as unlicensed vendors, illegal food vendors, people

J2RBOME1                          Taute - Direct

1    selling counterfeit merchandise.

2    Q.  Is that the task force still in existence?

3    A.  Yes.

4    Q.  Now, sir, during your time on the Manhattan South Peddler

5    Task Force, about how many police officers were on the task

6    force?

7    A.  Approximately 30.

8    Q.  And did you have any particular role within the task force?

9    A.  Yes, I was the trading coordinator.

10   Q.  Now, you stated that.  Can you tell us what your

11   responsibilities were as training coordinator with the

12   Manhattan South Peddler Task Force?

13   A.  To keep the members of the unit up to date on vendor

14   regulations, any new rules and regulations issued by the City

15   of New York, arranging for training from numerous companies

16   regarding the trademark counterfeiting, and what the brand

17   holders' trademarks are, and who were authorized to sell them.

18   Q.  Let me just ask you now, when you say "brand holders," can

19   you tell us who you're referring to?

20   A.  Companies that hold trademarks, brands like Louis Vuitton,

21   Rolex, Gucci, Chanel.

22   Q.  Was Omega one of those brands?

23   A.  Yes.

24   Q.  Sir, in terms of the training that you would conduct, did

25   that sometimes involve the brands owners?

1    A.  Yes.

2    Q.  Did that involve the brand owners working with the members

3    of the task force?

4    A.  Yes.

5    Q.  What was the purpose of providing training to the officers

6    on the Manhattan South Peddler Task Force with respect to brand

7    owners?

8    A.  To differentiate between legitimate merchandise produced by

9    the brand holders versus counterfeits sold out on the street or

10   in stores.

11   Q.  Sir, did you conduct as part of the task force, did the

12   task force from time to time conduct enforcement actions?

13   A.  Yes.

14   Q.  And what is an enforcement action?

15   A.  An enforcement action entails summonses, arrests.

16   Q.  And can an enforcement action involve counterfeit

17   counterfeiting?

18   A.  Absolutely.

19   Q.  Sir, would you communicate from time to time with brand

20   owners regarding anticounterfeiting enforcement actions?

21   A.  Yes.

22   Q.  Sir, to your knowledge is the sale or offer for sale of

23   counterfeit merchandise in New York City a crime?

24   A.  Yes.

25   Q.  Was it a crime when you were a police officer?

1    A.  Yes.

2    Q.  Now, sir, did you ever personally go out in the field to

3    search for counterfeit goods and effect arrests based on those

4    procedures?

5    A.  Yes.

6    Q.  Approximately what amount of your time when you were on the

7    Manhattan South Peddler Task Force was spent doing that?

8    A.  Approximately 90 percent.

9    Q.  And what area did your task force cover in terms of

10   enforcement?

11   A.  The Manhattan South Peddler Task Force covered from 59th

12   Street down to Battery Park from East River to Hudson River.

13   Q.  With respect to counterfeiting enforcement actions, was the

14   working of the task force concentrated in any particular area

15   of Manhattan?

16   A.  In the confines of the first and fifth precincts, which was

17   Lower Manhattan.

18   Q.  Sir, does that encompass the Canal Street area?

19   A.  That's correct.

20   Q.  Sir, what is the Canal Street area in your understanding?

21   A.  The zone for enforcement from Canal Street area was Canal

22   Street from Sixth Avenue to the other side of the Manhattan

23   Bridge.

24   Q.  The other side of the Manhattan Bridge, you said?

25   A.  Right on Canal Street.

J2RBOME1                         Taute - Direct

1    Q.  Thank you.  Now, sir, in terms of counterfeiting

2    enforcement, why was the work concentrated in the Canal Street

3    area?

4    A.  It was a precinct condition for numerous vendors selling

5    counterfeit merchandise in the area.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2rWome2                          Taute - Direct

1    BY MR. GUNTHER:

2    Q.  And was that historically true during the time that you

3    were on the task force?

4    A.  Yes.

5    Q.  And that time period was when, again?

6    A.  From October 1997 to March 21, 2011.

7    Q.  Sir, can you describe how as part of the task force you and

8    your colleagues searched for counterfeit merchandises out in

9    the field?

10   A.  We would see vendors with booths, with open briefcases,

11   hawking merchandise.

12   Q.  OK.

13   A.  And then we would make observations and then arrest would

14   be effected.

15   Q.  All right.  Now, sir, did your enforcement activities with

16   respect to counterfeit merchandise involve from time to time

17   retail establishments?

18   A.  Yes.

19   Q.  And in the field, was the task force, in terms of its

20   focus, was it focused on retail locations as opposed to

21   landlords or landlords as opposed to retailers?  Can you tell

22   us?

23            MR. SCHICK:  Objection.  Leading.

24            THE COURT:  Overruled.

25   A.  It would be retailers.

1    Q.  OK.  And what happened if you found someone selling

2    counterfeit merchandise during an enforcement action at a

3    retail location?

4    A.  If the merchandise was determined to be counterfeit, the

5    person would be arrested.

6    Q.  And what would be done with the counterfeit goods?

7    A.  Immediately, at the scene, in front of the person arrested,

8    it would be placed in a clear plastic bag with a fixed seal

9    with a serial number on it.

10   Q.  OK.  And sir, what would typically happen to the person who

11   was arrested as part of one of these enforcement actions for

12   selling counterfeit merchandise?

13   A.  They would be taken to the local precinct, and they would

14   be processed.  Their arrest would be processed.

15   Q.  Would any type of reports be created as a result of that

16   process?

17   A.  Yes, there would be a complaint report, an online booking

18   sheet, property vouchers.

19   Q.  Would an arrest report be also generated?

20   A.  Yes.

21   Q.  What's an arrest report?

22   A.  Arrest report would contain things such as the time, the

23   place, the person's name, date of birth, the amount of property

24   removed.

25   Q.  Who would typically prepare the arrest report?

1   A.  The arresting officer.

2   Q.  And did the New York Police Department, during the time

3   that you were employed there, have procedures governing arrest

4   reports?

5   A.  Yes.

6   Q.  Now, according to those procedures, what happened to the

7   arrest reports after they were completed?

8   A.  After an arrest report is completed, it's inputted into a

9   computer system called OmniForm, and then an arrest number is

10  generated.

11  Q.  OK.  And is OmniForm a database?

12  A.  Yes.

13  Q.  And can you tell us generally what the OmniForm database

14  is?

15  A.  It keeps track of arrest information.  It generates an

16  arrest number, which then would be -- what's the word I'm

17  looking for, assigned to that particular person that was

18  arrested.

19  Q.  OK.  Now, sir, did the Manhattan South peddler task force

20  keep itself a log of arrests made by the task force?

21  A.  Yes.

22  Q.  And how was that logged kept?

23  A.  It's a ledger.  It's handwritten.  All arrests effected,

24  whether for trademark counterfeit, unlicensed vending or any

25  other crimes, are entered into that arrest log.

1   Q.  And does the arrest log include for each entry the arrest

2   number?

3   A.  That's correct.

4   Q.  Now, sir, in terms of the enforcement actions relating to

5   counterfeiting, how did you and your colleagues determine

6   whether or not a good being sold was counterfeit or not?

7   A.  We would look at the manner of which the merchandise was

8   displayed.  A legitimate brand holder would not display their

9   watches in briefcases or on the ground or in the open without

10  packaging.  But that's just a primary indicator.  There are

11  other indicators that would determine whether counterfeit

12  merchandise is indeed counterfeit.

13  Q.  Can you go over some of those other indicators?

14  A.  Sure.  Country of origin.  For example, Louis Vuitton

15  handbags are made in France.  The counterfeits we would find

16  would have "made in China" stickers inside the handbags.  Louis

17  Vuitton does not make handbags in China.  Rolex watches,

18  another example, made in Switzerland, they would have "made in

19  China" stickers on them.  Individual serial numbers, genuine

20  individual serial numbers assigned to each Rolex watch, for

21  example.  Counterfeits would have the same serial number just

22  stamped on the back of each watch.  It wouldn't be a different

23  serial number, which it's supposed to be.

24  Q.  How about price?

25  A.  Price point is an indicator.  It wouldn't be a primary

1   indicator, but it is an indicator.  Genuine Rolexes can go

2   anywhere between seven to 20,000 and up, $20,000 and up, and

3   the counterfeits would be sold for 150.  You know, sometimes

4   less, sometimes more.

5   Q.  Is it fair to say that you and the other members of the

6   task force would evaluate those various factors?

7   A.  Yes.

8   Q.  Now, sir, when the task force effected an arrest during an

9   enforcement action for counterfeiting, what degree of certainty

10  did you need to reach in order to determine that the good being

11  sold or offered for sale was, in fact, counterfeit?

12  A.  We had to be certain 100 percent.

13  Q.  And why do you say that?

14  A.  Because we wouldn't want to arrest somebody without 100

15  percent knowledge, because, you know, it wouldn't be -- the

16  officer wouldn't feel comfortable with it, and it wouldn't be

17  fair.

18  Q.  OK.  Now, sir, I want to move to a different topic, and I

19  want to ask you if you -- you said before that in your role as,

20  your role on the task force, the peddler task force, that you

21  coordinated with brand holders?

22  A.  That's correct.

23  Q.  Sir, do you recall whether during your time on the task

24  force you coordinated with The Swatch Group?

25  A.  Yes.

1    Q.  And as part of that, did you coordinate with various of

2    their watch brands?

3    A.  Yes.

4    Q.  Can you tell us what brands you coordinated with Swatch

5    Group on?

6    A.  Omega, Rado.

7    Q.  Now, sir, could you take a look in your binder; there

8    should be an exhibit tag that says Exhibit 167.

9    A.  Yes.

10   Q.  Do you recognize this document, sir?

11   A.  I wish I had some reading glasses.

12       Yes.

13   Q.  Can you see it?

14   A.  Yes.

15   Q.  I'm sorry to make you strain your eyes.

16   A.  No.  That's all right.

17   Q.  Can you tell us what it is?

18   A.  It's an email sent by myself to Mr. Joshua Paul of The

19   Swatch Group.

20   Q.  And what's the date of the email?

21   A.  September 28, 2010.

22   Q.  Does this accurately reflect communication that you made to

23   Mr. Paul on September 28, 2010?

24   A.  Yes.

25           MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

1    167.

2              MR. SCHICK:  No objection, your Honor.

3              THE COURT:  167's in evidence.

4              (Plaintiffs' Exhibit 167 received in evidence)

5              MR. GUNTHER:  All right.  Let's put it up on the

6    screen, if we can.

7              Ladies and gentlemen, do you have it on the screen?

8              Thank you.

9    Q.  Sir, you sent this email to Joshua Paul, correct?

10   A.  Correct.

11   Q.  Who is he?

12   A.  He was a brand representative of The Swatch Group.

13   Q.  OK.  And is the email address that appears at the top,

14   where it says from, it says r_taute@verizon.net --

15   A.  That's correct.

16   Q.  Is that your email address?

17   A.  Yes.

18   Q.  When did you exchange --

19        Now, you actually see there's an email from you to

20   Mr. Paul, correct?

21   A.  Yes.

22   Q.  OK.  And there's also an email below that from Mr. Paul to

23   you, correct?

24   A.  That's correct.

25   Q.  What's the date of that email?

1    A.  Looks like September 27, 2010.

2    Q.  All right.  Can you read the first sentence of Mr. Paul's

3    email?

4    A.  "Dear Mr. Taute, once again, thank you so much for reaching

5    out to my firm's client, The Swatch Group U.S. Inc., last week

6    about the presence of counterfeit Swatch watches in lower

7    Manhattan."

8    Q.  Sir, does that accurately reflect the impetus for this

9    communication?

10   A.  Yes.

11   Q.  You were the impetus for this communication?

12   A.  Yes.

13   Q.  And was it typical for you, sir, as part of your activities

14   as training coordinator, to reach out to brand owners like

15   this?

16   A.  Yes.

17   Q.  And did you do that on your own?

18   A.  No.  It was with supervisor's approval.

19   Q.  Supervisors at the NYPD?

20   A.  Yes.

21   Q.  That you worked for?

22   A.  Yes.

23   Q.  OK.  Were you the initial person to reach out to Mr. Paul?

24   A.  Yes.  I was the contact person, yes.

25   Q.  OK.  If you'd actually take a look at the email that you

1    sent to Mr. Paul on September 28 -- well, let me ask you this,

2    before we get to that.

3        Can you tell us why you reached out to Mr. Paul?

4    A.  We would typically reach out to brand holders if we saw

5    different brands in the -- in the, in the area of enforcement

6    that we were not trained in.  During enforcement of other

7    trademark counterfeit merchandise, aside from typically Louis

8    Vuitton, Rolex, we would see other brands, and we would inquire

9    to see if the brands would give us training to conduct further

10   enforcement action.

11   Q.  OK.  And in fact, sir, was the impetus for your call to

12   Mr. Paul the observation that there were counterfeit Swatch

13   Group watches being offered for sale in Manhattan?

14   A.  Yes.

15   Q.  And in lower Manhattan, correct?

16   A.  Yes.

17   Q.  Now, sir, looking at your response from Mr. Paul, your

18   email at the top, you say, "In addition to Swatch watches, we

19   also see numerous vendors who sell Omega."  It goes on, but I

20   want to focus on the Omega.  Do you see that?

21   A.  Yes.

22   Q.  Had you, in fact, observed vendors selling Omega-branded

23   watches in lower Manhattan in the fall of 2010?

24   A.  Yes.

25   Q.  And do you recall where you saw those vendors selling

1   Omega–branded watches; what area of Manhattan?

2   A.  The Canal Street area.

3   Q.  Now, sir, was corresponding with Mr. Paul, this type of

4   correspondence that I've shown you in Exhibit 167, typical of

5   your responsibilities?  Was it typical of your responsibilities

6   as training coordinator on the peddler task force?

7   A.  Yes.

8   Q.  Now, sir, in addition to your coordination with The Swatch

9   Group, approximately how many other brand holders did you

10  coordinate with in this way during your time on the peddler

11  task force?

12  A.  Numerous.  Upwards of 50 or more.

13  Q.  OK.  And sir, in corresponding with Mr. Paul in these

14  emails, were you conducting official New York Police Department

15  work?

16  A.  Yes.

17  Q.  Were you authorized to provide this information to

18  Mr. Paul?

19  A.  Yes.

20  Q.  Why did you send an email from a Verizon.net email address

21  rather than a New York Police Department email address?

22  A.  At that time, I wasn't authorized, nor anybody in my unit

23  were authorized, to have an NYPD.org email address.  It was a

24  fairly new email system.  Supervisors would have it,

25  detectives.

1    Q.  Did your supervisors know that you were communicating over

2    that email?

3    A.  Yes.

4    Q.  Now, sir, moving back to your coordination with Mr. Paul

5    and The Swatch Group, did you coordinate any training sessions

6    regarding Swatch and omega trademarks?

7    A.  Yes.

8    Q.  Again, was this consistent with your practice with respect

9    to other brand owners?

10   A.  Yes.

11   Q.  Now, sir, I'd like you to take a look at an exhibit we have

12   marked as Plaintiffs' Exhibit 291.  And if you could just look

13   at that in your binder.

14        MR. SCHICK:  I think this would be the same objection.

15   It's not on their exhibit list, your Honor.

16        MR. GUNTHER:  Your Honor, I won't do the exhibit, but

17   let me ask you this.

18   Q.  Can you describe generally, sir, whether you did a training

19   session with Swatch and with Swatch Group in the 2010 time

20   frame?

21   A.  Yes.

22   Q.  Where did that training take place?

23   A.  It took place at our base, which was 524 West 42nd Street.

24   Q.  And who was present for that training session in 2010?

25   A.  Representatives of the brand holder, myself and the members

1    of the peddler task force.

2    Q.  All right.  Was that before -- there was an enforcement

3    action that was conducted on December 7, 2010, in the Canal

4    Street area, correct?

5    A.  Correct.

6    Q.  Was this training session before that?

7    A.  Yes.

8    Q.  All right.  Now, sir, do you recall who was present at the

9    training session, or did I just ask you that?

10   A.  You just asked me that.

11   Q.  I apologize.

12       What happened at the training session, generally?

13   A.  What usually happens at a training session, the brand

14   holder will have either a PowerPoint presentation or -- and

15   also including handouts differentiating the merchandise sold by

16   the brand holder versus counterfeit.  They may also have

17   counterfeit or genuine watches on hand to show us the

18   difference.

19   Q.  OK.  Now, sir, I'd like you to look at Plaintiffs' Exhibit

20   168 in your binder.  Can you tell us what that is?

21   A.  It's an email from Joshua Paul to myself, and "attached are

22   completed and signed trademark counterfeiting manufacturer's

23   affidavits covering each of the four Swatch Group brands we

24   discussed at today's meeting:  Omega, Rado, Swatch and

25   Longines."

1    Q.  What's the date of the email?

2    A.  November 30.

3    Q.  And it's from you?

4    A.  It's from Joshua Paul.

5    Q.  Excuse me.

6        From Joshua Paul to you?

7    A.  Yes.

8            MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

9    168.

10           MR. SCHICK:  No objection, your Honor.

11           THE COURT:  168's in evidence.

12           (Plaintiffs' Exhibit 168 received in evidence)

13           MR. GUNTHER:  Let's put it up on the screen, if we

14   can.

15   Q.  If you can focus on it, I want to go to the first sentence.

16   This is from Mr. Paul on November 30, 2010, to you, and he

17   says, "attached are completed and signed trademark

18   counterfeiting manufacturer's affidavits covering each of the

19   four Swatch Group brands we discussed at today's meeting:

20   Omega, Rado Swatch and Longines."

21       Now, sir, if you take a look at the second page of 168, can

22   you tell us what that is?

23   A.  That's a New York County District Attorney's Office

24   trademark counterfeiting manufacturer's affidavit.

25   Q.  And is this something that typically is signed by a

1    manufacturer in a counterfeiting investigation conducted by the

2    task force?

3    A.  Yes.

4    Q.  Now, sir, the one I've shown you relates to what company,

5    the one that's on the screen right now?

6    A.  Swatch S.A.

7    Q.  All right.  If we could turn to the page that's marked page

8    4 of Plaintiffs' Exhibit 168, can you tell us what this is?

9    A.  That also is a New York County District Attorney's Office

10   trademark counterfeiting manufacturer's affidavit.

11   Q.  All right.  For what brand?

12   A.  Omega S.A.

13   Q.  Sir, had you requested this information from Mr. Paul?

14   A.  Yes.

15   Q.  And why did you request this information from Mr. Paul?

16   A.  It's needed because in order to do enforcement actions, we

17   need to -- and this is included in the arrest paperwork as

18   well, to show that the brand holder has the trademark and it's

19   in effect.

20   Q.  OK.  And sir, is this a regular type of information that

21   you would request from brand holders in performing enforcement

22   actions?

23   A.  Yes.

24   Q.  All right.  Now, sir, I want to focus on the raid, or the

25   enforcement action, that took place in December of 2010.  OK?

1   Sir, do you recall where that enforcement action took place?

2   A.   The Canal Street area.

3   Q.   Were you involved in that enforcement action?

4   A.   I'm sorry.  The date was?

5   Q.   Do you recall an enforcement action in December of 2010?

6   A.   Yes.

7   Q.   OK.  Do you recall being involved in that enforcement

8   action?

9   A.   Yes.

10  Q.   Now, sir, I want to show you Exhibit 169, if you'd take a

11  look at that.

12            MR. SCHICK:  Your Honor, yesterday was very smooth

13  with respect to documents.  Today, less so, and I think we're

14  going to get into an area where, next couple documents -- we

15  previewed this a couple days ago, and these are the documents

16  we have substantial concerns about.

17            MR. GUNTHER:  Should I proceed, your Honor?

18            THE COURT:  Yes.  Proceed.

19            MR. GUNTHER:  Thank you, your Honor.

20  Q.   Now, sir, I'd like you to take a look at Exhibit 169.  Do

21  you have that in front of you, sir?

22  A.   Yes.

23  Q.   Can you tell us what it is?

24  A.   It is an email sent from myself to Joshua Paul.

25  Q.   What's the date of the email?

J2rWome2                          Taute - Direct

1      A.  December 13.

2      Q.  OK.  And sir, is there an email below that?  Is this a

3      string of emails on the page?

4      A.  Yes.

5      Q.  Can you tell us about the email below that?

6      A.  Let's see.  It says, "Feel better, Richard."

7      Q.  OK.  And then how many emails are actually in this exhibit

8      on the string; can you count them up?

9      A.  One, two, three -- for 169, correct?

10     Q.  169.

11     A.  Looks like three.

12     Q.  OK.  Are they all in the December 2010 time frame?

13     A.  No.

14     Q.  Is --

15     A.  I'm sorry.  I apologize.  That was the wrong page.

16     December 13.

17     Q.  All right.  And sir, do these accurately reflect

18     communications that you had with Mr. Paul in December of 2010,

19     these emails?

20     A.  Yes.

21            MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

22     169.

23            MR. SCHICK:  Your Honor, we object.  Mr. Gunther is

24     certainly free to ask the witness with respect to his

25     recollection of any events that day, but the email, and in

J2rWome2                        Taute - Direct

1   particular the email top on the chain, most recent one

2   chronologically, Monday, December 13, reflects hearsay.  They

3   are trying, and the witness -- well, I can do it at a sidebar,

4   your Honor, because maybe we shouldn't do the full thing in

5   front of the jury, but as was highlighted previously --

6                THE COURT:  Why don't we take a five-minute break.

7   The jury will step out for five minutes.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Mr. Schick.

3          MR. SCHICK:  Your Honor, the sworn deposition

4    testimony of the witness is that he has no recollection of the

5    events of December 7, 2010, and therefore, the plaintiffs are

6    trying to get this email or this exhibit in as a public record.

7    They're not trying to get it in as a business record.  They're

8    trying to get it in as a public record of the city of New York,

9    New York Police Department.

10         Now, as the witness testified, there are arrest logs,

11   OmniForms, all sorts of things, which actually reflect public

12   records you get on sale, under seal -- with an seal on it.

13   This is an email he sent, where the testimony will be he cut

14   and pasted some information from presumably somewhere else.

15   It's surely not a public record and should not come in under a

16   public records exception to hearsay.

17         MR. GUNTHER:  Your Honor, with respect to both

18   levels -- and Mr. Schick is incorrect -- we are arguing that

19   the email itself is a business record regularly kept, activity

20   in the course of his police department duties, A; and that to

21   the extent he has placed in it information from arrest logs or

22   from the OmniForm system, that's information from public

23   records.

24         I'll bring both of those out, and your Honor, to the

25   extent there is any issue, they both fall within hearsay

1    exceptions.

2                  THE COURT:  This is obviously an extract from the

3    arrest log, correct?

4                  MR. GUNTHER:  Correct.

5                  THE COURT:  The arrest log is a public record?

6                  MR. GUNTHER:  Yes, sir.

7                  MR. SCHICK:  Your Honor, it's not an extract.  For

8    example, it notes 14 arrests on the bottom, and 13 over there.

9    It does not have, certainly, all the information, including

10   first name or other information.  The witness might say it

11   reflects something that he typed from what is a public record

12   or what is a business record, but this is neither.  And it's

13   surely not a business record, where in the ordinary course of

14   business he sends, he would make this kind of email.

15                  I'm not disputing the email was sent, your Honor.  I'm

16   just saying the witness has testified that he has no

17   recollection of the events that day, and therefore, it's

18   neither a public record and surely also not a business record.

19                  THE COURT:  All right.  Your objection's overruled.

20                  MR. GUNTHER:  Thank you, your Honor.

21                  THE COURT:  I think the jurors are complaining that

22   they can't hear as well.  We're going to call our technical

23   people up here.

24                  MR. GUNTHER:  Thanks, your Honor.  Sometimes my voice

25   doesn't carry.

1              THE COURT:  On the other hand, why don't we do it the

2      old-fashioned way and everybody just speak louder.

3              MR. GUNTHER:  Your Honor, I'm happy to do that.  I'm

4      trying, but sometimes the timber of my voice, for whatever

5      reason, is a little bit hard to -- I don't know if it's the

6      Long Islandese, but it's a little hard to hear sometimes.

7              THE COURT:  I can hear you fine.

8              MR. GUNTHER:  You can hear me fine?

9              THE COURT:  But I can't hear Mr. Taute.

10              MR. GUNTHER:  Is Mr. Taute's mike on?

11              THE DEPUTY CLERK:  The mikes are all on.  There's just

12      a technical issue going on today.

