J2sWome1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

OMEGA SA, et al.,

                    Plaintiffs,

             v.                          12 Civ. 6979 (PAC)

375 CANAL, LLC, et al.,

                    Defendants.
                                         Trial
------------------------------x
                                         New York, N.Y.
                                         February 28, 2019
                                         9:20 a.m.

Before:

                    HON. PAUL A. CROTTY,

                                         District Judge
                                         -and a Jury-

                         APPEARANCES

WILMER CUTLER PICKERING HALE & DORR LLP
        Attorneys for Plaintiffs
BY:   ROBERT J. GUNTHER JR.
        ISLEY MARKMAN GOSTIN
        CHRISTOPHER R. NOYES

DENTONS U.S.LLP
        Attorneys for Defendants
BY:   STEPHEN G. DELLA FERA
        -and-
TROUTMAN SANDERS LLP
BY:   AVI SCHICK


Also Present:   Sarah Finkel, Paralegal
                Clinton Lam, Technician

J2sWome1

1          (Trial resumed)

2          THE COURT:  Please be seated.  My apologies.  I was

3     stuck in traffic.  You've heard that before; it's true this

4     time.

5          Call the jury.

6          MR. SCHICK:  Your Honor, we don't have to do this now,

7     but I'll start.

8          Ms. Caponegro is the first witness, and we have no

9     issues with whatever's intended then, but we did get last night

10    from the plaintiffs a long list of exhibits that they intend to

11    use with Mr. Laboz, which includes exhibits that have already

12    been ruled as not in evidence, new exhibits that we never saw

13    before, and more importantly, exhibits that go far afield from

14    the issues in this case.  Before Mr. Laboz goes on in front of

15    the jury, I would like to have a moment to discuss that with

16    your Honor because it would be prejudicial if we have to do it

17    ten times with each document.  It doesn't have to be this

18    minute.

19          THE COURT:  OK.

20          MR. SCHICK:  But all the building, the projects --

21    anyway, we can do it after Ms. Caponegro.

22          THE COURT:  Let's do it after Ms. Caponegro --

23          MR. SCHICK:  Thank you, your Honor.

24          THE COURT:  -- when we take our early morning recess.

25          (Continued on next page)

1            (Jury present)

2            THE COURT:  Good morning.  My apologies.  I was a

3    little bit tardy this morning.  That's the reason we're late.

4    Please be seated.

5            Call your next witness, please.

6            MS. GOSTIN:  Plaintiffs call Lisa Caponegro.

7            THE COURT:  Ms. Caponegro.

8     LISA MARIE SILVEY,

9         called as a witness by the plaintiffs,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MS. GOSTIN:

13   Q.  Good morning, Ms. Silvey.

14   A.  Good morning.

15   Q.  Just for the record, what is your maiden name?

16   A.  Caponegro.

17   Q.  When did your name change?

18   A.  Early 2018.

19   Q.  Where are you currently employed?

20   A.  At Gibney Anthony & Flaherty.

21   Q.  And what is your position there?

22   A.  I'm a senior intellectual property paralegal.

23   Q.  How long have you been an intellectual property paralegal

24   at Gibney Anthony & Flaherty?

25   A.  That was my title starting in 2007, but I've worked there

J2sWome1                         Silvey - Direct

1    since 2003.

2    Q.  And what are your job responsibilities as an intellectual

3    property paralegal?

4    A.  I coordinate investigations into the sale of counterfeit

5    merchandise with private investigators, with the attorneys in

6    my office.  I assist with our landlord program and conduct

7    training for law enforcement around the United States.

8    Q.  And you mentioned the landlord program.  Can you please

9    explain what that is?

10   A.  Yes.  Our firm hires private investigators to go out in New

11   York City to identify locations where counterfeit goods are

12   being offered for sale, and then we -- they make evidential

13   purchases or other reports, and we follow up with letters to

14   put the landlords on notice.  It also involves going out and

15   conducting civil seizures.

16   Q.  And you mentioned you draft communications with landlords?

17   A.  Yes.

18   Q.  Can you explain what those communications are?

19   A.  Basically, they notify them that either counterfeit goods

20   were observed at a location or purchased from or seized from a

21   particular location.

22   Q.  And is drafting those notices an ordinary business practice

23   of Gibney Anthony & Flaherty?

24   A.  Yes.

25   Q.  Can you explain what type of information is generally

1    included in those notices?

2    A.   Initially, it's very basic information, the types of things

3    that I just mentioned.  But upon request, we would also provide

4    any photos that we may have or copies of seizure receipts or

5    even if it did go far enough, have our investigators attend and

6    testify in a trial.

7    Q.   And on what information are the notices that you're

8    drafting based?

9    A.   Based on the reports that we receive back from our

10   investigators.

11   Q.   And when you send those notices, do you send those via

12   regular mail or by email?

13   A.   It can be both.

14   Q.   And does the law firm of Gibney Anthony & Flaherty maintain

15   records in conducting the business of the law firm?

16   A.   Yes.

17   Q.   And as a paralegal at Gibney Anthony & Flaherty, are you

18   generally familiar with the law firm's records?

19   A.   Yes.

20   Q.   Plaintiffs' Exhibits 19, 23, 47 and 79 are in the binder to

21   your left.  Did you review those documents in advance of your

22   testimony today?

23   A.   Yes, I did.

24   Q.   And what, as a general matter, are those documents?

25   A.   They're letters from attorneys at my firm to either

J2sWome1                              Silvey - Direct

1    landlords or their representatives.

2    Q.   And what type of information is in those notices?

3    A.   Information regarding the sale of counterfeit merchandise.

4    Q.   And were those documents prepared in the ordinary course of

5    Gibney Anthony & Flaherty's business?

6    A.   Yes, I believe so.

7    Q.   And were those documents drafted soon after the events

8    described in those documents?

9    A.   Yes.

10   Q.   And were those documents drafted by someone with knowledge

11   of or made with information from a person with knowledge of

12   information in those documents?

13   A.   I believe so.

14   Q.   Could you please turn in your binder to Plaintiffs' Exhibit

15   19?

16   A.   OK.

17            MS. GOSTIN:  Let's not publish this to the jury yet,

18   please.

19   Q.   Can you explain what this document is, please?

20   A.   This is a letter from Heather McDonald at Gibney Anthony &

21   Flaherty to Mercury Associates, care of United American Land,

22   regarding --

23            MR. DELLA FERA:  Objection, your Honor.  I don't think

24   it's appropriate to begin reading what the substance of the

25   letter is at this point if it's not yet in evidence.

J2sWome1                         Silvey - Direct

1                 THE COURT:  Sustained.

2    BY MS. GOSTIN:

3    Q.   Who is Heather McDonald?

4    A.   She was a partner at my firm.

5    Q.   And was this letter maintained in the files of Gibney

6    Anthony & Flaherty in the ordinary course of the firm's

7    business?

8    A.   Yes, it was.

9                 MS. GOSTIN:  Plaintiffs offer Exhibit 19.

10                MR. DELLA FERA:  Objection, your Honor.

11                If I could have brief voir dire of the witness?

12                THE COURT:  Yes.

13   VOIR DIRE EXAMINATION

14   BY MR. DELLA FERA:

15   Q.   This letter that's in front of you, Ms. Silvey, it does not

16   include a FedEx receipt, a UPS receipt or any indication it was

17   actually sent, does it?

18   A.   No.

19   Q.   And you said that you believe these letters, including this

20   letter, was drafted by someone with knowledge.  Do you know

21   that or do you just believe it?

22   A.   I believe so, but no, I don't have direct knowledge of

23   that.

24   Q.   And you have no direct knowledge of whether or not this

25   letter was actually received by the recipient, correct?

1    A.  No.

2    Q.  And this letter was written by an attorney, correct?

3    A.  Yes.

4    Q.  An attorney who works in litigation, correct?

5    A.  She no longer works there.  I didn't work with her at the

6    time she was there.

7    Q.  So you're not aware whether or not she worked in litigation

8    or not?

9    A.  I don't believe so.

10   Q.  And this letter includes, and I'm going to speak very

11   generally here, mentions --

12             THE COURT:  You're going to quote from the letter not

13   in evidence?

14             MR. DELLA FERA:  Sorry.  You're right, your Honor.

15   Withdrawn.

16             Your Honor, I object to this letter because it is a

17   hearsay document.  It was not prepared in the ordinary course

18   of business but in anticipation of litigation.  The Second

19   Circuit is clear that documents made in anticipation of

20   litigation are not business records.

21             THE COURT:  All right.  The objection is overruled.

22   It's received in evidence.  19 is in evidence.

23             (Plaintiffs' Exhibit 19 received in evidence)

24             MS. GOSTIN:  Thank you, your Honor.

25             Could we please publish this to the jury, Mr. Lam.

J2sWome1                        Silvey - Direct

1   BY MS. GOSTIN:

2   Q.  Ms. Silvey, what is the date of this letter?

3   A.  November 1, 2004.

4   Q.  And what is the subject of this letter?

5   A.  375 Canal Street, New York, New York.

6   Q.  Can you please read the first sentence of this letter,

7   starting with, "We are counsel"?

8   A.  Sure.  "We are counsel to Polo Ralph Lauren LP, Rolex Watch

9   U.S.A. Inc., Louis Vuitton Malletier, Coach Inc., Movado Inc.,

10  Chanel Inc., Calvin Klein Inc., Burberry Ltd., Kate Spade LLC,

11  Fendi S.L.A., Tiffany & Co. and Marc Jacobs International

12  Company LLC (hereinafter referred to as the trademark owners)."

13  Q.  And now turning to the third paragraph of that letter, can

14  you please read the first sentence that starts, "This letter.

15  A.  "This letter gives you formal notice that the illegal sale

16  of counterfeit merchandise during one or more of the federally

17  registered trademark of trademark owners identified herein has

18  been taking place at 375 Canal Street, New York, New York, a

19  building which you own, by tenants who presently occupy the

20  premises."

21  Q.  Thank you.

22      And now turning to the second page of the letter --

23          MS. GOSTIN:  Actually, we can move on from that.

24  Q.  Can you please turn in your binder to PX-23?

25  A.  Sure.

1    Q.  And what, just generally, is this document?

2    A.  So this is another letter that was sent by Heather McDonald

3    regarding -- looks like it's regarding a number of different

4    properties.

5    Q.  And was this letter maintained in the files of Gibney

6    Anthony & Flaherty in the ordinary course of the firm's

7    business?

8    A.  Yes.

9               MS. GOSTIN:  Plaintiff offers Exhibit 23.

10              MR. DELLA FERA:  Objection, your Honor.

11              THE COURT:  Overruled.  Received in evidence, 23.

12              (Plaintiffs' Exhibit 23 received in evidence)

13              MS. GOSTIN:  Mr. Lam, can you please publish this to

14   the jury as well.

15   Q.  Ms. Silvey, what is the date of this letter?

16   A.  November 18, 2004.

17   Q.  Are you looking at Exhibit 23?

18   A.  Oh, I'm sorry.  I was on 20.  I'm on 23 now.  It's February

19   22, 2005.

20   Q.  And is 375 Canal in the subject of this email?

21   A.  It is.

22   Q.  And then scrolling down, can you read the last bullet?

23   A.  "375B Canal Street, 1 Coach handbag."

24   Q.  And then can you please read the fifth sentence after that?

25   A.  "While we appreciate the efforts you have shown, further

1   action needs to be taken immediately to have these tenants

2   removed."

3   Q.  Thank you very much.

4       Can you now please turn in your binder to PX-47, which is

5   already in evidence.

6   A.  OK.

7           MS. GOSTIN:  And can we please publish this to the

8   jury.

9   Q.  Can you generally explain what this document is?

10  A.  This was an email chain.  It looks like an email sent from

11  Sharyn Tritto to Kortny Browning, and after -- again, following

12  up on counterfeit merchandise being observed at these

13  locations.

14  Q.  And again, is 375 Canal in the subject of the email?

15  A.  Yes.

16  Q.  And what is the date of the emails?

17  A.  The first email -- they were both March 8, 2007.

18  Q.  And who is Brian Brokate?

19  A.  He is the head of the intellectual property department at

20  Gibney Anthony & Flaherty.

21  Q.  And he's a lawyer at the firm?

22  A.  Yes.

23  Q.  And who was Kortny Browning?

24  A.  She was a paralegal.

25  Q.  Can you please read the first two sentences of

J2sWome1                          Silvey - Direct

1    Ms. Browning's email?

2    A.  Yes.  "Our investigators also made observations of

3    counterfeit merchandise on 1/13/07 at the following locations:

4    375A Canal Street.  The outside right console openly displayed

5    100 pieces of Tiffany jewelry; a counterfeit Tiffany ring was

6    purchased from an Asian female vendor at the location."

7    Q.  Thank you.

8        Could you now please turn to PX-79.

9            MS. GOSTIN:  This is also already in evidence.

10   A.  OK.

11           MS. GOSTIN:  Could we please publish this to the jury.

12   Q.  And again, could you just briefly explain what this

13   document is?

14   A.  This is a letter sent by Brian Brokate to Sharyn Tritto

15   regarding counterfeiting at 375 Canal Street and another

16   location.

17   Q.  And what is the date of this letter?

18   A.  June 26, 2009.

19   Q.  And can you please read the body of the letter?

20   A.  Sure.  "As you are aware, we have been notifying you of the

21   illegal counterfeiting activities occurring at your client's

22   premises since 2004.  On June 24, 2009, the mayor's office of

23   special enforcement and NYPD conducted enforcement actions,

24   including nuisance abatement and court-ordered closings at

25   several locations in Chinatown.  As you undoubtedly know, your

J2sWome1                    Silvey - Direct

1   client's properties at 327 Canal Street and 375 Canal Street

2   were among the buildings shut down during these actions."

3   Q.  And now if you could turn to PX-87 in your binder.

4   A.  OK.

5          MS. GOSTIN:  Mr. Lam, this is already in evidence, so

6   we can publish this to the jury as well.

7          THE COURT:  What number is this, Ms. Gostin?

8          MS. GOSTIN:  It's PX-87, your Honor.

9          THE COURT:  Thank you.

10  BY MS. GOSTIN:

11  Q.  And again, can you just generally explain what this

12  document is?

13  A.  This is another email string between Sharyn Tritto, Brian

14  Brokate and myself.

15  Q.  And what are the dates of these emails?

16  A.  April 14, 2011, and April 18, 2011.

17  Q.  And what is the subject of the emails?

18  A.  375 Canal Street.

19  Q.  Can you please read the first paragraph of your email?

20  A.  Sure.  "On April 6, 2011, our investigators made an

21  evidential purchase of a counterfeit Chanel necklace at 375

22  Canal Street.  I have attached a declaration for your

23  reference."

24  Q.  Thank you.

25         Other than the four documents we just looked at, has Gibney

J2sWome1                           Silvey - Cross

1   Anthony & Flaherty sent other notices of counterfeiting

2   activity at 375 Canal Street?

3   A.  Yes.

4            MR. DELLA FERA:  Objection, your Honor.

5            THE COURT:  Overruled.  Notices have been sent.

6   That's in evidence.

7   Q.  And approximately how many?

8   A.  I would say approximately a dozen or so.

9   Q.  And with regard to the notices of counterfeiting activities

10  sent by your firm since 2007, can you give a general idea of

11  what percentage dealt with the Canal Street area?

12  A.  I would say the majority of them.

13           MS. GOSTIN:  Thank you, Ms. Silvey.  I don't have any

14  further questions.

15           THE COURT:  OK.  Mr. Della Fera.

16           MR. SCHICK:  Steve's got me working again.

17           THE COURT:  Early in the day too.

18           MR. SCHICK:  I did OK yesterday so he's got me doing

19  it again.

20           MR. DELLA FERA:  Take what I can, your Honor.

21  CROSS-EXAMINATION

22  BY MR. DELLA FERA:

23  Q.  Good morning, Ms. Silvey.

24  A.  Good morning.

25  Q.  Congratulations on your marriage.

1    A.  Thank you.

2    Q.  Ms. Silvey, you reviewed a number of notices or emails sent

3    by your firm to 375 Canal LLC with Ms. Gostin, right?

4    A.  Yes.

5    Q.  And you just mentioned that you send notices to the Canal

6    Street area generally, correct?

7    A.  Yes.

8    Q.  So you don't just send them to 375 Canal LLC?

9    A.  No.

10   Q.  And you mentioned that you sent probably a dozen or so to

11   375 Canal LLC, correct?

12   A.  Yes.

13   Q.  How many would you say you send per year to landlords in

14   New York City?

15   A.  I don't have a number off the top of my head.

16   Q.  More than 50?

17   A.  I mean, it would vary over time, and I wasn't involved in

18   this for the entire time that the program was conducted, so I

19   don't know.

20   Q.  And let's take a look, then, at some of the notices that

21   you reviewed with Ms. Gostin.

22          MR. DELLA FERA:  I'd like to pull up PX-23 if we

23   could, Sarah.

24   A.  Which binder should I be looking at?

25   Q.  You can look at either binder.  I believe both -- actually,

J2sWome1                      Silvey - Cross

1    if you could use the one I gave you, that would be a little bit

2    better.

3    A.  OK.

4    Q.  PX-23 is a letter sent on February 23, 2005, correct?

5    A.  Yes.

6    Q.  And it's sent to 375 Canal Street and some other addresses,

7    correct?

8    A.  Yes.

9    Q.  And this is from about 14 years ago, then, correct?

10   A.  Yes.

11   Q.  And this email concerns 375B Canal Street, correct?

12   A.  Correct.

13   Q.  Do you have an understanding of what that means, what 375B

14   is?

15   A.  That the location was probably either divided up into

16   sections or possibly different storefronts or booth in the

17   location.

18   Q.  And in this letter, Ms. McDonald wrote, "While we

19   appreciate the efforts you have shown, further action needs to

20   be taken immediately to have these tenants removed," correct?

21   A.  Yes.

22   Q.  So while Ms. McDonald wanted additional steps to be taken,

23   she also did appreciate the efforts that 375 Canal Street and

24   these other buildings had taken to date, correct?

25   A.  Yes.

J2sWome1                              Silvey - Cross

1     Q.  And she didn't seem to think that they were ignoring the
2     problem, correct?
3               MS. GOSTIN:  Objection.
4               THE COURT:  Overruled.
5     Q.  You can answer.
6     A.  I don't know what she thought.
7               MR. DELLA FERA:  Your Honor, I would offer Defendants'
8     Exhibit A into evidence at this point.  It should be in the
9     binder, your Honor.
10              MS. GOSTIN:  We have no objection.
11              THE COURT:  All right.  Defendants' Exhibit A is
12    received in evidence then.
13              (Defendants' Exhibit A received in evidence)
14    BY MR. DELLA FERA:
15    Q.  Ms. Silvey, can you please turn to the tab in your binder
16    that says Defendants' Exhibit A, DX-A?
17    A.  OK.
18    Q.  Can you turn to page 3 of DX-A --
19    A.  OK.
20    Q.  Actually, page 4.
21    A.  OK.
22    Q.  What is the title of this document -- it's a little
23    faded -- if you can read it?
24    A.  It's Mercury Funding L -- I guess the header is the -- it
25    says --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

J2sWome1                          Silvey - Cross

1    Q.  Beneath the phone number, what is the title of this

2    document?

3    A.  Five-day notice to cure.

4    Q.  And if you read below that, it says 375 Canal Street,

5    correct?

6    A.  Yes.

7    Q.  All right.  If I read the first paragraph -- it's not quite

8    so faded -- it says, "Please take notice that you are in

9    default of your obligations of your tenancy under the standard

10   form of store lease dated April 2004," correct?

11   A.  Yes.

12   Q.  And that's between Mercury Funding LLC and Zhong Xing

13   Trading?

14   A.  Yes.

15   Q.  Did you understand that Mercury Funding LLC was the entity

16   that owned 375 Canal Street at the time we looked at PX-23, at

17   the time that PX-23 was sent?

18   A.  Yes.

19   Q.  And do you know what a notice to cure is?

20   A.  No, not really.

21   Q.  Let's go down to the next sentence, the next paragraph.  It

22   says, "Please take further notice that your violations of the

23   terms of the lease as well as the facts necessary to establish

24   the violations of the terms of your lease include, but are not

25   limited to, the following."  And then it lists in the next few

J2sWome1                         Silvey - Cross

1   paragraphs some potentially counterfeit merchandise that was

2   purchased at 375 Canal Street, correct?

3   A.  Yes.

4   Q.  All right.  Let's turn to the next page of this.  And then

5   it says, "Please take further notice that pursuant to paragraph

6   52 of the lease, the above default must be cured on or before

7   April 20, 2005."  Correct?

8   A.  Yes.

9   Q.  And this was signed by a member of Mercury Funding LLC,

10  correct?

11  A.  Yes.

12  Q.  And this was signed on April 21, 2005, correct?

13  A.  Yes.

14  Q.  So about two months after the letter that was in PX-23?

15  A.  Yes.

16  Q.  So this document shows that following receipt of PX-23,

17  Mercury Funding LLC sent a notice to cure to the tenant of the

18  building, correct?

19          MS. GOSTIN:  Objection.

20          THE COURT:  Overruled.

21  Q.  You can answer.

22  A.  Yes.

23  Q.  Let's turn to page 1 of this document.  Below the phone

24  number on this document, what does it state?

25  A.  Three-day notice of termination.

J2sWome1                    Silvey - Cross

1    Q.  And it's sent to Zhong Xing Trading Inc., correct?

2    A.  Yes.

3    Q.  Same entity that we saw on page 4, correct?

4    A.  Yes.

5    Q.  And it says, "Please take notice that the undersigned

6    hereby elects to terminate your tenancy at the above-referenced

7    premises effective May 18, 2005."  Correct?

