J31VOME1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   OMEGA SA, *et al.*,

4              Plaintiffs,

5          v.                          12 Civ. 6979 (PAC)

6   375 CANAL, LLC, *et al.*,

7              Defendants.
                                       Trial
8   ------------------------------x
                                       New York, N.Y.
9                                      March 1, 2019
                                       9:00 a.m.
10
    Before:
11
                       HON. PAUL A. CROTTY,
12
                                       District Judge
13                                     -and a Jury-

14                     APPEARANCES

15  WILMER CUTLER PICKERING HALE & DORR LLP
         Attorneys for Plaintiffs
16  BY:  ROBERT J. GUNTHER JR.
         ISLEY MARKMAN GOSTIN
17       CHRISTOPHER R. NOYES

18  DENTONS U.S.LLP
         Attorneys for Defendants
19  BY:  STEPHEN G. DELLA FERA
         -and-
20  TROUTMAN SANDERS LLP
    BY:  AVI SCHICK

21

22

23  Also Present:  Sarah Finkel, Paralegal
                   Clinton Lam, Technician
24

25

1              (Trial resumed; jury not present)

2              THE COURT:  I assume everybody is ready.

3              MR. GUNTHER:  Ready for the plaintiffs, your Honor.

4              MR. SCHICK:  Ready for the defendants, your Honor.

5              (Jury present)

6              THE COURT:  Good morning.

7              THE JURY:  Good morning.

8              THE COURT:  Please be seated.

9              We're now going to have summations by the parties.

10             Plaintiffs have the burden of proof, so they go first.

11             Mr. Gunther.

12             MR. GUNTHER:  Thank you, your Honor.

13             Good morning, ladies and gentlemen.

14             THE JURY:  Good morning.

15             MR. GUNTHER:  I want to start by thanking you.  I want

16     to thank you on behalf of Omega, on behalf of the Swatch Group,

17     on behalf of myself and my colleagues who have tried this case

18     with me, Mr. Noyes and Ms. Gostin.  I want to thank you on

19     behalf of Ms. Aubert, who has come here from Switzerland to be

20     with us for the trial.  And I want to thank you for your

21     service.  You've been here all week.  You've listened intently.

22     You have done a terrific job in that respect and we thank you

23     for that.

24             And we thank you because this is an important case to

25     Omega and Swatch Group.

1              It's important because Omega is a major brand for

2    Swatch Group.  Omega watches are sophisticated, high-end

3    products that have been precision-made in Switzerland for 170

4    years.  Omega has become an iconic brand here in the United

5    States, and that brand is protected by Omega's federally

6    registered trademarks, one of which was first registered in

7    1894.  It's probably one of the oldest trademarks that's still

8    on the books in the United States.

9              It's important because the sales of counterfeit Omega

10   watches in the Canal Street area have been a problem for years.

11   It's important because the Laboz brothers, who own 375 Canal

12   LLC, have allowed 375 Canal Street to be a haven of

13   counterfeiting activity for years.

14             And it's important because our case is against the

15   landlord, 375 Canal LLC.  And that was deliberate.  While

16   tenants come and go and subtenants come and go, the landlord

17   remains the same.  And the Laboz brothers have continuously

18   owned 375 Canal Street since at least 2004.

19             And finally, this case is important because we need

20   your help.  We need your help in dealing with this kind of

21   counterfeiting which everyone involved in this case recognizes

22   is wrong.

23             Now, I'd like to start by summarizing the evidence

24   that you've heard in the case.

25             So what is the evidence that you've been shown over

J31VOME1                    Summation - Mr. Gunther

1    this past week?  Much of the evidence that we brought forward

2    really isn't in dispute.  As Mr. Laboz testified yesterday, 375

3    Canal Street has been owned by entities controlled by the Laboz

4    brothers since at least 19 -- sorry, since at least 2004.  They

5    have been the landlord of 375 Canal Street since at least then.

6          375 Canal Street is one of some 50 buildings owned by

7    the Laboz brothers in New York City, managed by their company

8    United American Land.  Half a dozen or more of the Laboz-owned

9    buildings are in the Canal Street area.  And the evidence

10   showed that counterfeiting was a constant problem at 375 Canal

11   Street for years.  Mr. Laboz admitted that sales of counterfeit

12   goods was a problem in general in the Canal Street area from at

13   least the period 2004 to 2012.

14         Ladies and gentlemen, we have proven that during the

15   time it has been owned by the Laboz brothers, they have allowed

16   the tenants or others operating at 375 Canal Street to

17   repeatedly sell counterfeit goods, including counterfeit Omega

18   watches.

19         And we told you about the Louis Vuitton lawsuit.

20   Louis Vuitton sued 375 Canal LLC in 2005, alleging that

21   counterfeit Louis Vuitton goods were being sold at 375 Canal

22   Street.  In December 2005, 375 Canal LLC resolved that lawsuit

23   by entering into an order for a permanent injunction on

24   consent.  You'll have this exhibit in the jury room; it's

25   Plaintiffs' Exhibit 138.

1         Pursuant to this consent injunction, 375 Canal LLC

2    was -- and now I'm quoting from the consent injunction --

3    "permanently enjoined and restrained from using, modifying,

4    disseminating, marketing, selling, offering to sell any Louis

5    Vuitton counterfeit products in any manner."

6         In paragraph 11 of that same consent injunction -- and

7    I've put that up on the screen -- 375 Canal LLC was required

8    for a period of two years to hire a private investigator -- and

9    I'm quoting from paragraph 11 of the consent injunction -- to,

10   quote, inspect, investigate, and conduct searches of all areas

11   of each of the properties, one of which was 375 Canal Street,

12   on a weekly basis for a period of two years.

13        And we brought in evidence and brought the evidence

14   before you of the three lawsuits brought against 375 Canal LLC

15   by the City of New York.  In 2005 they were sued by the City of

16   New York, 2006, and 2009.

17        375 Canal LLC settled every one of those three cases.

18   And in each one the Laboz brothers agreed that the premises

19   were enjoined, permanently enjoined -- forever -- from the sale

20   or possession of counterfeit merchandise.  Those stipulated

21   settlements -- which will again be in the jury room for you to

22   inspect -- are Plaintiffs' Exhibit 137, Plaintiffs' Exhibit

23   140, and Plaintiffs' Exhibit 147.

24        The August 2009 stipulation, the one that settled a

25   third of the lawsuits, Plaintiffs' Exhibit 147, also provided

1   in paragraph 8 -- and I have that up on the screen -- that, and

2   I'm quoting:  "375 Canal or the subsequent tenant shall

3   dismantle and remove all hidden storage facilities, structures

4   inside the premises to allow open access to all areas within

5   the storefront."

6           That same stipulation of settlement also contained a

7   requirement in paragraph 12, and I put that up on the screen,

8   that, and I'm quoting:  "375 Canal shall have professional

9   course of conduct signs posted throughout the premises.  Said

10  signs shall inform patrons that the sale and/or possession of

11  either pirated or trademark counterfeit merchandise will not be

12  tolerated and may result in their arrest.  Signs shall be

13  visible at all times and are to be posted on or before August

14  15th, 2009."

15          And we brought in evidence regarding, following those

16  lawsuits, the lease to T.A. Discount.  And the lease to T.A.

17  Discount occurred in July of 2009, one month after -- excuse

18  me, August of 2009, one month after the 2009 stipulation of

19  settlement with the City of New York.

20          The lease contains a provision prohibiting sales of

21  counterfeit goods, but there's no requirement for signs that

22  counterfeiting is a crime.  There's no requirement that storage

23  or hidden areas must be dismantled.  There's no provision for

24  monitoring the property to detect the sale, whether there's

25  sales of counterfeit goods.  The lease contained none of these

1   provisions, despite the fact that the settlement of the Louis

2   Vuitton case required a monitor for two years.

3           And you heard Mr. Laboz testify that after those two

4   years ran out, he dropped the private investigator that was

5   monitoring 375 Canal, and he did not have any private

6   investigator monitoring the property after that, after 2007.

7   After that, the only monitoring that you heard was Mr. Laboz or

8   his brothers occasionally walking by or walking in the

9   property.  That was the extent of it.  And that type of

10  occasional walk-by or walk-in was plainly not sufficient.

11          You heard Mr. Laboz admit that most counterfeit

12  merchandise is not out in the open in the store; he admitted

13  that's not how it works.  The T.A. Discount lease contained

14  none of these provisions, even though the 2009 settlement of

15  the third case brought by New York City required posting of

16  signs at 375 Canal saying counterfeiting is a crime, and

17  dismantling any storage or hidden rooms.

18          And the evidence showed that in December of 2010, when

19  Investigator Brad Cole accompanied the New York Police

20  Department Peddler's Task Force to the raid on Canal Street, he

21  took pictures of the storefront at 375 Canal Street.

22          And what did that show?  We showed these to him during

23  his cross-examination, Mr. Laboz.  No signs.  We showed him

24  both PX 106 and 107.  And we showed him PX 107 and showed him

25  that, in fact, there was still a door to a back hidden

1    storeroom.  And we showed that and we've pointed out both the

2    door and the latch.  That was in 2010, not long after they had

3    agreed to dismantle all of that stuff in the back and put up

4    signs.

5         And sales of counterfeit products continued at 375

6    Canal Street.  You heard the testimony from Mr. Taute, the

7    former member of the New York Police Department Peddler's Task

8    Force, and Private Investigator Brad Cole, that in December

9    2010, the New York Police Department conducted an enforcement

10   action in the Canal Street area during which at least one

11   counterfeit Omega watch was seized from 375 Canal Street,

12   numerous other counterfeit Omega watches were seized from other

13   locations, retail locations, on the Canal Street area.

14        And we showed you the April 2011 notice to 375 Canal

15   LLC about sales of counterfeit Chanel jewelry that were taking

16   place at 375 Canal Street.  That's Plaintiffs' Exhibit 87.

17        And then we showed you the September 28th, 2011 letter

18   from Omega's lawyer, Mr. Lindenbaum, to Albert Laboz regarding

19   sales of counterfeit Omega and Swatch watches at 375 Canal.

20   That letter will be in evidence and you can inspect it; it's

21   Plaintiffs' Exhibit 90.

22        And Ms. Tritto, who was the lawyer for 375 Canal LLC,

23   admitted -- and this is in Plaintiffs' Exhibit 91 -- that there

24   was apparent selling of counterfeit goods bearing your -- that

25   is, Omega's -- client's trademarks at 375 Canal.  She said the

1    offending subtenant was removed.  But the tenant, T.A.

2    Discount, was not removed and the counterfeiting continued.

3           And then we brought evidence in of the May 19, 2012

4    investigation, the purchase of the counterfeit Omega watch at

5    375 Canal Street.  The investigators for Omega looked at two

6    counterfeit Omega watches that were brought by the clerk from

7    the back storeroom.  They bought one; it was sold in a plastic

8    Ziploc bag for $80.  No packaging, no box, no manual, no

9    warranty cards.  $80 price, despite the fact that genuine Omega

10   watches sell for thousands of dollars.  And there's still, in

11   2012, no signs at 375 Canal Street saying counterfeiting is a

12   crime.  The back storeroom is still there, and that is where

13   the clerk goes to get the counterfeit Omega watches.

14          Now, our burden was to prove by a preponderance of the

15   evidence the purchase of this counterfeit Omega watch.  That

16   means that to prevail, we just have to make the scales tip a

17   little bit in our favor, slightly in our favor.

18          I submit to you that we proved the purchase of that

19   watch by far more than a preponderance of the evidence.  We

20   called Leslie Quinonez, now a teacher; she came in here from

21   Denver to testify.  She was the investigator that day who

22   purchased each of the watches during the investigation when she

23   purchased the watch at 375 Canal Street.  We showed you the

24   video that she took of the sale.  She noted from the video that

25   the purchased watch has a smooth surface around the outside

1    face of the watch.  She testified that it was six watches that

2    she purchased that day on May 19th, 2012.  The only watch

3    without markings around the face was the one that she bought at

4    375 Canal Street.

5            And we called Brad Cole, the private investigator who

6    ran the investigation.  We showed you the two videos that he

7    took of the purchase of the watch at 375 Canal Street.  And we

8    put into evidence -- and you'll have it in the jury room -- his

9    report, Plaintiffs' Exhibit 240A, the full report that he

10   prepared on May 23rd, 2012, just days after the May 19, 2012

11   investigation.  It has all the attachments in it.  You'll be

12   able to look at those.

13           Both Ms. Quinonez and Mr. Cole explained to you how,

14   after the purchase of the watch, which was given to her by the

15   clerk in a black plastic bag, she took a yellow Post-It note,

16   wrote "375" on it, and put it in the bag with the watch and

17   tied it closed.  Both Ms. Quinonez and Mr. Cole testified that

18   she purchased six watches that day from six different locations

19   in the Canal Street area; and that she placed a yellow Post-It

20   note with the store number in the bag of each one of those

21   watches to keep everything in order.  And their testimony is

22   corroborated by Mr. Cole's May 23rd, 2012 report, Exhibit 240A,

23   which says precisely the same thing.

24           Mr. Cole further testified that he took -- within days

25   after the purchase, took separate photos of each of the

1   watches, along with the yellow Post-It notes and the bags they

2   were sold with, and attached each photo to his report.  And

3   that will be in the jury room with you.  You can look at those

4   attachments.

5           Attachment 21 to Mr. Cole's report, which is also in

6   evidence as Plaintiffs' Exhibit 104, is the photo of the

7   counterfeit Omega watch purchased at 375 Canal Street on May

8   19, 2012, along with the yellow Post-It note on which

9   Ms. Quinonez wrote "375," and the small plastic Ziploc bag

10  which the watch was sold in.

11          And we showed you PX 100 -- we passed it around to

12  you.  It will be in the jury room.  You can look at it

13  further -- which both Ms. Quinonez, Mr. Cole and Mr. Foster all

14  testified was the actual counterfeit Omega watch purchased on

15  May 19, 2012 at 375 Canal Street.  Ms. Quinonez and Mr. Cole

16  explained that they both believed the watch was counterfeit

17  because of the $80 purchase price, the lack of a box or any

18  packaging, and the circumstances of the sale:  The souvenir

19  shop on Canal Street.

20          And Mr. Foster, with decades of experience assessing

21  real versus counterfeit watches, explained all of the reasons

22  why he was immediately able to tell upon inspecting the watch

23  that it was a counterfeit.

24          That was the evidence that we presented to you over

25  this past week.

1           And our claim, as we said, is against the landlord,

2     375 Canal LLC, the owner of 375 Canal Street.  And our claim

3     against 375 Canal LLC is that they are liable for contributory

4     trademark infringement.

5           And what I'd like to do now is briefly summarize the

6     elements of that claim, which the judge will instruct you on,

7     and explain how the evidence shows that we have proven each

8     element of contributory trademark infringement.

9           The Court will instruct you that in order to establish

10    our claim for direct -- that we first have to show direct

11    infringe as part of it.  And this will be on the jury verdict

12    form as well.  The Court will instruct you that in order to

13    establish our claims for direct trademark infringement, we must

14    prove by a preponderance of the evidence the following:

15          One, goods were sold or offered for sale from 375

16    Canal Street by one or more tenant, subtenant or occupant at

17    375 Canal Street; two, that those goods contained the words,

18    symbol, or designation that; three, to an average observer was

19    likely to cause confusion, to cause mistake or to deceive as to

20    the source, origin, affiliation, approval or sponsorship of the

21    goods.

22          That's trademark infringement.

23          The Court will also instruct you that counterfeit

24    marks by their very nature cause confusion.  So if you find

25    that the goods sold or offered for sale from 375 Canal Street

1    contained counterfeit marks, in other words, a word or symbol

2    or other designation that to an average observer was identical

3    to or substantially indistinguishable from Omega's trademarks,

4    then you don't need to separately determine whether there's a

5    likelihood of confusion if it's a counterfeit, if that's what

6    you conclude.

7            Now, we have proven -- and I think we've proven by far

8    more than a preponderance of the evidence, that counterfeit

9    watches, Omega watches, were offered for sale at 375 Canal

10   Street.

11           You heard from Leslie Quinonez, you heard from Brad

12   Cole about the counterfeit Omega watches that were offered for

13   sale to Ms. Quinonez at 375 Canal Street on May 19, 2012.

14   Everything that they told you from that witness stand was

15   backed up by documents, it was backed up by videos, it was

16   backed up by photographs.  And the watches offered for sale at

17   375 Canal contained identical versions of Omega's trademarks.

18   The watches offered for sale from 375 Canal with Omega

19   trademarks were counterfeits; they weren't genuine Omega

20   watches.

21           Plaintiffs' Exhibit 100 is not a genuine Omega watch;

22   it's counterfeit.  Mr. Foster gave you many reasons; he

23   explained that to you.  To name a few, there's no such thing as

24   a Seamaster Broad Arrow; that's what's on the back of the

25   watch.  There's no eight-digit engraved serial number on this

1    watch, but everybody Omega watch has one.  There's no water

2    resistance indication.  Every Omega Seamaster watch has a water

3    resistance indication.

4            He pointed to the foldover hinge clasp on this watch

5    which is not used by Omega.  And he pointed to the green hour

6    markings on this watch instead of the yellow/yellowish-white

7    luminescent material which he explained to you was something

8    called Super Lumi-Nova.

9            Now, he also looked and determined that the watch that

10   he showed to you, which is Plaintiffs' Exhibit 9, and which you

11   will have in the jury room as well, is the closest genuine

12   Omega watch to Plaintiffs' Exhibit 100.  You can compare them

13   in the jury room.