13              THE COURT:  When you give your answers, you tend to be

14      very clipped.  Maybe you could use a little more wind power,

15      Mr. Taute.

16              MR. GUNTHER:  Mr. Taute, if you can do it, I can do

17      it.

18              THE WITNESS:  Absolutely.

19              MR. GUNTHER:  OK.  Thank you, your Honor.

20              (Continued on next page)

21

22

23

24

25

```
 1              (Jury present)

 2              THE COURT:  Thank you.  Please be seated.

 3              I've asked everybody to speak a little bit louder.

 4              MR. GUNTHER:  And your Honor, I'm going to do my best

 5    to do that.

 6              Your Honor, I offer Plaintiffs' Exhibit 169.

 7              THE COURT:  The objection to 169 has been overruled.

 8    169 is in evidence.

 9              (Plaintiffs' Exhibit 169 received in evidence)

10              MR. GUNTHER:  Let's put up on the screen Exhibit 169.

11    We don't have it yet.

12              Thank you, Mr. Lam.

13    Q.  Now, sir, you had mentioned in your prior testimony that

14    there's an email at the top from you to Mr. Paul.  Is that

15    right?

16    A.  That's correct.

17    Q.  And then in the first sentence of the email, you say "Hi,

18    Joshua.  I feel somewhat better.  Here are the arrests for

19    Omega on 12/7."  Do you see that?

20    A.  Yes.

21    Q.  When you say "here are the arrests for Omega on 12/7," what

22    are you referring to?

23    A.  The arrests from the enforcement action taken on that date.

24    Q.  And when you say for Omega, specifically what are you

25    referring to?
```

1   A.  Those arrests we made that day that the complainant was

2   Omega.

3   Q.  OK.  Now, under that first sentence, there is a series of

4   numbers, rows of numbers and names and addresses.  Do you see

5   that?

6   A.  Yes.

7   Q.  Now, sir, can you explain, taking the first one, the first

8   row, what this information -- well, let me ask you first, where

9   did that information come from?

10  A.  It came from our arrest log.

11  Q.  All right.  And that's the arrest log that's kept by the

12  New York Police Department peddler task force?

13  A.  That's correct.

14  Q.  And sir, would this information also be in the OmniForm

15  database?

16  A.  Yes.

17  Q.  And sir, is this information that you extracted from the

18  log?

19  A.  That's correct.

20  Q.  OK.  And sir, if you look at the first --

21      Sir, when you refer to arrests for Omega, is that relating

22  to counterfeit Omega watches?

23  A.  That's correct.

24  Q.  OK.  Let's take the first line.  There's a number that

25  begins with the letter M, and then it's 10708483 and then

1    there's a space 001.  Do you see that?

2    A.  Yes.

3    Q.  What is that?

4    A.  The M is for Manhattan, and that's the arrest number

5    assigned to that individual.

6    Q.  OK.  And you've testified already about how an arrest

7    number is generated, correct?

8    A.  Yes.

9    Q.  Now, sir, do you see next to it there's a date, 12/7, 2010?

10   I think I might be able to figure this one out on my own, but

11   let me ask you, for the record, what does that refer to?

12   A.  That's the date of arrest.

13   Q.  Then it says PL 165.71.  What does that refer to?

14   A.  PL is penal law; 165.71, which is the arrest charge, which

15   is trademark counterfeiting in the third degree.

16   Q.  Then, sir, there's a name, and it looks like it's Rahman,

17   R-A-H-M-A-N.  What does that refer to?

18   A.  That would be the person who was arrested.  That would be

19   their last name.

20   Q.  OK.  And then finally, there's an address, 375 Canal.  What

21   does that refer to?

22   A.  That would be the location where the arrest was effected.

23   Q.  OK.  Now, sir, you extracted this information relating to

24   arrests concerning Omega watches during the enforcement action

25   on 12/7, correct?

J2rWome2                          Taute - Direct

1   A.  That's correct.

2   Q.  You didn't just copy the entire log?

3   A.  No.

4   Q.  Why didn't you just copy the entire log?

5   A.  Because there would be arrests in there that would not be

6   for Omega.  It may be for Louis Vuitton or Rolex or even

7   unlicensed general vending, which wouldn't have a brand holder,

8   and therefore, Omega would not be entitled to that information.

9   Q.  Now, sir, why did you send this information, this arrest

10  information from the December 7, 2010, enforcement action to

11  Mr. Paul?

12  A.  To show the complainant that an action, an enforcement

13  action had taken place in the name of Omega.

14  Q.  Was that something that you would typically do following an

15  enforcement action?

16  A.  Yes.

17  Q.  Is that part of your official responsibilities?

18  A.  Yes.

19  Q.  Did your supervisors understand that you were using your

20  personal email address for the purpose of sending this type of

21  information to brand owners?

22  A.  Yes.

23  Q.  Sir, I want to ask you this question.  Do you specifically,

24  as you sit here today in 2019, recall whether you were there,

25  whether you were physically present during the raid,

1  enforcement action on December 7, 2010?

2  A.  I don't recall specifically, but more than likely I would

3  have been there.

4  Q.  And why do you say that?

5  A.  Because as a senior member of the Manhattan South task

6  force, we had a lot of younger members that didn't have as much

7  experience, and I would basically show them what had to be

8  done, kind of like veteran leadership.

9  Q.  Sir, is there any doubt in your mind that the arrest that

10  we've now highlighted in Plaintiffs' Exhibit 167 --

11          MR. GUNTHER:  I'm sorry.  Do I have the exhibit number

12  right?

13          MR. SCHICK:  169.

14          MR. GUNTHER:  169.  Thank you very much, Mr. Schick.

15  Q.  Sir, do you have any doubt in your mind that the arrest of

16  a person named Rahman at 375 Canal occurred on December 7,

17  2012?

18  A.  There is no doubt in my mind, because it would be entered

19  from the information in the arrest log.

20          THE COURT:  You mean 2010.

21          MR. GUNTHER:  Did I say -- 2010.  Thank you, your

22  Honor.

23  Q.  And sir, how many counterfeit watches -- well, let me ask

24  you this.  If you look down a little bit further, there's

25  another email in Exhibit 169 from you to Mr. Paul, and it's at

1   the bottom of the page.  Do you see that, sir?

2   A.  Yes.

3   Q.  Sir, is that an email you sent to Mr. Paul on December 8,

4   2010?

5   A.  That's correct.

6   Q.  Can you read the first -- actually, can you read the second

7   sentence of the email?

8   A.  "We had 14 arrests totaling over 360 Omega watches."

9   Q.  OK.  And sir, is that information that you provided to

10  Mr. Paul the day after your enforcement action?

11  A.  That's correct.

12  Q.  And sir, what does it say in terms of the number of Omega

13  watches that were seized during the December 7, 2010,

14  enforcement action?

15  A.  360 -- I'm sorry.  Over 360.

16  Q.  Sir, was that at a variety of locations?

17  A.  Yes.

18  Q.  That doesn't reflect just what was at 375 Canal, correct?

19  A.  No.

20  Q.  And sir, let me ask you to take a look at Plaintiffs'

21  Exhibit 230, and you can just look at that in your book.

22          MR. GUNTHER:  Actually, this is in evidence.

23          Excuse me, your Honor.  I apologize.

24  Q.  Take a look at Plaintiffs' Exhibit 230.  Can you tell us

25  what that is?

1   A.  It's a court document with the, looks like disposition of

2   the case.

3          MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

4   230 as a public record.

5          MR. SCHICK:  Well, your Honor, I mean, certainly this

6   witness doesn't have a foundation for it.  I'd also note it's

7   supposed to be a sealed document, but I just note those two

8   points.

9          THE COURT:  OK.  The objection's overruled.

10          MR. GUNTHER:  Thank you.

11          (Plaintiffs' Exhibit 230 received in evidence)

12          MR. GUNTHER:  Your Honor, let me put Plaintiffs'

13   Exhibit 230 up on the screen.

14   Q.  Sir, can you tell us what that is?

15   A.  It's a court document which shows the disposition of --

16   basically what happened to the case.

17   Q.  OK.  Sir, who is the plaintiff or the complainant in this

18   document?  Is it the People of the State of New York?

19   A.  People of the State of New York.

20   Q.  And who is the defendant?

21   A.  Syed Rahman.

22   Q.  And what is Mr. or Ms. Rahman charged with?

23   A.  He was charged with 165.71, which is trademarking

24   counterfeiting in the third degree.

25   Q.  What's the date of the arrest?

J2rWome2                          Taute - Direct

1   A.  12/7, 2010.

2   Q.  Sir, is there a case disposition?

3   A.  Yes.

4   Q.  What's the date of the case disposition?

5   A.  January 24, 2011.

6   Q.  Can you tell us what it says in terms of court action?

7   A.  Pled guilty and sentence imposed, 240.20, conditional

8   discharge and community service.

9   Q.  Does this indicate that the defendant, Rahman, pleaded

10  guilty?

11  A.  That's correct.

12  Q.  To counterfeiting in the?

13  A.  The -- actually, where it says here court action pled

14  guilty and sentence imposed, it says 240.20, which is

15  disorderly conduct.

16  Q.  OK.  He was charged with -- what was the charge?

17  A.  165.71 was the arraignment charge, and the court action,

18  the defendant pled guilty and sentence is imposed of 240.20,

19  which is disorderly conduct.

20  Q.  OK.  Now, sir, I want to ask you about a raid that occurred

21  in February of 2011.  Can you take a look at Plaintiffs'

22  Exhibit 170 in your binder.

23          MR. SCHICK:  Your Honor, can we approach for a sidebar

24  for one moment?

25          THE COURT:  Yes.

1           (At sidebar)

2           MR. SCHICK:  This document doesn't relate to Omega.

3      It relates to Swatch watches.  They obviously dropped any

4      Swatch claim, and we moved *in limine* to have no reference to

5      the Swatch claims that they dismissed.  So for them to take

6      this witness through a raid that doesn't touch on Omega and

7      only has Swatch is prejudicial and not probative.

8           MR. GUNTHER:  Your Honor, we're entitled, under your

9      rules, and we're putting in evidence of counterfeiting activity

10     from various brands at 375 Canal Street, including Louis

11     Vuitton and a number of other brands.  This is exactly in that

12     same category, and we're attempting to show and demonstrate

13     that 375 Canal Street was a haven for counterfeiting activity,

14     which is part of our claim for contributory infringement.  It

15     goes directly to that.

16          MR. SCHICK:  Two points, your Honor.

17          With respect to Mr. Gunther's first point, your Honor

18     made a specific ruling the first time around that they can get

19     in three settlements with the Louis Vuitton lawsuit.  We're not

20     disputing that.  Your Honor didn't say that they have an open

21     door to discuss an endless supply of other brands.  Your Honor

22     said four, and those there's no dispute.  They're trying to get

23     in cumulative evidence, but more important, specifically with

24     respect to Swatch, it cannot be the case that they get to say

25     it's Swatch counterfeiting, file a claim against Swatch,

1    dismiss it and have us precluded from saying the claim was

2    dismissed.  Your Honor has allowed them four different brands,

3    four different other brands.

4              THE COURT:  What about that?

5              MR. GUNTHER:  Your Honor, again, whether or not we're

6    pressing a claim under a specific counterfeit sale for a Swatch

7    watch has nothing to do with whether we can still --

8              THE COURT:  But Mr. Schick is right.  You dropped

9    Swatch, right?

10             MR. GUNTHER:  We dropped Swatch with respect to the

11   particular watch that had been purchased during the

12   anticounterfeiting thing, but we did not drop the fact that it

13   goes toward --

14             MR. SCHICK:  Your Honor, Mr. Gunther wasn't there,

15   obviously, for the first motions *in limine*, September 5, 2017.

16   You made a clear ruling that they get to put in three

17   settlements related to different brands.

18             THE COURT:  The objection's sustained.

19             (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  OK, Mr. Gunther.

3              MR. GUNTHER:  Thank you, your Honor.

4    Q.  Now, Mr. Taute, going back to the December 7, 2010,

5    enforcement action, sir, in terms of that enforcement action,

6    is it your testimony that at least one counterfeit watch was

7    seized, Omega counterfeit watch was seized at 375 Canal Street?

8    A.  That would be correct.

9              MR. GUNTHER:  I think we have the microphones on now.

10             All right.  And with that, Mr. Taute, I have no

11   further questions.  Thank you very much.

12             THE COURT:  Mr. Schick.

13             MR. SCHICK:  I do have a few.

14             THE COURT:  Good.

15             MR. SCHICK:  Your Honor, I know that this is going to

16   be -- to forestall what will otherwise be an objection later,

17   if I could ask for one more sidebar?  It goes to some of the

18   cross, but I just know that it will be much quicker if I make a

19   point to you and Mr. Gunther out of the presence -- and it will

20   be very quick.

21             THE COURT:  All right.

22             (Continued on next page)

23

24

25

1           (At sidebar)

2           MR. SCHICK:  Before we get in front of the jury, I

3    have, at the end, a couple questions on cross which relate to

4    his post-NYPD private investigator service, but it has nothing

5    to do with that issue.  I'm not going anywhere near any of the

6    problems he had.  But I know if I turn to it then, you would

7    scream.

8           THE COURT:  What are you going to ask him?

9           MR. SCHICK:  I'm going to ask him about a raid that he

10   conducted at a distributor on behalf of Disney, shortly

11   thereafter.

12          THE COURT:  What's that about?

13          MR. SCHICK:  It's about a trademark holder asking him

14   to take down a distributor.  It'll be two or three questions,

15   your Honor.  It will be really quick.

16          THE COURT:  No.

17          MR. GUNTHER:  It's got nothing to do with this case.

18          THE COURT:  It's got nothing to do with this case.  I

19   mean, it's not only arm's length, it's miles away.

20          MR. GUNTHER:  Right.

21          Thank you, your Honor.

22          (Continued on next page)

23

24

25

1          (In open court)

2               THE COURT:  It's also beyond the scope of direct.

3               MR. DELLA FERA:  Your Honor, copies for the Court.

4               THE COURT:  Yes, please.  Thank you, Mr. Della Fera.

5     CROSS-EXAMINATION

6     BY MR. SCHICK:

7     Q.  Good morning, Mr. Taute.

8     A.  Good morning.

9     Q.  I just have a few questions for you following up on the

10    testimony you presented earlier.  I just wanted to clarify.  Do

11    you recall, you testified at a deposition in this matter?

12    A.  Yes.

13    Q.  And that would be in early 2014?

14    A.  Either 2013, 2014.  I don't recall.

15    Q.  So several years ago?

16    A.  Yes.

17    Q.  Closer in time to December 7, 2010, than today?

18    A.  Correct.

19    Q.  And do you recall that at that deposition you also

20    testified that you had no recollection of whether you did or

21    did not personally participate on the December 7 raid?

22    A.  I don't recall, but possibility.

23    Q.  As you sit here today, do you have any recollection of

24    whether you personally participated in the December 7, 2010,

25    raid?

1    A.  I don't recall.

2            MR. SCHICK:  Can we go for a moment to the exhibit we

3    had up.  We can put it up with our exhibit number, but -- I

4    guess it doesn't really matter, but the exhibit, the email to

5    Mr. Paul, 169, that we just had up.

6            THE COURT:  It's up.

7    Q.  And I think you testified that the information there would

8    have been extracted from other documents that were kept by the

9    New York Police Department.  Is that correct?

10   A.  Correct.

11   Q.  And those are the arrest logs?

12   A.  Yes.

13   Q.  And you mentioned an OmniForm system?

14   A.  Correct.

15   Q.  And any other types of records that would have been created

16   with respect to the information that is reflected on this

17   exhibit?

18   A.  Just from what I remember, it's the OmniForm and arrest

19   log.

20   Q.  And is it possible for people, if they request it, to get

21   copies of the arrest logs or the OmniForm information?

22   A.  If they're the complainant, yes.

23   Q.  To your recollection, did Omega or any of its

24   representatives ever ask you to get the actual arrest logs or

25   OmniForms?

1    A.  No, not that I'm aware of.

2    Q.  Now, there was some focus on the first name on the first

3    line of this email, and it refers to a Mr. Rahman -- it refers

4    to Rahman, doesn't say Ms. or Mr., correct?

5    A.  Correct.

6    Q.  And can you go to the fifth line on that email?

7    A.  Yes.

8    Q.  And what does that reflect?  What's the information on that

9    line?

10   A.  It has -- begins with the M10708509?  Is that correct?

11   Q.  Yes.

12   A.  That would be the Manhattan arrest number, which was -- the

13   precinct of arrest was the 5th Precinct on December 7, 2010,

14   for penal law 165.71.

15   Q.  Is that the same charge as the one you see on top?

16   A.  That's correct.

17   Q.  Are all the arrests listed here for the same exact charge?

18   A.  Yes.

19   Q.  And does this indicate on the fifth line the name of the

20   individual who was arrested?

21   A.  Yes.

22   Q.  What's the name?

23   A.  Rahman.

24   Q.  Is that name, as it's listed, any different from the name

25   on the first line?

1    A.   The spelling is the same, but they're assigned different

2    arrest numbers, so they're two individual people, two different

3    people.

4    Q.   Correct.  Two people with the same name were arrested that

5    day, correct?

6    A.   Correct.

7    Q.   What address was this arrest associated with?

8    A.   Looks like 81 Mott Street.

9    Q.   Now, if we could turn for a moment to what Mr. Gunther

10   showed you as 230.  Do you see that?

11   A.   Yes.

12   Q.   And looking at 230, which is a disposition, does this

13   reflect the disposition for -- as we said, the charge is

14   165.71, correct?

15   A.   Yes.

16   Q.   And is there anything on this disposition that would

17   indicate to you that it refers not to the Rahman who was

18   arrested in reference to 81 Mott?

19   A.   I don't see an arrest number on there, but I do see a New

20   York State ID number, which would be associated with that

21   arrest of that individual.  But it doesn't say anything about

22   his arrest number for a location.

23   Q.   There's no location given here, is there?

24   A.   No.

25   Q.   And there's no summons number given here, is there?

1  A.  No.  Just a case number, docket number.

2  Q.  So as you testified to this jury today, under oath, can you

3  tell this jury whether this disposition that was shown to you

4  by Mr. Gunther refers to the Rahman at 81 Mott Street or the

5  Rahman at 375 Canal?

6  A.  I couldn't tell, no.

7  Q.  If you had the arrest records or police log or OmniForm,

8  would that be helpful?

9  A.  The OmniForm may be helpful, because it may have the New

10  York City ID number, which is an individual number assigned

11  based on your fingerprints.

12  Q.  But from this document, yourself, you can't tell whether

13  this refers to an individual associated with activity at the

14  address 375 Canal Street or the address at 81 Mott Street,

15  correct?

16  A.  That's correct.

17  Q.  Now, if I can ask you one other question with respect to

18  this document, and that is, I think you testified earlier that

19  you wanted to be 100 percent sure of counterfeiting when you

20  made the charge.  Correct?

21  A.  Correct.

22  Q.  And that's because you're a public officer doing a public

23  duty and you wanted to do the right thing, correct?

24  A.  Absolutely.

25  Q.  And if we look here, as you pointed out, Mr. Taute, that

1    while the charge was for counterfeiting, the disposition

2    reflected a different charge, correct?

3    A.   Correct.

4    Q.   And that charge was, you said, disorderly conduct?

5    A.   Yes, looks like 240.20.

6    Q.   And if it says -- it says, what does it say under the

7    240.20?

8    A.   Conditional discharge, one year, and then community

9    service.  Looks like three days.

10   Q.   And if you can take each line separately and just tell us

11   what that reflects.

12   A.   Conditional discharge is if the person doesn't get arrested

13   for a year, the charge would be dismissed.

14   Q.   And do you know if this charge was dismissed?

15   A.   That I'm not sure.

16          MR. SCHICK:  Sarah, could you show us the bottom of

17   this document.

18   Q.   Did you provide this document, Mr. Taute?

19   A.   No.

20   Q.   Do you see it says on the bottom that this is sealed?  I

21   don't mean the seal that's sort of shown in some broad way, but

22   the big letters sealed.  Do you see that?

23   A.   Yes.

24   Q.   Did you provide this sealed document to the plaintiffs?

25   A.   No.

J2rWome2                              Taute - Cross

1    Q.  Do you know who provided this sealed document to the

2    plaintiffs?

3    A.  No.

4    Q.  But it wasn't you?

5    A.  No.

6    Q.  And at any time have the plaintiffs, has Omega asked you to

7    get any documents related to the events of December 7, 2010?

8    A.  Not that I'm aware of.  Not that I recall.

9    Q.  Thank you.

10       With respect to -- if we can go back a moment to talk about

11   the street peddlers -- one other thing.  I think the email

12   indicated that you reported there were 360 or so Omega watches

13   seized that day?

14   A.  Correct.

15   Q.  And you assumed, based on the email you sent, that there

16   was a charge associated with activity at -- by a peddler at 375

17   Canal, correct?

18   A.  Correct.

19   Q.  But as you sit here today, is there any evidence of how

20   many of those 360 might have been associated with 375 Canal?

21   A.  I have nothing here that would indicate that, no.

22   Q.  And it could be one, correct?

23   A.  It could be one or more.

24   Q.  Right.  You just don't know?

25   A.  Right.

1          MR. SCHICK:  Now, if we can just pull that back up for

2     one moment.  I'm sorry.  Not the arrest record, the email to

3     Mr. Paul.  Right.

4     Q.  And if you can just quickly count up, Mr. Taute, how many

5     arrests on Canal Street or the Canal Street area are indicated

6     in your email?

7     A.  Is it 13?  Right?

8          It's 13.

9          MR. SCHICK:  And scroll down to the bottom of that

10    email.

11    Q.  Your message to Mr. Paul says how many arrests?

12    A.  14.

13    Q.  Obviously one -- either one got left off on top or there's

14    a typo on the bottom?

15    A.  Possibility.

16    Q.  One or the other presumably happened?

17    A.  It's 13 listed -- might have been a typo.  I'm not sure.

18    Q.  OK.  Let's focus on the peddler task force for a moment,

19    please.  I think you testified -- how long were you training

20    coordinator?

21    A.  Approximately three years.

22    Q.  And I think you testified that there was often activity

23    as -- well, let me stop that and say what activity did the

24    peddler task force look at?

25    A.  General vendors, food vendors, people selling trademark

J2rWome2                              Taute – Cross

1    counterfeit merchandise.

2    Q.  And were there street vendors who would be looked at with

3    respect to the peddler task force?

4    A.  Yes.

5    Q.  And what's a street vendor?

6    A.  A street vendor is anyone selling or offering for sale

7    merchandise.

8    Q.  Where would they sell the merchandise?

9            THE COURT:  On the street.

10   A.  In the street.

11   Q.  So were there peddlers who were not selling from a fixed

12   location but would just hang out on the street with

13   merchandise?

14   A.  Some, sure.

15   Q.  And was any of that activity on Canal Street?

16   A.  Yes.

17   Q.  And was part of the work of the task force to conduct raids

18   and potentially arrests of those who were selling on the

19   streets from nonfixed locations?

20   A.  Correct.

21   Q.  And as you sit here today, do you know if any of the

22   December 7, 2010, raids involved street peddlers?

23   A.  Possibility.

24   Q.  You just don't know?

25   A.  I'm not sure.

1   Q.  And if somebody's arrested for selling on the street, would

2   they -- how would the police officer note their location?

3   A.  If they're on, if they're on the street level, on the

4   arrest report, it would be, say, front of 81 Mott Street.

5   Q.  And we don't have the police report here today, do we?

6   A.  No.

7   Q.  And if someone was arrested in front of 375 Canal Street

8   for selling on the street, the police report would indicate

9   that?

10  A.  It would say front of.

11  Q.  And again, you don't recall, as you sit here today, whether

12  you even participated in the raid personally, you certainly

13  have no recollection of what happened that day?

14  A.  That's correct.

15  Q.  Do you know how long the police keep the records?  If

16  somebody today wanted to get the police log or the OmniForm

17  from December 7, 2010, is it available?

18  A.  Possibility.  I'm not -- I can't testify to that.  I'm not

19  sure.  I have been retired for almost eight years.

20  Q.  Do you know the names of any of the other officers or any

21  of the officers who might have participated in the December 7

22  raid, who worked with you at the time?

23  A.  I can't recall.  I know the officers' names, but I'm not

24  sure if they were there or not.

25  Q.  Now, you were shown by Mr. Gunther, and if we could put it

1    on the screen, the affidavits that were provided to you by

2    Omega.  Do you recall that, a few moments ago?

3    A.  Yes.

4           MR. SCHICK:  Can you pull that up, Sarah, Exhibit 168,

5    and let's look at the page, page 4 of that.  And just going to

6    the bottom.