8    A.  Yes.

9    Q.  And if you take a look at the "please take further notice"

10   paragraph, they did so because the lease prohibits counterfeit

11   merchandise from being sold, correct?

12   A.  Yes.

13   Q.  And despite the notice to cure that we saw just a minute

14   ago, an additional counterfeit piece of merchandise apparently

15   seems to have been bought at this location, correct?

16   A.  Yes.

17   Q.  So in response, this document was sent terminating the

18   lease, correct?

19   A.  I guess -- it appears so.

20   Q.  And let's turn to the next page of this document.  This was

21   sent on May 12, 2005, correct?

22   A.  Yes.

23   Q.  And it's signed, again, by a member of Mercury Funding LLC?

24   A.  Yes.

25   Q.  So the entity that owned 375 Canal Street, after having

1    received notice from your firm, sent a notice to cure, correct?

2    A.  Yes.

3    Q.  And then after the notice of cure wasn't effective, they

4    sent a notice of termination, correct?

5    A.  Yes.

6    Q.  And they attempted to terminate the lease?

7    A.  Yes.

8    Q.  Because the tenant was selling counterfeit goods?

9    A.  Yes.

10   Q.  Let's move to PX-44, another document that I believe you

11   reviewed with Ms. Gostin.  And PX-44 is from December 19, 2006,

12   correct?

13   A.  Yes.

14   Q.  The top email in the chain?

15   A.  Yes.

16   Q.  And the bottom email in the chain is from December 4, 2006?

17   A.  Correct.

18   Q.  And so this is about a year and a half after the notice to

19   cure we saw and the notice of termination in the previous

20   exhibits?

21   A.  Yes.

22   Q.  And I'd like to direct you to the email from Ms. Tritto in

23   the middle of the page that's dated December 4, 2006.  Do you

24   see that?

25   A.  I do.

1   Q.  And if you look at the paragraph below the list of

2   addresses, do you see the third sentence in that paragraph that

3   starts with "I was also"?

4   A.  Yes.

5   Q.  And that sentence says, "I was also in court with the

6   tenant in 375 Canal Street."

7   A.  Yes.

8   Q.  So this letter or this email indicates that Ms. Tritto was

9   in court with the tenant 375 Canal Street?

10  A.  Yes.

11  Q.  Do you know why she would be in court?

12  A.  I didn't --

13          MS. GOSTIN:  Objection.

14          THE COURT:  If she knows why she can say.  Objection's

15  overruled.

16          MR. DELLA FERA:  Thank you.

17          THE COURT:  Do you know why?

18          THE WITNESS:  I do not know.

19  BY MR. DELLA FERA:

20  Q.  Is it possible she was in court to remove the tenant?

21          MS. GOSTIN:  Objection.

22  Q.  If you know.

23          THE COURT:  Sustained.

24  Q.  Let's look at page 2 of PX-44.  This is a receipt that you

25  attached from an apparent purchase made at 375 -- your firm,

1    excuse me.  This is a receipt that your firm attached from the

2    apparent purchase made at 375 Canal Street in December 2006,

3    correct?

4    A.  Yes.

5    Q.  And this receipt was completed by an investigator your firm

6    hired, correct?

7    A.  Yes.

8    Q.  And if you look at the top of this document, it says that

9    the address is 375A Canal Street, correct?

10   A.  Yes.

11   Q.  So that's, again, we talked about 375B a minute ago, and

12   that might be one subunit of the location --

13            MS. GOSTIN:  Objection.

14   Q.  -- correct?

15   A.  Yes.

16   Q.  And 375A might be another subunit of the location?

17   A.  It might be, yes.

18   Q.  And I'd like you to look right above the address at 375A.

19   Do you see where there's an M listed on the left?

20   A.  Yes.

21   Q.  And it says outside stand?

22   A.  Yes.

23   Q.  Now, do you have any personal knowledge about this

24   investigation?

25   A.  I do not.

1    Q.  You didn't go on it?

2    A.  No.

3    Q.  But the investigator wrote outside stand, correct?

4    A.  Yes.

5    Q.  Have you seen counterfeit goods sold on -- goods of any

6    type in New York sold on tables in the street?

7    A.  I have.

8    Q.  Could it be possible that the outside stand listed here is

9    one such table?

10   A.  I don't know.

11          MR. DELLA FERA:  Let's move to PX-47 now.

12   Q.  PX-47 is another email that you reviewed with Ms. Gostin,

13   correct?

14   A.  Yes.

15   Q.  All right.  And again, this is an email chain from about 12

16   years ago, March of 2007, correct?

17   A.  Correct.

18   Q.  And this is a few months after that December 2006 email we

19   were just looking at, correct?

20   A.  Yes.

21   Q.  All right.  And Ms. Gostin had you look that there was a

22   notice of, again, outside -- the outside right console was

23   displaying a hundred pieces of Tiffany jewelry, correct?

24   A.  Yes.

25   Q.  And that's at that 375A unit again, correct?

1    A.  Yes, that's what it says here.

2    Q.  And at the top of the document, there's an email from

3    Ms. Tritto, March 8, 2007, right?

4    A.  Yes.

5    Q.  And that email says, "The lease for 375A expires at the end

6    of this month.  I will be seeking possession."  Correct?

7    A.  Yes.

8    Q.  Let's see if Ms. Tritto followed through.

9            MR. DELLA FERA:  Can we pull up Defendants' Exhibit J,

10   please.

11   Q.  You can turn to that in your binder.

12   A.  I found it.

13           MR. DELLA FERA:  Defendants' Exhibit J is in evidence,

14   your Honor.

15           THE COURT:  Pardon me?

16           MR. DELLA FERA:  Defendants' Exhibit J is already in

17   evidence.

18           THE COURT:  Yes, I understand.

19   BY MR. DELLA FERA:

20   Q.  Ms. Silvey, can you read the top of this document?

21   A.  It's a surrender agreement.

22   Q.  And the date of this document?

23   A.  4/17/07.

24   Q.  And the landlord?

25   A.  375 Canal LLC.

J2sWome1                         Silvey - Cross

1    Q.  And this says that the description of leased premises is

2    corner store premises?

3    A.  Yes.

4    Q.  At 375 Canal Street, correct?

5    A.  Yes.

6    Q.  You're not sure whether that's 375A or 375B, are you?

7    A.  No.

8    Q.  But Ms. Tritto did say that she'd be seeking possession

9    because the lease ended at the end of the month for the tenant

10   at 375A, correct?

11   A.  Yes, that's right.

12   Q.  And if you look at the bottom or at the middle of this

13   document, that says surrender in the middle, correct?

14   A.  Yes.

15   Q.  It says:  "Tenant gives possession of the leased premises

16   and the keys to the landlord.  The landlord accepts the keys

17   and possession of the leased premises in the condition

18   delivered."  Is that right?

19   A.  Yes.

20   Q.  And this document was signed, it appears, by the

21   landlord -- that is, 375 Canal LLC -- at the bottom?

22   A.  Yes.

23   Q.  So this document shows that 375 Canal LLC did seek

24   possession from the tenant as Ms. Tritto stated in her March

25   2007 email, correct?

1    A.  Yes.

2    Q.  And so this email shows that Ms. Tritto followed through

3    with you, with your firm about what she said she would do,

4    correct?

5    A.  Yes, that's what it says.

6    Q.  She was good to her word?

7    A.  I --

8    Q.  From what this document's showing?

9    A.  From what I see, I suppose so.

10   Q.  And so let's look at PX-87, which I believe is the final

11   document that you reviewed with Ms. Gostin.

12           MR. DELLA FERA:  Actually, can we go back to PX-47.

13   There's one final issue on PX-47.

14   Q.  I apologize.

15   A.  That's OK.

16   Q.  Do you see at the top of this email, on PX-47, the third

17   sentence, "Please provide seizure vouchers if you have them"?

18   A.  Yes.

19   Q.  And then, "I will serve appropriate notices and keep you

20   advised"?

21   A.  I see that.

22   Q.  Do you know why Ms. Tritto would ask for seizure vouchers?

23   A.  I would imagine just for further proof or evidence of what

24   we sent her previously.

25   Q.  If you know, can a landlord evict a tenant without some

1   sort of evidence like that?

2   A.  I don't know.

3          MR. DELLA FERA:  Let's now turn to PX-87.

4   Q.  And looking at PX-87, you focus on an email from

5   Ms. Tritto -- to Ms. Tritto from you saying that there had been

6   a purchase of a Chanel necklace at 375 Canal Street, correct?

7   A.  Yes.

8   Q.  And in response, Ms. Tritto says that she was informed that

9   the offending subtenant was removed, correct?

10  A.  Yes.

11  Q.  Do you understand what a subtenant is?

12  A.  Yes, it was -- well, I imagine if we're saying the space

13  was divided up into different booths or sections, it was

14  someone in one of those sections.

15  Q.  Wouldn't a tenant be the person who leases directly from

16  the landlord?

17  A.  Yes.

18  Q.  And wouldn't a subtenant be somebody who then leases from

19  the tenant?

20  A.  I don't know exactly how it works, but that would be my

21  understanding.

22  Q.  OK.  And when she said that the offending subtenant had

23  surrendered, did you follow up on that?

24  A.  I don't remember.

25  Q.  Did Ms. Gostin show you any email where you said that's not

1    good enough, we need the tenant to be removed?

2    A.  I don't recall.

3    Q.  You don't recall if she showed you an email?  I'm asking if

4    Ms. Gostin showed you an email indicating that you felt that

5    additional action needed to be taken against the tenant.  I'm

6    talking about what she showed you this morning.

7              THE COURT:  I don't understand the question.

8    Q.  Did Ms. Gostin show you any document after this document

9    showing that you followed up with Ms. Tritto?

10   A.  I don't think so.

11   Q.  OK.  Let's go back to this document and look at the -- and

12   again, if you look at your email, you said that you have

13   attached a declaration for your reference, correct?

14   A.  Yes.

15   Q.  Let's look at that declaration.  Turn to page 3.  Do you

16   see paragraph 3 of this declaration?

17   A.  Yes.

18   Q.  And it says, in sum and substance, that a necklace was

19   purchased from an Asian female vendor, correct?

20   A.  Yes.

21   Q.  It doesn't say a man of Middle Eastern descent?

22   A.  No, it does not.

23   Q.  Or a man of Indian descent?

24   A.  It does not say that.

25   Q.  And if we go back to the first page of this document,

J2sWome1                          Silvey - Cross

1   again, it says that the offending subtenant has surrendered,

2   correct?

3   A.  Yes.

4   Q.  And that subtenant was likely this Asian female vendor?

5   A.  Yes.

6           MR. DELLA FERA:  Nothing further, your Honor.

7           MS. GOSTIN:  We have no further questions.

8           THE COURT:  Ms. Silvey, you're excused.  Thank you

9   very much.

10          THE WITNESS:  Thank you.

11          (Witness excused)

12          MR. GUNTHER:  Your Honor, our next witness is going to

13  be Albert Laboz.

14          THE COURT:  OK.  We're going to take a short recess.

15  There's a legal matter we have to inquire into.  It'll take

16  about ten minutes.

17          (Continued on next page)

18

19

20

21

22

23

24

25

J2sWome1

1          (Jury not present)

2          THE COURT:  OK, Mr. Schick.

3          MR. SCHICK:  Thank you, your Honor.

4          What we received last night from plaintiffs' counsel

5    indicates that what they intend to do with Mr. Laboz is

6    extraordinarily far afield from what the judge has ruled is

7    relevant and in many cases admissible in this trial.  For

8    example, they sent a new exhibit last night.

9          Your Honor made a ruling in 2017 with respect to

10   documents that plaintiffs' prior counsel wanted to put in that

11   may have shown Laboz family wealth and the like.  Your Honor

12   made specific rulings about documents, and last night they sent

13   us Exhibit 292, never been produced before, never been on any

14   exhibit list before, which shows, "Development dreams, Laboz

15   family has amassed $76 million of property on Downtown Brooklyn

16   block," entirely irrelevant to this case, obviously, not in any

17   exhibit list.

18         THE COURT:  What's the next one?

19         MR. SCHICK:  Then, your Honor, they have well over a

20   dozen exhibits that are solely related to other buildings,

21   picture after picture of buildings that are not 375 Canal

22   Street, that have no relevance to this case.

23         I know your Honor has let in specific letters that

24   have, you know, some reference to one or more buildings as long

25   as we focus on the buildings, but they have document after

J2sWome1

document.  Your Honor made a ruling at -- before opening with

respect to certain documents they wanted to put in about United

American Land and all its holdings.  Your Honor said they could

not use that, and yet here it is as an exhibit.

Your Honor made a ruling yesterday with Mr. Taute

about an email about the Swatch seizure in 2012, and yet it is

last night sent to us as an exhibit when your Honor sustained

the objection, and now there's certainly no basis for it.

This is solely -- and one more thing, your Honor.

There's exhibit after exhibit in this book like that.

And then one final point, your Honor, which is -- two

final points, please.

One, again, they clearly are trying to go to the fact

that Mr. Laboz has some means.  They have, for example, the

mortgage of this property.  There is no dispute that Mr. Laboz,

375 Canal owns the property and the Laboz family are members,

but the only purpose to put in a mortgage is to show some value

of the property.  Your Honor made a ruling with respect to

actual damages and your Honor has his jury instruction, which

both sides have to live with -- right -- which is we're not

going to show how many billions Omega has and the fact that it

had zero actual damages here and they're not going to show the

Laboz family is rich, so therefore, goes left.  And we've kept

our end of that bargain.

The last, final point, your Honor, is your Honor

J2sWome1

```
1    admitted three settlement agreements with the city and the

2    Louis Vuitton settlement.  And that's all in, and we have

3    haven't tried to reargue that.  Now they want to put in a

4    settlement agreement about a different building, your Honor,

5    415 Broadway.  Your Honor made a ruling about other buildings.

6    In any event, your Honor also said even with respect to 375

7    Canal, three settlements with the city, Louis Vuitton, we've

8    lived with that, and now with the last witness they just want

9    to take this entire case in an entirely different,

10   inappropriate and irrelevant direction.

11            THE COURT:  Mr. Gunther.

12            MR. GUNTHER:  Yes, your Honor.

13            Your Honor, first of all, we put a bunch of exhibits

14   in the binder to make sure that we had what we might use with

15   this witness.  But let me be very clear.  In terms of my

16   cross-examination of Mr. Laboz, to the extent I'm talking about

17   counterfeiting activity, I'm going to focus my questions on

18   what was going on at 375 Canal Street.  That's point one.

19            Point two, I am going to ask him questions about other

20   buildings that they own, that he and his brothers own.  I'm

21   entitled to do that because, and your instructions make this

22   clear, your Honor, it goes directly to the issue of the amount

23   of statutory damages.

24            THE COURT:  How does that deal with statutory damages?

25            MR. GUNTHER:  Your Honor, two ways.
```

J2sWome1

1          The amount of statutory damages has to have the

2     potential for discouraging the defendant; that's 375 Canal

3     Street, owned by the Laboz brothers.  And No. 4 in the list, in

4     your jury instruction, is the deterrent effect on others

5     besides the defendant.  So to the extent that they're arguing

6     that 375 Canal Street is all by itself and the Laboz brothers

7     should not be looked at beyond that, I'm entitled to show that

8     they own, through common ownership, a number of other buildings

9     in the Canal Street area; and that in terms of deterring them,

10    your Honor, it's important for the jury to consider that they

11    have other buildings in the Canal Street area besides 375 Canal

12    Street.

13         When Mr. Noyes opened, and your Honor allowed him to

14    do this, we put up a demonstrative exhibit that showed the

15    other buildings owned by the Laboz brothers in the Canal Street

16    area.  I'm not going to ask him about counterfeiting activity

17    at those locations, but it is important for the jury to

18    understand that these three brothers own a number of properties

19    down there and that, in assessing the amount of statutory

20    damages in this case, they should assess -- they should think

21    about and keep in mind -- how are they going to discourage this

22    defendant as well as others from doing what we think is

23    improper counterfeiting, a haven for counterfeiting activity?

24         So, your Honor, I'm being very specific.

25         THE COURT:  What about the references to his wealth?

1          MR. GUNTHER:  Your Honor, I'm not going to ask him

2     about his wealth.  I wasn't planning to.  The document in there

3     is just to show that they own -- I'm going to ask him about how

4     many buildings they own in the New York area.

5          THE COURT:  Mr. Schick.

6          MR. SCHICK:  Your Honor, I was not allowed to ask

7     Mr. Foster how many billions of dollars Omega has in sales, how

8     Omega sales went up every year, how they have no actual

9     damages.

10          Now, actual damages are a factor in statutory damages.

11     It's included in the jury instruction.  I was prohibited from

12     pointing out that they're at zero.  Everything -- with respect

13     to the exhibit, the demonstrative, they argued then it's for

14     general background, and your Honor let it in.  They put in so

15     many letters with respect to 375 Canal with other addresses,

16     and your Honor let it in.

17          THE COURT:  How could I keep it out?

18          MR. SCHICK:  OK.

19          THE COURT:  I'm trying to be practical here.

20          MR. SCHICK:  Well, they picked the ones that have

21     other addresses.

22          MR. GUNTHER:  That's just not right.

23          MR. SCHICK:  The point has been made, your Honor.  I

24     must then be able to say Omega had no damages.  It's an

25     admission they made in open court.  Your Honor can say the

J2sWome1

1    instructions say that that's not the only factor, but they're

2    not letting me say that, your Honor.  You didn't let me ask Mr.

3    Foster that.  You didn't let me ask anybody that.

4         And now they want to say -- if they want to ask the

5    general question, Did you own a few buildings, the jury has got

6    that already, obviously.  If he wants to ask a general

7    question, your Honor can ask the general question, Do you own a

8    half a dozen buildings?  He can do that, but this is what their

9    whole testimony is, picture after picture.  He's admitted it's

10   about wealth.  All it is is about send a message.

11        THE COURT:  Mr. Gunther represents that he's not going

12   to ask him about wealth.

13        MR. GUNTHER:  I just said that, your Honor.  And you

14   know something?  I think, your Honor, one of the things you can

15   count on me for is that when I make a representation to you,

16   I'm going to stick by it.

17        MR. SCHICK:  Your Honor, if you ask somebody in New

18   York, How many cars do you own and they say 20, you've asked

19   them about their wealth.  If you ask them about how many

20   buildings you own, you've asked that.  Now he's saying he's

21   going to ask him totally how many buildings he owns.  It's far

22   afield, your Honor.  It's totally far afield.

23        THE COURT:  All right.  I've heard enough.

24        You're not going to ask him about wealth.

25        MR. GUNTHER:  Your Honor, I represent to you I will

J2sWome1

```
 1    not ask him a question about his wealth.

 2              THE COURT:  Or his family's wealth.

 3              MR. GUNTHER:  Or his family's wealth.

 4              THE COURT:  Or the company's wealth.

 5              MR. GUNTHER:  Or the company's wealth.

 6              MR. SCHICK:  Your Honor, he should be limited to the

 7    demonstrative he said shows half a dozen buildings.  If he

 8    wants him to say, We own those buildings, your Honor, that's

 9    fine.  He wants to go far afield with that, with the whole

10    United American Land.  It's inappropriate, your Honor.  It's no

11    different than actual damages.

12              THE COURT:  OK.  The rule is no wealth.

13              MR. SCHICK:  And your Honor, there's one final issue,

14    415B, the settlement on the other building.  I raised the issue

15    with the settlement on the other building.

16              MR. GUNTHER:  Your Honor, I really wish Mr. Schick

17    would listen when I talk.  I represented to you that the only

18    examination I'm going to do with respect to counterfeiting

19    activities is at 375 Canal Street.  I've made that

20    representation to you, and I intend to stick to it.

21              THE COURT:  Call the jury, please.

22              (Continued on next page)

23

24

25
```

```
 1              (Jury present)
 2              THE COURT:  Please be seated.
 3              Call your next witness.
 4              MR. GUNTHER:  Your Honor, we call Mr. Albert Laboz.
 5     ALBERT LABOZ,
 6          called as a witness by the plaintiffs,
 7          having been duly sworn, testified as follows:
 8              THE COURT:  Mr. Gunther.
 9              MR. GUNTHER:  Thank you, your Honor.
10     DIRECT EXAMINATION
11     BY MR. GUNTHER:
12     Q.  Good morning, Mr. Laboz.
13     A.  Good morning.
14     Q.  Can you tell the jury what your occupation is?
15     A.  I'm a real estate owner and manager.
16     Q.  OK.  And do you own real estate in the Manhattan area?
17     A.  Yes.
18     Q.  And in the New York City area in general?
19     A.  Yes.
20     Q.  Now, sir, you're a lawyer, am I correct?
21     A.  Yes.
22     Q.  How long have you been a lawyer?
23     A.  Since '85.
24     Q.  OK.  Sir, have you ever practiced law?
25     A.  No.
```

1   Q.  OK.  Now, sir, are you familiar with a company called 375

2   Canal Street LLC?

3   A.  Yes.

4   Q.  And sir, that is a limited liability company, correct?

5   A.  Correct.

6   Q.  That's what LLC stands for?

7   A.  Yes.

8   Q.  And sir, the members of 375 Canal Street LLC are you and

9   your brothers Jason Laboz and Jody Laboz, correct?

10  A.  That's correct.

11  Q.  And apart from your brothers, you and your brothers, no one

12  else makes any decisions in connection with the affairs of 375

13  Canal Street, isn't that right?

14  A.  Correct.

15  Q.  Now, your understanding, sir, is that 375 Canal Street is

16  the defendant in this case, correct?

17  A.  Correct.

18  Q.  And 375 Canal Street currently owns the building located

19  at -- sorry.  375 Canal LLC currently owns the building located

20  at 375 Canal Street, right?