14           The watch offered for sale in PX 108A -- remember,

15   this is the one that was offered for sale; we're showing it to

16   you on the screen.  They actually purchased the other watch --

17   that was not a genuine Omega watch either.  Mr. Foster

18   explained that there is no genuine Omega watch with those

19   features, that is, a white face, white dials, and a black

20   bezel, which is the ring around the outside.  No genuine Omega

21   Speedmaster watch has days of the week like that one does.

22           But you really don't even need Mr. Foster.  I don't

23   mean to denigrate him.  He's clearly an expert.  But you really

24   don't need Mr. Foster to tell you.  All you need to do is use

25   your common sense.  The watch had blue tape on it, it was sold

1    in a Ziploc bag, it was sold with no box or instruction manual,

2    it was kept in a back room, sold for $80 at a Canal Street

3    souvenir shop.

4          And there is no doubt, members of the jury, that the

5    watch in my hand, PX 100, is the same watch that Ms. Quinonez

6    purchased at 375 Canal Street on May 19th, 2012.

7          We put up a slide that shows three things.  It shows

8    the watch in the video.  And you can see the watch on

9    Mr. Porco's arm, and you can see the smooth bezel around the

10   outside of the face.  You can also see what is marked as

11   Plaintiffs' Exhibit 104, the photograph of the watch that

12   Mr. Cole took to attach to his May 23rd, 2012 report.

13   Mr. Cole, Ms. Quinonez both testified that the watch that she

14   purchased on May 19th, 2012, was this watch, Plaintiffs'

15   Exhibit 100.

16         Mr. Foster compared the watch, the actual watch in

17   Plaintiffs' Exhibit 100, to the watch in Mr. Cole's photo,

18   Plaintiffs' Exhibit 104, and he confirmed and explained to you

19   the reasons why it's the same watch.  Look with your own eyes.

20   Look at those three things.  There's no difference.

21         In short, we have proven direct infringement:  The

22   offer for sale and sale of counterfeit Omega watches at 375

23   Canal Street.

24         Now I want to go on to contributory infringement,

25   which is the part that we're going after the landlord for.

1          The Court will instruct you that in order to establish

2     our claim for contributory trademark infringement, plaintiffs

3     must prove by a preponderance of the evidence, making it

4     slightly tip in our favor, the following four things:

5          One.  Whether defendant possessed -- and this is 375

6     Canal LLC.  Whether defendant possessed the power and authority

7     to exercise control over the use of the premises at 375 Canal

8     Street for selling or offering for sale merchandise that

9     infringed Omega's trademarks, power and authority.  Control.

10         Two.  Whether defendant knew or had reason to know

11    that merchandise that infringed Omega's trademarks was being

12    sold or offered for sale at 375 Canal Street.

13         Three.  Whether defendant continued to lease its

14    premises at 375 Canal Street even after it knew or had reason

15    to know that the premises were being used as a place from which

16    merchandise that infringed Omega's trademarks was sold or

17    offered for sale.

18         And then finally, four, whether defendant took

19    reasonable remedial steps to try to stop the sale or offer for

20    sale of merchandise that infringed Omega's trademarks at 375

21    Canal Street.

22         Let me take those one-by-one.

23         The first one is control.

24         We presented evidence that 375 Canal Street is the

25    owner and landlord of 375 -- sorry, 375 LLC, excuse me, is the

1    owner and landlord of 375 Canal Street.  Its lease with T.A.

2    Discounts, which is in evidence as Plaintiffs' Exhibit 206 and

3    will be before you in the jury room, in section 13, that lease

4    gave 375 Canal LLC the right to inspect the premises at any

5    time.  Section 45 of the lease said that T.A. Discount could

6    only operate as a perfume store.  You saw the evidence of what

7    they were doing there.

8            It also said that they could not sell counterfeit

9    goods.  And it gave 375 Canal LLC the right to immediately,

10   immediately obtain possession of the premises if any of these

11   provisions was violated.  In section 8 of that lease said that

12   the tenant who had signed the lease, T.A. Discounts, was liable

13   for the actions or omissions of any subtenant.

14           Control.  We proved control in spades.

15           Knowledge.  What was the evidence on their knowledge

16   of counterfeiting activity with respect to Omega and generally?

17           Defendants knew that their premises were being used as

18   a haven for counterfeiting activity:  The three settlements

19   with the City of New York; a dozen notices that Ms. Caponegro

20   Silvey testified about from her law firm, including Plaintiffs'

21   Exhibit 19, 23, 44, 47, 79, and 87; the lawsuit from Louis

22   Vuitton and that settlement; and even after the consent

23   injunction where they permanently agreed no more counterfeiting

24   activity at 375, further notice of counterfeiting of Louis

25   Vuitton products at 375 Canal Street, that's Plaintiffs'

1    Exhibit 164.

2             Defendant had specific knowledge that they were

3    being -- that 375 Canal was being used to sell counterfeit

4    Omega goods.  We showed you Plaintiffs' Exhibit 90, the

5    September 28, 2011 notice letter from Mr. Lindenbaum that

6    Mr. Laboz and his in-house lawyer, Ms. Goodman and Ms. Tritto,

7    all reviewed.  That letter specifically informed the defendants

8    of the counterfeiting arrests at 375 Canal in December 2010 and

9    in 2011.  Ms. Tritto's email response, Exhibit 91, even admits

10   that an occupant of 375 Canal Street was apparently selling

11   counterfeit goods bearing your client's -- Omega's --

12   trademarks.

13            The element of their continuing to supply services,

14   continuing to supply the space after notice.  The defendant 375

15   Canal LLC had notice since at least -- we believe before, but

16   at least September 2011.  And it continued to lease the

17   premises to the same tenant, T.A. Discount Store, in May 2012,

18   when Leslie Quinonez bought the watch, the counterfeit Omega

19   watch.

20            The defendant showed you documents from attempts to

21   other tenants, but defendant did not show you a single document

22   between September 29, 2011, the date of the notice letter,

23   until after this lawsuit was filed in September 2012 of an

24   effort to try to do anything about T.A. Discount.  We know that

25   T.A. Discount, the tenant, was still there until November 2012.

1    And that's apparent from Plaintiffs' Exhibit 206 and 227, both

2    of which will be in the jury room with you.

3            The defendant showed you court documents from attempts

4    to remove other tenants, but nothing about T.A. Discount or any

5    subtenant between September 2011, when they certainly had

6    notice of counterfeiting of Omega goods, Omega watches, and May

7    2012, when Leslie Quinonez purchased the watch.

8            Finally, lack of reasonable remedial steps.

9            We know there was continued counterfeiting after

10   defendant was on notice, because Leslie Quinonez was offered

11   two counterfeit watches at 375 Canal Street on May 19, 2012.

12   And we know, because we heard him testify, that Mr. Laboz said

13   he only walked by or occasionally went inside the store at 375

14   Canal, never asked for counterfeit merchandise, he never made

15   any effort to see whether there was counterfeit merchandise in

16   the back storeroom.

17           But we know from Ms. Quinonez's video -- and that's

18   Plaintiffs' Exhibit 108A -- and from the notice from

19   Ms. Silvey's firm sent to 375 Canal LLC, like Plaintiffs'

20   Exhibit 87, that counterfeit goods weren't kept out in the

21   open.  Indeed Mr. Laboz testified that he knew -- that he

22   knew -- that counterfeit merchandise is not obviously displayed

23   and is not sold front and center in a souvenir shop.

24           375 Canal LLC didn't just negligent to take remedial

25   steps, it didn't take the steps it was required to do by law

1    under its stipulation of settlement with the City of New York,

2    the one that settled the 2009 lawsuit.

3         There was testimony that they did remove the hidden

4    storeroom; but you saw the photos Mr. Cole took in 2010, in

5    December 2010.  It was there.  And they didn't do that despite

6    the fact that Mr. Laboz acknowledged it would have been

7    inexpensive to require them to remove that storeroom.

8         375 Canal LLC did not put up any warning signs,

9    despite the fact that Mr. Laboz admitted that it would have

10   been really inexpensive to put up those signs.  It didn't do

11   anything serious to monitor the property to ensure that there

12   were no sales of counterfeit goods.  The Laboz brothers dropped

13   the private investigator after the Louis Vuitton two-year

14   agreement ended, and that was it.  And Mr. Laboz admitted that

15   hiring a private investigator would not have been that

16   expensive.  In fact, he admitted that each of these basic

17   remedial measures would have cost far less than a lawsuit to

18   remove a tenant; and yet he and his brothers failed to

19   implement any of them.

20        Mr. Laboz admitted that in 2006, when they signed the

21   agreement with the City of New York on the second lawsuit, he

22   admitted that he agreed to do -- and this is a quote from his

23   testimony -- everything in his power to stop counterfeiting at

24   375 Canal Street.  But plainly he did not.

25        In sum, we have proven each of the four elements of

1    contributory trademark infringement:  Control, knowledge,

2    continued supply of the leased space to the tenant, and lack of

3    reasonable remedial measures.

4           Now I want to turn to the question of damages,

5    statutory damages.

6           On the issue of statutory damages, the Court will

7    instruct you as follows:

8           If you find that 375 Canal LLC is liable for

9    contributory trademark infringement, then you must determine

10   Omega's damages.

11          Omega seeks what is known as an award of statutory

12   damages.  The purpose of statutory damages is to compensate the

13   trademark owner, penalize the defendant, and deter future

14   trademark counterfeiting.  That's all in the instruction the

15   judge will read to you.

16          Defendant made a big deal about Omega seeking damages.

17   They mentioned the number $8 million several times.  But what

18   they didn't tell you is that the amount of damages that we can

19   receive, that Omega can receive in terms of the ranges, is set

20   by law.  We didn't pick those numbers out of thin air.

21          Section 35(c) of the Trademark Act established by

22   Congress provides that -- and I'm quoting -- "Plaintiff may

23   elect to recover an award of statutory damages in the amount of

24   not less than 1,000 or more than 200,000 per counterfeit mark

25   for type of goods sold offered for sale or distributed."

1             The Trademark Act goes on to say that if you find

2     375 -- that the conduct was willful, you may award statutory

3     damages of up to $2 million per counterfeit mark -- that's in

4     the statute; we didn't make that up -- for type of goods sold,

5     offered for sale or distributed.

6             The Court will instruct you this to effect.

7             So what does that mean?

8             There's only one type of goods here:  Watches.  We

9     have four federally registered trademarks.  The first one is

10    Plaintiffs' Exhibit 3.  You'll have all of our federally

11    registered trademarks in the jury room.

12            Plaintiffs' Exhibit 3 is the Omega symbol and it goes

13    back -- this is the one that goes back all the way to 1894.

14    And you can see I've highlighted, it says, Omega, the word,

15    Omega may be omitted without materially altering the character

16    of our trademark, the essential feature of which is the Greek

17    letter.  And then there is the symbol for "Omega."

18            And you can see -- and we've put on the slide Exhibit

19    100, there's three views of Exhibit 100 on the bottom, and

20    you'll be able to see it in the jury room, you'll have it --

21    that there is an Omega symbol on the face of the watch, there

22    is an Omega symbol on the top of the winder, there is an Omega

23    symbol on the back of the clasp, and there is an Omega symbol

24    on the back case.  All of them are circled.

25            The watch that was offered for sale but which

1   Ms. Quinonez did not buy, and I've got the screenshot of that

2   up on the top right, has the Omega mark.  You can see that.

3   Just the Omega, the symbol.  So each one of the two watches has

4   that symbol.

5        Plaintiffs' Exhibit 4 is our second federally

6   registered trademark.  And that's the Omega symbol and word

7   "Omega" together.  This mark was first registered in 1953.  And

8   we've put up on the screen the two views of Plaintiffs' Exhibit

9   100 that show the Omega symbol with the "Omega" word on the

10  watch face and on the back of the watch, on the clasp.  And

11  we've shown also up in the right-hand corner from Plaintiffs'

12  Exhibit 108A, and this is at -- just to be very precise, at

13  seven minutes, 29 seconds, 13-hundredths of a second -- we are,

14  after all, Omega; we do the timing for the Olympics -- you can

15  see the Omega symbol and the Omega word.  So that federally

16  registered trademark is used on both of those products.

17       And we can put up Plaintiffs' Exhibit 5.  That's the

18  "Omega" word alone.  That was also registered -- that was

19  registered first in 1952.  And we've shown you Omega, that

20  mark, that trademark appearing on the face of the counterfeit

21  watch in Plaintiffs' Exhibit 100 and on the back, on the clasp.

22  And on the watch that was offered for sale, which they did not

23  purchase, the word "Omega" also appears on the face of the

24  watch.  Both of those watches contain that mark.

25       And then finally, Plaintiffs' Exhibit 6 is Omega's

1    Seamaster mark, first registered, again, in 1952.  And we've

2    shown the counterfeit watch, Exhibit 100.  The face has the

3    word "Seamaster" written on it, and it has the word "Seamaster"

4    on the back.

5         Now, defendant has tried to suggest that the

6    trademarks are all the same.  They are not.  Each trademark is

7    individually registered with the United States Patent and

8    Trademark Office.  Each has a separate registration number.

9    You can look at the four registrations; they are in evidence.

10   Each trademark is Omega's property branded to Omega by the

11   United States Government.  Each trademark can be enforced

12   against the defendant in this case.

13        Omega is entitled to damages for infringement of each

14   of those four registered trademarks.  We are entitled to

15   statutory damages for the infringement of Plaintiffs' Exhibit

16   3, Plaintiffs' Exhibit 4, Plaintiffs' Exhibit 5, and

17   Plaintiffs' Exhibit 6, because counterfeit versions of each of

18   those registered trademarks are on PX 100, and several of those

19   trademarks on the watch that was offered for sale.  And that's

20   up to $200,000 for each of the four trademarks, so up to

21   800,000 in total, and up to two million per mark -- remember,

22   that's what the statute says; that's what Congress passed --

23   for eight million in total.

24        So how do you determine the amount to award?  Well,

25   the judge is going to give you guidance on that.  And you'll

1    hear from the judge that in determining the amount of statutory

2    damages, you may select an amount as you consider just, based

3    on the facts and circumstances of this case.  So it's up to

4    you, members of the jury, to select a number from the required

5    ranges, a number that you consider just.  The judge will

6    instruct you that you can consider a number of factors in

7    making that assessment.

8              I'm going to focus on a couple of them now.

9              One is the value of the trademark.  It's undisputed

10   that these trademarks are highly valuable.  The Omega mark that

11   I showed you first has been used for Omega watches since 1894.

12   It's undisputed that these four trademarks have come to

13   symbolize and identify the Omega brand, an iconic brand that is

14   world renowned.

15             And importantly for this case, another factor the

16   judge will tell you you can consider in assessing the amount of

17   damages is the potential for discouraging the defendant.

18   Ladies and gentlemen of the jury, that's exactly what's needed

19   here.  We need your help to send a message to 375 Canal LLC and

20   its owners, the Laboz brothers.

21             Mr. Laboz agreed that between at least 2004 and 2012,

22   sales of counterfeit goods was a problem in the Canal Street

23   area.  But respectfully, I submit to you Mr. Laboz still

24   doesn't get it.  He still chooses to ignore the problem.

25   Despite getting all the notices, despite getting sued multiple

1     times, he testified in front of you that he had no reason to

2     believe there was any counterfeiting activity.  Despite telling

3     the City of New York he'd removed hidden storerooms and that he

4     put up a sign or signs, you saw the photos, you saw the videos,

5     375 Canal didn't have any signs in 2010, didn't have any signs

6     in 2012.  What did it have in 2010?  It had a hidden storeroom.

7     And what did it have in 2012?  It had the same hidden

8     storeroom.  And Mr. Laboz admitted that he never inspected the

9     hidden areas.  His excuse for that was, "Tenants don't like

10    that."  That was his excuse.

11         So when awarding damages, we ask that you award an

12    amount that will get this defendant, the Laboz brothers, to pay

13    attention; an amount that will discourage the Laboz brothers

14    from making those kinds of excuses, from looking the other way;

15    an amount that will encourage them to do the right thing.

16         Another important factor you may consider in assessing

17    the amount of damage -- and the judge will instruct you -- is

18    "the deterrent effect on others besides the defendant."  It's

19    not just about 375 Canal LLC in this case; it's about deterring

20    others, other landlords, including the Laboz brothers

21    themselves who own many other buildings in the city, and own

22    buildings -- at least half a dozen or more buildings -- in the

23    Canal Street area.

24         Mr. Laboz testified that out of the 50 buildings that

25    he and his brothers own, most of them have retail space.  Some

1    are still souvenir shops, selling watches, jewelry, T-shirts.

2    He's still collecting rent from those shops.  And he has vacant

3    shops.  Mr. Laboz testified that if a tenant wanted to pay

4    money, he'd rent it to them.

5            And the counterfeiting problem is still very much a

6    problem.  It hasn't stopped.  You heard from Mr. Foster that he

7    works continually with United States Customs to help identify

8    counterfeit watches.

9            I submit to you that sending a message here to this

10   defendant, to the Laboz brothers, will deter others as well,

11   will deter them from looking the other way, from doing the bare

12   minimum and, instead, hopefully get landlords to begin to take

13   responsibility for their properties, to stop permitting

14   counterfeiting activity to take place on their premises.

15           And finally, in assessing the amount of damages, the

16   judge will tell you that one thing you may consider is whether

17   the defendant's conduct was innocent or whether it was willful.

18   I submit to you that we have proven in this case that the

19   defendant's conduct was willful.