7    Q.  This was a document that was provided to the government

8    before you conducted the raid?

9    A.  That's correct.

10   Q.  And just going up for a minute, do you see it says

11   something on the bottom; it says note?

12   A.  Yes.

13   Q.  What does that say?

14   A.  "False statements made herein are punishable as a class A

15   misdemeanor pursuant to Section 210.45 of the penal law."

16   Q.  And false statement made in an affidavit is, to your mind,

17   a class A misdemeanor?

18   A.  Yes.

19   Q.  And in your experience, did you ever --

20          MR. SCHICK:  I'll take that back.

21   Q.  Are you aware whether after the events of December 7, you

22   or anybody else with the city of New York actually reached out

23   to the owners of the property listed, various owners, 13

24   owners, to advise them of the activity taken by the police?

25   A.  No.  Any property that was removed from those people was

1    bagged, tagged and sealed in front of them.

2    Q.  No, that's not --

3    A.  And actually, the amount removed from them would be

4    actually on the arrest report.

5    Q.  Thank you, Mr. Taute.

6        I'm asking you whether the police department or other parts

7    of the city of New York that were aware of the raid that was

8    conducted and the arrests made, beyond the arrest, did they

9    contact the owner of the building subsequent --

10   A.  No.

11   Q.  No?  So, to your knowledge, was there a way for the 13

12   owners of the 13 different buildings listed in your email to be

13   aware of the conduct that occurred on December 7, 2010?

14              MR. GUNTHER:  Objection.  Lack of foundation.

15              THE COURT:  Overruled.

16   A.  I'm sorry.  Repeat that again, please.

17   Q.  To your knowledge, was there any way for the owners of the

18   buildings at the 13 different addresses listed in your email to

19   Mr. Paul to be aware of the arrests that were made on December

20   7, 2010?

21   A.  Not to my knowledge.

22   Q.  As part of the task force, would you have been interested

23   if there was information with respect to not just a street

24   peddler of individual watches but a distributor, wholesale, of

25   counterfeit goods?

1   A.  I mean, our unit was primarily street level and store

2   enforcement from retail locations, but as far as distributors,

3   if we did get that information, we wouldn't act upon that.  We

4   would give that to an investigative unit.

5   Q.  An investigative unit where?

6   A.  In the New York City Police Department.

7   Q.  And was there an investigative unit that would deal with

8   distribution of counterfeit goods?

9   A.  It would be the office of criminal investigation.

10  Q.  And to your knowledge, were you ever asked by Omega or

11  anybody else to convey information to that unit about the

12  distributor of counterfeit goods?

13  A.  No.

14  Q.  Now, do you know what happened to the watches that were

15  confiscated on December 7?

16  A.  Yes.  They're taken back to our office, where they're

17  logged and information was typed, and then the property would

18  be transported to Queens, to the property clerk.

19  Q.  And do you know who was -- have you seen any of the watches

20  that were confiscated that day?

21  A.  Possibly, but I don't recall.

22  Q.  Do you know if they're returned to Omega?

23          MR. GUNTHER:  Objection, your Honor.  Returned to

24  Omega?

25          THE COURT:  Sustained.

1          MR. GUNTHER:  They're counterfeit.

2     BY MR. SCHICK:

3     Q.  Do you know if they were provided to Omega?

4     A.  No, not that I'm aware of.  It wouldn't be procedure.

5     Q.  Now, why is it, do you think, that the individual who,

6     Mr. Rahman, who pled guilty -- the court did not convict him of

7     counterfeiting activities, is that correct?

8     A.  That's correct.

9     Q.  And in your experience, is that surprising when you saw

10    that this morning?

11    A.  No.

12    Q.  And why is it not surprising?

13    A.  Because usually they, the person arrested really doesn't

14    want to go to trial, and the D.A.'s office may offer them a

15    plea deal to plead to a lesser charge.

16    Q.  And that's because it's cumbersome and difficult to

17    actually prove all the cases?

18          MR. GUNTHER:  Objection, your Honor.

19          THE COURT:  Overruled.

20    A.  I wouldn't say that.  I'd say maybe it's to unclog some of

21    the court system, you know, a lot of backlog of cases.  Or you

22    know, if the person was offered a plea deal, perhaps it was a

23    certain time he was arrested.  I'm not 100 percent sure.  I

24    don't know what goes through the minds of the D.A.'s office

25    sometimes.

1    Q.  Just one final, short line.

2        You talked a few times about the evidence that is -- when

3    it's seized, counterfeit watch, what did you say you do with

4    it?

5    A.  At the moment of the arrest, the property that was deemed

6    counterfeit would be placed in a clear plastic bag with a red

7    seal affixed with it, and then we would note the location where

8    it was from so it wouldn't get confused.

9    Q.  When you say tagged, do you mean tagged, like with a

10   Post-it note?

11   A.  No.  It would be a seal with a small string around it, and

12   it would be affixed so it wouldn't come off.

13   Q.  So with a Ziploc bag, where you actually zip it all the way

14   across?

15   A.  No, it wouldn't be a Ziploc bag.  It would be actually a

16   red seal that has teeth in it, and when you pull -- when you

17   put it on the bag and you pull it tight, there's no way to open

18   it up without destroying the bag.

19   Q.  And why does the police department keep evidence that way?

20   A.  It's kept that way to prevent tampering.

21   Q.  How many years were you a police officer?

22   A.  I'm sorry?

23   Q.  How many years, roughly, were you a police officer?

24   A.  18-1/2.

25   Q.  And in your experience and training, is that the best way

1   to keep evidence?

2   A.  That type of evidence, yes.

3   Q.  You wouldn't keep it in a Ziploc bag with a Post-it and --

4   A.  No.

5   Q.  Excuse me?

6   A.  No.

7           MR. SCHICK:  Thank you, I have nothing further.

8   REDIRECT EXAMINATION

9   BY MR. GUNTHER:

10  Q.  Just one last point, Mr. Taute.  When you were doing

11  enforcement actions in the Canal Street area, when you actually

12  made a seizure, were you attempting to hide the fact or be

13  surreptitious with the person from whom you were seizing a

14  counterfeit watch, for example?

15  A.  From the person arrested?

16  Q.  Yes.

17  A.  No.  If we're removing property, they have every right to

18  see that we're removing property.

19  Q.  And sir, just to make sure I understand that, as you were

20  doing enforcement actions, were you attempting to obtain

21  examples of counterfeit merchandise in a way that did not tip

22  off the people from whom you were buying or taking that

23  merchandise?  Did you do it in a way that would not tip them

24  off?

25  A.  I'm sorry.  I'm having difficulty --

1    Q.  Sure.

2              THE COURT:  Did they understand that you were

3    conducting a raid?

4              THE WITNESS:  Yes.

5    BY MR. GUNTHER:

6    Q.  You were conducting a raid --

7              THE COURT:  And the customers understood it was a

8    raid?

9              THE WITNESS:  Yes.

10   BY MR. GUNTHER:

11   Q.  -- you weren't conducting an undercover investigation, were

12   you?

13   A.  No, because the merchandise was open and displayed for the

14   public to see.

15             MR. GUNTHER:  Thank you very much.

16             No further questions.

17             MR. SCHICK:  Could I just have one question, your

18   Honor?

19             THE COURT:  One question.

20   RECROSS-EXAMINATION

21   BY MR. SCHICK:

22   Q.  Do you recall what time of the day the raid on December 7,

23   2010, was?

24   A.  I don't recall.

25   Q.  Morning, evening?

```
 1   A.  I would say early afternoon.  That's when typically we

 2   would do something like that.

 3   Q.  And how long do the raids take, something like that,

 4   roughly?

 5            THE COURT:  You said one question.  You asked three

 6   questions.

 7            MR. SCHICK:  I apologize.

 8            THE COURT:  Mr. Taute, you're excused.  Thank you very

 9   much.

10            (Witness excused)

11            THE COURT:  Next witness.

12            MR. NOYES:  Your Honor, plaintiffs call Peter Foster.

13            THE COURT:  Would anyone on the jury like a short

14   break?

15            We'll take a short break.

16            (Recess)

17            THE COURT:  Please be seated.

18            Call your next witness.

19            MR. NOYES:  Your Honor, the plaintiffs call Peter

20   Foster.

21            THE COURT:  Mr. Foster.

22    PETER ANDREW FOSTER,

23        called as a witness by the plaintiffs,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION
```

1   BY MR. NOYES:

2   Q.  Mr. Foster, please introduce yourself to the jury.

3   A.  Peter Foster.  I'm the vice president of customer service

4   for Swatch Group U.S.

5   Q.  Where do you live, Mr. Foster?

6   A.  Tinton Falls, New Jersey.

7   Q.  How long have you lived in New Jersey?

8   A.  Practically my entire life.

9   Q.  You mentioned you're the vice president of customer service

10  for The Swatch Group U.S.  What is the business of Swatch Group

11  U.S.?

12  A.  We are the distributor and we take care of the service for

13  the brands of Swatch Group.  That includes Omega, Longines,

14  Tissot, Hamilton, Breguet, Blancpain, all the way up to 18

15  brands.

16  Q.  What products do those brands sell?

17  A.  We're watches.

18  Q.  How long have you watched for The Swatch Group U.S.?

19  A.  15 years.

20  Q.  How did you get involved in the watch industry?

21  A.  It's been a long time.  All in all, it's about 30 years I'm

22  in the watch industry.  I graduated college, wasn't sure

23  exactly what I wanted to do, so picked up selling watches at a

24  retailer in New Jersey, called Fortunoff.  They had about five

25  stores in the New York-New Jersey area.  Did that for a couple

1    years and got promoted into their management program, and the

2    first department they gave me was their service center, their

3    customer service.  So I had a watchmaker and jeweler, engraver

4    and staff, and very interested in what they were doing day in

5    and day out, assisting customers, and helped them for about

6    four years and then got recruited to Cartier, here in New York,

7    to oversee their customer service department on Fifth Avenue,

8    and was with them -- I started in 1993, and then was asked by

9    them to work within the boutique itself as the assistant store

10   manager.  So about four years in total, I was just at the

11   Cartier boutique and then stayed with the parent company of

12   Cartier, which is Richemont, another big watch group, all in

13   all for about ten years, holding various positions in customer

14   service, overseeing the brands, such as Piaget and Baume &

15   Mercier, Vacheron Constantin, all of the customer service

16   aspects in there.  And then in 2004, January of 2004, I joined

17   The Swatch Group as vice president of customer service and

18   opened the facility in Secaucus, New Jersey.

19   Q.  Let me stop you there, Mr. Foster.

20   A.  OK.

21   Q.  Let's focus on your current job.  What are your

22   responsibilities as the vice president of customer service at

23   The Swatch Group U.S.?

24   A.  My main responsibilities are to oversee all of the, what we

25   call after-sale servicing.  We have a staff about 150 people in

1    my division, mostly technical people, watchmakers and

2    technicians that work on the movements of the watches.  I also

3    have an administrative team and call center, where we handle

4    issues and questions from customers day in, day out.  We also

5    have a spare parts team that we sell parts to watchmakers in

6    need of them to service our timepieces.  I oversee the

7    technical training department, where we teach the nuances of

8    our brands to watchmakers that are already established across

9    the country.  And we also have a watchmaking school, where we

10   teach watchmaking as a career, in our Miami office.

11   Q.  Do you have a position within the watchmaking school?

12   A.  I'm the dean of the school.

13   Q.  How many students are in that school?

14   A.  It's a very selective process.  The maximum we will take in

15   a year is six because of how intricate it is to learn the

16   details to be a fine watchmaker.

17   Q.  How long does it take to graduate from the watchmaking

18   school?

19   A.  It's one year of continuous training for the school, about

20   1,800 hours.

21   Q.  Now, Mr. Foster, given your responsibilities for The Swatch

22   Group U.S., are you familiar with the Omega watch brand?

23   A.  Oh, yes.

24   Q.  And how much time have you spent working with Omega watches

25   since you started at Swatch Group U.S. in 2004?

1    A.  I would say it's the majority of my time.  Omega, for us,

2    is our No. 1 service brand, and that's not to speak to the

3    quality of it.  It is more to speak to the amount of watches

4    that we have in the market and the history, especially here in

5    the United States.  It's always been a very popular brand.

6    Q.  Now, where are Omega watches made?

7    A.  In Switzerland.

8    Q.  How long have they been made there?

9    A.  Always, since the inception of the brand in 1848.

10   Q.  Over the years, have Omega watches become known for

11   anything in particular?

12   A.  Yeah.  We have close ties to a couple of industries.  I

13   think first and foremost, I would talk about our space program,

14   NASA.  We are the official watch, always have been, since its

15   inception.  What's known as the Moonwatch, the Speedmaster

16   Chronograph is the only watch -- first and only watch worn on

17   the moon for an American astronaut.

18        MR. NOYES:  Let me put up Plaintiffs' Demonstrative

19   Exhibit 3-1.

20   Q.  Can you describe -- Mr. Foster, have you seen this

21   plaintiffs' demonstrative exhibit before?

22   A.  I have.

23   Q.  What is shown on Plaintiffs' Demonstrative Exhibit 3-1?

24   A.  This is a screenshot from our Omega website.  On the left

25   side you have the -- one of the original Speedmaster

J2rWome2                        Foster - Direct

1    Moonwatches, from 1965, when Omega was -- announced that it

2    was, the Speedmaster was flight qualified for missions.  It was

3    chosen amongst other competitors.

4    Q.  Now, Mr. Foster, other than its ties with NASA, is the

5    Omega brand known for anything else in particular?

6    A.  Yes.  I think next I would say the Olympic Games is the

7    thing that we would see Omega at for the last 28 years.  If

8    you've watched any of the competitions, you would see in all --

9    on the bottom right-hand corner, whenever there's timekeeping

10   involved, you'll always see the Omega name in it.  On the

11   starting blocks in track and field; in the swimming pools, you

12   would see it along with the starting blocks.

13            MR. NOYES:  Let's put up Plaintiffs' Demonstrative

14   Exhibit 3-3.

15   Q.  Have you seen this demonstrative before?

16   A.  Yes, I have.

17   Q.  What is shown here?

18   A.  The first two papers are advertisements of Omega,

19   specifically regarding the Olympic Games, and on the right you

20   have Michael Phelps, who is one of our brand ambassadors, after

21   winning one of his many, many medals, and you can see Omega on

22   the back panel of the pool.

23   Q.  Are there any other reasons why the Omega brand is

24   well-known?

25   A.  I would also say Hollywood, our ties with James Bond and

1    007 movies.  Going back to the mid 1990s, we started with them

2    and in each of the movies there is a specific model design made

3    for the Bond movie at the time.

4                MR. NOYES:  Let's put up Plaintiffs' Demonstrative

5    Exhibit 3-2.

6    Q.  Have you seen this demonstrative, Mr. Foster?

7    A.  Yes, I have.

8    Q.  Can you describe what's shown here?

9    A.  It's also a screenshot from our Omega website, showing two

10   different scenes of different Bond movies.  In the scene to the

11   left, he's wearing Omega Seamaster 300, and in the right, we

12   have a Seamaster Planet Ocean 600 meter.

13   Q.  Now, you mentioned a few different models of Omega watch

14   models, the Speedmaster, for example?

15   A.  Yes.

16   Q.  Are there other models of Omega watches?

17   A.  Yeah.  There are four families or pillars within our

18   collection that we have stuck to:  Speedmaster, Seamaster,

19   Constellation, and we have a dress model called the DeVille.

20               MR. NOYES:  Let's put up Plaintiffs' Demonstrative

21   Exhibit 3-4.

22               MR. SCHICK:  Your Honor, we objected to that

23   previously when it was produced.  It's not relevant here.  It

24   doesn't involve watches that are at issue in this case.

25               THE COURT:  It's all background.  The objection is

1    overruled.

2            MR. SCHICK:  Thank you, your Honor.

3    BY MR. NOYES:

4    Q.  Mr. Foster, have you seen Plaintiffs' Demonstrative Exhibit

5    3-4?

6    A.  I have.

7    Q.  OK.  What is shown on that slide?

8    A.  These are examples of each of the families of the Omega

9    collection, starting with the Speedmaster Moonwatch on the

10   left, the Seamaster, the Aqua Terra is in the second position.

11   Constellation Globemaster, third, and Deville Hour Vision on

12   the left.

13   Q.  Let's move to a different topic now, Mr. Foster.

14       In what types of stores are Omega watches sold in the

15   United States?

16   A.  Very selective retailers and our own boutiques.  We have

17   about 30 boutiques around the country for Omega.

18   Q.  You said selected retailers.  What do you mean by that?

19   A.  The process of us vetting or a retailer trying to vet us to

20   put our watches for sale in their stores is -- it's an

21   important partnership.  We want to make sure that we are in the

22   right retailers, in the right cities, to make sure our watches

23   are shown and displayed and sold properly.

24   Q.  Are those selected retailers called any particular name?

25   A.  Authorized retailers.

J2rWome2                          Foster - Direct

 1    Q.  Can any that wants to become an authorized Omega retailer?

 2    A.  No.  It's quite a selective process.

 3    Q.  What is the process for becoming an authorized Omega

 4    retailer?

 5    A.  They would inquire with the brand initially, and we would

 6    ask for pictures of the store.  We would make a store visit to

 7    make sure that the environment is proper for our watches to be

 8    sold.

 9    Q.  Are there any Omega boutiques or Omega authorized retailers

10    in lower Manhattan?

11    A.  There are.  We have an Omega boutique right here in

12    Brookfield center.

13    Q.  Are there any Omega boutiques or authorized retailers on

14    Canal Street in Manhattan?

15    A.  No, there are not.

16    Q.  And how do you know that?

17    A.  Because I'm familiar with the retailers.  It's also

18    available -- we list our retailers on our Omega website.

19    Q.  Are you familiar with how Omega watches are displayed at

20    either Omega boutiques or authorized retailers?

21    A.  Yes.

22    Q.  How are they displayed?

23    A.  We have a guideline book that retailers are provided that

24    explains to them just how the watches should be categorized

25    within the families that I spoke about before.

J2rWome2                            Foster - Direct

1   Q.  And how are the watches -- how do the guidelines suggest

2   the watches should be displayed?

3   A.  Well, the retailer would be provided with material, meaning

4   specific stands that say Omega and display platforms, and we

5   would actually give them visuals as to -- to show them which

6   way and how the families should be shown.

7   Q.  Now, when a customer goes to an authorized retailer or an

8   Omega boutique, does Omega have any guidelines for how a

9   particular watch is shown to that customer?

10  A.  Yes.  So, if we are picking a watch from the display case,

11  the presentation is very important as well.  We make sure our

12  salespeople have gloves, very soft, like satin or silk gloves,

13  to take the watches out of the showcase.  It helps to keep the

14  watches clean.  It also keeps them protected so they don't

15  scratch during the presentation.

16      Out on the display case itself, we would have a tray,

17  normally a leather-lined tray with our logos on it.  And we

18  would then lay the watch down for the customer to be able to

19  view.  If they wanted to see more than one watch at a time, we

20  would take the second one out and make sure to align them next

21  to each other, so they wouldn't hit, knock and cause any

22  scratches.

23  Q.  Mr. Foster, are you familiar with how Omega watches are

24  packaged and sold?

25  A.  Yes.

1          MR. NOYES:  Permission to approach, your Honor?

2          THE COURT:  Yes, you may, Mr. Noyes.

3    Q.  I'm going to hand you, Mr. Foster, what's been marked as

4    Plaintiffs' Exhibit No. 9.

5          Mr. Foster, do you recognize Plaintiffs' Exhibit No. 9?

6    A.  I do.

7    Q.  What is it?

8    A.  This is an Omega presentation box.

9    Q.  OK.  If you open the box, can you tell us what's inside?

10   A.  So you have a wooden Omega --

11   Q.  Why don't you just tell us before you show the jury.

12   A.  OK.

13   Q.  Just tell us --

14   A.  You have the wooden Omega box that the Omega watch, once

15   it's sold, would be given to the customer.  You also have the

16   operating instruction book that details the different movements

17   that we have and the warranty that we provide.  And then you

18   have a leather wallet that would contain a series of cards with

19   a red hard plastic, almost like credit card.  One would be the

20   international warranty.  And the other is what's called a

21   pictogram card, which shows all the specifications about the

22   watch.

23   Q.  Now, if you open up the wooden box you described, what's

24   inside that?

25   A.  There's an Omega Seamaster Aqua Terra automatic chronograph

1   watch.

2   Q.  Are you familiar with that watch?

3   A.  I am.

4   Q.  How are you familiar with that watch?

5   A.  It's one of the models that was in our collection for many

6   years, this specific one.  The Aqua Terra has been in the line

7   for decades.

8         MR. NOYES:  Your Honor, plaintiffs offer Plaintiffs'

9   Exhibit 9.

10        MR. SCHICK:  Your Honor, I certainly have no objection

11   to the watch.

12        THE COURT:  You have no objection?

13        MR. SCHICK:  To the watch, your Honor.

14        I'd just note that the whole box was presented.  I've

15   seen it previously because they asked me to come -- I went to

16   their office.  It was sent by the company to Mr. Gunther in

17   anticipation of litigation, so I have no problem with the

18   watch.  I have a problem --

19        THE COURT:  If you have no problem, it's received in

20   evidence.

21        MR. SCHICK:  Thank you, your Honor.

22        (Plaintiffs' Exhibit 9 received in evidence)

23   BY MR. NOYES:

24   Q.  Mr. Foster, why don't you stand up and show the jury the

25   contents of Plaintiffs' Exhibit 9.

1    OK.  Now, before you mentioned a warranty card.  Can you

2    show that to the jury, please?

3    A.  Yes.

4    So, you have the leather wallet and then the red

5    international warranty card that is printed with the retailer's

6    name, the reference number and the individual serial number of

7    the watch.

8    Q.  And then you have another card in your hand.  What is that?

9    A.  This is the red pictogram card with the Omega seal, and on

10   the front would be the reference and serial number of the

11   watch, and on the back would be all of the distinguishing

12   characteristics of the watch.

13   Q.  What's the purpose of the pictogram card?

14   A.  It tells you how water resistant the watch would be.  It

15   tells you what type of crystal, glass, would be on the front.

16   It tells you the material of the watch.  It tells you all of

17   these specific details that Omega has about their product.

18   Q.  OK.  And can you show the jury the instruction manual you

19   described?

20   A.  This is the red Omega operating instruction book.  It is

21   published in multiple languages, and in the beginning, you

22   would have a pullout to show you all of the different

23   movements, mechanisms that are inside the watch and how to

24   operate each one properly.

25   Q.  OK.  Now, are the pictogram and warranty cards you

1    described sold with every authentic Omega watch?

2    A.  Yes.

3    Q.  And are the pictogram -- were the pictogram and warranty

4    cards sold with authentic Omega watches in 2012?

5    A.  Yes, they were.

6    Q.  OK.  Now let's focus on the watch, Mr. Foster, in

7    Plaintiffs' Exhibit 9.  Take it out, please.

8        What type of Omega watch is that?

9    A.  This is an Omega Seamaster Aqua Terra automatic

10   chronograph.

11   Q.  And how do you know that?

12   A.  From dealing with the brand for the past 15 years and

13   received trainings from the brand itself over those course of

14   years.

15   Q.  Are there any markings on the watch that indicate to you

16   that's the model watch it is?

17   A.  Yes, there are.

18   Q.  And what are those?

19   A.  Well, specifically on the case back -- I'm just going to

20   open the clasp here for a second.  On the case back it would be

21   engraved Seamaster Aqua Terra.

22          MR. NOYES:  Your Honor, permission to show the jury

23   the watch?

24          THE COURT:  Yes.

25          MR. NOYES:  Thank you.

1           And your Honor, while we're at it, permission to show

2      the box and materials?

3           THE COURT:  Yes.

4      BY MR. NOYES:

5      Q.  Now, Mr. Foster, what is the retail value of the Omega

6      Seamaster Aqua Terra that is in Plaintiffs' Exhibit No. 9?

7      A.  It is about $5,000.

8      Q.  And was the Omega Seamaster Aqua Terra that is Plaintiffs'

9      Exhibit 9 available for purchase in 2012?

10     A.  Yes, it was.

11     Q.  Now, how were authentic Omega Seamaster Aqua Terra watches

12     packaged in 2012?

13     A.  It would have been in a similar box to that.  Back in 2012,

14     it was slightly smaller, and the box packaging was red leather

15     material instead of the wood that you see here.  And the

16     interior would have been more of a cloth material as opposed to

17     the leather.  But the operating instruction book, the warranty

18     card and the leather wallet would have been the same.