21  A.  Yes.

22  Q.  And it owns the storefront that is 375A Canal Street,

23  right?

24  A.  Yes.

25  Q.  And it owns the storefront that is 375B Canal Street,

1    right?

2    A.  Yes.

3    Q.  And it has owned the entire building, including both of

4    those storefronts, since 2005, correct?

5    A.  That's right.

6    Q.  And the building is on the corner of Canal Street and West

7    Broadway, right?

8    A.  Yes.

9    Q.  It's a four-story building with retail stores on the ground

10   floor, right?

11   A.  Yes.

12   Q.  And it has retail storefronts both on the Canal Street side

13   and on the West Broadway side, right?

14   A.  Yes.

15   Q.  And the address of the West Broadway-facing storefront is

16   301 Canal Street, correct?

17   A.  That's right.

18   Q.  Now, 375 Canal Street LLC purchased the property located at

19   375 Canal Street from an entity known as Mercury Funding LLC,

20   right?

21   A.  Yes.

22   Q.  And Mercury Funding LLC was also owned by you and your two

23   brothers, correct?

24   A.  Correct.

25       I want to correct something.  I'm not sure if it was a

1    purchase.  It was just an internal transfer.

2    Q.  An internal transfer?

3    A.  Yes.

4    Q.  OK.  And sir, that occurred in 2005?

5    A.  Yes, I believe so.

6    Q.  OK.  Now, sir, you and your brothers are principals in

7    another entity called United American Land LLC, correct?

8    A.  Yes.

9    Q.  I'd like to take a look, if I can, at -- and I'm going to

10   ask you --

11          MR. GUNTHER:  Have we handed up the binders?  OK.

12   Q.  There should be a binder in front of you on the witness

13   stand to your left, and if you look at Plaintiffs' Exhibit

14   219 --

15   A.  Yes.

16   Q.  Sir, is that a printout of a portion of the United American

17   Land LLC website?

18   A.  Yes.

19          MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

20   219.

21          MR. SCHICK:  Your Honor, it's not relevant.  He's

22   obviously testified that, you know, he has relationship there,

23   but it's really not relevant and taking us far afield, I feel,

24   your Honor.  I see the next ones in the book.  You can page

25   through the book, your Honor.

1          THE COURT:  This is all background information.  The

2     objection is overruled.

3          (Plaintiffs' Exhibit 219 received in evidence)

4          MR. GUNTHER:  Thank you, your Honor.

5          With 219 now in evidence, I'll put it up on the

6     screen, and can we blow up the paragraph at the top.

7     Q.  Can you see that on the screen, sir?

8     A.  No.

9          MR. GUNTHER:  All right.  Hang on.

10         Does the jury have it?  Thank you.

11    Q.  I want to make sure you have it, sir.  You could look at it

12    in the book.

13    A.  OK.

14    Q.  It's Plaintiffs' Exhibit 219, and it's on the first page

15    and it's the first paragraph under United American Land.  Do

16    you see that?

17    A.  Correct.

18    Q.  And it says, "United American Land LLC (UAL) is a

19    family-owned real estate development, investment and management

20    company based in New York City.  Its principals, the brothers

21    Albert, Jason and Jody Laboz, own and manage almost 50

22    properties in Manhattan, Brooklyn and Queens."  Do you see

23    that?

24    A.  Yes.

25    Q.  And sir, that's an accurate statement, correct?

J2sWome1                         Laboz - Direct

1   A.  Yes.

2   Q.  OK.  Sir, you and your brothers run your business as

3   landlords of these various buildings under the name United

4   American Land LLC, right?

5   A.  Well, United American Land is really the management

6   company.

7   Q.  OK.  And one of the properties that United American Land

8   manages is the property at 375 Canal Street, right?

9   A.  That's right.

10  Q.  Now, sir, I'd like to show you what's been marked, and it

11  should be in your binder, as 222.

12  A.  Two -- I'm sorry?

13  Q.  222, PX-222.

14  A.  OK.

15  Q.  Sir, this is a printout of another portion of the United

16  American Land website, correct?

17  A.  Correct.

18          MR. GUNTHER:  Your Honor, I offer Plaintiffs' Exhibit

19  222.

20          MR. SCHICK:  Your Honor, we object.

21          THE COURT:  Sustained.

22  BY MR. GUNTHER:

23  Q.  Now, is it fair to say, sir, that of the buildings that you

24  own a number of them have retail space as well as other space?

25  A.  Yes.

1    Q.  Would you say that the majority have retail space?

2    A.  Mostly.

3    Q.  OK.  So of the 50 buildings you own, most of them have

4    retail space in them?

5    A.  Correct.

6    Q.  Now, sir, are you aware that during at least the period

7    2004 to 2012, the sales of counterfeit goods were a problem in

8    the Canal Street area?

9    A.  Yes.

10   Q.  And sir, you know that the sale or offer for sale of

11   counterfeit goods is wrong, correct?

12   A.  Absolutely.

13   Q.  And you know it's a crime, it's actually a crime in New

14   York, correct?

15   A.  Yes.

16   Q.  To sell --

17   A.  Yes.

18   Q.  -- or offer to sell counterfeit goods?

19   A.  Yes, and we take it seriously.

20   Q.  And sir, you know that it's wrong for tenants in one of

21   your buildings to sell or offer for sale counterfeit goods,

22   right?

23   A.  Absolutely.

24   Q.  Now, sir, I'd like to ask you to take a look at --

25       Well, let me ask you this.  Sir, 375 Canal LLC has been a

J2sWome1                          Laboz - Direct

1  defendant in at least three lawsuits brought by the city of New

2  York, right?

3  A.  I think so.

4  Q.  All right.  So in 2004, 375 Canal was owned -- Canal Street

5  was owned by Mercury Associates, right?

6  A.  Yes.

7  Q.  And that was the company that you and your brothers

8  controlled, correct?

9  A.  Correct.

10  Q.  And when it was transferred in 2005, it was the internal

11  transfer to 375 Canal, also controlled by you and your

12  brothers, right?

13  A.  Yes.

14  Q.  OK.  So your family owned or really controlled Mercury

15  Associates in 2004, right?

16  A.  Correct.

17  Q.  In 2004, the city of New York commenced an action against

18  Mercury Associates and the occupants of 375 Canal Street

19  relating to counterfeiting activity at 375 Canal Street, right?

20  A.  I believe so.

21  Q.  Sir, let me show you Plaintiffs' Exhibit 137 in evidence,

22  and I'll put up the first page, and hopefully -- is it on the

23  screen for you, sir, or do you have to --

24  A.  No screen.

25          MR. GUNTHER:  No screen.  Is there a way to just check

J2sWome1                        Laboz - Direct

1    the monitor for him?

2              THE COURT:  I can't check the monitor.

3              MR. GUNTHER:  Your Honor, that's fine.  I apologize.

4    I'll keep going.

5              THE COURT:  The old-fashioned way is the best way.

6              MR. GUNTHER:  Mr. Gonzalez can check the monitor.

7              THE WITNESS:  It went on for a second.

8              There you go.

9              MR. GUNTHER:  You got it?

10             Thank you, Mr. Gonzalez.

11             THE COURT:  He shook the screen and it turned on.

12   It's a function of turning it on and off.

13             MR. GUNTHER:  Turning it on and turning it off, right.

14             Thank you, your Honor.

15             THE COURT:  Mr. Laboz has a screen now.

16             MR. GUNTHER:  OK.  Great.

17             If we could turn to the second page of Plaintiffs'

18   Exhibit 137 and -- actually, go to the third page.  I'm sorry.

19   And if we could blow up the caption.

20   Q.  Now, sir, this is actually -- this is the city of New York,

21   and this is the caption of the lawsuit in 2004 relating to the

22   city of New York suing Mercury Associates and 375 Canal Street

23   for counterfeiting activity, correct?

24   A.  Correct.

25             MR. SCHICK:  I object, your Honor.  I think it's an 05

1    index number.  I just want to clarify for a second.  Looks like

2    05.

3             MR. GUNTHER:  The settlement was filed in October.

4    There's a stamp right on the front, October 26, 2005, right?

5             THE COURT:  Correct.

6    BY MR. GUNTHER:

7    Q.  Now, sir, this was a stipulation that 375 Canal LLC entered

8    into -- sorry, Mercury Associates, not 375 Canal -- mercury

9    Associates entered into with the city of New York to settle

10   that action, right?

11   A.  Yes.

12   Q.  Sir, you were represented by counsel in connection with

13   that settlement, right?

14   A.  Yes.

15   Q.  And that counsel was Sharyn Tritto?

16   A.  Yes.

17   Q.  And sir, as part of that settlement --

18             MR. GUNTHER:  And I'd like to look at paragraph 3 of

19   the settlement if we can, and we're putting that up.

20   Q.  As part of that settlement, Mercury Associates agreed that

21   the premises located, and then there's a listing, "the land and

22   building known as 375 Canal Street will be permanently enjoined

23   as a place where the sale and/or possession of trademark

24   counterfeit merchandise occurs."  Do you see that?

25   A.  Correct.

1  Q.  You agreed to that, correct?

2  A.  Correct.

3  Q.  And you agreed to that injunction, correct?

4  A.  Yes.

5          MR. GUNTHER:  All right.  Now I'd like to go to

6  Plaintiffs' Exhibit 140, which is also in evidence, and if we

7  could put that up.

8  Q.  In 2006, the city of New York again sued 375 Canal Street,

9  and now the defendant was 375 Canal, which had purchased the

10 building in 2005, right?

11 A.  Again, you used the word "purchased."

12 Q.  It had transferred?

13 A.  Yes.

14 Q.  I apologize.

15 A.  Don't apologize.

16 Q.  Transferred?

17 A.  Yes.

18 Q.  With that correction, is the answer to my question yes?

19 A.  Yes.

20 Q.  So the lawsuit in 2006 was the city of New York suing 375

21 Canal LLC as well as the land and building known as 375 Canal

22 Street, right?

23 A.  Correct.

24 Q.  And once again, this action related to counterfeiting of

25 goods either being sold or offered for sale at 375 Canal

1   Street, right?

2   A.  Yes.

3   Q.  And sir, 375 Canal Street settled that lawsuit; in fact,

4   this document, Plaintiffs' Exhibit 140, is the stipulation of

5   that settlement, right?

6   A.  Yes.

7   Q.  And again, you were represented by counsel in connection

8   with that settlement, right?

9   A.  Yes.

10  Q.  Ms. Tritto?

11  A.  Yes.

12          MR. GUNTHER:  If we could again turn to paragraph 3

13  and put that up.

14  Q.  Sir, again, you, as the owners of 375 Canal Street LLC,

15  agreed that "the land and building known as 375 Canal Street

16  will be permanently enjoined as a place where the sale and/or

17  possession of trademark counterfeit merchandise or pirated

18  merchandise occurs," correct?

19  A.  Correct.

20  Q.  You agreed to that, right?

21  A.  Yes.

22  Q.  You agreed to that injunction; that was part of the

23  stipulation and settlement, right?

24  A.  Well, I agreed to use everything in my power to stop it.

25  Q.  OK.  Everything in your power?

1   A.  Yes.

2   Q.  Everything in your power?

3   A.  As my landlord, yes.

4   Q.  Now, sir, I want to show you what's been marked and is in

5   evidence as Plaintiffs' Exhibit 147.

6           MR. GUNTHER:  And let's go to the third -- the

7   second -- that's the page.  I'm sorry.

8   Q.  Sir, again, for a third time, in 2009, the city of New York

9   again sued 375 Canal LLC and the land and building at 375 Canal

10  Street for counterfeiting activity that was going on in those

11  premises, right?

12  A.  Correct.

13  Q.  And once again, 375 Canal LLC, owned by you and your two

14  brothers, settled with the city of New York, correct?

15  A.  Correct.

16  Q.  And again, you were represented by counsel?

17  A.  Yes.

18  Q.  Right?

19  A.  Yes.

20  Q.  Ms. Tritto, right?

21  A.  Yes.

22  Q.  Sir, let's go to paragraph 4 of that stipulation of

23  settlement.  And it says, "Defendant 375 Canal, without

24  admitting any knowledge of the underlying allegations in the

25  complaint, consents that it, its agents, assigns, employees,

1    patrons and/or representatives shall be permanently and

2    perpetually" --

3        What does perpetually mean?  That means forever, right?

4    A.  Right.

5    Q.  "-- enjoined from violating either New York State penal

6    laws or the parameters enumerated in Section 7-703 of Title 7

7    of the New York City Administrative Code within the premises."

8    Do you see that?

9    A.  Yes.

10       Well, we didn't violate the penal law.

11   Q.  Sir, I didn't ask you that.  I just asked you what it says,

12   right?

13   A.  Yes.

14   Q.  So you agreed and consented to that injunction, correct?

15   A.  Yes.

16   Q.  In perpetuity, correct?

17   A.  Yes.

18           MR. GUNTHER:  Now, let's turn to paragraph 8 of the

19   stipulation of settlement and we're getting that.

20   Q.  Now, in the stipulation of settlement, paragraph 8 reads as

21   follows:  "375 Canal and the subsequent tenant shall dismantle

22   and remove all hidden storage facilities/structures inside the

23   premises to allow open access to all areas within the

24   storefront."  Do you see that?

25   A.  Yes.

1    Q.  And it says, "Said defendant further agrees that prior to

2    the premises being reopened for lawful business operations,

3    plaintiff's representative shall be permitted entry to conduct

4    a walk-through to ensure compliance with this provision."  Do

5    you see that?

6    A.  Yes.

7    Q.  And it says, "Should the walk-through demonstrate that the

8    premises has not been satisfactorily dismantled, the location

9    will not be reopened for lawful business operations pending

10   compliance with this paragraph."  Do you see that?

11   A.  Yes.

12   Q.  And you agreed to that, right?

13   A.  Yes.

14   Q.  You agreed to take those steps, right?

15   A.  Yes.

16            MR. GUNTHER:  Let's go to paragraph 12.

17   Q.  Paragraph 12 says that "375 Canal shall have professional

18   course of conduct signs posted throughout the premises.  Said

19   signs shall inform patrons that the sale and/or possession of

20   either pirated or trademark counterfeit merchandise will not be

21   tolerated and may result in their arrest."  Do you see that?

22   A.  Yes.

23   Q.  "Said signs shall be visible at all times and are to be

24   posted on or before August 15, 2009."  Do you see that?

25   A.  Yes.

J2sWome1                        Laboz - Direct

1   Q.  And then it talks about failure to comply with the

2   provision.  Do you see that?

3   A.  Yes.

4   Q.  OK.  And it talks about a two-year period, correct?

5   A.  Yes.

6   Q.  All right.  So 375 Canal LLC agreed to make sure that those

7   signs were put up warning about counterfeiting activity and the

8   penalties therefor as part of this settlement," correct?

9   A.  Correct.

10  Q.  Now, sir, I'd like to show you Plaintiffs' Exhibit 106 in

11  evidence.

12          MR. GUNTHER:  Could we put that up.

13  Q.  Now, sir, there's been evidence in this case that this is a

14  photograph that was taken in December of 2010.  My question is,

15  sir, do you recognize this as the storefront at 375B Canal

16  Street?

17          MR. SCHICK:  Your Honor, I object not to the question

18  he asked but to the prior characterization of disputed and

19  unfounded testimony.  But the question of what he recognizes I

20  have no objection to.

21          THE COURT:  OK.  Thanks for the observation.

22          MR. GUNTHER:  Your Honor, I'm not quite sure what the

23  observation had to do with this case.

24          THE COURT:  Yes.

25  BY MR. GUNTHER:

1    Q.  Sir, do you recognize that to be the premises at 375B Canal

2    Street?

3    A.  Yes.

4    Q.  Now, sir, assuming that this photograph was taken in

5    December 2010, do you see any signs warning, related to

6    counterfeiting, anticounterfeiting activity?

7    A.  No, I don't.

8    Q.  OK.

9    A.  But we did put up the signs.

10   Q.  Sir, are there any signs there?  It's 2010.

11   A.  No.

12   Q.  Was that within the two-year period of the stipulation of

13   settlement?

14   A.  Yes.

15   Q.  Do you see any signs there?

16   A.  I answered it.  I didn't see a sign, no.

17           MR. GUNTHER:  OK.  Let's take a look at the next

18   exhibit, which is Plaintiffs' Exhibit 107.

19   Q.  Sir, do you recognize this to be an interior shot of that

20   same storefront?

21   A.  I believe so.

22   Q.  All right.  And sir, if the evidence shows that this

23   photograph were taken in December of 2010, do you see any signs

24   that say there should be no counterfeiting activity,

25   counterfeiting activity is a crime?

1    A.  No, but it's not an entire shot of the premises.

2    Q.  All right.  OK.  So we showed you the outside and we showed

3    you the inside, correct?

4    A.  I'm not sure if this is the entire inside.

5    Q.  Is that your best answer to my question?

6    A.  Yes.

7    Q.  OK.  Now, sir, you remember the stipulation of settlement

8    said that any interior storerooms should be removed?  Do you

9    remember that?

10   A.  Yes.

11   Q.  All right.  And do you remember that statement about how

12   you agreed to do a walk-through before the building was

13   reopened -- this is, again, back in 2009 -- to make sure --

14   A.  Yes.

15           MR. SCHICK:  Objection, your Honor.  That's not what

16   it said.  It said plaintiff, the city, would do that.  He's

17   mischaracterizing what the document said.  I object.

18           THE COURT:  The objection's overruled.

19           MR. GUNTHER:  Thank you.

20   Q.  And sir, do you remember that there was a requirement that

21   you agreed to as part of that stipulation of settlement to make

22   sure there were no hidden storerooms or storage facilities and

23   that everything be visible from the street?

24   A.  Yes.

25   Q.  All right.  Now, sir, do you see there's a line going down

J2sWome1                          Laboz - Direct

1    the back of the room?

2            MR. GUNTHER:  I'm going to ask Mr. Lam to put a circle

3    around it.  Put it all the way up to the top, Mr. Lam, showing

4    that line.

5    A.  Yes.

6    Q.  OK.  Sir, do you see there's a latch right in the middle of

7    that line, right there?

8    A.  Yes.

9    Q.  Sir, do you understand that to be a storeroom or access to

10   a storeroom?

11   A.  Yes.

12   Q.  OK.  So there was a storeroom, and again, the evidence

13   shows that this is a photograph that was taken in December of

14   2010.  It shows, despite what you agreed to do as part of the

15   stipulation of settlement in 2009 with the city of New York,

16   that there was still an interior storage room at 375B Canal

17   Street, correct?

18       Can you answer that question yes or no, sir?

19   A.  Well, when we rented the space --

20   Q.  Can you answer the question yes or no?

21   A.  Could you repeat the question?

22   Q.  Yes.

23       If the evidence shows that by December 2010 -- this

24   photograph was taken in December of 2010 of 375B Canal Street.

25   Wouldn't you agree with me that despite the fact that you had

J2sWome1                          Laboz – Direct

1  agreed to make sure that all storage areas in that premises

2  were removed as part of the stipulation of settlement with the

3  city of New York in 2009 there still was a storeroom, a back

4  storeroom in 2010, right?

5  A.   We fulfilled the condition.  There was no storeroom when we

6  delivered possession to the tenants.

7  Q.   Sir.

8  A.   So we fulfilled the condition with the city.  The tenant

9  must have installed the storeroom after we delivered possession

10  to them.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2SVOME2                          Laboz – direct

 1  BY MR. GUNTHER:

 2  Q.   Do you know, sir, as a fact whether that's the case?

 3  A.   Yes, because the city does a walk-through before we get

 4  possession.

 5  Q.   Did you do a walk-through?

 6  A.   I don't recall.

 7  Q.   You don't recall.

 8        Do you recall whether either of your brothers did a

 9  walk-through?

10  A.   One of us must have done it because the city would not

11  permit us to reopen the building if there were no storerooms.

12  Q.   Sir, do you know as you sit here today whether anyone did a

13  walk-through before this building was reopened?

14  A.   It's part of our practice that one of us would have done so

15  or somebody in our office would have done so, otherwise the

16  city would never let us reopen the space.

17  Q.   So your testimony is that there was no storeroom, and that

18  at the time when the building reopened after the stipulation of

19  settlement of 2009, another one was built during the period

20  after that and you didn't see that, right?

21  A.   Correct.

22  Q.   Is that your testimony?

23  A.   Yes.

24  Q.   That's your testimony?

25  A.   Yes.

1    Q.  All right.

2            Sir, were you inspecting this property in 2010?

3    A.  No.

4    Q.  Were either of your brothers inspecting this property in

5    2010?

6    A.  We have managers for that.  No.

7    Q.  Sir, did anyone -- to your knowledge, was anyone affiliated

8    with 375 Canal LLC inspecting this property to determine

9    whether there were storerooms that had been built in it in

10   2010?

11   A.  I don't recall.

12   Q.  Now, sir, did you -- you take this case seriously, right?

13   A.  Absolutely.

14   Q.  Right.  And it's something that you are -- that you're here

15   testifying because you take it seriously, right?

16   A.  Yes.

17   Q.  Now, sir, in connection with your work on this case, did

18   you review the video that one of the investigators, Leslie

19   Quinonez, took of the purchase of a counterfeit Omega watch at

20   375 Canal Street on May 19, 2012?

21   A.  I might have saw maybe like a few seconds of a clip of it,

22   but I didn't really review it, if that's what you mean.

23   Q.  Okay.

24           Do you have any recollection when you reviewed it of

25   seeing the clerk retrieve the counterfeit watches from that

1   storeroom that we observed?

2   A.  No, I really didn't pay attention to the -- really if I

3   saw -- I didn't pay attention to the clip.