20           The Court will instruct you that to prove willfulness,

21   Omega must show, one, that 375 Canal LLC was actually aware of

22   the infringing activity; or two, that 375 Canal LLC's actions

23   were the result of reckless disregard or willful blindness.

24           We submit to you that we have proven that the

25   defendants acted with reckless disregard and willful blindness

1   concerning the trademark counterfeiting going on at 375 Canal

2   Street.

3          What did the evidence show in that regard?

4          They leased 375B Canal Street to T.A. Discount in July

5   2009, just a month after agreeing to dismantle all storage

6   areas.  In December 2010 they get raided, Omega watches are

7   confiscated, and there were hidden storage areas.

8          In September 2011, Omega sends 375 Canal the notice

9   letter telling them about the raids and about the ongoing Omega

10  counterfeiting.  Nothing happens.  They don't ask whether the

11  tenant is selling counterfeit goods, they don't inspect the

12  hidden areas, they don't hire an investigator, they don't even

13  put up signs.  They do nothing.

14         So what happens?

15         In May 2012, counterfeit Omega watches were available

16  at 375 Canal Street.  Ladies and gentlemen, I submit to you

17  that is reckless disregard.

18         Mr. Laboz's testimony confirmed that he was willfully

19  blind to the counterfeiting at 375 Canal Street.  He was

20  ignoring the problem, not paying attention.  Mr. Laboz

21  testified he didn't even know the police raided 375 Canal, his

22  own property, in December of 2010.  And despite all of the

23  counterfeiting activity that we submitted to you that's shown

24  on this timeline for years and years, he testified to you that

25  he had no reason to believe there was counterfeiting at 375

1   Canal Street.  I submit to you he had every reason to believe

2   it, he just chose to ignore it.

3          So when you consider the value of the Omega

4   trademarks, the potential for discouraging this defendant, and

5   deterring others, other landlords, we ask you to award

6   statutory damages of at least 200,000 for each of the four

7   infringements of our trademarks.  But we also ask you,

8   considering defendant's reckless disregard and willful

9   blindness -- which we've proven to you -- to award two million

10  to Omega for each of those four trademark infringements; that's

11  a total of $8 million.  And you heard Mr. Schick say that's a

12  lot of money.  I agree with him.  In terms of deterring this

13  defendant and deterring others, we believe that is just and we

14  ask you to consider that a just award.

15         So in response to all of the evidence we've presented

16  demonstrating that 375 Canal LLC is liable for contributory

17  infringement, what have we heard in response from the

18  defendant?

19         What we've heard is a litany of excuses in efforts to

20  point fingers at others, rather than taking responsibility for

21  their own conduct.  Defendants said that it's Omega's fault --

22  they told us it was our fault because we took too long to

23  notify them of counterfeiting and not providing specific

24  evidence.  But the defendant got notice of counterfeiting

25  activity at 375 Canal Street again and again and again.

1          You heard Ms. Tritto.  She testified that it's too

2     difficult and it takes too long to evict a tenant after a

3     counterfeiting notice.  But you've also seen and we've shown

4     you paragraph 25 of the T.A. Discount lease.  That lease

5     clearly states -- and this is Plaintiffs' Exhibit 206 at

6     paragraph 35 -- that 375 Canal could have immediately,

7     immediately terminated the lease should there be counterfeiting

8     on the premises.

9          Now, defendant tries to argue that they asked the

10    tenant to remove the subtenant.  But did they?

11         Ms. Tritto said on Wednesday, she testified that --

12    and I'm quoting here -- she would have told the tenant that

13    they needed to deal with this immediately.  She said "I would

14    have."  But she didn't have -- when Ms. Gostin asked her the

15    question, she didn't have a specific recollection of what she

16    actually did.  Whether she did anything or not, we don't know.

17    But what we do know is that according to the lease, the tenant

18    was responsible for the actions of the subtenant.  That's

19    paragraph 8 of Exhibit 208.

20         And if there was counterfeiting going on by a

21    subtenant, the tenant should have had the subtenant removed.

22    And leaving the tenant aside, do we have evidence that the

23    subtenant was actually removed?  No, we don't.  The truth is

24    the tenant was not removed from 375 Canal Street when

25    Ms. Tritto responded to Omega's notice letter in October of

1    2011.  The tenant was not removed when Ms. Quinonez and

2    Mr. Cole conducted the undercover operation on May 19, 2012.

3    And the tenant was not removed from 375 Canal Street when this

4    lawsuit was filed in September 2012.  No attempt was made to

5    get rid of this tenant until after we brought this lawsuit.

6            You heard a number of times about that this is a case

7    about so-called failed buys, and how could 375 Canal LLC be

8    expected to know that there was counterfeiting at the location

9    when plaintiffs' investigators didn't buy a watch in 2011 or

10   2012.

11           Ladies and gentlemen, that's just another excuse.

12           You heard evidence from Mr. Cole that a lot of that

13   work was canvassing operations, where they would look, but not

14   buy.  And in addition to that, it's a red herring for this

15   reason:  Defendant had actual knowledge of ongoing

16   counterfeiting activity at 375 Canal Street for years, not just

17   through Omega's letter of September 2011 regarding the New York

18   Police Department raids, not just because of the three New York

19   City lawsuits, not just because of Louis Vuitton litigation,

20   and not just because of the numerous notices sent by several

21   different brand holders.

22           Finally, let's think one more time about defendant's

23   excuses concerning the watch that is Plaintiffs' Exhibit 100.

24           Despite the testimony of Ms. Quinonez and Mr. Cole and

25   Mr. Foster, defendant still will not admit that Plaintiffs'

1    Exhibit 100 is a counterfeit Omega watch or that Plaintiffs'

2    Exhibit 100 is the same counterfeit Omega watch that was

3    purchased by Ms. Quinonez on May 19, 2012 at 375 Canal Street.

4    I submit to you the evidence is crystal clear that it is.  You

5    heard the testimony.  You saw the videos.  You saw the photos.

6    You've seen the watch.

7            And you'll have Plaintiffs' Exhibit 240A, Mr. Cole's

8    report, May 23, 2012, days after the investigation, which

9    documents everything, including the photographs he took at the

10   time.  A picture is worth a thousand words.  Plaintiffs'

11   Exhibit 100 is the watch that Ms. Quinonez purchased from 375

12   Canal Street.

13           But despite all this evidence, defendant asked you to

14   speculate that maybe the watches somehow got mixed up.  There's

15   simply no evidence to support that assertion.

16           Defendant's continuing denial in the face of

17   overwhelming evidence that Plaintiffs' 100 is a counterfeit

18   Omega watch, and that it's the same watch that was purchased by

19   Ms. Quinonez at 375 Canal Street on May 19, 2012, is consistent

20   with the approach it has taken in failing to take steps and

21   repeated steps to do anything reasonable with respect to

22   ameliorating counterfeiting activity at 375 Canal Street.

23           375 Canal and the Laboz brothers never take

24   responsibility.  They only offer excuses; they only offer to

25   blame others.  And that's not right.

1            I'm going to sit down and you're going to hear from

2     Mr. Schick.  But I'm going to have one last chance to address

3     you briefly before you begin your deliberations.

4            Thank you very much for your attention this week and

5     this morning.

6            THE COURT:  We'll take a short recess, and then we'll

7     hear from Mr. Schick.

8            (Jury not present)

9            THE COURT:  We'll resume at five after.

10           MR. GUNTHER:  Thank you, your Honor.

11           MR. SCHICK:  Thank you, your Honor.

12           (Recess)

13           (Jury present)

14           THE COURT:  Mr. Schick.

15           MR. SCHICK:  Yes, your Honor.  Thank you.

16           Good morning.

17           THE JURY:  Good morning.

18           MR. SCHICK:  Thank you for your service today and the

19     entire week.

20           When I stood before you right here on Monday morning,

21     I told you that this week we will hear very, very little about

22     counterfeiting of Omega goods.  As I stand here now, that

23     remains true.

24           When I stood before you on Monday morning, I told you

25     that you will see Omega investigative reports that show there

1    was no Omega merchandise at 375 Canal Street between the

2    September 28, 2011 letter from Mr. Lindenbaum and the May 19,

3    2012 purchase.  As I stand here now, that also is true.

4           When I stood before you on Monday morning, I told you

5    there will be no evidence or testimony that anyone associated

6    with the defendant, 375 Canal LLC, was ever even accused of

7    being involved with the sale of counterfeit goods of any type,

8    let alone Omega goods.  As I stand here now, that remains true.

9           When I stood before you on Monday morning, I told you

10   that you will see that 375 Canal LLC worked with local

11   merchants when they can because they had a soft spot for them

12   and because Laboz's father got a start there and wanted it that

13   way.  As I stand here now, that's still true.

14          When I stood before you on Monday morning, I told you

15   that you will see that Omega's investigations and investigators

16   were sloppy.  They submitted false declarations in this case.

17   As I stand here now, that's true.

18          As I stood before you on Monday morning, I said that

19   this defendant, 375 Canal LLC, will be criticized for renting

20   to local immigrant merchants and for not evicting them sooner.

21   As I stand here before you now, that remains true.

22          When I stood before you on Monday morning, I did not

23   say that the single watch that they claim was purchased on May

24   19th, 2012 was not counterfeit.  I didn't say that.  What I did

25   say was that Omega's story about the watch and who purchased it

1    changed over time.  As I stand here now, that remains true.

2              When I stood before you on Monday morning, I told you

3    that Steve and I will have to ask questions about the events of

4    May 19th, 2012, even though our client, the defendant, 375

5    Canal LLC, was not involved in those events.  Well, boy, was

6    that true.

7              When I stood before you on Monday morning, I told you

8    that 375 Canal LLC did what Omega asked them to do in its

9    September 28, 2011 letter from Mr. Lindenbaum; and that we

10   never heard another word from them until they filed this

11   lawsuit a year later.  As I stand here now, that remains true.

12             I'm not going to take the time to get into everything

13   that I said on Monday morning, but I will say this:  As I stand

14   here now, it all remains true.  You're smart.  You paid

15   attention.  You listened to everything.  You get it.  I trust

16   you.

17             By contrast, when Mr. Noyes stood before you on Monday

18   morning, he said that the evidence will show that the

19   defendant, 375 Canal LLC, profited from the sale of Omega

20   counterfeit goods.  As we stand here now, that was not true.

21             Now, when I stood before you on Monday morning, I

22   raised questions about whether the watch they put before you

23   was sold at 375 Canal Street or was it sold at one of the five

24   other stores they visited that day, where they also purchased a

25   watch.  I raised those questions because of the sloppiness of

1      the Omega investigations.

2              As I stand here now I say this:  After Omega spent two

3      days on that topic, they probably demonstrated that it was the

4      same watch.  Now, things would have been way easier if they

5      just would have used a proper evidence bag, as Mr. Taute

6      explained to you was standard procedure.

7              I'll return to this topic in a few moments, but ask

8      yourselves this:  You saw the Omega letter sent by

9      Mr. Lindenbaum on September 28, 2011; it's Exhibit PX 90.  It's

10     before you.  It didn't include any evidence -- none

11     whatsoever -- not even a name, let alone police records.  It

12     didn't include anything that 375 Canal could use to convince a

13     judge to evict a tenant.  Nothing at all.

14             Compare that letter, compare Mr. Lindenbaum's letter,

15     compare the Omega September 28, 2011 letter to the types of

16     letters and information that we saw from Ms. Silvey and her law

17     firm and Ms. Tritto.  One approach -- you see some of those

18     there in front of you; it's PX 47, it's PX 87 -- talks about

19     seizure vouchers, talks about declarations, talks about all

20     sorts of information that's useful to help a landlord get a

21     counterfeiting selling tenant or subtenant out.  So compare PX

22     90, the Omega/Lindenbaum/Collen letter with the other letters

23     you saw from Ms. Tritto, from Ms. Silvey, PX 47 and 87, and

24     others.

25             One approach helps combat counterfeiting.  Another

1     approach only helps collect a judgment in the lawsuits.  Ask

2     yourself, which approach did Omega take?

3              We received nothing from Omega except for a lawsuit.

4              Now, let's talk about the only thing in this case that

5     really matters:  The sale of Omega merchandise at 375 Canal

6     Street.

7              Remember on Monday I told you they are going to talk

8     about everything else and very little about Omega.  That was

9     true.  But we want to focus on Omega, because that's what this

10    lawsuit is about; that's the only thing they are entitled to

11    damages for, if at all.

12             Omega alleges two events, and two events only:  A

13    December 7th, 2010 police raid on Canal Street, and a May 19th,

14    2012 purchase at 375 Canal Street.

15             Now, when we think about these two allegations about

16    Omega sales, the only two allegations about Omega sales, let's

17    keep two things in mind:  First, that Omega -- and only

18    Omega -- has the burden of proof in this case; second, that

19    Omega does not allege that there was any Omega merchandise sold

20    at 375 Canal Street by anyone at anytime prior to December

21    2010.

22             So they talked all the way back to 2004, and they

23    talked for about a decade's worth of time.  And they have

24    nothing about Omega for most of that time.  Even though Omega

25    talked this week about stuff all the way back to 2004, none of

that, not a piece of it, had anything to do with Omega; nothing

in 2004 regarding Omega, nothing in 2005 regarding Omega,

nothing in 2006 regarding Omega, nothing in 2007 regarding

Omega, nothing in 2008 regarding Omega, nothing in 2009

regarding Omega, and nothing in 2010 regarding Omega, until

they talk about the Canal Street police raid in December 2010.

So let's turn to that, the police raid on Canal Street

conducted by the Street Peddler's Unit that Mr. Taute talked

about, December 7, 2010.  That's a very, very important date,

because Omega has to prove that 375 Canal LLC, the defendant,

knew that there was infringement of Omega trademarks at 375

Canal Street before May 19, 2012.

Let me repeat that.

For Omega to get anything in this case, Omega has the

burden of proof to establish to you, the jury, that there was

the sale of infringing Omega goods; that there was a sale of

counterfeit Omega goods at 375 Canal Street before May 19,

2012.  Mr. Gunther spent very, very, very little time this

morning talking about December 7, 2012, and I don't blame him.

Because there's very little for Omega to talk about there.

Let's talk about what evidence they have about

December 7, 2010, evidence that is necessary for them to prove,

before you can even consider the events of May 19, 2012.

Well, Mr. Taute testified that he had no recollection

at all of the events of December 7, 2010.  He testified he has

1    no recollection of whether he was even present on Canal Street

2    that day.  And I'm not saying that you're questioning whether

3    there was a police raid on Canal Street that day, Mr. Taute

4    told you that there was.  I'll take him at his word.

5             But we do know what occurred at 375 Canal Street.

6             What we do not know what occurred at 375 Canal Street,

7    we do not know if Street Peddlers were swept up that day on the

8    raid or shopkeepers were swept up.  We do know that the task

9    force conducting the raid was called the Street Peddler's Task

10   Force, and it did focus on street peddlers.  Mr. Taute told you

11   that.

12            We do not know if someone was arrested in front of a

13   store, as Mr. Taute said often happened, or inside the store.

14            We do not know if someone was arrested after running

15   into 375 Canal trying to avoid the police.

16            Why don't we know the answer to these questions?

17   Because Omega did not get the documents that Mr. Taute said the

18   police department has that would answer the questions.

19   Mr. Taute testified that the police department keeps an arrest

20   log that would contain much more information that was in the

21   single email that we saw on this subject.

22            Mr. Taute said that the police department has a

23   database called OmniForm where the complete records are kept.

24   Omega could have gotten those documents.  The police department

25   building, the NYPD headquarters, is a five-minute walk from

1    this courthouse.  The cost of getting a copy of a police report

2    is $15.  You can do it online.  Look at the screen right in

3    front of you.  You want a copy of a police report?  You go

4    online, you walk five minutes from here, you pay $15, and you

5    don't have to speculate, you don't have to guess, you don't

6    have to wonder.  You actually know.

7            Think Omega could afford the $15?  It's Omega's burden

8    of proof, and they didn't spend $15 to get the only document

9    that contains any proof.  Think about that.  Think Omega spent

10   15 bucks this week putting on this case?

11           Let's think about what Omega showed you instead of the

12   actual documents, the official police records.  They showed you

13   a disposition record that Mr. Taute said he was not even sure

14   related to 375 Canal Street, a disposition record that,

15   according to Mr. Taute, could apply to 81 Mott Street; a

16   disposition record that showed that the resolution was for

17   disorderly conduct, something consistent with a street peddler

18   running into a store to avoid arrest.

19           Now, Mr. Cole says he was on Canal Street that day.

20   But does that make any sense?  Is there even a single document

21   that places him there that day?

22           Mr. Gunther waved before you the May 23, 2012 report,

23   Exhibit 240A, about the events of May 19th, 2012.  He waved

24   before you that big binder.  And you'll have that big binder

25   with you.  And, of course, you'll do what you need with that

1   big binder.

2           But ask yourself this:  If you place that big binder

3   in front of you on the left side of the table, on the right

4   side of the table place before you all the evidence you have

5   that Mr. Cole was there on Canal Street on December 7, 2012.

6   Did he prepare a report?  Is there a single document that

7   places him there that day?  No.

8           Did he prepare a report?  Did Mr. Cole prepare a

9   report, as he testified he always did, as was his normal

10  practice?  We haven't seen one.  And more importantly, you

11  haven't seen one.

12          Did Mr. Cole submit an invoice for his work on Canal

13  Street that day, December 7, 2010?  Again, we haven't seen one.

14  And more importantly, you haven't seen one.

15          Did Mr. Cole even send a single email to anybody

16  associated with Omega:  Mr. Lindenbaum, Mr. Collen, Mr. Paul?