19     Q.  Now, Mr. Foster, a slightly different topic, Mr. Foster.

20     Are Omega watches ever sold pre-owned?

21     A.  Yes, they are.

22     Q.  Where can a customer purchase an Omega pre-owned Omega

23     watch?

24     A.  They can purchase them at retailers.  They can also

25     purchase them online.

J2rWome2                         Foster - Direct

1   Q.  Based on your responsibilities at The Swatch Group U.S.,

2   are you familiar with the prices for pre-owned Omega watches?

3   A.  Yes, I do check them.

4   Q.  And what is the price range for pre-owned authentic Omega

5   watches?

6   A.  I've seen them, depending on the collection and how popular

7   they are, being sold close to the original retail or as much as

8   30 to 50 percent off the original retail.

9   Q.  Now, in your experience, Mr. Foster, are new Omega watches

10  sold for less than $100?

11  A.  No.

12  Q.  And in your experience, has Omega, the company, ever sold

13  an authentic Omega watch for less than $100?

14  A.  No, they haven't.

15  Q.  Are you aware of any pre-owned authentic Omega watches that

16  have been sold for less than $100?

17  A.  No.

18  Q.  And what is the least expensive watch that Omega currently

19  sells?

20  A.  Our current collection is -- begins at $2,400.

21  Q.  Turning to a --

22          MR. NOYES:  Oh, I'll take that back.

23  Q.  I'm going to hand you back Plaintiffs' Exhibit 9,

24  Mr. Foster.

25  A.  OK.

J2rWome2                         Foster - Direct

1    Q.  Mr. Foster, turning to a related but slightly different

2    topic, are you familiar with the term "gray market"?

3    A.  Yes.

4    Q.  And how are you familiar with that term?

5    A.  Gray market is a -- it's a part of our industry that we're

6    aware of and has been known for many, many years.

7    Q.  And with respect to Omega watches, what is the gray market?

8    A.  The gray market is where authentic Omega watches are sold

9    by nonauthorized retailers.

10   Q.  And based on your experience at The Swatch Group, are

11   authentic Omega watches sold on the gray market for less than

12   $100?

13   A.  No, they're not.

14   Q.  How much do Omega watches generally cost on the gray

15   market?

16   A.  I would say the average is about 30 percent off the retail

17   price.

18   Q.  Now, Mr. Foster, let's move to a different topic, the

19   identification of counterfeit watches.

20       Do your responsibilities at The Swatch Group include

21   identifying counterfeit watches?

22   A.  Yes, they do.

23   Q.  What responsibilities do you have for identifying

24   counterfeit watches?

25   A.  It starts with training of my staff.  The majority of the

```
1    time if something comes into one of my service centers, then
2    that team, the initial team that would see the watch would be
3    responsible to identify it.  If there's any question, then it
4    would be brought to me and I would verify for sure whether it
5    was counterfeit or not.
6    Q.  Do you personally identify counterfeit watches --
7    A.  Yes.
8    Q.  -- for The Swatch Group?
9    A.  Yes, I do.
10   Q.  How long have you been involved in identifying counterfeit
11   watches for The Swatch Group?
12   A.  For The Swatch Group, my entire career, 15 years.
13   Q.  Before you joined The Swatch Group, did you have any
14   experience identifying counterfeit watches?
15   A.  Yes.  My previous job, the same issues occurred with
16   counterfeit, and I would have to identify at that time as well.
17   Q.  Now, you mentioned working with your service center.  At
18   The Swatch Group, are you involved in the identification of
19   counterfeit watches in any other way?
20   A.  Yes.  I've worked with law enforcement and federal agencies
21   on identifying counterfeit.
22   Q.  And what are some of the law enforcement or federal
23   agencies that you've worked with?
24   A.  I've worked with the New York Police Department, their
25   anticounterfeiting task force.  I've worked with U.S. Customs,
```

1   when they confiscate inbound shipments and have questions on

2   them.  And I've also worked probably most recently with the

3   West Palm Beach police department in Palm Beach County,

4   Florida.

5   Q.  Let's focus on your work with customs.  How long have you

6   worked with customs to identify counterfeit watches?

7   A.  I would probably say the last ten years we've been

8   contacted multiple times to help with customs.

9   Q.  How do you help customs to identify counterfeit watches?

10  A.  When they seize a shipment, they will normally email me

11  pictures of the seized watches and ask me to identify and show

12  them the characteristics of why or why not they would be real.

13  Q.  When you're working with customs, do you analyze or

14  actually get the watches that have been confiscated?

15  A.  No.  It's pictures that are sent to us.  They don't have

16  the ability to ship them to where I'm located, so we can do

17  everything electronically.

18  Q.  OK.  How are you able to identify whether a watch is

19  authentic or counterfeit based on pictures?

20  A.  Well, you take the picture of what they're sending us

21  that's been confiscated.  We do a comparison of that to an

22  original, and we look for the differentials between the two,

23  and if there are enough characteristics or -- that are wrong,

24  then it's pretty easy to identify.

25  Q.  Has customs ever asked you to identify whether any Omega

1    watches are authentic or counterfeit?

2    A.  Yes, it's the majority of my requests.

3    Q.  How many times have you worked with customs to identify

4    counterfeit Omega watches?

5    A.  I would say at least 10 times in the past 15 years.

6    Q.  You mentioned you worked with the sheriff's department in

7    Florida to identify counterfeit watches?

8    A.  Yes.

9    Q.  Can you describe what you did with the sheriff's department

10   in Florida to identify counterfeit watches?

11   A.  They had a ring of counterfeit that hit their area, and

12   what people were doing were they were bringing the fake watches

13   to pawnbrokers, trying to get the cash for them, passing them

14   off as real.  And the pawnbrokers then contacted the police.

15   They in turn reached out to us and sent, sent -- sent me the

16   pictures of the watches in question.

17        From what we were able to discern in the pictures, I did a

18   side-by-side comparison of the original authentic product,

19   returned the information back to them, and from that they were

20   able to confiscate the watches and also make arrests.

21   Q.  When did you do this work?

22   A.  That was in July of 2017.

23   Q.  Finally, you mentioned working with the New York Police

24   Department to identify counterfeit watches.  Can you describe

25   the work you've done with the New York Police Department?

1    A.   Yeah.  We were asked to do a presentation to the task force

2    that was going to be making some raids on counterfeit shops

3    that sell counterfeit watches here in New York City, so I did a

4    presentation for them of Omega as well as some of our other

5    brands that would give them the ability to visually identify a

6    counterfeit very quickly, because they would have to make

7    split-second decisions whether they were going to do the raids

8    or not.

9    Q.   Now, when did you provide that training to the New York

10   City Police Department?

11   A.   That was in November of 2010.

12   Q.   OK.  And did you prepare a presentation that you gave to

13   the police department?

14   A.   I did.

15          MR. NOYES:  OK.  Now let's look at Plaintiffs' Exhibit

16   286.

17   Q.   Why don't you look at your binder, Mr. Foster, on the

18   witness stand, and turn to plaintiffs' 286.  Let me know when

19   you're there.

20   A.   OK.

21   Q.   Do you recognize PX-286?

22   A.   Yes, I do.

23   Q.   What is this?

24   A.   This is my presentation that was done to the police

25   department back in 2010.

J2rWome2                              Foster - Direct

1    Q.  And why did you prepare this presentation?

2    A.  So the officers making the raids would be able to know

3    whether a watch is real or counterfeit quickly and visually.

4    Q.  What information did you use to prepare this presentation?

5    A.  I used counterfeit watches that had come to our service

6    centers over the years -- we take photographs of them -- and

7    then did a comparison of why -- well, identifiers as to why

8    they are fake and then comparisons to original products so they

9    can see the difference.

10   Q.  Did anyone help you to prepare this presentation?

11   A.  No.  I did it on my own.

12   Q.  And when did you give this presentation to the New York

13   Police Department?

14   A.  November 2010.

15              MR. NOYES:  Your Honor, plaintiffs offer PX-286.

16              MR. SCHICK:  No objection.

17              THE COURT:  286 is in evidence.

18              (Plaintiffs' Exhibit 286 received in evidence)

19              MR. NOYES:  Thank you.  Let's put up for the jury the

20   front page, and if we could turn to page 14 of Exhibit 286.

21   Q.  Mr. Foster, can you describe to the jury what is shown on

22   this page in your presentation to the New York Police

23   Department?

24   A.  Yes.  These are examples of authentic case backs that we

25   have at Omega.

J2rWome2                          Foster - Direct

1    Q.  And using the pictures on this, can you describe how this

2    would help the New York Police Department to identify

3    counterfeit watches?

4    A.  Yes.  So, on the picture to the left, it is a case back of

5    an Omega Seamaster Planet Ocean watch.  The authentic watches

6    have different -- in this particular case, it has six

7    squared-off holes to unscrew or undo the case back.  The

8    Seamaster and the Omega logo at the bottom as well as that

9    mythological creature in the middle -- it's called a

10   Hippocampus -- are raised and engraved.  So there's a big

11   distinction when you visually see it and feel it.

12       And then on the bottom you have the Planet Ocean also

13   engraved inside -- onto the case back.

14             MR. NOYES:  We can take that down, Mr. Foster.

15             Your Honor, permission to approach the witness?

16             THE COURT:  Yes.

17   BY MR. NOYES:

18   Q.  Mr. Foster, I'm going to hand you what's been marked as

19   Plaintiffs' Exhibit 100, which is in evidence.  Mr. Foster,

20   have you seen Plaintiffs' Exhibit 100 before?

21   A.  Yes, I have.

22   Q.  Have you reviewed it in advance of your testimony today?

23   A.  I have.

24   Q.  What is the watch in Plaintiffs' Exhibit 100?

25   A.  This is a -- supposed to be an Omega Seamaster Aqua Terra.

J2rWome2                        Foster - Direct

1   Q.  Can you take the watch out of the bag, Plaintiffs' Exhibit

2   100?

3   A.  OK.

4   Q.  Now, based on your experience at Swatch Group identifying

5   counterfeit watches, is the watch in Plaintiffs' Exhibit 100 an

6   authentic Omega watch?

7   A.  No, it is not.

8   Q.  Why do you say that?

9   A.  There are multiple characteristics about this watch that

10  are just not original to Omega.

11              MR. NOYES:  OK.  Let's put up on the screen

12  Plaintiffs' Demonstrative Exhibit 4.

13  Q.  Mr. Foster, have you seen this demonstrative before?

14  A.  Yes, I have.

15  Q.  What is shown on Plaintiffs' Demonstrative Exhibit 4?

16  A.  They are three pictures showing the different sides of the

17  watch that I have here.

18  Q.  That's the Plaintiffs' Exhibit 100 watch?

19  A.  Yes, it is.

20  Q.  Have you compared the actual watch, Plaintiffs' Exhibit

21  100, to the photographs shown here on Plaintiffs' Demonstrative

22  Exhibit 4?

23  A.  Yes.

24  Q.  And are the photographs on Plaintiffs' Demonstrative

25  Exhibit 4 an accurate representation of the watch that you're

1   holding currently?

2   A.  Yes, they are.

3            MR. NOYES:  Now, to assist with your testimony, we

4   have prepared a large version of Plaintiffs' Demonstrative

5   Exhibit 4.

6            MR. SCHICK:  Your Honor, it's on the screen like

7   everything else.  I'm not sure what they're doing here.

8            THE COURT:  OK.  If that's an objection, it's

9   overruled.

10           Go ahead.

11           MR. NOYES:  Mr. Lam, please put up the enlarged

12  version of Plaintiffs' Demonstrative Exhibit 4.

13           For the record, your Honor, we have marked it as

14  Plaintiffs' Demonstrative Exhibit 4-A.

15           Your Honor, may Mr. Foster continue his testimony

16  from --

17           THE COURT:  Yes, he may.

18           MR. NOYES:  Thank you.

19  Q.  Mr. Foster, can you please step down to the demonstrative.

20  I'm going to hand you some markers.  And keep your voice up,

21  Mr. Foster, so the court reporter can hear you.

22      Now, Mr. Foster, using Plaintiffs' Demonstrative Exhibit

23  4-A, can you explain why you believe that the watch in

24  Plaintiffs' Exhibit 100 is a counterfeit Omega watch?

25  A.  Yes.  There are a few characteristics on each of the

1    pictures.  First, I will tell you that these green squares here

2    at the bottom of the markers are painted this color, and in an

3    original Omega Seamaster Aqua Terra, you would have a very

4    light, almost yellowish-white luminescent material called

5    Super-LumiNova.  It's used throughout the watch industry.  It

6    would never be this dark-colored green.

7         Next I would say that the subdials here, OK, the three of

8    them, do not coincide with the characteristics on a subdial of

9    an Omega Seamaster Aqua Terra, like the watch we've just looked

10   at previously.

11        Other characteristics are this blue tape that is on here is

12   not the way an Omega would be packaged going to an individual

13   customer.  We wouldn't have any of this blue material on it

14   whatsoever.

15   Q.  Are there any other characteristics on the front of the

16   watch PX-100 that indicate to you that it is not an authentic

17   Omega watch?

18   A.  Yeah, the Omega symbol and the name Omega, the lettering of

19   it, is not consistent with the Omega Seamaster Aqua Terra in

20   this particular model.  Ours would be a broader font size, if

21   you will.

22        Additionally, the hour -- I'm sorry.  The minute markers in

23   between each of the five-minute segments, that whole dial is

24   not consistent with what the original would be.

25   Q.  Now, looking at the picture in the middle of Plaintiffs'

J2rWome2                          Foster - Direct

Demonstrative Exhibit 4-A, are there any characteristics on the

back or the band of the watch that indicate to you that it is

not an authentic Omega?

A.   Yes.   First, the whole clasp cover is incorrect for this

model watch.   This is a rectangular sort of single piece, and

then it has a push-button release system on the side, which the

Omega Seamaster Aqua Terra does not have.

Additionally, the clasp is marked "professional," and in

the Seamaster Aqua Terra collection, there is no professional

series.   The clasp itself is what we call a single-hinge clasp,

meaning that it would fold over itself and lock down on this

pin here.   And that is not the locking mechanism that we use on

an Aqua Terra watch.

(Continued on next page)

1   BY MR. NOYES:

2   Q.  Mr. Foster, turn to the last picture on the demonstrative

3   exhibit.

4           Are there the characteristics on the back of the watch

5   that indicate to you that it is not an authentic Omega?

6   A.  Yes.  Quite a few.  The way the band connects to the back

7   of the case is not fitted in the same format that an Omega

8   would.  The Hippocampus, like we looked at before, is very flat

9   and flushed to the case where ours is raised and has a very

10  distinct difference in the material, with the shiny finish.

11  But I think the most glaring point is the fact that this is a

12  great Broad Arrow here, and Broad Arrow just does not exist as

13  part of the Seamaster collection.

14  Q.  Does Broad Arrow exist as any part of Omega collection?

15  A.  It does.  It's only in the Speedmaster collection.

16  Q.  And that Speedmaster was the watch that was used by NASA?

17  A.  Yes.

18  Q.  Now, are there any numbers, serial numbers on the watch,

19  the PX-100?

20  A.  No.  And there should be.  On each original Omega watch, we

21  would have an engraved eight-digit serial number that

22  distinguishes that watch in our database.

23          And then lastly, I will tell you that the Aqua Terra

24  water resistant is tested to 150 meters and it's required that

25  we have the distinction of water resistance engraved on the

1    back of the watch.  And on this watch, there is no distinction.

2    Q.  Now, there are some numbers on the back beginning with

3    four.  Do you see that?

4    A.  I do.

5    Q.  And given your experience working with Omega watches for 15

6    years, do you know what those numbers are?

7    A.  I have no idea what those numbers are.

8    Q.  Is that something that Omega puts on authentic Omega

9    watches?

10   A.  Not these numbers, no.

11   Q.  Now, Mr. Foster, before you sit back down, have you done

12   anything to determine which authentic Omega watch is closest in

13   appearance to the watch that is Plaintiffs' Exhibit 100?

14   A.  I did.

15   Q.  What did you do?

16   A.  I went back to our collection books where we -- each year

17   we put out a book that shows all of the watches that are

18   currently in that collection of Omega for the time.

19   Q.  And were you able to determine a watch that you concluded

20   as closest in appearance to the watch PX-100?

21   A.  I did.

22   Q.  And what watch is that?

23   A.  It's the watch we saw before.

24   Q.  That was Plaintiffs' Exhibit 9?

25   A.  Yes.

 1          THE COURT:  We're going to take our lunch break now.

 2     We'll resume at a quarter after 12:00.

 3          (Jury not present)

 4          MR. NOYES:  Thank you, your Honor.

 5          THE COURT:  Mr. Foster, you're excused.

 6          THE WITNESS:  Thank you.

 7          (Witness excused)

 8          THE COURT:  I think we need to pick up the pace in

 9     this examination.

10          MR. NOYES:  Yes, your Honor.  We're moving into the

11     heart of the comparison between this watch and the authentic

12     watch.  And I'll have one other subject matter, and then we'll

13     be concluded.

14          THE COURT:  Is there any doubt that 100 is a

15     counterfeit watch?

16          MR. NOYES:  We don't think so, your Honor.

17          THE COURT:  Mr. Schick?

18          MR. SCHICK:  Yes, your Honor.

19          THE COURT:  Is there any doubt that the 100 is a

20     counterfeit watch?  I understand you're saying the 100 -- was

21     that the watch that was purchased.  I understand that argument.

22          MR. SCHICK:  I think he's already testified it's

23     counterfeit, so I'm not sure why they have to go through that

24     demonstrative or get me to admit state to that point.  And I'm

25     not going to spend a lot of time on my cross, your Honor, on

1    going through this watch.

2            So, you know, he's testified already that it's

3    counterfeit, so whether or not I admit to it now is not the

4    question.  The question is why they think they have to show him

5    another watch, another demonstrative, and keep the testimony

6    going.  They made the decision showing the jury it takes hours

7    to determine whether it's counterfeit.  I'm not sure that's

8    right but, you know, if that's the way they want to do it,

9    they'll do it that way.  My cross on this point will be quite

10   brief.

11           MR. NOYES:  Your Honor, we can move on if the

12   defendant is willing to stipulate that Plaintiffs' Exhibit 100

13   is a counterfeit watch.

14           MR. SCHICK:  Your Honor, I don't need to stipulate.

15   They just had him on for half an hour talking about 100.  Now

16   they want to show him nine.  They don't want to show him 100

17   anymore.  They want to show him nine.  I don't know why they

18   have to show him nine.

19           THE COURT:  What's nine?

20           MR. NOYES:  Nine, your Honor, is the authentic Omega

21   watch.  Mr. Foster will compare the authentic -- which he

22   testified is closest to this fake watch.  He's going to compare

23   the two to show the jury how they're different.

24           MR. SCHICK:  Your Honor, I don't intend to ask him any

25   questions on cross about nine or things like that.

1          And again, I'm not going to stipulate to something.

2    So, they want to go on because they have to.

3          THE COURT:  I'd like to get this trial over and done

4    with.  It seems to me that this is an awful lot of extraneous

5    material.  I mean, the same thing over and over and over again.

6          MR. GUNTHER:  Your Honor, this just goes right to the

7    heart of our case.  He won't stipulate to it.  We're entitled

8    to prove it.  We're entitled to prove that's a counterfeit,

9    we're entitled to compare it to the original watch and show

10   that.  Now, Mr. Noyes is going to do that very succinctly.  If

11   he won't stipulate to it, you know --

12         THE COURT:  I understand that.  I'm just saying pick

13   up the pace.

14         MR. GUNTHER:  We'll pick up the pace, your Honor.

15         MR. SCHICK:  Thank you, your Honor.

16         MR. NOYES:  Thank you, your Honor.

17         (Luncheon recess)

18         THE COURT:  Okay.  Please be seated.

19         (Jury present)

20         THE COURT:  Mr. Noyes.

21   BY MR. NOYES:

22   Q.  Mr. Foster, you have in front of you the PX100?

23   A.  Yes.

24   Q.  How long did it take you to determine that that watch was

25   counterfeit?

1    A.   Pretty much as soon as I had it in my hand, I was able to

2    see it was counterfeit.

3    Q.   Okay.  Now, Mr. Foster, in your binder there are three

4    demonstrative exhibits.  Demonstrative Exhibits 5, 6 and 7, can

5    you take a look at those?

6    A.   Okay.

7    Q.   Did you review those for your testimony today?

8    A.   Yes.

9    Q.   What is shown?

10   A.   They are side-by-side comparisons of the fake watch and the

11   original Omega watch, showing the front of it, the back of it

12   and then the back case of each watch.

13          MR. NOYES:  Okay.  Let's put up Plaintiffs'

14   Demonstrative Exhibit 5, please.

15   Q.   Now, Mr. Foster, comparing the front of the two watches,

16   Plaintiffs' Exhibit 100 and Plaintiffs' Exhibit 9, what

17   characteristics indicate to you that PX-100 is a counterfeit

18   watch?

19   A.   The watch on the left, the first thing that stands out,

20   again, is those green rectangular squares versus the original.

21   They do have the same rectangulars, but you can hardly see any

22   color to them.  It's a faint yellow.

23          Next on the watch to the left is you have -- the

24   minute indicators that are on the original watch, in between

25   each minute, you also have three other incremental slash marks.

1   The three smaller dials on the watches, on the fake watch, on

2   the left, you have really just minute mark indicators, where on

3   the original you have the 60 and the 30 indicated on the dial.

4   On the fake watch, on the subdial to the right, you have the

5   ten, 20 and 30-minute indicated, versus on the original it is

6   only a 30 and a 15 indicated.  And then below, on the fake

7   watch you do have 12, 3, 6 and 9 indicated on that lower dial.

8   But on the original you only see 12, 3 and 9 because on the

9   original there is a calendar function as well, which the fake

10  watch doesn't have.

11  Q.  And is that the calendar function shown in No. 4?

12  A.  Yes, it is.

13  Q.  Let's take a look at Plaintiff Demonstrative Exhibit 6.

14  Okay.

15          Now, comparing the back of the two watches, PX-100 and

16  PX-9, what characteristics indicate to you that the PX-100 is

17  counterfeit?

18  A.  The first thing is the class, as I showed before, on the

19  fake one to the left, you've got this large block case cover

20  with a push button off to the left side.  It also indicates the

21  word "professional," which is not used in the Aqua Terra

22  collection.  The class on the right is a fold-over clasp that

23  is integrated into that watch with just the Omega symbol.

24  Q.  Let's look at Plaintiffs' Exhibit 7.

25          In comparing the case backs of the watches, the PX100

1   and also the PX9, what characteristics indicate to you that the

2   watch PX-100 is counterfeit?

3   A.  So, first and foremost, is the word Broad Arrow on the

4   fake.  Again, that just doesn't exist on Omega Seamaster

5   collection.  The proper engraving in this particular piece on

6   the right is Aqua Terra.  When you look at the Seamaster and

7   the Hippocampus in the center, it's certainly distinguishable

8   engraving, which would be significant for me to know that it

9   was an original one.

10          And then, again, the picture to the left is missing

11  the serial number, which is engraved on that bottom left corner

12  of the back of the case, as well as the water-resistance

13  indication of the 150-meter/500 feet.  The other piece that I

14  would say is on the original, you see five smaller circles on

15  the case back, and that is used with a special tool that Omega

16  makes to unscrew an open latch in order to get to the movement,

17  where on the fake watch you just have a six generic squares

18  screwed into it, which is used with just a generic tool.

19  Q.  Okay.  Now, I'm going to show, Mr. Foster, what's marked as

20  Plaintiffs' Demonstrative Exhibit 2.  And on the left is a

21  picture of PX100, the counterfeit watch, and on the right is

22  the photo of PX-104, which is in evidence.

23      Now, Mr. Foster, did you review this demonstrative in

24  advance of your testimony?

25  A.  Yes, I did.

1    Q.   Okay.  Now, based on your experience at the Swatch Group

2    identifying watches, do you believe the watch marked as PX-100

3    on the left of the slide is the same watch shown in the photo

4    that is in evidence as PX-104?

5    A.   Yes, it is.

6    Q.   Explain why.

7    A.   It has many of the same characteristics that are clearly

8    visible:  The three rectangular squares; minute indicators;

9    like I said, the blue tape that is noted on the top and the

10   bottom of the case; it has the same case design, the round

11   smooth bezel, the buttons on the top and bottom of the right

12   side of the case.  They're all clear indicators to me.