4   Q.  You didn't pay attention to it?

5   A.  No.  The clip was shown to me for maybe a few seconds and

6   we didn't follow through on it.

7   Q.  Got it.

8   A.  It wasn't part of my preparation.

9   Q.  Got it.  Okay.  Didn't pay attention.  Got it.

10              MR. SCHICK:  Your Honor, he didn't say that.

11  Q.  Now, let me ask you, sir, if you could answer this question

12  for me:  One of the exhibits that we've put in evidence in this

13  case is Exhibit 240A, which is a report that the investigator

14  Brad Cole, who's testified in this case, put together after the

15  investigation that led to the purchase of the Omega counterfeit

16  watch at 375 Canal Street.

17              Have you ever seen that report?

18  A.  I believe I did, but he tried four times to buy it.

19              MR. GUNTHER:  Your Honor, I move to strike.

20              I asked him a very specific question.

21              THE COURT:  He said he's seen it.

22  BY MR. GUNTHER:

23  Q.  Okay.  So you've seen it.

24  A.  If I did, I don't recall.

25  Q.  You don't recall whether you saw it?

1    A.  I don't recall if I saw it, no.

2    Q.  All right.  So it's an important case to you, but you

3    didn't look at the video for the purchase of the watch, right?

4              MR. SCHICK:  Your Honor --

5              THE COURT:  That's not what he said.

6              MR. SCHICK:  Your Honor, with all respect, he's

7    talking about events years later.  We're not talking about the

8    lawsuit --

9              THE COURT:  Mr. Schick, you can object, not

10   speaking --

11             MR. GUNTHER:  He's making speeches.

12             MR. SCHICK:  I object, your Honor.

13             I object, your Honor.

14             THE COURT:  Overruled.

15             MR. GUNTHER:  And your Honor, you're right, I was

16   imprecise --

17             THE COURT:  Don't tell me I'm right.  Just ask

18   questions.

19             MR. GUNTHER:  Yes, sir, I will.  Thank you.

20   BY MR. GUNTHER:

21   Q.  It's an important case to you; you'd only looked at the

22   video quickly of the purchase, right?

23             THE COURT:  That's what he said.

24   A.  Yes.

25   Q.  Okay.

J2SVOME2                          Laboz - direct

 1             It's an important case to you, but you can't recall

 2   whether you've looked at the investigator's report, right?

 3             MR. SCHICK:  Asked and answered, your Honor.

 4             THE COURT:  Sustained.

 5             MR. GUNTHER:  Thank you, your Honor.

 6   Q.  Now, sir, I want to show you another exhibit that's already

 7   in evidence, and that's Plaintiffs' Exhibit 138.  And we've put

 8   that up.

 9             Now, sir, this is a matter, a lawsuit, that was filed

10   by Louis Vuitton against a number of entities, including 375

11   Canal LLC.  Do you see that?

12   A.  Yes.

13   Q.  And the date of the document, it says January 17, 2006.

14   A.  Yes.

15   Q.  And sir, the court is the United States District Court for

16   the Southern District of New York, right?

17   A.  Correct.

18   Q.  And sir, this is an order for a permanent injunction on

19   consent; correct?

20   A.  Yes.

21   Q.  And the lawsuit that Louis Vuitton brought against these

22   entities, including 375 Canal LLC, involved allegations that

23   375 Canal LLC was permitting occupants of 375 Canal Street to

24   sell counterfeit Louis Vuitton goods; correct?

25   A.  Yes.

J2SVOME2                           Laboz - direct

1    Q.  And 375 Canal LLC entered into this consent injunction with

2    Louis Vuitton in 2006, right?

3    A.  Yes.

4    Q.  Now, sir, looking at the first page, going down to the

5    bottom, there's a thing you see it says "consented to"?

6    A.  Yes.

7    Q.  Do you see that, consented to by defendants.  And then one

8    of the defendants that consented to this consented injunction

9    is 375 Canal, LLC, right?

10   A.  Correct.

11   Q.  And sir, from your lawyer training, you know that an

12   injunction prohibits certain activity; correct?

13   A.  Yes.

14   Q.  Sir, pursuant to this injunction, I'm looking at the bottom

15   of page 2.  And if we go to the bottom, it says:  It is

16   hereby --

17          MR. GUNTHER:  Stop right there.  Thank you, Mr. Lam.

18   Q.  "It is hereby ordered that," and then there's a number of

19   entities, but one of them is 375 Canal, LLC; correct?

20   A.  Yes.

21   Q.  "Individually and collectively," and then it goes on,

22   right, referring to various parents, subsidiaries, etc.

23          And then it says that it's ordered that --

24          MR. GUNTHER:  And if you can keep going up a little

25   bit more, Mr. Lam, into page 3.

J2SVOME2                         Laboz - direct

1    Q.  It says:  "Are permanently enjoined and restrained from."

2              Permanently is forever, right?

3    A.  Yes.

4    Q.  And "enjoined and restrained from" means you can't do it

5    anymore, right?

6    A.  Correct.

7    Q.  And it says:  "1.  Using, modifying, disseminating,

8    marketing, selling, or offering to sell any Louis Vuitton

9    counterfeit product in any manner whatsoever."

10             Do you see that?

11   A.  Yes.

12   Q.  You agreed to that in perpetuity on behalf of 375 Canal;

13   correct?

14   A.  Yes.

15   Q.  Now, sir, I'd like to show you what is also in evidence as

16   Plaintiffs' Exhibit 219.

17             First of all, before we go to that, I just want to

18   make sure we get the date of this consent injunction.

19             So if you'd look at the front page and if we go down

20   to the bottom, it says "dated December 30, 2005"; correct?

21   A.  Yes.

22   Q.  Okay.  And prior to getting that, prior to making that

23   settlement, 375 Canal had been informed by Louis Vuitton -- by

24   lawyers for Louis Vuitton, they had been notified that there

25   were sales of counterfeiting activity going on; correct?

```
 1    A.  Correct.

 2              MR. GUNTHER:  You can take that down, Mr. Lam.

 3              Thank you.

 4    Q.  You had a retail tenant at 375 Canal Street called T.A.

 5    Discount Store; isn't that right?

 6    A.  Yes.

 7              MR. GUNTHER:  And let's put up Plaintiffs' 206, which

 8    is in evidence.  And if we can go to the second page.

 9    Q.  This is a standard form of lease.  And this is, in fact, a

10    lease between the landlord at 375 Canal LLC and T.A. Discount

11    store, right?

12    A.  Yes.

13    Q.  You see it's made as -- of it doesn't have a day, but it

14    says July 2009; right?

15    A.  Correct.

16    Q.  It talks about 375B Canal Street as being the premises,

17    right?

18    A.  Yes.

19    Q.  And B refers to a subdivision of the address at 375 Canal

20    Street; correct?

21    A.  Yes.

22    Q.  And so there were two stores at this point under the 375

23    address facing out onto Canal Street, right?

24    A.  Correct.

25    Q.  Now, this lease was entered into after the 2004 settlement
```

1    of the lawsuit brought against 375 Canal by the City of New

2    York, right?

3    A.  Yes.

4    Q.  This lease was entered into after the 2006 settlement of

5    the lawsuit brought against 375 Canal LLC by the City of New

6    York, right?

7    A.  Yes.

8    Q.  This lease was entered into, sir, just before -- and I'll

9    represent to you the settlement with respect to the third New

10   York City -- City of New York of lawsuit against 375 Canal was

11   July of 2009.  So this lease -- sorry, it was August of 2009.

12   So this lease was entered into about a month before you made

13   that settlement, right?

14   A.  Yes.

15   Q.  And sir, turning to page 8 of Plaintiffs' Exhibit 206 in

16   evidence, and if we go down, there's a heading that says

17   "Rent," right?

18   A.  Yes.

19   Q.  Now, what the top of this document --

20          MR. GUNTHER:  We go back to where you were, Mr. Lam.

21   Q.  It says:  "Rider attached to and forming a part of the

22   lease."  Do you see that?

23   A.  Yes.

24   Q.  And sir, a rider is a typical document at the back of a

25   lease; correct?

1   A.  It's part of the lease.

2   Q.  Okay.

3        And sir, it against says July 2009 is the date, right?

4   A.  Yes.

5   Q.  375 Canal LLC is the landlord, right?

6   A.  Yes.

7   Q.  Tenant is T.A. Discount, right?

8   A.  Yeah.

9   Q.  Premises is 375 Canal Street, right?

10  A.  Yes.

11  Q.  And then it says under rent -- and I want to scroll down

12  just a little bit -- it says that from July 2009 to December

13  of -- the end of December of 2009, the rent would be $11,000 a

14  month, right?

15  A.  Correct.

16  Q.  Then it goes on to say from January 1, 2010, to December

17  31, 2010, the rent would be $144,000 per annum, or 12,000 per

18  month.  Do you see that?

19  A.  Yes.

20  Q.  And, in fact, is that the rent that you charged during that

21  period?

22  A.  Yes.

23  Q.  All right.

24        Now, if you'll turn to page 10 of Plaintiffs' Exhibit

25  206, we're still in the rider of the lease, there's a heading

1  that says "Tenant's Use and Maintenance."  It's paragraph 45.

2          Do you see that?

3  A.  Yes.

4  Q.  And sir, there it says -- and I'm looking at the first

5  sentence:  "Subject to in accordance with the provisions of

6  this lease, tenant shall use the premises for the operation of

7  a retail store selling perfume, except that portion of the

8  premises located in the basement of the building shall be used

9  for storage purposes only."  Do you see that?

10 A.  Correct.

11 Q.  Then it goes on to say:  "Tenant agrees not to permit or

12 suffer the use of the premises for any other business purpose.

13          Do you see that?

14 A.  Yes.

15 Q.  Now, sir, do you know, did T.A. Discount, in fact, operate

16 375B Canal Street as a perfume store?

17 A.  They sold some perfume.

18 Q.  Do they sell a lot of other stuff?

19 A.  Yes.

20 Q.  T-shirts?

21 A.  Yes.

22 Q.  Jewelry?

23 A.  Yes.

24 Q.  Watches?

25 A.  Yes.

J2SVOME2                          Laboz - direct

1   Q.   Pendants?

2   A.   Yes.

3   Q.   And sir, if you look --

4   A.   By the way, there's nothing wrong with that.

5   Q.   Your lawyer will have a chance to ask you questions.

6   A.   Okay.

7   Q.   And I'm sure he'll bring that up.

8        Now, sir, if you look at the next sentence, it says:

9   "Tenant shall not sell trademark or counterfeit merchandise of

10  any kind."  Do you see that?

11  A.   Yes.

12  Q.   And it says:  "In the event of the sale or possession of

13  counterfeit merchandise is conducted, maintained, permitted,

14  facilitated, promoted, or carried on, the premises shall

15  immediately be closed and the tenant shall immediately

16  surrender the entire premises to the landlord and deliver the

17  same vacant."  Do you see that?

18  A.   Yes.

19  Q.   And it goes on to say various other things about

20  broom-clean condition, etc.

21  A.   Yes.

22  Q.   Now, sir, you put that provision in this lease; correct?

23  A.   Absolutely.

24  Q.   And sir, specifically, the lease provided for immediate

25  possession back to you in the event that counterfeiting

1   activity occurred; correct?

2   A.  Correct.

3   Q.  And sir, the purpose of this clause was to make sure that

4   your tenants don't sell counterfeit merchandise, right?

5   A.  Correct.

6   Q.  Now, sir, not all of your retail leases contain a clause

7   like this one, right?

8   A.  Correct.

9   Q.  And I'm specifically referring to the anti-counterfeiting

10  clause, right?

11  A.  Correct.

12  Q.  You only do that for certain types of businesses, right?

13  A.  Correct.

14  Q.  Okay.  Now, I just want to go back to -- we still have up

15  on the screen paragraph 45, the rider from the lease at 375

16  Canal to T.A. Discount.  And just going a little bit further,

17  in terms of if the tenant were to violate the

18  anti-counterfeiting provision, not only did they have to give

19  it back to you immediately vacant, it had to be free of all

20  occupants, right?

21  A.  That's correct.

22  Q.  Now, sir, at the time that the T.A. Discount was a tenant

23  at 375B Canal Street, the tenant of the space next door was

24  Bank of America, right?

25  A.  That's right.

J2SVOME2                              Laboz - direct

1   Q.  There was an ATM next door, a Bank of America ATM next

2   door, right?

3   A.  Yes.

4   Q.  And that was at 375A Canal Street, right?

5   A.  Yes.

6   Q.  Now, sir, the lease with Bank of America didn't contain an

7   anti-counterfeiting clause, right?

8   A.  Correct.

9   Q.  And that's because a bank isn't likely to sell counterfeit

10  merchandise, right?

11  A.  They are a bank.

12  Q.  Right?

13  A.  They didn't sell anything.

14  Q.  They have services, right?

15  A.  I'm sorry?

16  Q.  They have services, don't they, banks?

17          THE COURT:  He said they don't sell anything.

18  Q.  Oh, sell anything.  Okay.

19          Sir, did you include an anti-counterfeiting provision

20  in the July 2009 lease with T.A. Discount because for a retail

21  discount store located on Canal Street was more likely -- the

22  possibility of them selling counterfeit merchandise was higher

23  than, for example, Bank of America?

24  A.  Yes.

25  Q.  Okay.

J2SVOME2                         Laboz - direct

1            Sir, there's nothing in this lease about having signs
2      posted that counterfeiting was a crime, right?
3      A.   In the lease?
4      Q.   Yes.
5      A.   Not that I'm aware of.
6      Q.   Do you want to check it?  I will tell you, just to save
7      time --
8      A.   I take your word for it.
9      Q.   -- I went through it.
10     A.   I take your word for it.
11     Q.   Thank you.
12           There's nothing in this lease about dismantling or
13     removing all hidden storage facilities or structures, is there?
14     A.   In the lease there's a -- they cannot do any alterations
15     without my consent.
16     Q.   Sir, is there anything in the lease about dismantling or
17     removing any hidden structures?  That's specifically my
18     question.
19     A.   No.
20     Q.   Sir, is there anything in this lease about allowing private
21     investigators that you've hired to monitor the premises to
22     determine whether there's counterfeiting activity going on?
23     A.   Hire an investigator.
24     Q.   Can you answer my question?
25     A.   I don't need permission in my lease granted to send an

1    investigator in.

2    Q.  You could have done that?

3    A.  It's not necessary.  If I need an investigator, he can just

4    walk in.  It's a retail store.

5            So your implication is by not having the

6    investigator --

7    Q.  Sir, I'm not implying anything; I'm just asking a question.

8    A.  Okay.

9    Q.  My question is pretty straightforward:  Is there anything

10   allowing in the lease about monitors coming in to be able to

11   look to see what's going on in the store in terms of

12   counterfeiting activity, yes or no?

13   A.  No, nothing prevented the monitor to come in regardless.

14   Q.  All right.

15           And sir, did you have a monitor that was looking at

16   375 Canal Street?

17   A.  At some point we did.

18   Q.  Sir, did you have it in 2010?

19   A.  I don't believe so.

20   Q.  Okay.

21           And sir, did you have anyone other than you or your

22   brothers that would occasionally walk in or walk by your

23   properties as monitoring the properties?

24   A.  Our property managers.

25   Q.  Did you instruct any of your property managers during the

1    period 2005 to 2012 to regularly visit 375B Canal Street to

2    determine whether there was counterfeiting activity going on

3    there?

4    A.  Absolutely.  We make sure there's no counterfeit

5    merchandising being sold outright.

6    Q.  Sir -- outright.

7    A.  Yes.

8    Q.  So you go in and look, right?

9    A.  Yes.

10   Q.  Did you have anyone that would go in and ask whether the

11   clerk or the store had counterfeit goods?

12   A.  I don't know.

13   Q.  Okay.

14           Sir, in the video that you said you looked at very

15   quickly --

16   A.  Yes.

17   Q.  -- do you recall in that video that the Omega merchandise

18   was not on display; the investigators had to ask for it, and

19   then the clerk went into the back room and got the counterfeit

20   Omega watches.  Do you recall that?

21   A.  The investigator went there four times.

22   Q.  Sir, sir, sir --

23   A.  So now you get the fifth time.

24           MR. GUNTHER:  Your Honor, I'm --

25           THE COURT:  Excuse me.

1              MR. GUNTHER:  Yes.

2              THE COURT:  Listen to his questions and answer his

3     questions.

4              THE WITNESS:  Yes.

5              THE COURT:  Mr. Schick will have an opportunity to

6     examine you and bring out all the information that you want.

7              THE WITNESS:  Thank you, your Honor.

8     BY MR. GUNTHER:

9     Q.  So my question is when you looked at that video, did you

10    see that it wasn't -- the watches, the Omega watches, weren't

11    on display; they had asked for them, the clerk went into the

12    back storeroom and retrieved them.  Did you see that?

13    A.  Yes.

14    Q.  You did see that.

15             Now, sir, I'd like to turn to what's already in

16    evidence as Plaintiffs' Exhibit 90.  And we'll put that up on

17    the screen.

18             Sir, this is a letter from the Collen IP law firm

19    dated September 28, 2011, and it's sent by Federal Express to

20    375 Canal LLC, care of United American Land LLC.

21             Do you see that?

22    A.  Yes.

23    Q.  And then it goes on with an address, and then it says:

24    Attention Albert Laboz.  Do you see that?

25    A.  Yes.

J2SVOME2                           Laboz - direct

1    Q.  That's you, right?

2    A.  Yes.

3    Q.  And the "re" says "Trademark Counterfeiting at 375 Canal

4    Street."  Do you see that?

5    A.  Yes.

6    Q.  And sir, you received this letter on or about September 28,

7    2011, right?

8    A.  Yes.

9    Q.  And you definitely read it, didn't you?

10   A.  Yes.

11   Q.  And sir, do you see where it says -- the first paragraph

12   talks about various trademarks owned by the Swatch Group;

13   correct?

14   A.  Yes.

15   Q.  All right.

16          And if you go to the second paragraph, it says:  "As

17   you are already aware, in December 2010 and February 10, 2011,

18   the New York Police Department arrested certain individuals

19   selling counterfeit versions of our client's Omega and Swatch

20   branded watches at a storefront retailer located at 375 Canal

21   Street."  Do you see that?

22          MR. SCHICK:  Objection, your Honor.  If we can have a

23   brief sidebar.  We discussed some of these issues yesterday.

24          THE COURT:  No, no, no.

25          The objection is overruled.

 1              MR. GUNTHER:  Thank you, your Honor.

 2       BY MR. GUNTHER:

 3       Q.  And then, sir, were you aware of enforcement actions that

 4       were taken by the New York Police Department that involved

 5       raids at 375 Canal Street for counterfeit goods in December

 6       2010?

 7       A.  No.

 8       Q.  Were you aware of a raid that took place on February 10,

 9       2011, again, where people at 375 Canal Street were arrested for

10       selling Omega branded watches?

11              MR. SCHICK:  Objection, your Honor.

12              They asked for a ruling about certain of the issues

13       that they are now trying to go into.

14              THE COURT:  Okay.  Overruled.

15       A.  No.  First time I was aware, when I got this letter, ten

16       months after the raids.

17       Q.  Did you investigate to determine whether such raids had

18       occurred?

19       A.  I took it at face value.

20       Q.  You accepted it as true?

21       A.  I accepted it as true, absolutely.

22       Q.  Okay.

23       A.  Ten months later.

24       Q.  Okay.  Fair enough.

25              Were you aware, sir, generally, as a result of your

J2SVOME2                          Laboz - direct

1   ownership of several buildings in the Canal Street area, that

2   there were enforcement activities related to counterfeiting

3   going on in 2010 and 2011?

4   A.  I don't recall.

5   Q.  You don't remember.  Okay.

6            And if you go on to the next sentence in the second

7   paragraph of the letter:  "Counterfeit watches bearing our

8   client's Omega and Swatch marks were also seized from this

9   location."  Do you see that?

10           MR. SCHICK:  Objection, your Honor.  Same objection

11   about the ruling they asked for and received about those

12   claims.

13           THE COURT:  Overruled.

14           MR. GUNTHER:  Thank you.

15   Q.  Do you see that, sir?

16   A.  Yes.

17   Q.  You received that information from Mr. Lindenbaum, the

18   Collen IP lawyer, on September 28, 2011, right?

19   A.  Yes.

20   Q.  Now, after you read the letter, you gave it to Stephanie

21   Goodman, right?

22   A.  I believe so.

23   Q.  Stephanie Goodman was an in-house lawyer for United

24   American Land, right?

25   A.  Yes.

J2SVOME2                          Laboz - direct

1    Q.  And one of your lawyers responded to this letter, right?

2    A.  Yes.

3    Q.  Now, I'm showing you Plaintiffs' Exhibit 91, which is

4    already in evidence.  This is an email from Sharyn Tritto at

5    pennprolaw.com.  Do you see that?

6    A.  Yes.

7    Q.  And that's dated October 3, 2011.  Do you see that?

8    A.  Yes.

9    Q.  All right.

10          She's responding to Mr. Lindenbaum's September 28,

11   2011 letter, right?

12   A.  Correct.

13   Q.  Okay.

14          And it says:  "This firm represents the landlord in

15   the above-referenced premises.  Your letters regarding same

16   have been forwarded to me for a response."

17          Do you see that?

18   A.  Yes.

19   Q.  Please be advised that the tenant occupying 361 Canal --

20   I'll go on to the next one.  Sorry.

21          "With respect to 375 Canal, apparently the tenant

22   sublet the space to an entity that was selling counterfeit

23   goods bearing your client's marks."

24          Do you see that?

25   A.  Yes.

1    Q.  All right.

2              So Ms. Tritto, responding on your behalf, said that

3    apparently the tenant was, in fact, selling counterfeit goods

4    bearing your client's trademarks; correct?