17  Did Mr. Cole send a single email to anyone demonstrating,

18  reporting, saying, showing, alleging that he was on Canal

19  Street on December 7, 2010?  We haven't seen one.  And again,

20  much more important than what I haven't seen, you haven't seen

21  one.

22          Now, Mr. Gunther said there's a picture that was taken

23  on December 7, 2010.  Now, Mr. Taute said it was an

24  afternoon -- late afternoon raid that went on for hours, and so

25  I'm not -- I can't do all the fancy stuff that Omega and its

1    team does.  I can't bring in meteorologist weather people to

2    show you whether it can be this light on December 7th, that

3    late in the day, we can't do that.  But we can talk about

4    common sense.

5           Mr. Cole says he's a trained investigator.  So let's

6    look at this picture, that, nine years later -- I just want to

7    say it's pretty funny, right?  Mr. Gunther criticized

8    Ms. Tritto for telling you about evicting a subtenant.  And she

9    told you honestly, That would have been my practice, that's

10   what I would have done.

11          Did she say, Oh, I have a specific recollection of a

12   call that day?  No, because most human beings don't have

13   specific recollections of calls ten years before, nine years

14   before, when Steve was in college.  No.

15          So she told you honestly what her practice was and

16   what she would have done before she sent an email.

17          But Mr. Cole, Mr. Cole knows it all.  Remembers

18   everything.  Look at this picture.  Trained investigator

19   charging good money to Omega, big company, working with a team.

20   Is there a time stamp on this photo?  I don't see it.  You

21   don't see it.

22          Is there any document that says this picture was taken

23   on December 7th, 2010?  No, there isn't.  I don't see it.  You

24   don't see it.  Is there an email that was sent that says back

25   then this picture was taken on December 7th, 2010?  No.

1           Now, look at the picture.  Common sense, me and you,

2     regular folks, Brooklyn people.  You see any police activity on

3     this?  This is a picture of a police raid.  Police raid.  You

4     see the police officers?  I don't.  This is a picture to show

5     police activity.  None there.  This is a picture to show

6     arrests.  Do you see anybody arrested?  I don't see it.  You

7     don't see it.  It's not there.

8           Does it show any seized watches?  This is their

9     evidence about December 7th?  They want you to look at this

10    random picture that shows nothing and believe that when you

11    look at this and say, This shows you that in this store there

12    was a police officer arresting the shopkeeper with an Omega

13    watch.  Well, I don't see it in the picture; you don't see it

14    in the picture.  The picture is not there.

15          Now, let's go back to some common sense again.

16          Mr. Taute's email said that there were 14 different

17    locations where arrests were made on that afternoon.  Do you

18    see that list?  Fourteen different addresses.

19          Now, Mr. Cole testified he had you believe that at no

20    time was he targeting 375 Canal Street.  He wasn't focusing on

21    375 Canal Street.  Let me ask you, he wasn't targeting 375

22    Canal Street and he wasn't focusing on 375 Canal Street, how in

23    heaven's name would he remember that nine years ago he took a

24    picture of 375 Canal Street on that day at that time?  It

25    doesn't make sense.  It doesn't add up.

J31VOME1                    Summation - Mr. Schick

1           Think about the evidence you see in this case, the

2     evidence we've seen when trademark owners send evidence

3     receipts.  We've seen lots of that.  Ms. Silvey talked about it

4     about her law firm; Ms. Tritto talked about it, when trademark

5     owners send evidence receipts.

6           Ask yourself:  Has Omega even come close to meeting

7     its burden of proof that there was an infringing sale of Omega

8     watches at 375 Canal Street on December 7, 2010?  The answer to

9     that, ladies and gentlemen of the jury, is no.

10          And again, the only reason we even have to ask the

11    question is because Omega did not bring the police department

12    records to court.  Now, again, maybe that's because Omega can't

13    afford the $15.  Maybe, but I don't think so.  Maybe they don't

14    want you to see the full records showed -- maybe they don't

15    want you to see what the full records showed.  We'll never

16    know.

17          But I do know that if Omega hasn't proved an

18    infringement of its trademarks occurred at 375 Canal Street on

19    December 7th, 2010, this case ends.  You have to find in favor

20    of 375 Canal Street.  And Omega did not meet its burden and did

21    not prove infringing activity at 375 Canal Street on December

22    7, 2010.  For that reason alone, you should find in favor of

23    the defendant, 375 Canal LLC.

24          Now, my time isn't up, so let's discuss the rest of

25    the evidence.

1              After December 7, 2010, nothing much happens for a

2      long time.  There's nothing in January 2011, nothing in

3      February, nothing in March, nothing in April 2011, nothing in

4      May, nothing in June, nothing in July, nothing in August,

5      nothing in September, till the very last Friday of the month,

6      September 28, 2011.

7              More than eight months goes by, eight months of

8      nothing, eight months of radio silence by Omega, the company

9      that claims it really cares about infringement and needs your

10     help.  They didn't do anything with the information that we

11     know Mr. Paul had.

12             Mr. Paul says he had an email about December 7th,

13     2010.  He said they need your help to crack down on

14     infringement.  What did Mr. Paul do with that email?  What did

15     Omega do with that email?  Nothing.  Total, absolute radio

16     silence until September 28, 2011.  That's the day they finally

17     sent a letter, the letter we had before you before at PX 90,

18     the letter from Mr. Lindenbaum.

19             Now, keep in mind that Mr. Taute testified that the

20     police department did not, would not, inform the landlord about

21     the Canal Street raid on December 7, 2010.  So Mr. Gunther

22     stood up here a little while ago and criticized Mr. Laboz for

23     not knowing about the police activity.  Mr. Taute said the

24     police did not notify them.  What Mr. Gunther didn't say is

25     that his client knew, the prior law firm knew, and they did

1    nothing for nine months.  Did Josh Paul, Jess Collen, Jeffrey

2    Lynn, did anybody in Omega's prior law firm say anything?  No.

3    Total, absolute radio silence until September 28, 2011.

4           And then they finally send something.

5           Let's look at what they sent.  Let's look at

6    Mr. Lindenbaum's letter before you, PX 90.

7           It has no details in it at all; not a name, not a

8    time, not a description of what was seized.  Nothing.  Oh, it

9    has one of my favorites.  See it's highlighted?  What does it

10   say?  It has a great phrase:  As you already know.  We're all

11   familiar with that phrase from that cover-your-butt guy at work

12   that we can't stand.  Well, excuse me, but of course 375 Canal

13   LLC did not already know.  How could 375 Canal LLC already

14   know.  Nobody told them anything.  The police didn't tell them

15   anything, Mr. Taute testified to that.  And Omega didn't tell

16   them anything, Omega admitted to that.  Not only that, but more

17   importantly, there was nothing attached to the Omega Collen law

18   firm letter of September 28, 2011 that actually demonstrates

19   there was any infringing activity.

20          Now, we spoke before about the letters from Ms. Tritto

21   and Ms. Silvey and the law firms that would attach receipts,

22   things like that, one of the things that was evidence of

23   trademark infringement.  What did Mr. Lindenbaum's letter

24   attach?  What did Omega's letter attach?  Look at these, an

25   array of trademarks, nine different ones.  None of them in this

1    case, but nine different ones.  Did anybody even say there were

2    nine watches taken that day?  Did they have any idea what

3    happened that day?  He just threw everything in the kitchen

4    sink.  He didn't say nine watches in his letter, but he says,

5    We got a lot of trademarks, something must have happened that

6    day, you now know.  This is knowledge?  What do we know?

7    Blancpain, are we here for that?  Breguet?  I can't even

8    pronounce some of these things so I'm not going to try.  I

9    don't want to offend Omega.

10          But this is not evidence of anything related to

11    counterfeiting; this is evidence that Omega itself had no idea

12    what happened on December 7th, 2009.  This is PX 90; you'll

13    have it with you.  It's the attachment to Mr. Lindenbaum's

14    letter.  It's the only thing Omega sent, not a seizure record,

15    not that $15 police record, not the OmniForm database, not a

16    picture, nothing but this.

17          Now, as I said before, we've seen what other law firms

18    and trademark owners do, how they attach evidence.  You see PX

19    44, Ms. Tritto and Ms. Silvey's law firm.  Copies of the

20    receipts are attached for your review.  That's evidence that

21    can be used.  That's evidence that can hold up in court.

22    That's evidence that a trademark owner would send a landlord if

23    what they were interested in is eradicating the infringing

24    activity.  Nothing like that was attached to Mr. Lindenbaum's

25    letter.

1          Well, now let's go to what happened -- and that's

2     PX -- as I said, PX 44.  You'll have it with you.

3          Now let's think about what happened after September

4     28, 2011.  Surely Mr. Lindenbaum did send his letter and it was

5     received.  Everybody agrees on that.

6          But what happened?  Ms. Tritto followed up immediately

7     with Omega's lawyers.  She spoke to Mr. Lindenbaum and she

8     reported that the offending subtenant had been removed.

9     Mr. Lindenbaum, Mr. Collen, Mr. Paul, and Omega, they were all

10    fine with that.  How do we know?  We've seen the email.  Here's

11    the response, PX 91:  The offending subtenant has been removed.

12         How do we know that Omega was fine with that?  Because

13    after Ms. Tritto's October 3rd, 2011 email to Mr. Lindenbaum,

14    he and Mr. Collen, Mr. Paul and the entire Collen law firm and

15    the entire Omega machine, they returned to radio silence.

16    There was not a word.  Not another word was heard from Omega or

17    its lawyers until they filed this lawsuit the following

18    September, September 2012, almost an entire year after

19    Ms. Tritto's email.

20         Now, just because Omega was silent doesn't mean that

21    important relevant things didn't happen between October 3rd,

22    2011 and September 2012.  Some important relevant things did

23    happen.

24         Do you know what happened that was important?  Omega

25    sent investigators to 375 Canal Street repeatedly between

1    September 28, 2011 and February 2012.  And each and every time

2    those investigators reported back, Omega's investigators

3    reported back that there was no Omega merchandise for sale at

4    375 Canal Street.

5              Let's look at the first of those visits on December

6    11, 2011.  That's when William Quinonez visited 375 Canal

7    Street in search of Omega watches.  Mr. Quinonez wrote back to

8    his boss, Mr. Cole, that there was no Swatch trademarks for

9    sale at 375 Canal Street.  Mr. Cole, who was here as Omega's

10   witness, testified that meant there was no Omega merchandise.

11             Let's look.

12             Do you see it on top?  It says DX DD, that's the one

13   on top.  Mr. Quinonez to Mr. Cole, December 11, 2011 at 9:31

14   p.m.  And it says on a -- 12/11/11, on December 11, 2011, a

15   visit was made to stores located at 375 Canal Street.  And

16   there were no watches associated with the client's trademark,

17   Swatch.  That means Omega.  Photos were taken by cellphone and

18   were forwarded to you via text.

19             That's the only email, by the way, that we have that

20   mentions a photo, okay?  Is that where Mr. Cole got the photo

21   that he sends on December 7, 2011, when Mr. Quinonez sent him

22   this email?  He surely received it, because the next day, that

23   DX DD, look at that, the only email that talks about a photo.

24             Now look at DX EE, that's the one right below it.

25             So Mr. Cole, back to Mr. Quinonez.  And it says:  Hi,

J31VOME1                        Summation - Mr. Schick

1    William.  Reviewed your emails and text messages.  All the

2    locations on the client's hit list either were closed down or

3    do not have watches, am I correct?

4           All the stores on the hit list, including 375 Canal,

5    were visited.  And as Mr. Quinonez reported in DX DD,

6    Defendant's Exhibit DD, that email, there were no watches

7    associated with the client's trademark at 375 Canal Street.

8    None.

9           Now, let's go to the next visit, a visit that is

10   recorded in a December 30, 2011 memo from Mr. Cole.  And

11   remember, Mr. Cole is Omega's witness.  And he testified that

12   his practice was to prepare memos on the day of the activity

13   discussed in the memo, unless the memo says the activity

14   occurred on a different date.

15          So let's look at the December 30, 2011 memo.

16          It lists a whole bunch of addresses, including 375

17   Canal Street.  Do you see that DX UU and attachment 10.

18   There's a file number -- there's a file number on top, 11-046.

19          My wife showed up.  Sorry.  Got distracted.  She

20   apparently wants to make sure I'm actually working this week,

21   not playing hooky at home.  I'm sorry.

22          So what does this show?  DX UU, they visited 375 Canal

23   Street.  No Swatch trademarks were observed for sale nor were

24   any offered for sale upon an undercover investigator's

25   inquiries.  Mr. Gunther tried to get you not to think about

1   this, right?  Before he sat down he said, Oh, they are going to

2   talk about failed buys; you know, they just canvassed.

3          Well, two points on that.  First of all, it says

4   inquiries.  And second of all -- so first of all, the document

5   says it.  They asked, prior exhibit says they asked, they asked

6   on December 11, 2011, there was no Omega trademark infringing

7   merchandise present.  They went back on December 30 and there

8   was no Omega trademark infringing merchandise at 375 Canal

9   Street.

10         Now, wouldn't it be funny actually if Mr. Gunther

11   confuses you so much that -- right, he criticized Mr. Laboz for

12   saying, Oh, Mr. Laboz didn't go in and make undercover asks; he

13   just observed.  Observing is nothing.  And then he wanted you

14   to believe they paid Mr. Cole to observe, right?  A canvass.

15   We paid Mr. Cole to walk down the street, not to ask questions.

16   Well, I know you know that defies common sense; but, more

17   importantly, it defies the truth.  Wants the executive summary?

18   No Swatch Group trademarks were observed for sale nor were any

19   offered for sale upon an undercover investigator's inquiries.

20   DX UU, pages 10 and 11.  We go to the prior one, back for one

21   second, December 11, 2011, there were no watches associated.

22   None.

23         So we know after September 28, 2011, what was radio

24   silence from Omega to us, 375 Canal LLC, about any concern they

25   have, any ongoing questions, any issues.  They were repeatedly

1    going to the location, they are seeing what goes on there, they

2    are reporting back internally that there was no Omega

3    merchandise for sale there.  And they are going and they are

4    taking pictures and they are not complaining about the way the

5    store looks, they are not complaining about anything.

6          Now, let's move forward about six weeks to mid

7    February 2012.  And this is from DX NN.  Again, here it says --

8    same reference -- do you see the file number that's highlighted

9    in the lower left?  The same file number as the December 30

10   report, the same investigation.  See?  UU is 11-046.  Now, if

11   we roll forward, the next one, NN, the February 21st cover

12   email, what does it say?  Same file number.  This is the same

13   investigation.

14         Now, it notes 81 Mott Street.  Remember I mentioned 81

15   Mott Street before, the address that Mr. Taute said could be

16   linked to the arrest disposition record that Mr. Gunther showed

17   him, that Omega showed him?  It notes activity there.  It notes

18   problems there.  It says executive summary.  Is this a canvass?

19   Counterfeit Omega watches were being sold on the street by

20   street sellers and in storefront retailers hidden away from

21   public view in drawers.

22         Did Mr. Cole or Mr. Lindenbaum ascertain by walking

23   down the street that certain of the stores that day were

24   selling Omega counterfeit merchandise by not going inside and

25   asking?  Hidden?  Of course not.  They went in; they asked;

1    they tried to buy.  Where they could buy, it's noted, 81 Mott

2    Street.  Where they didn't buy, they didn't buy.

3            Where didn't they buy?  They did not buy at 375 Canal

4    Street.  This is a report; you see it's an email.  You'll have

5    it with you.  DX NN.  Mr. Cole is reporting to Mr. Lindenbaum

6    about what he found, what he thinks, what he saw, what he

7    bought, and then where he didn't buy.  So it tells you where

8    they purchased watches, and then there's locations where they

9    didn't find anything.  And one of the places they found

10   nothing, again, 375 Canal Street.

11           Now, I want to pause here for a moment.

12           I want you to think just for a moment about the

13   evidence that plaintiffs' own hired investigators generated

14   that shows that there was no Omega merchandise for sale at 375

15   Canal Street.  We have emails from Mr. Quinonez, Mr. Cole; we

16   have documents; we have reports, you've seen them:  DX UU, DX

17   NN, and others.  Contrast how complete the evidence that there

18   was no watches for sale at 375 Canal Street is; contrast that

19   with the utter lack of any evidence supporting Omega's claim

20   about infringement at 375 Canal Street on December 7, 2010.

21   Three reports with emails and other things when there isn't

22   anything found there, no document when they say there was

23   something there.  But they say trust them, believe me.  We just

24   didn't spend the 15 bucks.

25           Now, Omega has an email saying there was a police raid

1    on Canal Street on December 7, 2010.  We told you that.  But

2    just because it was a police raid on Canal Street does not mean

3    there was infringing activity at 375 Canal Street.  We wouldn't

4    be asking you to guess.  It's their burden of proof, but they

5    wouldn't be asking you to guess if they didn't have to.  And

6    they could have paid $15 for the police report.

7          Ladies and gentlemen, when you go into the jury room,

8    and you think about what was proven in this case, and you have

9    to find infringing activity on December 7, 2012 to even go

10   forward -- December 7, 2010, my apologies, ask yourselves the

11   lack of evidence that there was any sales of infringing

12   activity on December 7, 2010, with the hard evidence of Omega's

13   own investigators about nothing for sale, no Omega merchandise

14   for sale at 375 Canal on December 11, 2011, on December 30,

15   2011, and on February -- I believe it's 18 -- it's covered in

16   the February 21 email -- 2012.