13   Q.   Okay.  And based on your experience, 15 years' experience

14   at Swatch Group identifying watches, do you have any doubt that

15   those watches are the same?

16   A.   No doubt they are the same.

17   Q.   Now, let's move to a slightly different topic, Mr. Foster.

18        Did you have your deposition taken in this case?

19   A.   Yes, I did.

20   Q.   And when was that?

21   A.   August 31st, 2017.

22   Q.   Now, before your deposition, were you shown the watch that

23   you have?

24   A.   Yes, I was.

25   Q.   When did you first see it?

J2RLOME3                         Foster - Direct

1    A.  I saw that a three weeks before.

2    Q.  You remember the timeframe?

3    A.  That would have been around July of 2017.

4    Q.  Okay.  And had you seen the watch, PX-100, before

5    July 2017?

6    A.  No, I had not.

7    Q.  Okay.  And who showed you the watch?

8    A.  Former counsel, Joshua Paul.

9    Q.  Okay.  Where were you shown the watch PX100?

10   A.  In our corporate offices in Weehawken, New Jersey.

11   Q.  Now, did Mr. Paul tell you anything about the watch when he

12   showed it to you?

13   A.  No, he did not.

14   Q.  Did Mr. Paul ask you to ascertain whether that watch was

15   counterfeit or authentic?

16   A.  Yes, he did.

17   Q.  And did you do that?

18   A.  I did.

19   Q.  What did you determine?

20   A.  That it was a counterfeit watch.

21   Q.  And how did you make that determination at the time?

22   A.  Simple visual inspection.

23   Q.  Okay.  When Mr. Paul showed you the watch, did you make any

24   notes about that watch?

25   A.  No, I did not.

1    Q.  Okay.  And again, you had your deposition taken in

2    August 2017; is that right?

3    A.  Yes.

4    Q.  Between the time Mr. Paul showed you the watch, PX-100, in

5    July of 2017 and your deposition in August of 2017, did anyone

6    show you the watch that is PX-100?

7    A.  No, they didn't.

8    Q.  Okay.  Now, between the time Mr. Paul showed you the watch

9    in your deposition, did you make any notes about the watch?

10   A.  No, I did not.

11   Q.  Now, at any time before your deposition in 2017, did you

12   make any notes about the watch that is PX-100?

13   A.  No, I did didn't.

14   Q.  And, Mr. Foster, did you take any notes or make any notes

15   to prepare for your deposition in August 2017?

16   A.  I did.

17   Q.  Okay.  How many pages of notes did you take?

18   A.  It was about a page and a half.

19   Q.  Okay.  And what was the subject matter of those notes?

20   A.  It was mainly information about the sales history of Omega

21   U.S. and marketing investment made by the brand for Olympic

22   Games.

23   Q.  Who provided that information to you?

24   A.  The attorneys.

25   Q.  Okay.  And why did you take notes about Omega sales

1    information -- withdrawn.

2         Why did you take notes about Omegas U.S.'s sales

3    information and marketing at the Olympics?

4    A.   It was my understanding that part of the deposition and the

5    case might rely upon me knowing that.

6    Q.   Now, in your role as vice president of customer service for

7    Swatch Group U.S., are you responsible for knowing U.S. sales

8    of Omega watches?

9    A.   No, I'm not.

10   Q.   Do you receive that information as part of your duties?

11   A.   No, I don't.

12   Q.   Now, in your role as vice president of customer service for

13   Swatch Group U.S., are you responsible for knowing Omega's

14   marketing expenditures at the Olympics?

15   A.   No.

16   Q.   Did you receive that information as part of your duties?

17   A.   No.

18   Q.   Now, those notes that you took before your deposition, did

19   they contain any information about identifying counterfeit

20   watches?

21   A.   No, they didn't.

22   Q.   Did they contain any information about watches purchased on

23   Canal Street?

24   A.   No.

25   Q.   Did your notes contain any information about 375 Canal

1    Street?

2    A.   No.

3    Q.   Did your notes contain any information about investigations

4    into the potentially counterfeit watches?

5    A.   No, they didn't.

6    Q.   Did your notes contain any information other than

7    information about U.S. sales of Omega watches and Omega's

8    marketing expenditures at the Olympics?

9    A.   No.  That was it.

10   Q.   Okay.  And, Mr. Foster, do you still have those notes that

11   you took for your deposition?

12   A.   No, I don't.

13   Q.   What did you do with them?

14   A.   I threw them away.

15   Q.   And when did you throw them away?

16   A.   The morning of the deposition.

17   Q.   And why did you do that?

18   A.   Because I was under the impression that they would no

19   longer be needed, that the case was not going to include that

20   type of information.

21   Q.   That type of information?  You mean information about sales

22   of Omega watches and marketing expenditures?

23   A.   Correct.

24   Q.   Okay.  Was Mr. Paul with you when you threw those notes

25   away?

1    A.  No, wasn't.

2    Q.  Did anyone instruct you to throw away your notes?

3    A.  No.

4    Q.  Did anyone ask you to throw away your notes?

5    A.  No.

6    Q.  So, now, let's -- I want to show you what's in evidence as

7    Plaintiffs' Exhibit 108A --

8              MR. NOYES:  And Mr. Lam, can you go to 7 minutes and

9    29 seconds.

10   Q.  Now, on the screen here is a watch.  Have you reviewed this

11   portion of the video in advance of your testimony today, Mr.

12   Foster?

13   A.  Yes, I have.

14   Q.  Okay.  And can you please describe the watch shown on the

15   screen here?

16   A.  It's supposed to be an Omega Speedmaster watch.

17   Q.  Okay.  Is this a men's or a woman's watch?

18   A.  That would be a men's watch.

19   Q.  Okay.  And have you ever seen this watch in person?

20   A.  No, I have not.

21   Q.  Now, why do you believe that the watch shown on the screen

22   here from Plaintiffs' Exhibit 108A is a counterfeit Omega

23   watch?

24             MR. SCHICK:  Objection.  I don't think he said that,

25   but --

1           MR. NOYES:  Well, I'll ask the question better.

2           THE COURT:  Thank you.

3   BY MR. NOYES:

4   Q.  Mr. Foster, do you believe the watch shown on the screen

5   here Plaintiffs' Exhibit 108A is a counterfeit Omega watch?

6   A.  Yes, it is.

7   Q.  And why do you believe that?

8   A.  The visual characteristics will tell me that.

9   Q.  And can you identify some of those?

10  A.  Yes.  First of all, the composition of it with the blue

11  tape on the top is not something that Omega would have.  But

12  probably more importantly, is the white dial, white subdials

13  along with the black bezel.  This connection of elements would

14  indicate that it's not originally Omega.  Omega doesn't make

15  that.  So, you can identify the subdial to the left has seven

16  markings which are the days of the week, and there's no Omega

17  Speedmaster that has a subdial with days of the week on it.

18  Q.  Okay.  And can you see any Omega mark brand on logos or

19  trademarks on the watch?

20  A.  The Omega symbol is at the top at 12 o'clock, and the word

21  omega beneath.

22  Q.  One final topic.  And I'd like to focus on the Omega

23  trademarks that are at issue in this case.

24      In advance of your testimony today, did you review any

25  Omega registered trademarks?

1    A.  I did.

2           MR. NOYES:  Let's put up Plaintiffs' Exhibit 4, which

3    is in evidence.  And if you could go to page two and blow up

4    the upper portion of the exhibit.

5    Q.  Now, Mr. Foster, do you recognize this as an Omega

6    trademark?

7    A.  I do.

8    Q.  Okay.  And do you see that this Omega trademark is for

9    watches?

10   A.  Yes.

11          MR. NOYES:  Can you just a highlight that for me.

12          Okay.

13   Q.  Now, let's go back to Plaintiffs' Demonstrative Exhibit 4.

14   And you testified about this earlier.

15       Can you identify the Omega trademark that we just looked at

16   from Plaintiffs' Exhibit 4 on the watch that is Plaintiffs'

17   Exhibit 100?

18   A.  Yes.  On the picture to the left, the symbol of Omega and

19   the word omega on the front of the watch on the face.  And in

20   the middle picture, the omega symbol and word omega are on the

21   clasp.

22          MR. NOYES:  So, now, let's look at another Omega

23   trademark and put up on the screen Plaintiffs' Exhibit 3, which

24   is in evidence.  And let's go up to the language in the first

25   two columns.

1          Okay.  And Mr. Lam, can you highlight, starting at

2     about line seven where it says our trademark, and down to the

3     bottom, please.

4     Q.  And do you see that, Mr. Foster, is describing the

5     trademark consisting of the arbitrary sign, the last letter of

6     the Greek alphabet?

7          Do you see that?

8     A.  Yes, I do.

9     Q.  It says it may appear above the word omega but it may be

10    differently arranged and the word omega may be omitted without

11    altering the character of our trademark, the central feature of

12    which is the Greek letter Omega.

13         Do you see that?

14    A.  Yes, I do.

15    Q.  And in the column to the right, that is line -- about 22,

16    it says, "Which it is used by us in watching movement in watch

17    cases.

18         Do you see that?

19    A.  Yes.

20         MR. NOYES:  Now, let's go back to Plaintiffs'

21    Demonstrative Exhibit 4.

22    Q.  Can you identify on Plaintiffs' Exhibit 100, the Omega

23    trademark we just looked at that is Plaintiffs' Exhibit 3?

24    A.  Yes.  On the picture to the right underneath that

25    Hippocampus, you have the Greek letter "Omega."

1    Q.  And that's on the watch, correct?

2    A.  Correct.  On the case back.

3    Q.  Now, let's look at Plaintiffs' Exhibit No. 5, which is in

4    evidence.

5           MR. NOYES:  And, Mr. Lam, could you blow that up.

6    Q.  Now, you see this, Mr. Foster, is a trademark for the word

7    "Omega?"

8    A.  Yes.

9           MR. NOYES:  And, Mr. Lam, can you highlight where it

10   says "four watches and parts thereof."

11   Q.  Do you see that, Mr. Foster?

12   A.  Yes.

13   Q.  Let's go back to Plaintiffs' Demonstrative 4 again.  Again,

14   this is the watch that is PX-100.

15      Can you identify where on the watch PX-100 the Omega

16   trademark that we just looked at from Plaintiffs' Exhibit 5 is

17   located?

18   A.  The picture on the left, it's on the face of the watch by

19   the 12 o'clock.  And in the middle picture, it is on the clasp

20   as well.

21   Q.  Now, last trademark, Mr. Foster, let's look at Plaintiffs'

22   Exhibit No. 6.  Again, this is in evidence.

23          MR. NOYES:  And if we could blow that up.  Thank you.

24   Q.  And you see this is the trademark for the word "Seamaster?"

25   A.  Yes.

J2RLOME2                          Foster - Cross

1    Q.  And that is a trademark for watches, watch parts and watch

2    movements.  Do you see that?

3    A.  Yes, I do.

4    Q.  Okay.  Let's go back to Plaintiffs' Demonstrative Exhibit

5    No.4.  Can you identify, Mr. Foster, where on the watch that is

6    PX-100 you see the trademark Seamaster from Plaintiffs' Exhibit

7    6?

8    A.  Yes.  On the third picture on the case back is where the

9    word "Seamaster" is engraved.

10   Q.  Okay.  Thank you, Mr. Foster.

11               MR. NOYES:  Nothing further.

12               THE COURT:  Mr. Schick.

13   CROSS-EXAMINATION

14   BY MR. SCHICK:

15   Q.  Good afternoon, Mr. Foster.

16   A.  Good afternoon.

17   Q.  I'd like to show you what's been previously admitted into

18   evidence as Exhibit 90.

19       Mr. Foster, this is a letter sent by, you see it says

20   Collen IP?

21   A.  Yes.

22   Q.  And that's the law firm that you referenced with regard to

23   your deposition?

24               MR. NOYES:  Your Honor, object to lack of foundation.

25               MR. SCHICK:  The letter is admitted, your Honor.

1              THE COURT:  It's in evidence.

2              Okay.  What's your question?

3     BY MR. SCHICK:

4     Q.  Collen IP was the law firm that was representing Omega at

5     the deposition, correct?

6     A.  Yes.

7     Q.  And you see this is a notice about trademark

8     counterfeiting.  You see that?

9     A.  Yes.

10    Q.  I'm not going to make you go through the whole letter, but

11    I want to bring your attention to the third page.  The two-page

12    letter you'll see.  And now, the third page attached is an

13    Omega trademark.

14             You see that?

15    A.  Yes.

16    Q.  Now, Mr. --

17             MR. NOYES:  Your Honor, I object.  This trademark is

18    not an issue in this case.

19             MR. SCHICK:  That's the point I want to make,

20    your Honor.  The trademarks that they attach --

21             THE COURT:  The trademarks in the case are the ones

22    identified.  Anything else is irrelevant.

23             MR. SCHICK:  Correct.

24             THE COURT:  Objection's sustained.

25             MR. NOYES:  Thank you, your Honor.

1    BY MR. SCHICK:

2    Q.  Do you recall at your deposition you testified that you had

3    absolutely no responsibilities with respect to marketing?

4    A.  Yes.

5    Q.  And was that correct at the time?

6    A.  Yes.

7    Q.  Is that correct today?

8    A.  Yes.

9    Q.  Have you ever been asked by Omega or your employer to speak

10   about their marketing efforts?

11   A.  No.

12   Q.  Do you have any responsibility for brand issues?

13   A.  Yes.

14   Q.  And what are those responsibilities?

15   A.  Which relate to customer service and the brand.

16   Q.  But relating to how the brand is displayed to the public

17   with respect to the Olympics, for example?

18   A.  No.

19   Q.  Any responsibility for that?

20   A.  No.

21   Q.  And that was true at the time of your deposition, correct?

22   A.  Correct.

23   Q.  And that's true today?

24   A.  Yes.

25   Q.  And how about with respect to marketing?  Do you have any

1  responsibilities with respect to marketing?

2  A.  No.

3  Q.  And was that true at the time of your deposition?

4  A.  Yes.

5  Q.  Is that true today?

6  A.  Yes.

7  Q.  In fact, your testimony to the jury today about the

8  marketing brand, is this the first and only time Omega has

9  asked you to speak about brand marketing and promotion issues?

10 A.  Yes.

11 Q.  You've never done so at all?  It's not part of your job,

12 correct?

13 A.  Correct.

14 Q.  You have other colleagues whose job it is?

15 A.  Yes.

16 Q.  Several?

17 A.  Yes.

18 Q.  Do you know if they were unavailable today?

19         MR. NOYES:  Objection, your Honor.

20         THE COURT:  Sustained.

21 BY MR. SCHICK:

22 Q.  But, again, other than today, you've never been asked by

23 Omega to speak about any brand marketing or promotion efforts,

24 correct?

25 A.  Correct.

1   Q.  Now, you spent some time looking at the watch that is

2   PX100.  I just want to ask you.  At your deposition you

3   testified -- well, you testified this morning that you hadn't

4   seen the watch until the summer of 2017, correct?

5   A.  Yes.

6   Q.  And when was this case filed; do you recall?

7   A.  I don't know.

8   Q.  I represent that it was in 2012.

9          Okay.  Now, at any time in 2012 did anybody at Omega

10  or any law firm working with them ask you to evaluate the

11  watch?

12  A.  No.

13  Q.  How about in 2013?

14  A.  No.

15  Q.  2014?

16  A.  No.

17  Q.  First time in 2017, correct?

18  A.  Yes.

19  Q.  Now, how did you first learn that you were going to be

20  asked about the watch?

21  A.  I was contacted by Joshua Paul.

22  Q.  And did he tell you at the time that a case had been filed

23  already?

24  A.  No.

25  Q.  So, at the time he told you, you didn't know there was a

J2RLOME2                         Foster - Cross

1   lawsuit pending?

2   A.  No.

3   Q.  And what did he tell you at that call?

4           MR. NOYES:  Your Honor, objection.

5           THE COURT:  Sustained.

6   BY MR. SCHICK:

7   Q.  Mr. Foster, do you recall you testified under oath in 2017

8   at your deposition?

9   A.  Yes.

10  Q.  And do you recall that you didn't know whether the --

11  withdrawn.

12      Do you recall you testified it was possible that the watch

13  you were shown at the deposition could have been manufactured

14  in 2015?

15  A.  Yes, could have been.

16  Q.  That's what you said at your deposition, correct?

17  A.  Yes.

18  Q.  And you said it could have been manufactured in 2014,

19  correct?

20  A.  Yes.

21  Q.  Or it could have been manufactured in 2013, correct?

22  A.  Possibly.

23  Q.  And as you sit here today, do you have any knowledge about

24  who sold that watch?

25  A.  No.

```
 1   Q.  And do you have any knowledge about where that watch was

 2   sold?

 3   A.  I had knowledge.

 4   Q.  You had personal knowledge of where it was sold?

 5   A.  No.

 6   Q.  You have none, correct?

 7   A.  Correct.

 8   Q.  Now, you testified before about you have been contacted by

 9   a sheriff's department with respect to a counterfeiting ring

10   and a distributor in Florida, right?

11   A.  Yes.

12   Q.  And, of course, you and your colleagues at Omega

13   cooperated, correct?

14   A.  Yes.

15   Q.  Now, as far as you recall, were you ever told in 2012 by

16   the lawyers who represent Omega that there was a lead on a

17   distributor of counterfeit Omega watches?

18           MR. NOYES:  Objection, your Honor.

19           THE COURT:  Sustained.

20   BY MR. SCHICK:

21   Q.  Did you ever look at the inside of this watch?

22   A.  No, I didn't.

23   Q.  And does the watch movement relate to the inside of the

24   watch?

25   A.  Yes, it does.
```

1   Q.  So, you have no knowledge about watch movement as you sit

2   here today -- of Exhibit 100?

3   A.  I had knowledge of it.

4   Q.  But you haven't looked at it?

5   A.  I haven't looked at it.

6   Q.  At the watch movement.  Okay.

7              MR. SCHICK:  Can we pull up what you were shown by

8   Mr. Noyes as PX-3 Omega.

9              I'm sorry.  Show PX-5 first.  I'm sorry.  And if you

10  go to the next page.

11  Q.  Is it correct that the trademark reflected here is simply

12  the word "Omega?"

13  A.  Yes.

14  Q.  And let's go to PX-2 -- PX-3, I'm sorry.

15             THE COURT:  What's the question?

16             MR. SCHICK:  If you could look at the first page where

17  it says -- not that page.  The next page of the trademark

18  itself.

19  Q.  It says, "The trademark consists of the arbitrary sign of

20  the last letter of the Greek alphabet," correct?

21  A.  Yes.

22  Q.  Which appears and is generally shown as a company with the

23  word omega?"

24  A.  Yes.

25  Q.  So, over here the trademark is the Greek sign plus the word

1    omega sometimes, and sometimes without the word omega?

2    A.  Yes.

3    Q.  But generally with the word omega -- correct -- is what it

4    says here?

5    A.  Generally, yes.

6    Q.  So, the first one that we saw, right, PX-5, was just the

7    word omega.  The second one, PX-3, is the Omega symbol

8    generally with the word omega correct?

9    A.  Yes.

10             THE COURT:  The letter omega.

11             MR. SCHICK:  The letter omega.  Thank you, your Honor.

12   A clearer way of saying it.  Thank you, your Honor.

13             THE COURT:  What's the question?

14   Q.  PX4 is the combination of the letter omega and the word

15   omega, correct?

16   A.  Yes.

17   Q.  So, the trademark showing PX4 is the same one that is

18   generally the way it's shown in PX-3, right?  The omega letter

19   with the word omega, correct?

20             MR. NOYES:  Objection, your Honor.

21             THE COURT:  What's your objection?

22             MR. NOYES:  There's different trademarks.  He's asking

23   him to testify about legal issues relating to trademarks.

24             MR. SCHICK:  He's their expert.

25             JUROR:  Overruled.

1                MR. SCHICK:  Thank you, your Honor.

2                THE WITNESS:  The question again?  I'm sorry.

3                MR. SCHICK:  Sure.

4     BY MR. SCHICK:

5     Q.  The symbol you're seeing in front of you is PX4, right?

6     A.  Yes, it is.

7     Q.  And we just said that PX-3 -- and the one in front of you,

8     PX4, that trademark has the letter -- the Omega letter and the

9     word, correct?

10    A.  Yes, it does.

11    Q.  And you just said that the prior one we saw, PX-3-3, is

12    also the letter omega and the word "omega," correct?

13    A.  Yes.

14    Q.  So, what's the difference between PX4 and PX-3?

15               MR. NOYES:  Objection, your Honor.

16               THE COURT:  Sustained.

17               THE WITNESS:  The difference --

18               THE COURT:  You can't answer.

19    BY MR. SCHICK:

20    Q.  And with respect to PX-5, which is the word "omega,"

21    correct?  Just the word "omega."

22    A.  Yes.

23    Q.  Is the word "Omega," as it appears in PX-5, any different

24    than the word "Omega" as it appears in PX-3?

25    A.  No.

J2RLOME2                         Foster - Cross

1    Q.   It's all the same, correct?

2    A.   Omega is Omega.

3    Q.   Yes.  The word "Omega" doesn't appear differently in any of

4    the three trademarks that you were shown, correct?

5    A.   No.

6    Q.   And the symbol doesn't appear -- the omega letter doesn't

7    appear differently in any of the three trademarks you were

8    shown, does it?

9    A.   No.

10   Q.   Now, do you recall how you first came to be contacted by

11   Mr. Paul in the summer of 2017?

12   A.   I believe it was just a quick phone call.

13   Q.   Directly from him?

14   A.   Initially, no.  I received a note from our attorney that

15   I'd be getting a call from Mr. Paul.

16   Q.   And did that note indicate that there was a lawsuit pending

17   about alleged counterfeit sale?

18   A.   No.  Just said he would call.

19   Q.   Did it say it was about a lawsuit?

20   A.   No.

21   Q.   So, your testimony is that when Mr. Paul called you in the

22   summer of 2017, he did not know whether the watch he was

23   showing you was counterfeit?

24   A.   You're asking me if the lawyer knew if it was counterfeit?

25   Q.   Correct.

1    A.  I wouldn't know.

2    Q.  You met with him, didn't you?

3    A.  Yes.

4    Q.  And you discussed it with him, didn't you?

5    A.  Yes.

6    Q.  And during your meeting and discussion, did he indicate at

7    all whether he thought or knew the watch was counterfeit?

8            MR. NOYES:  Objection, your Honor.

9            THE COURT:  Sustained.

10   Q.  Now, I think you said, Mr. Foster, that you occasionally

11   get contacted by customers with regard to whether the watch

12   they purchased is authentic or counterfeit?

13   A.  Yes.

14   Q.  And in your 15 years, were you ever contacted by someone --

15   you or your department ever contacted by someone who said they

16   bought a watch on Canal Street and they wanted you to determine

17   whether it's authentic?

18   A.  No, not that I recall.

19   Q.  Okay.  How many calls or contacts about counterfeit do you

20   get a year, roughly?

21   A.  It would be difficult to say.  We don't keep track of the

22   calls that way.

23   Q.  And just to go back for a moment to the issue of the notes

24   that Mr. Noyes asked you about.

25           You said you were with a lawyer that morning?

 1  A.  Yes.

 2  Q.  And, in fact, was it two lawyers who -- were you prepared

 3  for the deposition that morning?

 4  A.  I'm sorry.  Say again?

 5  Q.  Were you meeting that morning to prepare for your

 6  deposition?

 7  A.  No.

 8  Q.  You were just meeting them before the deposition?

 9  A.  I was meeting them because I didn't know exactly where the

10  law office was, and that was where we decided to meet.

11  Q.  And who's the "them?"

12  A.  It was Jess Collen.

13  Q.  And who else?

14  A.  Nobody else.

15  Q.  And who was present at your deposition?  Was Mr. Paul or

16  Mr. Collen present?

17  A.  Mr. Collen was there from the beginning, and Mr. Paul

18  showed up about halfway through.

19  Q.  And do you recall in your deposition that Mr. Collen

20  directed you not to answer several questions?

21  A.  Yes.

22  Q.  And do you remember the topics of the questions he directed

23  you not to answer?

24  A.  I don't recall.

25  Q.  But did you answer the questions under oath when I put them

1    to you at that time?

2    A.  Yes.

3    Q.  Did you answer the questions that Ms. Collen directed you

4    not to answer?

5    A.  No.

6    Q.  And at any time --

7              THE COURT:  There's something wrong with this

8    procedure because when you object and direct your witness not

9    to answer, that's a question that's preserved for ruling by the

10   Judge.

11   Q.  And were you ever asked at any time to preserve any notes

12   or documents related to this case?