5    A.  I believe so.

6    Q.  Okay.

7              And then she goes on to say:  "The lease provides that

8    the tenant may not sublet the premises without the landlord's

9    consent."  Do you see that?

10   A.  Correct.

11   Q.  Do you understand that to mean that there had been an

12   illegal subtenant in the building?

13   A.  I wouldn't use the word "illegal."

14   Q.  What would you use?

15   A.  Violation of lease.

16   Q.  Okay.  I'll accept that.  Thank you.

17             And then it says:  "I have been informed that the

18   tenant had the offending tenant removed."

19             And again, I want to be very fair to you.  Ms. Tritto

20   testified in this case and said that that second reference to

21   tenant was a typographical error and she meant to say

22   subtenant.  Do you see that?

23   A.  Correct.

24   Q.  Then she goes on to say:  "If you have any questions

25   regarding these matters, please feel free to contact me."

1    Right?

2    A.  Correct.

3    Q.  Now, I want to turn to a different topic, and that's about

4    monitoring at the properties that you own, okay?

5    A.  Okay.

6    Q.  Now, sir, in your experience, if there's a sale of

7    counterfeit merchandise at a retailer, it's not obviously

8    displayed typically, right?

9    A.  Correct.

10   Q.  Counterfeit merchandise is generally not sold front and

11   center, right?

12   A.  Yes.

13   Q.  That's not how it works, right?

14   A.  I'm not an expert.

15   Q.  Okay.

16          Now, sir, you've testified before that you may have

17   walked in or walked by 375 Canal Street to see what's there,

18   right?

19   A.  Yes.

20   Q.  But only occasionally, right?

21   A.  Correct.

22   Q.  You own 50 buildings; how much time can you spend with

23   respect to any particular one; correct?

24          MR. SCHICK:  Object, your Honor.

25          THE COURT:  Overruled.

1    Q.  Am I right?

2    A.  My office is in the neighborhood.  We pass by, we walk by.

3    We are hands-on; we like seeing what's going on in our

4    properties.

5    Q.  All right.

6             Occasionally you walk by, right?

7    A.  Yes.

8    Q.  But other than occasionally walking by or in, you have

9    never inspected the premises at 375 Canal Street to determine

10   whether there's counterfeiting activity taking place there,

11   right?

12   A.  I had no reason to believe there was counterfeiting,

13   because I didn't have to inspect.

14   Q.  You had no reason to believe, is that your testimony?

15   A.  I'm sorry?

16   Q.  Your testimony is you had no reason to believe?

17   A.  Right.

18   Q.  Okay.

19             Now, sir, apart from that, you didn't do anything to

20   determine if counterfeit goods were being sold, right?

21   A.  Could you say that again?  I'm sorry.

22   Q.  Sure.  Other than occasionally walking by or walking into

23   the store, you did not do anything to determine whether

24   counterfeit goods were being sold, right?

25   A.  No.

1    Q.  And sir, when you did those walk-ins, occasional walk-ins

2    or walk-bys, you just looked to see what was visible in the

3    store, right?

4    A.  Yes.

5    Q.  You made no effort to see if there was anything hidden

6    behind a door or otherwise, right?

7    A.  Tenants don't like landlords walking into their spaces and

8    harassing them.

9    Q.  Sir, I didn't ask you whether they like it or not.  I'm

10   just asking you what you did or didn't do.  Very simple

11   question.

12   A.  No, I did not.

13   Q.  Let me repeat the question; I want you to have it in mind.

14          Did you make any effort to see -- in those occasional

15   walk-bys or walk-ins, did you make any effort to see whether

16   there was anything hidden, counterfeit merchandise hidden in

17   back storerooms?

18   A.  No.

19   Q.  Now, sir, we discussed the earlier settlement of Louis

20   Vuitton, which occurred in December of 2005, right?

21   A.  Yes.

22   Q.  As part of that settlement, you hired a private

23   investigator to monitor the property for two years; correct?

24   A.  Correct.

25   Q.  But since those two years ended, that would have been about

J2SVOME2                            Laboz – direct

1    2007, right?

2    A.  Yes.

3    Q.  375 Canal LLC hasn't hired any private investigator to

4    monitor counterfeiting activities at the premises, right?

5    A.  No.

6    Q.  When the agreement was over with that private investigator,

7    you were done, right?

8    A.  Correct.

9    Q.  In your opinion, it wasn't necessary anymore, right?

10   A.  Not only my opinion, Mr. Lindenbaum didn't request that in

11   his letter to me.

12           MR. GUNTHER:  Your Honor, I just asked him a very

13   simple question.

14   Q.  Let me try it again.

15           In your opinion, your opinion, it wasn't necessary,

16   right?

17   A.  Correct.

18   Q.  Thank you.

19   A.  The monitoring only monitors --

20   Q.  Sir --

21           THE COURT:  Let me remind you, answer his questions.

22   Mr. Schick will have an opportunity to ask you --

23           THE WITNESS:  Okay.  Apologies, your Honor.

24   Q.  Sir, since the agreement with the private investigator

25   event ended in 2007, after that board provision in the Louis

J2SVOME2                        Laboz - direct

1    Vuitton settlement agreement expired, you've not had since then

2    any type of investigator monitor any of your properties to

3    determine whether there's sale of counterfeit goods, right?

4    A.  You characterize that as an investigator; it's really a

5    monitor.  It wasn't an investigator, it's a monitor.

6    Q.  There was an investigator hired, that's my question.

7    A.  A monitor.  The monitor.  We call them monitors.

8    Q.  Sir, I'm asking you a question now.

9    A.  Okay.

10   Q.  If you could listen to my question.

11   A.  Yes.

12   Q.  My question is subsequent to 2007, have you ever hired any

13   private investigator or private investigation firm to monitor

14   any of your properties for counterfeiting activity since that

15   day?

16   A.  No.

17   Q.  Now, sir, let me ask you this:  When you occasionally walk

18   by and into 375 Canal, is it your testimony that on the

19   occasions that you did that, you didn't see any counterfeit

20   merchandise, is that your testimony?

21   A.  Correct.

22   Q.  Would you characterize that as a failed buy, what you did?

23   A.  No.

24   Q.  You didn't try to buy it, right?

25   A.  Right.

J2SVOME2                          Laboz - direct

```
1    Q.  Just observing, right?

2    A.  They would never sell me as a landlord a watch.

3    Q.  Sir, could you answer the question?

4    A.  Of course they wouldn't sell it to me though.

5    Q.  Sir, sir, please, I'm just asking you a yes-or-no question.

6             MR. SCHICK:  Objection, your Honor.

7             He's not on the stand to discuss failed buys and what

8    Brad Cole did or didn't do.

9             THE COURT:  Mr. Schick, please try not to be so

10   argumentative.

11            Mr. Gunther, just ask questions.

12            MR. GUNTHER:  Yes, sir.  Yes, sir.

13            I think I made the point, your Honor.

14            THE COURT:  Go on to something else.

15            MR. GUNTHER:  Yes, I will.

16   BY MR. GUNTHER:

17   Q.  Now, sir, Mr. Laboz, 375 Canal Street today, in February

18   2019, is a wine store, right?

19   A.  Yes.

20   Q.  But it didn't become a wine store until 2015, right?

21   A.  Right.

22   Q.  That was three years after you purchased the Omega branded

23   watch from 375 Canal Street in May of 2012, right?

24   A.  Okay.

25   Q.  Correct?
```

J2SVOME2                          Laboz - direct

1    A.  Yes.

2    Q.  And sir, you and your brothers own a number of buildings on

3    Canal Street, right?

4    A.  Yes.

5    Q.  And in the Canal Street area, right?

6    A.  Yes.

7    Q.  Sir, let me put up what is Plaintiffs' Exhibit --

8    demonstrative exhibit -- I think it's 222.

9             MR. GUNTHER:  Can I just see that on the screen before

10   we put it up for everybody?  I'm actually looking at --

11            THE COURT:  222 is already --

12            MR. SCHICK:  Objected to.

13            MR. GUNTHER:  Your Honor, that's not what I meant to

14   show.  1-10.

15            MR. SCHICK:  Your Honor, if you look at the exhibit on

16   the bottom, they refer to a source that's already been

17   objection sustained.

18            MR. NOYES:  Speech in front of the jury, your Honor.

19            MR. GUNTHER:  It should be taken down.  I did not

20   intend to show it to the jury.  It was shown in the opening

21   statement.

22            Your Honor, my question is simply to put this up and

23   ask him if those are the buildings that he owns in the Canal

24   Street area.  That's all I'm going to do.  And he can answer it

25   yes or no or otherwise and then I'll move on.

1          THE COURT:  How many buildings do you own in the Canal

2     Street area, Mr. Laboz?

3          THE WITNESS:  Half a dozen, more or less.  Seven.

4     BY MR. GUNTHER:

5     Q.  And sir, all of those buildings have retail space in them?

6     A.  Yes.

7     Q.  Currently do several of those buildings have souvenir

8     shops?

9     A.  Some of them do, yeah.

10    Q.  Okay.

11         Some of them are discount shops like T.A. Discount?

12    A.  Souvenir shops.  I don't know if it's discounts.

13    Q.  Fair enough.

14         They sell watches, right?

15    A.  Yes.

16    Q.  They sell T-shirts, right?

17    A.  Yes, yes.

18    Q.  They sell jewelry, right?

19    A.  Yes.

20    Q.  Some of those locations, those storefronts on buildings

21    that you own on Canal Street are currently vacant, right?

22    A.  No.

23    Q.  Oh, you have no vacancy?

24    A.  They are activated by artists.  We've given out spaces with

25    a local artist group to activate them for artist exhibits.

J2SVOME2                           Laboz - cross

1   Q.  But, sir, you're not collecting rent from those buildings,

2   right?

3   A.  I'm sorry?

4   Q.  You're not collecting rent from those spaces, right?

5   A.  No.

6   Q.  And if you were to find a tenant for those spaces, they

7   would pay you rent, assuming that the tenant was appropriate to

8   you, you'd take it, right?

9   A.  Sure.

10  Q.  So currently in the Canal Street area one of the things

11  that you are trying to do is to rent retail space, correct, in

12  some of your buildings?

13  A.  Once we finish with this artist exhibit, down the road we

14  plan on doing that, yes.

15  Q.  Okay.  All right.

16          MR. GUNTHER:  Your Honor, I have no further questions

17  of the witness.  Thank you.

18          THE COURT:  Mr. Schick.

19          MR. GUNTHER:  Thank you, Mr. Laboz.

20          THE WITNESS:  Thank you.

21  CROSS-EXAMINATION

22  BY MR. SCHICK:

23  Q.  Can I ask you, Mr. Laboz, you mentioned at the end the

24  artist program.  And Mr. Gunther asked you if you collected

25  rent.  Describe the artist program and what is going on in

J2SVOME2                              Laboz - cross

1    those buildings.

2    A.  So we're dealing with a local artist group that is

3    activating the space and having local artists, show them the

4    space.  And in the meantime -- and correction to -- I should

5    say Mr. Gunther, sometimes we get like a pop-up tenant that

6    will come in and do some business and they'll pay rent.  But,

7    for the most part, it's really to display art.

8    Q.  Now, Mr. Gunther asked you if the artists pay you money and

9    you said the answer is no; correct?

10   A.  Correct.

11   Q.  Does the artist program cost you money?

12   A.  Yeah, we have to carry the building.

13   Q.  Was there any fund created to fund the artist program?

14   A.  Yes.

15   Q.  And who created that fund?

16   A.  We did.

17   Q.  And who paid for that fund?

18   A.  I did.

19   Q.  How much money did you contribute to that fund?

20   A.  About $80,000.

21   Q.  And was the purpose of creating that fund and giving the

22   space to allow opportunities for local residents?

23   A.  Yes.

24           THE COURT:  We're wandering pretty far afield now.

25   Q.  With respect to 375 Canal LLC, we've talked about how long

1    you've owned the building; correct?

2    A.   Correct.

3    Q.   Who owned the building before you and your brothers owned

4    the building?

5    A.   My father owned it.

6    Q.   And did your father own properties on Canal Street?

7    A.   Yes.

8    Q.   And what was your father's background?  Did he come into

9    the real estate business?

10   A.   My father was born in the depression era, came from a

11   broken home.  First generation immigrant mother.  And became --

12   never graduated high school and didn't have skills, but he was

13   a salesman.  So he used to peddle from town to town, open

14   seasonal stores in different towns, Kennebunkport, Maine;

15   Texas.  His thought really was to deal with smaller tenants

16   and, you know, deal with the local merchants.

17   Q.   Did the bank banks of America of the world pay more money

18   or less money in rent than the local merchants you've been

19   talking about renting to this morning?

20   A.   More money.

21   Q.   Do the Starbucks of the world pay more money or less money?

22   A.   More money.  In fact, we were negotiating another letter of

23   intent with Starbucks.  And this is like years back.  And we're

24   going back and forth.  My dad just pointed out the local

25   merchant.  And we thought we were smart being young kids

J2SVOME2                         Laboz - cross

1    showing my dad how business should be, and my father showed us.

2    Q.  Now, Mr. Gunther before showed you a couple of settlements,

3    and I want to discuss a settlement that he showed you.

4         Do you know that in the settlements with the city, did

5    the city insist that the tenant who sold counterfeit

6    merchandise, did the city insist that the tenant be -- that the

7    tenant vacate the premises?

8    A.  The offending occupant, yes.

9    Q.  Let's go to Exhibit 140, if we can.  And if we could turn

10   to the last page of 140.

11        MR. SCHICK:  This is in evidence already, your Honor.

12   Q.  This is a signature page and there's a lot of people who

13   signed this stipulation.  Do you see that?

14   A.  Yes.

15   Q.  And it mentions the law firm of Penn Proefriedt, right?

16   A.  Yes.

17   Q.  And were they representing 375 Canal LLC?

18   A.  Yes.

19   Q.  Okay.

20        That is the name below -- and that's Ms. Tritto;

21   correct?

22   A.  Correct.

23   Q.  And now below that is the name Jian Liang Ge.

24        Do you see that?

25   A.  Yes.

1    Q.   And Mr. Jian Liang Ge signed that; correct?

2    A.   Yes.

3    Q.   Now, were 375 Canal's lawyers representing the tenant in

4    this?

5    A.   No.

6    Q.   And now, if you see on the right side, there are more

7    signatures.

8    A.   Yes.

9    Q.   And that's the signature below the name Michael Cardoza, do

10   you see that?

11   A.   Yes.

12   Q.   Now, Mr. Cardoza didn't sign that.  He was the Corporation

13   Counsel, an esteemed position; most people have gone on to

14   greater things.  But below that it indicates Allen Schwartz;

15   correct?

16   A.   Yes.

17   Q.   Would that be the lawyer for the city who signed it on

18   behalf of Mr. Cardoza?

19   A.   Yes.

20   Q.   Now, if you go back to paragraph 5 on page 3, does this

21   indicate that Mr. Jian Liang Ge was permitted to retain his

22   occupancy in this space?

23   A.   Yes.

24   Q.   Now, did you instruct Ms. Tritto to advocate on behalf of

25   Mr. Jian Liang Ge?

1    A.  No.

2    Q.  Did you tell the city you wouldn't settle with them unless

3    they allowed Mr. Jian Liang Ge to stay in?

4    A.  Of course not.

5    Q.  Do you think the city did something wrong by allowing

6    Mr. Jian Liang Ge to stay in?

7            MR. GUNTHER:  Objection, your Honor.

8            THE COURT:  Overruled.

9    A.  Listen, it was their call.

10   Q.  Now, I want to pull up -- we saw this morning from

11   Ms. Caponegro -- and it's PX 44/47, hold on one second.  We'll

12   pull it up in one second.  PX 44.  And it will be on the screen

13   in a moment.  Second page.

14           MR. SCHICK:  My apologies.

15           THE COURT:  What document are we looking at,

16   Mr. Schick?

17           MR. SCHICK:  I'll be, I think, sort of brief.

18           THE COURT:  No, no.  What document are we looking at?

19           MR. SCHICK:  Oh, I'm sorry.  47, PX 47.

20   Q.  I think Mr. Gunther asked you if it's always the case that

21   counterfeit goods that were found at 375 Canal were in hidden

22   storerooms in the back or something like that.

23           Do you recall that?

24   A.  Yes.

25   Q.  And if you look at the second sentence in the email to

1    Sharyn Tritto.

2    A.  Yes.

3    Q.  Do you see it talks about -- well, the first sentence says:

4    "Hi, Sharon.  Our investigators also made observations of

5    counterfeit merchandise."  Do you see that?

6    A.  Yes.

7    Q.  Does it say that they needed an undercover investigator?

8    A.  No.

9    Q.  Does it say that everything is in a hidden storeroom?

10   A.  No.

11   Q.  In fact, did Mr. Gunther show you anything this morning

12   that indicated that prior to the purchase that led to this

13   lawsuit, that there was a sale related to a back room or space?

14   A.  No.

15   Q.  And there may have been, because you certainly agreed to

16   make sure there is no space, but he didn't show you any such

17   things; correct?

18   A.  Correct.

19   Q.  And I can represent to you that this morning plaintiff and

20   the witness before you put on documents like this that showed

21   sales of a large number of allegedly counterfeit goods being

22   displayed.  Do you see that?

23   A.  Yes.

24   Q.  So if you had gotten a letter like this, would that tell

25   you that walking by to make observations would be similar to

J2SVOME2                          Laboz - cross

1    what the investigator who had previously sent a complaint

2    letter found?

3    A.  Yes.  Absolutely.

4    Q.  Now, you testified earlier, Mr. Gunther asked you if there

5    was a specific document in the lease with T.A. Discount that

6    related to -- that said that they couldn't have a storeroom.

7         Do you recall he asked you a question?

8    A.  Yes.

9    Q.  And you started to say something at the time, and then

10   Mr. Gunther said it was my opportunity.  So now it is.

11        And I think what you started to say had to do with is

12   there a provision in the lease that the tenant could not --

13        MR. SCHICK:  It's document 206, if you want to put it

14   up.

15        MR. GUNTHER:  Your Honor, this is totally leading;

16   this whole examination has been leading.  And I would

17   appreciate it if we'd have a few unleading questions.

18        So I object.

19        THE COURT:  Overruled.

20   Q.  Mr. Laboz, were tenants allowed to do any work that they

21   wanted in the spaces that you rented?

22   A.  No.

23   Q.  What would prevent them from doing that?

24   A.  The lease specifically says that any alterations would need

25   my consent; and if not, it would be a default.

1    Q.   Do you recall -- if you settled with the city and the city

2    settlement said a space would be delivered a certain way, would

3    the city have any follow-up after settlement?

4    A.   Yeah.

5    Q.   At any time?

6    A.   Yes.

7    Q.   What would the follow-up be?

8    A.   They would inspect the premises before they release us.

9    Q.   And would the city be aware of the stipulation in the

10   settlement that said that it had to be open?

11   A.   Of course --

12            MR. GUNTHER:  Objection.

13   A.   Of course they --

14            THE COURT:  Overruled.

15            Of course what?

16   A.   Of course they would, because they made the settlement

17   agreement.

18   Q.   And you would make sure -- take efforts to make sure that

19   the space was delivered as required under the stipulation?

20   A.   Of course.  Otherwise, the city would not let me go back

21   and rent the space.

22   Q.   And the lease would have prohibitions for the tenant to

23   change that?

24   A.   Correct.

25   Q.   Now, I want to go back for a moment to Exhibit 90.

1          Mr. Gunther asked you if you received this letter and

2    ultimately transmitted it to Sharyn Tritto for a response.

3          Do you recall that?

4    A.  I don't see the letter.

5    Q.  Oh, I'm sorry.  It is not up on your screen?

6    A.  No, but what is it?

7          THE COURT:  Number 90.

8    Q.  Number 90.

9          You learned from this morning how to hit the screen

10   the right away to get it going again.

11   A.  All right.  Go ahead.

12        THE COURT:  He's got it in his notebook, Mr. Schick.

13   Q.  Mr. Laboz, did you have occasion -- before we get to the

14   specifics of this document, Mr. Laboz, have you ever had

15   occasion to have to evict a tenant?

16   A.  Yes.

17   Q.  And is it sometimes a contentious process?

18   A.  Very.

19   Q.  It's a legal process?

20   A.  Yes.

21   Q.  And --

22   A.  Timely.

23   Q.  I'm sorry.

24        Is there evidence necessary to initiate that process?

25   A.  Depending on what the default is, yes.

J2SVOME2                         Laboz - cross

1   Q.  Now, I want you to look through what's been marked as
2   Exhibit 90.
3   A.  Yes.
4   Q.  And is there any evidence that was provided by the Collen
5   firm about the alleged counterfeit?
6   A.  No.
7   Q.  Take your time.  There are pages attached to it, so please
8   let's go page-by-page.  That's the first page, right?
9            I think you said -- it says:  As you are already
10  aware.  You testified you were not already aware?
11  A.  That's correct.
12  Q.  Okay.
13           Now, the second page, it says on top:  We demand that
14  you immediately remedy the situation by taking the following
15  action.  Correct?
16  A.  Correct.
17  Q.  Did you advise either -- anybody who worked for you to push
18  back or fight back with whatever Mr. Lindenbaum requested?
19  A.  No, we cooperated immediately.  We take this very seriously
20  and we want to cooperate and eradicate the offending action.
21  Q.  Let's go to the next page.
22           So this is a two-page letter, okay.
23           Let's go to the next page.
24           Now, this is Omega's trademark, right?
25  A.  Correct.

1    Q.  Now, if you sent that to the court and saying, Please evict

2    the tenant because Omega's lawyer sent this to me, could you

3    get the tenant evicted?