17         Now let's turn to May 19, 2012.  As I said earlier, we

18   never said that the watch purchased that day was not

19   counterfeit.  We didn't say it in the morning of Monday when we

20   were here.  We raised questions about whether the watch they

21   were showing was purchased at 375 Canal Street or was it one of

22   these five other watches that they bought at five different

23   locations that day, the stores that were not associated with

24   375 Canal Street.  We raised questions because of how sloppy

25   Omega's investigators were.

1          Mr. Taute explained it in about 30 seconds how easy it

2     is to proper tie off an evidence bag.  Mr. Cole gave a song and

3     dance about not being able to do that on the street.  But, come

4     on, they were on the street on Canal Street on May 19, 2012 for

5     a few minutes or a few hours in total, if you think about all

6     the stores.  The watch stayed in the Ziploc bag for about seven

7     years.

8          But after spending hours and hours on it this week,

9     with video editing that would make Sports Center proud and

10    would make John Madden proud, I will say that I do not question

11    whether the watch that they showed you, the watch that

12    Ms. Quinonez purchased seven years ago, was at 375 Canal

13    Street.  But that doesn't mean anything unless 375 Canal Street

14    had prior knowledge of an infringing sale of Omega merchandise

15    at 375 Canal Street, and it didn't.

16         Now Omega, Mr. Gunther, have made a big deal about the

17    fact that there was a storage room at 375 Canal Street.

18    Really?  Maybe it's the Brooklyn in me.  I don't know where

19    they shop, but every bodega I've been in in my life, every New

20    York City retail store, every shop, it has a closet, it has a

21    place for inventory, it has a place to hang your coat, every

22    single one.  There's nothing nefarious about that.

23         Now, it's true the tenant, T.A. Discount, was not

24    supposed to have built a wall in the back of the store, that's

25    true.  And the least that 375 Canal LLC provided for the tenant

1   said that the tenant had to keep the store as delivered by 375

2   Canal LLC, that's before you as PX 206.

3           Tenant shall make no changes without owner's prior

4   written consent, see that?  No alterations.  That's paragraph

5   3.

6           Paragraph 45:  Tenant shall not sell, trade, broker

7   counterfeit merchandise of any kind.

8           We put in the necessary precautions.  We gave it to

9   the tenant as we were supposed to give it, without a back wall.

10  How did we know that's how 375 delivered the space?  Because as

11  Mr. Laboz explained, the city insisted on the right to a

12  walk-through before the tenant moved in.  That's right, before

13  T.A. Discount moved in, New York City inspected the space.  The

14  city enforced the agreement it signed.

15          And keep in mind that Omega sent an investigator to

16  375 Canal Street many, many times by May 19, 2012:  December

17  11, December 30, February 18.  Did they ever notify 375 Canal

18  that it did not like the interior of its space?  Did it ever

19  follow up to Mr. Lindenbaum's September 28th letter?  Was that

20  one of the complaints?  Was that one of the remedial actions

21  asked for in Mr. Lindenbaum's letter?

22          We'll see it again soon.  The answer is no.  Never.

23          Now, we saw a thick report that Omega prepared about

24  May 19, 2012.  It was used during Mr. Cole's testimony, and

25  Mr. Gunther showed it -- waved it to you this morning.

1          Mr. Gunther asked Mr. Laboz about his reaction to the
2     report.  And Mr. Gunther didn't like Mr. Laboz's reaction.  But
3     what Mr. Gunther left out is that Omega or its lawyers at the
4     time did not provide 375 Canal with that report.  Mr. Laboz
5     didn't get that report.  375 Canal LLC didn't get that report
6     or any information after its May 19, 2012 purchase of an Omega
7     watch.  They didn't get it in May 2012, they didn't get it at
8     any time in 2012, they didn't get it at any time in 2013.

9          Mr. Gunther asked Mr. Laboz yesterday about the video
10    they have played forwards and backwards this week.  And he
11    asked him, Did you watch it?  And he tried to suggest to you
12    that, Oh, if he didn't spend a lot of time watching it, that
13    means he didn't care.  Again, what they left out was that Omega
14    did not provide any video in May 2012, again, or at any time in
15    2012 or at any time in 2013.

16         Now, you've seen this week the evidence, the
17    testimony.  You heard and saw evidence and testimony about how
18    trademark owners operate.  You heard Ms. Silvey and her firm;
19    you heard about Ms. Tritto.  You know what a trademark owner
20    does when they want to work with a landlord to crack down on
21    counterfeiting.

22         But that's not the approach Omega took.  They said
23    they did nothing from May 2012, when Ms. Quinonez purchased the
24    watch, until September 2012.  Again, they say need --
25    Mr. Gunther said he needs your help this morning to crack down.

1    Well, they certainly need somebody's help because, you know,

2    they waited from December -- they say they waited from early

3    December 2010 till the very end of September 2011 the first

4    time to crack down, they couldn't get a letter out.  And then,

5    after they saw infringing activity, May 19, 2012, they waited

6    another five months, unlike everything we've seen from

7    Ms. Tritto and Ms. Silvey.

8            And then what did they do when they broke their

9    silence?  They filed this lawsuit.  What did 375 Canal LLC do?

10   What did Mr. Laboz do?  They evicted the tenant.  Here you see

11   PX 206.  You've got a lawsuit.  The lawsuit at least had some

12   specific allegations, something that they can move upon, as

13   opposed to Mr. Lindenbaum's September 28, 2011 letter, and they

14   evicted the tenant.  The tenant was gone by Thanksgiving.

15           When Omega finally got around to providing Mr. Cole's

16   report of the May 19, 2012 investigation, it was more than a

17   year after 375 Canal LLC had already evicted the tenant in the

18   space at the time the report was made.

19           The same thing was true with the video.  By the time

20   Omega provided the video, it was more than a year after 375

21   Canal LLC had evicted the tenant who was in the space at the

22   time of the video.

23           Omega didn't provide the May 19, 2012 report or the

24   video of May 19, 2012, to provide evidence to help 375 Canal

25   LLC evict a tenant; they sent it more than a year later, more

1    than 18 months later, when they wanted to use it to support

2    their claims in this case.  Now, they are entitled to choose to

3    do that, but they can't turn around and criticize Mr. Laboz for

4    not pouring over it closely two years after the fact and a year

5    and-a-half after he had already evicted the tenant.

6            Now, that's all there is about allegations of Omega

7    merchandise at 375 Canal Street:  A general police raid on

8    Canal Street in December 2010, and the purchase of a watch in

9    May 19, 2012, with three repeat visits by Omega investigators

10   in between that demonstrated there were no watches, no Omega

11   watches for sale.

12           Now, of course, as Steve and I predicted to you on

13   Monday morning, you are going to hear a lot more in this case

14   about other brands than you were going to hear about Omega.

15           Let's talk quickly about some of that.

16           You heard this morning and during this week about a

17   settlement with Louis Vuitton in 2006.  Omega showed you a

18   settlement agreement with Louis Vuitton.  It's a settlement

19   agreement in which Louis Vuitton permitted the tenant to remain

20   in place.  Louis Vuitton permitted in the settlement the tenant

21   to remain in place.

22           Now, ask yourself, was Louis Vuitton guilty of

23   contributory trademark infringement because it permitted the

24   tenant who sold counterfeit merchandise, counterfeit Louis

25   Vuitton merchandise at that, to stay in its place?  No.  It was

1      guilty of being human, of not taking away the livelihood of

2      someone who made a mistake, who stepped over the line, who did

3      something wrong.  It was guilty of giving a second chance.

4              Now, Louis Vuitton asked for 375 Canal LLC to pay for

5      a monitor to make periodic visits to the store to report back,

6      and asked 375 Canal LLC that signs be posted.  Do these things

7      help?  Do they matter?  I don't know.  Louis Vuitton wanted it

8      and so they did it.  375 Canal always went along with the

9      trademark owner's requests.  That's what Ms. Silvey's testimony

10     was, that was Ms. Tritto's testimony.  If they got complaints

11     from a trademark owner, they addressed it.

12             Mr. Gunther this morning made a big deal about signs,

13     big deal about monitors.  Are these the persons that really

14     matter?  Of course, the jury decides that, not myself and

15     Mr. Gunther.

16             Luckily we have a guide over here.

17             There's a settlement with the city in 2005.

18             What did the city want?  What did the Corporation

19     Counsel's office ask for?  Here you have it before you, PX 137.

20             Did the city demand or require a monitor?

21             No.

22             Did the city demand or require the sign be posted?

23             No.

24             Now, do you think that's because New York City was

25     soft on counterfeiting?  Do you think it's because -- no, it's

1   because that stuff didn't work, in their opinion; because it

2   wasn't meaningful.  Because the City of New York wasn't engaged

3   in the game of gotcha.

4           Now, what does the agreement say about fines or

5   penalties?  It says that next time if 375 Canal LLC was at

6   fault it would have to pay $3500.  The City of New York said in

7   a settlement agreement with a landlord about counterfeit

8   activity at its space, that next time it would have to pay

9   $3500.  That's PX 137.

10          The next settlement with the city was in September

11  2006.  Why did the city want this settlement?  Well, for

12  starters, like the Louis Vuitton settlement, the city permitted

13  the tenant to stay.  It's in front of you; it's PX 140.

14  Defendant Jian Liang Ge was permitted to stay; paid a fine, was

15  permitted to stay.  Paragraph 5, paragraph 7.

16          Ask yourselves, was the City of New York guilty of

17  contributory trademark infringement because it permitted Jian

18  Liang Ge, who had sold counterfeit merchandise, to stay in its

19  space?  No, again, it was guilty of being human, of not taking

20  away the livelihood of someone who made a mistake, who stepped

21  over a line, who did something wrong, was guilty of giving a

22  second chance.

23          The city wanted 375 Canal LLC to pay a $2,000 fine.

24  Look at paragraph 8.  That's right, $2,000.  Couple of zeroes

25  short of what Mr. Gunther suggested this morning for each mark.

1          Once again, the city did not request or demand a

2     monitor.  And once again, there was no signs requirement, not

3     because it was going soft on counterfeiters, not because it was

4     in cahoots with counterfeiters, not because it was profiting

5     off counterfeiters, not because it didn't care about

6     counterfeiters, but because the city knew what did work and

7     what didn't work.  They knew what made a difference.  The City

8     of New York, again, it wasn't about a game of gotcha.

9          There was one more settlement with the city, October

10    11, 2009.  In that case they wanted 375 Canal LLC to evict a

11    tenant, which it did.  And the city wanted a $10,000 fine,

12    which it received.  $10,000.  Again, not a number on the Omega

13    calculator.

14         The city also wanted the right to walk through and

15    inspect the space to see that there was no back wall before the

16    tenant moved in.  And 375 Canal LLC did that; and it included

17    in its lease with the tenant a provision prohibiting from

18    altering the space.  We saw that before.

19         Now let's turn to a February 12, 2005 letter you were

20    shown this week.  Let's see what trademark owners asked for,

21    what 375 LLC did, right.  We saw, we heard Ms. Silvey and the

22    documents she and her law firm prepared:  PX 23, the February

23    2005 complaint letter.  If you look at it, it attaches

24    evidence, evidence that a trademark owner -- that a landlord

25    can use in a legal action against an infringer.

1             And what did Ms. Tritto do for 375 Canal LLC when they

2     received it?  Well, the letter is dated in February; by April

3     it sent out a notice to cure; and by May they sent out a notice

4     of termination.  When they were given evidence, you'll see

5     these all in front of you, PX 23 is Ms. Silvey's letter.  Her

6     name is not on it, but she's the one who spoke about it.  The

7     name Heather McDonald was on it.  She testified Ms. McDonald

8     was a partner at the firm, Ms. Silvey was a paralegal who

9     worked with her.  It's the February 22 complaint letter, PX 23,

10    and at DX A, it's the follow-up, a late February complaint, a

11    notice to cure, a notice of termination.

12            Here's another letter from Ms. Silvey in March 2007,

13    PX 47.  It's a March letter with a complaint.  Again, you'll

14    see Ms. Tritto asked for the evidence so that it will assist in

15    the eviction.  The tenant was evicted by April 2007.  A month

16    later, when the trademark owner wants to actually combat

17    counterfeiting, it provides the evidence so that the landlord

18    can do an eviction.

19            What does it show you?  It shows you that 375 Canal

20    LLC cooperated with any complaints received; 375 Canal took

21    action after it received the complaint; 375 Canal LLC did what

22    was necessary to combat infringement, activity that took place

23    by occupants in the space it owned.

24            Now I want to turn to a different topic, a topic that

25    Mr. Gunther covered, and that's the elements in this case.

1              And when you think about the elements, you'll hear and

2      you'll know this case isn't about other trademarks or earlier

3      complaints of other trademarks.  Those trademark holders aren't

4      the plaintiff here today.  Omega is not entitled to anything

5      because a tenant of 375 Canal LLC may have sold a Prada bag in

6      2004.  This case is about Omega.  This case is about whether

7      375 Canal LLC contributed to infringement of Omega's

8      trademarks, that's all this case is about.

9              Judge Crotty will instruct you on the legal standard

10     in this case.  He will instruct you that, among other things,

11     to find 375 Canal LLC liable, Omega must prove by a

12     preponderance of the evidence that 375 Canal LLC had knowledge

13     of infringement of Omega's trademarks by an occupant of its

14     property, continued to rent to an occupant that it knew had

15     infringed or was infringing on Omega's trademarks, and failed

16     to take reasonable remedial steps to try to stop the

17     infringement.

18             Let's talk about those piece-by-piece.

19             The first element, the first aspect of that, is

20     knowledge.  For knowledge, Omega must prove that 375 Canal knew

21     or had reason to know that an occupant of its premises was

22     infringing on Omega's trademarks.

23             Now, is there any way that 375 Canal had knowledge

24     before September 28, 2011, when the Lindenbaum Omega letter

25     finally was sent to Mr. Laboz, when it was finally sent to 375

1      Canal LLC?  Of course not.  Mr. Taute testified he did not

2      notify 375 Canal LLC about the police raid.  Both Ms. Tritto

3      and Mr. Laboz testified they never received anything about it.

4      And, of course, Omega and its lawyers this week did not show

5      you any evidence that 375 Canal received any notice of any

6      potential Omega trademark violations issues until September 28,

7      2011.  So there surely could not have been knowledge before

8      that point.

9             Now, again, let's look at the September 28, 2011

10     letter.  What does it say?  It's PX 90.  It says there were

11     police raids.  Throws up no receipts, no pictures, no reports,

12     no emails, no documents.  Throws up the names -- the trademarks

13     of nine different watches, because they don't know what

14     happened that day.  They have no evidence of what happened that

15     day.  They have no seizure records.  They have no police log.

16     They have no arrest record.  They didn't try to get it, not

17     between December 7th, 2010 and September 28, 2011; and worse,

18     not at any point until today.

19            But let's focus on what 375 Canal did after it

20     received that letter.

21            Well, for that, we should talk about the next factor,

22     contributory infringement, whether 375 Canal continued to rent

23     its premises to one who know or had reason to know was

24     infringing on Omega's marks.  Did 375 Canal do that?

25     Absolutely not.

1            Ms. Tritto testified that she had the offending

2      subtenant removed.  We saw that October 3rd, 2011 email.  And

3      Omega was fine with that.

4            But that's not all we have.

5            We also have the three investigations conducted by

6      Mr. Collen's colleagues.  We have the December 11, 2011

7      investigation in which Mr. Quinonez reports that all the

8      stores, all the locations, all the addresses, all the landlords

9      on the hit list that were provided by Omega, including 375

10     Canal LLC, had no watches; that no Omega watches were found at

11     375 Canal LLC.  Again, you'll see it; DX DD, that's Exhibit DD

12     in defendant's binder, and EE.

13           And we have a December 30 report from Mr. Cole that

14     also reported that there were no Omega watches for sale at 375

15     Canal Street.  That's UU.  No Swatch Group trademarks were

16     observed for sale or any offered for sale upon an undercover

17     investigator's inquiries.  Not a canvass, an inquiry.

18           And finally, we have the Collen/Lindenbaum joint

19     investigation in February 2012.  What did that investigation

20     turn up?  Certainly the big news was not about 375 Canal

21     Street, that's for sure.

22           So let's go back to the prior factor, knowledge.

23           Even if you assume that 375 Canal had somehow received

24     knowledge in late September 2011, by Mr. Lindenbaum's letter,

25     did they still have knowledge by May 2012?  Well, no, of course

1    not.  How could they?  They have removed the offending

2    subtenant, to the satisfaction of Omega.  And Omega's own

3    investigator's reports show that that was a successful

4    remediation.  There were no Omega watches for sale found at 375

5    Canal Street on three subsequent visits:  December 11, 2011,

6    December 30, 2011, February 18, 2012.  You'll see the email is

7    February 21; it attaches the February 18, 2012 report.

8            December 11, right -- September 18, 2011.  Let's think

9    about the timeline.  The notice letter, if that does provide

10   notice, was September 18, 2011 -- September 28, 2011.  That's

11   the Lindenbaum letter.  By October 3rd, Ms. Tritto reports back

12   that they have removed the offending subtenant.  That's the

13   remediation.  Omega accepted that.  Mr. Lindenbaum accepted

14   that.  And then there were three follow-up visits:

15           December 11th, 2011, Omega reports back --

16   Mr. Quinonez reports back that there were no watches at 375

17   Canal.  The remediation worked.

18           Three weeks later, December 30, 2011, Mr. Cole reports

19   no watches for sale at 375 Canal Street.  The remediation

20   works.