13   A.  No.

14             MR. SCHICK:  Nothing further, your Honor.

15             MR. NOYES:  Redirect, your Honor?

16             THE COURT:  Yes.

17   REDIRECT EXAMINATION

18   BY MR. NOYES:

19   Q.  Mr. Foster, you were asked about the manufacturing of the

20   watch PX100?

21   A.  Yes.

22   Q.  Did you attempt to determine when that watch was

23   manufactured?

24   A.  I did.

25   Q.  You did?

1    A.  Oh, the counterfeit watch?

2    Q.  Yes.

3    A.  No.  Sorry.

4    Q.  Okay.  Let me ask you again.

5        PX100, you have in front of you?

6    A.  Yes, I do.

7    Q.  Did you make any attempt to determine when that watch was

8    manufactured?

9    A.  No, I didn't.

10   Q.  And then PX-9, the authentic Omega watch, did you make any

11   attempt to determine when that watch was available for sale?

12   A.  Yes, I did.

13   Q.  When was that?

14   A.  That was available for sale between -- I don't recall

15   exactly.  Between 2004 and 2010, is what I recall.

16   Q.  Would that watch have been available in 2012?

17   A.  It would have been.

18   Q.  Now, let's go back to the trademarks -- well, one more

19   question before we look at the trademarks.

20       Based on your experience identifying counterfeit watches,

21   do you need to look inside of the watch's movement to determine

22   whether or not it is counterfeit?

23   A.  No, you don't.

24   Q.  Why not?

25   A.  Because normally the external characteristics are the most

1    glaring points to tell you it's a counterfeit watch.

2              MR. NOYES:  Let's go back to Plaintiffs' Exhibit 3.

3    Can you just go to the front page of Plaintiffs' Exhibit 3

4    please?

5    Q.  Okay.  And do you see there it says "registered for a term

6    of 30 years from July 24th, 1994?"  Do you see that?

7    A.  I do.

8              MR. NOYES:  And let's go to the next page.  And then

9    at the very bottom of the column on the left, highlight the

10   word, Omega," Mr. Lam, the actual word.

11   Q.  "The word may be omitted without materially altering the

12   character of our trademark, the essential feature of which is

13   the Greek letter omega."

14             Do you see that?

15   A.  I do.

16   Q.  Now, let's look quickly at Plaintiffs' Exhibit No. 4 on the

17   front page.  Okay.

18       And do you see that under the date January 25th, 2009, "The

19   attached U.S. trademark registration 578041?"

20   A.  I do.

21   Q.  Do you see that?

22   A.  I do.

23   Q.  And then below that it says, "Registered for a term of 20

24   years from July 28th, 1953."  Do you see that?

25   A.  Yes.

1            MR. NOYES:  Okay.  Now, let's go to Plaintiffs'

2     Exhibit 5 on the first page.  And let's highlight the first

3     sentence under the date, please.

4     Q.  "The attached U.S. trademark registration 566370," do you

5     see that?

6     A.  Yes.

7     Q.  Okay.  And below that, it says, "Registered for a term of

8     20 years from November 4th, 1952."  Do you see that?

9     A.  Yes.

10    Q.  And then below that says, "Fourth renewal for a term of ten

11    years from November 4th, 2012."  Do you see that?

12    A.  Yes.

13    Q.  Okay.  And let's go to Plaintiffs' Exhibit No. 6.

14         Do you see where it says, "The attached U.S. trademark

15    registration 556602."  Do you see that?

16    A.  Yes.

17    Q.  It says, "Registered for a term of 20 years from

18    March 25th, 1952."  Do you see that?

19    A.  Yes.

20    Q.  And then, "Fourth renewal for a term of ten years from

21    March 25th, 2012."  Do you see that?

22    A.  Yes.

23    Q.  And if we just go back to PX-3 very briefly, the front

24    page.  It says, "The attached you U.S. trademark

25    reconsideration 25036?"

J2RLOME2                          Foster - Direct

1    A.  Yes.

2    Q.  And then, "Registered for a term of 30 years from

3    July 24th, 1894," do you see that?

4    A.  Yes.

5    Q.  And then, "A sixth renewal for a term of ten years from

6    July 24 of 2014."  Do you see that?

7    A.  Yes.

8    Q.  Thank you, Mr. Foster.  Nothing further.

9            MR. SCHICK:  Honestly, your Honor, I don't understand

10   the point of that.  I certainly have nothing to --

11           MR. NOYES:  Objection.

12           THE COURT:  Ignore that last bit.

13           Mr. Foster, you're excused.

14           (Witness excused)

15           THE COURT:  Call your next witness.

16           MS. MARKMAN GOSTIN:  The plaintiffs call Sharyn

17   Tritto.

18           THE COURT:  Good afternoon.

19           THE WITNESS:  Good afternoon.

20           THE COURT:  How are you?

21           THE WITNESS:  I'd be better if I were not here.

22   SHARYN TRITTO,

23       called as a witness by the Plaintiff,

24       having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

1   BY MS. MARKMAN GOSTIN:

2   Q.  Good afternoon, Ms. Tritto.

3   A.  Good afternoon.

4   Q.  What do you do for a living?

5   A.  I'm an attorney.

6   Q.  And where were you employed are from 2001 to 2014?

7   A.  A law firm.

8   Q.  And what law firm was that?

9   A.  Penn Proefriedt Schwarzfeld & Schwartz.

10  Q.  For purposes of this examination, if I just refer to that

11  as the Penn law firm, will you understand what I'm referring

12  to?

13  A.  Yes.

14  Q.  And where is the Penn law firm located?

15  A.  Now or then?

16  Q.  Then.

17  A.  114 West 47th Street.

18  Q.  In New York City?

19  A.  Yes.

20  Q.  And what type of law did you practice there?

21  A.  Real estate law.

22  Q.  And while you were an attorney at the Penn law firm, did

23  you represent the defendant in this case, 375 Canal LLC?

24  A.  Yes.

25  Q.  And have you ever represented the company, Omega SA?

1    A.   No.

2    Q.   And have you ever represented the Swatch Group?

3    A.   No.

4    Q.   So, I'd like to talk about some of the work you did at the

5    Penn law firm related to 375 Canal Street.

6         There's a binder to your left on the corner of the podium.

7    And if you could turn to the tab that says PX-138 on it please.

8    A.   Okay.

9    Q.   So, looking at Exhibit 138, that is an order for permanent

10   injunction on consent; is that right?

11   A.   That's what it says.  I'd have to read the document to tell

12   you exactly what it is.

13   Q.   Sure.  Feel free to flip through the pages.  Take your

14   time.

15   A.   That's one of the things that the agreement provides for.

16   Q.   And the plaintiff in that lawsuit was Louis Vuitton; is

17   that right?

18   A.   Yes.

19   Q.   And the defendants were 375 Canal Street?

20          MR. DELLA FERA:  Objection, your Honor.  I just wanted

21   to raise the objection that there are other entities listed in

22   this document.

23          THE COURT:  It's overruled.

24   BY MS. MARKMAN GOSTIN:

25   Q.   And the defendants in that lawsuit were 375 Canal Street

1  LLC and others; is that correct?

2  A.  Yes.

3  Q.  And your firm, the Penn law firm, represented 375 Canal

4  Street LLC in that lawsuit; is that right?

5  A.  Yes.

6          MS. MARKMAN GOSTIN:  Plaintiff offers Exhibit 138.

7          MR. DELLA FERA:  No objection, your Honor.

8          THE COURT:  138 is in evidence.

9          (Plaintiffs' Exhibit 138 received in evidence)

10  Q.  And looking at the first page of this document, it was

11  filed on January 17, 2006; is that right?

12  A.  That's what it says.

13  Q.  Was this lawsuit about the sale of counterfeit Louis

14  Vuitton products?

15  A.  Well, it says it appeared to be engaging in the sale, so I

16  don't really know how to answer your question.

17  Q.  Okay.  Well, you'd need to read the document further to

18  figure it out, correct?

19  A.  Yes.

20  Q.  Okay.  So, you can put that document away.  And if you

21  could now turn no your binder to PX-164, please.

22  A.  Okay.

23  Q.  And this is a letter to you, dated July 17th, 2006; is that

24  right?

25  A.  Yes.

1   Q.  And it was set from the law firm of Arent Fox to you?

2   A.  Yes.

3   Q.  And it was sent by email and by fax?

4   A.  That's what it says.

5   Q.  And you received this letter; is that right?

6   A.  The letter was sent 13 years ago.  I can't sit here today

7   and tell you that I absolutely received the letter.  But I have

8   no reason to believe I didn't.  But I have no idea.

9   Q.  Okay.  So, just to clarify, you have no reason to doubt

10  that you received the letter; is that right?

11  A.  I have no way of knowing really one way or the other as I

12  sit here right now.

13           THE COURT:  You have the presumption that when a

14  letter is mailed, it is delivered?

15           THE WITNESS:  Absolutely.

16           THE COURT:  You believe this is outside that

17  presumption?

18           THE WITNESS:  Well, the letter says it was emailed and

19  faxed.

20           THE COURT:  So, as you sit here now, do you have a

21  doubt --

22           THE WITNESS:  Sorry.

23           THE COURT:  -- based on the fact that you did not

24  receive this letter?

25           THE WITNESS:  I don't --

1           THE COURT:  You just don't know?

2           THE WITNESS:  I assume I received it, but I cannot say

3    with certainty one way or the other.

4           THE COURT:  All right.  That's the best she can do.

5           MS. MARKMAN GOSTIN:  All right.  Plaintiff offers 164.

6           MR. DELLA FERA:  Your Honor, objection.

7           THE COURT:  It's overruled.

8           MR. DELLA FERA:  Your Honor, just if I may?

9           THE COURT:  It's overruled.

10   BY MS. MARKMAN GOSTIN:

11   Q.  So, looking at the first sentence of this letter, it says,

12   We write further to advise you of additional purchases of

13   illegal counterfeit merchandise at many of the above-referenced

14   properties that are subject to the terms of the permanent

15   injunction."

16        Did I read that correctly?

17   A.  Yes.

18   Q.  Then below that it says, "Investigators made purchases of

19   counterfeit Louis Vuitton and/or Burberry merchandise at 375

20   Canal Street."

21        And did I read that correctly?

22   A.  Yes.

23   Q.  And then below that, it says, "The details of the purchases

24   are set forth below."  And then it says, "375 Canal Street:

25   Purchases of counterfeit Louis Vuitton were made at 375 Canal

1    Street on June 23rd and July 1, 2006."

2              Do you see that?

3    A.  Yes.

4    Q.  Okay.  You can put that document away.

5        Could you please now turn in your binder to Plaintiffs'

6    Exhibit 44.

7    A.  Okay.

8    Q.  And this is an email chain; is that correct?

9    A.  Yes.

10   Q.  And the first email in the chain is from you to Courtney

11   Browning and Brian Brokate; is that right?

12   A.  Yes.

13   Q.  And then the second email is from Courtney Browning to you,

14   dated December 19th, 2008; is that right?

15   A.  Yes -- 2006.

16   Q.  My apologies.  2006?

17   A.  Yes.

18   Q.  And then if you turn to the other pages, there are two

19   receipts for counterfeit receipts; is that right?

20   A.  Not exactly.  So, there's one page that lists items that

21   were, I guess, allegedly seized.  There's another one that says

22   "documents."  I have no idea what that is.

23   Q.  But the first one that was a receipt was an alleged

24   receipts; is that right?

25   A.  Yes.

1   Q.  Okay.  And you don't have any reason to doubt that you

2   received this email and these attachments from Courtney

3   Browning; is that right?

4   A.  Correct.

5          MS. MARKMAN GOSTIN:  Plaintiff offers Exhibit 44.

6          MR. DELLA FERA:  Your Honor, I would just register my

7   objection even though I can see your ruling coming.

8          THE COURT:  Overruled.

9   BY MS. MARKMAN GOSTIN:

10  Q.  If you could look at the email from Ms. Browning to you,

11  please.

12  A.  Okay.

13  Q.  And it says, "Hi Sharyn, we conducted seizures at 300 and

14  375 Canal Street on December 13th, 2006.  Copies of the

15  receipts are attached for your review."

16     Do you see that?

17  A.  Yes.

18  Q.  And then if you turn to the first attachment, it says at

19  the top, "Receipt for counterfeit goods seized?"

20  A.  Yes.

21  Q.  And then under "address," it lists 375A Canal Street.  Do

22  you see that?

23  A.  Yes.

24  Q.  And then under the description, the first two rows say, "16

25  Rolex watches."  And then the second row says, "eight Movado

1    watches."

2         Do you see that?

3    A.   Yes.

4    Q.   Thank you.  You can now close that document.

5         Now if you could turn to PX-47.

6    A.   Okay.

7    Q.   This is another email chain; is that right?

8    A.   Yes.

9    Q.   And the bottom email is from Courtney Browning to you,

10   dated March 8th, 2007; is that right?

11   A.   Yes.

12   Q.   And the top email is your response to Ms. Browning?

13   A.   It appears to be, yes.

14   Q.   The top email is an email from you to Ms. Browning; is that

15   right?

16   A.   That's correct.

17   Q.   Okay.  And, again, you don't have any reason to doubt that

18   you exchanged these emails with Ms. Browning?

19   A.   No.

20             MS. MARKMAN GOSTIN:  Plaintiffs offer Exhibit 47.

21             MR. DELLA FERA:  Your Honor, I would just register for

22   the record this Exhibit and other remaining exhibits, that we

23   object to any other building.  I say that now so I don't

24   disrupt Ms. Gostin.

25             THE COURT:  Objection's noted and overruled.

1          MR. DELLA FERA:  Thank you, your Honor.

2          THE COURT:  You're asking about 375 Canal Street.

3    BY MS. MARKMAN GOSTIN:

4    Q.  So, looking at the bottom email from Ms. Browning to you,

5    it says, "Our investigators also made observations of

6    counterfeit merchandise on 1/13/07 at the following locations:

7    375A Canal Street:  The outside right console openly displayed

8    100 pieces of Tiffany jewelry.  A counterfeit Tiffany ring was

9    purchased from an Asian female vendor at the location."

10         Did I read that correctly?

11   A.  Yes.

12   Q.  PX-39.

13   A.  Okay.

14   Q.  And this is a letter from Bryan Brokate to you; is that

15   right?

16   A.  Yes.

17   Q.  And you, again, have no reason to doubt that you received

18   this letter?

19   A.  I mean, I have no way of knowing one way or the other.  And

20   the letter doesn't say how it was sent.

21   Q.  But you have no reason to think that you never received

22   this letter?

23   A.  I have no reason to really think one way or the other about

24   this letter.

25         MS. MARKMAN GOSTIN:  Plaintiffs offer Exhibit 79.

1            MR. DELLA FERA:  Objection.  This is a hearsay

2      document.  There's no proof of mailing.  There's not even a

3      stamp indicating how it may have been mailed.  So, therefore,

4      there's no exception to hearsay.

5            THE COURT:  Overruled.

6            MR. DELLA FERA:  Your Honor, if I may?  I'm not

7      rearguing the ruling, I just --

8            THE COURT:  It's overruled.  We're not -- we're trying

9      to conduct a trial.  The objections are made and ruled on.

10     Please sit down.

11           MR. DELLA FERA:  Yes, your Honor.

12           MS. MARKMAN GOSTIN:  Can we publish to the jury,

13     please?

14           THE COURT:  Yes.

15     BY MS. MARKMAN GOSTIN:

16     Q.  So, the date of this letter is June 26, 2009.  Do you see

17     that?

18     A.  Yes.

19     Q.  And part of the subject of this email is:  375 Canal

20     Street; is that right?

21     A.  Yes.

22     Q.  And then the letter says, "As you are aware, we have been

23     notifying you of the illegal counterfeiting activities

24     occurring at your client's premises since 2004.  On June 24th,

25     2009, the Mayor's Office of Special Enforcement and NYPD

1    conducted enforcement actions, including nuisance abatement and

2    court-ordered closings at several locations in China Town.  As

3    you undoubtedly know, your client's properties at 327 Canal

4    Street and 375 Canal Street were among the buildings shut down

5    during those actions."

6        Did I read that correctly?

7    A.  Yes.

8    Q.  Do you recall whether there was, in fact, such an action by

9    the mayor's task force involving 375 Canal Street and others?

10   A.  No, I do not.

11   Q.  And if you could now turn in your binder to Plaintiffs'

12   Exhibit 147, which is already in evidence.

13            MS. MARKMAN GOSTIN:  So, if we can publish this to the

14   jury, please.

15            THE WITNESS:  Okay.

16   BY MS. MARKMAN GOSTIN:

17   Q.  This is a stipulation of settlement between the City of New

18   York and 375 Canal Street LLC and other defendants; is that

19   correct?

20   A.  Yes.

21   Q.  And turning to the last page --

22   A.  Yes.

23   Q.  -- you signed this document on behalf of 375 Canal Street

24   LLC and the land and building notice, 375 Canal Street, New

25   York, NY.  Is that correct?

1    A.  Yes.

2    Q.  And the date of your signature is August 11, 2009?

3    A.  Yes.

4    Q.  Turning to page two.

5    A.  Yes.

6    Q.  "It says, It is hereby stipulated and agreed by and between

7    the plaintiff and 375 Canal as follows."

8        Do you see that?

9    A.  Yes.

10   Q.  And then turning to the next page, it says in paragraph

11   five, "The premises located within defendant The Land and

12   Building known as 375 Canal Street, Tax lot 228, Tax lot 10,

13   County of New York and State of New York, shall be permanently

14   and perpetually enjoined as a place where violations of either

15   the New York State Penal Laws, or any of the provisions

16   enumerated within Sections 7-703 of Title 7 of the New York

17   City Administrative Code."

18       Do you see that?

19   A.  Yes.

20   Q.  And that's something that your client agreed to in this

21   document?

22   A.  That is correct.

23           MS. MARKMAN GOSTIN:  Now, if you could please turn to

24   the next page Mr. Lam.

25           And going down to paragraph eight, please.  It says

1   here, "375 Canal, or the subsequent tenant, shall dismantle and

2   remove all hidden storage facilities/structures inside the

3   premises to allow open access to all areas within the

4   storefront."

5          Did I read that right?

6   A.  Yes.

7   Q.  And, again, that's something your client agreed to in this

8   document?

9   A.  That is correct.

10  Q.  And then if you could turn to page six.  There are two

11  pages.  Paragraph 12, it says, "375 Canal shall have

12  professional course of conduct signs posted throughout the

13  premises.  Said signs shall inform patrons that the sale and/or

14  possession of either pirated or trademark counterfeit

15  merchandise will not be tolerated and may result in their

16  arrest.  Said signs shall be visible at all times and are to be

17  posted on or before August 15, 2009."

18         Is that correct?

19  A.  Yes.

20  Q.  And, again, this is something that 375 Canal Street agreed

21  to in this document?

22  A.  Yes.

23  Q.  And turning now to PX-90 in your binder.

24         MS. MARKMAN GOSTIN:  And this is already in evidence

25  as well, so we can publish this to the jury, please.

1    Q.  And this is a letter to 375 Canal Street, dated

2    September 28th, 2011; is that right?

3    A.  Yes.

4    Q.  And this letter was forwarded to you at some; is that

5    correct?

6    A.  I believe so, yes.

7    Q.  And you responded to this letter on the behalf of 375 Canal

8    Street; is that right?

9    A.  I believe so.

10   Q.  If you could turn in your binder, please, to PX-91.

11            MS. MARKMAN GOSTIN:  But let's not yet publish this to

12   the jury.  Thank you.

13   Q.  Looking at the bottom portion of this document, this is an

14   email that you sent to Jeffrey Lindenbaum; is that correct?

15   A.  Yes.

16   Q.  And this email was sent in response to the letter that we

17   just looked at in PX90?

18            MS. MARKMAN GOSTIN:  Plaintiff offers Exhibit 91.

19            MR. DELLA FERA:  No objection.

20            THE COURT:  91 is in evidence.

21            (Plaintiffs' Exhibit 91 received in evidence)

22   BY MS. MARKMAN GOSTIN:

23   Q.  And the subject of your email was 361 and 375 Canal Street;

24   is that right?

25   A.  Yes.

1    Q.  And the first two sentences say, "This firm represents the

2    landlord of the above-referenced premises.  Your letters

3    regarding the same have been forwarded to me for a response."

4         Did I read that correctly?

5    A.  Yes.

6    Q.  And then skipping the third sentence, the sentence that

7    starts with "respect," says, "With respect to 375 Canal,

8    apparently the tenants sublet the space to an entity that was

9    selling counterfeit goods bearing your client's trademarks.

10   Please advise that the tenants may not sublet the premises

11   without the landlord's consent.  I have been informed that the

12   tenant the tenant had the offending tenant removed."

13        Did I read that correctly?

14   A.  Yes, but I must tell you that I made a mistake in this

15   email.  And when I said "the offending tenant removed," I meant

16   subtenant.

17   Q.  Ms. Tritto, you didn't ask the tenant to ask 375 Canal to

18   vacate the property; is that correct?

19   A.  It appears from reading this email that I asked the tenant

20   to have the person that was allegedly engaging in the violation

21   removed.

22   Q.  And when did you discover the mistake in your email?

23   A.  As I look at it now.  Because, if you read the email, what

24   I wrote, it says that "the tenant sublet the space to an entity

25   that was selling counterfeit goods bearing your client's

```
 1   trademark."  And then it further says, "I've been informed that
 2   the tenant had the offending tenant removed."
 3            That makes no sense.
 4   Q.  But you didn't personally contact the tenant; is that
 5   correct?
 6   A.  No.  That's probably incorrect.  I probably did contact the
 7   tenant.
 8   Q.  Ms. Tritto, were you deposed in this case?
 9   A.  Yes.
10   Q.  And you swore under oath in that deposition that you would
11   testify truthfully?
12   A.  Yes.
13            MS. MARKMAN GOSTIN:  Would you please pull up
14   Ms. Tritto's deposition, page 46.
15            MR. SCHICK:  Not to everybody.  Just to her, right?
16            MS. MARKMAN GOSTIN:  You can put it on for the jury.
17            THE COURT:  No.  We can't put it up for the jury.
18            MS. MARKMAN GOSTIN:  Sorry.
19   BY MS. MARKMAN GOSTIN:
20   Q.  Ms. Tritto, it's also in your binder if that's easier.
21            THE COURT:  Your deposition.
22            THE WITNESS:  Do you know what number?
23            MS. MARKMAN GOSTIN:  It just says, "deposition
24   transcript" on the back.
25            THE WITNESS:  Okay.
```

1          THE COURT:  Page 46.

2          MS. MARKMAN GOSTIN:  Page 46, please.

3   BY MS. MARKMAN GOSTIN:

4   Q.  And starting at line eight, it says:

5   "Q.  After reviewing Tritto 2, does it refresh your

6   recollection as to what action was taken in response to Tritto

7   1?

8   "A.  The email I sent you was a response to your letter.  If

9   there was additional action, I don't recall.

10  "Q.  Do you recall, for example, if the tenant was asked to

11  vacate the property?

12  "A.  I would have to say that's privileged because I didn't ask

13  the tenant to do anything."

14          Did I read that correctly?

15  A.  Yes.

16          THE COURT:  What's the inconsistency with the prior

17  testimony?

18          MS. MARKMAN GOSTIN:  I believe Ms. Tritto just

19  testified that she did contact the tenant.

20          THE COURT:  Okay.

21          MR. DELLA FERA:  Your Honor, contacting the tenant is

22  not the same as asking the tenant.

23          THE COURT:  Okay.  The jury can sort this out.

24  BY MS. MARKMAN GOSTIN:

25  Q.  Other than sending your email, do you know what steps were

1   taken, if any, in response to Mr. Lindenbaum's letter?

2   A.  Based on the content of the email I believe that I reached

3   out to the tenant.

4   Q.  And what did you ask the tenant to do?

5   A.  I mean, I -- I can't tell you a hundred percent because

6   this was a very long time ago.  But I can tell you that, upon

7   receiving a letter with serious allegations, I would have --

8   and based on my response to Mr. Lindenbaum, I told the tenant

9   what the letter said and I told the tenant that they needed to

10  deal with this immediately.

11          And based on my response to Mr. Lindenbaum, I have to

12  assume that the tenant got with the other person that was

13  engaging in the counterfeiting.

14  Q.  But you don't have any recollection of that; is that right?

15  A.  Today, I do not.  But I would never have sent

16  Mr. Lindenbaum an email to the fact that I did if I didn't have

17  personal knowledge of something.