4    A.  No.

5    Q.  Next page.

6         That's a Swatch trademark.  If you attach that, now

7    you have not one trademark, but two, now would the judge be

8    impressed?

9    A.  No.

10   Q.  Let's go to the next one.

11        How about a third one, would the judge say you've got three

12   trademarks attached?

13   A.  No.

14   Q.  Keep on going.

15        Now you've got a fourth watch.

16   A.  No.

17        THE COURT:  The point is regardless of the number of

18   attachments, you'd be in the same position; correct?

19        THE WITNESS:  I'll be laughed out of court.

20   Q.  Is that because you need evidence?

21   A.  You need evidence, yes, absolutely.

22   Q.  Now, Mr. --

23        THE COURT:  Gunther.

24   Q.  Mr. Gunther --

25        MR. SCHICK:  Thank you, your Honor.

1    Q.  Mr. Gunther asked you if he showed you that -- you received

2    rent from T.A. Discount; correct?

3    A.  Correct.

4    Q.  And you received -- and he also mentioned there was a

5    subsequent tenant; correct?

6    A.  Correct.

7    Q.  And the subsequent tenant was a wine store; correct?

8    A.  Correct.

9    Q.  And without getting into specifics, do you receive roughly

10   the same rent from the wine store as you did from T.A.

11   Discount?

12   A.  Yes.

13   Q.  You're familiar with Amazon, correct, or eBay?

14   A.  Yes, yes.

15   Q.  EBay gets a cut of every sale; correct?

16   A.  Correct.

17   Q.  Do you have an eBay-like relationship with the tenants at

18   375 Canal Street?

19   A.  Not at all.

20   Q.  So you didn't profit from whatever they did?

21   A.  No.

22   Q.  They paid rent; correct?

23   A.  They only pay rent.

24   Q.  Now, are there any expenses -- I don't want to get into a

25   long thing, but does the government impose any charges on

J2SVOME2                         Laboz - cross

1   buildings that you own?

2   A.  Yes.  We have to pay mortgages, we have to pay insurance,

3   we have to pay taxes, taxes, water, sewer.

4            THE COURT:  They are not taxes, water and sewer.

5            THE WITNESS:  Water and sewer.  That's true.

6   Q.  Now, the city -- Mr. Gunther showed you a few settlements

7   with the city; correct?

8   A.  Yes.

9   Q.  Did the city ever impose a requirement to be a monitor?

10  A.  No.

11  Q.  To your knowledge, did the city ever request it as part of

12  the settlement?  Did you push back or fought back?

13  A.  I'm sorry, say that again.

14  Q.  Did the city ever request a monitor as part of settlement

15  and you said, No, we don't agree to that?

16  A.  No, they never asked me for a monitor.  Mr. Lindenbaum

17  didn't ask me for a monitor, no.

18  Q.  Now, we showed you a letter from Mr. Lindenbaum that was

19  dated September 28, 2011.  And we showed you Ms. Tritto's

20  response, right?  Mr. Lindenbaum said please respond by October

21  11th?

22  A.  Right.

23  Q.  Ms. Tritto responded by October 3rd, just a couple of days

24  later?

25  A.  Right.

1    Q.   Now, after that, did Mr. Lindenbaum ever write back with

2    respect to any action that you had taken that Ms. Tritto had

3    communicated to him?

4    A.   No, it seems like he was satisfied.  We removed the

5    offending occupant and --

6            MR. GUNTHER:  Your Honor, I move to strike anything

7    after the answer to the question.

8            THE COURT:  Overruled.

9    Q.   Now, at any time -- at any time -- so, for example, this

10   lawsuit involves the alleged sale of -- this lawsuit involves a

11   purchase that was made at 375 Canal on May 19, 2012.  That's

12   what they are talking here about; correct?

13   A.   Correct.

14   Q.   Did Mr. Lindenbaum send you any letter, either before or

15   after that sale, either complaining of the condition or

16   complaining of counterfeit products?

17   A.   No.

18   Q.   Now, have you seen documentary evidence about instances in

19   which Mr. Lindenbaum or his colleagues sent investigators to

20   search for counterfeit merchandise at 375 Canal?

21   A.   No.

22   Q.   You haven't seen those documents about the failed buys?

23   A.   No.

24   Q.   Okay.

25            Mr. Lindenbaum didn't send them to you, did he?

1    A.  No.

2    Q.  Mr. Lindenbaum and the Collen firm --

3              MR. GUNTHER:  Your Honor, there's no foundation.  He

4    just said he doesn't know --

5              MR. SCHICK:  I want to make sure he didn't send it to

6    him.

7              THE COURT:  You want to make sure he did what?

8    Q.  Let me ask you a question:  Mr. Gunther asked you if you

9    saw a report by Brad Cole relating to May 19th, 2012, do you

10   remember that?  He asked you if you saw an investigator report

11   by Mr. Cole?

12   A.  Yes, yes.

13   Q.  Okay.

14             And you said you don't recall that you did; correct?

15   A.  Correct.

16   Q.  And I'm asking you Mr. Cole -- I'll represent that Mr. Cole

17   prepared several reports about 375 Canal.

18   A.  Okay.

19   Q.  Have you seen any of them?

20   A.  No.

21   Q.  Regardless of what they said?

22   A.  No.

23   Q.  Whether they said there was a failed buy or a buy?

24             MR. GUNTHER:  Now we're off into the netherworld.

25             THE COURT:  Objection sustained.

1          MR. SCHICK:  Just give me one moment, I think I have

2     one question.  Just give me one moment.  I think I'm going to

3     have the last question.

4          (Pause)

5     BY MR. SCHICK:

6     Q.  Has anybody who works for 375 Canal LLC or you in any

7     capacity ever been charged -- claimed either by the city or a

8     private trademark owner with selling counterfeit goods?

9     A.  No.

10    Q.  Has anybody ever alleged that anybody who works for you

11    participated in the sale of counterfeit goods?

12    A.  No.

13    Q.  And is that at any time?

14    A.  At any time.

15    Q.  At any place.

16         If Mr. Lindenbaum had written to you that somebody who

17    worked for you participated in the sale of counterfeit goods,

18    would you have taken action?

19    A.  Absolutely.

20    Q.  If Mr. Lindenbaum would have followed up to the email from

21    Ms. Tritto, Mr. Lindenbaum had written back to Ms. Tritto's

22    October 3rd, 2011 email in which she said remove the offending

23    subtenant and asked for more, would you have cooperated with

24    them?

25    A.  100 percent.  She said we cooperated previously.

```
 1                MR. SCHICK:  Thank you, your Honor.

 2                No further questions.

 3                MR. GUNTHER:  Just a little redirect, your Honor.

 4                THE COURT:  All right.

 5                MR. GUNTHER:  Can we please put up Plaintiffs' Exhibit

 6     87, which is in evidence.

 7     REDIRECT EXAMINATION

 8     BY MR. GUNTHER:

 9     Q.  Sir, do you see this is an email from Lisa Caponegro at a

10     law firm, do you see that, to Sharyn Tritto?

11     A.  Yes.

12     Q.  And the subject is 375 Canal Street.  Do you see that?

13     A.  Yes.

14     Q.  And the date of that email, sir, is April 14, 2011.

15                Do you see that?

16     A.  Yes.

17     Q.  And it says:  "Hi, Sharon.  On April 6th, 2011, our

18     investigators made an evidential purchase of a counterfeit

19     Chanel necklace at 375 Canal Street.  I have attached a

20     declaration for your reference."

21                Do you see that?

22     A.  Yes.

23                MR. GUNTHER:  Let's turn to the declaration, if we

24     can, and put up paragraph 3.

25     Q.  The declaration says:  "On April 6, 2011, an undercover
```

1   investigator acting under my supervision and control went to

2   375 Canal Street, New York, New York.  The undercover

3   investigator purchased one necklace bearing the Chanel

4   trademark which was identified as a counterfeit."

5          Do you see that?

6   A.  Yes.

7   Q.  "The necklace was purchased for $35 from the Asian female

8   vendor."  Do you see that?

9   A.  Yes.

10  Q.  Then it goes on to say, this is the investigator's report:

11  "The vendor retrieved the necklace from a black plastic bag

12  that was stored below the jewelry counter."  Do you see that?

13  A.  Yes.

14  Q.  Do you have any basis to disagree that that, in fact, is

15  accurate?

16  A.  It's like any other store.

17  Q.  Like any other store, right?

18  A.  Yes.

19  Q.  Yes.  Thank you.

20          MR. SCHICK:  Your Honor --

21  Q.  Now, let me go on to, if I can -- and I'd like to put up --

22  well, let me do this:

23          Sir, you talked in your examination by Mr. Schick

24  about the difficulties of evicting tenants, right?

25  A.  Correct.

J2SVOME2                        Laboz - redirect

1   Q.  Let me ask you this:  About how much do you think it would

2   cost you to evict a tenant in 2012 who had been accused or

3   credibly accused of counterfeiting activity?

4   A.  How much it would cost?

5   Q.  Yes, legal fees, whatever.  Give me an estimate.

6           MR. SCHICK:  Your Honor, we didn't get into the cost

7   of it, we got into the time of it.  This is really beyond the

8   scope.

9           MR. GUNTHER:  Your Honor, it's relevant and I'll show

10  why.

11          THE COURT:  All right.

12  A.  In legal fees?

13  Q.  Yes.

14  A.  I don't know, 15, 20,000.

15  Q.  20,000.  Okay.

16  A.  Depends.

17  Q.  Sure.

18  A.  Depends if they fight and delay and drag it out and drag it

19  out, or we do a quick settlement, which we really try to do

20  usually.

21  Q.  Okay.  But it could be as much as 20 grand, right?

22  A.  Could be.

23  Q.  All right.

24          Sir, how much would it cost to put up a couple of

25  signs that say "counterfeiting is a crime"?

J2SVOME2                          Laboz - redirect

1    A.  Not much.

2    Q.  Fifty bucks, 100 bucks --

3    A.  Maybe.

4    Q.  -- if you made them fancy?  Right?

5    A.  Correct.

6    Q.  How much would it cost to make sure that all storage areas

7    and back rooms had been removed on an ongoing basis?  How much

8    would it cost to have somebody walk in and check that at 375

9    Canal Street?

10   A.  I don't know.

11   Q.  Not a lot, right?

12   A.  Nope.

13   Q.  Less than 20 grand, right?

14   A.  Yeah.

15   Q.  Sir, how much would it cost to hire a private investigator

16   to investigate whether properties like 375 Canal, where there

17   were repeated instances of counterfeiting activity, how much

18   would it have cost you to hire a private investigator to

19   monitor those properties?

20   A.  Listen --

21   Q.  Can you answer that question, sir?

22   A.  It wouldn't cost much, but all --

23   Q.  That's all I asked.

24   A.  -- not work --

25   Q.  That's all I ask.

J2SVOME2                           Laboz - recross

1    A.  Throwing out a tenant works.

2    Q.  That's all I asked you.

3            Thank you very much.

4            MR. SCHICK:  I just have one question, your Honor.

5            THE COURT:  Yes, Mr. Schick.

6            MR. SCHICK:  Or two questions.

7            Keep this up, Mr. Lam, if you can, please.

8    RECROSS EXAMINATION

9    BY MR. SCHICK:

10   Q.  Mr. Gunther showed you paragraph 3; correct?

11   A.  Correct.

12   Q.  And he implied in paragraph 3 that this involves something

13   found from a back storeroom; correct?

14   A.  Yeah, but it wasn't.

15   Q.  I'm just asking you.  Right?  Correct?

16   A.  Yes.

17   Q.  And he cut you off when you tried to answer.  I just did

18   that too.

19           MR. SCHICK:  I guess we're a little alike, Bob.

20   Q.  But, in any event, does anything in paragraph 3 suggest

21   that there was something found at a back storeroom?

22   A.  No.

23   Q.  What does it say?

24   A.  It says:  "The offender retrieved the necklace from a black

25   plastic bag that was stored below the jewelry counter."

1    Q.   Okay.  Now, one other question, which is, this is an

2    affidavit that a trademark owner sent to you to try to help you

3    get action against a tenant; correct?  If you go back to the

4    first page, do you see that?

5    A.   Yes.

6              MR. SCHICK:  Oh, Mr. Lam, I'm sorry.

7              THE COURT:  Page 87.

8              MR. SCHICK:  Just one up, Mr. Lam.  I'm sorry.

9              Go down a little bit.

10             THE COURT:  Mr. Laboz.

11             THE WITNESS:  Thank you, your Honor.

12   A.   Okay.  Screen is out.

13             Okay.  Go ahead.

14   Q.   Do you see this is an email that accompanied the

15   declaration that was provided to Sharyn Tritto to help her

16   remove a tenant?  Do you see that?

17   A.   Yes.

18   Q.   Now, do you recall whether Mr. Lindenbaum or anybody at his

19   firm or anybody working for Omega gave you any affidavits with

20   respect to any activity that occurred at 375 Canal?

21   A.   No, they gave us nothing.

22             MR. SCHICK:  Nothing further, your Honor.

23             THE COURT:  Mr. Laboz, you're excused.

24             THE WITNESS:  Thank you, your Honor.

25             (Witness excused)

1            MR. SCHICK:  Mr. Laboz can stay in the courtroom at

2      this point?

3            THE COURT:  Yes.

4            Do you have any objection, Mr. Gunther?

5            MR. GUNTHER:  No, your Honor, I have no objection at

6      all.  Be happy to have him watch.

7            THE COURT:  Do you have another witness?

8            MR. GUNTHER:  Your Honor, at this point the plaintiff

9      rests.

10           Your Honor, there are a few exhibits that I want to

11     make sure I get moved into evidence, and I can do that at any

12     appropriate time, but I want to make sure they are all in

13     evidence as part of my case.

14           THE COURT:  All right.

15           Ladies and gentlemen, we'll take our luncheon recess

16     now.  We'll resume about quarter after 12.  Thank you.

17           (Jury not present)

18           MR. GUNTHER:  Your Honor, I just want -- I'm going to

19     have Mr. Noyes do it; he knows what he's talking about.

20           MR. NOYES:  Your Honor, during the examination of

21     Ms. Tritto yesterday, there were some objections to evidence

22     that Ms. Gostin offered; they were overruled.

23           We re-reviewed the transcript, and the transcript does

24     not reflect that they were in evidence, so we would just move

25     them again, your Honor.

```
1              THE COURT:  What are they?

2              MR. NOYES:  They are PX 44, PX 47, PX 79.

3              THE COURT:  44, 47, 40 --

4              MR. GUNTHER:  79.

5              MR. NOYES:  79.  164.

6              MR. SCHICK:  I'm sorry, I can't hear you.

7              MR. NOYES:  164.

8              MR. SCHICK:  Sure.

9              MR. NOYES:  And then 227.

10             MR. SCHICK:  Can you please give us a minute.

11             MR. DELLA FERA:  Your Honor, we reviewed the

12    transcript.  I believe the issue is that they weren't listed in

13    the final -- I'm sorry.

14             MR. NOYES:  I apologize.  I misspoke.

15             Just so the record is clear, it's 228 is the final

16    exhibit.

17             THE COURT:  All right.

18             Mr. Della Fera.

19             MR. DELLA FERA:  We reviewed the transcript; we

20    noticed the same issue.  We believe that it's in the body of

21    the transcript.  They were offered, it was just not reflected

22    on the final page.  We have no issue.

23             THE COURT:  So it's clear, 44, 47, 79, 164, and 228

24    are in evidence.

25             MR. NOYES:  Thank you, your Honor.
```

```
1              (Plaintiffs' Exhibits 44, 47, 79, 164, 228 received in
2       evidence)
3              THE COURT:  Does that take care of your --
4              MR. NOYES:  It does, your Honor.
5              THE COURT:  Okay.  So you're finally rested?
6              MR. GUNTHER:  I'm as rested as I could be, your Honor.
7              THE COURT:  Do you want to make motions, Mr. Schick?
8              MR. SCHICK:  Yes, your Honor, I'd like to make a
9       motion for a directed verdict.
10             We believe that the predicate sale that they made of a
11      prior art infringement of Omega has not been proven.  They had
12      only two witnesses who talked about it at all.  One was
13      Mr. Taute, who said he has no recollection at all of what
14      happened; and one was Mr. Cole, who said he made no report, he
15      sent no document, he has no testimony other than a picture.  He
16      has a declaration which has been changed twice with respect to
17      that, but he certainly has no evidence to be able to testify
18      about.
19             The final point, even with respect to Mr. Taute, I
20      know your Honor let in the email between Mr. Taute and
21      Mr. Paul, but the disposition of that case, which is the only
22      evidence that we have, the disposition is that somebody was
23      given a disorderly conduct charge and a conditional release and
24      removed from his records.
25             I don't believe that they have satisfied their burden
```

1    of showing the predicate sale.

2              THE COURT:  All right.  I'm going to reserve.

3              Your case, Mr. Schick, is going to take how long?

4              MR. SCHICK:  Your Honor, I have what others here might

5    think is good news.  We had two witnesses after you precluded

6    Mr. Paul.  I don't think I have to make another motion about

7    that.

8              THE COURT:  I think you made your record on that.

9              MR. SCHICK:  Correct.

10             We had Mr. Quinonez and Mr. Stone-Jansen.

11             Mr. Quinonez we had decided and told he was not

12   necessary.  He was going to testify about the two failed buys

13   in December 2011, and we feel we have that in evidence.

14             With respect to Mr. Stone-Jansen, who has been under

15   subpoena and in communication, he may have taken off with Juror

16   No. 8, because he sent us an email early there morning saying

17   he's not coming.  He's the plaintiffs' investigator.  He said

18   he's feeling sickly and he's not coming today.  And then he

19   said tomorrow, if it's relevant, he has a doctor's appointment

20   or a doctor's procedure.

21             And so we'll have to think about the potential adverse

22   inference.  He was under subpoena, he was in communication, and

23   he just sent us an email early this morning right before we --

24   oh, late last night?

25             MR. DELLA FERA:  3:30 a.m.

1        MR. SCHICK:  3:30 a.m.

2        THE COURT:  He must have really been sick.

3        MR. SCHICK:  I don't know, your Honor.  He's not our

4   witness.  We're calling him as a witness; he's plaintiffs'

5   investigator.

6        MR. GUNTHER:  Your Honor, he's not our witness either.

7   They had the subpoena.  This notion that they're going to --

8   here we go again with adverse inferences.  This witness is not

9   under our control at all.

10       THE COURT:  Who is he?

11       MR. GUNTHER:  He was an investigator that years ago

12  did some work for the Collen firm.

13       MR. SCHICK:  Your Honor he's an investigator who

14  testified at deposition, who submitted a declaration in the

15  first summary judgment before your Honor in this case.

16       THE COURT:  Want to use his deposition?

17       MR. SCHICK:  We just got this information right before

18  we came to court.  We have to think about during the break how

19  we deal with it, that's all I've said.

20       THE COURT:  All right.

21       So you may or may not have witnesses this afternoon.

22       MR. SCHICK:  I certainly have no live witnesses

23  because I'm not calling Mr. Quinonez, and Mr. Stone-Jansen is

24  not coming.

25       THE COURT:  Okay.  So you'll let me know at the

1  luncheon break, after the luncheon break, what your intentions

2  are.

3          MR. SCHICK:  Yes, your Honor.  Absolutely.

4          THE COURT:  Okay.  And then depending upon -- then we

5  can take up the jury charge.

6          MR. SCHICK:  Correct.

7          THE COURT:  How long is your summation going to be,

8  Mr. Gunther?

9          MR. GUNTHER:  Your Honor, I think I would plan to do

10 just maybe about 50 minutes and about 10 minutes in rebuttal.

11         THE COURT:  Fifty?

12         MR. GUNTHER:  Fifty, five-oh minutes, and 10 minutes

13 of rebuttal.

14         THE COURT:  Oh.

15         MR. SCHICK:  I'm not sure rebuttal is --

16         THE COURT:  He's entitled to his rebuttal; he's got

17 the burden.

18         How much for you, Mr. Schick?

19         MR. SCHICK:  I was going to say an hour, but now I'm

20 rethinking whether I should give that answer, your Honor.  I

21 would assume it's going to be anywhere, you know 45, 50

22 minutes.

23         THE COURT:  Okay.

24         We can do that in the morning session.

25         MR. SCHICK:  That's what we said.

1        If I could raise one other issue just as a

2   housekeeping matter.  I don't know the best way to deal with

3   this.

4        Obviously it might be in everybody's interest -- I

5   don't know what your Honor intends in terms of the schedule

6   tomorrow, in terms of keeping to the 2:30 day or beyond that.

7   If your Honor keeps the 2:30 day, I have nothing else to say.

8   If your Honor suggests going beyond that, I just need to figure

9   out how much --

10        THE COURT:  You're going to have your summations, an

11   hour each, approximately.  That will take care of the morning

12   session.

13        The afternoon session, I'll take a little bit less

14   than an hour for my jury charge.  I intend to give it to the

15   jury then.  I'd let the jury decide whether they want to go

16   home or stay.  So I don't tell them what they -- once they've

17   been charged and begin their deliberations, I let them

18   deliberate in accordance with their own schedule, their own

19   wishes.

20        MR. SCHICK:  The problem is, your Honor, that tomorrow

21   is Friday.