21           Let's go forward six weeks this time.  February 18,

22   2012.  Mr. Cole's report, again, there were no watches.  The

23   remediation works.

24           Now, it's true that after February 18, 2012, there was

25   a sale of an Omega watch on May 19, 2012, a counterfeit Omega

1    watch, when Mr. Cole and a team of five investigators showed

2    up, this time with video cameras.  And boy, wouldn't it be nice

3    if you actually had the video of all the prior three visits

4    that we're talking about here.  And someone bought a watch.

5    That's unfortunate.  It's wrong.  It shouldn't have happened.

6    Someone should not have been selling a counterfeit watch out of

7    that space.  But does the fact that it's wrong and it shouldn't

8    have happened, does that mean that 375 Canal LLC had knowledge

9    that it was going to happen?  No.

10            Finally, the judge will instruct you about the final

11   factor for contributory infringement, which is whether 375

12   Canal took reasonable and remedial steps to try to stop the

13   infringement.  That's right, try.  Not always successful, but

14   you take a reasonable step to try to stop it.

15            Did 375 Canal LLC do that?  Well, they made sure that

16   the offending subtenant was removed.  Ms. Tritto told Omega

17   that's what she did, and Omega was okay with it.  You haven't

18   heard a word this week about Omega pointing to Mr. Lindenbaum's

19   letter and saying that they somehow responded to Ms. Tritto

20   saying, We asked you a whole bunch of things in that letter, A,

21   B, C, D.  Why didn't you do them?  You didn't hear a word.

22   Omega didn't write back; didn't ask for more.  There was radio

23   silence for a year until this lawsuit.

24            Let's talk for a moment about when the lawsuit was

25   filed.

1              After the lawsuit was filed, 375 Canal did remove the

2      tenant as well.  That was reasonable under the circumstances.

3              In September 2011, they believed the issue was the

4      subtenant, because that is who they ensured was removed.  It

5      appeared effective.  Omega certainly never followed up to ask

6      for more, and plaintiffs' own investigators showed that there

7      were no Omega watches for sale anymore.

8              But, unfortunately, there was a problem on May 19,

9      2012.  That was not brought to 375 Canal's attention until

10     September 2012, four months of silence.  But once it was

11     brought to their attention via this lawsuit, what did they do?

12     They learned of the May sale; they promptly took action against

13     the tenant; the tenant was gone by Thanksgiving.  They took

14     reasonable remedial steps.

15             So at the end of the day, the question is simple:

16     Does all of that amount to someone who was knowingly

17     contributing to the infringement of Omega's trademarks?  The

18     only reasonable answer, I believe, is no.

19             Now I want to turn to my last point.  It's about the

20     damages.

21             I want to conclude this morning by talking about the

22     penalty that Omega wants you to impose on 375 Canal.

23             First let's review what you, the jury, have to decide.

24             The judge will tell you you'll have to decide the

25     damages are for willful conduct or not.  If the conduct is not

J31VOME1                    Summation - Mr. Schick

willful, the range of damages that you must decide is between

$1,000 and $200,000.  You are the ones to decide that; not

Omega, not Mr. Gunther, not me.  You are the ones.

         Was there any willful conduct?  It's hard to see how

even Omega could allege that there was willful conduct with

respect to Omega merchandise between knowledge on September 28,

2011, and the purchase of May 19, 2012.  How could there have

been any willful conduct?  They got a letter September 28, they

had a subtenant out of the space by October 3rd, they

communicated that to Omega; Omega didn't complain.  And then

three follow-up times Omega said in its own internal reports

there were no watches for sale there.  I don't know how anybody

could say that that was willful, willful misconduct, willful

disregard, with respect to Omega trademarks.

         The only timeframe here -- right, they go back to 2004

about the case.  But the only time frame here with Omega is

December 7, 2010, when they allege is a raid.  But even they

don't say that anybody told 375 Canal about that until

September 28th.  So willfulness couldn't start until September

28th, 2011, when it was brought to their attention.

         Could they have been willfully guilty of anything

between September 28, 2011 and May 2012, when they got rid of

the subtenant?  When there was no complaint?  When there was

radio silence from Omega?  When there are three reports by

Omega's investigators that there were no offending Omega

1     merchandise to be found at 375 Canal between September 28, 2011

2     and February 18, 2012?  I do not think so.

3          So I don't think that there's any basis for you to

4     consider willful damages.  But, again, that's not my decision;

5     that's your decision.

6          And so let's review what your range is in that case.

7          In that case, your range is not 1,000 to 200,000, it's

8     1,000 to $2 million.  In other words, the $1,000 end of the

9     damages remains the same, whether its willful or nonwillful; in

10    either case you could award $1,000.  The only thing that

11    changes is on the upper end, it allows you to go above 200,000.

12    But it does not require you to do that.  It does not require

13    you to go past $1,000.

14         Now, please, you don't have to take my word for that.

15    You will hear from Judge Crotty and, of course, you can always

16    send him a question if you are not clear about any of the

17    issues.

18         Now, in thinking about damages in this case, you're

19    lucky to have been presented a guide.  You have me talking, you

20    have Mr. Gunther talking, but we also have an unbiased guide.

21    I represent 375 Canal, Mr. Gunther represents Omega; you pretty

22    much knew before we came in this morning more or less which

23    positions we're going to take about that issue, right?  We

24    didn't shock you; you're not shocked to hear I don't think you

25    should give them anything or much; you're not shocked to hear

1   that Mr. Gunther thinks you should give them $8 million, or

2   maybe you are shocked.  But, in any event, it doesn't surprise

3   you, right?

4        But you have an unbiased guide who can help you.

5   Who's that guide?  The City of New York.  Because we saw what

6   kind of penalty New York City thought was appropriate:  $2,000.

7   Look at paragraph 8.  This is PX 140, a settlement with The

8   City of New York.  $2,000 is what 375 Canal LLC had to pay.

9        Now, what is Omega asking you to do here?  It's asking

10  you to award 1,000 times that amount for each trademark on the

11  same watch; wants you to take the $2,000 that the city thought

12  was appropriate in its settlement, multiply that by 1,000, and

13  then multiply that again by each time it says you find the mark

14  on the watch.

15       Now, what do I mean for each trademark on the same

16  watch?  Mr. Gunther touched on it for a moment, so I just want

17  to go back very quickly.

18       We know we hear about the sale of the counterfeit

19  Omega watch that was sold at 375 Canal on May 19, 2012, one

20  watch.  But Omega says, Hey, wait a minute.  One watch, but

21  four different trademarks on that watch.

22       Let's take a look.

23       One mark is Seamaster.  That surely appears on the

24  watch.  Then there are three more.  One of them is the Omega

25  letter or symbol.  You see that.  Now, the trademark for the

1   Omega letter or symbol says in the highlighted thing, it's

2   PX 3 -- a little difficult to read, but you'll have it in front

3   of you -- it generally appears with the word "Omega."  In other

4   words, the symbol Omega, the trademark for the symbol Omega,

5   generally appears with the word "Omega."  That's PX 3.

6       Let's look at the next one, PX 4.  It's the Omega

7   symbol together with the Omega trademark.  In other words, PX 4

8   is always as PX 3 is generally.  PX 3 is generally the symbol

9   of Omega, together with the word "Omega"; PX 4 is the symbol of

10  Omega, always with the word "Omega."  That's the difference.

11  Not how they look.  One's generally like that, one's always

12  like that.

13       What's the third trademark?  Well, that one is the

14  word "Omega."  That's right.  The Omega symbol, the word

15  "Omega," and the combination of the two are three separate

16  trademarks.

17       Now, it's their trademarks.  I'm not going to start

18  with what kind of this does, trademarks.  I'm not saying they

19  are not three separate trademarks, but they are asking you for

20  a penalty here.  Does anybody think the conduct was three times

21  as bad and the penalty should be three times as high because

22  the Omega symbol and the Omega word together can be three

23  separate trademarks?  Only in lawyers' gotcha land.  Come on.

24       Again, you have a guide here.  You don't have to trust

25  me.  You don't have to trust Mr. Gunther.  You have the City of

J31VOME1                        Summation - Mr. Schick

1   New York.  You know what they have done.  They set a penalty at

2   $2,000.  Once there was no penalty, $2,000.  While Jian Liang

3   Ge stayed in the space.  Jian Liang Ge paid $8,000.  That's

4   right, the higher end of the range is for the person who is

5   selling a store full of counterfeit Omega goods, not the

6   landlord.  The higher end of the range is the person who is

7   distributing counterfeit Omega merchandise across the

8   neighborhood, not the landlord of a store where a single Omega

9   watch was sold.  It's for the manufacturer supplying large

10  quantities of counterfeit merchandise, it's not for the

11  landlord of a store where a single Omega watch was sold.

12          Now, Omega says they need deterrence.  Ask yourself,

13  do you really believe that's why Omega brought this lawsuit?

14  Do you really believe that's why Omega is here this week?

15  Everything you saw and heard this week, think about that.

16          Finally, Omega says you should send a message.

17          Send a message?  Send a message to who?  To a landlord

18  who they say spent tens of thousands of dollars on legal

19  proceedings, and they criticized for not spending 50 bucks on a

20  sign that the City of New York never said was meaningful, not

21  required.  Why?  You think the landlord wanted to save 50 bucks

22  and instead spend tens of thousands of dollars?  Send a message

23  to the landlord who they admit spent tens of thousands of

24  dollars on legal fees anytime a trademark holder brought it to

25  its attention.

 1          Send a message to who?  To the landlord whose leases

 2     prohibit counterfeiting?  You see the lease is in front of you.

 3          Send a message to who?  To the landlord who followed

 4     up appropriately and effectively with every trademark owner who

 5     ever contacted it with a complaint?

 6          Send a message to who?  To the landlord who had a soft

 7     spot for the immigrant and the local merchant?

 8          Send a message to who?  To the landlord who gets more

 9     rent from Bank of America and could get more money from

10     Starbucks, but doesn't, so he can give local merchants a shot?

11     Locals who are all described at Omega as Hindu male?

12          Send a message to who?  To the landlord who sees them

13     not as Hindu male, but as human beings, as individuals with a

14     dream who deserve a chance?  Just like their dad had and a

15     dream was given --

16          MR. GUNTHER:  I object to that, your Honor.

17          MR. SCHICK:  Send a message to who?  To the landlord

18     who created a residency program for local artists and who

19     helped pay for a program to support local artists out of his

20     own pocket?

21          THE COURT:  Mr. Schick, are you coming to a close?

22          MR. SCHICK:  Yes, sir.

23          New York needs more landlords like him, not fewer.

24     They need to be praised, not punished or penalized.

25          Think about the evidence you saw this week and think

1   about the evidence you did not see.

2           Omega said this man sold a watch on May 19, 2012.

3   They don't say who he is.  They don't tell you what his name

4   is.  They don't say where you first got the space.  They don't

5   say he ever sold counterfeit Omega before.  They don't say he

6   ever sold any counterfeit of any type before.  They don't say

7   375 Canal had knowledge of his activity.

8           Omega needs to prove that prior to May 2012, there was

9   a sale of Omega merchandise at 375 Canal Street.  What do they

10  have on that?  A police raid on Canal Street in December 2010.

11  Where's the evidence that anything occurred at 375 Canal Street

12  that day?  They don't have any.  Why?  Because they wouldn't

13  get or show you the complete official police records.

14          A record is available two blocks from here, and that

15  they could have purchased for $15.  Well, Omega's refusal to

16  spend $15 on real evidence does not entitle them to $8 million

17  from 375 Canal LLC.

18          It's been a long week.  Steve and I and Sarah and Jody

19  and Jason and Albert Laboz appreciate your service this week.

20  We appreciate your attention.

21          All we ask you to do now is to think about the

22  evidence, listen to what you heard, and remember what you did

23  not hear.  And most importantly, we ask you to do justice.

24  That's what the City of New York does, justice.

25          We think Omega hasn't proven its case.  But if you

J31VOME1                    Rebuttal - Mr. Gunther

1    disagree and think there must be a penalty, let's look at what

2    we think the penalty should be.  It ought to be in the

3    thousands of dollars, like New York City demands in its

4    settlements, not in the hundreds of thousands of dollars or the

5    millions of dollars like Mr. Gunther is demanding.

6           Justice, that's all we ask you for.  Justice, like the

7    defendant 375 Canal provided when dealing with others who

8    sought a chance.  All we are asking for today is justice.

9           We thank you so much for your service this week.

10           THE COURT:  Mr. Gunther, you have a short rebuttal?

11           MR. GUNTHER:  I do, your Honor.  Thank you.

12           THE COURT:  Thank you, Mr. Schick.

13           MR. GUNTHER:  Ladies and gentlemen, thank you.  This

14    is my last chance to be before you and I promise I'll be brief.

15    We're coming into the homestretch here.

16           One thing that I want to cover -- I just want to cover

17    two things first.

18           There have been a number of statements by Mr. Schick

19    that New York City did not require signs.  I showed you the

20    paragraph from the 2009 stipulation of settlement, the third

21    one, where they required the signs and where they required the

22    back rooms to be dismantled.  You saw that.  You can evaluate

23    that.

24           The other thing I'd want to just cover briefly is the

25    point -- he spent a lot of time on the notice point, the

J31VOME1                         Rebuttal – Mr. Gunther

1    knowledge point.  But he didn't read you what the judge is

2    going to instruct you on the knowledge point.  Let me read that

3    to you now.

4            The second element of contributory trademark

5    infringement is whether the defendant had knowledge that

6    infringements of Omega's trademarks were being sold or offered

7    for sale at 375 Canal Street.  Knowledge can be shown by

8    proving that 375 Canal had actual knowledge or reason to know

9    about the direct infringement of Omega's marks.

10           THE COURT:  Mr. Gunther?

11           MR. GUNTHER:  Yes, sir.

12           THE COURT:  I'm going to read those instructions.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. GUNTHER:  Yes, sir.

2              There can be actual knowledge and there can be reason

3    to know, and the judge will instruct you and you'll hear that.

4              So what do we have in terms of notice, in terms of

5    knowledge?  We do have Plaintiffs' Exhibit 90, Mr. Lindenbaum's

6    September 28, 2011, letter, and the second paragraph says, "As

7    you are already aware, in December 2010 and February 2011, the

8    New York City Police Department arrested certain individuals

9    for selling counterfeit versions of our clients' Omega and

10   Swatch-branded watches at a storefront retailer located at 375

11   Canal Street."

12             Now, I asked Mr. Laboz about that.  I asked him about

13   that letter, and here are my questions:

14   "Q.  And then, sir, were you aware of enforcement actions that

15   were taken by the New York Police Department that involved

16   raids at 375 Canal Street for counterfeit goods in December

17   2007?

18   "A.  No.

19   "Q.  Were you aware of a raid that took place on February 10,

20   2011, again, where people at 375 Canal Street were arrested for

21   selling Omega-branded watches?"

22             Then there's an objection.  It's overruled, and he

23   says no.

24   "A.  No.  The first time I was aware is when I got this letter,

25   ten months after the raids."

1          And this is the question I'd ask you to focus on.

2     "Q.  Did you investigate to determine whether such raids had

3     occurred?

4     "A.  I took it at face value.

5     "Q.  You accepted it as true?

6     "A.  I accepted it as true, absolutely."

7          The notion that he did not have notice, that 375 Canal

8     LLC did not have knowledge is refuted by his own testimony that

9     I just read to you.

10         Plaintiffs' Exhibit 91 further refutes that.  That's

11    Ms. Tritto's response to Mr. Lindenbaum on October 3, 2011.

12    She says, "With respect, 375 Canal, apparently the tenant

13    sublet the space to an entity that was selling counterfeit

14    goods bearing your clients' trademarks."

15         They accept it.  They accept it as true.  We've proven

16    knowledge, and I'm not going to cover the other parts, because

17    I think I anticipated what Mr. Schick was going to say.  You've

18    heard a lot of complaints from him.  He complained that Omega

19    is making a federal case out of a single counterfeit watch.

20    Lots of efforts to blame Omega for not doing more.  Lots of

21    efforts to point fingers at other people, so in conclusion, I'd

22    like to come back to something that Mr. Noyes said in his

23    opening statement.

24         This is not a case about just the sale of one Omega

25    watch, although everyone in this agrees that even the sale of a

J31Wome2                         Rebuttal - Mr. Gunther

1   single counterfeit watch is wrong.  This is a case about a

2   landlord, 375 Canal, owned by Albert Laboz and his brothers,

3   that for years has allowed 375 Canal Street to be a haven for

4   the sale of counterfeit goods, including counterfeit Omega

5   watches.  We have cataloged that evidence for you, almost all

6   of which is not disputed by the defendant.

7          Now, most counterfeit cases settle because in each

8   individual case, it's about the sale of one Louis Vuitton

9   handbag or one Chanel necklace or one Rolex watch.  Litigation

10  is expensive.  Taking a case all the way to trial is expensive,

11  and it takes a long time.  This case was filed in 2012, and

12  here we are in 2019.  It's only come to trial now, seven years

13  later.

14         You can see just in this case there were at least four

15  lawsuits that were brought against 375 Canal that all ended in

16  settlements, three brought by the city of New York and the

17  fourth brought by Louis Vuitton.  But you also saw what

18  happened after each of those settlements.  Nothing changed.