18  Q.  So, is it fair to say, Ms. Tritto, that that letter

19  demonstrates to you that you contacted the tenant; is that

20  right?

21  A.  I believe so, yes.  The email demonstrates to me that.

22  Q.  Yes.  The email?

23  A.  Yes.

24  Q.  And you were shown that email in your deposition; is that

25  correct?

1   A.  It appears so, yes.

2   Q.  And could you please turn in your deposition to page 36.

3   Starting at line 16 --

4   A.  Hold on a second.

5   Q.  Sure.  My apologies.

6   A.  Okay.

7   "Q.  Just to be clear, when you say 'I don't specifically

8   recall,' does that mean you have no recollection?  I just want

9   the record to be clear.  Do you have some recollection or not?

10  "A.  Other than responding to this letter, I don't have any

11  specific recollection as to what steps, if any, were taken."

12  Q.  Is that the answer that you gave in your deposition?

13  A.  That is correct.

14          MR. DELLA FERA:  Your Honor, again, I don't believe

15  there's an inconsistency.

16          THE COURT:  Agreed.

17  BY MS. MARKMAN GOSTIN:

18  Q.  Would you now turn into your binder to Exhibit 228?

19          MR. DELLA FERA:  Your Honor, I request respectfully a

20  side bar on this specific exhibit.  It will be very brief.

21          THE COURT:  Okay.

22          (Continued on next page)

23

24

25

1          (At sidebar)

2          THE COURT:  Never confront a witness with a

3    deposition.  You can't, in the middle of an examination, just

4    start reading from the deposition.

5          Yes.

6          MR. DELLA FERA:  Your Honor, we object to the

7    holdover.  There's no indication that this was ever filed or

8    signed.  It's arguably work product.  We think it's highly

9    prejudicial to show this work product to the witness.

10          And your Honor, the only other point I would make,

11    very briefly, is the evidence will show that this was dated

12    December 2012, and the tenant vacated in November of 2012,

13    prior to the date that this would have potentially even been

14    filed.  So, this is irrelevant.

15          MS. MARKMAN GOSTIN:  Your Honor, this document was

16    produced to us by the defendant.  And there's no objection to

17    it in the joint pretrial order.

18          THE COURT:  Well, it has nothing to do with

19    admissibility.

20          MS. MARKMAN GOSTIN:  Okay.  Also, this document

21    demonstrates that the tenant, the subtenant at least as of the

22    time this was drafted, was Rahman.  That's why we think it's

23    not a different subtenant.

24          THE COURT:  You'll have to cover this on cross.

25          (Continued on next page)

J2RLOME2                         Tritto - Direct

1   BY MS. MARKMAN GOSTIN:

2   Q.  Ms. Tritto, do you have 228 in front of you?

3   A.  Yes.

4   Q.  Okay.  This is a draft notice of petition holdover; is that

5   right?

6   A.  Yes.

7   Q.  And looking at the bottom right-hand corner of the first

8   page, you see that it has the name of the Penn law firm, the

9   full name; is that right?

10   A.  Yes.

11   Q.  And that's where you were employed in 2012; is that right?

12           MS. MARKMAN GOSTIN:  Plaintiff offers PX-228.

13           THE COURT:  Received.

14           MR. DELLA FERA:  For the record, I object, your Honor.

15           THE COURT:  The objection's overruled.

16           (Continued on the next page)

17

18

19

20

21

22

23

24

25

1   BY MS. MARKMAN GOSTIN:

2   Q.  If you could look at the caption on the first page of the

3   document, please?

4   A.  Yes.

5   Q.  It says 375 Canal LLC, petitioner, listed as the

6   petitioner-landlord on this document, is that correct?

7   A.  Yes.

8   Q.  And then it says T.A. Discount Store as the

9   respondent-tenant, is that correct?

10  A.  Yes.

11  Q.  And then it says Sayed Rahman and XYZ Corp. as the

12  respondent-undertenants, is that correct?

13  A.  Yes.

14  Q.  And undertenant is another word for subtenant?

15  A.  It -- undertenant could be the -- it could be anyone that

16  might be occupying the premises, not necessarily, though.

17  Q.  But it could include a subtenant?

18  A.  That's correct.

19  Q.  And if you look at the bottom of the page, the date --

20  there's a blank, but it says December blank 2012, is that

21  correct?

22  A.  Yes.

23          MS. MARKMAN GOSTIN:  Thank you, Ms. Tritto.  I don't

24  have any other questions.

25          MR. DELLA FERA:  Your Honor, we have binders for the

1  witness.

2          THE COURT:  Sure.

3          MR. SCHICK:  Mr. Della Fera is putting me to work, and

4  I'm enjoying it, your Honor.

5  CROSS-EXAMINATION

6  BY MR. DELLA FERA:

7  Q.  Good afternoon, Ms. Tritto.

8  A.  Good afternoon.

9  Q.  Ms. Tritto, you testified that you're with the Penn law

10  firm, correct?

11  A.  Yes.

12  Q.  And you testified that you do landlord-tenant work, is that

13  right?

14  A.  I don't think I testified to that, but that is correct.

15  Q.  I'm sorry.  You said real estate.

16  A.  Yeah.

17  Q.  Real estate, does that include landlord tenant --

18  A.  That is correct.

19  Q.  Do you do a lot of work involving any --

20          MR. DELLA FERA:  Excuse me.  I grabbed the wrong

21  document, your Honor.  I just want to grab the correct one.

22          THE COURT:  Sure.

23  Q.  Do you handle any complaints about counterfeits or

24  trademark infringement as part of your practice?

25  A.  I'm not sure what you mean by that.  I don't do trademark

1   or copyright law.

2   Q.  You receive complaints, but you don't engage in trademark

3   or copyright law, correct?

4   A.  That is correct.

5   Q.  Ms. Tritto, in the phase of your landlord-tenant work, you

6   often -- do you ever engage in proceedings to remove tenants

7   from buildings?

8   A.  Yes.

9   Q.  And those proceedings are here in New York City, is that

10  correct?

11  A.  Well, all in -- in many of the counties, in the five

12  boroughs.

13  Q.  So some of those are here in Manhattan?

14  A.  Yes.

15  Q.  And can you take a letter, like the letter that was sent to

16  you by Jeffrey Lindenbaum, which is PX-90, can you bring that

17  to court and have an order to evict a tenant on the basis of

18  that letter?

19  A.  Absolutely not.

20  Q.  And why not?

21  A.  Because the letter is filled with allegations that are not

22  supported by admissible evidence, and if I brought that letter

23  to a judge when I was seeking to evict a tenant based upon an

24  allegation of the sale of counterfeit goods, the judge would

25  look me in the eye and say, Counselor, you know better.

1      So in order for me to have a proceeding where I'd be

2  successful, I would need declarations.  I'd need the actual

3  goods sold.  I'd need the person that seized the goods to

4  authenticate that they were, in fact, counterfeit.  I'd need a

5  whole host of evidence in order to be successful in evicting a

6  tenant.

7  Q.  Thank you, Ms. Tritto.

8      Are there any actions that a tenant can take to prolong

9  eviction proceedings in New York?

10 A.  Absolutely.

11 Q.  What sort of actions can they take?

12 A.  Well, if a tenant is *pro se* but they're a corporation, then

13 they need to be represented by counsel, so the first court

14 appearance would involve the tenant requesting a postponement

15 to seek counsel.  The second court appearance, the attorney

16 could come in and say I was just retained, I need to get up to

17 speed on the case.

18     Then the third court appearance, I get an answer which

19 might have a whole host of technical defenses because landlord

20 tenant law is very statutory, so it lends itself to technical

21 defenses, and sometimes you never even get to the merits

22 because tenants' attorneys bring up all these technical

23 defenses, and a lot of the judges are tenant-friendly, so

24 they're not so thrilled about evicting a tenant, so it takes a

25 very long time to actually evict a tenant.

1   Q.  You said that the first appearance they can take an action

2   to delay.  When would the first appearance occur?

3   A.  When you serve a tenant with a holdover proceeding, the

4   papers that you serve the tenant with have an actual court date

5   on them.

6   Q.  And typically, when would that court date be from --

7           MR. DELLA FERA:  Let me restate the question.

8   Q.  From the date that you serve the initial document, the

9   petition, when would the court date be scheduled?

10  A.  Probably no more than two weeks after the tenant is served

11  with the papers.

12  Q.  And I want to back up a bit.  Can you serve a tenant with

13  the petition right away, without doing anything first?

14  A.  No.  So typically what you would do is serve a tenant with

15  a notice to cure, where you set forth all of the facts that

16  serve the basis for the violation under the lease, which in

17  this case, would be the allegation that they're engaging in the

18  sale of counterfeit goods, and the notice to cure would follow

19  the lease.  So if the lease says you have to serve a five-day

20  notice to cure or ten-day notice, whatever that might be, and

21  once the time set forth in the notice to cure expires, you

22  could then serve a notice of termination.

23      But before you serve the notice of termination, you would

24  have to inquire from someone with knowledge whether, in fact,

25  the tenant cured or not.  So I would have to call one of the

1    attorneys who represents one of the trademark holders or call

2    the civil enforcement unit at the New York Police Department

3    and ask them whether they have any additional evidence that the

4    tenant subsequently engaged in the sale of counterfeit goods.

5    Q.  So sometimes eviction proceedings will result because the

6    tenant hasn't paid their rent, correct?

7    A.  Yes, but that's a completely different type of proceeding.

8    Q.  And when a tenant doesn't pay their rent, the landlord can

9    provide the evidence that the rent hasn't been paid as part of

10   that notice-to-cure process, correct?

11   A.  Well, the landlord would have personal knowledge as to

12   whether or not the tenant paid, so that's much more simple.

13   Q.  But when it's counterfeit goods, the landlord might not

14   have any personal knowledge about whether or not there are

15   specific counterfeit goods that are being sold, is that

16   correct?

17   A.  That is correct.

18   Q.  So it would take a little bit longer in the context of a

19   counterfeit goods case than it might in the context of a

20   nonpayment-of-rent case, is that fair to say?

21   A.  Well, it would probably take a lot longer, because the

22   landlord would have to rely on a third party go get the

23   evidence to support its claims.

24   Q.  Ms. Tritto, I'd like to take you through some of the

25   documents that Ms. Gostin discussed with you.  First, we'll

1    start with PX-138.

2                MR. DELLA FERA:  Could we pull that up, Sarah?

3                THE WITNESS:  Is that in the --

4                MR. DELLA FERA:  It should be in the binder I provided

5    you.

6                THE WITNESS:  Oh, OK.

7                THE COURT:  Your binder or Ms. Gostin's?

8                MR. DELLA FERA:  I believe it's in both, your Honor.

9                THE COURT:  OK.  What's the number, Mr. Della Fera?

10               MR. DELLA FERA:  138.  PX-138.

11               THE COURT:  OK.

12   BY MR. DELLA FERA:

13   Q.  Do you have that in front of you, Ms. Tritto?

14   A.  Wait one second.

15       Yes.

16   Q.  Now, looking at page 1, you testified that this was an

17   agreement between Louis Vuitton Malletier -- I may be

18   pronouncing that incorrectly -- and 375 Canal LLC and other

19   entities, correct?

20   A.  Yes.

21   Q.  375 Canal LLC does not own those other entities, as far as

22   you know, does it?

23   A.  No, it does not.

24   Q.  And looking at this agreement, and if you could, and if you

25   recall, is there anything in this agreement that requires that

1  tenants be removed?

2  A.  So, it appears that the current tenant, whoever that was,

3  did not have to be removed, and pursuant to paragraph 8, if the

4  landlord was told by the plaintiff that there was some illegal

5  activity, then the landlord would take steps to address it.

6  Q.  Subsequent to the agreement, correct?

7  A.  Correct.

8  Q.  Subsequent to the settlement agreement?

9  A.  Yes.

10  Q.  I'd like to now go to PX-164, which you also reviewed with

11  Ms. Gostin.

12          MR. DELLA FERA:  And which, your Honor, is in the

13  binder that I provided as well.

14  A.  OK.

15  Q.  Do you have that in front of you?

16  A.  Yes.

17  Q.  Now, this is a letter to 375 Canal LLC and -- or to you

18  regarding 375 Canal Street and other properties, correct?

19  A.  Yes.

20  Q.  375 Canal LLC does not own any of those other properties?

21  A.  No.

22  Q.  I'd like to direct you to the line on the first page that

23  says 375 Canal Street.

24  A.  Yes.

25  Q.  Do you see the first bullet point listed below 375 Canal

J2rWome4                         Tritto - Cross

1   Street?

2   A.  Yes.

3   Q.  And it states that there was -- I'm going to read the

4   second sentence in that first bullet point:  "Upon reaching the

5   bottom of the stairs, the investigator encountered an Asian

6   female known as 'Shirley' with whom investigator had dealt

7   previously."  Did I read that correctly?

8   A.  Yes.

9   Q.  And so this investigator was able to report the name of the

10  person who was providing counterfeit goods, is that correct?

11  A.  Yes.

12  Q.  If you look at the second bullet point on that same page --

13  A.  Yes.

14  Q.  -- you also see that this same clerk is listed as Shirley?

15  A.  Yes.

16  Q.  And does this letter indicate that there are any Omega

17  goods being sold at 375 Canal Street?

18  A.  No.

19  Q.  And did the settlement agreement with Louis Vuitton -- I

20  think that was PX-138, did that indicate anything about Omega

21  goods being sold at 375 Canal Street?

22  A.  No.

23  Q.  I'd next like to direct you to PX-47, another document that

24  you reviewed with Ms. Gostin.

25  A.  OK.

1   Q.   Do you have that in front of you?

2   A.   Yes.

3   Q.   And looking at PX-47, you wrote that, at the top of the

4   page:  "The lease for 375A expires at the end of this month.  I

5   will be seeking possession."

6   A.   Yes.

7   Q.   Did I read that correctly?

8   A.   Yes.

9   Q.   Then you wrote, "Please provide seizure vouchers if you

10  have them."  Why did you write that?

11  A.   Well, as I explained to you a little while ago, in order

12  for the landlord to be successful in seeking the eviction of

13  any tenant alleged to be selling counterfeit goods, I would

14  need evidence to that effect.  So if I got the seizure

15  vouchers, then I could review them, see what was taken, find

16  out more information and go from there to, perhaps, bring a

17  holdover proceeding against the tenant.  But I need the backup

18  information.

19  Q.   And you said in this email that you would be seeking

20  possession of the premises, is that right?

21  A.   So, the email says that the lease expires at the end of

22  this month, I guess meaning the end of March.  It's much easier

23  to evict a tenant based on the fact that their lease expired

24  because by operation of the fact that the lease expired, the

25  tenant no longer has any right to remain in possession of the

1    space beyond the term of their lease, so all I need to do is go

2    into court, show the judge the lease expired, and I can be

3    successful.  Whereas when there's an allegation that

4    counterfeit goods were sold in the space, I need, as I

5    explained to you earlier, all of the backup information from

6    third parties.

7        So to make your analogy, a lease-expiration case is much

8    similar to a nonpayment case, because the landlord will possess

9    all of the information in its office rather than have to rely

10   on a third party for additional information.

11   Q.  Thank you for that, Ms. Tritto.

12       I want to focus on one other aspect of this email.  The

13   email says, "The lease for 375A expires at the end of the

14   month."  Is that right?

15   A.  Yes.

16   Q.  What is 375A, if you know?

17   A.  I have no idea.

18   Q.  Is --

19   A.  I mean, I assume it's part of 375 Canal.

20           MR. DELLA FERA:  Your Honor, just one -- 15 seconds,

21   if I may?

22           THE COURT:  Go ahead.

23   BY MR. DELLA FERA:

24   Q.  Ms. Tritto, I'd like you to move to the part of your binder

25   that is PX-140.

1    A.  OK.

2    Q.  In PX-47, you were discussing how you were going to remove

3    the tenant, correct?  Once the lease expired, is that correct?

4    A.  Yes.

5    Q.  Now, PX-140 is a settlement agreement that 375 Canal LLC

6    entered into with the city of New York, is that right?

7    A.  Yes.

8             MR. DELLA FERA:  Your Honor, I believe PX-140 has

9    already been admitted into evidence.

10            MS. MARKMAN GOSTIN:  That's our understanding, your

11   Honor.  Yes, that's correct.

12            THE COURT:  140 is in evidence.

13   BY MR. DELLA FERA:

14   Q.  Now, I'd like to direct you to the first page of PX-140,

15   and when I say the first page, it's page 3 -- page 1 of the

16   document.

17   A.  I'm sorry.  You want me to look at page 3?

18            THE COURT:  No.

19   Q.  PX-140 --

20            THE COURT:  Excuse me.

21            MR. DELLA FERA:  I'm sorry, your Honor.

22            THE COURT:  It's Bates numbered in the lower

23   right-hand corner with the number three.  Stipulation of

24   settlement.

25            MR. DELLA FERA:  Thank you, your Honor.

1    Q.  This document indicates that there was a public nuisance

2    inside the establishment operating on the ground floor at 375A

3    Canal?

4    A.  Yes.

5    Q.  And you testified you weren't quite sure what 375A meant,

6    but this at least represents that this is about the same space

7    in the building, correct?

8    A.  Yes.

9    Q.  I'd like to turn your attention to the second page, the

10   next page -- I think that's easiest -- the next page in this

11   document.

12   A.  Yes.

13   Q.  Do you see here there's a named defendant?  At the top of

14   the page, there's a "whereas" clause, is that right?

15   A.  Yes.

16   Q.  And the "whereas" clause names, first, defendant John Doe,

17   a/k/a Jian Liang Ge?

18   A.  Yes.

19   Q.  Is that right?

20   A.  Yes.

21   Q.  And then the second defendant listed is 375 Canal Street?

22   A.  Yes.

23   Q.  Jian Liang Ge, would that have been the tenant of 375 Canal

24   Street?

25   A.  Yes.

```
 1    Q.  And this settlement indicates that there was some sort of
 2    nuisance being caused by this tenant at 375 Canal Street, is
 3    that right?
 4    A.  Yes.
 5    Q.  And I'd like to turn, Ms. Tritto, to paragraph 5 --
 6    A.  Yes.
 7    Q.  -- of this document.  Paragraph 5 says, "Defendant John
 8    Doe, a/k/a Jian Liang Ge, shall not sell, transfer, sublease or
 9    assign his interest in the subject premises for the balance of
10    his lease term."  Is that right?
11    A.  Yes.
12    Q.  So defendant Jian Liang Ge is, again, the tenant, correct?
13    A.  Yes.
14    Q.  And the tenant would be the one that was engaging in the
15    public nuisance, is that right?
16    A.  Yes.
17    Q.  But under the terms of this settlement agreement, it
18    appears that the city is permitting the tenant to remain in the
19    premises, is that right?
20    A.  That is correct.
21    Q.  So the city had notice of infringement -- of some sort of
22    nuisance by Jian Liang Ge, correct?
23    A.  Well, the city is the one that brought the case against the
24    landlord and the tenant.  That is correct.
25              MR. DELLA FERA:  Let's turn back to one page, Sarah,
```

1  to page 3.

2  Q.  And you see there, at the bottom of page 3 -- page 2,

3  paragraph 3, that it appears that this -- paragraph 2, excuse

4  me, relates to counterfeit merchandise, is that correct?

5  A.  Yes.

6  Q.  So the city had notice that defendant in this case, this

7  settlement agreement, Jian Liang Ge, had been engaging in

8  potentially the sale of counterfeit merchandise?

9  A.  Yes.

10  Q.  And the city still allowed Jian Liang Ge to remain on the

11  premises, is that right?

12  A.  That is correct.

13  Q.  Was the city contributing to the infringement by Jian Liang

14  Ge by doing so?

15          MS. MARKMAN GOSTIN:  Objection, your Honor.

16          THE COURT:  Sustained.

17  Q.  Please turn to page 4 of this agreement, and I'd like to

18  direct you to paragraph 7.

19  A.  Yes.

20  Q.  Paragraph 7 provides that, as part of the settlement

21  agreement, Jian Liang Ge shall be liable to the plaintiff, the

22  city of New York, for civil penalties in the amount of $8,000."

23  Did I read that correctly, Ms. Tritto?

24  A.  Yes.

25  Q.  And if we turn to paragraph 8 on the next page, page 5, it

1   states that "375 Canal LLC shall be liable to the plaintiff,

2   the city of New York" as well, correct?

3   A.  Yes.

4   Q.  And what's the amount that 375 Canal would be liable for?

5   A.  $2,000.

6   Q.  Four times less than the amount of the tenant, correct?

7   A.  Yes.

8   Q.  Far less than a million dollars, correct?

9   A.  Far less, yes.

10  Q.  And much farther less than $8 million, correct?

11  A.  Yes.

12          THE COURT:  Everybody can do that math.

13          MR. DELLA FERA:  That's correct.  I hope so.

14          THE COURT:  I hope so too.

15  BY MR. DELLA FERA:

16  Q.  Thank you, Ms. Tritto.  I'm concluded with PX-140.  I'd now

17  like to direct you to PX-79.

18  A.  OK.

19  Q.  Do you have that in front of you?

20  A.  Yes.

21  Q.  PX-79 provided notice of infringement at 375 Canal Street,

22  is that right?

23  A.  Yes.

24  Q.  Do you know if the tenant that's indicated in PX-79 was the

25  same tenant that was indicated in the settlement with the city

1    in 2006 that we just looked at?

2    A.  I don't know.

3    Q.  Well, if you recall, when we looked at PX-47, you said that

4    the lease for 375A expired at the end of the month and you

5    would be seeking possession, is that right?

6    A.  Yes.  So presumably, it's a different tenant.

7            THE COURT:  At least it appears to be.

8    Q.  Well, Ms. Gostin didn't show you anything between 2007 and

9    2009 regarding 375 Canal Street, did she?

10   A.  No.

11   Q.  Ms. Tritto, there's one other document I'd like to show

12   you.  Could you please turn to the document in the binder

13   that's marked as PX-229?

14   A.  Yes.

15   Q.  PX-229 is a letter from a Robert Karin to a Stephanie

16   Goodman, is that right?

17   A.  Yes.

18   Q.  And it appears to attach a lease.  Is that correct?

19   A.  Yes.

20   Q.  And the lease deals with 375 Canal LLC, is that right?

21   A.  Yes.

22           MR. DELLA FERA:  I would move PX-229, offer PX-229

23   into evidence, your Honor.

24           MS. MARKMAN GOSTIN:  No objection, your Honor.

25           THE COURT:  229 is received in evidence.

1              (Plaintiffs' Exhibit 229 received in evidence)

2              MR. DELLA FERA:  Could we publish that to the jury,

3     Judge?

4              THE COURT:  Yes.

5     BY MR. DELLA FERA:

6     Q.  Ms. Tritto, what is the date on this letter, PX-229?

7     A.  March 15, 2007.

8     Q.  And if I read the body of this email, it says, "Enclosed

9     are four counterparts of the lease in connection with the

10    above-referenced transaction which have been signed by our

11    client."  Did I read that correctly?

12    A.  Yes.

13    Q.  And the re line that it's referring to says Bank of

14    America, 375 Canal Street, is that right?

15    A.  Yes.

16    Q.  And then if we turn to the next page in this document, this

17    is the lease with Bank of America, correct?

18    A.  Yes, dated March 19, 2007.

19    Q.  And this lease provides that Bank of America would be

20    taking possession as a tenant of a space in 375 Canal Street,

21    is that right?

22    A.  Yes.

23    Q.  So it appears from the documents we reviewed that you

24    removed a tenant after its lease expired in March of 2007,

25    correct?

1    A.  Yes.

2    Q.  And then into that space you put the Bank of America, is

3    that right?

4                MS. MARKMAN GOSTIN:  Objection, your Honor.

5                THE COURT:  Calls for speculation.  Objection

6    sustained.

7    Q.  Ms. Tritto, can you turn to Defense Exhibit J in the binder

8    in front of you?

9    A.  OK.

10   Q.  And Defense Exhibit J is a surrender agreement, is that

11   correct?

12   A.  Yes.

13   Q.  It's dated April 17, 2007?

14   A.  Yes.

15   Q.  And it deals with the landlord 375 Canal LLC, correct?

16   A.  Yes.

17               MR. DELLA FERA:  I would offer this exhibit, Defense

18   Exhibit J, into evidence.

19               MS. MARKMAN GOSTIN:  No objection.

20               THE COURT:  It is in evidence.

21               (Defendants' Exhibit J received in evidence)

22   BY MR. DELLA FERA:

23   Q.  Ms. Tritto, what is the date of Defense Exhibit J?

24   A.  April 17, 2007.

25   Q.  And it is a surrender agreement, is that right?

J2rWome4                         Tritto - Cross

1   A.  Yes.

2   Q.  And can you read, going down the page to the paragraph that

3   has the word "surrender" next to it?