22        THE COURT:  I understand.

23        MR. SCHICK:  And I can't be here and Mr. Laboz can't

24   be here if it goes on, and that's somewhat prejudicial.  So I

25   would ask if we say we'll run until 2:30 until now, and now it

642

J2SVOME2

```
 1    runs till 4 or something like that, because otherwise you get
 2    into a situation where we're just not present in court and I
 3    don't think that's appropriate.
 4             I wish it were otherwise, your Honor.
 5             THE COURT:  Why can't Mr. Della Fera handle it?  He's
 6    doing a great job.
 7             MR. SCHICK:  He is.  He absolutely is.  But Mr. Laboz
 8    has the right to be here.  And I have -- for better, for worse,
 9    they are stuck with me, as the court staff is writing here.
10    And again, I'm not saying that it has to be 2:30, your Honor.
11    I understand the issue is where I'm raising it like this, but I
12    do think it's --
13             (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

1          THE COURT:  What time do you have to leave?

2          MR. SCHICK:  I would say like this.  Sabbath begins,

3     like, about 5:20.  I want to be out of the courtroom roughly

4     4:15.

5          I understand if the jury reaches a verdict and it

6     comes in and it goes beyond that, it creates an issue, and

7     certainly if the jury comes to a verdict and finds Mr. Schick

8     not here and Mr. Laboz not here, it could be certainly

9     prejudicial.  And if an issue comes in on a note, it could be

10    an issue.  Again, none of us wanted this to come to a Friday

11    with our case being put on.

12         THE COURT:  All right.

13         MR. SCHICK:  And I certainly don't want the jury to be

14    told it's us, either.

15         THE COURT:  Well, I understand that.

16         MR. SCHICK:  I appreciate your Honor's sensitivity.  I

17    just wanted to raise it at this point.

18         THE COURT:  All right.  I'll see you after lunch.

19         (Luncheon recess)

20

21

22

23

24

25

J2sWome3

```
 1                         AFTERNOON SESSION

 2                            12:15 p.m.

 3               THE COURT:  Please be seated.

 4               Mr. Schick, what have you decided on?

 5               MR. SCHICK:  We're OK with the evidence as it's come

 6      in, Judge.

 7               THE COURT:  Does that mean you rest?

 8               MR. SCHICK:  We didn't start yet, so I don't know if

 9      we rest, but yes.

10               THE COURT:  Do you want to rest in front of the jury?

11               MR. SCHICK:  Yes.

12               THE COURT:  I'll call on you and you'll have the

13      opportunity to say you rest.

14               MR. SCHICK:  Sure.

15               THE COURT:  We took an informal poll of the jury.

16      I'll Mr. Gonzalez to report on what the jury told him.

17               THE DEPUTY CLERK:  One of the jurors has work

18      obligations tomorrow, so she has to be out of here by 2:30 the

19      latest, and it seems we can come back on Monday, however, we

20      may need to start later in the morning.  Other than that,

21      assuming they don't submit a verdict by tomorrow, we can resume

22      on Monday morning, sometime after 10, sometime after 11.  I'll

23      find out for sure afterwards.

24               THE COURT:  OK.

25               MR. GUNTHER:  That's acceptable, and fine.
```

```
 1                 THE COURT:  OK.

 2                 MR. SCHICK:  Yes, your Honor.

 3                 THE COURT:  I'm going to call in the jury, excuse them

 4     and tell them we're going to have summations tomorrow and the

 5     case will be in their hands by tomorrow afternoon, I assume.

 6                 MR. SCHICK:  9:00 tomorrow?  Same time.

 7                 THE COURT:  Yes.

 8                 (Jury present)

 9                 THE COURT:  Good afternoon.  Please be seated.

10                 Mr. Schick.

11                 MR. SCHICK:  I think Mr. Gunther has not rested in

12     front of the jury.  I may be wrong about that.

13                 THE COURT:  I thought you did rest.

14                 MR. GUNTHER:  I thought I did, but in case, I didn't,

15     I rest.

16                 MR. SCHICK:  I, too, rest so we can get on to the next

17     part of this case.

18                 THE COURT:  That means, as they said in their opening

19     statements, the lawyers will both have the chance to make their

20     closing arguments.  We're going to schedule those for tomorrow

21     morning at 9:00.  Then I'll give you my instructions, and

22     you'll begin your deliberations.  I'm going to excuse you now

23     and ask you to come back tomorrow morning at 9:00, and we'll

24     begin promptly.

25                 Remember what I've said.  Keep an open mind.  Don't
```

1   discuss the case, and we'll see you tomorrow morning at 9:00.

2           Thank you very much.

3           (Jury not present)

4           THE COURT:  Please be seated.

5           Last night we transmitted to you a proposed jury

6   charge which reflects our work on the charges that you

7   submitted, our consideration of the evidence, and this is what

8   we've come up with.

9           I'd like to go through this page by page, take your

10  objections as we go along.  The first 10 or 11 pages deal with

11  general introductory charges, and these are my standard charges

12  that I've been using for all the time that I've been on the

13  bench, so I hope you don't have any issue about 1 through 14.

14          MR. SCHICK:  We do not, your Honor.

15          MR. NOYES:  No objection, your Honor.

16          THE COURT:  Then we'll turn to page 11, the

17  substantive law charges.

18          OK.  I'm on page 11.

19          MR. NOYES:  No objection from the plaintiffs, your

20  Honor.

21          MR. DELLA FERA:  No objection from the defense.

22          THE COURT:  12.

23          MR. NOYES:  No objection, your Honor.

24          MR. DELLA FERA:  No objection.

25          THE COURT:  13.

J2sWome3

```
 1              MR. NOYES:  No objection.

 2              MR. DELLA FERA:  No objection.

 3              THE COURT:  When do you have your first objection,

 4    Mr. Noyes?

 5              MR. NOYES:  We have only one objection, your Honor.

 6              THE COURT:  You get a gold star.

 7              MR. NOYES:  It is on page 19.

 8              THE COURT:  OK.

 9              MR. NOYES:  The last sentence of page 19, the sentence

10    that begins "conversely."

11              THE COURT:  Yes.

12              MR. NOYES:  Your Honor, the sentence that immediately

13    precedes that is, "If the infringement is serious and

14    widespread, it is more likely that 375 Canal knew about and

15    condoned the acts of its tenants, subtenants or other occupants

16    of its premises."  That is language from a jury instruction

17    cited by the defendant.  We also cited those jury instructions.

18    We're fine with that language, but the next sentence is a

19    sentence that we don't believe has a basis in those jury

20    instructions or in the law, and our concern with that final

21    sentence is that it suggests that actual knowledge could be

22    negated by a limited infringement.

23              For example, we would contend that 375 Canal LLC had

24    actual knowledge of infringement of Omega's trademarks here

25    even if it was only one watch that was sold, so for that
```

```
 1   reason, your Honor, we would object to this particular

 2   instruction.

 3              THE COURT:  Mr. Della Fera.

 4              MR. DELLA FERA:  Your Honor, the final sentence is

 5   merely the converse of the preceding sentence.

 6              THE COURT:  That's true.

 7              MR. DELLA FERA:  And I think it's unfair to only give

 8   the instruction that seems favorable to plaintiffs and not the

 9   instruction that conversely would be more favorable to the

10   defendant.

11              THE COURT:  I think that's why it's there.  I'm trying

12   to say you can decide things one way or the other, and this is

13   the other.  I think it's a fair commentary.

14              MR. DELLA FERA:  I have one other comment on that.

15              THE COURT:  Do you have any comments before page 19,

16   Mr. Della Fera?

17              MR. DELLA FERA:  I do, your Honor.

18              THE COURT:  Do you want to take those up?

19              MR. DELLA FERA:  I do, if you don't mind.  And I

20   apologize.

21              THE COURT:  You don't have to apologize.

22              MR. DELLA FERA:  I don't believe I'll be getting a

23   gold star, but hopefully a bronze one.

24              Page 16.

25              THE COURT:  Yes, sir.
```

J2sWome3

<table>
<tr><td>1</td><td>MR. DELLA FERA:  Section IV, and it's the third</td></tr>
</table>

1         MR. DELLA FERA:  Section IV, and it's the third

2    factor.

3         THE COURT:  Yes.

4         MR. DELLA FERA:  And really, continues on to page 17

5    as well.  We believe it should say "whether the defendant

6    continued to lease its premises at 375 Canal Street to one who

7    it knew or had reason to know was infringing on Omega's

8    trademarks," and then continuing on to the end.  And the reason

9    we believe that's appropriate, your Honor, is that if they

10   remove the infringer and they continue to lease their premises

11   to someone else, that's completely permissible under the law,

12   and the way this instruction reads is as if they need to shut

13   down the premises completely.

14        THE COURT:  Where does it say it has to shut them down

15   completely?

16        MR. DELLA FERA:  It doesn't, your Honor.

17        THE COURT:  Oh.

18        MR. DELLA FERA:  It's an inference.  The inference

19   would be that after it knew that its premises were being used

20   as a place to continue infringing Omega's marks, they continued

21   to lease its premises.  It needs to be that they continued to

22   lease their premises to the person or entity or group of

23   people.  We're not contesting that it needs to be an identified

24   person, but it must be the person about whom they had knowledge

25   or the people about whom they had knowledge, or reason to know.

1   We acknowledge that, but it needs to be -- can't continue to

2   lease to new tenants.

3              THE COURT:  How do you want to change it?  What change

4   do you propose?

5              MR. DELLA FERA:  I propose adding in the phrase, after

6   the words "375 Canal Street," adding in the phrase "to one who

7   it knew or had reason to know was infringing on Omega's

8   trademarks," or if your Honor prefers one to a group of

9   people -- we're not specifically saying it needs to be a

10  specific person, but that's the change that we would request.

11             THE COURT:  Mr. Noyes.

12             MR. NOYES:  Your Honor, this is essentially the same

13  request that the defendants have made multiple times.  They're

14  trying to inject the requirement that Omega needed to prove the

15  same individual that was infringing the mark and that 375 canal

16  knew it was the same individual and that same individual

17  continued to be at the premises.  You've rejected this now

18  twice, your Honor.  In 2013, in your decision, for example, you

19  said 375 Canal's argument is that specific notice of

20  counterfeit sales by an identified individual is required

21  before it can be cast into liability, that is not the law.

22             They've argued this multiple times, and you've

23  rejected it.  We believe it's the law of the case, and this is

24  improper.

25             MR. DELLA FERA:  Your Honor, if I may just respond to

1    that one point?

2              THE COURT:  Yes, please.

3              MR. DELLA FERA:  I believe the specific individual,

4    what your Honor was doing, and your Honor can correct me if I'm

5    wrong, is it was that you  must identify the individual by

6    name, they must know who it is.  We're not contesting that they

7    must know the identity of the individual, but they must have

8    knowledge or reason to know that some person or entity has

9    infringed and then continued to supply their services to that

10   same person or entity.  As I stated before, as it reads

11   currently, they could kick that person out, bring someone else

12   in, and this instruction would indicate that that element has

13   still been satisfied.

14             THE COURT:  I think it's clear the way it is.  I'm

15   going to overrule your objection and leave the language the way

16   it's presented at page 16.

17             What else do you have, Mr. Della Fera?

18             MR. DELLA FERA:  Your Honor, factor 4, below that.

19             THE COURT:  Yes.

20             MR. DELLA FERA:  We believe it's fine but we would add

21   a clause at the end, which is "after it knew of or had reason

22   to know that infringement of Omega's mark had occurred on its

23   premises," and the reason for that is there's no requirement to

24   take remedial steps until there's knowledge.

25             MR. NOYES:  Your Honor, that's covered in the factors.

1    Knowledge is one of the required factors.

2              THE COURT:  I think that's right.

3              What's your next one, Mr. Della Fera?

4              MR. DELLA FERA:  Page 20, your Honor.

5              THE COURT:  OK.

6              MR. DELLA FERA:  It's the "as I stated" paragraph

7    under "continued to supply services."  And the issue here, your

8    Honor, is that -- it's sort of the same issue, and I think your

9    Honor will probably decide the same way, but we would add "to

10   one who knew or had reason to know" --

11             Your Honor, I will withdraw our objection to 20,

12   "continued to supply services."

13             THE COURT:  OK.

14             MR. DELLA FERA:  For the remedial steps, however, we

15   believe that it must be that 375 Canal took reasonable remedial

16   steps to try to stop the sale or offer for sale of merchandise

17   infringing on Omega's trademarks.  The *Tiffany* case from the

18   Second Circuit is clear that general knowledge of infringement

19   of other brands is insufficient.  It needs to be specific to

20   plaintiffs' brand.

21             THE COURT:  Are you saying, under remedial steps, 375

22   took remedial steps --

23             MR. DELLA FERA:  Yes.

24             THE COURT:  -- to stop the sale or offer for sale

25   what?

1          MR. DELLA FERA:  "Of merchandise that infringed on

2     Omega's trademark at 375 Canal Street."

3          THE COURT:  Of merchandise.

4          MR. DELLA FERA:  "That infringed on Omega's trademarks

5     at 375 Canal Street."

6          THE COURT:  That infringed on Omega's mark.

7          MR. DELLA FERA:  "At 375 Canal Street."

8          MR. NOYES:  Your Honor, we'd just --

9          THE COURT:  I'll make that change.

10          Yes, Mr. Noyes.

11          MR. NOYES:  That's consistent with your previous

12     instructions that we just discussed.  Trademark is the only

13     change that we would make.

14          MR. DELLA FERA:  We have no objection.

15          THE COURT:  Trademarks.

16          The sale of merchandise that infringed Omega's

17     trademarks at 375 Canal Street.

18          MR. DELLA FERA:  That's right.

19          THE COURT:  That change is made.

20          MR. DELLA FERA:  Thank you, your Honor.

21          I have nothing further in the instructions.  We have a

22     few on the special verdict form.

23          THE COURT:  OK.

24          MR. DELLA FERA:  Our first objection to the special

25     verdict form is to --

J2sWome3

<table>
<tr><td>1</td><td>THE COURT:  Hold on for a second.  Be right with you.</td></tr>
<tr><td>2</td><td>MR. DELLA FERA:  Your Honor, I apologize.  I didn't</td></tr>
<tr><td>3</td><td>realize the sheet I was reading from was double-sided.  I have</td></tr>
<tr><td>4</td><td>a few more on the jury charge that were on the back of the</td></tr>
<tr><td>5</td><td>page.</td></tr>
<tr><td>6</td><td>MR. GUNTHER:  I knew it was too good to be true.</td></tr>
<tr><td>7</td><td>THE COURT:  OK.  Go ahead.  You took care of the odd</td></tr>
<tr><td>8</td><td>numbers.</td></tr>
<tr><td>9</td><td>MR. DELLA FERA:  That's right, your Honor.</td></tr>
<tr><td>10</td><td>THE COURT:  Now you're going to do the even numbers.</td></tr>
<tr><td>11</td><td>MR. DELLA FERA:  That's right.  Like this case, your</td></tr>
<tr><td>12</td><td>Honor, everything comes in out of order.</td></tr>
<tr><td>13</td><td>THE COURT:  Yes.</td></tr>
<tr><td>14</td><td>MR. DELLA FERA:  And I believe we covered these</td></tr>
<tr><td>15</td><td>already, so it should be relatively painless.</td></tr>
<tr><td>16</td><td>On page 18.</td></tr>
<tr><td>17</td><td>THE COURT:  Hold on.</td></tr>
<tr><td>18</td><td>Page 18.  Yes, sir.</td></tr>
<tr><td>19</td><td>MR. DELLA FERA:  The "actual knowledge" instruction.</td></tr>
<tr><td>20</td><td>THE COURT:  Right.</td></tr>
<tr><td>21</td><td>MR. DELLA FERA:  Again, we think that that final</td></tr>
<tr><td>22</td><td>clause of "trademark infringing merchandise" should be changed</td></tr>
<tr><td>23</td><td>to "merchandise that infringed on Omega's trademarks at 375</td></tr>
<tr><td>24</td><td>Canal Street."</td></tr>
<tr><td>25</td><td>THE COURT:  OK.</td></tr>
</table>

J2sWome3

1          MR. DELLA FERA:  And similarly, in the next paragraph,

2     which goes on to page 19, for the "reason to know," again, we

3     believe the phrase "trademark infringing merchandise" in both

4     of the places that it is included in this instruction should be

5     "that infringe on Omega's trademarks at 375 Canal Street."

6          THE COURT:  OK.

7          MR. NOYES:  The only thing, your Honor, with respect

8     to that is that this is discussing willful blindness, and it's

9     hard to understand how you could be willfully blind to specific

10    marks.  For that one it's more difficult to add the specific

11    language.

12         MR. DELLA FERA:  Your Honor, if that means the willful

13    blindness is not part of the case, that's fine with us, but the

14    standard is clear, it's specific trademark knowledge.

15         THE COURT:  I'm going to make the change suggested by

16    Mr. Della Fera and leave it at that.

17         MR. DELLA FERA:  And your Honor, on page 21, for the

18    statutory damages, we believe that there should be an

19    additional instruction that, "even if you determine 375 Canal

20    LLC acted willfully, you may still award any amount between

21    1,000 and $2 million."

22         MR. NOYES:  We would object to that, your Honor.

23         THE COURT:  What's the basis of the objection?  It's

24    clear enough the way it is already?  I mean, we're quoting the

25    statute here.

J2sWome3

1          MR. NOYES:  Right.  We're quoting the statute, and

2     that implies to the jury that they can ignore the law and the

3     evidence.

4          MR. DELLA FERA:  Your Honor, it does not imply they

5     can ignore the law.  The law is that it can be anywhere between

6     1,000 and $2 million.

7          MR. SCHICK:  The concern here is, your Honor, it reads

8     as if it has to be at least 200,000.

9          MR. DELLA FERA:  Yes.

10          Factor 2, "if you find that 375 Canal's conduct was

11     willful, you may award statutory damages up to 2 million."  I

12     just think that the jury needs to be aware that the law does

13     allow them to provide as low as 1,000 and up to 2 million.

14          MR. SCHICK:  Right.  The suggestion is it's 1,000 up

15     to 200,000 if it's not willful and 200,000 to 2 million if it's

16     willful.  And I don't even think willful should go to the jury,

17     but in any event, an instruction as Mr. Della Fera suggested

18     would make it absolutely clear what the purview of the jury is.

19          MR. NOYES:  Your Honor, this is the language of the

20     statute.

21          THE COURT:  Yes.

22          MR. NOYES:  It's appropriate.

23          THE COURT:  I'm going to leave it the way it is.

24          MR. DELLA FERA:  Finally, your Honor, also on page

25     21 -- it's actually on page 22, I believe, in the revised

1    version, where it states, "There is no necessary mathematical

2    relationship."

3              THE COURT:  Yes.

4              MR. DELLA FERA:  We acknowledge that that is true,

5    your Honor.  However, we think that given -- and again, we

6    haven't offered evidence of actual damages, and Mr. Schick

7    won't offer any argument on that in the closing.  We respect

8    your Honor's ruling, but if you look at the factors, the

9    revenues lost by Omega, which is actual damages, is a factor to

10   be included, and we think that, as we cited in our motions *in*

11   *limine*, courts consistently hold that the most relevant factor

12   is actual damages, and so if there's going to be an instruction

13   that there's no necessary mathematical relationship, which is

14   true, I think there should also be an instruction that says:

15   "Statutory damages typically bear some relation to actual

16   damages, where actual damages can be shown.  However, there is

17   no necessary mathematical relationship."

18             THE COURT:  This language is an extract from the

19   controlling language in the Second Circuit, and I'm not of the

20   mind to amend it along the lines you suggest, Mr. Della Fera,

21   so I'm going to overrule your objection.

22             MR. DELLA FERA:  That's all we have for the jury

23   charge, your Honor.

24             THE COURT:  OK.  Thank you.

25             Now the special verdict form.

J2sWome3

1          MR. NOYES:  Your Honor, for the plaintiffs, the only

2     issue we have is with respect to the trademarks that we

3     removed, that we dropped from the case, which is registration

4     No. 577,415.

5          THE COURT:  It's removed from the version I have.

6          MR. NOYES:  Thank you.

7          THE COURT:  I thought we shared that with you.

8          MR. DELLA FERA:  I don't think the parties have had

9     the opportunity --

10          MR. NOYES:  We haven't seen it.

11          THE COURT:  I'm down to four trademarks.  They are as

12     follows, just so it's clear:  25036; 578,041; 566,370 and the

13     Seamaster, 556,602.

14          MR. NOYES:  That's correct, your Honor.

15          THE COURT:  Those are the four I have.

16          Mr. Della Fera.

17          MR. DELLA FERA:  Your Honor, on special verdict form,

18     1, 6, and 8, which are all the same charge, we can just talk

19     about one and do the same thing for each of them.

20          THE COURT:  Yes.

21          MR. DELLA FERA:  We believe that it should just say

22     "watch" for the type of good.  The evidence came in that it was

23     discussing only "watch."  For instance, watch movements, bands,

24     the watch movement in this case, each of the registration

25     statements for these trademarks indicated that watches and

1   parts thereof were essentially what the single type of good

2   was, so we think it should be "watch."

3           THE COURT:  Watch for all of them?

4           MR. NOYES:  Your Honor, we would object to that.

5   There was evidence presented to the jury that a second watch

6   was offered for sale at 375 Canal on May 19, 2012, and the

7   language, I believe, in the charge here comes directly from the

8   trademark registration.

9           MR. DELLA FERA:  Your Honor, on that point we have no

10  objection to saying watches.  The standard is clear that it's

11  the type of good, so one or two watches makes no difference

12  under the law.  Even 2,000 watches, for statutory damages, it's

13  the same, so we have no issue with that.  We just think it

14  should be "watches."

15          THE COURT:  What's wrong with that, Mr. Noyes?

16          MR. NOYES:  That's fine, your Honor.  "Watches" is

17  fine.

18          THE COURT:  So for Omega registration No. 25036 we'll

19  change watch movements and watch cases.

20          MR. GUNTHER:  No, your Honor.  On this one, remember,

21  what they're going to argue, if you make that change, is that

22  there was only one watch, therefore, you should check the

23  verdict form in their favor.  That's why they're doing that.

24  The reason it's got to be "watch" or "watches" is that if

25  ultimately the jury decides --

J2sWome3

1          THE COURT:  "Watch movements or watch cases."

2          MR. GUNTHER:  Yes.  If ultimately the jury decides

3    that there was only one watch that was sold, I don't want to

4    hear an argument.  I think it would be entirely inappropriate

5    for them to say, We win; it was only one watch.  And that's

6    what they're trying to do by making this change.

7          MR. DELLA FERA:  Your Honor, to be clear, we're fine

8    with "watches," plural.

9          MR. NOYES:  That's their big point.

10          MR. SCHICK:  They're seeking damages.

11          MR. DELLA FERA:  I understand the point now.

12          "Watch or watches" is fine with us, your Honor.

13          MR. GUNTHER:  That's what's in there.

14          MR. DELLA FERA:  But removing the bracelets, bands,

15    straps, movements, cases, we just think each one --

16          MR. GUNTHER:  No, no, no.

17          (Discussion off the record)

18          MR. DELLA FERA:  OK.  The first trademark's out.  It's

19    really just the second one.  I apologize.  If it's just the

20    second one, your Honor, we think it should say watch or

21    watches.  That's fine.

22          THE COURT:  Amy, why don't you show them what you

23    have.

24          MR. DELLA FERA:  I'm sorry, your Honor.

25          MR. SCHICK:  We want to make sure that they don't

J2sWome3

```
1  argue that there's multiple types of goods on a single watch so

2  they can get damages three times, and that's what they want to

3  argue.