19  The counterfeiting activity at 375 Canal Street continued.  The

20  Laboz brothers chalked up the minor inconvenience of the

21  litigation to the cost of doing business.  But Omega and The

22  Swatch Group decided not to settle this case.  They decided to

23  invest the time and give us the resources to take this case to

24  trial, in the hope of breaking the endless cycle of

25  counterfeiting activity at 375 Canal Street and, hopefully, to

1  send a broader message to the Laboz brothers and landlords in

2  the Canal Street area and even beyond that.

3            Well, I think we have the Laboz brothers' attention.

4  They're here, sitting at counsel table.  They're all here

5  today.  They're watching.  They're listening, and I suppose

6  that's a good thing.

7            Now, as Mr. Schick has said, $8 million is a lot of

8  money.  He and I don't agree on almost anything, but we agree

9  on that.  But if the Laboz brothers walk out of this courtroom

10  with a slap on the wrist, use your good judgment to think about

11  what lesson they will take from that.  Will just go back to

12  business as usual, and will the cycle of counterfeiting

13  continue?  But consider what an award of $8 million might do to

14  change their behavior.

15            Maybe, just maybe, we'll get those anticounterfeiting

16  signs put up.  Maybe, just maybe, we'll get those hidden

17  storerooms dismantled.  Maybe, just maybe, we'll get the Laboz

18  brothers to take monitoring of their properties seriously.

19  Maybe, just maybe, other landlords will look at the verdict, at

20  this verdict, at your verdict, and do the same.  Maybe, just

21  maybe, the endless cycle of counterfeiting will be broken.  And

22  maybe, just maybe, your week of sacrifice, your week of

23  service, members of the jury, in this case will not have been

24  in vein and will have been worthwhile.

25            Thank you very much.

1              THE COURT:  We'll take another short recess.  Then

2      I'll give you the instructions, we'll swear in the marshal and

3      you'll begin your deliberations.  We'll take about five

4      minutes.

5              (Recess)

6              THE COURT:  Please be seated.

7              I notice some of you have been taking notes.  You

8      don't have to take notes, because I'm going to give you a copy

9      of the charge when you go into the jury room, so try to pay

10     attention to what I say; don't try to take notes now.

11             Members of the jury, you have now heard all of the

12     evidence in the case as well as the final arguments of the

13     parties.  We have reached the point where you are about to

14     undertake your final function as jurors.  You have paid careful

15     attention to the evidence, and I am confident that you will act

16     together with fairness and impartiality to reach a just verdict

17     in the case.

18             My duty at this point is to instruct you as to the

19     law.  It is your duty to accept these instructions of law and

20     to apply them to the facts as you determine them, just as it

21     has been my duty to preside over the trial and to decide what

22     testimony and evidence was relevant, under the law, for your

23     consideration.

24             On these legal matters, you must take the law as I

25     give it to you.  If any attorney has stated a legal principle

1    different from any that I state to you in my instructions, it

2    is my instructions that you must follow.  You must not

3    substitute your own notions or opinions of what the law is or

4    ought to be.  As I told you at the beginning and reminded you

5    during the trial, you are not to infer from any of my questions

6    or my comments or any of my rulings on objections or anything

7    else I have done during this trial that I have any view as to

8    the credibility of the witnesses or how you should decide the

9    case.  How you decide the case is strictly up to you.

10          As members of the jury, you are the sole and exclusive

11   judges of the facts.  You review the evidence.  You determine

12   the credibility of the witnesses.  You resolve any conflicts in

13   the testimony.  You draw reasonable inferences you decide to

14   draw from the facts as you have determined them, and you

15   determine the weight of the evidence.  It is your sworn duty,

16   and you have taken the oath as jurors, to determine the facts

17   and to follow the law as I give it to you.

18          It is the duty of the attorneys to object when the

19   other side offers testimony or evidence that the attorney

20   believes is not properly admissible.  Therefore, you should

21   draw no inference from the fact that an attorney raised an

22   objection.  Nor should you draw any inference from the fact

23   that I sustained or overruled an objection.

24          From time to time, the lawyers and I have had sidebar

25   conferences and other conferences out of your hearing.  These

conferences involved procedural and other matters.  You should

not take into account any of the events relating to these

conferences.

         You are to evaluate the evidence calmly and

objectively, without prejudice or sympathy.  You are to be

completely fair and impartial.  Your verdict must be based

solely on the evidence developed at this trial, or the lack of

evidence.  The parties in this case are entitled to a trial

free from prejudice and bias.  Our judicial system cannot work

unless you reach your verdict through a fair and impartial

consideration of the evidence.  All parties are entitled to the

same fair trial at your hands.  They stand equal before the

law, and are to be dealt with as equals in this court.

         Burden of proof.

         In a civil case such as this, and unless I instruct

you otherwise, the plaintiff has the burden to prove all

elements of its claim by a preponderance of the evidence.  What

does that mean?  Establishing a fact by a preponderance of the

evidence means proving that the fact is more likely true than

not by the weight of the evidence.  It refers to the quality

and persuasiveness of the evidence, not the number of witnesses

or documents.  In determining whether a claim has been proven

by a preponderance of the evidence, you may consider the

relevant testimony of all witnesses, regardless of who may have

called them, and all the relevant exhibits received in

 1    evidence, regardless of who may have introduced them.

 2              If, after considering all of the evidence, you are

 3    satisfied that plaintiff has carried its burden on each element

 4    of the claim for which it has the burden of proof, then you

 5    must find in the plaintiffs' favor.  The party with the burden

 6    of proof needs no more than a preponderance of the evidence.

 7    So long as you find that the scales tip, however slightly, in

 8    favor of the plaintiff -- that what it claims is more likely

 9    true than not -- then the element will have been proven by a

10    preponderance of the evidence.

11              If, however, you find that the evidence on a given

12    element is evenly divided between the parties or that the

13    evidence produced by the plaintiff is outweighed by evidence

14    against its claim, then you must decide that issue against

15    Omega and find for the defendant.  That is because the party

16    bearing the burden of proof must prove that element by more

17    than a simple equality of evidence.

18              Remember what I said in the beginning about the scales

19    of justice.  At the start of the trial, they are equally

20    balanced.  The party with the burden of proof must make those

21    scales of justice tip in its favor, even if only slightly, if

22    it is to meet this burden of proof.  If the scales have not

23    moved or tip in the opposite direction, then that party has not

24    met its burden of proof.

25              The evidence in this case includes the sworn testimony

1    of the witnesses and the documents admitted into evidence.  The

2    lawyers' questions are not evidence; rather, it is the

3    witnesses' answers to the questions that are evidence.

4         Testimony that has been stricken or excluded by me is

5    not evidence and may not be considered by you in rendering your

6    verdict.  Arguments by lawyers are not evidence, because the

7    lawyers are not witnesses.  Lawyers are not under oath; they do

8    not testify.  The lawyers' opening statements and their

9    summations are intended to help you understand the evidence.

10   If, however, your recollection of facts differs from the

11   lawyers' statements, it is your recollection that controls.

12        Evidence also includes exhibits that have been

13   received into evidence.  Exhibits marked only for

14   identification, but not admitted into evidence, are not

15   evidence.  Nor are materials brought forth only to refresh a

16   witness's recollection.  Finally, any statements that I may

17   have made during the trial do not constitute evidence.  It is

18   for you alone to weigh the evidence and decide the facts based

19   on the testimony you have heard and the exhibits you have seen.

20        There are two types of evidence that you may properly

21   use in reaching your verdict.  One type of evidence is direct

22   evidence.  One kind of direct evidence is a witness's testimony

23   about something he knows by virtue of his own senses --

24   something the witness has seen, felt, touched or heard.  Direct

25   evidence may also be in the form of an exhibit.

1          The other type of evidence is circumstantial evidence.

2    Circumstantial evidence is evidence that tends to prove one

3    fact by proof of other facts.  There is a simple example of

4    circumstantial evidence that is often used in this courthouse.

5          Assume that when you came into the courthouse this

6    morning, the sun was shining and it was a nice day.  Assume

7    that the courtroom blinds are drawn and you cannot look

8    outside.  As you are sitting here, someone walks in with an

9    umbrella that is dripping wet.  Somebody else then walks in

10   with a raincoat that is also dripping wet.

11         Now, you cannot look outside the courtroom and you

12   cannot see whether or not it is raining.  So you have no direct

13   evidence of that fact.  But on the combination of the facts

14   that I have asked you to assume, it would be reasonable and

15   logical for you to conclude that between the time that you

16   arrived at the courthouse and the time these people walked in,

17   it had started to rain.

18         That is all there is to circumstantial evidence.  You

19   infer on the basis of reason and experience and common sense

20   from an established fact the existence or nonexistence of some

21   other fact.

22         Many facts, such as a person's state of mind, can only

23   rarely be proved by direct evidence.  Circumstantial evidence

24   is of no less value than direct evidence; the law makes no

25   distinction between direct and circumstantial evidence, but

J31Wome2                              Charge

1   simply requires that you, the jury, decide the facts in

2   accordance with the preponderance of all the evidence, both

3   direct and circumstantial.

4            You have had the opportunity to observe witnesses.  It

5   is now your job to decide how believable each witness was in

6   his or her testimony.  You are the sole judges of the

7   credibility of each witness and of the important of his or her

8   testimony.  You should carefully scrutinize all of the

9   testimony of each witness, the circumstances under which each

10  witness testified, the impression the witness made when

11  testifying, and any other matter in evidence that may help you

12  decide the truth and the importance of each witness's

13  testimony.  Was the witness candid, frank and forthright, or

14  did the witness seem to be evasive or suspect in some way?  In

15  answering questions, did the witness volunteer more information

16  than asked?  Was the witness telling the truth or trying to

17  sell you a bill of goods?  Was the witness exaggerating or

18  telling it to you straight?  How did the way the witness

19  testified on direct examination compare with how the witness

20  testified on cross-examination?  In other words, what you must

21  try to do in deciding credibility is to size a witness up in

22  light of his or her demeanor, the explanations given and all of

23  the other evidence in the case.  You should use your common

24  sense, your good judgment, and your everyday experience in life

25  to make your credibility determinations.

1          In deciding whether to believe a witness, you may take

2    account of the fact that some of the witnesses are parties to

3    the lawsuit and may benefit in some way from the outcome of the

4    case.  You may consider evidence of any other interest or

5    motive that the witness may have in cooperating with a

6    particular party.

7          Of course, the mere fact that a witness is interested

8    in the outcome of the case does not mean he or she has not told

9    the truth.  It is for you to decide from your observations and

10   applying your common sense and experience and all the other

11   considerations mentioned whether the possible interest of any

12   witness or of any party has intentionally or otherwise colored

13   or distorted his testimony.  You are not required to disbelieve

14   an interested witness; you may accept as much of the testimony

15   as you deem reliable and reject as much as you deem unworthy of

16   acceptance.  In other words, what you must try to do in

17   deciding credibility is to size up a person just as you would

18   in any important matter where you are trying to decide if a

19   person is truthful, straightforward and accurate in his or her

20   recollection.

21          I have not expressed nor have I intended to intimate

22   any opinion as to which witnesses are or are not worthy of

23   belief, what facts are or are not established, or what

24   inference or inferences should be drawn from the evidence.  If

25   any expression of mine has seemed to indicate an opinion

J31Wome2                    Charge

1    relating to any of these matters, I instruct you to disregard

2    it.  You are, I repeat, the exclusive, sole judges of all of

3    the questions of fact submitted to you and of the credibility

4    of the witnesses.  Your authority, however, is not to be

5    exercised arbitrarily; it must be exercised with sincere

6    judgment, sound discretion, and in accordance with the rules of

7    law which I give you.  In making your determination of the

8    facts, your judgment must be applied only to that which is

9    properly in evidence.  Arguments of counsel are not in

10   evidence, although you may give consideration to those

11   arguments in making up your mind on what inferences to draw

12   from the facts which are in evidence.

13           Your verdict must be based solely upon the evidence,

14   or the lack of evidence, developed at trial and the

15   instructions I give to you on the law.  It would be improper

16   for you to consider any personal feelings you may have about a

17   party's race, sex, ethnicity, national origin or disability.

18           The law does not require any party to call as

19   witnesses all persons who may have been present at any time or

20   place involved in the case, or who may appear to have some

21   knowledge of the matters in issue at the trial.  Nor does the

22   law require any party to produce as exhibits all papers and

23   things mentioned in the evidence in the case.  Your decision

24   must be based on the testimony and documents admitted into

25   evidence.

1          You should consider and decide this case as a dispute

2     between persons of equal standing in the community, of equal

3     worth, and holding the same or similar station in life.  A

4     corporation is entitled to the same fair trial as a private

5     individual.  All persons, including corporations and other

6     organizations, stand equal before the law and are to be treated

7     as equals.

8          I'll turn now to the substantive law charges.

9          As you have heard throughout this trial, Omega asserts

10    that 375 Canal LLC, the owner and landlord of 375 Canal Street,

11    is liable for contributory trademark infringement and

12    counterfeiting of a number of Omega trademarks.  For Omega to

13    prevail on its claim in this action, it must prove its claims

14    by a preponderance of the evidence.  I will refer to the

15    defendant 375 Canal LLC as 375 Canal.  I will refer to the

16    address of the storefront at issue in this case as 375 Canal

17    Street.

18         Omega seeks damages against 375 Canal for contributory

19    trademark infringement.  To help you understand the evidence

20    presented in the case, I will explain some of the legal terms

21    you have heard during this trial.

22         As I explained in my instructions to you at the

23    beginning of the trial, a trademark is any word, name, symbol,

24    device, or any combination thereof, used by a person or company

25    to identify and distinguish that person's goods from those sold

by others and to indicate that the owner is the source of the

goods.  The main function of a trademark is to identify and

distinguish the product of a particular merchant and to protect

its goodwill against the sale of another's product as its own.

The trademark laws balance three often-conflicting

goals:  (1) protecting the public from being misled about the

nature and source of goods and services, so that the consumer

is not confused or misled in the market; (2) protecting the

rights of a business to identify itself to the public and its

reputation in offering goods and services to the public; and

(3) protecting the public interest in fair competition in the

market.

The law entitles the owner of a trademark to exclude

others from using that trademark without its permission.  The

unauthorized use of a trademark is called "infringement" of the

trademark if the use of the mark in commerce creates a

likelihood of confusion, mistake, or deception as to the

source, affiliation, or sponsorship of the goods.  The owner of

a trademark may enforce the right to exclude its use by others

in an action for trademark infringement.

Because Omega owns federal registrations for its

trademarks, all persons are deemed to have knowledge of these

registrations and of the rights claimed in the registrations.

Omega, as the holders of registered trademarks, can bring a

trademark infringement claim against any person who, without

Omega's consent (1) uses any reproduction, counterfeit, copy or

colorable imitation of one of its registered marks; (2) in

commerce; (3) in connection with the sale, offering for sale,

distribution, or advertising of any goods or services; (4)

where such use is likely to cause confusion, or to cause

mistake, or to deceive as to the source, origin, affiliation,

approval, or sponsorship of Omega's goods.

          The distribution, sale, or offer for sale of goods

bearing a counterfeit trademark is a form of trademark

infringement referred to as "counterfeiting."  Omega contends

that the watch at issue here contained counterfeits of the

trademarks.  A counterfeit trademark or counterfeit mark is a

nongenuine or unauthorized trademark that, to an average

observer, is identical to, or substantially indistinguishable

from, a registered trademark.  A mark is "substantially

indistinguishable" if it contains only minor differences from

the registered trademark that may be apparent upon close

inspection but would not necessarily be obvious to an average

observer.

          Omega does not allege that 375 Canal directly sold or

offered for sale watches containing counterfeit Omega

trademarks.  Omega's claim against 375 Canal is for what the

law calls contributory trademark infringement.  Omega contends

that the defendant, through its actions or inactions,

contributed to or facilitated the sale or offering for sale of

J31Wome2                    Charge

1    watches containing counterfeit Omega trademarks.

2            Before I instruct you on what Omega has to have shown

3    in this case to prove contributory trademark infringement, I

4    want to clarify something that came up during the trial.  You

5    may have heard suggestion that Omega should have brought an

6    action against particular individuals for direct infringement

7    instead of against 375 Canal LLC for contributory infringement.

8    I'm instructing you that the law does not require a party to

9    bring an action against any direct infringer in order to

10   succeed in a claim of contributory trademark infringement.

11   Accordingly, when determining whether 375 Canal LLC is liable

12   for contributory infringement in this case, please disregard

13   whether plaintiffs tried and/or succeeded in pursuing an action

14   against individual trademark infringers, such as those who

15   manufactured, distributed or sold infringing goods.

16           In considering Omega's claims, you must first consider

17   whether defendant's tenants, subtenants, or occupants of 375

18   Canal Street infringed Omega's trademarks.  That is, you must

19   determine by a preponderance of the evidence:  (1) whether

20   goods were sold or offered for sale from 375 Canal or by one or

21   more tenant, subtenant or occupant at 375 Canal Street; (2)

22   that those goods contained a word, symbol or other designation;

23   (3) that, to an average observer, was likely to cause

24   confusion, or cause mistake, or to deceive as to the source,

25   origin, affiliation, approval, or sponsorship of the goods.

"source," "origin," "affiliation," "approval," or "sponsorship"
means that the public believes that the merchandise sold by the
vendors comes from, are affiliated with, are approved by, or
sponsored by Omega.

        For trademark infringement, it is not necessary that
the word, symbol, or other designation on the goods sold or
offered for sale be an exact copy of Omega's trademark.  It is
enough that the word, symbol, or other designation on the goods
sold or offered for sale is likely to cause consumer confusion
about the source, origin, affiliation, approval or sponsorship
of the goods.