4   A.  Yes.

5   Q.  Can you read that into the record, please?

6   A.  "Tenant gives possession of the leased premises and the

7   keys to the landlord.  The landlord accepts the keys and

8   possession of the leased premises in the condition delivered."

9   Q.  So again, in PX-47, you stated that you would be seeking

10  possession of the premises, correct?

11  A.  Yes.

12  Q.  And that was in March of 2017 -- 2007?  Excuse me.

13  A.  Correct.  And this document brings it full circle.  The

14  tenant did surrender the premises.

15  Q.  And then Bank of America moved into the space?

16  A.  Yeah.

17          MS. MARKMAN GOSTIN:  Objection, your Honor.

18          THE COURT:  Sustained.

19  Q.  This document does show that a tenant vacated the premises

20  on April 17, 2007, correct?

21  A.  That is correct.

22  Q.  And that is one month after March of 2007, correct?

23  A.  That is correct.

24  Q.  And that's the month that you said you would be seeking

25  possession following termination of the lease, correct?

1    A.  That is correct, and I probably procured this surrender.

2    Q.  To be clear, you say you probably procured it, but it was

3    about 12 years ago almost now?

4    A.  That's correct.

5    Q.  You don't have a specific recollection?

6    A.  I -- no, I don't.

7    Q.  But just it's possible you did?

8    A.  I don't know.

9    Q.  Ms. Tritto, I'd like to now turn to PX-79, another document

10   that Ms. Gostin looked at with you.

11   A.  Yes.

12   Q.  So, I think we might need to -- hopefully you can clarify

13   some things for me.  It's a bit confusing.

14       We saw that Bank of America was in 375 Canal Street as of

15   2007, correct?

16   A.  Yes.

17   Q.  And this is from 2009, correct?

18   A.  Yes.

19   Q.  And so this relates to a different unit of 375 Canal

20   Street, or would this relate to Bank of America?

21   A.  I believe that 375 Canal is divided in half, so Bank of

22   America would be in one space and someone else would be in the

23   other space.

24   Q.  So we saw there was --

25               THE COURT:  Bank of America is usually presumed by the

1    Securities and Exchange Commission, not the NYPD.

2              MR. SCHICK:  I think they have bigger problems than

3    just one federal agency, your Honor.

4    BY MR. DELLA FERA:

5    Q.  So the June of 2009 email would not relate to 375A, the

6    space that you had removed the tenant from, correct?

7    A.  Correct.

8    Q.  It would refer to the other location, correct?

9    A.  Which I believe was 375B.

10   Q.  And again, regarding 375B, we didn't see any notification

11   from Ms. Gostin -- she didn't show you any notification prior

12   to this June 26, 2009, letter from Brian Brokate, correct?

13   A.  That is correct.

14   Q.  I'd like to now turn to PX-147.  PX-147 is a settlement

15   agreement that you reviewed with Ms. Gostin, is that right?

16   A.  Yes.

17   Q.  And PX-147 states on the first page that it was filed

18   August 14, 2009, is that right?

19   A.  Yes.

20   Q.  And it's, again, a lawsuit by the city of New York against

21   375 Canal LLC?

22   A.  Yes.

23   Q.  And if you look in the caption, it specifically locates --

24   notified of a store located at 375B Canal Street, is that

25   right?

1   A.  Yes.

2   Q.  And let's go to the "whereas" clause at the bottom of this

3   page.  It says, "Whereas, after receipt of plaintiff's order to

4   show cause, 375 Canal demanded that the only record tenant of

5   the premises, F.T. Jay Inc. (hereinafter 'Jay'), immediately

6   surrender possession of the premises and all right, title and

7   interest to the premises."  Did I read that correctly?

8   A.  Yes.

9   Q.  So it states that after you received receipt of the

10  plaintiffs' order to show cause, you demanded that the -- by

11  you, meaning 375 Canal -- 375 Canal demanded that the only

12  record tenant in the premises surrender possession, is that

13  right?

14  A.  Yes.

15  Q.  And this is a settlement agreement dated August 14, 2009,

16  correct?

17  A.  Yes.

18  Q.  The order to show cause references -- first, can you

19  explain what an order to show cause is to the jury?

20  A.  Yes.

21      So, in this particular instance, it -- it's some papers

22  that the civil enforcement unit, which is an agency of the city

23  of New York, prepares after they go to a location and conduct a

24  seizure of alleged counterfeit goods, and then they compile a

25  set of papers, which includes a summons and a complaint, and

1  present it to a judge, saying that Mr. Landlord at 375 Canal

2  Street, or some other location, has a tenant that's engaging in

3  the sale of counterfeit goods, and they ask the judge -- and

4  the attorney from the civil enforcement unit actually go before

5  the judge when they present the papers to the judge.  And they

6  ask the judge to close the premises pending a court date where

7  the landlord will appear, and then they will address the

8  allegations.

9      And the judge, in its discretion, can either close the

10  premises pending the court date, or the judge can say I'm not

11  going to close the premises; I'm just going to issue a

12  restraining order, meaning that until the next court date, no

13  illegal activity can occur, but I'm not going to close the

14  premises.  And so this stipulation is a result of that court

15  process.

16  Q.  And between the filing of this stipulation of settlement

17  and filing of that order to show cause, about how much time

18  would elapse?

19  A.  It could be 30-ish days.

20  Q.  About a month?

21  A.  Give or take.

22  Q.  And we saw that you received notification, I believe, June

23  24, 2009, about a police raid, is that right?

24  A.  Yes.

25  Q.  And would this order to show cause that's referenced in

1   this agreement have been filed before that police raid or

2   afterwards?

3   A.   It would have to be filed after, because when the city

4   conducts the raid, that's when they gather the evidence to

5   prepare the order to show cause and present it to the judge.

6   So if the police raid occurred on June 24, by the time the city

7   gathered their evidence and did their papers, it probably would

8   not have been presented to a judge until sometime in early July

9   or maybe even mid-July, depending upon how quickly the city

10  acted.

11  Q.   And so, we saw that you received notification on June 24,

12  2009, and then this settlement is agreed to in August of 2009.

13  Correct?

14  A.   Yes.

15  Q.   Would you have been able to evict the tenant had you

16  attempted to between June 24, 2009, and August 14, 2009?

17  A.   No way.

18  Q.   Why not?

19  A.   Because as I explained to you earlier, the tenant -- if I

20  had started a proceeding -- first of all, I have to serve the

21  notices before I can even start the proceeding.  But let's just

22  assume I didn't have to serve notices and I could just start

23  the proceeding.  The first thing the tenant would do is go into

24  court and ask for a postponement, and postponements in court

25  can be anywhere from two to four weeks.

1   Q.  Ms. Tritto, I'd like to direct you to the next page of this

2   settlement.  I'm going to read that top whereas clause to you:

3   "Whereas, the premises was surrendered by Jay at 375 Canal and

4   are presently closed and vacant."  Did I read that correctly?

5   A.  Yes.

6   Q.  So after the order to show cause was filed, this tenant,

7   Jay, surrendered the premises at 375 Canal Street, is that

8   right?

9   A.  Yes.

10  Q.  And they surrendered these premises at some point between

11  June of 2009 and August 14 of 2009, is that correct?

12  A.  Yes.

13  Q.  And the letter you received -- and so any police raid that

14  occurred in 2010 would have been a police raid that occurred at

15  375 Canal Street with a different tenant in the premises, is

16  that right?

17  A.  Yes.

18  Q.  One final question on this exhibit.  I'd like to direct you

19  to paragraph 10, and that's on, it starts on the middle of the

20  bottom of page 6, and it's page 8 of the exhibit.  Do you see

21  that?

22  A.  Uh-huh.

23  Q.  And again, there's a police raid that caused the premises

24  to be shut down, correct?

25      I'm not reading from the document, just this agreement in

1    general and the circumstances we've been discussing.  There was

2    a police raid you were notified about followed by an order to

3    show cause resulting in a settlement agreement, correct?

4    A.  Yes, but just to clarify, again, not every time the city

5    brings an order to show cause are the premises closed.  It's

6    completely discretionary with the judge who is assigned the

7    particular case.

8    Q.  Right, but PX-140, we saw the tenant could stay in the

9    premises, correct?

10   A.  Yes.

11   Q.  PX-147, you had the premises -- the premises were vacated

12   by the tenant, correct?

13   A.  Yes, but from looking at this settlement, I can't tell if

14   the judge had closed them or not, initially.

15   Q.  I understand.  I want to go back, then, to paragraph 10 --

16   A.  OK.

17   Q.  -- and just focus on that first line.  And that says, "375

18   Canal shall be liable to the plaintiff for civil penalties in

19   the amount of $10,000 to be paid in two installments of

20   $5,000."  Is that right?

21   A.  Yes.

22   Q.  And so there was some sort of police activity that we saw

23   in June of 2009, correct?

24   A.  Yes.

25   Q.  And resulting in this settlement agreement, correct?

1   A.  Yes.

2   Q.  And the amount that was payable to the city in civil

3   penalties was $10,000, correct?

4   A.  That is correct.

5   Q.  Ms. Tritto, I'd now like to discuss the letter from Jeffrey

6   Lindenbaum that you discussed with Ms. Gostin, and that's

7   PX-90.

8   A.  Yes.

9   Q.  Now I'd like you to look at the second page of PX-90.  And

10  if you look at the top of this page, Mr. Lindenbaum demanded

11  that you immediately remedy the situation by taking specific

12  action, correct?

13  A.  Yes.

14  Q.  Declare the leases void, correct?

15  A.  Yes.

16  Q.  Deliver goods found at 375 Canal Street to his office?

17  A.  Yes.

18  Q.  Confirm in writing that you will permanently refrain from

19  leasing any space at 375 Canal Street to any tenant dealing in

20  counterfeit products?

21  A.  Yes.

22  Q.  And provide him with the name and address and all other

23  pertinent information of the persons or entities that are

24  selling counterfeit products at 375 Canal Street?

25  A.  Yes.

1    Q.  But if we look at the attachments to this letter

2    Mr. Lindenbaum provided, at the next page, an Omega trademark,

3    correct?

4    A.  Yes.

5    Q.  But he didn't provide any information about the counterfeit

6    goods that had been seized from 375 Canal Street?

7    A.  That's correct.

8    Q.  And if we go back to the first page of PX-90,

9    Mr. Lindenbaum wrote, "As you are already aware" -- in the

10   second paragraph.  Excuse me.  "As you are already aware, in

11   December 2010 and on February 10, 2011, the New York Police

12   Department arrested certain individuals for selling counterfeit

13   versions of our clients' Omega and Swatch branded watches at a

14   storefront retailer located at 375 Canal Street."  Did I read

15   that correctly?

16   A.  Yes.

17   Q.  Were you already aware of that, as far as you know?

18   A.  I don't believe so.

19   Q.  Do you know why Mr. Lindenbaum wrote that?

20   A.  I have no idea.

21   Q.  Had you ever had a conversation with Jeffrey Lindenbaum

22   prior to receiving this letter?

23   A.  No.

24   Q.  Let's then go to PX-91, which you also reviewed with

25   Ms. Gostin.

1   A.  Yes.

2   Q.  Now, PX-91 provides that you represent the landlord at the

3   above-referenced premises, correct?

4   A.  Yes.

5   Q.  And one of those premises is 375 Canal Street?

6   A.  Yes.

7   Q.  And you sent this letter to Jeffrey Lindenbaum?

8   A.  This email.

9   Q.  This email.  Excuse me.

10  A.  Yes.

11  Q.  And in this email you stated that the tenant had the

12  offending tenant removed, correct?

13  A.  Yes.

14  Q.  Ms. Gostin asked you about that?

15  A.  Yes, and I explained that I made a mistake in my email and

16  should have written subtenant.

17  Q.  And if you see the prior line, you indicate the tenant had

18  sublet the space to an entity, correct?

19  A.  Yes.

20  Q.  So it makes sense that the person that would have been

21  removed was the offending subtenant, correct?

22  A.  Yes, that is correct.

23  Q.  Now, would you have written this email to Mr. Lindenbaum

24  without having done anything to ascertain whether or not the

25  information that you provided him was correct?

J2rWome4                        Tritto - Cross

1   A.  Absolutely not, because part of the methodology that I have

2   in dealing with any case is my credibility is really important,

3   so if I wrote something that I didn't know to be true, that

4   would be a problem for my credibility.  And so, if I wrote it,

5   I had to have known or had information that that was actually

6   true.

7   Q.  And you testified earlier that you don't specifically

8   recall if you spoke with the tenant here but that generally

9   that's probably what you did, correct?

10  A.  That is correct.

11  Q.  And between receiving PX-90 from Mr. Lindenbaum and sending

12  PX-91 to Mr. Lindenbaum, did you have a conversation with

13  Mr. Lindenbaum?

14  A.  I believe that when the letter from Mr. Lindenbaum was

15  forwarded to me, I called Mr. Lindenbaum immediately to

16  introduce myself and to assure him that the landlord took this

17  quite seriously and that we would deal with it.  And then I

18  followed up with an email to allay his fears, that the landlord

19  had in fact addressed the issue raised in his letter.

20  Q.  Did Mr. Lindenbaum follow up with you after you sent PX-91,

21  if you recall?

22  A.  I do not believe I ever heard from him again.

23  Q.  He didn't send you an email saying removing the subtenant

24  isn't enough, we want the tenant out?

25  A.  I do not believe he ever emailed, called or anything else.

J2rWome4                         Tritto - Cross

1   Q.  He didn't say you need to give us the name of the person

2   you kicked out?

3            MS. MARKMAN GOSTIN:  Objection, your Honor.

4            THE COURT:  Sustained.

5   Q.  As far as you recall, did you have any communication with

6   Mr. Lindenbaum after this email --

7            THE COURT:  You asked that question before.

8            MR. DELLA FERA:  Sorry?

9            THE COURT:  You asked that question before, just three

10  minutes ago.

11           MR. DELLA FERA:  Very well, your Honor.

12  Q.  Finally, I'd like to discuss very briefly the last document

13  that you discussed with Ms. Gostin, PX-228.

14  A.  Yes.

15  Q.  Now, this is a draft notice of petition holdover, is that

16  right?

17  A.  Yes.

18  Q.  And this draft indicates that it's dated December 2012?

19  A.  Yes.

20  Q.  Doesn't indicate a specific date?

21  A.  No.

22  Q.  Do you know if this was filed?

23  A.  It was not.

24  Q.  And this petition, notice of petition indicated an

25  undertenant, correct?

J2rWome4                         Tritto - Cross

1    A.  Yes.

2    Q.  And it gives the name Sayed Rahman?

3    A.  Yes.

4    Q.  Is an undertenant always an occupant of the premises that

5    is permitted to be there?

6    A.  No.

7    Q.  It could be somebody who is not allowed on the premises?

8              MS. MARKMAN GOSTIN:  Objection.

9              THE COURT:  What's the objection?

10             MS. MARKMAN GOSTIN:  Lack of foundation.

11             THE COURT:  Overruled.

12             Go ahead.

13   A.  An undertenant can be someone who is a permissible occupant

14   or someone who is not permissible but is someone who is in

15   possession, and in order to evict them, you need to name them

16   or have an XYZ Corp. to cover someone who may or may not be

17   there, but it has -- they don't necessarily have to be there

18   with permission from the landlord.

19   Q.  And if you know potentially the name of either a tenant or

20   an undertenant, can you omit that from the notice of petition

21   and file it with an alias like XYZ Corp.?

22   A.  If you know the name, then you should name them, because it

23   could be a technical defense by a tenant's attorney saying you

24   knew the name of the person but you didn't name them, and

25   rather called them XYZ Corp. or John Doe or Jane Doe.  So the

1    if you know the name, the rule is you should name them

2    specifically.

3              THE COURT:  And for safety's sake, you added the XYZ.

4              THE WITNESS:  That is correct.

5              THE COURT:  Like John Doe.

6              THE WITNESS:  Yes.

7    BY MR. DELLA FERA:

8    Q.  And you've reviewed the complaint in this case, Ms. Tritto?

9    A.  Yes.

10   Q.  And the complaint was filed in September of 2012, correct?

11   A.  I believe so, yes.

12   Q.  And that's before this December, blank date of December

13   2012 notice of petition?

14   A.  Yes.

15   Q.  Did the complaint include the name Rahman in it?

16   A.  I believe so, yes.

17   Q.  And finally, I'd like to direct you to PX-206.

18             MR. DELLA FERA:  Your Honor, we would offer PX-206 in

19   evidence.

20             MS. MARKMAN GOSTIN:  No objection.

21             THE COURT:  206 is in evidence.

22             (Plaintiffs' Exhibit 206 received in evidence)

23             MR. DELLA FERA:  Sarah, could you publish that.

24   Q.  This is a vacate, surrender and release document, is that

25   right, Ms. Tritto?

1   A.  Yes.

2   Q.  And it's dated November 26, 2012, correct?

3   A.  That's correct, yes.

4   Q.  And that's before December 2012?

5   A.  Yes.

6   Q.  And this states that "T.A. Discount Store hereby

7   voluntarily vacates and surrenders possession of the premises

8   known as and located at 375 Canal Street, New York, New York,

9   (the premises) on this date"?

10  A.  Yes.

11  Q.  So you received a complaint in this action at some point in

12  September 2012, correct?

13  A.  Yes.

14  Q.  And then you had the tenant, T.A. Discount Store, vacate

15  the premises in November of 2012, correct?

16  A.  Yes.

17  Q.  So earlier, you had asked T.A. Discount Store, which is the

18  tenant of 375 Canal Street, correct?

19  A.  Yes.

20  Q.  You asked them to remove their subtenant?

21  A.  Yes.

22  Q.  And you in good faith believed that they had removed their

23  subtenant?

24  A.  Yes.

25  Q.  And then you received a lawsuit indicating that despite

1  your efforts there had been another instance of counterfeit

2  activity at the premises, correct?

3  A.  Yes.

4  Q.  And so at that point, you removed the actual tenant, is

5  that right?

6  A.  Well, at that point the landlord felt that they needed to

7  get rid of everyone, because apparently the activity was

8  continuing and the landlord wasn't going to fool around and let

9  anything continue.

10 Q.  Thank you, Ms. Tritto.

11        MR. DELLA FERA:  I believe, and hold me to this, your

12 Honor, I have five more questions or less.

13 Q.  Ms. Tritto, if you turn to the next page in this document,

14 this is the lease?

15 A.  Yes.

16 Q.  And this lease is dated -- this is a lease for 375B,

17 correct?

18 A.  Yes.

19 Q.  And the lease begins in the year 2009, is that right?

20 A.  Yes.

21 Q.  And the tenant here is T.A. Discount Store?

22 A.  Yes.

23 Q.  I'd like you to now turn to paragraph 45 of this, which is

24 the tenth page of PX-206.

25 A.  OK.

1   Q.  Can you go down -- it's the line that I just marked with a

2   dash on the screen, "in the."  Do you see that?

3   A.  Sorry.  I'm, like, blind, so --

4           THE COURT:  Try again.  Paragraph 45.

5   Q.  Paragraph 45.

6   A.  Right.  Oh, in the event?

7   Q.  Yes.  I'd actually like you to start with the sentence

8   right above that that says "tenant shall."  See that?

9   A.  Yes.

10  Q.  It says, "Tenant shall not sell trademark or counterfeit

11  merchandise of any kind."

12  A.  That is correct.

13  Q.  So this is a lease from 2009, correct?

14  A.  Yes.

15  Q.  And in this lease, you prospectively, or the landlord, 375

16  Canal, prospectively required that the tenant not engage in the

17  sale of counterfeit merchandise, correct?

18  A.  Yes, the landlord took this very seriously.

19          MR. DELLA FERA:  Nothing further, your Honor.

20          THE COURT:  Ms. Gostin.

21          MS. MARKMAN GOSTIN:  We have nothing further.

22          THE COURT:  OK.  You're excused.  Thank you very much.

23          THE WITNESS:  Thank you.

24          (Witness excused)

25          THE COURT:  It's 20 minutes after 2.  I think we'll

J2rWome4                          Tritto - Cross

1    adjourn for the day.

2              Ladies and gentlemen, remember what we said before,

3    keep open minds.  Don't discuss the case.  Safe travels to your

4    homes tonight.  See you tomorrow morning at 9:00.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  How are we doing on time?

3           MR. GUNTHER:  Your Honor, I think we're doing pretty

4    well.  After this witness is done, we are going to call --

5           THE COURT:  This witness is done.

6           MR. GUNTHER:  Sorry.  I misspoke.  The witness is

7    done.

8           We're going to call next Ms. Caponegro.  I expect that

9    examination on direct will be about a half hour.  After that we

10   will call Mr. Laboz.  I'm going to handle that.  I think I've

11   got about an hour for him, and that's it for us.  We're going

12   to rest at that point.

13          MR. SCHICK:  Your Honor, we indicated that we would

14   have two witnesses.  We originally had three, but your Honor

15   made a ruling about Mr. Paul, so we have Mr. Quinonez and Mr.

16   Stone-Jensen.  We were going to call Ms. Tritto about these

17   things we covered on cross now but were covered on direct, so

18   we are done with her.

19          THE COURT:  So you have two more.

20          MR. SCHICK:  We have two witnesses who will be very

21   brief.

22          THE COURT:  OK.  Do you want to set up a time for a

23   conference on the instructions to the jury?

24          MR. GUNTHER:  Yes.  I think that's a good idea, your

25   Honor.  I think if we could have a conference after we finish

J2rWome4

```
 1   evidence, which I assume will be tomorrow --

 2             THE COURT:  Yes.

 3             MR. GUNTHER:  -- and then close on Friday, I think

 4   we'll be in good shape.

 5             THE COURT:  OK.

 6             MR. SCHICK:  That's fine, your Honor.

 7             THE COURT:  Does that sound right to you, Mr. Schick?

 8             MR. SCHICK:  I heard it from Mr. Gunther, so it must

 9   be.

10             MR. GUNTHER:  I like that.

11             He's starting to get it.

12             THE COURT:  He's very selective about that.

13             MR. GUNTHER:  Yes, that's true.

14             MR. SCHICK:  I've got to give him something.

15             MR. DELLA FERA:  And your Honor, we would like to

16   thank the plaintiffs' counsel for accommodating Ms. Tritto's

17   schedule.  We really appreciate that.

18             THE COURT:  Yes.

19             OK.

20             MR. GUNTHER:  Thank you, your Honor.  See you

21   tomorrow.

22             (Adjourned to February 28, 2019, at 9:00 a.m.)

23

24

25
```

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     BRADFORD COLE

4     Redirect By Mr. Gunther  . . . . . . . . . . 333

5     Recross By Mr. Schick  . . . . . . . . . . . 340

6      RICHARD TAUTE

7     Direct By Mr. Gunther  . . . . . . . . . . . 343

8     Cross By Mr. Schick  . . . . . . . . . . . . 381

9     Redirect By Mr. Gunther  . . . . . . . . . . 396

10    Recross By Mr. Schick  . . . . . . . . . . . 397

11    PETER ANDREW FOSTER

12    Direct By Mr. Noyes  . . . . . . . . . . . . 399

13    Cross By Mr. Schick  . . . . . . . . . . . . 443

14    Redirect By Mr. Noyes  . . . . . . . . . . . 456

15    SHARYN TRITTO

16    Direct By Ms. Markman Gostin . . . . . . . . 461

17    Cross By Mr. Della Fera  . . . . . . . . . . 483

18

19

20

21

22

23

24

25

PLAINTIFF EXHIBITS

Exhibit No.                                              Received

167   . . . . . . . . . . . . . . . . . . . 355

168   . . . . . . . . . . . . . . . . . . . 361

169   . . . . . . . . . . . . . . . . . . . 369

230   . . . . . . . . . . . . . . . . . . . 375

9   . . . . . . . . . . . . . . . . . . . . 409

286   . . . . . . . . . . . . . . . . . . . 419

138   . . . . . . . . . . . . . . . . . . . 463

91   . . . . . . . . . . . . . . . . . . . . 474

229   . . . . . . . . . . . . . . . . . . . 499

206   . . . . . . . . . . . . . . . . . . . 515

DEFENDANT EXHIBITS

Exhibit No.                                              Received

J   . . . . . . . . . . . . . . . . . . . . 500