4           MR. GUNTHER:  No.

5           THE COURT:  We're going to print it.

6           MR. GUNTHER:  OK, let's get it printed.

7           MR. DELLA FERA:  I think there's less disagreement

8  here, your Honor, than it appears.

9           THE COURT:  Is that right?

10          MR. DELLA FERA:  I think.

11          MR. GUNTHER:  I've got to tell you, I don't think so.

12          MR. DELLA FERA:  OK.  Move on.

13          MR. SCHICK:  We'll reserve on that.

14          MR. DELLA FERA:  Your Honor, may I?

15          THE COURT:  Yes.

16          MR. DELLA FERA:  This clarifies things.  It's just for

17  the first trademark, 25036.

18          THE COURT:  Yes.

19          MR. DELLA FERA:  And we believe it should say watches,

20  like the other ones.

21          MR. NOYES:  Your Honor, with respect to that, the

22  trademark in evidence, PX-3, at page 2, it says "a trademark

23  for watch movements and watch cases."  We would be OK with

24  changing the first part, "watch movements," to just "watches,"

25  but we need to include "watch cases" as well.
```

J2sWome3

```
 1              MR. DELLA FERA:  Your Honor, I believe the issue here
 2     is that a watch case is a part of a watch.  I believe that if
 3     it's on the watch case it's also on the watch.
 4              THE COURT:  What terrible deed, Mr. Gunther, is the
 5     defendant going to do if we don't say watch movements or watch
 6     cases?
 7              MR. GUNTHER:  Your Honor, here's what I'm worried
 8     about.  There's trademarks on the back of the watch.  We showed
 9     that, right?  If part of what they're trying to do here is to
10     say --
11              THE COURT:  I thought movements were inside of the
12     watch.
13              MR. GUNTHER:  The movements I don't care about.  It's
14     the cases part, the cases part.  If they're going to say the
15     case doesn't count because that's not -- if there's going to be
16     an argument like that --
17              THE COURT:  Is there going to be an argument like
18     that?  It would be a spurious argument.
19              MR. DELLA FERA:  I can represent absolutely not, your
20     Honor.  We believe that the watch case is part of the watch.
21     So if it says watches, anything on the watch case would be
22     included.
23              MR. GUNTHER:  With that representation, your Honor,
24     I'm good with watches.
25              THE COURT:  OK.
```

1          MR. DELLA FERA:  Your Honor, I have --

2          THE COURT:  Wait a minute.  Watches.

3          MR. DELLA FERA:  I apologize.

4          THE COURT:  And I'll make that change in one --

5          MR. DELLA FERA:  One, six and eight, your Honor.

6          THE COURT:  One, six and eight, yes.  Thank you.

7          MR. DELLA FERA:  I wasn't wrong.  There's less

8    disagreement, your Honor.

9          THE COURT:  OK.

10          MR. DELLA FERA:  Finally, we have two more objections.

11    I believe I know how your Honor will rule, but I'd like to make

12    a record on them, if I could.

13          THE COURT:  OK.

14          MR. DELLA FERA:  Special verdict form 4, we believe it

15    should say after the first -- the only reference to 375 Canal

16    Street the phrase should be added "to one who knew or had

17    reason to know it was infringing on Omega's trademarks."

18          MR. NOYES:  Your Honor, we object to that for the same

19    reason.

20          THE COURT:  I understand.

21          Your prediction was right, Mr. Della Fera.  The

22    objection's overruled.

23          MR. DELLA FERA:  Thank you, your Honor.

24          On special verdict form No. 5, I'll just make the

25    record that we would request that after the reference to 375

1    Canal Street it state "after it had knowledge or reason to know

2    of infringement of Omega's marks on its premises."

3             THE COURT:  Keep in mind this is a verdict sheet, not

4    an instruction.

5             MR. NOYES:  We object to that, your Honor, for the

6    same reason.

7             MR. DELLA FERA:  That's all I have, your Honor.

8             THE COURT:  All right.  We'll make the changes that we

9    said we'd make, and we'll see you tomorrow morning at 9:00.

10            You're going to be an hour.

11            MR. GUNTHER:  Your Honor, I would say just short of an

12   hour for the main closing and then about ten minutes' rebuttal.

13            THE COURT:  Mr. Schick.

14            MR. SCHICK:  I will try to be about 45 to 50, 55

15   minutes, your Honor.

16            THE COURT:  OK.

17            MR. GUNTHER:  Your Honor, there's one other issue.  I

18   know your Honor was detained a little bit this morning.  We

19   sent a letter this morning, and this relates to the closing.

20            THE COURT:  I got it.  I read it at lunchtime.

21            MR. GUNTHER:  OK.  Your Honor, I think it's really

22   important, given what went on in the opening statement, that

23   there be instructions to counsel about this stuff that has

24   nothing to do with any of the evidence that came in, no empty

25   chairs, no talking about Mr. Paul's setups and things like

1    that.  Your Honor, that is entirely out of bounds, and it's not

2    supported by any of the evidence.  And in fact, on the point

3    with respect to we should have sued other people, you put an

4    instruction in because of that.  We think all of that stuff is

5    out and should not be permitted in terms of closing argument.

6              THE COURT:  Mr. Schick.

7              MR. SCHICK:  Yes, your Honor.

8              Mr. Gunther, after getting us precluded from calling

9    Mr. Paul, submitted about 20 documents into evidence to or from

10   Mr. Paul.  The fact that he was at the center of this lawsuit,

11   that he decided to do it, is certainly not in dispute.  I do

12   not intend tomorrow to make this about Mr. Paul, but I should

13   not be precluded from referencing Mr. Paul or the fact that he

14   was at the center of this.

15             Mr. Cole, their witness; Mr. Taute, their witness, all

16   their factual witnesses, will testify their point of contact

17   was Mr. Paul, so that's on that issue.

18             With respect to those they didn't sue, your Honor has

19   absolutely said he's going to given an instruction that there's

20   no legal necessity for Omega to sue others, those who they

21   think were responsible for the direct infringement.  However,

22   Mr. Gunther has also said he's going to talk about the steps

23   that Omega takes to protect its trademark.  They had Mr. Foster

24   talk about things he testified later he has never spoken about

25   previously, in all his years of employment, about the Omega

brand, how much effort Omega puts into his brand, even though
he didn't know about it until they handed it to him.  But your
Honor, if they can put in effort about how much they protect
their brand and talk about deterrent effect, we can say this is
what they did not do.

        And in addition, your Honor, with respect to those who
they didn't call, surely the jury can hear about who they chose
to call as witnesses, who they didn't choose to call as
witnesses; whose names they tried to get into evidence, whose
names they didn't try to get into evidence.  There's been a lot
of motions *in limine* here which, for the most part, precluded
stuff from our case, and we respect that, your Honor.  And we
did a good, fair trial and go to closing.  But we should not be
precluded, your Honor, at closing from making the argument.
Your Honor's going to instruct the jury, as you have twice
before, that what the lawyers say is just what lawyers say and
what counts is what they think the facts are and what your
Honor says the law is.  But we should not be precluded, your
Honor.

        MR. GUNTHER:  Your Honor, what we're talking about is
scurrilous stuff:  Mr. Paul set up this case, he set up 375
Canal.

        THE COURT:  That he was the mastermind; set out to set
the landlord up.

        MR. GUNTHER:  Yes, your Honor.

```
 1              THE COURT:  Saw a payday.

 2              MR. GUNTHER:  Right.

 3              THE COURT:  Smelled a windfall.

 4              MR. GUNTHER:  Right.

 5              THE COURT:  Mr. Schick, I must tell you --

 6              MR. GUNTHER:  Your Honor, that's outrageous.

 7              THE COURT:  I don't know if it's outrageous, but it

 8   was over the top.

 9              MR. SCHICK:  You have my word, your Honor.

10              THE COURT:  I ask you not to do it.

11              MR. SCHICK:  I will not be over the top tomorrow.  He

12   certainly initiated this, but I understand what your Honor's

13   saying.  And trust me, your Honor, I do not want to get an

14   objection sustained or a direction from your Honor in front of

15   the jury in closing tomorrow.

16              THE COURT:  I'm most reluctant to interrupt lawyers in

17   the summations, because I know how important it is, but on

18   this, Mr. Schick, I want to warn you that I will exercise my

19   prerogatives.  I caution you to limit yourself to the material

20   that's in evidence.  There's nothing in here about Mr. Paul

21   being a mastermind or that he was out to set the landlord up.

22   There's nothing about that at all.

23              MR. DELLA FERA:  Your Honor, if I may?

24              Setting up the landlord, we agree there's nothing in

25   evidence, and we wouldn't make those arguments.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  Really, if Mr. Schick wants to promise,

2     Mr. Della Fera, then I'm afraid that an instruction that gives

3     you some discretion on this may not be --

4          MR. GUNTHER:  Your Honor, that's exactly right.  He

5     will.  What he did in the opening, now I think it was

6     outrageous, your Honor, but let me tell you something.  If he's

7     not shut down on this, I can guarantee you he's going to make

8     me stand up, and I shouldn't have to do that in closing.

9          MR. SCHICK:  Your Honor, that's not true and it's not

10    fair.  We didn't interrupt them in opening.  Mr. Noyes got up

11    there and said Mr. Laboz personally profited from the

12    infringing activity of trademarks.  They put up pictures of

13    buildings.  They clearly have a goal to inflame the jury about

14    the wealth of the Labozes.  50 buildings with them showing a

15    development project.

16         Your Honor, we understand your instruction.  We

17    understand.  You didn't let us call Mr. Paul to testify.  After

18    they precluded us, they put in 20 documents.  I've heard you,

19    your Honor.  I'm not going to say he was the mastermind or he

20    set up.  I've heard you, your Honor.

21         THE COURT:  What are you going to say about Mr. Paul?

22         MR. SCHICK:  Listen, your Honor, I have not --

23    contrary to the team in front, I have not -- you know, I don't

24    have a whole army back in the office doing other things as this

25    case goes on.

1          Obviously, the fact that -- you know, I can't tell you

2     precisely what I'm going to say.  Mr. Paul -- your Honor, I

3     hear your instruction.  Mr. Paul is on every document that's

4     relevant that they submitted, your Honor.  I'm not going to say

5     this is his payday or this is his thing.  I've heard you, your

6     Honor, but a preclusion, you know -- they wanted to call him as

7     a witness.  They lost the motion in limine.  Then they said we

8     shouldn't be able to.  After they said we shouldn't be able to

9     because he's not relevant, they put in 20 documents from him.

10    We obviously couldn't question him.  We're not going to go past

11    the bounds you've said, your Honor, but it truly would be

12    unfair, and really, your Honor, they pushed the bounds so many

13    places here.  They talked about damages.

14          THE COURT:  You are running a substantial risk now,

15    Mr. Schick, of transgressing what my instructions are.  If you

16    want to take that risk, you can, but I'm not going to be

17    hesitant about interrupting you and cautioning you to confine

18    yourself to the facts of the case.

19          MR. SCHICK:  Understood, your Honor.

20          THE COURT:  The same goes for the retailers,

21    manufacturers and distributors of counterfeit merchandise.

22    There's no requirement in the lawsuit for infringement that the

23    retailers, the manufacturers or the distributor be sued.  This

24    is a contributory trademark infringement case, and plaintiffs

25    can sue whoever they want.  The question is do they meet the

J2sWome3

1    standards for contributory infringement, and that's what we're

2    going to stick with.

3            MR. DELLA FERA:  Your Honor, if I may, just on that

4    point?

5            THE COURT:  Yes.

6            MR. DELLA FERA:  The plaintiffs are going to put on

7    evidence that the Labozes and 375 Canal were required to hang

8    up signs, were required to hire investigators.  We saw that

9    today with the direct of Mr. Laboz.  That's also not required,

10   though we agree, it's relevant.  And I think similarly, as Mr.

11   Schick stated, the efforts to protect their trademarks is

12   relevant to this case.  We would absolutely honor your Honor's

13   ruling about bringing up the claims that they made or did not

14   bring up in this case, but efforts to figure out, to make a

15   factual inquiry into who was doing those acts is directly

16   relevant to evidence that they put on as a rebuttal of the

17   efforts they take to protect their trademark.

18           MR. GUNTHER:  Your Honor, you said it.  This is a case

19   about contributory infringement.  Everything else is

20   irrelevant.  They want to make it about something else.  Every

21   time, they want to point to somebody else, point the finger at

22   somebody else.  We've got to stick to the evidence in this case

23   and they don't want to, and they should be precluded.

24           MR. SCHICK:  Your Honor, I don't have to add to what

25   Mr. Della Fera said on that precise point, but how is the

J2sWome3

```
 1    evidence in the case about 50 buildings that the Laboz brothers
 2    have, wherever they have it, other than to inflame the jury?
 3    This is a direct point on the information they chose to gather
 4    during the investigation that they chose to provide, your
 5    Honor.
 6              I must be able to say they didn't provide names to the
 7    defendants.  There was lots of testimony about that, that they
 8    did not provide names to the defendants or anything like that.
 9    We cannot be precluded from saying what they themselves did not
10    gather here.  Whether they sued them is not a necessary
11    component of proving their claim, but surely in terms of what
12    the jury knows or doesn't know and the suppositions they're
13    supposed to make, the fact that they didn't gather certain
14    information is clearly relevant.
15              THE COURT:  OK.  I'm going to adhere to the ruling.
16    I've updated my jury charge at page 13:  "Any suggestion that
17    there is a defense here available to 375 Canal because Omega
18    did not pursue distributors and manufacturers and retailers is
19    not appropriate for summation."
20              I direct you not to do it.
21              MR. SCHICK:  Your Honor, does it go to damages?  Not a
22    retail.  Does it go to damages?  How can it be that they can
23    put on the fact that Laboz, all this information, I cannot talk
24    about who they didn't call as witnesses, who they didn't gather
25    information from?
```

J2sWome3

1          Clearly, your Honor, the fact that when they sent Mr.

2     Laboz the letter on September 20, 2011, and they did not

3     include the name of the supposed --

4          THE COURT:  Tell me this.  Mr. Rahman, for example --

5          MR. SCHICK:  Yes.

6          THE COURT:  -- why are you going into Mr. Rahman?  Why

7     before Swatch can sue you for contributory infringement do they

8     have to sue Mr. Rahman?

9          MR. SCHICK:  I didn't say they have to sue Mr. Rahman.

10    I want to be very clear to your Honor.

11         THE COURT:  Why do they have to do anything with Mr.

12    Rahman?

13         MR. SCHICK:  Your Honor, if they gave his name to us,

14    if they found out who he is, it is so clearly relevant to how

15    he can follow up on protecting the trademark.  They had the

16    name.  They could have called him as a witness here.  There's

17    an address on the form that Mr. Taute introduced yesterday,

18    although it's unclear, clearly, whether it's 81 Mott Street or

19    375 Canal.  The fact that they take no efforts to find and

20    locate these people.

21         They put up, your Honor -- it's like a Zapruder film.

22    They circle the guy who's sitting there, and want the jury to

23    believe that it's Mr. Rahman.  Right?  That's exactly what they

24    want to do.  They want to say Mr. Rahman was there on December

25    7, 2010, and they want to say Mr. Rahman was there on May 19,

1    2012.  And your Honor, there's a document that they think shows

2    that Mr. Rahman was there on December 7 with an address in New

3    York.  They didn't bother to get him.  They didn't give us the

4    name Rahman in the complaint letter.  We have to be able to

5    talk about that, not about not filing lawsuits necessarily

6    about the general efforts they took here.  It's relevant, your

7    Honor.  Please, it would not be fair to preclude defendants at

8    this point.

9          MR. GUNTHER:  What he wants to do is stand up and say

10   we should have done other things.  We should have gone and

11   found Mr. Rahman and played whack-a-mole with all the people

12   that have been going in and out of 375 Canal Street over the

13   past 20 years and go after all of those people.  We chose to do

14   a contributory infringement case.  That's what this case is

15   about.  That's what these facts are about, and argument to that

16   effect is improper.  Your Honor is correct.  What you just read

17   into the record is absolutely correct, and he should not be

18   permitted to do it.

19         MR. SCHICK:  Your Honor, one final point.

20         They are going to put up on the screen that video from

21   May 19, 2012, and they're going to suggest to the jury that's

22   Mr. Rahman, without any predicate for it.  And I have to be

23   able to talk to the jury about the deficiencies in their

24   evidence on that point.  They want to say it's the same --

25         THE COURT:  What's the deficiency in the evidence?

1    Rahman is irrelevant to this.

2              MR. GUNTHER:  I won't say the word "Rahman" in my

3    closing.

4              MR. SCHICK:  Will you say same seller?  Will you say

5    it's the same seller?  Will you say it's the same person?  Will

6    you say it's the same person who was there December 7, 2010,

7    and was there on May 19, 2012?

8              MR. GUNTHER:  Your Honor --

9              THE COURT:  OK.  I've heard enough now, and time is

10   getting short.

11             MR. SCHICK:  On this point, then 228 is out, correct?

12   It's an exhibit that they have with Mr. Rahman's name.

13             MR. GUNTHER:  No.

14             MR. SCHICK:  It has to be out.

15             MR. GUNTHER:  Your Honor, you made a ruling.  He just

16   keeps trying to chip away at it.

17             MR. SCHICK:  And the ruling is that he said he's not

18   going to include anything with Mr. Rahman's name.  That

19   document, 228, is what they fought to get in yesterday.

20             MR. GUNTHER:  Please.

21             THE COURT:  I've heard enough now.

22             MR. GUNTHER:  Thank you.

23             THE COURT:  Retailers, manufacturers and distributors

24   are not necessary to bring a case for contributory

25   infringement, and so I don't want any kind of reference in the

1   closing arguments to people who are not here.  That takes care

2   of the second objection that was made by Mr. Gunther.

3            MR. GUNTHER:  Thank you, your Honor.

4            THE COURT:  The third objection, the empty chair

5   argument is pretty much the same as retailers, manufacturers

6   and distributors, in paragraph 2, so it's the same ruling.

7            MR. GUNTHER:  Thank you, your Honor.

8            MR. SCHICK:  Your Honor, we just note our objection to

9   the record.

10           THE COURT:  You have your objection, Mr. Schick.

11           MR. SCHICK:  And we will object during closing if

12   Exhibit 228 comes in, which is the one they had with

13   Mr. Rahman's name, and Mr. Gunther is not willing to say he's

14   not using it.  He can stop this right now.

15           THE COURT:  If you object on that basis, I'm going to

16   tell you don't interrupt while we're having summations.

17           MR. SCHICK:  So he can use an exhibit with

18   Mr. Rahman's name, but I can't say that they didn't do any

19   other efforts to identify him?  How could that be?  They don't

20   get to use the exhibit, your Honor.  He said he's not going to

21   reference Mr. Rahman.

22           THE COURT:  Then what's your argument if he's not

23   going to reference Mr. Rahman?

24           MR. SCHICK:  Because he's not willing to take out the

25   exhibit.

J2sWome3

1               THE COURT:  All right.  I've made my rulings.

2          Thank you.  See you at 9:00 tomorrow.

3          MR. GUNTHER:  Thank you, your Honor.

4          (Adjourned to March 1, 2019, at 9:00 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    LISA MARIE SILVEY

 4    Direct By Ms. Gostin . . . . . . . . . . . . 526

 5    Cross By Mr. Della Fera  . . . . . . . . . . 537

 6    ALBERT LABOZ

 7    Direct By Mr. Gunther  . . . . . . . . . . . 561

 8    Cross By Mr. Schick  . . . . . . . . . . . . 612

 9    Redirect By Mr. Gunther  . . . . . . . . . . 629

10    Recross By Mr. Schick  . . . . . . . . . . . 633

11                       PLAINTIFF EXHIBITS

12    Exhibit No.                              Received

13     19    . . . . . . . . . . . . . . . . . . . 531

14     23    . . . . . . . . . . . . . . . . . . . 533

15     219   . . . . . . . . . . . . . . . . . . . 565

16     44, 47, 79, 164, 228  . . . . . . . . . . . 637

17                       DEFENDANT EXHIBITS

18    Exhibit No.                              Received

19     A    . . . . . . . . . . . . . . . . . . . 540

20

21

22

23

24

25
```