        In determining whether a particular good is likely to
cause confusion regarding its source, you may draw on your
common experience as citizens of the community.  Likelihood of
confusion is also determined by evaluating the following
factors:

        First, the distinctiveness or strength of the
trademarks that Omega alleges were infringed.  The more the
consuming public recognizes Omega's trademark as an indication
of origin of Omega's goods, the more likely it is that
consumers would be confused about the source of goods that use
a similar mark;

        Second, the degree of similarity between the words,
symbols or designations on the goods sold or offered for sale
at 375 Canal Street and Omega's trademarks;

1          Third, the degree or similarity between the type of

2    goods sold by Omega under its trademarks and the type of goods

3    sold or offered for sale at 375 Canal Street containing similar

4    marks.  If Omega and the sellers of goods at 375 Canal Street

5    use the marks on the same, related or complimentary kinds of

6    goods, there may be a greater likelihood of confusion;

7          Fourth, the existence of actual confusion;

8          Fifth, the intent of the sellers of goods at 375 Canal

9    Street;

10         Sixth, the quality of the defendant's products; and

11         Seventh, the sophistication of the purchasers.

12         No one factor or consideration is conclusive, but each

13   should be weighed in light of the total evidence presented at

14   the trial.  In light of these considerations and your common

15   experience, you must determine if ordinary consumers, neither

16   overly careless nor overly careful, would be, upon encountering

17   the items sold at 375 Canal Street, confused about the source,

18   sponsorship, approval or affiliation of the parties' products.

19         Counterfeit marks, by their very nature, cause

20   confusion.  So if you find that the goods sold or offered for

21   sale from 375 Canal Street contained counterfeit marks —— in

22   other words, a word, symbol or other designation that, to an

23   average observer, was identical to, or substantially

24   indistinguishable from, Omega's trademarks —— then you do not

25   need to separately determine whether there is a likelihood of

1    confusion.  A counterfeit mark is a mark that infringes a

2    trademark.

3           If you find infringement of any of Omega's trademarks,

4    you must then consider whether 375 Canal is contributorily

5    liable for that trademark infringement.  That is, you must

6    determine each of four elements by a preponderance of the

7    evidence.  I am going to describe each of the four elements

8    first and will then provide further explanation on each.

9           First whether defendant possessed the power and

10   authority to exercise control over the use of the premises at

11   375 Canal Street for selling or offering for sale merchandise

12   that infringed Omega's trademarks;

13          Second, whether defendant knew or had reason to know

14   that merchandise that infringed Omega's trademarks was being

15   sold or offered for sale at 375 Canal Street;

16          Third, whether defendant continued to lease its

17   premises at 375 Canal Street even after it knew or had reason

18   to know that the premises were being used as a place from which

19   merchandise that infringed Omega's trademarks was sold or

20   offered for sale; and

21          Fourth, whether defendant took reasonable remedial

22   steps to try to stop the sale or offer for sale of merchandise

23   that infringed Omega's trademarks at 375 Canal Street.

24          As I stated, the first element of contributory

25   trademark infringement is whether 375 Canal possessed the power

1    and authority to exercise control over the use of the premises

2    at 375 Canal Street for selling or offering for sale

3    merchandise that infringed Omega's trademarks.

4            This element may be satisfied by Omega showing that

5    375 Canal possessed the right, ability or authority either (i)

6    to control the use of the physical retail space that it rented

7    at 375 Canal Street, or (ii) to control the activities that any

8    of 375 Canal Street's tenants could engage in while occupying

9    such space at 375 Canal Street.

10           Omega may establish that 375 Canal controlled these

11   premises by showing that it possessed the necessary power or

12   authority to restrict, through provisions in the lease

13   agreements, or by pointing to rules and regulations in the

14   lease agreements regarding the activities in which tenants,

15   subtenants or occupants were permitted to engage in at the 375

16   Canal Street address.  For this element, the issue is only

17   whether 375 Canal possessed such power and authority, not

18   whether it chose to exercise that power and authority in any

19   particular case.

20           Even if 375 Canal has control over the premises, 375

21   Canal has no affirmative duty to take precautions against the

22   sale of counterfeit goods or to seek out and prevent alleged

23   trademark violations, and cannot be found liable if it simply

24   fails to take reasonable preemptive precautions against sales

25   of counterfeit items.  As explained above and below, however,

1    375 Canal may be contributorily liable for infringement if it

2    continues to supply its services after 375 Canal either knew or

3    had reason to know that a tenant, subtenant or other occupant

4    of its premises was selling, offering for sale, or distributing

5    products bearing counterfeits of Omega's trademarks.

6           The second element of contributory trademark

7    infringement is whether defendant had knowledge that

8    infringements of Omega's trademarks were being sold or offered

9    for sale at 375 Canal Street.  Knowledge can be shown by

10   proving that 375 Canal had actual knowledge or reason to know

11   about the direct infringement of Omega's trademarks.

12          Actual knowledge means 375 Canal or its agents

13   possessed specific knowledge that one or more tenants,

14   subtenants or occupants were selling merchandise that infringed

15   Omega's trademarks at 375 Canal Street.

16          Reason to know means that a reasonably prudent owner,

17   manager, landlord or their agents would or should have known of

18   the sale or offer for sale of merchandise that infringed

19   Omega's trademarks at 375 Canal Street by tenants, subtenants

20   or occupants of the premises.  It also includes a concept known

21   as willful blindness.  Willful blindness means that 375 Canal

22   or its agents had reason to suspect that trademark infringing

23   merchandise was being offered or sold but deliberately failed

24   to investigate or looked the other way to avoid seeing such

25   activity.  Willful blindness asks what 375 Canal or its agents

suspected and what they did with such suspicion.  Thus, 375

Canal can be found liable for contributory trademark

infringement if it or its agents suspected wrongdoing was

occurring at 375 Canal Street and deliberately failed to

investigate.

In determining the scope of 375 Canal's knowledge, you

may consider the nature and extent of the communication between

375 Canal and its tenants, subtenants or other occupants of the

premises regarding the infringing acts.  You may also consider

the extent and nature of the alleged infringement of Omega's

trademarks.  If the infringement is serious and widespread, it

is more likely that 375 Canal knew about and condoned the acts

of its tenants, subtenants or other occupants of its premises.

Conversely, if the infringement is limited, it is less likely

that 375 Canal knew about and condoned the infringement of

Omega's marks.

As I stated, the third element of contributory

trademark infringement is whether 375 Canal continued to lease

its premises at 375 Canal Street even after it knew or had

reason to know that the premises were being used as a place

from which merchandise that infringed Omega's trademarks was

sold or offered for sale.

Even if 375 Canal took action to remove a particular

occupant from the premises, you may find that this element is

satisfied if 375 Canal continued to make the premises available

1    to other occupants whose infringing activities it knew of or

2    had reason to know of.

3           As I stated, the fourth element of contributory

4    trademark infringement is whether, considering the facts

5    specific to this case, 375 Canal took reasonable remedial steps

6    to try to stop the sale or offer for sale of merchandise that

7    infringed Omega's trademarks at 375 Canal Street.  You must

8    decide whether 375 Canal had knowledge of the infringing

9    activity at its premises, and whether it failed to take

10   reasonable steps to halt this infringing activity.

11          If you find that 375 Canal is liable for contributory

12   trademark infringement, then you must determine Omega's

13   damages.  Omega seeks what is known as an award of statutory

14   damages.  Statutory damages are damages established by

15   Congress.  The purpose of statutory damages is to compensate

16   the trademark owner, penalize the defendant, and deter future

17   trademark counterfeiting.

18          Under federal trademark infringement laws, Omega is

19   entitled to recover an award of statutory damages for each of

20   its trademarks that was counterfeited.  Section 35(c) of the

21   trademark act provides that plaintiff may elect to recover an

22   award of statutory damages in the amount of:

23          (1) not less than $1,000 or more than $200,000 per

24   counterfeit mark per type of good sold, offered for sale, or

25   distributed; or

1          (2) if you find that 375 Canal's conduct was

2     "willful," you may award statutory damages up to $2 million per

3     counterfeit mark per type of good sold, offered for sale, or

4     distributed.

5          To prove willfulness, Omega must show (1) that 375

6     Canal was actually aware of the infringing activity; or (2)

7     that 375 Canal's actions were the result of reckless disregard

8     or willful blindness.  The fact that 375 Canal did not directly

9     sell or offer for sale counterfeit Omega watches does not

10    prevent you from finding that 375 Canal's acts of contributory

11    trademark infringement were willful.  Similarly, whether or not

12    the direct infringer acted willfully has no bearing on whether

13    375 Canal acted willfully.

14         In determining the amount of statutory damages, you

15    may select an amount as you consider just based upon the facts

16    and circumstances of this case, and you may consider a number

17    of factors, including, but not limited to, (1) the profits

18    realized by the defendant as a result of the infringing

19    activity; (2) the revenues lost by Omega; (3) the value of the

20    trademark; (4) the deterrent effect on others besides the

21    defendant; (5) whether the defendant's conduct was innocent or

22    willful; (6) whether a defendant has cooperated in providing

23    particular records from which to assess the value of the

24    infringing material produced; and (7) the potential for

25    discouraging the defendant.

1          There is no necessary mathematical relationship

2     between the size of a statutory damages award and any profits

3     made by defendant or damage suffered by plaintiffs.  Statutory

4     damages may still be awarded even if Omega did not lose revenue

5     or suffer any actual damages.

6          Ladies and gentlemen of the jury, that concludes my

7     instructions to you.  You are about to go into the jury room to

8     begin your deliberations.  I am going to designate juror No. 1

9     as your foreperson.  Ms. Burns will preside over your

10    deliberations and serve as your spokesperson if you need to

11    communicate with the Court.  I send the exhibits into the jury

12    room along with the jury charge and verdict sheet.  If you want

13    any of the trial testimony read, please send out a note

14    specifying what you want to hear, and we will bring you back to

15    the courtroom to read it back for you.  Please be as specific

16    as you possibly can in requesting a read back of the trial

17    testimony.  If you want any further explanation of the law as I

18    have explained it to you, you may also request that.

19         All communications with the Court should be made to me

20    in writing, signed by your foreperson, Ms. Burns, and given to

21    the court officer.  In any event, do not tell me or anyone else

22    how the jury stands on any issue until after a verdict is

23    reached.

24         Some of you may have taken notes during this trial.

25    Remember what I said to you.  Your notes are simply an aid to

1   memory.  Notes that any of you may have made may not be given

2   any greater weight or influence in determination of the case

3   than the recollections or impressions of other jurors, whether

4   from notes or memory, with respect to the evidence presented or

5   what conclusions, if any, should be drawn from such evidence.

6   Any difference between a juror's recollection and another

7   juror's notes should be settled by asking to have the court

8   reporter read back the transcript, for it is the court record

9   rather than any juror's notes upon which the jury must base its

10  determination of the facts and its verdict.

11          You will now retire to decide the case.  To prevail,

12  Omega must sustain its burden of proof as I have explained it

13  to you with respect to each element of its claim.  If you find

14  that Omega has succeeded, you must return a verdict in its

15  favor.  If you find that Omega has not, then your verdict must

16  be for the defendant.

17          It is your duty as jurors to consult with one another

18  and to deliberate with a view to reaching an agreement.  Each

19  of you must decide the case for himself or herself, but you

20  should do so only after a consideration of the case with your

21  fellow juror, and you should not hesitate to change an opinion

22  when convinced that it is erroneous.  Your verdict must be

23  unanimous, but you are not bound to surrender your honest

24  convictions concerning the effect or weight of the evidence for

25  the mere purpose of returning a verdict solely because of the

1    opinion of other jurors.  Discuss and weigh your respective

2    opinions dispassionately, without regard to sympathy, without

3    regard to prejudice or favor for either party, and adopt that

4    conclusion which in your conscience appears to be in accordance

5    with the truth.

6            Again, each of you must make your own decision about

7    the proper outcome of this case based on your consideration of

8    the evidence and your discussions with your fellow jurors.  No

9    juror should surrender his or her conscientious beliefs solely

10   for the purpose of returning a unanimous verdict.

11           I have prepared a special verdict sheet for you to use

12   in recording your decisions.  The form contains eight

13   questions, although, depending on your answers, you may or may

14   not need to answer all eight.  You should proceed through the

15   questions on the special verdict sheet in the order in which

16   they are listed and follow the instructions provided.

17           Finally, Ms. Burns, the foreperson, will send out any

18   notes, and when the jury has reached a verdict, she will notify

19   the court officer that the jury has reached a verdict, and you

20   will come into open court and give the verdict.

21           After you have reached a verdict, your foreperson will

22   fill in the form that has been given to you, sign and date it,

23   and advise the court officer outside your door that you are

24   ready to return to the courtroom.  I stress that each of you

25   must be in agreement with the verdict that is announced in

1     court.

2              Members of the jury, that concludes my instructions to

3     you.  I will ask you to remain seated while I confer with the

4     attorneys to see if there are any additional instructions that

5     they would like to have me give to you or anything I may not

6     have covered in my previous instruction or if I've misstated

7     the law in any way.  I ask you not to discuss the case while

8     seated in the box, because the case has not yet been formally

9     submitted to you.

10             One formal point.  We've been breaking at 2:30.  Would

11    you please send out a note, after conferring among yourselves,

12    and let us know what your schedule is for deliberations.  If

13    you can reach a verdict today, fine.  If you can't, you have to

14    come back on Monday.  Tell us what time you're coming back on

15    Monday, but you can't deliberate unless all of you are present.

16    So agree upon a time.  We'll make sure that the courtroom is

17    open and the jury room is open too and the court officer will

18    be here to assist you.

19             I'll take a short break here.

20             Can I see counsel.

21             (At sidebar)

22             THE COURT:  Any objections?

23             MR. GUNTHER:  No, your Honor.  As read, we have no

24    further objections.

25             THE COURT:  Mr. Della Fera.

J31Wome2

1          MR. DELLA FERA:  One point, your Honor, I know I

2     raised this yesterday, "continued to lease the premises," and

3     the issue I'm going to raise today is we think that maybe the

4     word "lease" specifically is misleading; you don't necessarily

5     lease to a subtenant.  So "provide space" or something like

6     that might clarify.

7          THE COURT:  You want a supplement to what I've read?

8          MR. DELLA FERA:  Yes.

9          MR. SCHICK:  Evict the tenant as opposed to the

10    subtenant.

11         MR. DELLA FERA:  We understand the additional

12    instruction that your Honor had, that if they evict one and

13    there is still another about whom they had knowledge, that that

14    still continues.

15         THE COURT:  The objection's overruled.

16         (In open court)

17         THE COURT:  Swear the marshal, please.

18         THE DEPUTY CLERK:  Marshal, please come to the front.

19    Please raise your right hand.

20         (Marshal sworn)

21         THE COURT:  We'll send in the exhibits.  We'll send in

22    a jury charge for each one of you and one copy of the verdict

23    form.

24         Thank you very much.

25         (At 12:17 p.m., the jury retired to deliberate)

J31Wome2

```
 1              THE COURT:  Leave your cell phone numbers.

 2              MR. GUNTHER:  Your Honor, do you want us to stay in

 3   the court area?

 4              THE COURT:  Oh, yes, especially today, because I

 5   believe that they're not going to deliberate beyond 2:30, at

 6   least based on what we learned yesterday.

 7              MR. GUNTHER:  We totally understand that, your Honor.

 8              THE COURT:  Stay close by.

 9              MR. GUNTHER:  We'll stay close by.

10              THE COURT:  And I think we ought to get a note soon

11   from the jury letting us know what the deliberation schedule is

12   going to be.

13              MR. GUNTHER:  Thank you, your Honor.

14              (Recess pending verdict)

15

16

17

18

19

20

21

22

23

24

25
```

```
1              (Jury present)
2              THE COURT:  We have your note.  I guess you're going
3    to go home and resume your deliberations at 10 o'clock on
4    Monday morning; is that correct?
5              THE JURY:  Yes, your Honor.
6              THE COURT:  Now, don't take any of the notes that
7    you've taken, any of the jury charge; leave those here.
8              Keep your minds open.  Don't talk about the case.
9              When all seven of you arrive on Monday, whatever time
10   you agree to, that's when you can begin your deliberations.  If
11   anybody is missing, you can't start till everybody is there.
12             All right?
13             THE JURY:  Okay.
14             THE COURT:  Have a nice weekend.
15             THE JURY:  Thank you, your Honor.
16             THE COURT:  See you on Monday.
17             (Jury not present)
18             THE COURT:  Anything to take up?
19             MR. GUNTHER:  Your Honor, just one thing.
20             I have an unavoidable trip that I have to make out of
21   town next week.  But Mr. Noyes and Ms. Gostin will be here and
22   will be able to take care of things in my absence, if that's
23   okay with your Honor.
24             THE COURT:  That's all right with me.
25             MR. GUNTHER:  Thank you, your Honor.
```

J31VOME3

1          THE COURT:  If it's all right with Mr. Noyes.

2          MR. NOYES:  Yes, it is.  Thank you.

3          THE COURT:  Anything from you, Mr. Schick?

4          MR. SCHICK:  I will unavoidably be here, your Honor.

5          THE COURT:  Okay.  All right.

6          Everybody have a nice weekend.

7          MR. GUNTHER:  You too, your Honor.  Thank you.

8          MR. SCHICK:  Thank you.

9          (Adjourned to March 4, 2019 at 10 o'clock a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25